# EXHIBIT A

**MANNING, CURTIS, BRADSHAW & BEDNAR LLC**
Alan C. Bradshaw (4801)
Michael E. Harmond (17230)
136 E. South Temple, Suite 1300
Salt Lake City, Utah 84111
Telephone:  (801) 363-5678
Facsimile:  (801) 364-5678
abradshaw@mc2b.com
mharmond@mc2b.com

**GAUNTLETT & ASSOCIATES**
David A. Gauntlett (Cal State Bar No. 96399) *pro hac vice application forthcoming*
James A. Lowe (Cal State Bar No. 214383) *pro hac vice application forthcoming*
18400 Von Karman, Suite 300
Irvine, California 92612
Telephone:  (949) 553-1010
Facsimile:  (949) 553-2050
dag@gauntlettlaw.com
jal@gauntlettlaw.com

*Attorneys for Plaintiffs Hitchman Fiduciaries, LLC; Bruce Hitchman; and Lee Ann Hitchman*

---

## IN THE FOURTH JUDICIAL DISTRICT COURT OF UTAH
## UTAH COUNTY

| | |
|---|---|
| HITCHMAN FIDUCIARIES, LLC, a California limited liability company; BRUCE HITCHMAN, an individual; LEE ANN HITCHMAN, an individual<br><br>        Plaintiffs,<br><br>   vs.<br><br>DOMINION INSURANCE SERVICES, INC., a Utah corporation; CERTAIN UNDERWRITERS AT LLOYD'S LONDON; and LAWRENCE D. HILTON, an individual<br><br>        Defendants. | **SUMMONS**<br><br>**Tier 3**<br><br>**Civil No. 220401108**<br><br>**Judge:   James Brady** |

THE STATE OF UTAH TO:

**Certain Underwriters at Lloyd's London**
**C/o Wilson, Elser, Moskowitz, Edelman & Dicker LLP**
**150 East 42nd Street**
**New York, NY 10017**

You are hereby summoned and required to file an Answer in writing to the Complaint, which has been filed with the Court and is herewith served upon you, with the Clerk of the above-entitled Court at 137 N. Freedom Blvd., Suite 100, Provo, Utah 84601, and serve upon or mail to Plaintiffs' attorney, Alan C. Bradshaw and Michael E. Harmond of Manning Curtis Bradshaw & Bednar PLLC, 136 East South Temple, Suite 1300, Salt Lake City, Utah  84111, and David A. Gauntlett and John A. Lowe of Gauntlett & Associates, 18400 Von Karman, Suite 300, Irvine, CA  92612, a copy of said Answer within twenty-one (21) days after service of said Complaint upon you.

If you fail to do so, judgment by default will be taken against you for the relief demanded in said Complaint.

DATED this 26th day of July, 2022.

**MANNING CURTIS BRADSHAW**
**& BEDNAR PLLC**

/s/ Alan C. Bradshaw
Alan C. Bradshaw
Michael E. Harmond

**GAUNTLETT & ASSOCIATES**
David A. Gauntlett *pro hac vice application forthcoming*
James A. Lowe *pro hac vice application forthcoming*

*Attorneys for Plaintiffs Hitchman Fiduciaries, LLC;*
*Bruce Hitchman; and Lee Ann Hitchman*

A lawsuit has been filed against you. You must respond in writing by the deadline for the court to consider your side. The written response is called an Answer.

**Deadline!**
Your Answer must be filed with the court and served on the other party **within 21 days** of the date you were served with this Summons.
If you do not file and serve your Answer by the deadline, the other party can ask the court for a default judgment. A default judgment means the other party can get what they asked for, and you do not get the chance to tell your side of the story.

**Read the complaint/petition**
The Complaint or Petition has been filed with the court and explains what the other party is asking for in their lawsuit. Read it carefully.

**Answer the complaint/petition**
You must file your Answer in writing with the court **within 21 days** of the date you were served with this Summons. You can find an Answer form on the court's website:
utcourts.gov/ans



Scan QR code

to visit page

**Serve the Answer on the other party**
You must email, mail or hand deliver a copy of your Answer to the other party (or their attorney or licensed paralegal practitioner, if they have one) at the address shown at the top left corner of the first page of this Summons.

**Finding help**
The court's Finding Legal provides information about the Self-Help Center, and free legal clinics.



Scan QR code

to visit page

Help web page (utcourts.gov/help) the ways you can get legal help, including reduced-fee attorneys, limited legal help

**MANNING, CURTIS, BRADSHAW & BEDNAR LLC**
Alan C. Bradshaw (4801)
Michael E. Harmond (17230)
136 E. South Temple, Suite 1300
Salt Lake City, Utah 84111
Telephone:  (801) 363-5678
Facsimile:   (801) 364-5678
abradshaw@mc2b.com
mharmond@mc2b.com

**GAUNTLETT & ASSOCIATES**
David A. Gauntlett (Cal State Bar No. 96399) *pro hac vice application forthcoming*
James A. Lowe (Cal State Bar No. 214383) *pro hac vice application forthcoming*
18400 Von Karman, Suite 300
Irvine, California 92612
Telephone:  (949) 553-1010
Facsimile:  (949) 553-2050
dag@gauntlettlaw.com
jal@gauntlettlaw.com

Attorneys for Plaintiffs
Hitchman Fiduciaries, LLC; Bruce Hitchman; and Lee Ann Hitchman

---

## IN THE FOURTH JUDICIAL DISTRICT COURT OF UTAH
## UTAH COUNTY

| | |
|---|---|
| HITCHMAN FIDUCIARIES, LLC, a California limited liability company; BRUCE HITCHMAN, an individual; LEE ANN HITCHMAN, an individual <br><br> Plaintiffs, <br><br> vs. <br><br> DOMINION INSURANCE SERVICES, INC., a Utah corporation; CERTAIN UNDERWRITERS AT LLOYD'S LONDON; and LAWRENCE D. HILTON, an individual <br><br> Defendants. | **COMPLAINT FOR DECLARATORY RELIEF, BREACH OF CONTRACT, BREACH OF FIDUCIARY DUTY, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING** <br><br> **Tier 3** <br><br> **Civil No.** _____ <br><br> **Judge:** _____ |

Plaintiffs Hitchman Fiduciaries, LLC, Bruce Hitchman, and Lee Ann Hitchman (collectively "the Hitchmans") bring this action against its professional liability insurers, Certain Underwriters at Lloyd's London ("Underwriters"), Dominion Insurance Services, Inc. ("Dominion"), and their managing general agent, Lawrence D. Hilton ("Hilton"), to determine the parties' rights and obligations with respect to currently pending suits captioned as *In Re: The Beverly C. Morgan Family Trust as amended and restated on November 6, 2013, Thomas E. Morgan, III, et. al. v. Bruce Hitchman, et al.*, Case No. 30-2014-00726771-PR-TR-CJC, pending in the Orange County California Superior Court ("Probate Action") and *Thomas E. Morgan, III, et. al. v. Bruce Hitchman, et al.*, Case No. 30-2020-01155277-CU-BT-CJC, filed in the Orange County California Superior Court ("Civil Action") (collectively the "Underlying Actions") and to recover money damages arising out of the Defendants' breaches of their duties toward the Hitchmans.

The Hitchmans have paid substantial sums defending the Underlying Actions and although Underwriters has admitted its duty to defend the Underlying Actions, it has not fully and properly provided the Hitchmans with a complete and good faith defense and it is currently threatening to stop paying for the defense by claiming that its policies' limits will soon be exhausted, which presents substantial exposure for the Hitchmans in excess of Underwriters' claimed limits of liability under its policies.

Accordingly, the Hitchmans seek to recover money damages on account of the Underwriters' and Dominion's breach of their policies, the covenant of good faith and fair dealing, and the fiduciary duties each Defendant owes to the Hitchmans. The Hitchmans also seek a declaratory judgment that, subject to properly determined policy limits and other terms and conditions of the policies, Underwriters is obligated to pay on the Hitchmans behalf reasonable defense expenses, any reasonable settlement, or any judgment amount that the Hitchmans may become legally obligated to pay to resolve the claims asserted in the Underlying Actions.[1]

---

[1] The Hitchmans have included the declaratory judgment claim to determine Underwriters' current and future obligations to fund the defense, any settlement The Hitchmans may agree to or any judgment that may be entered

## THE PARTIES

1.      Plaintiff Hitchman Fiduciaries, LLC ("Hitchman Fiduciaries") is a limited liability company organized and existing under the laws of the State of California. Its principal place of business is located in Newport Beach, California.

2.      Plaintiff Bruce Hitchman is an individual residing in the State of California and is a licensed fiduciary.

3.      Plaintiff Lee Ann Hitchman is an individual residing in the State of California and is a licensed fiduciary.

4.      Plaintiffs Bruce Hitchman and Lee Ann Hitchman (collectively, the "Hitchmans") are members of Hitchman Fiduciaries, LLC. (Bruce Hitchman, Lee Ann Hitchman and Hitchman Fiduciaries, LLC are collectively referred to herein as the "Hitchmans.")

5.      On information and belief, Defendant Dominion Insurance Services, Inc. ("Dominion") is a corporation organized and existing under the laws of the State of Utah with its principal place of business located in Utah County.

6.      On information and belief, Defendant Certain Underwriters at Lloyd's London ("Underwriters") is organized and existing under the laws of the United Kingdom with its principal place of business located in London, United Kingdom.

7.      On information and belief, Lawrence D. Hilton ("Hilton") is an individual residing in Utah County, State of Utah. Hilton is the managing general agent of Dominion and of Underwriters.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this case pursuant to Utah Code Ann. §§ 78A-5-102 and 78B-6-401.

---

against The Hitchmans, if any. The Hitchmans reserve the right to move for a stay of issues or claims that must be resolved in the Underlying Actions to avoid prejudice to The Hitchmans' defense.

9. This Court has personal jurisdiction over Dominion under Utah Code §§ 78B-3-205(1), 205(3), and 205(5) because Dominion Insurance Services, Inc., is organized as a corporation under the laws of the State of Utah, conducts its business in the State of Utah, and transacts to insure risks within and emanating from Utah. Dominion's principal offices are, on information and belief, located at 341 S. Main, Suite 100, Alpine Utah. 84004, within this judicial district.

10. This Court has personal jurisdiction over Hilton under Utah Code § 78B-3-205 because Hilton is a resident of the State of Utah and conducts his business in and from the State of Utah, selling insurance policies for risks within and emanating from Utah, and, on information and belief, conducts business in and resides in this Judicial District.

11. This Court has personal jurisdiction over Underwriters under Utah Code § 78B-3-205 because Underwriters is authorized to and does underwrite the issuance of insurance policies in the State of Utah and insures risks within and emanating from Utah. Insurance policies issued by Dominion to the Plaintiffs assert that they are "Effected with Certain Underwriters at Lloyd's London" and are 100% underwritten by "Lloyd's Syndicate 609 AUW, UK."

12. Venue is proper in this Court pursuant to Utah Code Ann. § 78B-3-304(2) and/or 78B-3-307. Hilton's residence, on information and belief, and Dominion's principal place of business is in Alpine, Utah, a city within Utah County and this Judicial District. The insurance policies at issue in this action were issued to Hitchman Fiduciaries in Alpine, Utah.

13. This is a Tier 3 case under Utah Rule of Civil Procedure 26(c)(3).

## GENERAL ALLEGATIONS

### *The Underlying Actions*

14. Hitchman Fiduciaries and the Hitchmans have been sued in two underlying actions pending in the Superior Court of Orange County, California.

15. The first action against Hitchman Fiduciaries and the Hitchmans is part of a probate case concerning the Beverly C. Morgan Family Trust, entitled *In Re: The Beverly C. Morgan Family Trust as amended and restated on November 6, 2013, Thomas E. Morgan, III, et. al. v.*

*Bruce Hitchman, et al.*, Case No. 30-2014-00726771-PR-TR-CJC, filed and pending in the Orange County California Superior Court ("Probate Action").

16.     The second action is a civil case styled *Thomas E. Morgan, III, et. al. v. Bruce Hitchman, et al.*, Case No. 30-2020-01155277-CU-BT-CJC, filed in the Orange County California Superior Court ("Civil Action").

17.     On November 22, 2019, Thomas E. Morgan III ("TEM"), in his role as trustee and beneficiary of the Beverly C. Morgan Family Trust ("BCMFT"), filed an Amended Petition in the Probate Action for (1) Instructions, (2) Damages For Failure To Assert Claim, (3) Disgorgement Of Fees For Failure To Disclose Conflict Of Interest In Order To Secure And Preserve Appointment, And (4) Damages For Breach Of Fiduciary Duty ("Amended Petition"). A copy of TEM's Amended Petition is attached hereto as **Exhibit "4".**

18.     On August 14, 2020, fifteen distinct plaintiffs filed a Verified Complaint, initiating the Civil Action, asserting: (1) Conversion of TEMCT Funds, (2) Conversion of Distributions, (3) Breach of Fiduciary Duty, (4) Intentional Interference with MPI's Asset Management Contract, (5) Negligent Interference with MPI's Economic Advantage, (6) Intentional Interference with Bank of America Relationship, and (7) Negligent Interference with Bank of America Relationship ("Verified Complaint"). A copy of the Verified Complaint is attached hereto as **Exhibit "5"**.

The fifteen distinct plaintiffs who filed the Verified Complaint are: TEM as an individual; TEM as trustee of the Thomas E. Morgan Children's Trust ("TEMCT"); Morgan Partners, Inc.; Covina Hills GP LLC; Covina Hills MHC LP; Lamplighter Ontario Associates, L.P.; LOA GP, LLC; Ontario Associates LP; Las Palmas MHC LP; Las Palmas Holdings L.P.; Las Palmas GP LLC; Silver Oaks Business Park LP; Silver Oaks Business Park LLC; Juanita Springs Associates Limited Partnership; and Island Gateway LLC.

### *The Underwriters' Policies*

19.     Underwriters and Dominion, through Hilton, sold a Fiduciary Professional Liability Insurance Policy, No. FPL19105754K to the named insured, Hitchman Fiduciaries, for the Policy Period from January 01, 2019 to January 01, 2020 with limits of $2,000,000 per claim and

$4,000,000 in the aggregate. The 2019-2020 Policy has a retroactive date of January 01, 2010. A copy of the 2019-2020 Policy is attached hereto as **Exhibit "1"**.

20.     Underwriters and Dominion, through Hilton, sold a Fiduciary Professional Liability Insurance Policy, No. FPL20105754L to the named insured, Hitchman Fiduciaries, for the Policy Period from January 01, 2020 to January 01, 2021 with limits of $2,000,000 per claim and $4,000,000 in the aggregate. The 2020-2021 Policy has a retroactive date of January 01, 2010. A copy of the 2020-2021 Policy is attached hereto as **Exhibit "2"**.

21.     Underwriters and Dominion, through Hilton, sold a Fiduciary Professional Liability Insurance Policy, No. FPL21105754M to the named insured, Hitchman Fiduciaries, for the Policy Period from January 01, 2021 to January 01, 2022 with limits of $2,000,000 per claim and $4,000,000 in the aggregate. The 2021-2022 Policy has a retroactive date of January 01, 2019. A copy of the 2021-2022 Policy is attached hereto as **Exhibit "3"**.

22.     The 2019-2020 Policy provides, in pertinent part, as follows:

## I. INSURING AGREEMENTS

The Underwriters agree with the **Assured**, named in the Declarations made a part hereof, in consideration of the payment of the premium and reliance upon the statements in the application which is made a part of this **Insurance Policy** (hereinafter "**Policy**" or "**Insurance**") and subject to the **Limit of Liability**, exclusions, conditions and other terms of this **Insurance**:

### A.  Coverage
To pay on behalf of the **Assured Damages** and **Claims Expenses** which the **Assured** shall become legally obligated to pay because of any **Claim** or **Claims**, including **Claims** for **Personal Injury** as hereafter defined, first made against the **Assured** and reported to the **Underwriters** during the **Period of Insurance** or **Extended Reporting Period**, arising out of any act, error or omission of the **Assured** in rendering or failing to render **Professional Services** as hereinafter defined for others but solely for acts on behalf of the **Named Assured** designated in Item 1 of the Declarations and caused by the **Assured**, except as excluded or limited by the terms, conditions and exclusions of this **Policy**.

### B.  Defense and Settlement (Included in the Limit of Liability)
1.  The **Underwriters** shall have the right and duty to defend, subject to the **Limits of Liability**, any **Claim** against the **Assured** seeking **Damages** which are payable under the terms of this **Insurance**, even if any of the allegations of the **Claim** are groundless, false or fraudulent. However, **Underwriters** shall not formally appoint defense counsel

without the consent of the **Named Assured**, such consent not to be unreasonably withheld.

2. It is agreed that the **Limit of Liability** available to pay **Damages** shall be reduced and may be completely exhausted by payment of **Claims Expenses**. **Damages** and **Claims Expenses** shall be applied against the **Deductible**.

…

## V. DEFINITIONS

"**Claim**" means a demand received by any **Assured** for money or services outside the **Ordinary Course of Business** including the service of suit or institution of arbitration proceedings against the **Assured**.

"**Claims Expenses**" means:
1. fees charged by an attorney designated by **Underwriters** and consented to by the **Named Assured**, with such consent not to be unreasonably withheld; and
2. all other fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a **Claim**, suit or proceeding arising in connection therewith, if incurred by the **Underwriters**, or by the **Assured** with the written consent of the **Underwriters**.

…

"**Limit of Liability**" means the maximum amount for which **Underwriters** will be liable as provided herein.

…

"**Professional Services**" means services provided by an **Assured** to others for a fee, unless acting as a volunteer or in an official pro bono capacity, on behalf of the **Named Assured** in any of the following capacities:
- **Fiduciary**
- **Daily Money Manager**
- **Computer Consultant**
- **Care Manager**
- **Bookkeeper**

…

## VI. LIMIT OF LIABILITY

A. The **Limit of Liability** stated in the Declarations as "per Claim" is the limit of the **Underwriters**' liability for all **Damages** and **Claims Expenses** arising out of the same, related or continuing **Professional Services** without regard to the number of **Assureds**, **Claims** or claimants.

B. The **Limit of Liability** stated in the Declarations as "Aggregate" is the total limit of the **Underwriters**' liability for all **Damages** and **Claims Expenses** arising out of **Claims** or circumstances which might lead to a **Claim** first made and reported to the **Underwriters** during the **Period of Insurance** or during the **Extended Reporting Period** and **Claims** arising out of the same, related or continuing **Professional Services** as such **Claims** or circumstances which might lead to a **Claim**.

…

## XI. NOTICE OF CLAIM, OR CIRCUMSTANCE THAT MAY LEAD TO A CLAIM

A. If any **Claim** is made against the **Assured**, the **Assured** shall immediately forward to **Underwriters** through persons named in Item 7 of the Declarations every demand, notice, summons or other process received by him or his representative.

B. If during the **Period of Insurance** the **Assured** first becomes aware of any act, error or omission that could reasonably be the basis for a **Claim** it must give written notice to **Underwriters** through persons named in Item 7 of the Declarations as soon as practicable during the **Period of Insurance** of:

1. the specific act, error or omission; and
2. the injury or damage which may result or has resulted from the act, error or omission; and
3. the circumstance by which the **Assured** first became aware of the act, error or omission.

Any subsequent **Claim** made against the **Assured** which is the subject of the written notice shall be deemed to have been made at the time written notice was first given to **Underwriters**.

…

E. A **Claim** shall be considered to be reported to the **Underwriters** when notice is first given to **Underwriters** through persons named in Item 7 of the Declarations of the **Claim** or of an act, error or omission which could reasonably be expected to give rise to a **Claim**.

F. All **Claims** arising out of the same, continuing or related **Professional Services** shall be considered a single **Claim** and deemed to have been made at the time the first of the related **Claims** is reported to **Underwriters** and shall be subject to one **Limit of Liability**.

23.     The 2020-2021 and 2021-2022 Policies provide, in pertinent part, as follows:

## I. INSURING AGREEMENTS

The Underwriters agree with the **Assured**, named in the **Declarations** made a part hereof, in consideration of the payment of the premium and reliance upon the statements in the application which is made a part of this **Insurance Policy** (hereinafter "**Policy**" or "**Insurance**") and subject to the **Limit of Liability**, exclusions, conditions and other terms of this **Insurance**:

### A.  Coverage

To pay on behalf of the **Assured Damages** and **Claims Expenses** which the **Assured** shall become legally obligated to pay because of any **Claim** or **Claims**, including **Claims** for **Personal Injury** as hereafter defined, first made against the **Assured** and reported to the **Underwriters** during the **Period of Insurance** or **Extended Reporting Period**, arising out of any act, error or omission of the **Assured** in rendering or failing to render **Professional Services** as hereinafter defined for others but solely for acts on behalf of the

**Named Assured** designated in Item 1 of the Declarations and caused by the **Assured**, except as excluded or limited by the terms, conditions and exclusions of this **Policy**.

**B. Defense and Settlement (Included in the Limit of Liability)**

1. The **Underwriters** shall have the right and duty to defend, subject to the **Limits of Liability**, any **Claim** against the **Assured** seeking **Damages** which are payable under the terms of this **Insurance**, even if any of the allegations of the **Claim** are groundless, false or fraudulent. Although **Underwriters** retain the exclusive right to appoint defense counsel to represent the **Assured** during all pre-trial stages of any litigated **Claim** seeking **Damages** which are payable under the terms of this **Insurance**, **Underwriters** shall not formally appoint trial counsel without the consent of the **Named Assured**, such consent not to be unreasonably withheld.

2. It is agreed that the **Limit of Liability** available to pay **Damages** shall be reduced and may be completely exhausted by payment of **Claims Expenses**. **Damages** and **Claims Expenses** shall be applied against the **Deductible**.

…

**V. DEFINITIONS**

"**Claim**" means a demand received by any **Assured** for money or services outside the **Ordinary Course of Business** including the service of suit or institution of arbitration proceedings against the **Assured**.

"**Claims Expenses**" means:

1. fees charged by an attorney designated by **Underwriters** and consented to by the **Named Assured**, with such consent not to be unreasonably withheld; and
2. all other fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a **Claim**, suit or proceeding arising in connection therewith, if incurred by the **Underwriters**, or by the **Assured** with the written consent of the **Underwriters**.

…

"**Limit of Liability**" means the maximum amount for which **Underwriters** will be liable as provided herein.

…

"**Professional Services**" means services provided by an **Assured** to others for a fee, unless acting as a volunteer or in an official pro bono capacity, on behalf of the **Named Assured** in any of the following capacities:

- **Fiduciary**
- **Daily Money Manager**
- **Computer Consultant**
- **Care Manager**
- **Bookkeeper**

...

## VI. **LIMIT OF LIABILITY**

    A.  The **Limit of Liability** stated in the **Declarations** as "per **Claim**" is the limit of the **Underwriters**' liability for all **Damages** and **Claims Expenses** arising out of the same, related or continuing **Professional Services** without regard to the number of **Assureds**, **Claims** or claimants.

    B.  The **Limit of Liability** stated in the **Declarations** as "Aggregate" is the total limit of the **Underwriters**' liability for all **Damages** and **Claims Expenses** arising out of **Claims** or circumstances which might lead to a **Claim** first made and reported to the **Underwriters** during the **Period of Insurance** or during the **Extended Reporting Period** and **Claims** arising out of the same, related or continuing **Professional Services** as such **Claims** or circumstances which might lead to a **Claim**.

…

## XI. **NOTICE OF CLAIM, OR CIRCUMSTANCE THAT MAY LEAD TO A CLAIM**

    A.  If any **Claim** is made against the **Assured**, the **Assured** shall immediately forward to **Underwriters** through persons named in Item 7 of the **Declarations** every demand, notice, summons or other process received by him or his representative.

    B.  If during the **Period of Insurance** the **Assured** first becomes aware of any act, error or omission that could reasonably be the basis for a **Claim** it must give written notice to **Underwriters** through persons named in Item 7 of the **Declarations** as soon as practicable during the **Period of Insurance** of:

        1.  the specific act, error or omission; and

        2.  the injury or damage which may result or has resulted from the act, error or omission; and

        3.  the circumstance by which the **Assured** first became aware of the act, error or omission.

    Any subsequent **Claim** made against the **Assured** which is the subject of the written notice shall be deemed to have been made at the time written notice was first given to **Underwriters**.

    …

    E.  A **Claim** shall be considered to be reported to the **Underwriters** when notice is first given to **Underwriters** through persons named in Item 7 of the **Declarations** of the **Claim** or of an act, error or omission which could reasonably be expected to give rise to a **Claim**.

    F.  All **Claims** arising out of the same, continuing or related **Professional Services** shall be considered a single **Claim** and deemed to have been made at the time the first of the related **Claims** is reported to **Underwriters** and shall be subject to one **Limit of Liability**.

### *Hilton's Involvement In The Sale Of The Policies*

    24.     The Hitchmans purchased the Policies for Hitchman Fiduciaries through Dominion and Hilton. Dominion and Hilton contracted for the Policies with Underwriters to provide coverage for Hitchman Fiduciaries.

25.     Hilton acted in his capacity as managing general agent of Dominion and Underwriters in selling the Policies to Hitchman Fiduciaries.

26.     Hilton had and has an interest in protecting his own insurance and brokerage business, Dominion while dealing with the plaintiffs during and after the sale of the Policies and while responding to the claims against the Plaintiffs while also representing the interests of Dominion and Underwriters.

### *Notice Of Potential Claim And Appointment Of Hilton*

27.     On March 10, 2019, the Hitchmans provided Underwriters various documents from the Probate Action, requesting the communication be considered a Notice of Potential Claim.

28.     On March 29, 2019, Underwriters acknowledged receipt of the Notice of Potential Claim and the corresponding documents. A copy of Underwriters' March 29, 2019 letter is attached hereto as **Exhibit "6"**.

29.     In its March 29, 2019 letter, Underwriters advised that it is treating the communication as a Notice of Potential Claim but is not appointing defense counsel.

30.     In or around January 2020, Underwriters appointed Hilton as defense counsel in the Probate Action without sending the Hitchmans a formal letter providing notice or discussing Underwriters' coverage position.

31.     Hilton entered an appearance as counsel for the Hitchmans in both the Probate Action and Civil Action. Hilton apparently focused on providing a defense at minimal expense to Underwriters so as to avoid Underwriters from having to appoint defense counsel in the two cases. Hilton agreed to the setting of a trial in the Probate Action but without conducting any significant discovery in either case.

32.     Hilton proposed to conduct the defense in the Underlying Actions without charging for his services as a lawyer. On January 24, 2022, after the appointment of new defense counsel, Underwriters reinforced Hilton's statement that he was not charging for his services, stating that Hilton and Hilton's associate, Paul Savage ("Savage"), a Utah lawyer but not admitted to practice

law in California, "will continue to be available to the Hitchmans and [defense counsel] as a (free) resource." A copy of the January 24, 2022 email is attached hereto as **Exhibit "7"**.

33.     Hilton admitted that he was inexperienced in the issues raised in the Underlying Actions and therefore not competent to act as trial counsel for the Hitchmans in either case. Nevertheless, Hilton attended court hearings, entered his appearance as counsel, reviewed discovery documents, and proposed litigation strategies for the insureds.

*Appointment Of Sheppard Mullin*

34.     On September 13, 2021 after the insureds retained insurance coverage counsel, Underwriters agreed to defend the two actions under a reservation of rights and appointed the law firm of Sheppard Mullin to participate as defense counsel with the understanding that Hilton and Savage "would continue doing the heavy lifting in terms of drafting filings and discovery requests/responses." A copy of the September 13, 2021 email is attached hereto as **Exhibit "8"**.

35.     On September 13, 2021, the Hitchmans' coverage counsel responded to Underwriters that Sheppard Mullin must be able to direct the defense of the case with Hilton only being used for appropriate tasks because (1) Sheppard Mullin, as lead counsel, is responsible for all work done on the case, including discovery and briefing drafted by others, (2) Hilton has admitted that the case requires trial counsel with far more experience in the field than he has, and (3) Savage is not licensed to practice law in California. A copy of the September 13, 2021 response email is attached hereto as **Exhibit "9"**.

36.     On October 8, 2021, the Hitchmans, through coverage counsel, restated the need for Sheppard Mullin to be lead counsel as Hilton did not have the appropriate experience. A copy of the October 08, 2021 letter is attached hereto as **Exhibit "10"**.

37.     On October 19, 2021, Underwriters agreed to appoint Sheppard Mullen as "lead counsel" while Hilton and Savage would act in a capacity characterized by Underwriters as "Investigatory Defense Counsel," but not explained. A copy of Underwriters October 19, 2021 letter is attached hereto as **Exhibit "11"**.

38.     On December 24, 2021, the Hitchmans, through coverage counsel, explained that Sheppard Mullin must be treated as independent counsel to avoid a conflict of interest based on Underwriters' reservation of rights letter. A copy of the December 24, 2021 letter is attached hereto as **Exhibit "12"**.

39.     In a January 24, 2022 email, Underwriters agreed, under a reservation of rights, to treat Sheppard Mullin as independent counsel and have Hilton and Savage continue as "monitoring counsel."

### *Multiple Claims Across Multiple Policies*

40.     TEM, as trustee and beneficiary of the BCMFT, asserted multiple, distinct and unrelated Claims, within the Policies' definition of potentially covered "Wrongful Acts," in the Probate Action in 2019.

41.     Fifteen distinct entities asserted multiple, distinct and unrelated Claims, within the Policies' definition of potentially covered "Wrongful Acts," in the Civil Action in 2020.

42.     The 2019 Claims asserted in the Probate Action are also separate and distinct from and unrelated to the 2020 Claims asserted in the Civil Action.

### *Multiple Claims Asserted In 2019*

43.     The Amended Petition was filed as part of the ongoing Probate Action, adding new and distinct claims of injury against the Hitchmans.

44.     The Amended Petition alleged that the Hitchmans "fail[ed] to disclose a known conflict of interest that rendered the Hitchman team inappropriate for service in any case pending before Judge Hubbard." The failure to disclose allegation must have first been made in 2019, as the Amended Petition further alleges that it was at a hearing on June 17, 2019 that "Tom learned how the Hitchmans and their lawyers had been breaching their duties of candor to line their own pockets."

45.     The Amended Petition further asserts that "the Hitchmans failed to assert a malpractice claim against former Trust counsel (Richard Pech ("Pech")), for wrongly advising the trustee (Tom) that it was permissible for him to pay all Pech's fees associated with Trust litigation

out of funds held by the Trust, rather than distinguishing between Trust claims (for which Trust assets could be used) and claims properly viewed as personal to Tom (as to which Tom was to pay from personal funds)."

46.     The assertion that the Hitchmans failed to assert the malpractice claim against Richard Pech is unrelated to the allegation of a failure to disclose a known conflict of interest. With respect to the allegation of a failure to disclose a known conflict of interest, the Amended Petition asserts that "the Hitchmans owed a duty to the Court and to all Trust beneficiaries to disclose all material facts concerning their suitability to provide ongoing service in this case, and whether there were potential conflicts that could work adversely to the beneficiaries, and/or that could cause a reasonable person to question the fairness of ongoing proceedings." Allegedly failing to assert a malpractice claim against Pech does not breach a duty to disclose material facts concerning the Hitchmans' suitability as trustees nor does it result in the same type of injury.

47.     The Amended Petition further alleges that "the Hitchmans have wasted Trust assets on attorneys' fees, litigation expert fees and excessive trust fees for services that have been of no value to the Trust, such that they are subject to surcharge for any amounts the Court determines to have been excessive or improper."

48.     Allegedly wasting trust assets does not concern the Hitchmans' suitability as trustees, nor does it breach the Hitchmans' disclosure duties to the Court in the Probate Action and to BCMFT beneficiaries.

49.     The alleged wasting of trust assets also does not impact any claim against Pech. It is the action of allegedly wasting trust assets, as opposed to the inaction of failing to assert a claim against Pech for his conduct at the time TEM was trustee, which is at issue in this Claim.

50.     The injuries resulting from each asserted Claim are also distinct.

51.     For the alleged failure to disclose a conflict of interest, the Amended Petition demands "disgorgement of the[] ill-gotten profits plus interest."

52.     For the alleged failure to assert a malpractice claim against Pech, the Amended Petition demands the amount of trust assets Pech is wrongfully withholding if Pech's statute of

limitations defense succeeds, or "costs of having to deal with a statute of limitations defense" if Pech's statute of limitations defense is not successful.

53.     For the asserted wasting of trust assets, the Amended Petition demands "fees spent by the Hitchmans in activities that breached their fiduciary duties."

54.     The Amended Petition asserts at least three different Claims, as defined under the Policies, with distinct improper actions and corresponding injuries.

### *Multiple Claims Asserted In 2020*

55.     The Verified Complaint in the Civil Action made new, different and unrelated claims not asserted in the Amended Petition in the Probate Action. The Verified Complaint alleges that its claims were different from those asserted in the Probate Action, explaining that "[c]ertain claims…were required by law to be, and already have been, asserted in a probate proceeding" and "none of the claims being asserted [in the Verified Complaint] are claims belonging to the BCMFT."

56.     The Verified Complaint asserts, by TEM as trustee of the TEMCT, conversion of TEMCT funds as "[t]he Hitchmans substantially interfered with the TEMCT's right to [the $250,000 lent to Lamplighter Chino] by liquidating the certificate of deposit in question but refusing to return either the $250,000 or interest thereon."

57.     The Verified Complaint further alleges, by TEM as an individual owner of Lamplighter Chino, that instead of "properly distributing [to] the owners their proportionate shares of the $5.75 million (plus interest) [from the certificate of deposit], they over-distributed to the BCMFT and under-distributed to the other owners…by first spending $2.5 million to pay off an obligation of the BCMFT and then distributing the balance in accordance with the percentage ownership interests, with no accounting for the fact that $2.5 million already had been distributed on behalf of the BCMFT."

58.     The Verified Complaint claims asserted by the TEMCT, on the one hand, and TEM as owner of Lamplighter Chino, on the other, must be unrelated as they are based on independent rights. TEM would still be "short changed" and have a conversion cause of action for the alleged

under-distribution had the Hitchmans, while trustees of the BCMFT, returned the $250,000 lent by the TEMCT to Lamplighter Chino. The TEMCT would also still have a conversion cause of action for the $250,000 if the Hitchmans did not allegedly under-distribute the $5.75 million (plus interest) remaining in the certificate of deposit.

59.     The Verified Complaint further alleges that "[t]he Hitchmans wrongfully interfered with [MPI's Asset Management Contract] by instructing that MPI should not be paid for the services it was providing thereunder, without causing Chino Holdings LP to take any of the steps lawfully required to terminate that contract."

60.     The certificate of deposit, and the distributions upon liquidating the certificate of deposit, has no relation to MPI, Chino Holdings LP, or the relationship between the two entities as neither entity has or asserts an interest in the certificate of deposit. The Amended Petition states "[n]o one had a right to the $250,000 (plus interest)…other than the TEMCT" and "[t]he three Lamplighter Chino owners (Tom, Nancy, and the BCMFT) had interests in the remaining $5.75 million (plus interest)."

61.     The Verified Complaint asserts at least three different Claims, as defined under the Policies, by alleging at least three different improper actions on behalf of three different entities claiming distinct harm.

### The Claims In 2019 Are Unrelated To The Claims In 2020

62.     The Amended Petition in the Probate Action asserts three distinct claims in 2019: (1) failure to disclose a known conflict of interest, (2) failure to assert a malpractice claim against Pech, and (3) wasting trust assets on attorneys' fees, litigation expert fees and excessive trust fees.

63.     The Verified Complaint asserts three distinct claims in 2020: (1) conversion of the $250,000 TEMCT lent to Lamplighter Chino, (2) conversion of distributions by under-distributing to TEM as an owner of Lamplighter Chino, and (3) wrongful interference with MPI's Asset Management Contract by instructing that MPI should not be paid for its services.

64.     The three Claims in 2019 are distinct and unrelated to the three Claims in 2020.

65.     The alleged conversion of the $250,000 TEMCT lent to Lamplighter Chino, conversion of distributions by under-distributing to TEM as an owner of Lamplighter Chino, and wrongful interference with MPI's Asset Management Contract do not breach the Hitchmans' "duty to the Court and to all Trust beneficiaries to disclose all material facts concerning their suitability" for the 2020 Claims to be related to the 2019 failure to disclose a known conflict of interest Claim.

66.      The alleged conversion of the $250,000 TEMCT lent to Lamplighter Chino, conversion of distributions by under-distributing to TEM as an owner of Lamplighter Chino, and wrongful interference with MPI's Asset Management Contract also do not impact the alleged failure to assert a malpractice claim against Pech. The 2020 Claims do not affect the ability to bring the malpractice claim or were alleged to have been actions taken as an alternative to asserting the Pech malpractice claim.

67.     The alleged conversion of the $250,000 TEMCT lent to Lamplighter Chino, conversion of distributions by under-distributing to TEM as an owner of Lamplighter Chino, and wrongful interference with MPI's Asset Management Contract also are not in furtherance of wasting trust assets. The 2020 Claims do not have corresponding lawsuits that required the Hitchmans to spend trust assets on attorneys' fees or litigation expert fees, nor do they allege that the Hitchmans' services were excessive.

### *Underwriters Limiting Benefits*

68.     On March 29, 2019, Underwriters acknowledged receipt of the notice of circumstances and various filings while referencing the 2019-2020 Policy with limits of $2,000,000 per claim and $4,000,000 in the aggregate.

69.     Underwriters' October 19, 2021 letter also referenced the 2019-2020 Policy with limits of $2,000,000 per claim and $4,000,000 in the aggregate.

70.     On March 30, 2022, Underwriters first suggested that the allegations in both Underlying Actions constitute one Claim under the 2018-2019 Policy subject to limits of $1,000,000 per claim and $2,000,000 in the aggregate. A copy of Underwriters' March 30, 2022 letter is attached hereto as **Exhibit "13"**.

71.     On April 20, 2022, Underwriters continued to assert applicability of the 2018-2019 Policy and $1,000,000 per claim limit of liability. A copy of Underwriters' April 20, 2022 letter is attached hereto as **Exhibit "14"**.

72.     On May 12, 2022, the Hitchmans, through coverage counsel, detailed the distinct claims in the Amended Petition and Verified Complaint, triggering multiple policy periods and aggregate limits. A copy of the May 12, 2022 letter is attached hereto as **Exhibit "15"**.

73.     On June 16, 2022, Underwriters denied any liability greater than the $1,000,000 per claim limit under the 2018-2019 Policy, stating the Amended Petition and Verified Complaint "do not allege any independent acts that would not be deemed to have arisen out of, or relate back to, the acts first disclosed during the 2018 Policy" and that "[t]he allegations do not constitute a separate Claim that would trigger coverage under the 2019 Policy." A copy of the June 16, 2022 letter is attached hereto as **Exhibit "16"**.

74.     Despite repeated mediation efforts it appears unlikely that the Plaintiffs in the Civil Action and the Petitioners in the Probate Action will agree to settle the cases.

75.     A trial in the Probate Action is expected to occur in the Fall of 2022. No trial is set in the Civil Action. The Hitchmans' defense counsel have been defending against effectively "scorched Earth" litigation tactics in the Underlying Actions and defense expenses have been very substantial.

76.     Underwriters has refused to pay the reasonable defense expenses charged to the Hitchmans by their independent defense counsel, requiring the Hitchmans to pay the differential amounts of the defense expenses.

77.     Underwriters has informed the Hitchmans that it intends to deduct approximately $139,000 from its policy limits to pay for the work of Hilton.

78.     Underwriters has advised the Hitchmans that it has already spent most of the $1,000,000 from its asserted 2018-2019 single claim policy limits for the defense of the Underlying Actions and that the Hitchmans will shortly be without insurance coverage for defense.

79.     The Hitchmans believe that the defense of the Underlying Actions will shortly use up the $1,000,000 policy limit that Underwriters argues is the maximum amount available for defense of both Actions, especially when Underwriters deducts substantial funds from policy limits to pay Hilton.

80.     Without relief from this Court, the Hitchmans will shortly be unable to pay for their defense in the Underlying Actions because Underwriters has announced that it will shortly stop paying for the Hitchmans' defense.

### FIRST CAUSE OF ACTION
### Declaratory Relief
### (Against All Defendants)

81.     Plaintiffs incorporate each and every allegation set forth in the above paragraphs as though fully alleged herein.

82.     This count seeks declaratory relief pursuant to Utah Code § 78B-6-401 *et seq*.

83.     By issuing and delivering the Policies and taking payments from Plaintiffs, Underwriters and Dominion (the "Insurer Defendants") agreed to provide a defense for suits arising out of the Hitchmans' Professional Services.

84.     The Underlying Actions allege facts creating a potential for coverage under multiple Policies, thereby triggering the Insurer Defendants' obligation to defend the Hitchmans.

85.     No exclusions in any Policy preclude the Insurer Defendants' defense obligations in the Underlying Actions.

86.     Underwriters has acknowledged the potential for coverage and that it has an obligation to defend the Hitchmans in the Underlying Actions.

87.     Underwriters has reserved its rights to disclaim coverage for defense, or some or all of any future settlement or judgment.

88.     Underwriters has not properly and fully defended the Hitchmans in the Underlying Actions.

89.     Underwriters has not reimbursed the Hitchmans for all of their defense costs in the Underlying Actions to date.

90.     The Insurer Defendants have refused to provide any coverage greater than the $1,000,000 per claim policy limit under Underwriters' 2018-2019 Policy.

91.     The Insurer Defendants have refused to fully defend the Hitchmans, as required, under the 2019-2020 and 2020-2021 Policies in the Underlying Actions.

92.     The Hitchmans will shortly be without any insurer-paid defense in the Underlying Actions because of the actions of the Insurer Defendants.

93.     An actual controversy of a justiciable nature exists between the parties concerning the Insurer Defendants' duties toward the Hitchmans in connection with the Underlying Actions, which are still being litigated, the applicability of the 2018-2019, 2019-2020 and 2020-2021 Policies to defend and indemnify the Hitchmans in the Underlying Actions, and the applicability of the Policies' single and aggregate claim limits for the Underlying Actions.

94.     The controversy is of sufficient immediacy and magnitude to justify declaratory relief.

95.     Plaintiffs are entitled to judicial declarations that:

        a.      Underwriters is obligated to provide a full and complete defense, settlement, and indemnity of the Underlying Actions under the 2019-2020 and 2020-2021 Policies.

        b.      Underwriters' obligations are subject to the aggregate limits of the 2019-2020 and 2020-2021 Policies.

### SECOND CAUSE OF ACTION
### Breach of Contract
### (Against Dominion and Underwriters)

96.     Plaintiffs incorporate each and every allegation set forth in the above paragraphs as though fully alleged herein.

97.     Multiple valid insurance contracts, the Policies, exist between the Hitchmans, Underwriters and Dominion. The Policies were sold to the Hitchmans by Hilton as the managing general agent of Dominion and Underwriters.

98.     Underwriters and Dominion are legally responsible for the actions of their agent, Hilton.

99.     The Insurer Defendants are jointly responsible for the actions of each other in their dealings with the Hitchmans.

100.    The Hitchmans have fully performed all of the obligations and conditions to be performed by them under the Policies or have been excused from performing.

101.    By issuing and delivering the Policies and taking payments from Plaintiffs, the Insurer Defendants agreed to provide a defense for suits arising out of the Hitchmans' Professional Services.

102.    The Underlying Actions allege facts creating a potential for coverage under multiple Policies, thereby triggering the Insurer Defendants' obligation to defend the Hitchmans.

103.    No exclusions in any Policy preclude the Insurer Defendants' defense obligations in the Underlying Actions.

104.    Underwriters has acknowledged the potential for coverage and that it has an obligation to defend the Hitchmans in the Underlying Actions.

105.    The Insurer Defendants have breached their duties under the insurance contracts as a result of the conduct described above. The Insurer Defendants breached their defense obligations by, among other conduct, (1) refusing to provide defense benefits owed under the 2019-2020 and 2020-2021 Policies; (2) asserting the $1,000,000 per Claim limit of liability under the 2018-2019 Policy applied to the entirety of the Underlying Actions; (3) failing to hire competent defense counsel by appointing Hilton; and (4) unreasonably refusing to pay reasonable and necessary defense expenses by not providing for the full amount of defense invoices.

106.    The Insurer Defendants' breach of their defense obligations actually and proximately caused the Hitchmans' damages in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
### Breach of Fiduciary Duty
### (Against All Defendants)

107.    Plaintiffs incorporate each and every allegation set forth in the above paragraphs as though fully alleged herein.

108.    As third-party liability insurance companies or as managing general agent of third-party liability insurance companies, the Defendants owe Plaintiffs fiduciary duties, including to protect the Hitchmans' interest as their own.

109.    The Defendants have breached their fiduciary duties as a result of the conduct described above. The Defendants breached their duties by, among other conduct, (1) asserting the $1,000,000 per Claim limit of liability under the 2018-2019 Policy applied to the entirety of the Underlying Actions; (2) refusing to defend the Hitchmans under the 2019-2020 and 2020-2021 policies, (3) failing to exercise due care by appointing Hilton as defense counsel despite his conflict of interest and admitted lack of experience in the Underlying matters, (4) paying Hilton out of the policy proceeds as defense counsel after advising the Hiltons that his services would not be charged against the policy limits, (5) undertaking a defense with an improper focus on minimizing defense expenses, and (6) failing to exercise due care in the procuring and underwriting the Policies.

110.    Underwriters and Dominion are legally responsible for the actions of their agent, Hilton.

111.    Underwriters, Dominion, and Hilton are jointly responsible for the actions of each other in their dealings with the Hitchmans.

112.    In connection with their conduct described above, the acts or omissions of Defendants are the result of wilful and malicious or intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of the rights of others, including the Hitchmans' rights and interests.

113.    The Defendants' breach of fiduciary duty actually and proximately caused the Hitchmans' damages in an amount to be proven at trial. These damages include, but are not limited

to, monetary damages, attorneys' fees, costs and expenses of this suit, and punitive damages under
Utah Code § 78B-8-201.

**FOURTH CAUSE OF ACTION**
**Breach of Implied Covenant of Good Faith and Fair Dealing**
**(Against Dominion and Underwriters)**

114.     Plaintiffs incorporate each and every allegation set forth in the above paragraphs as
though fully alleged herein.

115.     Multiple valid contracts, the Policies, exist between the Hitchmans and the Insurer
Defendants.

116.     An implied duty of good faith and fair dealing is implicit in every contract,
including the Policies between Hitchmans and the Insurer Defendants.

117.     The Insurer Defendants breached the implied covenant of good faith and fair
dealing by, among other things, (1) unreasonably asserting the $1,000,000 per Claim limit of
liability under the 2018-2019 Policy applied to the entirety of the Underlying Actions; (2) placing
their own interests ahead of the interests of the Hitchmans by focusing on providing a defense at
minimal expense to the Insurer Defendants; (3) unreasonably refusing to pay reasonable and
necessary defense expenses by not providing for the full amount of defense invoices; and (4)
unreasonably deducting fees provided to Hilton and Savage from the available limits of liability
despite the conflict of interest and repeated assurances that Hilton's services would be "free" to
the Hitchmans.

118.     The Insurer Defendants' breach of the implied covenant of good faith and fair
dealing actually and proximately caused the Hitchmans' damages in an amount to be proven at
trial. These damages include, but are not limited to, monetary damages, attorneys' fees, and costs
and expenses of this suit.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Hitchman Fiduciaries, LLC, Bruce Hitchman, and Lee Ann
Hitchman pray for judgment against Defendants Certain Underwriters at Lloyd's London,
Dominion Insurance Services, Inc., and Lawrence D. Hilton as follows:

1.      A judicial declaration that the Insurer Defendants have a duty to provide defense benefits to the Hitchmans' in the Underlying Actions under Underwriters' 2019-2020 and 2020-2021 Policies and under those Policies' respective Aggregate limits;

2.      An award of direct, incidental, and consequential damages, pre- and post-judgment interest, attorney's fees, and costs of suit;

3.      An award of punitive damages;

4.      Other and further relief as the Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Utah R. Civ. P. 38(b), the Hitchmans hereby requests a trial by jury as to all issues triable to a jury in this action.

DATED this 21st day of July 2022.

**MANNING CURTIS BRADSHAW
& BEDNAR PLLC**
/s/ Alan C. Bradshaw
Alan C. Bradshaw
Michael E. Harmond

**GAUNTLETT & ASSOCIATES**
David A. Gauntlett *pro hac vice application forthcoming*
James A. Lowe *pro hac vice application forthcoming*

Attorneys for Plaintiffs
Hitchman Fiduciaries, LLC; Bruce Hitchman;
and Lee Ann Hitchman

## EXHIBITS TO COMPLAINT

**Exhibit 1**    2019-2020 Fiduciary Professional Liability Insurance Policy, No. FPL19105754K

**Exhibit 2**    2020-2021 Fiduciary Professional Liability Insurance Policy, No. FPL20105754L

**Exhibit 3**    2021-2022 Fiduciary Professional Liability Insurance Policy, No. FPL21105754M

**Exhibit 4**    Amended Petition filed in the Probate Action on November 22, 2019

**Exhibit 5**    Verified Complaint filed in the Civil Action on August 14, 2020

**Exhibit 6**    Letter from Underwriters' counsel to the Hitchmans dated March 29, 2019

**Exhibit 7**    E-mail from Underwriters' counsel to James A. Lowe dated January 24, 2022

**Exhibit 8**    E-mail from Underwriters' counsel to James A. Lowe dated September 13, 2021

**Exhibit 9**    E-mail from James A. Lowe to Underwriters' counsel dated September 13, 2021

**Exhibit 10**    Letter from James A. Lowe to Underwriters' counsel dated October 8, 2021

**Exhibit 11**    Reservation of Rights Letter from Underwriters' counsel dated October 19, 2021

**Exhibit 12**    Letter from James A. Lowe to Underwriters' counsel dated December 24, 2021

**Exhibit 13**    Reservation of Rights Letter from Underwriters' counsel dated March 30, 2022

**Exhibit 14**    Letter from Underwriters' counsel to James A. Lowe dated April 20, 2022

**Exhibit 15**    Letter from James A. Lowe to Underwriters' counsel dated May 12, 2022

**Exhibit 16**    Letter from Underwriters' counsel to James A. Lowe dated June 16, 2022

# EXHIBIT 1



370 Park Street, Suite 8, Moraga CA. 94556
341 S. Main, Suite 100, Alpine UT. 84004
888.313.9977(t) ~ 925.313.9978(f)
info@dominioninsurance.com
dominion-insurance.com

DECLARATIONS
**Fiduciary Professional Liability Insurance**
**Effected with Certain Underwriters at Lloyd's of London**
*Claims Made and Reported Coverage*

**Authority Number:** B0621P33057518

**Policy Number:** FPL19105754K

**1. Named Assured:** Hitchman Fiduciaries LLC
120 Tustin Avenue, Suite C, Newport Beach, CA 92663

**2. Period of Insurance:** 2019-01-01 to 2020-01-01 (year-month-day)
both dates at 12:01 am standard time at the location identified in item 1, above.

**3. Limits of Liabilty:** $2,000,000/$4,000,000 Per Claim/Aggregate, Including Costs and Expenses

**4. Deductible:** $15,000 Per Claim, Including Costs and Expenses

**5. Premium:** $23,169.00

**6. Retroactive Date:** 2010-01-01 (year-month-day)

**7. Notice of Claim:** Dominion Insurance Services, Inc.
341 South Main Street, Suite 100, Alpine, Utah 84004

Claim Prevention Hotline:
(212) 376-8599

**8. Service of Suit:** Wilson, Elser, Moskowitz, Edelman & Dicker LLP
150 East 42nd Street, New York, New York 10017

**9. Short Rate Table:** As per attached endorsement NMA 45.

**Prepared/Issued By:** Dominion Insurance Services, Inc.

_____        2019-01-01
Countersignature                        Date

**Forms & Notices:**
Surplus Lines Notice
Dominion FPL Wording (02/18)
Data Breach/Infection Sublimit: $1,000,000/$1,000,000
General Liability Coverage Endorsement: $1,000,000/$3,000,000
Crime Endorsement: $100,000/$100,000
General Change Endorsement: Split Retroactive Date of 2019-01-01 for Higher Limits of $2,000,000/$4,000,000
Deletion of Co-Trustee/Co-Agent Restriction Endorsement
Specific Claim(s) Exclusion: Anna L. Bostelman Trust
Medication Coordinator Endorsement
Neutral Facilitator Endorsement
Notary Public Endorsement
NMA2918 War and Terrorism Exclusion Endorsement
Several Liability Notice
Syndicates List

**Additional Charges:**
Taxes: $741.41

Dominion FPL Dec (12/15)

Dominion Insurance Services Inc. © 2019 | All Rights Reserved.



370 Park Street, Suite 8, Moraga CA. 94556
341 S. Main, Suite 100, Alpine UT. 84004
888.313.9977(t) ~ 925.313.9978(f)
info@dominioninsurance.com
dominion-insurance.com

NOTICE

1. THE INSURANCE POLICY THAT YOU HAVE PURCHASED IS BEING ISSUED BY AN INSURER THAT IS NOT LICENSED BY THE STATE OF CALIFORNIA. THESE COMPANIES ARE CALLED "NONADMITTED" OR "SURPLUS LINE" INSURERS.

2. THE INSURER IS NOT SUBJECT TO THE FINANCIAL SOLVENCY REGULATION AND ENFORCEMENT THAT APPLY TO CALIFORNIA LICENSED INSURERS.

3. THE INSURER DOES NOT PARTICIPATE IN ANY OF THE INSURANCE GUARANTEE FUNDS CREATED BY CALIFORNIA LAW. THEREFORE, THESE FUNDS WILL NOT PAY YOUR CLAIMS OR PROTECT YOUR ASSETS IF THE INSURER BECOMES INSOLVENT AND IS UNABLE TO MAKE PAYMENTS AS PROMISED.

4. THE INSURER SHOULD BE LICENSED EITHER AS A FOREIGN INSURER IN ANOTHER STATE IN THE UNITED STATES OR AS A NON-UNITED STATES (ALIEN) INSURER. YOU SHOULD ASK QUESTIONS OF YOUR INSURANCE AGENT, BROKER, OR "SURPLUS LINE" BROKER OR CONTACT THE CALIFORNIA DEPARTMENT OF INSURANCE AT THE FOLLOWING TOLL-FREE TELEPHONE NUMBER: 1-800-927-4357 OR INTERNET WEB SITE WWW.INSURANCE.CA.GOV. ASK WHETHER OR NOT THE INSURER IS LICENSED AS A FOREIGN OR NON-UNITED STATES (ALIEN) INSURER AND FOR ADDITIONAL INFORMATION ABOUT THE INSURER. YOU MAY ALSO CONTACT THE NAIC'S INTERNET WEB SITE AT WWW.NAIC.ORG.

5. FOREIGN INSURERS SHOULD BE LICENSED BY A STATE IN THE UNITED STATES AND YOU MAY CONTACT THAT STATE'S DEPARTMENT OF INSURANCE TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.

6. FOR NON-UNITED STATES (ALIEN) INSURERS, THE INSURER SHOULD BE LICENSED BY A COUNTRY OUTSIDE OF THE UNITED STATES AND SHOULD BE ON THE NAIC'S INTERNATIONAL INSURERS DEPARTMENT (IID) LISTING OF APPROVED NONADMITTED NON-UNITED STATES INSURERS. ASK YOUR AGENT, BROKER, OR "SURPLUS LINE" BROKER TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.

7. CALIFORNIA MAINTAINS A LIST OF APPROVED SURPLUS LINE INSURERS. ASK YOUR AGENT OR BROKER IF THE INSURER IS ON THAT LIST, OR VIEW THAT LIST AT THE INTERNET WEB SITE OF THE CALIFORNIA DEPARTMENT OF INSURANCE: WWW.INSURANCE.CA.GOV.

8. IF YOU, AS THE APPLICANT, REQUIRED THAT THE INSURANCE POLICY YOU HAVE PURCHASED BE BOUND IMMEDIATELY, EITHER BECAUSE EXISTING COVERAGE WAS GOING TO LAPSE WITHIN TWO BUSINESS DAYS OR BECAUSE YOU WERE REQUIRED TO HAVE COVERAGE WITHIN TWO BUSINESS DAYS, AND YOU DID NOT RECEIVE THIS DISCLOSURE FORM AND

A REQUEST FOR YOUR SIGNATURE UNTIL AFTER COVERAGE BECAME EFFECTIVE, YOU HAVE THE RIGHT TO CANCEL THIS POLICY WITHIN FIVE DAYS OF RECEIVING THIS DISCLOSURE. IF YOU CANCEL COVERAGE, THE PREMIUM WILL BE PRORATED AND ANY BROKER'S FEE CHARGED FOR THIS INSURANCE WILL BE RETURNED TO YOU.

D-2 (Effective January 1, 2017)

Dominion Insurance Services Inc. © 2017 | All Rights Reserved.



370 Park Street, Suite 8, Moraga CA. 94556
341 S. Main, Suite 100, Alpine UT. 84004
888.313.9977(t) ~ 925.313.9978(f)
info@dominioninsurance.com
dominion-insurance.com

## FIDUCIARY PROFESSIONAL LIABILITY INSURANCE

**NOTICE:** This is a claims made form. Words and phrases in **bold** (other than titles and section headings) have special meaning. See section V "Definitions." Except to such extent as may otherwise be provided herein, the coverage afforded under this **Insurance Policy** is limited to liability for only those **Claims** that are first made against the **Assured** and reported to the **Underwriters** while the insurance is in force. The **Limit of Liability** available to pay **Damages** shall be reduced and may be completely exhausted by payment of **Claims Expenses**. **Damages** and **Claims Expenses** shall be applied against the **Deductible**. Please review the coverage afforded under this **Insurance Policy** carefully and discuss the coverage hereunder with your insurance agent or broker.

### I. INSURING AGREEMENTS

The **Underwriters** agree with the **Assured**, named in the Declarations made a part hereof, in consideration of the payment of the premium and reliance upon the statements in the application which is made a part of this **Insurance Policy** (hereinafter "**Policy**" or "**Insurance**") and subject to the **Limit of Liability**, exclusions, conditions and other terms of this **Insurance**:

#### A. Coverage

To pay on behalf of the **Assured Damages** and **Claims Expenses** which the **Assured** shall become legally obligated to pay because of any **Claim** or **Claims**, including **Claims** for **Personal Injury** as hereafter defined, first made against the **Assured** and reported to the **Underwriters** during the **Period of Insurance** or **Extended Reporting Period**, arising out of any act, error or omission of the **Assured** in rendering or failing to render **Professional Services** as hereinafter defined for others but solely for acts on behalf of the **Named Assured** designated in Item 1 of the Declarations and caused by the **Assured**, except as excluded or limited by the terms, conditions and exclusions of this **Policy**.

#### B. Defense and Settlement (Included in the Limit of Liability)

1. The **Underwriters** shall have the right and duty to defend, subject to the **Limits of Liability**, any **Claim** against the **Assured** seeking **Damages** which are payable under the terms of this **Insurance**, even if any of the allegations of the **Claim** are groundless, false or fraudulent. However, **Underwriters** shall not formally appoint defense counsel without the consent of the **Named Assured**, such consent not to be unreasonably withheld.

2. It is agreed that the **Limit of Liability** available to pay **Damages** shall be reduced and may be completely exhausted by payment of **Claims Expenses**. **Damages** and **Claims Expenses** shall be applied against the **Deductible**.

3. The **Underwriters** shall have the right to make any investigation they deem necessary, including, without limitation, any investigation with respect to the application and statements made in the application and with respect to coverage.

4. If the **Assured** shall refuse to consent to any settlement or compromise recommended by the **Underwriters** and acceptable to the claimant and elects to contest the **Claim**, **Underwriters'** liability for any **Damages** and **Claims Expenses** shall not exceed the amount for which the **Claim** could have been settled plus the **Claims Expenses** incurred up to the time of such refusal, or the applicable **Limit of Liability**, whichever is less, and the **Underwriters** shall have the right to withdraw from the further defense thereof by tendering control of said defense to the **Assured**.

   Without waiving the foregoing, in order to enhance the likelihood of resolving **Claims** covered by this **Insurance** in a mutually agreeable manner to both **Underwriters** and the **Assured**, **Underwriters** agree to: (1) seek the **Assured's** views regarding any potential settlement or compromise recommended by **Underwriters** and acceptable to the claimant; and (2) substantively respond to any such views, explaining **Underwriters'** position and the reason(s) therefor.

#### C. Disciplinary Proceedings Defense (not in addition to the Limit of Liability)

To pay on behalf of the **Assured** up to ten thousand dollars ($10,000) for all **Claims Expenses** incurred with respect to the defense of any and all proceedings before any state or federal licensing board, peer review committee or governmental regulatory body first instituted against the **Assured** and reported to the **Underwriters** during the **Period of Insurance** or **Extended Reporting Period**, arising out of any act, error or omission of the **Assured** in rendering or failing to render **Professional Services** as hereinafter defined for others but solely for acts on behalf of the **Named Assured** designated in Item 1 of the Declarations and caused by the **Assured**, except as excluded or limited by the terms, conditions and exclusions of this **Policy**.

#### D. Lost Earnings Reimbursement (not in addition to the Limit of Liability)

To pay to the **Assured** two hundred and fifty dollars ($250) per day (subject to a maximum of five thousand dollars ($5,000) for the entire **Period of Insurance**) for each day any **Assured** is required to appear at a trial, hearing or arbitration involving any and all **Claims** first made against the **Assured** and reported to the **Underwriters** during the **Period of Insurance** or **Extended Reporting Period**, arising out of any act, error or omission of the **Assured** in rendering or failing to render **Professional Services** as hereinafter defined for others but solely for acts on behalf of the **Named Assured** designated in Item 1 of the Declarations and caused by the **Assured**, except as excluded or limited by the terms, conditions and exclusions of this **Policy**.

#### E. Data Security Breach and Client Network Infection Coverage

**Underwriters** will, subject to the **Limits of Liability** set forth below, pay on behalf of any **Assured Damages** and **Claims Expenses**, in excess of the "per Claim" **Deductible**, the greater of fifty thousand dollars ($50,000) or other applicable limit

expressly designated in the Declarations, which the **Assured** shall become legally obligated to pay because of any **Claim** first made against any **Assured** and reported in writing to **Underwriters** during the **Period of Insurance** or **Extended Reporting Period** (if applicable) arising out of:

1. any **Data Security Breach** of any **Data Security System** maintained by the **Assured** for the storage of **Confidential Information** pertaining to the **Assured's** clients in the **Assured's** rendering of **Professional Services**; or

2. any **Client Network Infection**.

Multiple **Claims** by more than one claimant arising out of the same **Data Security Breach** or **Client Network Infection** will be considered a single **Claim** for purposes of applying the per-claim **Limit of Liability** and **Deductible**.

It is a condition precedent to coverage and our liability under this section I.E of the **Policy** that at all times during the **Period of Insurance** the **Assured** shall:

1. maintain anti-virus and malware prevention solutions on the **Assured's Data Security System** and update the protection at regular intervals;

2. maintain firewalls on its **Data Security System**; and

3. maintain and implement ongoing patch management process to ensure timely patching of its **Data Security System**.

The most **Underwriters** will pay under each of the following coverages and the most **Underwriters** will pay in the aggregate for all of the following coverages set forth is thirty thousand dollars ($30,000), which aggregate limit of indemnity is included within and is not in addition to the aggregate limit of liability for all coverages set forth in Item 3. of the Declarations:

F. **Contractual Travel Indemnity (not in addition to the Limit of Liability)**
Subject to the limits of indemnity set forth below, **Underwriters** will indemnify the **Assured** for the **Contractual Financial Obligation** the **Assured** becomes obligated to pay to an officer, director, or employee in excess of any other insurance coverage, contribution, or indemnification available to the **Assured** and/or to the officer, director, or employee, where such obligation is based on or arises out of any written contract or manual requiring the **Assured** to indemnify the officer, director, or employee for **Injury** or **Accidental Death** sustained while traveling on a common carrier for the **Assured's** business during the **Period of Insurance**.

For the purposes of the **Contractual Travel Indemnity** coverage set forth above:
**Accidental Death** means the loss of life due to physical injury to an officer, director, or employee of the **Assured** caused by violence, fracture, or an accident occurring while traveling on a common carrier for the **Assured's** business during the **Period of Insurance**, provided that the loss of life takes place no later than one hundred eighty (180) days after the expiration date or the effective date of cancellation of the **Policy**.

**Injury** means:
1. Physical damage to the body caused by violence, fracture, or an accident;

2. Accidental loss of limbs or multiple fingers;

3. **Permanent** total loss of sight, speech or hearing caused by violence, fracture, or an accident.

**Contractual Financial Obligation** means a sum that the **Assured** is required to pay to satisfy its obligations under a written contract or manual which has a binding effect on the **Assured**.

**Permanent** means lasting more than 12 months and at the end of that time being without prospect of improvement.

The limit of indemnity for this **Contractual Travel Indemnity** coverage is twenty-five thousand dollars ($25,000) for all **Contractual Financial Obligation** combined for the **Period of Insurance**. No deductible applies to this **Contractual Travel Indemnity** coverage.

No coverage shall be afforded and no amounts shall be payable pursuant to the **Contractual Travel Indemnity** coverage if the cause of the **Injury** or **Accidental Death** was:
1. An intentional act by or at the direction of the **Assured**;

2. An act of suicide or attempted suicide;

3. An act of war or **Act of Terrorism** as defined in Section G. below; or

4. Any disease process, whether sudden, slow, or degenerative.

G. **Loss of Key Individual Replacement Expenses (not in addition to the Limit of Liability)**
The **Underwriters** will indemnify the **Assured** for its **Ascertained Net Loss** up to the limit of indemnity set forth below if the Chief Executive Officer of the **Assured** suffers an accidental injury during the **Period of Insurance** which results in the death of the Chief Executive Officer during the **Period of Insurance**. No deductible applies to this coverage.

For the purposes of the **Loss of Key Individual Replacement Expenses** coverage set forth above:

**Ascertained Net Loss** means additional irrecoverable **Replacement Expenses** directly incurred by the **Assured** independently of any other cause less any savings the **Assured** is able to obtain in mitigation of the loss.

**Replacement Expenses** means:

1. Costs of advertising the employment position opening;

2. Travel, lodging, meal and entertainment expenses incurred in interviewing job applicants for the employment position opening; and

3. Miscellaneous extra expenses incurred in finding, interviewing and negotiating with the job applicants, including, but not limited to, overtime pay, costs to verify the background and references of the applicants and legal expenses incurred to draw up and employment contract.

The aggregate limit of indemnity for this **Loss of Key Individual Replacement Expenses** coverage is five thousand dollars ($5,000) for all **Ascertained Net Loss** for the **Period of Insurance**. No deductible applies to this **Loss of Key Individual Replacement Expenses** coverage.

H. **Terrorism Travel Reimbursement (not in addition to the Limit of Liability)**
The **Underwriters** will, subject to the limit of indemnity set forth below, indemnify the **Assured** for the **Assured's** obligation to reimburse any present director or officer for **Emergency Travel Expenses** incurred by such director or officer during the **Period of Insurance** as the result of an **Act of Terrorism** taking place during the **Period of Insurance**. The aggregate limit of indemnity for this coverage is twenty-five thousand dollars ($25,000) for all **Emergency Travel Expenses** incurred by all such directors and officers for the **Period of Insurance**. No deductible applies to this coverage.

For the purposes of the **Terrorism Travel Reimbursement** coverage set forth above:

**Act of Terrorism** means an act, or acts, of any person, or group(s) of persons, committed for political, religious, ideological or similar purposes with the intention to influence any government and/or to put the public, or any section of the public, in fear. An **Act of Terrorism** can include, but not be limited to, the actual use of force or violence and/or the threat of such use. Furthermore, the perpetrators of an **Act of Terrorism** can either be acting alone, or on behalf of, or in connection with any organisation(s) or government(s).

Notwithstanding the above, **Underwriters** will not indemnify the **Assured** for any **Emergency Travel Expenses** arising out of or attributable to an **Act of Terrorism** involving the use or release, or the threat of use or release of any nuclear weapon or device or chemical or biological agent, regardless of any contributory cause(s).

**Emergency Travel Expenses** mean:

1. Hotel expenses incurred which directly result from the cancellation of a scheduled transport by a commercial transportation carrier, resulting directly from and within forty-eight (48) hours of an **Act of Terrorism**; and

2. The increased amount incurred which may result from re-scheduling comparable transport, to replace a similarly scheduled transport canceled by a commercial transportation carrier in direct response to an **Act of Terrorism**;

I. **Travel Delay Reimbursement (not in addition to the Limit of Liability)**
The **Underwriters** will, subject to the limit of indemnity set forth below, indemnify the **Assured** for its obligation to reimburse any present Chief Executive Officer of the **Assured** for any **Non-Reimbursable Travel Delay Expenses** the Chief Executive Officer incurs as a result of the cancellation of any regularly scheduled business travel on a common carrier. The aggregate limit of indemnity for this coverage is fifteen hundred dollars ($1,500) for all **Non-Reimbursable Travel Delay Expenses** incurred by all Chief Executive Officers during the **Period of Insurance**.

For the purposes of the **Travel Delay Reimbursement** coverage set forth above:

**Non-Reimbursable Travel Delay Expenses** means the following travel-related expenses incurred after a seventy-two (72) hour waiting period, beginning from the time documented on the proof of cancellation, which are not otherwise reimbursable by the carrier or any other, entity or insurer and for which the Chief Executive Officer produces a receipt:

1. Meals and lodging;

2. Alternative transportation;

3. Clothing and necessary toiletries; and

4. Emergency prescription and non-prescription drug expenses.

No coverage shall be afforded and no amounts shall be payable pursuant to the **Travel Delay Reimbursement** coverage if the cancellation is as a direct result of an **Act of Terrorism**.

J. **Reimbursement for** Bodily Injury **and** Property Damage **to** Personal Property **due to Assault (not in addition to the Limit of Liability)**
The **Underwriters** will, subject to the limit of indemnity set forth below, reimburse the **Assured** for those amounts the **Assured** becomes obligated to pay to an officer, director, or employee of the **Assured** for medical expenses as to **Bodily Injury** and **Property Damage** to the **Personal Property** of such officer, director, or employee sustained as a result of a physical assault on the officer, director, or employee taking place during the **Period of Insurance** at the **Premises** of the **Assured**, or while the officer, director, or employee is traveling to or from the **Premises** of the **Assured**, and which assault is reported to **Underwriters** within forty-eight (48) hours after the assault took place.

For the purposes of the Reimbursement for the **Bodily Injury** and **Property Damage** to **Personal Property** due to Assault coverage set forth above:

**Bodily Injury** means bodily injury, sickness or disease, mental anguish, psychological injury or emotional distress sustained by any officer, director, or employee of the **Assured**, which occurs during the **Period of Insurance**, including death arising directly from any of these at any time.

**Premises** means the physical premises owned, leased, or rented by the **Assured** for the conducting of its business.

The aggregate limit of indemnity payable to all directors, officers and employees of the **Assured** as a result of all such physical assaults taking place during the **Period of Insurance** for all **Bodily Injury** due to Assault is ten thousand dollars ($10,000) and the aggregate limit of indemnity for all **Property Damage** to **Personal Property** due to Assault is two thousand dollars ($2,000). No deductible applies to this coverage.

K. **Conference Cancellation Costs Reimbursement (not in addition to the Limit of Liability)**
The **Underwriters** will, subject to the limit of indemnity set forth below, reimburse the **Assured** for **Conference Cancellation Costs** incurred and paid by the **Assured** and not otherwise reimbursed, for a cancelled conference that an employee of the **Assured** was scheduled to attend during the **Period of Insurance** at the request and on the business of the **Assured**, but this coverage shall only be afforded if:

1. the cancellation was due directly to a "natural catastrophe" or a "communicable disease" outbreak that forces the cancellation of the conference;

2. the employee registered for the conference at least thirty (30) days prior to the cancellation; and

3. the cancellation was ordered by a local, state or federal Board of Health or other governmental authority having jurisdiction over the location of the conference.

For purposes of the **Conference Cancellations Costs Reimbursement** coverage set forth in 2. above;
**Conference Cancellation Costs** means:

1. Deposits for hotel, airline, rental car and other similar charges that were forfeited as a result of the cancellation;

2. Registration fees and charges for such conferences that were forfeited as a result of the cancellation;

3. Any other deposits, prepayments, or charges incurred by the employee of the **Assured** as a result of such cancellation, including but not limited to baby sitters, day care and fees for suspension of services, but only if such amounts would otherwise be reimburseable by the **Assured**.

The aggregate limit of indemnity for this **Conference Cancellation Cost Reimbursement** coverage is one thousand ($1,000) for all business-related conference expenses incurred for all cancelled conferences at which the employees of the **Assured** were to attend during the **Period of Insurance**. No deductible applies to this coverage.

L. **Temporary Meeting Space Reimbursement and Emergency Real Estate Consulting Fee (not in addition to the Limit of Liability)**
The **Underwriters** will, subject to the limit of indemnity set forth below, reimburse the **Assured** for

1. The cost of rental of meeting space necessitated by the temporary unavailability for up to one week of the **Assured's** primary location due to the failure of a climate control system, or leakage of a hot water heater during the **Period of Insurance**, but this coverage shall only apply if the scheduled meeting was with parties who are not insured under this **Policy**. The aggregate limit of indemnity for this coverage is ten thousand dollars ($10,000) for all costs of rental of meeting space as to all instances of temporary unavailability of the **Assured's** primary location during the **Period of Insurance**. No deductible applies to this coverage.

2. Reasonable realtor's fee or real estate consultant's fee incurred due to the need of the **Assured** to relocate its primary place of business from the principal location set forth in the Declarations as a direct result of the **Unforeseeable Destruction** of the **Assured's** primary location during the **Period of Insurance**. The aggregate limit of insurance for this coverage is five thousand dollars ($5,000) for all reasonable realtor's fees and real estate consultant's fees incurred by the **Assured** due to all **Unforeseen Destructions** of the principal location of the **Assured** during the **Period of Insurance**. No deductible applies to this coverage.

For purposes of the **Emergency Real Estate Consulting Fee** coverage set forth in 2. above:
**Unforeseeable Destruction** means the accidental and unpredictable destruction, or the long term or permanent rendering as unusable and uninhabitable for any purposes, of the principal location of the **Assured**. **Unforeseeable Destruction** shall not include any destruction or the rendering as unusable or uninhabitable of the principal location of the **Assured** as a result of any intentional or grossly negligent acts of the **Assured** or its officers, directors, or employees, nor due to any nuclear incident, accident, war, Act of Terrorism or other nuclear event. The term "long term" shall mean for the purposes of this definition any period longer than six months.

M. **Identity Theft Expense (not in addition to the Limit of Liability)**
The **Underwriters** will, subject to the limits of indemnity set forth below, reimburse the **Assured** for **Identity Theft Expense** the **Assured** becomes obligated to pay to its directors, officer, or employees as a result of any **Identity Theft** committed against such directors, officers, or employees while they were acting in their positions and on behalf of the **Assured**, provided such **Identity Theft** (1) is first discovered by the **Assured** or its officers, directors or employees and is reported to **Underwriters** as soon as practicable during the **Period of Insurance**, but in no event later than ten (10) days of the discovery by the **Assured** of the

**Identity Theft** and (2) the **Identity Theft** took place subsequent to the effective date of the **Assured's** first policy with **Underwriters**.

For purposes of the **Identity Theft Expense** coverage set forth above:

**Identity Theft** means the acquisition by fraud or other means of the private identifying information for the **Assured's** officers, directors, or employees and the use of such identifying information for financial gain or other purposes.

**Identity Theft Expense** means those expenses incurred as a direct result of **Identity Theft** for the following:

1. the cost of obtaining up to twelve (12) credit reports obtained within twelve (12) months of the discovery of the **Identity Theft** for purposes of determining and restoring credit ratings;

2. fees incurred in reapplying for loans, grants and other credit vehicles that were rejected solely as a result of the **Identity Theft** to which this **Policy** applies;

3. costs incurred in reporting the **Identity Theft** to applicable authorities, agencies, creditors, stores and other persons and entities, including telephone charges, postage, notarization fees, local travel expenses if personal appearance is required and duplication costs;

4. actual wages lost by the officer, director, or employee as a result of time away from work reasonably and necessarily required to take steps in order to correct and repair the results of the **Identity Theft**, including reimbursement for lost paid vacation and personal days used to take such steps;

5. fees and costs charged by an attorney retained by the officer, director, or employee with **Our** approval for purposes of defending any action or removing any judgment or award resulting directly from the **Identity Theft**; and

6. the cost of replacing any personal documents or other materials, including but not limited to passports, driver's licenses and credit and identification cards, which are lost or rendered unusable due directly to the **Identity Theft**.

The aggregate limit of indemnity for this coverage is fifteen thousand dollars ($15,000) for all **Identity Theft Expense** the **Assured** becomes obligated to pay to any and all of its officer, directors and employees due to all **Identity Theft** within the scope of this coverage. No deductible applies to this coverage.

N. **Image Restoration and Counseling (not in addition to the Limit of Liability)**
The **Underwriters** will, subject to the limits of indemnity set forth below, reimburse the **Assured** for **Covered Image Restoration and Counseling Expenses** incurred by the **Assured** as a direct result of **Improper Acts** by any officer, director, or employee of the **Assured** taking place and reported to **Underwriters** during the **Period of Insurance** before.

For purposes of the **Image Restoration and Counseling** coverage set forth above:

**Covered Image Restoration and Counseling Expenses** shall only mean and this coverage shall only apply to the following:

1. The costs of rehabilitation and counseling for the accused officer, director, or employee of the **Assured**, provided the officer, director, or employee is not ultimately found guilty of criminal conduct. No reimbursement of any **Covered Image Restoration and Counseling Expenses** by **Underwriters** to the **Assured** unless and until there has been an acquittal of the officer, director, or employee of the **Assured** accused of committing the **Improper Acts**;

2. The costs charged by a recruiter or expended on advertising for replacement of an officer or director as a result of **Improper Acts** by such officer or director; and

3. The costs of restoring the **Assured's** reputation and public, consumer or client confidence through image consulting.

**Improper Acts** means any criminal, fraudulent, immoral, or scandalous acts or conduct by an officer, director, or employee of the **Assured**, whether or not committed or conducted on behalf of or as part of the business of the **Assured**.

The aggregate limit of indemnity for this coverage is ten thousand dollars ($10,000) for all **Covered Image Restoration and Counseling Expenses** incurred by the **Assured** as a direct result of **Improper Acts** during the **Period of Insurance**. No deductible applies to this coverage.

II. **DEFINITION OF ASSURED**
Each of the following is an **Assured** under this **Insurance** to the extent set forth below:

A. if the **Named Assured** designated in Item 1 of the Declarations is an individual, the person so designated but only with respect to the conduct of a fiduciary practice of which the individual is the sole proprietor;

B. if the **Named Assured** designated in Item 1 of the Declarations is a partnership or Limited Liability Partnership, the partnership or Limited Liability Partnership so designated;

C. any **Fiduciary** who is a partner in the **Named Assured** including any incorporated partners and their shareholders but solely for acts on behalf of the **Named Assured** designated in Item 1 of the Declarations;

D. if the **Named Assured** designated in Item 1 of the Declarations is a corporation, Professional Corporation, Professional Association or Limited Liability Corporation, the corporation, Professional Corporation, Professional Association or Limited

Liability Corporation so designated;

   E. any **Fiduciary** who is a stockholder or member of the corporation, Professional Corporation, Professional Association or Limited Liability Corporation but solely for acts on behalf of such **Named Assured**;

   F. any **Fiduciary** acting as an independent contractor but solely for acts on behalf of the **Named Assured** designated in Item 1 of the Declarations;

   G. any employed **Fiduciary** or other employee or volunteer but solely for acts on behalf of the **Named Assured** designated in Item 1 of the Declarations;

   H. any person who previously qualified as an **Assured** under C, E, F or G above prior to the termination of the required relationship with the **Named Assured**, but solely for acts on behalf of the **Named Assured** designated in Item 1 of the Declarations;

   I. any partnership, Limited Liability Partnership, corporation, Professional Corporation, Professional Association or Limited Liability Corporation, advised in writing to the **Underwriters**, of which the **Named Assured** is the successor;

   J. any **Fiduciary** who during the **Period of Insurance** becomes a partner, member, stockholder or employee of the **Named Assured** but solely for acts on behalf of the **Named Assured** designated in Item 1 of the Declarations;

   K. the estate, heirs, executors, administrators, assigns and legal representatives of any **Assured** in the event of such **Assured's** death, incapacity, insolvency or bankruptcy, but only to the extent that such **Assured** would otherwise be provided coverage under this Insurance.

## III. TERRITORY

This **Insurance** applies to acts, errors or omissions which take place anywhere in the world provided that **Claim** is first made against the **Assured** within the United States of America, its territories or possessions or Canada during the **Period of Insurance** or **Extended Reporting Period** when purchased in accordance with Clause IX.

## IV. EXCLUSIONS

The coverage under this **Insurance** does not apply to **Damages** or **Claims Expenses** incurred with respect:

   A. to any **Claim** arising out of any criminal, dishonest, fraudulent or malicious act, error or omission of any **Assured**, committed with actual, criminal, dishonest, fraudulent or malicious purpose or intent. However, notwithstanding the foregoing, the insurance afforded by this **Policy** shall, subject to the sub-limit of liability specified in section VI.D of the policy, apply to **Claims Expenses** incurred in defending any such **Claim**, but shall not apply to any **Damages** which the **Assured** might become legally obligated to pay as a result of such **Claim**;

   B. to fines, penalties or sanctions, except that if a **Claim** shall have been brought against the **Assured** seeking **Damages** as well as fines, penalties or sanctions, then any coverage which may be afforded by this **Policy** will apply to any **Claims Expenses** incurred, without liability, however, for such fines, penalties or sanctions;

   C. to any **Claim** by one **Assured** under this **Policy** against another **Assured** under this **Policy**;

   D. to any **Claim** arising out of bodily injury to, or sickness, disease or death of any person, or to injury to or destruction of any tangible property, including the loss of use thereof;

       This exclusion shall not however apply to any **Claim**, other than one arising out of an automobile accident or other similar transportation accident, brought against the **Assured** alleging bodily injury to, or sickness, disease or death of any person for whom the **Assured** is or was a court appointed **Fiduciary**, so long as such bodily injury, sickness, disease or death is alleged to have arisen out of the rendering or failure to render **Professional Services** by the **Assured** in the capacity of a **Fiduciary**.

   E. to any loss sustained by an **Assured** as a beneficiary or distributee of any trust or estate;

   F. to any **Claim** arising out of any **Assured's** activities as a trustee, partner, officer, director or employee of any employee trust, charitable organization, corporation, company or business other than that of the **Named Assured** (except where the **Assured** is acting in such capacity by virtue of having been retained to perform **Professional Services** provided that it is notified to **Underwriters** as soon as practicable but no later than within 90 days of such appointment);

   G. to any **Claim** made by or against or in connection with any business enterprise (including the ownership, maintenance or care of any property in connection therewith), not named in Item 1 of the Declarations, which is owned by any **Assured** or in which any **Assured** is a trustee, partner, officer, director or employee (except where the **Assured** is acting in such capacity by virtue of having been retained to perform **Professional Services**), or which is directly or indirectly controlled, operated or managed by any **Assured** in a non-fiduciary capacity;

   H. to any **Claim** or circumstance which might lead to a **Claim** in respect of which any **Assured** has given notice to the insurer of any other policy in force previous to the effective date of this **Policy**;

   I. to any **Claim** arising out of any acts, errors, or omissions which took place prior to the effective date of this **Insurance**, if any **Assured** on the effective date knew or could have reasonably foreseen that such acts, errors or omissions might be expected to be the basis of a **Claim**;

   J. to any **Claim** arising out of any **Assured's** capacity as an elected public official or as an employee of a governmental body, subdivision, or agency thereof unless the **Assured** is deemed an employee solely by virtue of rendering services to such

governmental body, the remuneration for which services inures to the benefit of the **Named Assured**;

K. to any **Claim** arising out of any **Assured's** activities and/or capacity as a Fiduciary under the Employment Retirement Income Security Act of 1974 and its amendment or any regulation or order issued pursuant thereto;

L. to any **Claim** seeking the return or reimbursement of fees, costs, expenses, or expenditures paid to the **Assured**, paid on the **Assured's** behalf, or paid at the direction of the **Assured** pursuant to the **Assured's** role in providing **Professional Services**, including but not limited to any fees, costs, expenses, or expenditures paid from a trust, estate, guardianship, bank account, or other financial instrument under the **Assured's** direction or control;

M. to any **Claim** directly or indirectly brought about by, arising out of, or attributable to any actual or alleged violation of the Racketeer Influenced and Corrupt Organization Act, 18 USC Sections 1961 et seq., or any comparable state law, and any amendments thereto, or any rules or regulations promulgated thereunder;

N. to any **Claim** or circumstance that might lead to a **Claim** arising out of any act, error or omission which took place, or is alleged to have taken place, prior to the retroactive date, if any, as set forth in Item 6 of the Declarations;

O. to any **Claim** arising directly or indirectly out of the **Assured's** activities in any trade, business or profession other than a **Fiduciary**, including without limitation activities as a lawyer, accountant, property manager, nurse or other health care provider, securities broker, mortgage banker, mortgage broker, independent third party escrow agent, real estate and/or construction advisor, real estate and/or property appraiser, real estate and/or property developer, insurance agent or insurance broker, or activities involving property syndication, real estate investment trusts, limited partnerships or similar investments.

> This exclusion shall not, however, apply to any **Claim** arising directly or indirectly out of the **Assured's** performance of **Professional Services** simply because such or similar services could be rendered by a lawyer, accountant, property manager, independent third party escrow agent, nurse or other health care provider.

P. to any **Claim** arising out of any disputes involving an accounting, return or reimbursement of fees, commissions, costs or expenses paid to the **Assured**;

> This exclusion shall not, however, apply to any **Claim** seeking **Damages** based upon an alleged act, error or omission by the **Assured** with respect to an accounting of any estate or trust for which the **Assured** has provided **Professional Services**.

Q. to any **Claim** arising out of any actual or alleged commingling, conversion, misappropriation, defalcation, or inability or failure to collect or safeguard any funds, premium, escrow or tax money or other property for personal profit or advantage;

R. to any **Claim** involving misappropriation of trade secrets, client lists, any proprietary information or anything related thereto; and/or to any **Claim** arising out of the alleged violation of the Securities Act of 1933, the Securities Exchange Act of 1934, and any amendments thereto, or any related state Blue Sky law or regulation;

S. to any **Claim** arising out of the sale or purchase of insurance, or the failure to effect or maintain adequate levels or types of insurance;

> This exclusion shall not, however, apply to any **Claim** brought against the **Assured** where such **Claim** arises out of:
>
> 1. failure by the **Assured** to determine the scope or existence of insurance coverage for any estate property within 90-days of the **Assured's** first appointment as **Fiduciary** of such estate;
>
> 2. failure by the **Assured** to identify property included within an estate after having conducted a diligent search and inventory of the estate within 90-days of the **Assured's** first appointment as **Fiduciary** of such estate; or
>
> 3. a negligent clerical act, error or omission by or on behalf of the **Assured** in failing to make timely premium payments or otherwise respond to insurance carrier coverage requests to provide documentation and/or information;
>
> 4. any act, error or omission of the **Assured** while acting as a trustee under a life insurance trust.

T. to any **Claim** arising out of the **Assured's** services involving investment advice;

> This exclusion shall not, however, apply to any **Claim** brought against the **Assured** based upon the **Assured's** alleged negligent retention of a particular investment advisor so long as prior to any such **Claim** being made, the **Assured** had conducted a background check on such investment advisor and had instructed the advisor to develop and implement an investment plan based on the "prudent investor" strategy as set forth for in the Uniform Prudent Investor Act or other similar legislation.

U. to any **Claim** arising directly or indirectly out of any depreciation or loss of investment when such depreciation or loss arises from fluctuations in any financial stock or commodity or other markets;

V. to any **Claim** arising directly or indirectly out of any express or implied warranty or guarantee relating to the financial return of any investment or portfolio of investments;

W. to any **Claim** alleging, arising out of, based upon, attributable to, or in consequence of any actual or alleged liability of any

**Assured** under any express contract or agreement.

This exclusion shall not however apply to liability for damages that the **Assured** would have in the absence of the contract or agreement.

X. to any loss, cost or expense, directly or indirectly arising out of, resulting as a consequence of, or related to the manufacture, mining, processing, distribution, testing, remediation, removal, storage, disposal, sale, use of, or exposure to asbestos or materials or products containing asbestos, whether or not there is another cause of loss which may have contributed concurrently or in any sequence to a loss;

This exclusion shall not however apply to any **Claim** brought against the **Assured** arising out of the provision of **Professional Services**.

Y. to any loss, costs, or expenses, directly or indirectly arising out of, resulting from or in any manner related to "Fungi" whether or not there is another cause of loss which may have contributed concurrently or in any sequence to a loss.

"Fungi" as utilised herein shall mean any fungus or mycota or any by-product or type of infestation produced by such fungus or mycota, but not limited to mold, mildew, mycotoxins, spores or any biogenic aerosols.

This exclusion shall not however apply to any **Claim** brought against the **Assured** arising out of the provision of **Professional Services**.

Z. any **Claim** arising from the intentional release or disclosure of **Confidential Information** by the **Assured** which is alleged to be in violation of any statute, regulation, ethical rule, court or arbitral order, confidentiality agreement, or any other provision of this **Policy**.

AA. any **Claim** arising from the **Assured's** intentional transmittal of a virus or other electronic infection.

AB. the costs of repairing, replacing, or modifying the **Assured's Data Security System** or clearing the **Assured's Data Security System** of viruses and electronic infections, either preventatively or in response to a **Data Security Breach**, **Client Network Infections**, and/or **Claim** against the **Assured**.

AC. any **Data Security Breach** or **Client Network Infection** occasioned by acts of God, war, riot, civil commotion, insurrection or usurpation of governmental power.

AD. any **Data Security Breach** or **Client Network Infection** brought about by reason of any governmental authority seizing or gaining access to the **Assured's** computer or **Data Security System**.

AE. any proceedings initiated against the **Assured** before a governmental agency in connection with a **Data Security Breach** or **Client Network Infection**, including any audit or other investigation by such governmental agency.

AF. any **Claim** made by a client of the **Assured** arising out of the transmittal of a computer virus or other electronic infection from that same client's computer network to the **Assured's Data Security System**.

AG. any **Claim** arising out of **Social Engineering Fraud**; however, this exclusion shall not apply up to the aggregate sublimit of fifty thousand dollars ($50,000) for all **Claims** for **Social Engineering Fraud** solely arising out of the rendering of **Professional Services** by the **Assured**.

## V. DEFINITIONS

- "**Bookkeeper**" means one who performs the mechanical recording of debits and credits or the summarizing of financial information for others for a fee.

- "**Care Manager**" means one who provides the following services to others for a fee:
    1. coordinating assistance from paid service providers and/or unpaid help from family and friends to enable individuals with functional limitations to obtain the highest level of independence consistent with their capacity and preferences for care;

    2. face-to-face interviewing of individuals with functional limitations;

    3. assessment of functional limitations;

    4. care plan development for individuals with functional limitations;

    5. administrative and clerical aspects of care plan implementation and monitoring of individuals with functional limitations.

    The services performed by a **Care Manager** do not include:
    1. providing actual health care services directly; or

    2. performing any services in any trade, business or profession other than a **Care Manager**, including without limitation activities as a nurse or other health care provider.

- "**Claim**" means a demand received by any **Assured** for money or services outside the **Ordinary Course of Business** including the service of suit or institution of arbitration proceedings against the **Assured**.

- "**Claims Expenses**" means:
    1. fees charged by an attorney designated by **Underwriters** and consented to by the **Named Assured**, with such consent

not to be unreasonably withheld; and

    2. all other fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a **Claim**, suit or proceeding arising in connection therewith, if incurred by the **Underwriters**, or by the **Assured** with the written consent of the **Underwriters**.

    3. **Claims Expenses** does not include any costs incurred in the **Ordinary Course of Business**, nor any salary, overhead or other charges incurred by the **Assured** for time spent in cooperating in the defense and investigation of any **Claim** or circumstance which might lead to a **Claim** notified under this **Insurance**.

    4. **Claims Expenses** also does not include any fees, costs, expenses or other charges incurred by the **Assured** -- or incurred for or on behalf of the **Assured** -- if such fees, costs, expenses or other charges are payable or reimbursable by any other sources, including but not limited to any applicable trust or estate.

- "**Client Network Infection**" means the actual diagnosed transmittal from the **Assured's Data Security System** to the computer system of a client for whom the **Assured** is performing **Professional Services** of a computer virus or other electronic infection which causes damage to the client's computer or computer network or disrupts the client's business.

- "**Computer Consultant**" means one who provides to others for a fee advice, implementation, support and management of computer based information systems consisting of pre-packaged (not custom) locally-installed software or remote internet-based applications, as well as personal computer hardware together with associated peripheral devices, all in conjunction with other **Professional Services** aside from those rendered as a **Computer Consultant**.

- "**Confidential Information**" means personal and/or financial information of a sensitive nature including but not limited to account numbers, account balances, financial statements, tax returns, social security numbers, and medical and/or healthcare information protected by HIPAA.

- "**Daily Money Manager**" means one who provides any of the following services to others for a fee.
  1. paying bills;
  2. preparing budgets;
  3. reconciling accounts;
  4. making bank deposits
  5. balancing check books;
  6. preparing checks for signature;
  7. organizing or reviewing incoming correspondence and/or other miscellaneous documents;
  8. organizing tax records or other similar financial documents; or
  9. tracking/monitoring payments to creditors, insurance companies or medical providers.

The services performed by a "**Daily Money Manager**" do not include:
  1. incurring debt on behalf of a client;
  2. performing any services on behalf of a person adjudged to be legally incompetent;
  3. signing checks drawn on a client's account or otherwise withdrawing or transferring funds from a client's account other than to pay bills on behalf of a client pursuant to an express client directive or invoice received in the regular course of business;
  4. performing any services in any trade, business or profession other than a **Daily Money Manager**, including without limitation activities as a lawyer, accountant, property manager, nurse or other health care provider, securities broker, mortgage banker, mortgage broker, independent third party escrow agent, real estate and/or construction advisor, real estate and/or property appraiser, real estate and/or property developer, insurance agent or insurance broker, or activities involving property syndication, real estate investment trusts, limited partnerships or similar investments; or
  5. consultation or training in connection with customized financial software.

- "**Damages**" means a monetary judgment, award or settlement, and shall include:
  1. compensatory damages;
  2. damages calculated as a multiple of compensatory damages (where insurable by law);
  3. punitive or exemplary damages (where insurable by law);
  4. pre-judgment interest; and
  5. post-judgment interest that accrues after entry of judgment and before we have paid, offered to pay or deposited in court that part of judgment within the applicable **Limit of Liability**.

However, **Damages** shall not include any amounts for which the **Assured** is not financially liable or for which there is no legal recourse against the **Assured**, the costs and expenses of complying with any injunctive or other form of equitable relief, the

reimbursement of fees, the payment or sanctions, surcharges or any other matters that may be deemed uninsurable under the law.

- "**Data Security Breach**" means the actual breach, violation, unauthorized interception, unauthorized use, or misuse by any person not employed by, an agent of, or otherwise affiliated with or authorized by the **Assured**, of any **Data Security System** maintained by the **Assured** for the purpose of maintaining **Confidential Information** concerning the **Assured's** clients in the course of the **Assured's** provision of **Professional Services**.

- "**Data Security System**" means the **Assured's** computer system and/or computerized network utilized by the **Assured** to store and/or retrieve **Confidential Information** concerning the **Assured's** clients in connection with the **Assured's** rendering of **Professional Services**.

- "**Extended Reporting Period**", if applicable, means the 12 month period of time after the end of the **Period of Insurance** for reporting **Claims** arising out of acts, errors or omissions which take place prior to the end of the **Period of Insurance** and otherwise covered by this Insurance.

- "**Fiduciary**" means an **Assured's** capacity as:
  1. a guardian, guardian ad litem, or conservator;

  2. an executor or estate administrator;

  3. a bankruptcy administrator;

  4. a representative payee;

  5. a receiver;

  6. an agent or attorney in fact, serving alone without any co-agent, under a written power of attorney for the person or estate of a natural person, not a commercial or charitable entity; or

  7. a trustee, serving alone without any co-trustee, or trust administrator under trusts created by written trust agreement or court order with respect to the estate of natural persons, not commercial or charitable entities (although trust assets may include ownership interests in such entities).

  **Fiduciary** does not mean an **Assured's** capacity, nor activities as a lawyer, accountant, property manager, nurse or other health care provider, securities broker, mortgage banker, mortgage broker, independent third party escrow agent, real estate and/or construction advisor, real estate and/or property appraiser, real estate and/or property developer, insurance agent or insurance broker, or activities involving property syndication, real estate investment trusts, limited partnerships or similar investments.

- "**Limit of Liability**" means the maximum amount for which **Underwriters** will be liable as provided herein.

- "**Ordinary Course of Business**" means the usual, routine or customary services, practices and procedures of an **Assured** in rendering **Professional Services**, including but not limited to the production of, revision or supplement to an accounting, financial statement, invoice or other similar report or document.

- "**Period of Insurance**" means the period of time between the inception date shown in the Declarations and the effective date of termination, expiration or cancellation of this **Insurance** and specifically excludes any **Extended Reporting Period** hereunder.

- "**Personal Injury**" means:
  1. false arrest, detention or imprisonment, wrongful entry or eviction or other invasion of the right of private occupance, or malicious prosecution; and/or

  2. libel or slander or other defamatory or disparaging material, or a publication or an utterance in violation of an individual's right of privacy.

- "**Professional Services**" means services provided by an **Assured** to others for a fee, unless acting as a volunteer or in an official pro bono capacity, on behalf of the **Named Assured** in any of the following capacities:
  - **Fiduciary**

  - **Daily Money Manager**

  - **Computer Consultant**

  - **Care Manager**

  - **Bookkeeper**

- "**Social Engineering Fraud**" means the fraudulent, deceptive, or intentional practice of causing others, by means of hacking, phishing, spear phishing, smishing, spoofing, business e-mail compromise, or other similar electronic, telephonic, or other schemes, devices, or ploys seeking to impersonate legitimate persons or entities or influence transactions, to transmit funds or other assets of value electronically or otherwise to persons, entities, or accounts that are not the recipients intended to receive the funds or assets.

- "**Underwriters**" means those certain underwriters at Lloyd's of London subscribed to the **Insurance** afforded hereby.

Whenever the singular form of a word is used herein, the same shall include the plural when required by the context.

VI. **LIMIT OF LIABILITY**

A. The **Limit of Liability** stated in the Declarations as "per Claim" is the limit of the **Underwriters**' liability for all **Damages** and **Claims Expenses** arising out of the same, related or continuing **Professional Services** without regard to the number of **Assureds**, **Claims** or claimants.

B. The **Limit of Liability** stated in the Declarations as "Aggregate" is the total limit of the **Underwriters**' liability for all **Damages** and **Claims Expenses** arising out of **Claims** or circumstances which might lead to a **Claim** first made and reported to the **Underwriters** during the **Period of Insurance** or during the **Extended Reporting Period** and **Claims** arising out of the same, related or continuing **Professional Services** as such **Claims** or circumstances which might lead to a **Claim**.

C. The **Limit of Liability** for the **Extended Reporting Period** shall be part of, and not in addition to, the **Limits of Liability** of the **Underwriters** for the **Period of Insurance**.

D. In the event that **Underwriters** agree to pay **Claims Expenses** solely pursuant to the defense provision contained in section IV.A of this **Policy**, the applicable per **Claim** limit of **Underwriters**' liability for all **Claims Expenses** arising out of the same, related or continuing **Professional Services** without regard to the number of **Assureds**, **Claims** or claimants shall be twenty-five percent (25%) of the **Limit of Liability** denoted in the Declarations as "per Claim".

E. If both **Damages** covered by this **Insurance** and damages not covered by this **Insurance** are incurred, either because a **Claim** against any **Assured** includes both covered and uncovered matters or because a **Claim** is made against both **Assureds** and others, the **Assured** and **Underwriters** shall use their best efforts to agree upon a fair and proper allocation of such amount between covered **Damages** and **Claims Expenses** and uncovered portions of damages, settlements, judgments and/or claims expenses.

F. Notwithstanding Section VI. E above, **Underwriters**, at their sole discretion, have the right and the option to pay for non-covered damages, settlements, judgments and/or claims expenses, in which event the **Assured** agrees to repay **Underwriters** for any amounts so paid.

G. Additionally, notwithstanding Section VI. E above, any **Damages** or **Claims Expenses** payments made by **Underwriters** shall be repaid to **Underwriters** by the **Assured** in the event and to the extent that the **Assured** shall not be entitled under the terms and conditions of this **Insurance** to payment of such **Damages** or **Claims Expenses**.

H. The **Limit of Liability** stated in the Declarations as "per Claim" for **Data Security Breach** and **Client Network Infection** coverage is the limit of **Underwriters'** liability for all **Damages** and **Claims Expenses** arising out of such exposures without regard to the number of **Assureds**, **Claims** or claimants.

I. The **Limit of Liability** stated in the Declarations as "Aggregate" for **Data Security Breach** and **Client Network Infection** coverage is the total limit of **Underwriters'** liability for all **Damages** and **Claims Expenses** arising out of such **Claims** or circumstances which might lead to such a **Claim** first made and reported to **Underwriters** during the **Period of Insurance** or during the **Extended Reporting Period**.

J. The Aggregate **Limit of Liability** for all coverages indicated in the Declarations is the most **Underwriters'** will pay in the aggregate for all amounts payable by **Underwriters'** for all coverages afforded under this **Policy**.

VII. **DEDUCTIBLE**

The **Deductible** amount stated in the Declarations, shall be satisfied by payments by the **Assured** of **Damages** and **Claims Expenses** resulting from each **Claim** first made and reported to the **Underwriters** during the **Period of Insurance** and the **Extended Reporting Period** as a condition precedent to the payment by the **Underwriters** of any amounts hereunder and the **Underwriters** shall be liable only for amounts in excess of such **Deductible** subject to **Underwriters'** total liability not exceeding the limit set forth in Item 3 of the Declarations. The **Assured** shall make direct payments within the **Deductible** to appropriate other parties designated by the **Underwriters**.

If the **Assured**, at **Underwriters'** written request, submits a **Claim** to alternative dispute resolution in accordance with the rules of the American Arbitration Association or the Defense Research Institute, and such **Claim** is settled through this process, the **Deductible** obligation stated in the Declarations shall be deemed to be fifty percent (50%).

VIII. **INNOCENT ASSURED**

A. Whenever coverage under this **Insurance** would be excluded, suspended or lost:

1. because of any exclusion relating to criminal, dishonest, fraudulent or malicious acts, errors or omissions by any **Assured**, and with respect to which any other **Assured** did not personally participate or personally acquiesce or remain passive after having personal knowledge thereof, or

2. because of non-compliance with Clause XI Notice of **Claim** or Circumstance that may lead to a **Claim**, with respect to which any other **Assured** shall be in default solely because of the failure to give such notice or concealment of such failure by one or more **Assureds** responsible for the loss or damage otherwise insured hereunder,

the **Underwriters** agree that such insurance as would otherwise be afforded under this **Policy** shall cover and be paid with respect to those **Assureds** who did not personally commit or personally participate in committing or personally acquiesce in or remain passive after having personal knowledge of (a) one or more of the acts, errors or omissions described in any such exclusion; or (b) such failure to give notice, provided that if the condition be one with which such **Assured** can comply, after receiving knowledge thereof, the **Assured** entitled to the benefit of Clause VIII shall comply with such condition promptly after obtaining knowledge of the failure of any other **Assured** hereunder to comply therewith.

B. With respect to this provision, the **Underwriters'** obligation to pay in such event shall be in excess of the **Deductible** and in excess of the full extent of any assets of any **Assured** to whom the exclusion applies. Coverage under this **Innocent Assured** section shall only apply to **Claims** not otherwise subject to coverage under any crime endorsement offered to the **Named Assured** by **Underwriters**, whether purchased or not. In no event shall the **Underwriters'** obligation to pay exceed the **Limit of Liability** stated in Item 3 of the Declarations. Additionally, in no event shall the **Underwriters'** obligation to pay **Claim Expenses** exceed the **Limit of Liability** stated in Clause VI.D of the **Policy**.

## IX. EXTENDED REPORTING PERIOD

A. Extended Reporting Period **Options**

1. **Automatic** Extended Reporting Period

If **Underwriters** or the **Assured** shall cancel or elect not to renew this policy, the **Named Assured** designated in Item 1 of the Declarations shall have the right following the effective date of such cancellation or non-renewal to a period of sixty (60) days (herein referred to as the "Automatic **Extended Reporting Period**") in which to give written notice to **Underwriters** of **Claims** first made against the **Assured** during the Automatic **Extended Reporting Period** for any wrongful act occurring prior to the end of the policy period and otherwise covered by this **Policy**. The Automatic **Extended Reporting Period** shall not apply to **Claims** that are covered under any subsequent insurance you purchase or which is purchased for the **Assured's** benefit, or that would be covered by such subsequent insurance but for: (1) the exhaustion of the amount of insurance applicable to such **Claims**; or (2) any applicable retention or deductible.

2. **Optional** Extended Reporting Period

In the event of cancellation or non-renewal of this **Insurance** by **Underwriters** or the **Assured**, the **Named Assured** designated in Item 1 of the Declarations shall have the right, upon payment in full and not proportionally or otherwise in part of one hundred percent (100%) of the Premium set forth in Item 5 of the Declarations to have issued an endorsement providing a 12 month **Extended Reporting Period** for **Claims** first made against any **Assured** and reported to the **Underwriters** during the **Extended Reporting Period**, subject to the conditions set forth in the definition of **Extended Reporting Period** herein.

3. **Optional Retirement** Extended Reporting Period

In the event of non-renewal of this **Insurance** because of retirement (where the **Named Assured** permanently ceases to render **Professional Services**) by the **Named Assured** designated in Item 1 of the Declarations, provided that the **Named Assured** is a sole practitioner, the **Named Assured** shall have the right to have issued an endorsement providing a 12 months **Extended Reporting Period** for **Claims** first made against any **Assured** and reported to the **Underwriters** during the **Extended Reporting Period**, subject to the conditions set forth in the definition of **Extended Reporting Period** herein.

The calculation of the additional Premium for the **Extended Reporting Period** endorsement shall be according to the following table:

- For **Assureds** who have purchased insurance coverage under this program for a period of three consecutive years or less -- an additional premium of one hundred percent (100%) of the expiring annual policy premium.

- For **Assureds** who have purchased insurance coverage under this program for a period of four consecutive years -- an additional premium of ninety percent (90%) of the expiring annual policy premium.

- For **Assureds** who have purchased insurance coverage under this program for a period of five consecutive years -- an additional premium of eighty percent (80%) of the expiring annual policy premium.

- For **Assureds** who have purchased insurance coverage under this program for a period of six consecutive years -- an additional premium of seventy percent (70%) of the expiring annual policy premium.

- For **Assureds** who have purchased insurance coverage under this program for a period of seven consecutive years -- an additional premium of sixty percent (60%) of the expiring annual policy premium.

- For **Assureds** who have purchased insurance coverage under this program for a period of eight or more consecutive years -- an additional premium of fifty percent (50%) of the expiring annual policy premium.

B. In order for the **Named Assured** to invoke the Extended Reporting option, the payment of the premium for the **Extended Reporting Period** must be paid to **Underwriters** within 30 days of the non-renewal or cancellation.

C. The **Limit of Liability** for the **Extended Reporting Period** shall be part of, and not in addition to, the **Limits of Liability** of the **Underwriters** for the **Period of Insurance**.

D. The quotation by **Underwriters** of a different premium or deductible or limits of liability or changes in policy language for the purpose of renewal shall not constitute a refusal to renew by the **Underwriters**.

E. The right to the **Extended Reporting Period** shall not be available to the **Named Assured** where cancellation or non-renewal by the **Underwriters** is due to non-payment of premium or failure of an **Assured** to pay such amounts in excess of the applicable **Limit of Liability** or within the amount of the applicable **Deductible**.

F. All notices and premium payments with respect to the Extended Reporting option shall be directed to **Underwriters** through the entity named in Item 9 of the Declarations.

G. At the commencement of the **Extended Reporting Period** the entire premium shall be deemed earned, and in the event the **Named Assured** terminates the **Extended Reporting Period** for any reason prior to its natural expiration, **Underwriters** will not

be liable to return any premium paid for the **Extended Reporting Period**.

X. **OTHER INSURANCE**

This insurance shall apply in excess of any other valid and collectible insurance available to any **Assured**, unless such other insurance is a surety bond or is written only as specific excess insurance over the **Limit of Liability** of this Policy.

XI. **NOTICE OF CLAIM, OR CIRCUMSTANCE THAT MAY LEAD TO A CLAIM**

    A. If any **Claim** is made against the **Assured**, the **Assured** shall immediately forward to **Underwriters** through persons named in Item 7 of the Declarations every demand, notice, summons or other process received by him or his representative.

    B. If during the **Period of Insurance** the **Assured** first becomes aware of any act, error or omission that could reasonably be the basis for a **Claim** it must give written notice to **Underwriters** through persons named in Item 7 of the Declarations as soon as practicable during the **Period of Insurance** of:

        1. the specific act, error or omission; and

        2. the injury or damage which may result or has resulted from the act, error or omission; and

        3. the circumstance by which the **Assured** first became aware of the act, error or omission.

    Any subsequent **Claim** made against the **Assured** which is the subject of the written notice shall be deemed to have been made at the time written notice was first given to **Underwriters**.

    C. In the event the **Assured** becomes aware of a **Data Security Breach** or **Client Network Infection**, the **Assured** shall promptly notify **Underwriters**, through persons named in Item 7 of the Declarations, of such occurrence regardless of whether a **Claim** has been made against the **Assured**.

    D. With respect to any actual or potential **Data Security Breach** or **Client Network Infection Claim**, the **Assured** consents to **Underwriters** engaging, at their own expense, a computer forensics specialist or security specialist to investigate the circumstances surrounding the **Claim**, and the **Assured** agrees to cooperate fully with any such specialist.

    E. A **Claim** shall be considered to be reported to the **Underwriters** when notice is first given to **Underwriters** through persons named in Item 7 of the Declarations of the **Claim** or of an act, error or omission which could reasonably be expected to give rise to a **Claim**.

    F. All **Claims** arising out of the same, continuing or related **Professional Services** shall be considered a single **Claim** and deemed to have been made at the time the first of the related **Claims** is reported to **Underwriters** and shall be subject to one **Limit of Liability**.

    G. In the event of non-renewal of this **Insurance** by the **Underwriters**, the **Assured** shall have sixty (60) days from the expiration date of the **Period of Insurance** to notify **Underwriters** of **Claims** made against the **Assured** during the **Period of Insurance** which arises out of any act, error or omission which took place prior to the termination date of the **Period of Insurance** and otherwise covered by this Insurance.

    H. If any **Assured** shall make any **Claim** under this **Policy** knowing such **Claim** to be false or fraudulent, as regards amount or otherwise, this **Policy** shall become null and void and all coverage hereunder shall be forfeited.

XII. **ASSISTANCE AND COOPERATION OF THE ASSURED**

The **Assured** shall co-operate with the **Underwriters** in all investigations, including investigations regarding the application and coverage under this **Insurance** and, upon the **Underwriters**' request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization other than an employee of any **Assured** who may be liable to the **Assured** because of acts, errors or omissions with respect to which insurance is afforded under this **Policy**; and the **Assured** shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The **Assured** shall not, except at his own cost, admit liability, make any payment, assume any obligation, incur any expense, enter into any settlement, stipulate to any judgment or award or otherwise dispose of any **Claim** without the consent of the **Underwriters**.

XIII. **ACTION AGAINST UNDERWRITERS**

No action shall lie against the **Underwriters** unless, as a condition precedent thereto, there shall have been full compliance with all terms of this **Insurance**, nor until the amount of the **Assured's** obligation to pay shall have been finally determined either by judgment or award against the **Assured** after actual trial or arbitration or by written agreement of the **Assured**, the claimant and the **Underwriters**.

Any person or organization or the legal representative thereof who has secured such judgment, award or written agreement shall thereafter be entitled to make a **Claim** under this **Policy** to the extent of the insurance afforded by this **Policy**. No person or organization shall have any right under this **Insurance** to join the **Underwriters** as a party to an action or other proceeding against the **Assured** to determine the **Assured's** liability, nor shall the **Underwriters** be impleaded by the **Assured** or his legal representative. Bankruptcy or insolvency of the **Assured** or of the **Assured's** estate shall not relieve the **Underwriters** of any of their obligations hereunder.

XIV. **SUBROGATION**

In the event of any payment under this **Insurance**, the **Underwriters** shall be subrogated to all the **Assured's** rights of recovery therefor against any person or entity and the **Assured** shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The **Assured** shall do nothing after the payment of **Damages** by **Underwriters** to prejudice such rights.

XV. **CHANGES**

Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this

**Insurance** or estop the **Underwriters** from asserting any right under the terms of this **Insurance**, nor shall the terms of this **Insurance** be waived or changed, except by endorsement issued to form a part of this **Insurance**, signed by **Underwriters**.

XVI. **CHANGE IN MEMBERSHIP OF FIRM**

Any additions to the list of **Fiduciaries** in the application which take place during the **Period of Insurance** must be immediately reported to **Underwriters** in the event that:

    A. the total number of new **Fiduciaries** brought into or added to the firm during the **Period of Insurance** increases the number of **Fiduciaries** as stated in the application for coverage by 5 persons or 10% of the total number of **Fiduciaries** listed in the application, whichever amount is greater; or

    B. any **Fiduciary** brought into or added to the firm during the **Period of Insurance** had been or was in the process of being reprimanded or censured by any court or association body or disqualified or prohibited from practicing in a specified area of **Professional Services**; or

    C. prior to joining the firm, any **Claim** had been made against the **Fiduciary** or the **Fiduciary** had become aware of circumstances that might lead to a **Claim**.

**Underwriters** expressly reserve the right to demand a premium adjustment in the event that any additions to the list of **Fiduciaries** in the application for this **Insurance** meet the criteria set forth in the paragraphs immediately above.

XVII. **MERGERS AND ACQUISITIONS**

The **Named Assured** shall be required to give written notice to the **Underwriters** prior to the completion of a merger or acquisition by or of the **Named Assured** and **Underwriters** expressly reserve the right to demand a premium adjustment if this **Insurance** is to remain in force subsequent to any merger or acquisition.

XVIII. **ASSIGNMENT**

The interest hereunder of any **Assured** is not assignable. If the **Assured** shall die or be adjudged incompetent, this **Insurance** shall cover the **Assured's** legal representative as the **Assured** with respect to liability previously incurred and covered by this Insurance.

XIX. **CANCELLATION**

    A. This **Policy** may be canceled by the **Named Assured** by surrender thereof to **Underwriters** or by mailing to **Underwriters** written notice stating when thereafter the cancellation shall be effective. This **Insurance** may be canceled by the **Underwriters** by mailing to the **Named Assured** at the address shown in the Declarations written notice stating when not less than 60 days thereafter such cancellation shall be effective. However, if the **Underwriters** cancel this **Insurance** because the **Assured** has failed to pay a premium when due this **Insurance** may be canceled by the **Underwriters** by mailing a written notice of cancellation to the **Named Assured** at the address shown in the Declarations stating when not less than 10 days thereafter such cancellation shall be effective. The mailing of notice as aforesaid shall be sufficient proof of notice. The time of surrender or the effective date and hour of cancellation stated in the notice shall become the end of the **Period of Insurance**. Delivery (where permitted by law) of such written notice either by the **Named Assured** or by the **Underwriters** shall be equivalent to mailing.

    B. If the **Named Assured** cancels this **Insurance**, earned premium shall be computed in accordance with the attached short rate table and procedure. If the **Underwriters** cancel this **Insurance**, earned premium shall be computed pro rata. Premium adjustment may be made either at the time cancellation is effected or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

XX. **ENTIRE CONTRACT**

By acceptance of this **Policy** the **Assured** agrees that the statements in the Declarations and application are his agreements and representations, that this **Insurance** is issued in reliance upon the truth of such representations and that this **Policy** embodies all agreements existing between the **Assured** and the **Underwriters** relating to this Insurance.

XXI. **NUCLEAR INCIDENT EXCLUSION CLAUSE - LIABILTIY - DIRECT**

This **Policy** does not apply:

    A. Under any liability coverage, to injury, sickness, disease, death or destruction:

        1. with respect to which an **Assured** under the **Policy** is also an **Assured** under a nuclear energy liability policy issued by Nuclear Energy Liability **Insurance** Association, Mutual Atomic Energy Liability **Underwriters** or Nuclear **Insurance** Association of Canada, or would be an **Assured** under any such policy but for its termination upon exhaustion of its **Limit of Liability**; or

        2. resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the **Assured** is, or had this **Policy** not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

    B. Under any medical payments coverage, or under any supplementary payments provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

    C. Under any liability coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if:

        1. the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an **Assured** or (2) has been discharged or dispersed therefrom;

2. the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an **Assured**; or

3. the injury, sickness, disease, death or destruction arises out of the furnishing by an **Assured** of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion 3 applies only to injury to or destruction of property at such nuclear facility.

D. As used in this Clause (XXI):

"hazardous properties" include radioactive, toxic or explosive properties; "nuclear material" means source material, special nuclear material or by-product material; "source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act 1954 or in any law amendatory thereof; "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor; "waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph 1 or 2 thereof; "nuclear facility" means:

1. any nuclear reactor,

2. any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

3. any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the **Assured** at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

4. any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste, and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material. With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this clause is subject to the terms, exclusions, conditions and limitations of the **Policy** of which it is a part.

In relation to liability arising outside the USA, its Territories or Possessions, Puerto Rico or the Canal Zone, the **Policy** does not cover any liability of whatsoever nature directly or indirectly caused by or contributed to by or arising from ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel.

## XXII. **SERVICE OF SUIT**

A. It is agreed that in the event of the failure of the **Underwriters** to pay any amount claimed to be due under this **Insurance**, the **Underwriters**, at the request of the **Named Assured**, will submit to the jurisdiction of a court of competent jurisdiction within the United States. This clause does not constitute and should not be understood to constitute an agreement by **Underwriters** that an action is properly maintained in a specific forum, nor may it be construed as a waiver of the **Underwriters**' rights to commence an action in a court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any State of the United States, all of which rights the **Underwriters** expressly reserve. It is further agreed that service of process in such suit may be made upon the persons named in Item 8 of the Declarations and that in any suit instituted against any one of them upon this policy the **Underwriters** will abide by the final decision of such court or of any Appellate Court in the event of an appeal.

B. The persons named in Item 8 of the Declarations are authorized and directed to accept service of process on behalf of the **Underwriters** in any such suit and/or upon the request of the **Named Assured** to give written undertaking to the **Named Assured** that they will enter a general appearance upon **Underwriters**' behalf in the event such a suit shall be instituted. Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, **Underwriters** hereon hereby designate the Superintendent, Commissioner or Director of **Insurance** or other officer specified for that purpose in the statute or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the **Named Assured** or any beneficiary hereunder arising out of this policy of insurance, and hereby designate the persons named in Item 8 of the Declarations as the persons to whom the said officer is authorized to mail such process or a true copy thereof.

## XXIII. **SHORT RATE CANCELLATION TABLE**

Notwithstanding anything to the contrary contained herein and in consideration of the premium for which this **Insurance** is written it is agreed that in the event of cancellation thereof by the **Assured** the Earned Premium shall be computed as follows:

A. For insurance written for one year:

| Days In Force | % | Days In Force | % | Days In Force | % | Days In Force | % |
|---|---|---|---|---|---|---|---|
| 1 | 5 | 66-69 | 29 | 154-156 | 53 | 256-260 | 77 |
| 2 | 6 | 70-73 | 30 | 157-160 | 54 | 261-264 | 78 |
| 3-4 | 7 | 74-76 | 31 | 161-164 | 55 | 265-269 | 79 |
| 5-6 | 8 | 77-80 | 32 | 165-167 | 56 | 270-273 (9 months) | 80 |
| 7-8 | 9 | 81-83 | 33 | 168-171 | 57 | 274-278 | 81 |

| Days | % | Days | % | Days | % | Days | % | Days | % |
|---|---|---|---|---|---|---|---|---|---|
| 9-10 | 10 | 84-87 | 34 | 172-175 | 58 | 279-282 | 82 | | |
| 11-12 | 11 | 88-91 (3 months) | 35 | 176-178 | 59 | 283-287 | 83 | | |
| 13-14 | 12 | 92-94 | 36 | 179-182 (6 months) | 60 | 288-291 | 84 | | |
| 15-16 | 13 | 95-98 | 37 | 183-187 | 61 | 292-296 | 85 | | |
| 17-18 | 14 | 99-102 | 38 | 188-191 | 62 | 297-301 | 86 | | |
| 19-20 | 15 | 103-105 | 39 | 192-196 | 63 | 302-305 (10 months) | 87 | | |
| 21-22 | 16 | 106-109 | 40 | 197-200 | 64 | 306-310 | 88 | | |
| 23-25 | 17 | 110-113 | 41 | 201-205 | 65 | 311-314 | 89 | | |
| 26-29 | 18 | 114-116 | 42 | 206-209 | 66 | 315-319 | 90 | | |
| 30-32 (1 month) | 19 | 117-120 | 43 | 210-214 (7 months) | 67 | 320-323 | 91 | | |
| 33-36 | 20 | 121-124 (4 months) | 44 | 215-218 | 68 | 324-328 | 92 | | |
| 37-40 | 21 | 125-127 | 45 | 219-223 | 69 | 329-332 | 93 | | |
| 41-43 | 22 | 128-131 | 46 | 224-228 | 70 | 333-337 (11 months) | 94 | | |
| 44-47 | 23 | 132-135 | 47 | 229-232 | 71 | 338-342 | 95 | | |
| 48-51 | 24 | 136-138 | 48 | 233-237 | 72 | 343-346 | 96 | | |
| 52-54 | 25 | 139-142 | 49 | 238-241 | 73 | 347-351 | 97 | | |
| 55-58 | 26 | 143-146 | 50 | 242-246 (8 months) | 74 | 352-355 | 98 | | |
| 59-62 (2 months) | 27 | 147-149 | 51 | 247-250 | 75 | 356-360 | 99 | | |
| 63-65 | 28 | 150-153 (5 months) | 52 | 251-255 | 76 | 361-365 (12 months) | 100 | | |

% = Percentage of annual premium deemed earned

B. For insurances written for more or less than one year:

1. If insurance has been in force for 12 months or less, apply the standard short rate table for annual insurances to the full annual premium determined as for an insurance written for a term of one year.

2. If insurance has been in force for more than 12 months:

    a. Determine full annual premium as for an insurance written for a term of one year.

    b. Deduct such premium from the full insurance premium, and on the remainder calculate the pro rata Earned Premium on the basis of the ratio of the length of time beyond one year the insurance has been in force to the length of time beyond one year for which the insurance was originally written.

    c. Add premium produced in accordance with items a and b to obtain Earned Premium during full period insurance has been in force.

FPL Policy Form (02/18)

Dominion Insurance Services Inc. © 2018 | All Rights Reserved.



370 Park Street, Suite 8, Moraga CA. 94556
341 S. Main, Suite 100, Alpine UT. 84004
888.313.9977(t) ~ 925.313.9978(f)
info@dominioninsurance.com
dominion-insurance.com

# GENERAL LIABILITY COVERAGE ENDORSEMENT

This endorsement modifies insurance provided under the above referenced policy.

In consideration of the premium paid, and subject to the terms and conditions of the **Policy** not otherwise modified herein, it is hereby understood and agreed that:

1. Clause I. Insuring Clauses is amended to include the following:

   O. **General Liability Coverage**

   To pay on behalf of any **Assured Damages** and **Claims Expenses**, in excess of the "per Claim" **Deductible**, which the **Assured** shall become legally obligated to pay because of any **Claim** first made against any **Assured** and reported in writing to the **Underwriters** during the **Period of Insurance** or **Extended Reporting Period** (if applicable) arising out of **Property Damage**, **Bodily Injury**, **Fire Legal Liability** or **Advertising Liability** caused by an event or happening, including continuous or repeated exposure to substantially the same general harmful conditions, which involves one or more persons or entities on or after the **Retroactive Date** set forth in Item 6. of the **Declarations** and before the end of the **Period of Insurance**.

   P. **Hired and Non-Owned Auto Liability Coverage**

   To pay on behalf of any **Assured Damages** and **Claims Expenses**, in excess of the "per Claim" **Deductible**, the greater of ten thousand dollars ($10,000) or other applicable limit expressly designated in the **Declarations**, which the **Assured** shall become legally obligated to pay because of any **Claim** first made against any **Assured** and reported in writing to the **Underwriters** during the **Period of Insurance** or **Extended Reporting Period** (if applicable) arising out of:
   1. **Bodily Injury** or **Property Damage** arising out of the use or operation of a **Hired Auto** by **You** or **Your Employees** in the course of **Your** business; and

   2. **Bodily Injury** or **Property Damage** arising out of the use or operation of a **Non-Owned Auto** by any person other than **You** in the course of **Your** business.

   The coverage provided under this endorsement applies in excess of any other valid and collectible auto liability insurance coverage, including any personal or business auto liability coverage held by any **Assured** or other party on any **Auto** used in the conduct of **Your** business or operations.

   The **Named Assured** agrees and warrants that all **Employees**, and **You**, if **You** are a natural person, will maintain in full force and effect during the effective **Period of Insurance** primary auto liability insurance. If a **Claim** is made and the **Employee** or **You**, if **You** are a natural person, is determined to have failed to maintain the minimum limits required by State Law then the coverage under this endorsement will respond as excess coverage as though the minimum limits were in full force and effect, with the **Named Assured** agreeing to pay all amounts within and up to the required minimum limit.

2. For purposes of this endorsement, the following terms have the following meanings:
   a. "**Advertising Liability**" means injury arising out of one or more of the following, committed in the course of the **Assured's** advertising activities:
      i. libel, slander or defamation;

      ii. infringement of copyright, title, slogan, trade dress, or advertising idea;

      iii. Piracy or idea misappropriation under an implied contract;

      iv. Invasion of right of privacy.

   b. "**Aircraft Products**" means any aircraft whether or not heavier than air (including spacecraft and missiles) and any ground support, guidance, control or communications equipment used in connection therewith, and also includes parts, supplies, or equipment installed in or on or used in connection with aircraft, including tools, training aids, instructions, manuals, blue prints and other data, engineering and other advice, services and labor used in the operation, maintenance or manufacture of such products.

   c. "**Auto**" means a land motor vehicle, trailer or semi-trailer designed for travel on public roads, including any attached machinery or equipment.

   d. "**Auto Business**" means the business or occupation of selling, repairing, servicing, storing or parking **Autos**.

   e. "**Bodily Injury**" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

f. "**Computer Virus**" means a set of corrupting, harmful or otherwise unauthorized instructions or code including a set of maliciously introduced unauthorized instructions or code, programmatic or otherwise, that propagate themselves through a computer system or network of whatsoever nature. Computer Virus includes but is not limited to 'Trojan Horses', 'worms' and 'time or logic bombs'.

g. "**Electronic Data**" means facts, concepts and information converted to a form useable for communications, interpretation or processing by electronic and electromechanical data processing or electronically controlled equipment and includes programs, software and other coded instructions for the processing and manipulation of data or the direction and manipulation of such equipment.

h. "**Employee**" includes a "**Leased Worker**". "**Employee**" does not include a "**Temporary Worker**."

i. "**Fire Legal Liability**" means **Property Damage** to structures or portions thereof rented to or occupied by the **Named Assured**, including fixtures permanently attached thereto, if such **Property Damage** arises out of fire.

j. "**Grounding**" means the withdrawal of one or more aircraft from flight operation or the imposition of speed, passenger or load restrictions on such aircraft because of the existence of or alleged existence of a defect, fault or conditions in any **Aircraft Product**.

k. "**Hired Auto**" means any **Auto You** lease, hire, rent or borrow. This does not include any **Auto You** lease, hire, rent or borrow from any of **Your Employees**, **Your** partners or **Your** Executive Officers, or members of their households.

l. "**Insured Contract**" means a contract for lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to the **Named Assured** or temporarily occupied by the **Named Assured** with permission of the owner is not an "**Insured Contract**."

m. "**Leased Worker**" means a person leased to the **Named Assured** by a labor leasing firm under an agreement between the **Named Assured** and the labor leasing firm to perform duties related to the conduct of the **Named Assured's** business. "**Leased Worker**" does not include a "**Temporary Worker**."

n. "**Mobile Equipment**" means a land vehicle (including any attached machinery or apparatus) whether or not self-propelled:

    i. not subject to motor vehicle registration;

    ii. maintained for use exclusively on premises owned by or rented to the **Named Assured**, including the ways immediately adjoining;

    iii. designed for use principally off public roads; or

    iv. designed or maintained for the sole purpose of affording mobility to equipment of the following types forming an integral part of or permanently attached to such vehicle:

        A. power cranes, shovels, loaders, diggers and drills;

        B. concrete mixers (other than the mix-in-transit type), graders, scrapers, rollers and on the road construction or repair equipment;

        C. air-compressors, pumps and generators including spraying, welding and building cleaning equipment; or

        D. geophysical exploration and well servicing equipment.

o. "**Named Assured's Products**" means goods or products manufactured, sold, handled or distributed by the **Named Assured** or by others trading under its name, including any container thereof (other than a vehicle) but shall not include a vending machine or any property, other than such container rented to or located for use of others but not sold.

p. "**Non-Owned Auto**" means any **Auto You** do not own, lease, hire, rent or borrow which is used in connection with **Your** business. This includes **Autos** owned by **You**, if **You** are a natural person, **Your Employees**, **Your** partners or **Your** Executive Officers, or members of their households, but only while used in **Your** business.

q. "**Occurrence**" means an accident, including continuous or repeated exposure to substantially the some general harmful conditions.

r. "**Property Damage**" means:

    a. physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the **Occurrence** that caused it.

s. "**Temporary Worker**" means a person who is furnished to the **Assured** to substitute for a permanent **Employee** on leave to meet seasonal or short-term workload conditions.

t. "**You**" and "**Your**" means and refers to the **Named Assured**.

3. The coverage under this endorsement does not apply to **Damages** or **Claims Expenses** in connection with or resulting from any **Claim**:

    a. arising out of **Property Damage** or **Bodily Injury** resulting from the use of force expected or intended from the standpoint of the **Assured**;

b. arising out of **Bodily Injury** or **Property Damage** arising out of ownership, maintenance, operation, use, loading or unloading of any aircraft or watercraft owned by operated by or rented or loaned to any **Assured**. This exclusion does not apply to:

1. A watercraft while ashore on premises **You** own or rent;

2. A watercraft **You** do not own that is:
   a. Less than 26 feet long; and
   b. Not being used to carry persons or property for a charge;

3. Liability assumed under any **Insured Contract** for the ownership, maintenance or use of aircraft or watercraft;

c. arising out of **Property Damage** or **Bodily Injury** arising out of:
   i. the ownership, maintenance, operation, use, loading or unloading of any **Mobile Equipment** while being used in any prearranged or organized racing, speed or demolition contest or in any stunting activity or in practice or preparation for such contest or activity; or
   ii. the operation or use of any snowmobile, moped or motorized bicycle, or trailer designed for use therewith;

d. for **Property Damage** or **Bodily Injury** arising out of and in the course of the transportation of **Mobile Equipment** by any **Auto** owned or operated by or rented or loaned to any;

e. arising out of **Property Damage**, **Bodily Injury** or **Advertising Liability** for which the **Assured** or his or her indemnitee may be held liable:
   i. as a person or organization engaged in the business of manufacturing, distributing, selling, or serving alcoholic beverages; or
   ii. if not so engaged, as an owner or lessor of premises used for such purposes, if such liability is imposed by, or because of the violation of, any statute, ordinance or regulation pertaining to the sale, gift, distribution or use of any alcoholic beverage;

f. arising out of **Bodily Injury** to:
   i. any **Employee** or volunteer of the **Named Assured** arising out of and in the course of his employment or retention by the **Named Assured**; or
   ii. the spouse, child, parent, brother or sister of the **Employee** as a consequence of above. This exclusion applies:
      A. whether the **Assured** may be liable as an employer or in any other capacity; and
      B. to any obligation to share **Damages** with or repay someone else who must pay **Damages** arising out of such liability;

g. arising out of **Property Damage** to:
   i. property owned or occupied or rented to the **Assured**;
   ii. property used by the **Assured**; or
   iii. property in the care, custody or control of the **Assured** or as to which the **Assured** is for any purpose exercising physical control;

provided, that this exclusion shall not apply to **Fire Legal Liability**;

h. arising out of **Property Damage** to premises owned or alienated by the **Named Assured** arising out of such premises or any part thereof;

i. arising out of that part of any contract or agreement entered into, as part of **Your** business, pertaining to the rental or lease, by **You** or any of **Your Employees**, of any **Auto**. However, such contract or agreement shall not be considered an **Insured Contract** to the extent that it obligates **You** or any of **Your Employees** to pay for **Property Damage** to any **Auto** rented or leased by **You** or any of **Your Employees**.

j. arising out of loss of use of tangible property which has not been physically injured or destroyed resulting from:
   A. a delay in or lack of performance by or on behalf of the **Named Assured** of any contract or agreement; or
   B. the failure of the **Named Assured's Products** or work performed by or on behalf of the **Named Assured** to meet the level of performance, quality, fitness or durability warranted or represented by the **Named Assured**;

but this Exclusion does not apply to loss of use of the other tangible property resulting from the sudden and accidental injury to or destruction of the **Named Assured's Products** or work performed by or on behalf of the **Named Assured** after such products or work have been put to use by any person or organization other than the **Assured**, or products that are still in the **Named Assured's** possession;

k. arising out of **Property Damage** to the **Named Assured's Products**, or for the cost of inspecting, repairing or replacing any defective or allegedly defective product or part thereof or for loss of use of any defective or allegedly defective product;

l. arising out of **Property Damage** to work performed by or on behalf of the **Named Assured** arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith;

m. arising out of the withdrawal, recall, inspection, repair, replacement or loss of life of the **Named Assured's Products** or work

completed by or for the **Named Assured** or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein;

n. arising out of **Aircraft Products**, including, but not limited to, consequential loss of use thereof resulting from **Grounding**;

o. relating to **Advertising Liability** arising out of:

    i. failure of performance of contract; provided, however, that this Exclusion shall not apply to the unauthorized appropriation of ideas based upon alleged breach of an implied contract;

    ii. infringement of patent, trademark, service mark, and trade name, other than titles or slogans by use thereof on or in connection with goods, products or services sold, offered for sale or advertised;

    iii. incorrect description or mistake in advertised price of goods, products or services sold, offered for sale or advertised;

    iv. the failure of goods, products or services to conform with advertised quality or performance; or

    v. an offense committed by an **Assured** whose business is advertising, broadcasting, publishing or telecasting.

p. for or arising out of, or resulting from **Property Damage** or **Bodily Injury** for which any **Assured** may be held liable by reason of:

    i. Causing or contributing to the intoxication of any person;

    ii. The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

    iii. Any statute, ordinance or regulation relating to the sale, gift, distribution or use alcoholic beverages.

This exclusion applies only if **You** are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

q. any obligation of the **Assured** under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

r. arising out of loss, damage, destruction, distortion, erasure, corruption or alteration of **Electronic Data** from any cause whatsoever (including but not limited to **Computer Virus**) or loss of use, reduction in functionality, cost, expense of whatsoever nature resulting therefrom, regardless of any other cause or event contributing concurrently or in any other sequence to the loss.

s. for or arising out of, or resulting from **Property Damage** or **Bodily Injury** for which any **Assured** may be held liable by reason of:

    i. Physically administering any medication, whether prescription or over-the-counter, to others; or

    ii. Indirectly administering any medication, whether prescription or over-the-counter, to others via a remote and/or computerized system or by instructing a third party to administer said medication; or

    iii. Giving advice or opinion on medication or any medical condition or treatment thereof; or

    iv. Directly or indirectly administering and/or performing medical services commonly administered and/or performed by a nurse, licensed physician, or other licensed or certified medical professional.

t. arising out of **Bodily Injury** to any person while being transported by **You** for a fee.

4. Solely in respect of **Hired and Non-Owned Auto Liability Coverage** Clause II. **DEFINITION OF ASSURED** is deleted in its entirety and replaced with the following:

Each of the following is an **Assured** under this insurance to the extent set forth below:

    a. **You**.

    b. Any other person using a **Hired Auto** with **Your** permission.

    c. With respect to a **Non-Owned Auto**, any **Employee**, partner or Executive Officer of **Yours**, but only while such **Non-Owned Auto** is being used in **Your** business.

    d. Any other person or organization, but only with respect to their liability because of acts or omissions of an **Assured** under paragraphs A., B. or C. above.

None of the following is an **Assured**:

    i. Any person engaged in the business of his or her employer with respect to **Bodily Injury** to any co-employee of such person injured in the course of employment;

    ii. Any person while employed in or otherwise engaged in performing duties related to the conduct of an **Auto Business**, other than an **Auto Business You** operate;

    iii. The owner or lessee (of whom **You** are a sublessee) of a **Hired Auto** or the owner of a **Non-Owned Auto** or any agent or **Employee** of any such owner or lessee;

    iv. Any person or organization with respect to the conduct of any current or past partnership or joint venture that is not shown as a **Named Assured** in the **Declarations**.

5. Clause IV. Exclusions D. shall not apply to the coverage under this endorsement.

6. **Limits of Liability** under this endorsement.

   a. **Limit of Liability** for **Property Damage**, **Bodily Injury** and **Advertising Injury**:

      i. Each **Occurrence**

         The Each **Occurrence Limit of Liability** indicated in the **Declarations** is the most **Underwriters** will pay for all **Claims** first made against the **Assured** and reported to **Underwriters** during the **Period of Insurance** for **Property Damage**, **Bodily Injury** or **Advertising Liability** arising out of any one **Occurrence**. The **Limit of Liability** Each **Occurrence** applies regardless of the number of **Assureds** covered or **Claims** made based on the same **Occurrence** or interrelated **Occurrences**.

      ii. **Aggregate**

         The **Aggregate Limit of Liability** indicated in the **Declarations** is the most **Underwriters** will pay for all **Claims** for **Property Damage**, **Bodily Injury** or **Advertising Liability** first made against the **Assureds** and reported to **Underwriters** during the **Period of Insurance** arising out of all **Occurrences** regardless of the number of **Assureds** covered or **Claims** made against the **Assureds**.

   b. **Limit of Liability** for **Fire Legal Liability**:

      i. Each **Occurrence**

         The Each **Occurrence Limit of Liability** indicated in the **Declarations** is the most **Underwriters** will pay for all **Claims** first made against the **Assured** and reported to **Underwriters** during the **Period of Insurance** for **Fire Legal Liability** arising out of any one **Occurrence**. The **Limit of Liability** Each **Occurrence** applies regardless of the number of **Assureds** covered or **Claims** made based on the same **Occurrence** or interrelated **Occurrences**.

      ii. **Aggregate**

         The **Aggregate Limit of Liability** indicated in the **Declarations** is the most **Underwriters** will pay for all **Claims** for **Fire Legal Liability** first made against the **Assureds** and reported to **Underwriters** during the **Period of Insurance** arising out of all **Occurrences** regardless of the number of **Assureds** covered or **Claims** made against the **Assureds**.

   c. **Limits of Liability** for **Hired and Non-Owned Auto Liability**:

      i. Each **Occurrence**

         The **Hired** and **Non-Owned Auto** Each **Occurrence Limit of Liability** indicated in the **Declarations** is the most **Underwriters** will pay for all **Claims** first made against the **Assured** and reported to **Underwriters** during the **Period of Insurance** for **Property Damage** or **Bodily Injury** arising out of any one **Occurrence**. The **Limit of Liability** Each **Occurrence** applies regardless of the number of **Assureds** covered or **Claims** made based on the same **Occurrence** or interrelated **Occurrences**.

      ii. **Aggregate**

         The **Hired** and **Non-Owned Auto Aggregate Limit of Liability** indicated in the **Declarations** is the most **Underwriters** will pay for all **Claims** for **Property Damage** or **Bodily Injury** first made against the **Assureds** and reported to **Underwriters** during the **Period of Insurance** arising out of all **Occurrences** regardless of the number of **Assureds** covered or **Claims** made against the **Assureds**.

      These **Limits of Liability** stated above are part of, and not in addition to, the General Liability Limits listed in the **Declarations**.

7. Clause VI: **Limit of Liability** is amended to include the following:

     The **Aggregate Limit of Liability** for all coverages indicated in the **Declarations** is the most **Underwriters** will pay in the **Aggregate** for all amounts payable by **Underwriters** for all coverages afforded under this Policy.

8. For purposes of this endorsement with respect to the **General Liability Coverage** as set forth in Paragraph 1. above:

   1. We will pay, with respect to any **Claim** we investigate or settle against an **Assured** we defend:

     a. All expenses we incur.

     b. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the **Bodily Injury** Liability Coverage applies. The **Underwriters** do not have to furnish these bonds.

     c. The cost of bonds to release attachments, but only for bond amounts within the applicable **Limit of Liability**. The **Underwriters** do not have to furnish these bonds.

     d. All reasonable expenses incurred by the **Assured** at our request to assist us in the investigation or defense of the **Claim**, including actual loss of earnings up to $250 a day because of time off from work.

     e. All costs taxed against the **Assured** in the defense of the **Claim**.

     f. Prejudgment interest awarded against the **Assured** on that part of the judgment we pay. If we make an offer to pay the applicable **Limit of Liability**, we will not pay any prejudgment interest based on that period of time after the offer.

     g. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable **Limit of Liability**. These payments will not reduce the limits of insurance.

   2. If we defend an **Assured** against a **Claim** and an indemnitee of the **Assured** is also named as a party to the **Claim**, we will defend that indemnitee if all of the following conditions are met:

a. The **Claim** against the indemnitee seeks damages for which the **Assured** has assumed the liability of the indemnitee in a contract or agreement that is an **Insured Contract**;

b. This insurance applies to such liability assumed by **Assured**;

c. The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the **Assured** in the same **Insured Contract**;

d. The allegations in the **Claim** and the information we know about the **Occurence** are such that no conflict appears to exist between the interests of the **Assured** and the interests of the indemnitee;

e. The indemnitee and the **Assured** ask us to conduct and control the defense of that indemnitee against such **Claim** and agree that we can assign the same counsel to defend the **Assured** and the indemnitee; and

f. The indemnitee:
   1. Agrees in writing to:
      a. Cooperate with the Underwriters in the investigation, settlement, of the **Claim**;

      b. Immediately send the **Underwriters** copies of any demands, notices, summonses or legal papers received in connection with the **Claim**;

      c. Notify any other insurer whose coverage is available to the indemnitee; and

      d. Cooperate with the **Underwriters** with respect to coordinating other applicable insurance available to the indemnitee; and

   2. Provides the **Underwriters** with written authorization to:
      a. Obtain records and other information related to the **Claim**; and

      b. Conduct and control the defense of the indemnitee in such **Claim**.

So long as the above conditions are met, attorneys' fees incurred by the **Underwriters** in the defense of that indemnitee, necessary litigation expenses incurred by the **Underwriters** and necessary litigation expenses incurred by the indemnitee at the **Underwriters** request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph 5. above, such payments will not be deemed to be damages for **Bodily Injury** and **Property Damage** and will not reduce the limits of insurance.

The **Underwriters** obligation to defend an **Assured's** indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when:
   a. The **Underwriters** have used up the applicable **Limit of Liability** in the payment of judgments or settlements; or

   b. The conditions set forth above, or the terms of the agreement described in Paragraph f above, are no longer met.

### POLICYHOLDER DISCLOSURE NOTICE OF TERRORISM INSURANCE COVERAGE

**You** are hereby notified that, under the Terrorism Risk Insurance Act (the "Act"), effective December 26, 2007, this **Policy** makes available to **You** insurance for losses arising out of certain acts of terrorism. Terrorism is defined as any act certified by the Secretary of the Treasury, in concurrence with the Secretary of State, and the Attorney General of the United States, to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States Mission; and to have been committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**You** should know that the insurance provided by **Your Policy** for losses caused by acts of terrorism is partially reimbursed by the United States under the formula set forth in the Act. Under this formula, the United States pays 85% of covered terrorism losses that exceed the statutorily established deductible to be paid by the insurance company providing the coverage. However, if aggregate **Assured** losses attributable to terrorist acts certified under the Act exceed $100 billion in a Program Year (January 1 through December 31), the treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

If aggregate **Assured** losses attributable to terrorist acts certified under the Act exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case **Assured** losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

The portion of **Your** policy's annual premium that is attributable to insurance for such acts of terrorism is: $0.

If **You** have any questions about this notice, please contact **Your** agent or broker.

All other terms and conditions of this **Policy** remain unchanged.

General Liability Coverage Endorsement (02/18)

Dominion Insurance Services Inc. © 2018 | All Rights Reserved.



370 Park Street, Suite 8, Moraga CA. 94556
341 S. Main, Suite 100, Alpine UT. 84004
888.313.9977(t) ~ 925.313.9978(f)
info@dominioninsurance.com
dominion-insurance.com

# CRIME ENDORSEMENT

In consideration of the premium paid, and subject to the terms and conditions of the **Policy** not otherwise modified herein, it is hereby understood and agreed that:

1. Clause I. Insuring Clauses is amended to include the following:

   Q. **Theft Coverage.**

      To pay on behalf of the **Assured Damages** and **Claims Expenses**, in excess of the "per Claim" **Deductible**, and in excess of the full extent of the recoverable assets of any **Assured** by whose **Theft** any other **Assured** not complicit in such **Theft** shall sustain or become legally obligated to pay because of any **Claim** first made against an **Assured** and reported in writing to **Underwriters** during the **Period of Insurance** or **Extended Reporting Period** (if applicable) arising out of **Theft** by any **Assured** during the **Ordinary Course of Business** on or after the **Retroactive Date** set forth in Item 6 of the **Declarations** and before the end of the **Period of Insurance**.

2. For purposes of the coverage afforded under this Endorsement:
   a. "**Theft**" means the intentional, unlawful taking of money, securities or tangible property having intrinsic value to the deprivation of another; and

   b. Exclusions A and C in Clause IV of the **Policy** do not apply.

3. The coverage under this Endorsement does not apply to **Damages** or **Claims Expenses** in connection with or resulting from any **Claim**:
   a. arising out of loss resulting directly or indirectly from war, whether or not declared; civil war; insurrection; rebellion or revolution; military, naval or usurped power; governmental intervention, expropriation or nationalization; or any act or condition related to any of the foregoing; and

   b. arising out of loss resulting directly or indirectly from seizure or destruction of property by order of governmental authority.

4. The most **Underwriters** will pay per **Claim** or in the **Aggregate** for all **Claims** covered pursuant to this Endorsement is $100,000.

All other terms and conditions of this **Policy** remain unchanged.

Crime Endorsement (02/18)

Dominion Insurance Services Inc. © 2018 | All Rights Reserved.



370 Park Street, Suite 8, Moraga CA. 94556
341 S. Main, Suite 100, Alpine UT. 84004
888.313.9977(t) ~ 925.313.9978(f)
info@dominioninsurance.com
dominion-insurance.com

## General Change Endorsement

In consideration of the premium charged for which this **Insurance** is written, it is hereby understood and agreed that the wording listed under Forms & Notices on the Declarations is included as part of this **Policy**.

All other terms and conditions of the **Policy** remain unchanged.

General Change Endorsement (05/17)
Dominion Insurance Services Inc. © 2017 | All Rights Reserved.



370 Park Street, Suite 8, Moraga CA. 94556
341 S. Main, Suite 100, Alpine UT. 84004
888.313.9977(t) ~ 925.313.9978(f)
info@dominioninsurance.com
dominion-insurance.com

**FPL Change Endorsement**
**Deletion of Co-Trustee/Co-Agent Restriction**

In consideration of the premium for which this **Insurance** is written it is hereby understood and agreed that section V.H. of the **Policy** is amended to include the following as part of the definition of **Fiduciary**:

<u>Old Wording</u>:

H. "**Fiduciary**" means an **Assured's** capacity as:

    viii. an agent or attorney in fact, <u>*serving alone without any co-agent*</u>, under a written power of attorney for the person or estate of a natural person, not a commercial or charitable entity [emphasis added]; or

    ix. a trustee, <u>*serving alone without any co-trustee*</u>, or trust administrator under trusts created by written trust agreement or court order with respect to the estate of natural persons, not commercial or charitable entities (although trust assets may include ownership interests in such entities) [emphasis added].

<u>New (Revised) Wording</u>:

H. "**Fiduciary**" means an **Assured's** capacity as:

    viii. an agent or attorney in fact, under a written power of attorney for the person or estate of a natural person, not a commercial or charitable entity; or

    ix. a trustee or trust administrator, under trusts created by written trust agreement or court order with respect to the estate of natural persons, not commercial or charitable entities (although trust assets may include ownership interests in such entities).

All other terms and conditions of the **Policy** remain unchanged.

Dominion FPL Change Endorsement (02/08)

Dominion Insurance Services Inc. © 2017 | All Rights Reserved.



370 Park Street, Suite 8, Moraga CA. 94556
341 S. Main, Suite 100, Alpine UT. 84004
888.313.9977(t) ~ 925.313.9978(f)
info@dominioninsurance.com
dominion-insurance.com

## Specific Claim(s) Exclusion Endorsement

In consideration of the premium for which this **Insurance** is written it is hereby understood and agreed that this **Policy** does not apply to any claims brought by or related to any entity listed on the Declarations Page.

All other terms and conditions of the **Policy** remain unchanged.

Specific Claim(s) Exclusion Endorsement (11/15)

Dominion Insurance Services Inc. © 2017 | All Rights Reserved.



370 Park Street, Suite 8, Moraga CA. 94556
341 S. Main, Suite 100, Alpine UT. 84004
888.313.9977(t) ~ 925.313.9978(f)
info@dominioninsurance.com
dominion-insurance.com

## Medication Coordinator Endorsement

In consideration of the premium for which this **Insurance** is written it is understood and agreed that section V of the **Policy** is hereby amended as follows:

1. **Medication Coordinator** is added to the list of insured capacities under the definition of **Professional Services**; and

2. The following definition of **Medication Coordinator** is hereby added to this Policy.

"**Medication Coordinator**" means one who provides one or more of the following services to others for a fee:
i. retrieving from a pharmacy medications prescribed by a physician (hereinafter the "Doctor") of a client, ward or conservatee;

ii. filling weekly medication reminder pill boxes according to the Doctor's instructions.

iii. reviewing with the **Assured's** client, ward or conservatee the manufacturer's warnings and/or instructions

Notwithstanding the foregoing, "**Medication Coordinator**" does not mean one who physically administers any medication to others. Nor shall the activity of medication coordinator cover any liability arising out of the giving of advise or opinion on medication or any medical condition.

All other terms and conditions of the **Policy** remain unchanged.

Fiduciary Trainer Endorsement (07/10)

Dominion Insurance Services Inc. © 2017 | All Rights Reserved.



370 Park Street, Suite 8, Moraga CA. 94556
341 S. Main, Suite 100, Alpine UT. 84004
888.313.9977(t) ~ 925.313.9978(f)
info@dominioninsurance.com
dominion-insurance.com

## Neutral Facilitator Endorsement

In consideration of the premium for which this **Insurance** is written it is understood and agreed that the **Policy** is hereby amended as follows:

1. "**Neutral Facilitator**" is added to the list of insured capacities under the definition of **Professional Services** found in section V of the **Policy**.

2. The following Definition is added to section V of the **Policy**:

   "**Neutral Facilitator**" means one who provides services to others for a fee in any of the following capacities:

   1. Arbitrator;

   2. Mediator; or

   3. Court-Appointed Referee, Special Master, Neutral Evaluator or Judge Pro Tem.

3. The following exclusion is added to section IV of the **Policy**:

   to any **Claim** arising out of or in any way related to conflicts of interest, including but not limited to conflicts of interest alleged to have resulted from any **Assured** having rendered **Professional Service**s other than as a **Neutral Facilitator** to any party to a dispute resolution proceeding in which such **Assured** subsequently acts as a **Neutral Facilitator**.

All other terms and conditions of the **Policy** remain unchanged.

Neutral Facilitator Endorsement (12/15)

Dominion Insurance Services Inc. © 2017 | All Rights Reserved.



370 Park Street, Suite 8, Moraga CA. 94556
341 S. Main, Suite 100, Alpine UT. 84004
888.313.9977(t) ~ 925.313.9978(f)
info@dominioninsurance.com
dominion-insurance.com

## Notary Public Endorsement

In consideration of the premium for which this Insurance is written it is understood and agreed that the Policy is hereby amended as follows:

1. "**Notary Public**" is added to the list of insured capacities under the definition of **Professional Services** found in section V of the **Policy**; and

2. The following exclusion is added to section IV of the policy:
   to any **Claim** arising out of or in any way related to any notarization(s) performed by any **Assured** absent the immediate physical presence of the signatory(ies).

All other terms and conditions of the **Policy** remain unchanged.

Notary Public Endorsement (12/08)

Dominion Insurance Services Inc. © 2017 | All Rights Reserved.



370 Park Street, Suite 8, Moraga CA. 94556
341 S. Main, Suite 100, Alpine UT. 84004
888.313.9977(t) ~ 925.313.9978(f)
info@dominioninsurance.com
dominion-insurance.com

It is hereby understood and agreed that this insurance is subject to the following clauses:

## WAR AND TERRORISM EXCLUSION ENDORSEMENT

Notwithstanding any provision to the contrary within this insurance or any endorsement thereto it is agreed that this insurance excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss;

1. war, invasion, acts of foreign enemies, hostilities or warlike operations (whether war be declared or not), civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power; or

2. any act of terrorism.
   For the purpose of this endorsement an act of terrorism means an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organisation(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear.

This endorsement also excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to 1. and/or 2. above.

If the Underwriters allege that by reason of this exclusion, any loss, damage, cost or expense is not covered by this insurance the burden of proving the contrary shall be upon the Assured.

In the event any portion of this endorsement is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

**NMA2918**
**08/10/2001**

Dominion Insurance Services Inc. © 2017 | All Rights Reserved.



370 Park Street, Suite 8, Moraga CA. 94556
341 S. Main, Suite 100, Alpine UT. 84004
888.313.9977(t) ~ 925.313.9978(f)
info@dominioninsurance.com
dominion-insurance.com

## SEVERAL LIABILITY NOTICE

The subscribing Insurers' obligations under contracts of insurance to which they subscribe are several and not joint and are limited solely to the extent of their individual subscriptions. The subscribing Insurers are not responsible for the subscription of any co-subscribing Insurer who for any reason does not satisfy all or part of its obligations.

LSW1001

Dominion Insurance Services Inc. © 2017 | All Rights Reserved.



370 Park Street, Suite 8, Moraga CA. 94556
341 S. Main, Suite 100, Alpine UT. 84004
888.313.9977(t) ~ 925.313.9978(f)
info@dominioninsurance.com
dominion-insurance.com

### List of Lloyd's Syndicates

100.0000% Lloyd's Syndicate 609 AUW, UK

———————

100.0000%

Dominion Insurance Services Inc. © 2017 | All Rights Reserved.



370 Park Street, Suite 8, Moraga CA. 94556
341 S. Main, Suite 100, Alpine UT. 84004
888.313.9977(t) ~ 925.313.9978(f)
info@dominioninsurance.com
dominion-insurance.com

**PROFESSIONAL FIDUCIARY
RENEWAL LIABILITY INSURANCE
CLAIMS MADE COVERAGE APPLICATION
Underwritten by Lloyd's of London**

1. Business Name:
(Named Insured on Policy)

Hitchman Fiduciaries  LLC

   a.  Address:

120 Tustin Avenue, Suite C, Newport Beach, CA    92663

Website

   b.  Contact:

| First Name | Last Name | Phone | Email |
|---|---|---|---|
| Bruce | Hitchman | 9492009712 | bruce@hitchmanfiduciaries.com |

   c.  Previous year's gross annual billings, whether received or not:    900000

2. Within the past year has:

   a.  any Applicant member acted in a co-trustee or co-agent capacity?    ● Yes ○ No

   b.  Applicant brought any suits for the collection of fees?    ○ Yes ○ No

   c.  Applicant performed services for any family member of its employed fiduciaries?    ○ Yes ○ No

   d.  Applicant, any of its member or predecessors been subject to any professional liability claim?    ○ Yes ○ No

   e.  any current or past Applicant member been subject to professional discipline?    ○ Yes ○ No

3. Is any Applicant member aware of any pending:

   a.  objection to an accounting issued by the Applicant?    ○ Yes ● No

   b.  demand for a reduction or waiver of the Applicant's fees?    ○ Yes ● No

   c.  demand for the removal of Applicant or any of its members from a fiduciary role?    ● Yes ○ No

   d.  demand that a bond issued to the Applicant or any of its members be surcharged?    ○ Yes ● No

   e.  circumstances which may result in a claim against the Applicant, a predecessor or member?    ○ Yes ● No

4. Indicate whether Applicant requires any of the following coverages:

☐ Additional Insureds    ☐ Fiduciary Trainer    ☑ Medication Coordinator    ☐ Payroll Processor
☐ Debt Counselor    ☐ Grant Writer    ☑ Neutral Facilitator    ☐ Professional Organizer
☐ Expert Witness    ☐ Management Consultant    ☑ Notary Public    ☐ Tax Preparer

5. Please provide an explanation for any positive responses in questions 2 and 3 and additional coverage selected in question 4.

2a: Fiduciaries in our firm often co-
Trustee within our firm.  We also have a couple matters where we are co-trustee with an elder grantor who has capacity,
3c: No, we have two matters now where the former trustee was removed and they do not like our neutrality.

Increased revenues over prior year.

here is a list of the licensed fiduciaries we currently have:

Lee Ann Hitchman
Bruce Hitchman
Brett Hitchman
Rafael Chavez

We also have an office manager:

By and through the undersigned, Applicant acknowledges, agrees and declares to the best of its knowledge and belief that:

1. The information set forth herein is true and any change in circumstances prior to the effective date of the insurance applied for, which may render inaccurate, untrue, or incomplete any statement or disclosure made herein, will immediately be reported in writing to underwriters who may in turn withdraw or modify any outstanding offer of insurance;

2. Underwriters are hereby authorized, but not required, to make an investigation and inquiry in connection with the information provided in this application, understanding that any failure to do so shall not abridge any such rights nor estop underwriters from relying upon any of Applicant's representations herein;

3. The submission and review of this application shall not serve to bind Applicant to purchase, nor underwriters to issue, any policy of insurance;

4. In the event that an insurance policy is issued to applicant, in doing so, underwriters shall be entitled to rely upon all material representations contained within this application which forms the basis for such insurance and shall be attached to and become a part of any such policy;

5. Subject to all other policy terms and conditions, coverage under any policy issued will only apply to claims first made against Applicant and reported to underwriters during the policy period, or extended reporting period;

6. Subject to all other policy terms and conditions, the limit of liability available to pay damages shall be reduced and may be completely exhausted by payment of claims expenses; moreover, damages and claims expenses shall be applied against the applicable deductible;

7. Any person who knowingly and with intent to defraud files an application for insurance containing any materially false information, or for the purpose or misleading conceals any material fact, may be held criminally liable depending upon the laws of the applicable jurisdiction; moreover, any misrepresentation or misstatement of material facts may void coverage under the proposed insurance; and

8. Pursuant to the provisions of the Electronic Signatures in Global and National Commerce Act (E-SIGN, 2000) and the Uniform Electronic Transactions Act (UETA, 1999), execution of this application form by means of typing ones name, title and date below carries the same weight and legal effect as traditional paper documents and handwritten signatures.

| /s/ Bruce Hitchman | Manager | 12/20/2018 |
|---|---|---|
| **Electronic Signature** | **Signer's Title** | **Date Executed** |

Dominion FPL Renewal Application (05/18)                                                                                    Page 2 of 2

Dominion Insurance Services Inc. © 2019 | All Rights Reserved.

# EXHIBIT 2



370 Park Street, Suite 8, Moraga CA. 94556
341 S. Main, Suite 100, Alpine UT. 84004
888.313.9977(t) ~ 925.313.9978(f)
info@dominioninsurance.com
dominion-insurance.com

**DECLARATIONS**
**Fiduciary Professional Liability Insurance**
**Effected with Certain Underwriters at Lloyd's of London**
*Claims Made and Reported Coverage*

| | |
|---|---|
| **Authority Number:** | B0621P33057519 |
| **Policy Number:** | FPL20105754L |
| 1. **Named Assured:** | Hitchman Fiduciaries LLC<br>120 Tustin Avenue, Suite C, Newport Beach, CA 92663 |
| 2. **Period of Insurance:** | 2020-01-01 to 2021-01-01 (year-month-day)<br>both dates at 12:01 am standard time at the location identified in item 1, above. |
| 3. **Limits of Liabilty:** | $2,000,000/$4,000,000 ▼ Per Claim/Aggregate, Including Costs and Expenses (Primary Limits) |
| | $50k/$50k ▼ Data Security Breach/Client Network Infection Each Occurrence/Aggregate, including Costs and Expenses |
| | $250k/$250k ▼ Bodily Injury/Property Damage/Fire Legal/Advertising Liability Each Occurrence/Aggregate, Including Costs and Expenses |
| | $25k/$25k ▼ Hired Auto/Non-Owned Auto Liability Each Occurrence/Aggregate, Including Costs and Expenses |
| | $25k/$25k ▼ Theft Each Occurrence/Aggregate, Including Costs and Expenses |
| 4. **Deductible:** | $15,000 ▼ Per Claim, Including Costs and Expenses |
| 5. **Premium:** | $57,983.00 |
| 6. **Retroactive Date:** | 2010-01-01 (year-month-day) |
| 7. **Notice of Claim:** | Dominion Insurance Services, Inc.<br>341 South Main Street, Suite 100, Alpine, Utah 84004 |
| 8. **Service of Suit:** | Wilson, Elser, Moskowitz, Edelman & Dicker LLP<br>150 East 42nd Street, New York, New York 10017 |
| 9. **Short Rate Table:** | As per attached endorsement NMA 45. |
| **Prepared/Issued By:** | Dominion Insurance Services, Inc. |

Claim Prevention Hotline:
(212) 376-8599

_____        2020-01-01
Countersignature                                          Date

**Forms & Notices:**
Surplus Lines Notice
Dominion FPL Wording (11/19)
General Change Endorsement Split Retroactive Date of 01 Jan 2019 for Higher Limits of $2,000,000/$4,000,000
Deletion of Co-Trustee/Co-Agent Restriction Endorsement
Specific Claim(s) Exclusion: Anna L. Bostelman Trust
Medication Coordinator Endorsement
Neutral Facilitator Endorsement
Notary Public Endorsement
NMA2918 War and Terrorism Exclusion Endorsement
Several Liability Notice
Syndicates List
Policy Sublimits (Included as part of the Primary Limits)
- All Limits Listed Above in Item 3 Other Than Primary Limits
- Disciplinary Proceedings Defense: $10,000
- Lost Earnings Reimbursement: $250/Day; $5,000/Period of Insurance
- Contractual Travel Indemnity: $25,000

**Additional Charges:**
Taxes: $1,884.45

- Loss of Key Indiviual Replacement Expenses: $5,000
- Terrorism Travel Reimbursement: $25,000
- Travel Delay Reimbursement: $1,500
- Bodily Injury/Personal Property Damage due to Assault: $2,000
- Temporary Meeting Space Reimbursement: $10,000
- Emergency Real Estate Consulting Fee: $5,000
- Identity Theft Expense: $15,000
- Image Restoration and Counseling: $10,000

Dominion FPL Dec (12/19)

Dominion Insurance Services Inc. © 2020 | All Rights Reserved.



370 Park Street, Suite 8, Moraga CA. 94556
341 S. Main, Suite 100, Alpine UT. 84004
888.313.9977(t) ~ 925.313.9978(f)
info@dominioninsurance.com
dominion-insurance.com

## IMPORTANT NOTICE:

**1. The insurance policy that you have purchased is being issued by an insurer that is not licensed by the State of California. These companies are called "nonadmitted" or "surplus line" insurers.**

**2. The insurer is not subject to the financial solvency regulation and enforcement that apply to California licensed insurers.**

**3. The insurer does not participate in any of the insurance guarantee funds created by California law. Therefore, these funds will not pay your claims or protect your assets if the insurer becomes insolvent and is unable to make payments as promised.**

**4. The insurer should be licensed either as a foreign insurer in another state in the United States or as a non-United States (alien) insurer. You should ask questions of your insurance agent, broker, or "surplus line" broker or contact the California Department of Insurance at the toll-free number 1-800-927-4357 or internet website www.insurance.ca.gov. Ask whether or not the insurer is licensed as a foreign or non-United States (alien) insurer and for additional information about the insurer. You may also visit the NAIC's internet website at www.naic.org. The NAIC-the National Association of Insurance Commissioners-is the regulatory support organization created and governed by the chief insurance regulators in the United States.**

**5. Foreign insurers should be licensed by a state in the United States and you may contact that states department of insurance to obtain more information about that insurer. You can find a link to each state from this NAIC internet website: https://naic.org/state_web_map.htm.**

**6. For non-United States (alien) insurers, the insurer should be licensed by a country outside of the United States and should be on the NAIC's International Insurers Department (IID) listing of approved nonadmitted non-United States insurers. Ask your agent, broker, or "surplus line" broker to obtain more information about that insurer.**

**7. California maintains a "List of Approved Surplus Line Insurers (LASLI)." Ask your agent or broker if the insurer is on that list, or view that list at the internet website of the California Department of Insurance: www.insurance.ca.gov/01-consumers/120-company/07-lasli/lasli.cfm.**

**8. If you, as the applicant, required that the insurance policy you have purchased be effective immediately, either because existing coverage was going to lapse within**

**two business days or because you were required to have coverage within two business days, and you did not receive this disclosure form and a request for your signature until after coverage became effective, you have the right to cancel this policy within five days of receiving this disclosure. If you cancel coverage, the premium will be prorated and any brokers fee charged for this insurance will be returned to you.**

**D-2 (Effective January 1, 2020)**

Dominion Insurance Services Inc. © 2020 | All Rights Reserved.



370 Park Street, Suite 8, Moraga CA. 94556
341 S. Main, Suite 100, Alpine UT. 84004
888.313.9977(t) ~ 925.313.9978(f)
info@dominioninsurance.com
dominion-insurance.com

## FIDUCIARY PROFESSIONAL LIABILITY INSURANCE

**NOTICE:** This is a claims made form. Words and phrases in **bold** (other than titles and section headings) have special meaning. See section V "Definitions." Except to such extent as may otherwise be provided herein, the coverage afforded under this **Insurance Policy** is limited to liability for only those **Claims** that are first made against the **Assured** and reported to the **Underwriters** while the insurance is in force. The **Limit of Liability** available to pay **Damages** shall be reduced and may be completely exhausted by payment of **Claims Expenses**. **Damages** and **Claims Expenses** shall be applied against the **Deductible**. Please review the coverage afforded under this **Insurance Policy** carefully and discuss the coverage hereunder with **Your** insurance agent or broker.

### I. INSURING AGREEMENTS

The **Underwriters** agree with the **Assured**, named in the **Declarations** made a part hereof, in consideration of the payment of the premium and reliance upon the statements in the application which is made a part of this **Insurance Policy** (hereinafter "**Policy**" or "**Insurance**") and subject to the **Limit of Liability**, exclusions, conditions and other terms of this **Insurance**:

#### A. Coverage

To pay on behalf of the **Assured Damages** and **Claims Expenses** which the **Assured** shall become legally obligated to pay because of any **Claim** or **Claims**, including **Claims** for **Personal Injury** as hereafter defined, first made against the **Assured** and reported to the **Underwriters** during the **Period of Insurance** or **Extended Reporting Period**, arising out of any act, error or omission of the **Assured** in rendering or failing to render **Professional Services** as hereinafter defined for others but solely for acts on behalf of the **Named Assured** designated in Item 1 of the **Declarations** and caused by the **Assured**, except as excluded or limited by the terms, conditions and exclusions of this **Policy**.

#### B. Defense and Settlement (Included in the Limit of Liability)

1. The **Underwriters** shall have the right and duty to defend, subject to the **Limits of Liability**, any **Claim** against the **Assured** seeking **Damages** which are payable under the terms of this **Insurance**, even if any of the allegations of the **Claim** are groundless, false or fraudulent. Although **Underwriters** retain the exclusive right to appoint defense counsel to represent the **Assured** during all pre-trial stages of any litigated **Claim** seeking **Damages** which are payable under the terms of this **Insurance**, **Underwriters** shall not formally appoint trial counsel without the consent of the **Named Assured**, such consent not to be unreasonably withheld.

2. It is agreed that the **Limit of Liability** available to pay **Damages** shall be reduced and may be completely exhausted by payment of **Claims Expenses**. **Damages** and **Claims Expenses** shall be applied against the **Deductible**.

3. The **Underwriters** shall have the right to make any investigation they deem necessary, including, without limitation, any investigation or examination of the **Assured** under oath with respect to the application and statements made in the application and with respect to coverage.

4. If the **Assured** shall refuse to consent to any settlement or compromise recommended by the **Underwriters** and acceptable to the claimant and elects to contest the **Claim**, **Underwriters'** liability for any **Damages** and **Claims Expenses** shall not exceed the amount for which the **Claim** could have been settled plus the **Claims Expenses** incurred up to the time of such refusal, or the applicable **Limit of Liability**, whichever is less, and the **Underwriters** shall have the right to withdraw from the further defense thereof by tendering control of said defense to the **Assured**.

Without waiving the foregoing, in order to enhance the likelihood of resolving **Claims** covered by this **Insurance** in a mutually agreeable manner to both **Underwriters** and the **Assured**, **Underwriters** agree to: (1) seek the **Assured's** views regarding any potential settlement or compromise recommended by **Underwriters** and acceptable to the claimant; and (2) substantively respond to any such views, explaining **Underwriters'** position and the reason(s) therefor.

No **Deductible** applies to the following supplemental coverages. However, all payments under the following supplemental coverages erode and are not in addition to the **Limit of Liability**:

#### C. Disciplinary Proceedings Defense (not in addition to the Limit of Liability)

To pay on behalf of the **Assured** up to ten thousand dollars ($10,000) for all **Claims Expenses** incurred with respect to the defense of any and all proceedings before any state or federal licensing board, peer review committee or governmental regulatory body first instituted against the **Assured** and reported to the **Underwriters** during the **Period of Insurance** or **Extended Reporting Period**, arising out of any act, error or omission of the **Assured** in rendering or failing to render **Professional Services** as hereinafter defined for others but solely for acts on behalf of the **Named Assured**

designated in Item 1 of the **Declarations** and caused by the **Assured**, except as excluded or limited by the terms, conditions and exclusions of this **Policy**.

D. **Lost Earnings Reimbursement (not in addition to the Limit of Liability)**

To pay to the **Assured** two hundred and fifty dollars ($250) per day (subject to a maximum of five thousand dollars ($5,000) for the entire **Period of Insurance**) for each day any **Assured** is required to appear at a trial, hearing or arbitration involving any and all **Claims** first made against the **Assured** and reported to the **Underwriters** during the **Period of Insurance** or **Extended Reporting Period**, arising out of any act, error or omission of the **Assured** in rendering or failing to render **Professional Services** as hereinafter defined for others but solely for acts on behalf of the **Named Assured** designated in Item 1 of the **Declarations** and caused by the **Assured**, except as excluded or limited by the terms, conditions and exclusions of this **Policy**.

E. **Data Security Breach and Client Network Infection Coverage (not in addition to the Limit of Liability)**

**Underwriters** will, subject to the **Limits of Liability** set forth below, pay on behalf of any **Assured Damages** and **Claims Expenses**, in excess of the "per **Claim**" **Deductible**, the greater of fifty thousand dollars ($50,000) or other applicable limit expressly designated in the **Declarations**, which the **Assured** shall become legally obligated to pay because of any **Claim** first made against any **Assured** and reported in writing to **Underwriters** during the **Period of Insurance** or **Extended Reporting Period** (if applicable) arising out of:

1. any **Data Security Breach** of any **Data Security System** maintained by the **Assured** for the storage of **Confidential Information** pertaining to the **Assured's** clients in the **Assured's** rendering of **Professional Services**; or

2. any **Client Network Infection**.

Multiple **Claims** by more than one claimant arising out of the same **Data Security Breach** or **Client Network Infection** will be considered a single **Claim** for purposes of applying the per-**Claim Limit of Liability** and **Deductible**.

It is a condition precedent to coverage and our liability under this section I.E of the **Policy** that at all times during the **Period of Insurance** the **Assured** shall:

1. maintain anti-virus and malware prevention solutions on the **Assured's Data Security System** and update the protection at regular intervals;

2. maintain firewalls on its **Data Security System**; and

3. maintain and implement ongoing patch management process to ensure timely patching of its **Data Security System**.

F. **Bodily Injury, Property Damage, Fire Legal or Advertising Liability Coverage (not in addition to the Limit of Liability)**

**Underwriters** will, subject to the **Limits of Liability** set forth below, pay on behalf of any **Assured Damages** and **Claims Expenses** the greater of two hundred and fifty thousand dollars ($250,000) or other applicable limit expressly designated in the **Declarations**, which the **Assured** shall become legally obligated to pay because of any **Claim** first made against any **Assured** and reported in writing to the **Underwriters** during the **Period of Insurance** or **Extended Reporting Period** (if applicable) arising out of, in connection with, or in any way related to **Property Damage**, **Bodily Injury**, **Fire Legal Liability** or **Advertising Liability** caused by an event or happening, including continuous or repeated exposure to substantially the same general harmful conditions, which involves one or more persons or entities on or after the **Retroactive Date** set forth in Item 6. of the **Declarations** and before the end of the **Period of Insurance**.

G. **Hired and Non-Owned Auto Liability Coverage (not in addition to the Limit of Liability)**

To pay on behalf of any **Assured Damages** and **Claims Expenses** the greater of twenty five thousand dollars ($25,000) or other applicable limit expressly designated in the **Declarations**, which the **Assured** shall become legally obligated to pay because of any **Claim** first made against any **Assured** and reported in writing to the **Underwriters** during the **Period of Insurance** or **Extended Reporting Period** (if applicable) arising out of:

1. **Bodily Injury** or **Property Damage** arising out of the use or operation of a **Hired Auto** by **You** or **Your Employees** in the course of **Your** business; and

2. **Bodily Injury** or **Property Damage** arising out of the use or operation of a **Non-Owned Auto** by any person other than **You** in the course of **Your** business.

The coverage provided under this endorsement applies in excess of any other valid and collectible auto liability insurance coverage, including any personal or business auto liability coverage held by any **Assured** or other party on any **Auto** used in the conduct of **Your** business or operations.

The **Named Assured** agrees and warrants that all **Employees**, and **You**, if **You** are a natural person, will maintain in full force and effect during the effective **Period of Insurance** primary auto liability insurance. If a **Claim** is made and the

**Employee** or **You**, if **You** are a natural person, is determined to have failed to maintain the minimum limits required by State Law then the coverage under this endorsement will respond as excess coverage as though the minimum limits were in full force and effect, with the **Named Assured** agreeing to pay all amounts within and up to the required minimum limit.

H. **Theft Coverage (not in addition to the Limit of Liability)**

To pay on behalf of any **Assured** not complicit in any alleged **Theft** perpetrated with the alleged complicity of any other **Assured**, **Damages** and **Claims Expenses** and in excess of the full extent of the recoverable assets of any complicit **Assured**, the greater of twenty five thousand dollars ($25,000) or other applicable limit expressly designated in the **Declarations**, which any non-complicit **Assured** shall become legally obligated to pay because of any **Claim** first made against an **Assured** and reported in writing to **Underwriters** during the **Period of Insurance** or **Extended Reporting Period** (if applicable) arising out of any alleged **Theft** perpetrated with the alleged complicity of any **Assured** during the **Ordinary Course of Business** on or after the **Retroactive Date** set forth in Item 6 of the **Declarations** and before the end of the **Period of Insurance**. In the event that **Underwriters** elect to indemnify all **Assureds** under this coverage grant, including those potentially complicit in the subject **Theft**, **Underwriters** reserve the right to recover any such amounts from complicit **Assureds**.

I. **Contractual Travel Indemnity (not in addition to the Limit of Liability)**

Subject to the limits of indemnity set forth below, **Underwriters** will indemnify the **Assured** for the **Contractual Financial Obligation** the **Assured** becomes obligated to pay to an officer, director, or **Employee** in excess of any other insurance coverage, contribution, or indemnification available to the **Assured** and/or to the officer, director, or **Employee**, where such obligation is based on or arises out of any written contract or manual requiring the **Assured** to indemnify the officer, director, or **Employee** for **Injury** or **Accidental Death** sustained while traveling on a common carrier for the **Assured's** business during the **Period of Insurance**.

For the purposes of the **Contractual Travel Indemnity** coverage set forth above:

> **Accidental Death** means the loss of life due to physical injury to an officer, director, or **Employee** of the **Assured** caused by violence, fracture, or an accident occurring while traveling on a common carrier for the **Assured's** business during the **Period of Insurance**, provided that the loss of life takes place no later than one hundred eighty (180) days after the expiration date or the effective date of cancellation of the **Policy**.

> **Injury** means:

>> 1. Physical damage to the body caused by violence, fracture, or an accident;

>> 2. Accidental loss of limbs or multiple fingers;

>> 3. **Permanent** total loss of sight, speech or hearing caused by violence, fracture, or an accident.

> Contractual Financial Obligation means a sum that the **Assured** is required to pay to satisfy its obligations under a written contract or manual which has a binding effect on the **Assured**.

> **Permanent** means lasting more than 12 months and at the end of that time being without prospect of improvement.

The limit of indemnity for this **Contractual Travel Indemnity** coverage is twenty-five thousand dollars ($25,000) for all **Contractual Financial Obligation** combined for the **Period of Insurance**. No deductible applies to this **Contractual Travel Indemnity** coverage.

No coverage shall be afforded and no amounts shall be payable pursuant to the **Contractual Travel Indemnity** coverage if the cause of the **Injury** or **Accidental Death** was:

> 1. An intentional act by or at the direction of the **Assured**;

> 2. An act of suicide or attempted suicide;

> 3. An act of war or **Act of Terrorism** as defined in Section G. below; or

> 4. Any disease process, whether sudden, slow, or degenerative.

J. **Loss of Key Individual Replacement Expenses (not in addition to the Limit of Liability)**

The **Underwriters** will indemnify the **Assured** for its **Ascertained Net Loss** up to the limit of indemnity set forth below if the Chief Executive Officer of the **Assured** suffers an accidental **Injury** during the **Period of Insurance** which results in the death of the Chief Executive Officer during the **Period of Insurance**. No deductible applies to this coverage.

For the purposes of the **Loss of Key Individual Replacement Expenses** coverage set forth above:

> **Ascertained Net Loss** means additional irrecoverable **Replacement Expenses** directly incurred by the **Assured** independently of any other cause less any savings the **Assured** is able to obtain in mitigation of the loss.

**Replacement Expenses** means:

1. Costs of advertising the employment position opening;

2. Travel, lodging, meal and entertainment expenses incurred in interviewing job applicants for the employment position opening; and

3. Miscellaneous extra expenses incurred in finding, interviewing and negotiating with the job applicants, including, but not limited to, overtime pay, costs to verify the background and references of the applicants and legal expenses incurred to draw up and employment contract.

The aggregate limit of indemnity for this **Loss of Key Individual Replacement Expenses** coverage is five thousand dollars ($5,000) for all **Ascertained Net Loss** for the **Period of Insurance**. No deductible applies to this **Loss of Key Individual Replacement Expenses** coverage.

K. **Terrorism Travel Reimbursement (not in addition to the Limit of Liability)**

The **Underwriters** will, subject to the limit of indemnity set forth below, indemnify the **Assured** for the **Assured's** obligation to reimburse any present director or officer for **Emergency Travel Expenses** incurred by such director or officer during the **Period of Insurance** as the result of an **Act of Terrorism** taking place during the **Period of Insurance**. The aggregate limit of indemnity for this coverage is twenty-five thousand dollars ($25,000) for all **Emergency Travel Expenses** incurred by all such directors and officers for the **Period of Insurance**. No deductible applies to this coverage.

For the purposes of the **Terrorism Travel Reimbursement** coverage set forth above:

**Act of Terrorism** means an act, or acts, of any person, or group(s) of persons, committed for political, religious, ideological or similar purposes with the intention to influence any government and/or to put the public, or any section of the public, in fear. An **Act of Terrorism** can include, but not be limited to, the actual use of force or violence and/or the threat of such use. Furthermore, the perpetrators of an **Act of Terrorism** can either be acting alone, or on behalf of, or in connection with any organisation(s) or government(s).

Notwithstanding the above, **Underwriters** will not indemnify the **Assured** for any **Emergency Travel Expenses** arising out of or attributable to an **Act of Terrorism** involving the use or release, or the threat of use or release of any nuclear weapon or device or chemical or biological agent, regardless of any contributory cause(s).

**Emergency Travel Expenses** mean:

1. Hotel expenses incurred which directly result from the cancellation of a scheduled transport by a commercial transportation carrier, resulting directly from and within forty-eight (48) hours of an **Act of Terrorism**; and

2. The increased amount incurred which may result from re-scheduling comparable transport, to replace a similarly scheduled transport canceled by a commercial transportation carrier in direct response to an **Act of Terrorism**;

L. **Travel Delay Reimbursement (not in addition to the Limit of Liability)**

The **Underwriters** will, subject to the limit of indemnity set forth below, indemnify the **Assured** for its obligation to reimburse any present Chief Executive Officer of the **Assured** for any **Non-Reimbursable Travel Delay Expenses** the Chief Executive Officer incurs as a result of the cancellation of any regularly scheduled business travel on a common carrier. The aggregate limit of indemnity for this coverage is fifteen hundred dollars ($1,500) for all **Non-Reimbursable Travel Delay Expenses** incurred by all Chief Executive Officers during the **Period of Insurance**.

For the purposes of the **Travel Delay Reimbursement** coverage set forth above:

**Non-Reimbursable Travel Delay Expenses** means the following travel-related expenses incurred after a seventy-two (72) hour waiting period, beginning from the time documented on the proof of cancellation, which are not otherwise reimbursable by the carrier or any other, entity or insurer and for which the Chief Executive Officer produces a receipt:

1. Meals and lodging;

2. Alternative transportation;

3. Clothing and necessary toiletries; and

4. Emergency prescription and non-prescription drug expenses.

No coverage shall be afforded and no amounts shall be payable pursuant to the **Travel Delay Reimbursement** coverage if the cancellation is as a direct result of an **Act of Terrorism**.

M. **Reimbursement for Bodily Injury and Property Damage to Personal Property due to Assault (not in addition to the Limit of Liability)**

The **Underwriters** will, subject to the limit of indemnity set forth below, reimburse the **Assured** for those amounts the **Assured** becomes obligated to pay to an officer, director, or **Employee** of the **Assured** for medical expenses as to **Bodily Injury** and **Property Damage** to the **Personal Property** of such officer, director, or **Employee** sustained as a result of a physical assault on the officer, director, or **Employee** taking place during the **Period of Insurance** at the **Premises** of the **Assured**, or while the officer, director, or **Employee** is traveling to or from the **Premises** of the **Assured**, and which assault is reported to **Underwriters** within forty-eight (48) hours after the assault took place.

For the purposes of the Reimbursement for the **Bodily Injury** and **Property Damage** to **Personal Property** due to Assault coverage set forth above:

> **Bodily Injury** means bodily injury, sickness or disease, mental anguish, psychological injury or emotional distress sustained by any officer, director, or **Employee** of the **Assured**, which occurs during the **Period of Insurance**, including death arising directly from any of these at any time.

> **Premises** means the physical premises owned, leased, or rented by the **Assured** for the conducting of its business.

The aggregate limit of indemnity payable to all directors, officers and **Employees** of the **Assured** as a result of all such physical assaults taking place during the **Period of Insurance** for all **Bodily Injury** due to Assault is ten thousand dollars ($10,000) and the aggregate limit of indemnity for all **Property Damage** to **Personal Property** due to Assault is two thousand dollars ($2,000). No deductible applies to this coverage.

N. **Temporary Meeting Space Reimbursement and Emergency Real Estate Consulting Fee (not in addition to the Limit of Liability)**

The **Underwriters** will, subject to the limit of indemnity set forth below, reimburse the **Assured** for

1. The cost of rental of meeting space necessitated by the temporary unavailability for up to one week of the **Assured's** primary location due to the failure of a climate control system, or leakage of a hot water heater during the **Period of Insurance**, but this coverage shall only apply if the scheduled meeting was with parties who are not insured under this **Policy**. The aggregate limit of indemnity for this coverage is ten thousand dollars ($10,000) for all costs of rental of meeting space as to all instances of temporary unavailability of the **Assured's** primary location during the **Period of Insurance**. No deductible applies to this coverage.

2. Reasonable realtor's fee or real estate consultant's fee incurred due to the need of the **Assured** to relocate its primary place of business from the principal location set forth in the **Declarations** as a direct result of the **Unforeseeable Destruction** of the **Assured's** primary location during the **Period of Insurance**. The aggregate limit of insurance for this coverage is five thousand dollars ($5,000) for all reasonable realtor's fees and real estate consultant's fees incurred by the **Assured** due to all **Unforeseen Destructions** of the principal location of the **Assured** during the **Period of Insurance**. No deductible applies to this coverage.

For purposes of the **Emergency Real Estate Consulting Fee** coverage set forth in 2. Above:

> **Unforeseeable Destruction** means the accidental and unpredictable destruction, or the long term or **Permanent** rendering as unusable and uninhabitable for any purposes, of the principal location of the **Assured**. **Unforeseeable Destruction** shall not include any destruction or the rendering as unusable or uninhabitable of the principal location of the **Assured** as a result of any intentional or grossly negligent acts of the **Assured** or its officers, directors, or **Employees**, nor due to any nuclear incident, accident, war, **Act of Terrorism** or other nuclear event. The term "long term" shall mean for the purposes of this definition any period longer than six months.

O. **Identity Theft Expense (not in addition to the Limit of Liability)**

The **Underwriters** will, subject to the limits of indemnity set forth below, reimburse the **Assured** for **Identity Theft Expense** the **Assured** becomes obligated to pay to its directors, officer, or **Employees** as a result of any **Identity Theft** committed against such directors, officers, or **Employees** while they were acting in their positions and on behalf of the **Assured**, provided such **Identity Theft** (1) is first discovered by the **Assured** or its officers, directors or **Employees** and is reported to **Underwriters** as soon as practicable during the **Period of Insurance**, but in no event later than ten (10) days of the discovery by the **Assured** of the **Identity Theft** and (2) the **Identity Theft** took place subsequent to the effective date of the **Assured's** first policy with **Underwriters**.

For purposes of the **Identity Theft Expense** coverage set forth above:

> **Identity Theft** means the acquisition by fraud or other means of the private identifying information for the **Assured's** officers, directors, or **Employees** and the use of such identifying information for financial gain or other purposes.

> **Identity Theft Expense** means those expenses incurred as a direct result of **Identity Theft** for the following:

> 1. the cost of obtaining up to twelve (12) credit reports obtained within twelve (12) months of the discovery of the **Identity Theft** for purposes of determining and restoring credit ratings;

2. fees incurred in reapplying for loans, grants and other credit vehicles that were rejected solely as a result of the **Identity Theft** to which this **Policy** applies;

3. costs incurred in reporting the **Identity Theft** to applicable authorities, agencies, creditors, stores and other persons and entities, including telephone charges, postage, notarization fees, local travel expenses if personal appearance is required and duplication costs;

4. actual wages lost by the officer, director, or **Employee** as a result of time away from work reasonably and necessarily required to take steps in order to correct and repair the results of the **Identity Theft**, including reimbursement for lost paid vacation and personal days used to take such steps;

5. fees and costs charged by an attorney retained by the officer, director, or **Employee** with **Our** approval for purposes of defending any action or removing any judgment or award resulting directly from the **Identity Theft**; and

6. the cost of replacing any personal documents or other materials, including but not limited to passports, driver's licenses and credit and identification cards, which are lost or rendered unusable due directly to the **Identity Theft**.

The aggregate limit of indemnity for this coverage is fifteen thousand dollars ($15,000) for all **Identity Theft Expense** the **Assured** becomes obligated to pay to any and all of its officer, directors and **Employees** due to all **Identity Theft** within the scope of this coverage. No deductible applies to this coverage.

P. **Image Restoration and Counseling (not in addition to the Limit of Liability)**

The **Underwriters** will, subject to the limits of indemnity set forth below, reimburse the **Assured** for **Covered Image Restoration and Counseling Expenses** incurred by the **Assured** as a direct result of **Improper Acts** by any officer, director, or **Employee** of the **Assured** taking place and reported to **Underwriters** during the **Period of Insurance** before.

For purposes of the **Image Restoration and Counseling** coverage set forth above:

**Covered Image Restoration and Counseling Expenses** shall only mean and this coverage shall only apply to the following:

1. The costs of rehabilitation and counseling for the accused officer, director, or **Employee** of the **Assured**, provided the officer, director, or **Employee** is not ultimately found guilty of criminal conduct. No reimbursement of any **Covered Image Restoration and Counseling Expenses** by **Underwriters** to the **Assured** unless and until there has been an acquittal of the officer, director, or **Employee** of the **Assured** accused of committing the **Improper Acts**;

2. The costs charged by a recruiter or expended on advertising for replacement of an officer or director as a result of **Improper Acts** by such officer or director; and

3. The costs of restoring the **Assured's** reputation and public, consumer or client confidence through image consulting.

**Improper Acts** means any criminal, fraudulent, immoral, or scandalous acts or conduct by an officer, director, or **Employee** of the **Assured**, whether or not committed or conducted on behalf of or as part of the business of the **Assured**.

The aggregate limit of indemnity for this coverage is ten thousand dollars ($10,000) for all **Covered Image Restoration and Counseling Expenses** incurred by the **Assured** as a direct result of **Improper Acts** during the **Period of Insurance**. No deductible applies to this coverage.

II. **DEFINITION OF ASSURED**

Each of the following is an **Assured** under this **Insurance** to the extent set forth below:

A. if the **Named Assured** designated in Item 1 of the **Declarations** is an individual, the person so designated but only with respect to the conduct of a fiduciary practice of which the individual is the sole proprietor;

B. if the **Named Assured** designated in Item 1 of the **Declarations** is a partnership or Limited Liability Partnership, the partnership or Limited Liability Partnership so designated;

C. any **Fiduciary** who is a partner in the **Named Assured** including any incorporated partners and their shareholders but solely for acts on behalf of the **Named Assured** designated in Item 1 of the **Declarations**;

D. if the **Named Assured** designated in Item 1 of the **Declarations** is a corporation, Professional Corporation, Professional Association or Limited Liability Corporation, the corporation, Professional Corporation, Professional Association or Limited Liability Corporation so designated;

E. any **Fiduciary** who is a stockholder or member of the corporation, Professional Corporation, Professional Association or Limited Liability Corporation but solely for acts on behalf of such **Named Assured**;

F. any **Fiduciary** acting as an independent contractor but solely for acts on behalf of the **Named Assured** designated in Item 1 of the **Declarations**;

G. any employed **Fiduciary** or other **Employee** or volunteer but solely for acts on behalf of the **Named Assured** designated in Item 1 of the **Declarations**;

H. any person who previously qualified as an **Assured** under C, E, F or G above prior to the termination of the required relationship with the **Named Assured**, but solely for acts on behalf of the **Named Assured** designated in Item 1 of the **Declarations**;

I. any partnership, Limited Liability Partnership, corporation, Professional Corporation, Professional Association or Limited Liability Corporation, advised in writing to the **Underwriters**, of which the **Named Assured** is the successor;

J. any **Fiduciary** who during the **Period of Insurance** becomes a partner, member, stockholder or **Employee** of the **Named Assured** but solely for acts on behalf of the **Named Assured** designated in Item 1 of the **Declarations**;

K. the estate, heirs, executors, administrators, assigns and legal representatives of any **Assured** in the event of such **Assured's** death, incapacity, insolvency or bankruptcy, but only to the extent that such **Assured** would otherwise be provided coverage under this **Insurance**.

Solely in respect of **Hired** and **Non-Owned Auto** Liability Coverage provided in section I.G the DEFINITION of **ASSURED** is deleted in its entirety and replaced with the following:

Each of the following is an **Assured** under this **Insurance** to the extent set forth below:

1. **You**.

2. Any other person using a **Hired Auto** with **Your** permission.

3. With respect to a **Non-Owned Auto**, any **Employee**, partner or Executive Officer of **Yours**, but only while such **Non-Owned Auto** is being used in **Your** business.

4. Any other person or organization, but only with respect to their liability because of acts or omissions of an **Assured** under paragraphs A., B. or C. above.

None of the following is an **Assured**:

i. Any person engaged in the business of his or her employer with respect to **Bodily Injury** to any co-**Employee** of such person injured in the course of employment;

ii. Any person while employed in or otherwise engaged in performing duties related to the conduct of an **Auto Business**, other than an **Auto Business You** operate;

iii. The owner or lessee (of whom **You** are a sublessee) of a **Hired Auto** or the owner of a **Non-Owned Auto** or any agent or **Employee** of any such owner or lessee;

iv. Any person or organization with respect to the conduct of any current or past partnership or joint venture that is not shown as a **Named Assured** in the Declarations.

III. **TERRITORY**

This **Insurance** applies to acts, errors or omissions which take place anywhere in the world provided that **Claim** is first made against the **Assured** within the United States of America, its territories or possessions or Canada during the **Period of Insurance** or **Extended Reporting Period** when purchased in accordance with Clause IX.

IV. **EXCLUSIONS**

The coverage under this **Insurance** does not apply to **Damages** or **Claims Expenses** incurred with respect to:

A. any **Claim** alleging in whole or in part, arising out of, in connection with, or in any way related to **Theft** or any other criminal, dishonest, fraudulent or malicious act, error or omission of any **Assured**, regardless of the existence of additional **Claims** arising from substantially the same circumstances that would otherwise be covered, unless or until entry of a court or tribunal finding or determination of the absence of any actual, criminal, dishonest, fraudulent or malicious purpose or intent supporting any such **Claim**;

However, notwithstanding the foregoing, the insurance afforded by this **Policy** shall apply to **Claims Expenses** incurred in defending any **Claim** which would otherwise be excluded hereunder, other than one for **Theft**, up to a maximum aggregate sublimit of two hundred fifty thousand dollars ($250,000) with such amount eroding the **Limit of Liability**, but shall not apply to any **Damages** which the **Assured** might become legally obligated to pay as a result of such **Claim**.

This exclusion does not apply to **Theft** coverage under section I.H of the **Policy**.

B. fines, penalties or sanctions, except that if a **Claim** shall have been brought against the **Assured** seeking **Damages** as well as fines, penalties or sanctions, then any coverage which may be afforded by this **Policy** will apply to any **Claims Expenses** incurred, without liability, however, for such fines, penalties or sanctions;

C. any **Claim** by one **Assured** under this **Policy** against another **Assured** under this **Policy**;

D. any **Claim** arising out of, in connection with or in any way related to **Bodily Injury, Property Damage, Fire Legal or Advertising Liability**;

> This exclusion shall not apply to **Bodily Injury** and **Property Damage** Liability Coverage provided in section I.F or **Hired** and **Non-Owned Auto** Liability Coverage provided in section I.G.

E. any loss sustained by an **Assured** as a beneficiary or distributee of any trust or estate;

F. any **Claim** arising out of any **Assured's** activities as a trustee, partner, officer, director or **Employee** of any **Employee** trust, charitable organization, corporation, company or business other than that of the **Named Assured** (except where the **Assured** is acting in such capacity by virtue of having been retained to perform **Professional Services** provided that it is notified to **Underwriters** as soon as practicable but no later than within 90 days of such appointment);

G. any **Claim** made by or against or in connection with any business enterprise (including the ownership, maintenance or care of any property in connection therewith), not named in Item 1 of the **Declarations**, which is owned by any **Assured** or in which any **Assured** is a trustee, partner, officer, director or **Employee** (except where the **Assured** is acting in such capacity by virtue of having been retained to perform **Professional Services**), or which is directly or indirectly controlled, operated or managed by any **Assured** in a non-fiduciary capacity;

H. any **Claim** or circumstance which might lead to a **Claim** in respect of which any **Assured** has given notice to the insurer of any other policy in force previous to the effective date of this **Policy**;

I. any **Claim** arising out of any acts, errors, or omissions which took place prior to the effective date of this **Insurance**, if any **Assured** on the effective date knew or could have reasonably foreseen that such acts, errors or omissions might be expected to be the basis of a **Claim**;

J. any **Claim** arising out of any **Assured's** capacity as an elected public official or as an **Employee** of a governmental body, subdivision, or agency thereof unless the **Assured** is deemed an **Employee** solely by virtue of rendering services to such governmental body, the remuneration for which services inures to the benefit of the **Named Assured**;

K. any **Claim** arising out of any **Assured's** activities and/or capacity as a **Fiduciary** under the Employment Retirement Income Security Act of 1974 and its amendment or any regulation or order issued pursuant thereto;

L. any **Claim** directly or indirectly brought about by, arising out of, or attributable to any actual or alleged violation of the Racketeer Influenced and Corrupt Organization Act, 18 USC Sections 1961 et seq., or any comparable state law, and any amendments thereto, or any rules or regulations promulgated thereunder;

M. any **Claim** or circumstance that might lead to a **Claim** arising out of any act, error or omission which took place, or is alleged to have taken place, prior to the retroactive date, if any, as set forth in Item 6 of the Declarations;

N. any **Claim** arising directly or indirectly out of the **Assured's** activities in any trade, business or profession other than a **Fiduciary**, including without limitation activities as a lawyer, accountant, property manager, nurse or other health care provider, securities broker, mortgage banker, mortgage broker, independent third party escrow agent, real estate and/or construction advisor, real estate and/or property appraiser, real estate and/or property developer, insurance agent or insurance broker, or activities involving property syndication, real estate investment trusts, limited partnerships or similar investments.

> This exclusion shall not, however, apply to any **Claim** arising directly or indirectly out of the **Assured's** performance of **Professional Services** simply because such or similar services could be rendered by a lawyer, accountant, property manager, independent third party escrow agent, nurse or other health care provider.

O. any **Claim** seeking, related to, or arising out of any disputes involving an accounting, return or reimbursement of fees, commissions, costs or expenses paid to the **Assured**, paid on the **Assured's** behalf, paid to attorneys or other advisors retained by the **Assured**, or paid at the direction of the **Assured** pursuant to the **Assured's** role in providing **Professional Services**, including but not limited to any fees, costs, expenses or expenditures paid from a trust, estate, guardianship, bank account or other financial instrument under the **Assured's** control;

> While this exclusion applies to the cost of initially preparing or subsequently correcting a trust or estate accounting, it does not exclude coverage for any irreparable, consequential **Damages** resulting from allegedly related acts, errors or omissions in the rendition of **Professional Services** by the **Assured**.

P. any **Claim** arising out of any actual or alleged commingling, conversion, misappropriation, defalcation, or inability or failure to collect or safeguard any funds, premium, escrow of tax money or other property for personal profit or advantage;

Q. any **Claim** involving misappropriation of trade secrets, client lists, any proprietary information or anything related thereto; and/or to any **Claim** arising out of the alleged violation of the Securities Act of 1933, the Securities Exchange Act of 1934, and any amendments thereto, or any related state Blue Sky law or regulation;

R. any **Claim** arising out of the sale or purchase of insurance, or the failure to effect or maintain adequate levels or types of insurance;

This exclusion shall not, however, apply to any **Claim** brought against the **Assured** where such **Claim** arises out of:

1. failure by the **Assured** to determine the scope or existence of insurance coverage for any estate property within 90-days of the **Assured's** first appointment as **Fiduciary** of such estate;

2. failure by the **Assured** to identify property included within an estate after having conducted a diligent search and inventory of the estate within 90-days of the **Assured's** first appointment as **Fiduciary** of such estate;

3. a negligent clerical act, error or omission by or on behalf of the **Assured** in failing to make timely premium payments or otherwise respond to insurance carrier coverage requests to provide documentation and/or information; or

4. any act, error or omission of the **Assured** while acting as a trustee under a life insurance trust;

S. any **Claim** arising out of the **Assured's** services involving investment advice;

This exclusion shall not, however, apply to any **Claim** brought against the **Assured** based upon the **Assured's** alleged negligent retention of a particular investment advisor so long as prior to any such **Claim** being made, the **Assured** had conducted a background check on such investment advisor and had instructed the advisor to develop and implement an investment plan based on the "prudent investor" strategy as set forth in the Uniform Prudent Investor Act or other similar legislation.

T. any **Claim** arising directly or indirectly out of any depreciation or loss of investment when such depreciation or loss arises from fluctuations in any financial stock or commodity or other markets;

U. any **Claim** arising directly or indirectly out of any express or implied warranty or guarantee relating to the financial return of any investment or portfolio of investments;

V. any **Claim** alleging, arising out of, based upon, attributable to, or in consequence of any actual or alleged liability of any **Assured** under any express contract or agreement;

This exclusion shall not however apply to liability for **Damages** that the **Assured** would have in the absence of the contract or agreement.

W. any loss, cost or expense, directly or indirectly arising out of, resulting as a consequence of, or related to the manufacture, mining, processing, distribution, testing, remediation, removal, storage, disposal, sale, use of, or exposure to asbestos or materials or products containing asbestos, whether or not there is another cause of loss which may have contributed concurrently or in any sequence to a loss;

This exclusion shall not however apply to any **Claim** brought against the **Assured** arising out of the provision of **Professional Services**.

X. any loss, costs, or expenses, directly or indirectly arising out of, resulting from or in any manner related to "Fungi" whether or not there is another cause of loss which may have contributed concurrently or in any sequence to a loss;

"Fungi" as utilised herein shall mean any fungus or mycota or any by-product or type of infestation produced by such fungus or mycota, but not limited to mold, mildew, mycotoxins, spores or any biogenic aerosols.

This exclusion shall not however apply to any **Claim** brought against the **Assured** arising out of the provision of **Professional Services**.

Y. any **Claim** arising from the intentional release or disclosure of **Confidential Information** by the **Assured** which is alleged to be in violation of any statute, regulation, ethical rule, court or arbitral order, confidentiality agreement, or any other provision of this **Policy**;

Z. any **Claim** arising from the **Assured's** intentional transmittal of a virus or other electronic infection;

AA. the costs of repairing, replacing, or modifying the **Assured's Data Security System** or clearing the **Assured's Data Security System** of viruses and electronic infections, either preventatively or in response to a **Data Security Breach**, **Client Network Infections**, and/or **Claim** against the **Assured**;

AB. any **Data Security Breach** or **Client Network Infection** occasioned by acts of God, war, riot, civil commotion, insurrection or usurpation of governmental power;

AC. any **Data Security Breach** or **Client Network Infection** brought about by reason of any governmental authority seizing or gaining access to the **Assured's** computer or **Data Security System**;

AD. any proceedings initiated against the **Assured** before a governmental agency in connection with a **Data Security Breach** or **Client Network Infection**, including any audit or other investigation by such governmental agency;

AE. any **Claim** made by a client of the **Assured** arising out of the transmittal of a **Computer Virus** or other electronic infection from that same client's computer network to the **Assured's Data Security System**;

AF. any **Claim** arising out of **Social Engineering Fraud**; however, this exclusion shall not apply up to the aggregate sublimit of fifty thousand dollars ($50,000) for all **Claims** for **Social Engineering Fraud** solely arising out of the rendering of **Professional Services** by the **Assured**;

AG. any **Claim** or circumstance that might lead to a **Claim** arising out of the **Assured's** role as an employer, or joint employer, whether jointly or severally liable as an employer and/or joint employer, directly or indirectly, or in any other capacity whatsoever, to any of its **Employees**, including without limiting the generality of the foregoing, any liability under any Workers' Compensation Law, Labor Law, Unemployment Compensation Law, Disability Benefit Law, Longshore and Harbor Workers' Compensation Act, Jones Act, Death on the High Seas Act, General Maritime Law, Federal Employers' Liability Act, Employers Liability, Employers' Liability as respects Occupational Disease or any similar laws of liabilities, and including without limiting generality of the foregoing, any liability under a negligent hiring or related theory;

AH. any **Claim** or circumstance that might lead to a **Claim** arising out of loss resulting directly or indirectly from war, whether or not declared; civil war; insurrection; rebellion or revolution; military, naval or usurped power; governmental intervention, expropriation or nationalization; or any act or condition related to any of the foregoing; and arising out of loss resulting directly or indirectly from seizure or destruction of property by order of governmental authority;

AI. **Bodily Injury and Property Damage, Fire Legal or Advertising Liability** coverage provided in section I.F and **Hired** and **Non-Owned Auto** liability coverage provided in section I.G, any **Claim** or circumstance that might lead to a **Claim**:

   1. arising out of **Property Damage** or **Bodily Injury** resulting from the use of force expected or intended from the standpoint of the **Assured**;

   2. arising out of **Bodily Injury** or **Property Damage** arising out of ownership, maintenance, operation, use, loading or unloading of any aircraft or watercraft owned by operated by or rented or loaned to any **Assured**. This exclusion does not apply to:

      i. A watercraft while ashore on **Premises You** own or rent;

      ii. A watercraft **You** do not own that is:

         a. Less than 26 feet long; and

         b. Not being used to carry persons or property for a charge;

      iii. Liability assumed under any **Insured Contract** for the ownership, maintenance or use of aircraft or watercraft;

   3. arising out of **Property Damage** or **Bodily Injury** arising out of:

      i. the ownership, maintenance, operation, use, loading or unloading of any **Mobile Equipment** while being used in any prearranged or organized racing, speed or demolition contest or in any stunting activity or in practice or preparation for such contest or activity; or

      ii. the operation or use of any snowmobile, moped or motorized bicycle, or trailer designed for use therewith;

   4. for **Property Damage** or **Bodily Injury** arising out of and in the course of the transportation of **Mobile Equipment** by any **Auto** owned or operated by or rented or loaned to any;

   5. arising out of **Property Damage**, **Bodily Injury** or **Advertising Liability** for which the **Assured** or his or her indemnitee may be held liable:

      i. as a person or organization engaged in the business of manufacturing, distributing, selling, or serving alcoholic beverages; or

      ii. if not so engaged, as an owner or lessor of **Premises** used for such purposes, if such liability is imposed by, or because of the violation of, any statute, ordinance or regulation pertaining to the sale, gift, distribution or use of any alcoholic beverage;

   6. arising out of **Bodily Injury** to:

      i. any **Employee** or volunteer of the Named **Assured** arising out of and in the course of his employment or retention by the Named **Assured**; or

      ii. the spouse, child, parent, brother or sister of the **Employee** as a consequence of above. This exclusion applies:

         a. whether the **Assured** may be liable as an employer or in any other capacity; and

    b. to any obligation to share **Damages** with or repay someone else who must pay **Damages** arising out of such liability;

7. arising out of **Property Damage** to:

    i. property owned or occupied or rented to the **Assured**;

    ii. property used by the **Assured**; or

    iii. property in the care, custody or control of the **Assured** or as to which the **Assured** is for any purpose exercising physical control;

    provided, that this exclusion shall not apply to **Fire Legal Liability**;

8. arising out of **Property Damage** to **Premises** owned or alienated by the **Named Assured** arising out of such **Premises** or any part thereof;

9. arising out of that part of any contract or agreement entered into, as part of **Your** business, pertaining to the rental or lease, by **You** or any of **Your Employees**, of any **Auto**. However, such contract or agreement shall not be considered an **Insured Contract** to the extent that it obligates **You** or any of **Your Employees** to pay for **Property Damage** to any **Auto** rented or leased by **You** or any of **Your Employees**.

10. arising out of loss of use of tangible property which has not been physically injured or destroyed resulting from:

    i. a delay in or lack of performance by or on behalf of the Named **Assured** of any contract or agreement; or

    ii. the failure of the **Named Assured's Products** or work performed by or on behalf of the **Named Assured** to meet the level of performance, quality, fitness or durability warranted or represented by the **Named Assured**;

    but this Exclusion does not apply to loss of use of the other tangible property resulting from the sudden and accidental **Injury** to or destruction of the **Named Assured's Products** or work performed by or on behalf of the **Named Assured** after such products or work have been put to use by any person or organization other than the **Assured**, or products that are still in the **Named Assured's** possession;

11. arising out of **Property Damage** to the **Named Assured's Products**, or for the cost of inspecting, repairing or replacing any defective or allegedly defective product or part thereof or for loss of use of any defective or allegedly defective product;

12. arising out of **Property Damage** to work performed by or on behalf of the **Named Assured** arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith;

13. arising out of the withdrawal, recall, inspection, repair, replacement or loss of life of the **Named Assured's Products** or work completed by or for the **Named Assured** or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein;

14. arising out of **Aircraft Products**, including, but not limited to, consequential loss of use thereof resulting from **Grounding**;

15. relating to **Advertising Liability** arising out of:

    i. failure of performance of contract; provided, however, that this Exclusion shall not apply to the unauthorized appropriation of ideas based upon alleged breach of an implied contract;

    ii. infringement of patent, trademark, service mark, and trade name, other than titles or slogans by use thereof on or in connection with goods, products or services sold, offered for sale or advertised;

    iii. incorrect description or mistake in advertised price of goods, products or services sold, offered for sale or advertised;

    iv. the failure of goods, products or services to conform with advertised quality or performance; or

    v. an offense committed by an **Assured** whose business is advertising, broadcasting, publishing or telecasting;

16. for or arising out of, or resulting from **Property Damage** or **Bodily Injury** for which any **Assured** may be held liable by reason of:

    i. Causing or contributing to the intoxication of any person;

    ii. The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

      iii. Any statute, ordinance or regulation relating to the sale, gift, distribution or use alcoholic beverages;

This exclusion applies only if **You** are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages;

17. any obligation of the **Assured** under a workers' compensation, disability benefits or unemployment compensation law or any similar law;

18. arising out of loss, damage, destruction, distortion, erasure, corruption or alteration of **Electronic Data** from any cause whatsoever (including but not limited to **Computer Virus**) or loss of use, reduction in functionality, cost, expense of whatsoever nature resulting therefrom, regardless of any other cause or event contributing concurrently or in any other sequence to the loss;

19. for or arising out of, or resulting from **Property Damage** or **Bodily Injury** for which any **Assured** may be held liable by reason of:

      i. Physically administering any medication, whether prescription or over-the-counter, to others; or

      ii. Indirectly administering any medication, whether prescription or over-the-counter, to others via a remote and/or computerized system or by instructing a third party to administer said medication; or

      iii. Giving advice or opinion on medication or any medical condition or treatment thereof; or

      iv. Directly or indirectly administering and/or performing medical services commonly administered and/or performed by a nurse, licensed physician, or other licensed or certified medical professional;

20. arising out of **Bodily Injury** to any person while being transported by **You** for a fee.

## V. DEFINITIONS

- "**Advertising Liability**" means injury arising out of one or more of the following, committed in the course of the **Assured's** advertising activities:

        i. libel, slander or defamation;

        ii. infringement of copyright, title, slogan, trade dress, or advertising idea;

        iii. Piracy or idea misappropriation under an implied contract;

        iv. Invasion of right of privacy.

- "**Aircraft Products**" means any aircraft whether or not heavier than air (including spacecraft and missiles) and any ground support, guidance, control or communications equipment used in connection therewith, and also includes parts, supplies, or equipment installed in or on or used in connection with aircraft, including tools, training aids, instructions, manuals, blue prints and other data, engineering and other advice, services and labor used in the operation, maintenance or manufacture of such products.

- "**Auto**" means a land motor vehicle, trailer or semi-trailer designed for travel on public roads, including any attached machinery or equipment.

- "**Auto Business**" means the business or occupation of selling, repairing, servicing, storing or parking **Autos**.

- "**Bodily Injury**" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

- "**Bookkeeper**" means one who performs the mechanical recording of debits and credits or the summarizing of financial information for others for a fee.

- "**Care Manager**" means one who provides the following services to others for a fee:

  1. coordinating assistance from paid service providers and/or unpaid help from family and friends to enable individuals with functional limitations to obtain the highest level of independence consistent with their capacity and preferences for care;

  2. face-to-face interviewing of individuals with functional limitations;

  3. assessment of functional limitations;

  4. care plan development for individuals with functional limitations;

  5. administrative and clerical aspects of care plan implementation and monitoring of individuals with functional limitations.

The services performed by a **Care Manager** do not include:

1. providing actual health care services directly; or

2. performing any services in any trade, business or profession other than a **Care Manager**, including without limitation activities as a nurse or other health care provider.

- **"Claim"** means a demand received by any **Assured** for money or services outside the **Ordinary Course of Business** including the service of suit or institution of arbitration proceedings against the **Assured**.

- **"Claims Expenses"** means:

    1. fees charged by an attorney designated by **Underwriters** and consented to by the **Named Assured**, with such consent not to be unreasonably withheld; and

    2. all other fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a **Claim**, suit or proceeding arising in connection therewith, if incurred by the **Underwriters**, or by the **Assured** with the written consent of the **Underwriters**.

    3. **Claims Expenses** does not include any costs incurred in the **Ordinary Course of Business**, nor any salary, overhead or other charges incurred by the **Assured** for time spent in cooperating in the defense and investigation of any **Claim** or circumstance which might lead to a **Claim** notified under this **Insurance**.

    4. **Claims Expenses** also does not include any fees, costs, expenses or other charges incurred by the **Assured** -- or incurred for or on behalf of the **Assured** -- if such fees, costs, expenses or other charges are payable or reimbursable by any other sources, including but not limited to any applicable trust or estate.

- **"Client Network Infection"** means the actual diagnosed transmittal from the **Assured's Data Security System** to the computer system of a client for whom the **Assured** is performing **Professional Services** of a **Computer Virus** or other electronic infection which causes damage to the client's computer or computer network or disrupts the client's business.

- **"Computer Consultant"** means one who provides to others for a fee advice, implementation, support and management of computer based information systems consisting of pre-packaged (not custom) locally-installed software or remote internet-based applications, as well as personal computer hardware together with associated peripheral devices, all in conjunction with other **Professional Services** aside from those rendered as a **Computer Consultant**.

- **"Computer Virus"** means a set of corrupting, harmful or otherwise unauthorized instructions or code including a set of maliciously introduced unauthorized instructions or code, programmatic or otherwise, that propagate themselves through a computer system or network of whatsoever nature. **Computer Virus** includes but is not limited to 'Trojan Horses', 'worms' and 'time or logic bombs'.

- **"Confidential Information"** means personal and/or financial information of a sensitive nature including but not limited to account numbers, account balances, financial statements, tax returns, social security numbers, and medical and/or healthcare information protected by HIPAA.

- **"Daily Money Manager"** means one who provides any of the following services to others for a fee:

    1. paying bills;

    2. preparing budgets;

    3. reconciling accounts;

    4. making bank deposits;

    5. balancing check books;

    6. preparing checks for signature;

    7. organizing or reviewing incoming correspondence and/or other miscellaneous documents;

    8. organizing tax records or other similar financial documents; or

    9. tracking/monitoring payments to creditors, insurance companies or medical providers.

The services performed by a **"Daily Money Manager"** do not include:

1. incurring debt on behalf of a client;

2. performing any services on behalf of a person adjudged to be legally incompetent;

3. signing checks drawn on a client's account or otherwise withdrawing or transferring funds from a client's account other than to pay bills on behalf of a client pursuant to an express client directive or invoice received in the regular course of business;

4. performing any services in any trade, business or profession other than a **Daily Money Manager**, including without limitation activities as a lawyer, accountant, property manager, nurse or other health care provider,

securities broker, mortgage banker, mortgage broker, independent third party escrow agent, real estate and/or construction advisor, real estate and/or property appraiser, real estate and/or property developer, insurance agent or insurance broker, or activities involving property syndication, real estate investment trusts, limited partnerships or similar investments; or

5. consultation or training in connection with customized financial software.

- "**Damages**" means a monetary judgment, award or settlement, and shall include:

   1. compensatory damages;

   2. damages calculated as a multiple of compensatory damages (where insurable by law);

   3. punitive or exemplary damages (where insurable by law);

   4. pre-judgment interest; and

   5. post-judgment interest that accrues after entry of judgment and before we have paid, offered to pay or deposited in court that part of judgment within the applicable **Limit of Liability**.

   However, **Damages** shall not include any amounts for which the **Assured** is not financially liable or for which there is no legal recourse against the **Assured**, the costs and expenses of complying with any injunctive or other form of equitable relief, the reimbursement of fees, the payment of sanctions, surcharges or any other matters that may be deemed uninsurable under the law.

- "**Data Security Breach**" means the actual breach, violation, unauthorized interception, unauthorized use, or misuse by any person not employed by, an agent of, or otherwise affiliated with or authorized by the **Assured**, of any **Data Security System** maintained by the **Assured** for the purpose of maintaining **Confidential Information** concerning the **Assured's** clients in the course of the **Assured's** provision of **Professional Services**.

- "**Data Security System**" means the **Assured's** computer system and/or computerized network utilized by the **Assured** to store and/or retrieve **Confidential Information** concerning the **Assured's** clients in connection with the **Assured's** rendering of **Professional Services**.

- "**Declarations**" means the front page (or pages) of **Your Insurance Policy** that specifies the **Named Assured**, **Period of Insurance**, **Limits of Liability**, **Deductibles**, forms/endorsements and other key information relating to this **Insurance**.

- "**Electronic Data**" means facts, concepts and information converted to a form useable for communications, interpretation or processing by electronic and electromechanical data processing or electronically controlled equipment and includes programs, software and other coded instructions for the processing and manipulation of data or the direction and manipulation of such equipment.

- "**Employee**" includes a "**Leased Worker**". "**Employee**" does not include a "**Temporary Worker**."

- "**Extended Reporting Period**", if applicable, means the 12 month period of time after the end of the **Period of Insurance** for reporting **Claims** arising out of acts, errors or omissions which take place prior to the end of the **Period of Insurance** and otherwise covered by this **Insurance**.

- "**Fiduciary**" means an **Assured's** capacity as:

   1. a guardian, guardian ad litem, or conservator;

   2. an executor or estate administrator;

   3. a bankruptcy administrator;

   4. a representative payee;

   5. a receiver;

   6. an agent or attorney in fact, serving alone without any co-agent, under a written power of attorney for the person or estate of a natural person, not a commercial or charitable entity; or

   7. a trustee, serving alone without any co-trustee, or trust administrator under trusts created by written trust agreement or court order with respect to the estate of natural persons, not commercial or charitable entities (although trust assets may include ownership interests in such entities).

   **Fiduciary** does not mean an **Assured's** capacity, nor activities as a lawyer, accountant, property manager, nurse or other health care provider, securities broker, mortgage banker, mortgage broker, independent third party escrow agent, real estate and/or construction advisor, real estate and/or property appraiser, real estate and/or property developer, insurance agent or insurance broker, or activities involving property syndication, real estate investment trusts, limited partnerships or similar investments.

- "**Fire Legal Liability**" means **Property Damage** to structures or portions thereof rented to or occupied by the **Named Assured**, including fixtures **Permanently** attached thereto, if such **Property Damage** arises out of fire.

- "**Grounding**" means the withdrawal of one or more aircraft from flight operation or the imposition of speed, passenger or load restrictions on such aircraft because of the existence of or alleged existence of a defect, fault or conditions in any **Aircraft Product**.

- "**Hired Auto**" means any **Auto You** lease, hire, rent or borrow. This does not include any **Auto You** lease, hire, rent or borrow from any of **Your Employees**, **Your** partners or **Your** Executive Officers, or members of their households.

- "**Insured Contract**" means a contract for lease of **Premises**. However, that portion of the contract for a lease of **Premises** that indemnifies any person or organization for damage by fire to **Premises** while rented to the **Named Assured** or temporarily occupied by the **Named Assured** with permission of the owner is not an "**Insured Contract**."

- "**Leased Worker**" means a person leased to the **Named Assured** by a labor leasing firm under an agreement between the **Named Assured** and the labor leasing firm to perform duties related to the conduct of the **Named Assured's** business. "**Leased Worker**" does not include a "**Temporary Worker**."

- "**Limit of Liability**" means the maximum amount for which **Underwriters** will be liable as provided herein.

- "**Mobile Equipment**" means a land vehicle (including any attached machinery or apparatus) whether or not self-propelled:

  i. not subject to motor vehicle registration;

  ii. maintained for use exclusively on premises owned by or rented to the **Named Assured**, including the ways immediately adjoining;

  iii. designed for use principally off public roads; or

  iv. designed or maintained for the sole purpose of affording mobility to equipment of the following types forming an integral part of or **Permanently** attached to such vehicle:

    A. power cranes, shovels, loaders, diggers and drills;

    B. concrete mixers (other than the mix-in-transit type), graders, scrapers, rollers and on the road construction or repair equipment;

    C. air-compressors, pumps and generators including spraying, welding and building cleaning equipment; or

    D. geophysical exploration and well servicing equipment.

- "**Named Assured's Products**" means goods or products manufactured, sold, handled or distributed by the **Named Assured** or by others trading under its name, including any container thereof (other than a vehicle) but shall not include a vending machine or any property, other than such container rented to or located for use of others but not sold.

- "**Non-Owned Auto**" means any **Auto You** do not own, lease, hire, rent or borrow which is used in connection with **Your** business. This includes **Autos** owned by **You**, if **You** are a natural person, **Your Employees**, **Your** partners or **Your** Executive Officers, or members of their households, but only while used in **Your** business.

- "**Occurrence**" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

- "**Ordinary Course of Business**" means the usual, routine or customary services, practices and procedures of an **Assured** in rendering **Professional Services**, including but not limited to the production of, revision or supplement to an accounting, financial statement, invoice or other similar report or document.

- "**Period of Insurance**" means the period of time between the inception date shown in the **Declarations** and the effective date of termination, expiration or cancellation of this **Insurance** and specifically excludes any **Extended Reporting Period** hereunder.

- "**Personal Injury**" means:

  1. false arrest, detention or imprisonment, wrongful entry or eviction or other invasion of the right of private occupance, or malicious prosecution; and/or

  2. libel or slander or other defamatory or disparaging material, or a publication or an utterance in violation of an individual's right of privacy.

- "**Professional Services**" means services provided by an **Assured** to others for a fee, unless acting as a volunteer or in an official pro bono capacity, on behalf of the **Named Assured** in any of the following capacities:

  - **Fiduciary**

  - **Daily Money Manager**

- Computer Consultant

- Care Manager

- Bookkeeper

- **"Property Damage"** means:

  a. physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

  b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the **Occurrence** that caused it.

- **"Social Engineering Fraud"** means the fraudulent, deceptive, or intentional practice of causing others, by means of hacking, phishing, spear phishing, smishing, spoofing, business e-mail compromise, or other similar electronic, telephonic, or other schemes, devices, or ploys seeking to impersonate legitimate persons or entities or influence transactions, to transmit funds or other assets of value electronically or otherwise to persons, entities, or accounts that are not the recipients intended to receive the funds or assets.

- **"Temporary Worker"** means a person who is furnished to the **Assured** to substitute for a **Permanent Employee** on leave to meet seasonal or short-term workload conditions.

- **"Theft"** means the intentional, unlawful taking, diversion or sequestration of money, securities or tangible property to the deprivation of another, including but not limited to such taking, diversion or sequestration by means of any criminal, dishonest, fraudulent or malicious act, error or omission committed with actual, criminal, dishonest, fraudulent or malicious purpose or intent.

- **"Underwriters"** means those certain underwriters at Lloyd's of London subscribed to the **Insurance** afforded hereby.

- **"You"** and **"Your"** means and refers to the **Named Assured**.

Whenever the singular form of a word is used herein, the same shall include the plural when required by the context.

VI. **LIMIT OF LIABILITY**

A. The **Limit of Liability** stated in the **Declarations** as "per **Claim**" is the limit of the **Underwriters'** liability for all **Damages** and **Claims Expenses** arising out of the same, related or continuing **Professional Services** without regard to the number of **Assureds**, **Claims** or claimants.

B. The **Limit of Liability** stated in the **Declarations** as "Aggregate" is the total limit of the **Underwriters'** liability for all **Damages** and **Claims Expenses** arising out of **Claims** or circumstances which might lead to a **Claim** first made and reported to the **Underwriters** during the **Period of Insurance** or during the **Extended Reporting Period** and **Claims** arising out of the same, related or continuing **Professional Services** as such **Claims** or circumstances which might lead to a **Claim**.

C. The **Limit of Liability** for the **Extended Reporting Period** shall be part of, and not in addition to, the **Limits of Liability** of the **Underwriters** for the **Period of Insurance**.

D. If both **Damages** covered by this **Insurance** and damages not covered by this **Insurance** are incurred, either because a **Claim** against any **Assured** includes both covered and uncovered matters or because a **Claim** is made against both **Assureds** and others, the **Assured** and **Underwriters** shall use their best efforts to agree upon a fair and proper allocation of such amount between covered **Damages** and **Claims Expenses** and uncovered portions of damages, settlements, judgments and/or **Claims Expenses**.

E. Notwithstanding Section VI. D above, **Underwriters**, at their sole discretion, have the right and the option to pay for non-covered damages, settlements, judgments and/or **Claims Expenses**, in which event the **Assured** agrees to repay **Underwriters** for any amounts so paid.

F. Additionally, notwithstanding Section VI. D above, any **Damages** or **Claims Expenses** payments made by **Underwriters** shall be repaid to **Underwriters** by the **Assured** in the event and to the extent that the **Assured** shall not be entitled under the terms and conditions of this **Insurance** to payment of such **Damages** or **Claims Expenses**.

G. **Limit of Liability** for **Data Security Breach** and **Client Network Infection**:

  1. Per **Claim**

     The per **Claim Limit of Liability** indicated in the **Declarations** is the limit of the **Underwriters'** liability for all **Damages** and **Claims Expenses** arising out of the same, related or continuing **Professional Services** without regard to the number of **Assureds**, **Claims** or claimants.

  2. Aggregate

The Aggregate **Limit of Liability** for all coverages indicated in the **Declarations** is the total limit of the **Underwriters'** liability for all **Damages** and **Claims Expenses** arising out of **Claims** or circumstances which might lead to a **Claim** first made and reported to the **Underwriters** during the **Period of Insurance** or during the **Extended Reporting Period** and **Claims** arising out of the same, related or continuing **Professional Services** as such **Claims** or circumstances which might lead to a **Claim**.

H. **Limit of Liability** for **Property Damage**, **Bodily Injury** and **Advertising Liability**:

    1. Each **Occurrence**

    The Each **Occurrence Limit of Liability** indicated in the **Declarations** is the most **Underwriters** will pay for all **Claims** first made against the **Assured** and reported to **Underwriters** during the **Period of Insurance** for **Property Damage**, **Bodily Injury** or **Advertising Liability** arising out of any one **Occurrence**. The **Limit of Liability** Each **Occurrence** applies regardless of the number of **Assureds** covered or **Claims** made based on the same **Occurrence** or interrelated **Occurrences**.

    2. Aggregate

    The Aggregate **Limit of Liability** indicated in the **Declarations** is the most **Underwriters** will pay for all **Claims** for **Property Damage**, **Bodily Injury** or **Advertising Liability** first made against the **Assureds** and reported to **Underwriters** during the **Period of Insurance** arising out of all **Occurrences** regardless of the number of **Assureds** covered or **Claims** made against the **Assureds**.

I. **Limit of Liability** for **Fire Legal Liability**:

    1. Each **Occurrence**

    The Each **Occurrence Limit of Liability** indicated in the **Declarations** is the most **Underwriters** will pay for all **Claims** first made against the **Assured** and reported to **Underwriters** during the **Period of Insurance** for **Fire Legal Liability** arising out of any one **Occurrence**. The **Limit of Liability** Each **Occurrence** applies regardless of the number of **Assureds** covered or **Claims** made based on the same **Occurrence** or interrelated **Occurrences**.

    2. Aggregate

    The Aggregate **Limit of Liability** indicated in the **Declarations** is the most **Underwriters** will pay for all **Claims** for **Fire Legal Liability** first made against the **Assureds** and reported to **Underwriters** during the **Period of Insurance** arising out of all **Occurrences** regardless of the number of **Assureds** covered or **Claims** made against the **Assureds**.

J. **Limit of Liability** for **Hired** and **Non-Owned Auto** Liability:

    1. Each **Occurrence**

    The **Hired** and **Non-Owned Auto** Each **Occurrence Limit of Liability** indicated in the **Declarations** is the most **Underwriters** will pay for all **Claims** first made against the **Assured** and reported to **Underwriters** during the **Period of Insurance** for **Property Damage** or **Bodily Injury** arising out of any one **Occurrence**. The **Limit of Liability** Each **Occurrence** applies regardless of the number of **Assureds** covered or **Claims** made based on the same **Occurrence** or interrelated **Occurrences**.

    2. Aggregate

    The **Hired** and **Non-Owned Auto** Aggregate **Limit of Liability** indicated in the **Declarations** is the most **Underwriters** will pay for all **Claims** for **Property Damage** or **Bodily Injury** first made against the **Assureds** and reported to **Underwriters** during the **Period of Insurance** arising out of all **Occurrences** regardless of the number of **Assureds** covered or **Claims** made against the **Assureds**.

These **Limits of Liability** stated above are part of, and not in addition to, the General Liability Limits listed in the **Declarations**.

K. The Aggregate **Limit of Liability** for all coverages indicated in the **Declarations** is the most **Underwriters'** will pay in the aggregate for all amounts payable by **Underwriters'** for all coverages afforded under this **Policy**.

VII. **DEDUCTIBLE**

The **Deductible** amount stated in the **Declarations**, shall be satisfied by payments by the **Assured** of **Damages** and **Claims Expenses** resulting from each **Claim** first made and reported to the **Underwriters** during the **Period of Insurance** and the **Extended Reporting Period** as a condition precedent to the payment by the **Underwriters** of any amounts hereunder and the **Underwriters** shall be liable only for amounts in excess of such **Deductible** subject to **Underwriters'** total liability not exceeding the limit set forth in Item 3 of the **Declarations**. The **Assured** shall make direct payments within the **Deductible** to appropriate other parties designated by the **Underwriters**.

If the **Assured**, at **Underwriters'** written request, submits a **Claim** to alternative dispute resolution in accordance with the rules of the American Arbitration Association or the Defense Research Institute, and such **Claim** is settled through this process, the **Deductible** obligation stated in the Declarations shall be deemed to be fifty percent (50%).

VIII. **INNOCENT ASSURED**

    A. Whenever coverage under this **Insurance** would be excluded, suspended or lost:

        1. because of any exclusion relating to criminal, dishonest, fraudulent or malicious acts, errors or omissions by any **Assured**, and with respect to which any other **Assured** did not personally participate or personally acquiesce or remain passive after having personal knowledge thereof, or

        2. because of non-compliance with Clause XI Notice of **Claim** or Circumstance that may lead to a **Claim**, with respect to which any other **Assured** shall be in default solely because of the failure to give such notice or concealment of such failure by one or more **Assureds** responsible for the loss or damage otherwise insured hereunder,

    the **Underwriters** agree that such insurance as would otherwise be afforded under this **Policy** shall cover and be paid with respect to those **Assureds** who did not personally commit or personally participate in committing or personally acquiesce in or remain passive after having personal knowledge of (a) one or more of the acts, errors or omissions described in any such exclusion; or (b) such failure to give notice, provided that if the condition be one with which such **Assured** can comply, after receiving knowledge thereof, the **Assured** entitled to the benefit of Clause VIII shall comply with such condition promptly after obtaining knowledge of the failure of any other **Assured** hereunder to comply therewith.

    B. With respect to this provision, the **Underwriters'** obligation to pay in such event shall be in excess of the **Deductible** and in excess of the full extent of any assets of any **Assured** to whom the exclusion applies. Coverage under this **Innocent Assured** section shall only apply to **Claims** not otherwise subject to coverage under section I.H of this **Policy**, whether purchased or not. However, subject to the terms and conditions of the **Policy** the **Innocent Assured** section will apply to criminal, dishonest, fraudulent or malicious acts, errors or omissions by any **Assured** not subject to coverage under section I.H of this **Policy**. In no event shall the **Underwriters'** obligation to pay exceed the **Limit of Liability** stated in Item 3 of the **Declarations**. Additionally, in no event shall the **Underwriters'** obligation to pay **Claim Expenses** exceed two hundred fifty thousand dollars ($250,000).

IX. **EXTENDED REPORTING PERIOD**

    A. **Extended Reporting Period Options**

        1. **Automatic Extended Reporting Period**

        If **Underwriters** or the **Assured** shall cancel or elect not to renew this **Policy**, the **Named Assured** designated in Item 1 of the **Declarations** shall have the right following the effective date of such cancellation or non-renewal to a period of sixty (60) days (herein referred to as the "Automatic **Extended Reporting Period**") in which to give written notice to **Underwriters** of **Claims** first made against the **Assured** during the Automatic **Extended Reporting Period** for any wrongful act occurring prior to the end of the policy period and otherwise covered by this **Policy**. The Automatic **Extended Reporting Period** shall not apply to **Claims** that are covered under any subsequent insurance **You** purchase or which is purchased for the **Assured's** benefit, or that would be covered by such subsequent insurance but for: (1) the exhaustion of the amount of insurance applicable to such **Claims**; or (2) any applicable retention or deductible.

        2. **Optional Extended Reporting Period**

        In the event of cancellation or non-renewal of this **Insurance** by **Underwriters** or the **Assured**, the **Named Assured** designated in Item 1 of the **Declarations** shall have the right, upon payment in full and not proportionally or otherwise in part of one hundred percent (100%) of the Premium set forth in Item 5 of the **Declarations** to have issued an endorsement providing a 12 month **Extended Reporting Period** for **Claims** first made against any **Assured** and reported to the **Underwriters** during the **Extended Reporting Period**, subject to the conditions set forth in the definition of **Extended Reporting Period** herein.

        3. **Optional Retirement Extended Reporting Period**

        In the event of non-renewal of this **Insurance** because of retirement (where the **Named Assured Permanently** ceases to render **Professional Services**) by the **Named Assured** designated in Item 1 of the Declarations, provided that the **Named Assured** is a sole practitioner, the **Named Assured** shall have the right to have issued an endorsement providing a 12 months **Extended Reporting Period** for **Claims** first made against any **Assured** and reported to the **Underwriters** during the **Extended Reporting Period**, subject to the conditions set forth in the definition of **Extended Reporting Period** herein.

        The calculation of the additional Premium for the **Extended Reporting Period** endorsement shall be according to the following table:

- For **Assureds** who have purchased insurance coverage under this program for a period of three consecutive years or less -- an additional premium of one hundred percent (100%) of the expiring annual policy premium.

- For **Assureds** who have purchased insurance coverage under this program for a period of four consecutive years -- an additional premium of ninety percent (90%) of the expiring annual policy premium.

- For **Assureds** who have purchased insurance coverage under this program for a period of five consecutive years -- an additional premium of eighty percent (80%) of the expiring annual policy premium.

- For **Assureds** who have purchased insurance coverage under this program for a period of six consecutive years -- an additional premium of seventy percent (70%) of the expiring annual policy premium.

- For **Assureds** who have purchased insurance coverage under this program for a period of seven consecutive years -- an additional premium of sixty percent (60%) of the expiring annual policy premium.

- For **Assureds** who have purchased insurance coverage under this program for a period of eight or more consecutive years -- an additional premium of fifty percent (50%) of the expiring annual policy premium.

B. In order for the **Named Assured** to invoke the Extended Reporting option, the payment of the premium for the **Extended Reporting Period** must be paid to **Underwriters** within 30 days of the non-renewal or cancellation.

C. The **Limit of Liability** for the **Extended Reporting Period** shall be part of, and not in addition to, the **Limits of Liability** of the **Underwriters** for the **Period of Insurance**.

D. The quotation by **Underwriters** of a different premium or deductible or limits of liability or changes in policy language for the purpose of renewal shall not constitute a refusal to renew by the **Underwriters**.

E. The right to the **Extended Reporting Period** shall not be available to the **Named Assured** where cancellation or non-renewal by the **Underwriters** is due to non-payment of premium or failure of an **Assured** to pay such amounts in excess of the applicable **Limit of Liability** or within the amount of the applicable **Deductible**.

F. All notices and premium payments with respect to the Extended Reporting option shall be directed to **Underwriters** through the entity named in Item 9 of the **Declarations**.

G. At the commencement of the **Extended Reporting Period** the entire premium shall be deemed earned, and in the event the **Named Assured** terminates the **Extended Reporting Period** for any reason prior to its natural expiration, **Underwriters** will not be liable to return any premium paid for the **Extended Reporting Period**.

## X. OTHER INSURANCE

This **Insurance** shall apply in excess of any other valid and collectible insurance available to any **Assured**, unless such other insurance is a surety bond or is written only as specific excess insurance over the **Limit of Liability** of this **Policy**.

## XI. NOTICE OF CLAIM, OR CIRCUMSTANCE THAT MAY LEAD TO A CLAIM

A. If any **Claim** is made against the **Assured**, the **Assured** shall immediately forward to **Underwriters** through persons named in Item 7 of the **Declarations** every demand, notice, summons or other process received by him or his representative.

B. If during the **Period of Insurance** the **Assured** first becomes aware of any act, error or omission that could reasonably be the basis for a **Claim** it must give written notice to **Underwriters** through persons named in Item 7 of the **Declarations** as soon as practicable during the **Period of Insurance** of:

   1. the specific act, error or omission; and

   2. the injury or damage which may result or has resulted from the act, error or omission; and

   3. the circumstance by which the **Assured** first became aware of the act, error or omission.

   Any subsequent **Claim** made against the **Assured** which is the subject of the written notice shall be deemed to have been made at the time written notice was first given to **Underwriters**.

C. In the event the **Assured** becomes aware of a **Data Security Breach** or **Client Network Infection**, the **Assured** shall promptly notify **Underwriters**, through persons named in Item 7 of the **Declarations**, of such occurrence regardless of whether a **Claim** has been made against the **Assured**.

D. With respect to any actual or potential **Data Security Breach** or **Client Network Infection Claim**, the **Assured** consents to **Underwriters** engaging, at their own expense, a computer forensics specialist or security specialist to investigate the circumstances surrounding the **Claim**, and the **Assured** agrees to cooperate fully with any such specialist.

E. A **Claim** shall be considered to be reported to the **Underwriters** when notice is first given to **Underwriters** through persons named in Item 7 of the **Declarations** of the **Claim** or of an act, error or omission which could reasonably be expected to give rise to a **Claim**.

F. All **Claims** arising out of the same, continuing or related **Professional Services** shall be considered a single **Claim** and deemed to have been made at the time the first of the related **Claims** is reported to **Underwriters** and shall be subject to one **Limit of Liability**.

G. In the event of non-renewal of this **Insurance** by the **Underwriters**, the **Assured** shall have sixty (60) days from the expiration date of the **Period of Insurance** to notify **Underwriters** of **Claims** made against the **Assured** during the **Period of Insurance** which arises out of any act, error or omission which took place prior to the termination date of the **Period of Insurance** and otherwise covered by this **Insurance**.

H. If any **Assured** shall make any **Claim** under this **Policy** knowing such **Claim** to be false or fraudulent, as regards amount or otherwise, this **Policy** shall become null and void and all coverage hereunder shall be forfeited.

## XII. ASSISTANCE AND COOPERATION OF THE ASSURED

The **Assured** shall co-operate with the **Underwriters** in all investigations, including investigations regarding the application and coverage under this **Insurance** and, upon the **Underwriters'** request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization other than an **Employee** of any **Assured** who may be liable to the **Assured** because of acts, errors or omissions with respect to which insurance is afforded under this **Policy**; and the **Assured** shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The **Assured** shall not, except at his own cost, admit liability, make any payment, assume any obligation, incur any expense, enter into any settlement, stipulate to any judgment or award or otherwise dispose of any **Claim** without the consent of the **Underwriters**.

## XIII. ACTION AGAINST UNDERWRITERS

No action shall lie against the **Underwriters** unless, as a condition precedent thereto, there shall have been full compliance with all terms of this **Insurance**, nor until the amount of the **Assured's** obligation to pay shall have been finally determined either by judgment or award against the **Assured** after actual trial or arbitration or by written agreement of the **Assured**, the claimant and the **Underwriters**.

Any person or organization or the legal representative thereof who has secured such judgment, award or written agreement shall thereafter be entitled to make a **Claim** under this **Policy** to the extent of the insurance afforded by this **Policy**. No person or organization shall have any right under this **Insurance** to join the **Underwriters** as a party to an action or other proceeding against the **Assured** to determine the **Assured's** liability, nor shall the **Underwriters** be impleaded by the **Assured** or his legal representative. Bankruptcy or insolvency of the **Assured** or of the **Assured's** estate shall not relieve the **Underwriters** of any of their obligations hereunder.

## XIV. SUBROGATION

In the event of any payment under this **Insurance**, the **Underwriters** shall be subrogated to all the **Assured's** rights of recovery therefor against any person or entity and the **Assured** shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The **Assured** shall do nothing after the payment of **Damages** by **Underwriters** to prejudice such rights.

## XV. CHANGES

Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this **Insurance** or estop the **Underwriters** from asserting any right under the terms of this **Insurance**; nor shall the terms of this **Insurance** be waived or changed, except by endorsement issued to form a part of this **Insurance**, signed by **Underwriters**.

## XVI. CHANGE IN MEMBERSHIP OF FIRM

Any additions to the list of **Fiduciaries** in the application which take place during the **Period of Insurance** must be immediately reported to **Underwriters** in the event that:

A. the total number of new **Fiduciaries** brought into or added to the firm during the **Period of Insurance** increases the number of **Fiduciaries** as stated in the application for coverage by 5 persons or 10% of the total number of **Fiduciaries** listed in the application, whichever amount is greater; or

B. any **Fiduciary** brought into or added to the firm during the **Period of Insurance** had been or was in the process of being reprimanded or censured by any court or association body or disqualified or prohibited from practicing in a specified area of **Professional Services**; or

C. prior to joining the firm, any **Claim** had been made against the **Fiduciary** or the **Fiduciary** had become aware of circumstances that might lead to a **Claim**.

**Underwriters** expressly reserve the right to demand a premium adjustment in the event that any additions to the list of **Fiduciaries** in the application for this **Insurance** meet the criteria set forth in the paragraphs immediately above.

## XVII. MERGERS AND ACQUISITIONS

The **Named Assured** shall be required to give written notice to the **Underwriters** prior to the completion of a merger or acquisition by or of the **Named Assured** and **Underwriters** expressly reserve the right to demand a premium adjustment if this **Insurance** is to remain in force subsequent to any merger or acquisition.

## XVIII. ASSIGNMENT

The interest hereunder of any **Assured** is not assignable. If the **Assured** shall die or be adjudged incompetent, this **Insurance** shall cover the **Assured's** legal representative as the **Assured** with respect to liability previously incurred and covered by this **Insurance**.

## XIX. CANCELLATION

A. This **Policy** may be canceled by the **Named Assured** by surrender thereof to **Underwriters** or by mailing to **Underwriters** written notice stating when thereafter the cancellation shall be effective. This **Insurance** may be canceled by the **Underwriters** by mailing to the **Named Assured** at the address shown in the **Declarations** written notice stating when not less than 60 days thereafter such cancellation shall be effective. However, if the **Underwriters** cancel this **Insurance** because the **Assured** has failed to pay a premium when due this **Insurance** may be canceled by the **Underwriters** by mailing a written notice of cancellation to the **Named Assured** at the address shown in the **Declarations** stating when not less than 10 days thereafter such cancellation shall be effective. The mailing of notice as aforesaid shall be sufficient proof of notice. The time of surrender or the effective date and hour of cancellation stated in the notice shall become the end of the **Period of Insurance**. Delivery (where permitted by law) of such written notice either by the **Named Assured** or by the **Underwriters** shall be equivalent to mailing.

B. If the **Named Assured** cancels this **Insurance**, earned premium shall be computed in accordance with the attached short rate table and procedure. If the **Underwriters** cancel this **Insurance**, earned premium shall be computed pro rata. Premium adjustment may be made either at the time cancellation is effected or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

## XX. ENTIRE CONTRACT

By acceptance of this **Policy** the **Assured** agrees that the statements in the Declarations and application are his agreements and representations, that this **Insurance** is issued in reliance upon the truth of such representations and that this **Policy** embodies all agreements existing between the **Assured** and the **Underwriters** relating to this **Insurance**.

## XXI. NUCLEAR INCIDENT EXCLUSION CLAUSE - LIABILITY - DIRECT

This **Policy** does not apply:

A. Under any liability coverage, to injury, sickness, disease, death or destruction:

1. with respect to which an **Assured** under the **Policy** is also an **Assured** under a nuclear energy liability policy issued by Nuclear Energy Liability **Insurance** Association, Mutual Atomic Energy Liability **Underwriters** or Nuclear **Insurance** Association of Canada, or would be an **Assured** under any such policy but for its termination upon exhaustion of its **Limit of Liability**; or

2. resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the **Assured** is, or had this **Policy** not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

B. Under any medical payments coverage, or under any supplementary payments provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

C. Under any liability coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if:

1. the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an **Assured** or (2) has been discharged or dispersed therefrom;

2. the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an **Assured**; or

3. the injury, sickness, disease, death or destruction arises out of the furnishing by an **Assured** of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion 3 applies only to injury to or destruction of property at such nuclear facility.

D. As used in this Clause (XXI):

"hazardous properties" include radioactive, toxic or explosive properties; "nuclear material" means source material, special nuclear material or by-product material; "source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act 1954 or in any law amendatory thereof; "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor; "waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph 1 or 2 thereof; "nuclear facility" means:

1. any nuclear reactor,

2. any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

3. any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the **Assured** at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

4. any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste, and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material. With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this clause is subject to the terms, exclusions, conditions and limitations of the **Policy** of which it is a part.

In relation to liability arising outside the USA, its Territories or Possessions, Puerto Rico or the Canal Zone, the **Policy** does not cover any liability of whatsoever nature directly or indirectly caused by or contributed to by or arising from ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel.

XXII. **SERVICE OF SUIT**

A. It is agreed that in the event of the failure of the **Underwriters** to pay any amount claimed to be due under this **Insurance**, the **Underwriters**, at the request of the **Named Assured**, will submit to the jurisdiction of a court of competent jurisdiction within the United States. This clause does not constitute and should not be understood to constitute an agreement by **Underwriters** that an action is properly maintained in a specific forum, nor may it be construed as a waiver of the **Underwriters'** rights to commence an action in a court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any State of the United States, all of which rights the **Underwriters** expressly reserve. It is further agreed that service of process in such suit may be made upon the persons named in Item 8 of the **Declarations** and that in any suit instituted against any one of them upon this **Policy** the **Underwriters** will abide by the final decision of such court or of any Appellate Court in the event of an appeal.

B. The persons named in Item 8 of the **Declarations** are authorized and directed to accept service of process on behalf of the **Underwriters** in any such suit and/or upon the request of the **Named Assured** to give written undertaking to the **Named Assured** that they will enter a general appearance upon **Underwriters'** behalf in the event such a suit shall be instituted. Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, **Underwriters** hereon hereby designate the Superintendent, Commissioner or Director of **Insurance** or other officer specified for that purpose in the statute or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the **Named Assured** or any beneficiary hereunder arising out of this **Policy** of insurance, and hereby designate the persons named in Item 8 of the **Declarations** as the persons to whom the said officer is authorized to mail such process or a true copy thereof.

XXIII. **SHORT RATE CANCELLATION TABLE**

Notwithstanding anything to the contrary contained herein and in consideration of the premium for which this **Insurance** is written it is agreed that in the event of cancellation thereof by the **Assured** the Earned Premium shall be computed as follows:

A. For insurance written for one year:

| Days In Force | % | Days In Force | % | Days In Force | % | Days In Force | % |
|---|---|---|---|---|---|---|---|
| 1 | 5 | 66-69 | 29 | 154-156 | 53 | 256-260 | 77 |
| 2 | 6 | 70-73 | 30 | 157-160 | 54 | 261-264 | 78 |
| 3-4 | 7 | 74-76 | 31 | 161-164 | 55 | 265-269 | 79 |
| 5-6 | 8 | 77-80 | 32 | 165-167 | 56 | 270-273 (9 months) | 80 |
| 7-8 | 9 | 81-83 | 33 | 168-171 | 57 | 274-278 | 81 |
| 9-10 | 10 | 84-87 | 34 | 172-175 | 58 | 279-282 | 82 |
| 11-12 | 11 | 88-91 (3 months) | 35 | 176-178 | 59 | 283-287 | 83 |

| Days | % | Days | % | Days | % | Days | % |
|------|---|------|---|------|---|------|---|
| 13-14 | 12 | 92-94 | 36 | 179-182 (6 months) | 60 | 288-291 | 84 |
| 15-16 | 13 | 95-98 | 37 | 183-187 | 61 | 292-296 | 85 |
| 17-18 | 14 | 99-102 | 38 | 188-191 | 62 | 297-301 | 86 |
| 19-20 | 15 | 103-105 | 39 | 192-196 | 63 | 302-305 (10 months) | 87 |
| 21-22 | 16 | 106-109 | 40 | 197-200 | 64 | 306-310 | 88 |
| 23-25 | 17 | 110-113 | 41 | 201-205 | 65 | 311-314 | 89 |
| 26-29 | 18 | 114-116 | 42 | 206-209 | 66 | 315-319 | 90 |
| 30-32 (1 month) | 19 | 117-120 | 43 | 210-214 (7 months) | 67 | 320-323 | 91 |
| 33-36 | 20 | 121-124 (4 months) | 44 | 215-218 | 68 | 324-328 | 92 |
| 37-40 | 21 | 125-127 | 45 | 219-223 | 69 | 329-332 | 93 |
| 41-43 | 22 | 128-131 | 46 | 224-228 | 70 | 333-337 (11 months) | 94 |
| 44-47 | 23 | 132-135 | 47 | 229-232 | 71 | 338-342 | 95 |
| 48-51 | 24 | 136-138 | 48 | 233-237 | 72 | 343-346 | 96 |
| 52-54 | 25 | 139-142 | 49 | 238-241 | 73 | 347-351 | 97 |
| 55-58 | 26 | 143-146 | 50 | 242-246 (8 months) | 74 | 352-355 | 98 |
| 59-62 (2 months) | 27 | 147-149 | 51 | 247-250 | 75 | 356-360 | 99 |
| 63-65 | 28 | 150-153 (5 months) | 52 | 251-255 | 76 | 361-365 (12 months) | 100 |

% = Percentage of annual premium deemed earned

B. For insurances written for more or less than one year:

    1. If insurance has been in force for 12 months or less, apply the standard short rate table for annual insurances to the full annual premium determined as for an insurance written for a term of one year.

    2. If insurance has been in force for more than 12 months:

        a. Determine full annual premium as for an insurance written for a term of one year.

        b. Deduct such premium from the full insurance premium, and on the remainder calculate the pro rata Earned Premium on the basis of the ratio of the length of time beyond one year the insurance has been in force to the length of time beyond one year for which the insurance was originally written.

        c. Add premium produced in accordance with items a and b to obtain Earned Premium during full period insurance has been in force.

### POLICYHOLDER DISCLOSURE NOTICE OF TERRORISM INSURANCE COVERAGE

**You** are hereby notified that, under the Terrorism Risk Insurance Act (the "Act"), effective December 26, 2007, this **Policy** makes available to **You** insurance for losses arising out of certain acts of terrorism. Terrorism is defined as any act certified by the Secretary of the Treasury, in concurrence with the Secretary of State, and the Attorney General of the United States, to be an **Act of Terrorism**; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States Mission; and to have been committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the **Policy** or affect the conduct of the United States Government by coercion.

**You** should know that the insurance provided by **Your Policy** for losses caused by acts of terrorism is partially reimbursed by the United States under the formula set forth in the Act. Under this formula, the United States pays 85% of covered terrorism losses that exceed the statutorily established deductible to be paid by the insurance company providing the coverage. However, if aggregate **Assured** losses attributable to terrorist acts certified under the Act exceed $100 billion in a Program Year (January 1 through December 31), the treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

If aggregate **Assured** losses attributable to terrorist acts certified under the Act exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case **Assured** losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

The portion of **Your Policy's** annual premium that is attributable to insurance for such acts of terrorism is: $0.

If **You** have any questions about this notice, please contact **Your** agent or broker.

Dominion Insurance Services Inc. © 2020 | All Rights Reserved.



370 Park Street, Suite 8, Moraga CA. 94556
341 S. Main, Suite 100, Alpine UT. 84004
888.313.9977(t) ~ 925.313.9978(f)
info@dominioninsurance.com
dominion-insurance.com

## General Change Endorsement

In consideration of the premium charged for which this **Insurance** is written, it is hereby understood and agreed that the wording listed under Forms & Notices on the Declarations is included as part of this **Policy**.

All other terms and conditions of the **Policy** remain unchanged.

General Change Endorsement (05/17)
Dominion Insurance Services Inc. © 2020 | All Rights Reserved.



370 Park Street, Suite 8, Moraga CA. 94556
341 S. Main, Suite 100, Alpine UT. 84004
888.313.9977(t) ~ 925.313.9978(f)
info@dominioninsurance.com
dominion-insurance.com

**FPL Change Endorsement**
**Deletion of Co-Trustee/Co-Agent Restriction**

In consideration of the premium for which this **Insurance** is written it is hereby understood and agreed that section V.H. of the **Policy** is amended to include the following as part of the definition of **Fiduciary**:

<u>Old Wording</u>:

H. "**Fiduciary**" means an **Assured's** capacity as:

    viii.  an agent or attorney in fact, <u>*serving alone without any co-agent*</u>, under a written power of attorney forthe person or estate of a natural person, not a commercial or charitable entity [emphasis added]; or

    ix.  a trustee, <u>*serving alone without any co-trustee*</u>, or trust administrator under trusts created by written trust agreement or court order with respect to the estate of natural persons, not commercial or charitable entities (although trust assets may include ownership interests in such entities) [emphasis added].

<u>New (Revised) Wording</u>:

H. "**Fiduciary**" means an **Assured's** capacity as:

    viii.  an agent or attorney in fact, under a written power of attorney for the person or estate of a natural person, not a commercial or charitable entity; or

    ix.  a trustee or trust administrator, under trusts created by written trust agreement or court order with respect to the estate of natural persons, not commercial or charitable entities (although trust assets may include ownership interests in such entities).

All other terms and conditions of the **Policy** remain unchanged.

Dominion FPL Change Endorsement (02/08)

Dominion Insurance Services Inc. © 2020 | All Rights Reserved.



370 Park Street, Suite 8, Moraga CA. 94556
341 S. Main, Suite 100, Alpine UT. 84004
888.313.9977(t) ~ 925.313.9978(f)
info@dominioninsurance.com
dominion-insurance.com

## Specific Claim(s) Exclusion Endorsement

In consideration of the premium for which this **Insurance** is written it is hereby understood and agreed that this **Policy** does not apply to any claims brought by or related to any entity listed on the Declarations Page.

All other terms and conditions of the **Policy** remain unchanged.

Specific Claim(s) Exclusion Endorsement (11/15)

Dominion Insurance Services Inc. © 2020 | All Rights Reserved.



370 Park Street, Suite 8, Moraga CA. 94556
341 S. Main, Suite 100, Alpine UT. 84004
888.313.9977(t) ~ 925.313.9978(f)
info@dominioninsurance.com
dominion-insurance.com

### Medication Coordinator Endorsement

In consideration of the premium for which this **Insurance** is written it is understood and agreed that section V of the **Policy** is hereby amended as follows:

1. **Medication Coordinator** is added to the list of insured capacities under the definition of **Professional Services**; and

2. The following definition of **Medication Coordinator** is hereby added to this Policy.

"**Medication Coordinator**" means one who provides one or more of the following services to others for a fee:
   i. retrieving from a pharmacy medications prescribed by a physician (hereinafter the "Doctor") of a client, ward or conservatee;

   ii. filling weekly medication reminder pill boxes according to the Doctor's instructions.

   iii. reviewing with the **Assured's** client, ward or conservatee the manufacturer's warnings and/or instructions

Notwithstanding the foregoing, "**Medication Coordinator**" does not mean one who physically administers any medication to others. Nor shall the activity of medication coordinator cover any liability arising out of the giving of advice or opinion on medication or any medical condition.

All other terms and conditions of the **Policy** remain unchanged.

Fiduciary Trainer Endorsement (07/10)

Dominion Insurance Services Inc. © 2020 | All Rights Reserved.



370 Park Street, Suite 8, Moraga CA. 94556
341 S. Main, Suite 100, Alpine UT. 84004
888.313.9977(t) ~ 925.313.9978(f)
info@dominioninsurance.com
dominion-insurance.com

## Neutral Facilitator Endorsement

In consideration of the premium for which this **Insurance** is written it is understood and agreed that the **Policy** is hereby amended as follows:

1. "**Neutral Facilitator**" is added to the list of insured capacities under the definition of **Professional Services** found in section V of the **Policy**.

2. The following Definition is added to section V of the **Policy**:

   "**Neutral Facilitator**" means one who provides services to others for a fee in any of the following capacities:

   1. Arbitrator;

   2. Mediator; or

   3. Court-Appointed Referee, Special Master, Neutral Evaluator or Judge Pro Tem.

3. The following exclusion is added to section IV of the **Policy**:

   to any **Claim** arising out of or in any way related to conflicts of interest, including but not limited to conflicts of interest alleged to have resulted from any **Assured** having rendered **Professional Service**s other than as a **Neutral Facilitator** to any party to a dispute resolution proceeding in which such **Assured** subsequently acts as a **Neutral Facilitator**.

All other terms and conditions of the **Policy** remain unchanged.

Neutral Facilitator Endorsement (12/15)

Dominion Insurance Services Inc. © 2020 | All Rights Reserved.



370 Park Street, Suite 8, Moraga CA. 94556
341 S. Main, Suite 100, Alpine UT. 84004
888.313.9977(t) ~ 925.313.9978(f)
info@dominioninsurance.com
dominion-insurance.com

## Notary Public Endorsement

In consideration of the premium for which this Insurance is written it is understood and agreed that the Policy is hereby amended as follows:

1. "**Notary Public**" is added to the list of insured capacities under the definition of **Professional Services** found in section V of the **Policy**; and

2. The following exclusion is added to section IV of the policy:
    to any **Claim** arising out of or in any way related to any notarization(s) performed by any **Assured** absent the immediate physical presence of the signatory(ies).

All other terms and conditions of the **Policy** remain unchanged.

Notary Public Endorsement (12/08)

Dominion Insurance Services Inc. © 2020 | All Rights Reserved.



370 Park Street, Suite 8, Moraga CA. 94556
341 S. Main, Suite 100, Alpine UT. 84004
888.313.9977(t) ~ 925.313.9978(f)
info@dominioninsurance.com
dominion-insurance.com

It is hereby understood and agreed that this insurance is subject to the following clauses:

## WAR AND TERRORISM EXCLUSION ENDORSEMENT

Notwithstanding any provision to the contrary within this insurance or any endorsement thereto it is agreed that this insurance excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss;

1. war, invasion, acts of foreign enemies, hostilities or warlike operations (whether war be declared or not), civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power; or

2. any act of terrorism.
   For the purpose of this endorsement an act of terrorism means an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organisation(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear.

This endorsement also excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to 1. and/or 2. above.

If the Underwriters allege that by reason of this exclusion, any loss, damage, cost or expense is not covered by this insurance the burden of proving the contrary shall be upon the Assured.

In the event any portion of this endorsement is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

**NMA2918**
**08/10/2001**

Dominion Insurance Services Inc. © 2020 | All Rights Reserved.



370 Park Street, Suite 8, Moraga CA. 94556
341 S. Main, Suite 100, Alpine UT. 84004
888.313.9977(t) ~ 925.313.9978(f)
info@dominioninsurance.com
dominion-insurance.com

## SEVERAL LIABILITY NOTICE

The subscribing Insurers' obligations under contracts of insurance to which they subscribe are several and not joint and are limited solely to the extent of their individual subscriptions. The subscribing Insurers are not responsible for the subscription of any co-subscribing Insurer who for any reason does not satisfy all or part of its obligations.

LSW1001

Dominion Insurance Services Inc. © 2020 | All Rights Reserved.



370 Park Street, Suite 8, Moraga CA. 94556
341 S. Main, Suite 100, Alpine UT. 84004
888.313.9977(t) ~ 925.313.9978(f)
info@dominioninsurance.com
dominion-insurance.com

**List of Lloyd's Syndicates**

100.0000% Lloyd's Syndicate 609 AUW, UK

100.0000%

Dominion Insurance Services Inc. © 2020 | All Rights Reserved.



370 Park Street, Suite 8, Moraga CA. 94556
341 S. Main, Suite 100, Alpine UT. 84004
888.313.9977(t) ~ 925.313.9978(f)
info@dominioninsurance.com
dominion-insurance.com

**PROFESSIONAL FIDUCIARY BUSINESS LIABILITY INSURANCE**
**CLAIMS MADE COVERAGE PROPOSAL**
**Underwritten by Lloyd's of London**

1. Business Name:
(Named Insured on Policy)

Hitchman Fiduciaries LLC

a. Address:

120 Tustin Avenue, Suite C, Newport Beach, CA | 92663

www.hitchmanfiduciaries.com

b. Contact:

| First Name | Last Name | Phone | Email |
|---|---|---|---|
| Bruce | Hitchman | 9492009712 | bruce@hitchmanfiduciaries.com |

c. Business:

Founded 2017-12-07 as ○ SP   ○ GP   ○ LLP   ○ PC   ● LLC   ○ Other

d. Headcount and Roster

Professionals: 5   Support Staff: 4

| Professional's Name | Licenses\Certificates\Memberships | Hire Date | Hours/Week |
|---|---|---|---|
| Bruce Hitchman | CLPF | 1/1/2009 | 40 |
| Lee Ann Hitchman | CLPF | 1/1/2005 | 40 |
| Brett Hitchman | CLPF | 3/1/2016 | 40 |
| Rafael Chavez Giron | CLPF | 1/1/2017 | 40 |
| Annelise Hitchman | CLPF | 12/1/2018 | 40 |
| | | | |
| | | | |

**Please list any additional Professional Staff in question 6 below. *Current Credit Score required for crime cover and may yield premium discounts.**

2. Gross Billings Details:

a. Provide Applicant's annual gross billings, whether received or not. (If Applicant is a startup, please estimate Applicant's first year's gross billings?)   1800000

b. Provide a description of the professional services provided by Applicant:

Applicant acts as conservator of the person and estate, executor and administrator of an estate, attorney-in-fact, trustee, and case manager for clients.

c. Provide the number of open matters currently handled in each of the following areas, without double counting matters:
Tally each open matter/client into the single category that best describes it:

| Guardian* | Conservator* | Executor | POA Agent | Trustee | Rep. Payee | DMM* | Care Manager | Receiver | Other |
|---|---|---|---|---|---|---|---|---|---|
| 2 | 33 | 12 | 3 | 157 | 1 | 0 | 0 | 0 | |

*Guardian - of the Person (including Ad Litem); Conservator - of the Estate; DMM - Daily Money Manager.

d. Indicate whether Applicant generates and sends out billing statements on at least a monthly basis:   ○ Yes   ● No

e. List the states and counties in which those Applicant serves reside:

California: Riverside, Orange, San Bernardino, Los Angeles, San Diego
Alabama: Walker
Nevada: Clark County

3. List below Applicant's current and desired liability insurance:

| Carrier | Premium | Incept | Expiry | Retro* | Limits | Deductible |
|---------|---------|--------|--------|--------|--------|-----------|
| Lloyds | 23169 | 01/01/2019 | 01/01/2020 | 01/01/2010 | 2000000/4000000 | 15,000 |
| Desired Coverage: | | 01/01/2020 | 01/01/2021 | 01/01/2010 | 2000000/4000000 | 15000 |

*Note: Your **Retro(active) date** normally matches the date you first began uninterrupted liability coverage.

4. Within the past five (5) years has Applicant or any of its current or past professional or other money-handling staff:

a. participated as an owner, officer, director or employee of any other business, company, trade or profession? ○ Yes ● No

b. handled any cases without written documentation of Applicant's scope of services and authority? ○ Yes ● No

c. acted in a co-trustee/co-agent capacity or served under or as a trust protector? ● Yes ○ No

d. been appointed the successor to a fiduciary who was terminated for cause? ● Yes ○ No

e. brought any suit for the collection of professional service fees? ○ Yes ● No

f. maintained any branch offices/separate mailing addresses? ● Yes ○ No

g. performed professional services for a family member? ○ Yes ● No

h. contracted family members to serve clients? ○ Yes ● No

i. become aware of any pending:

   i. demand that any of its bonds be surcharged? ○ Yes ● No

   ii. objection to an accounting issued by the Applicant? ○ Yes ● No

   iii. demand for a reduction or waiver of the Applicant's fees? ○ Yes ● No

   iv. demand that Applicant be removed for cause from any professional roles? ○ Yes ● No

   v. circumstances which may result in a claim against Applicant, a predecessor or member? ● Yes ○ No

j. been subject to any liability claim arising out of the rendition of professional services? ○ Yes ● No

k. been accused of or charged with any crime or offense involving moral turpitude? ○ Yes ● No

l. had a liability policy cancelled or non-renewed by an insurer? ○ Yes ● No

m. been subject to a surety company bond surcharge? ○ Yes ● No

n. been subject to professional discipline? ○ Yes ● No

o. had a credit score below 700? ○ Yes ● No

p. with respect to the risk of interruption, suspension or unauthorized access, intrusion, breach, compromise or use of your computer systems, including embezzlement, fraud, theft of proprietary information, denial of service, electronic vandalism or sabotage, computer virus or other similar incidents:

   i. experienced any such computer or information security incidents? ○ Yes ● No

   ii. provided written notice of any such security event to an insurance carrier? ○ Yes ● No

   iii. failed to maintain adequate computer virus, firewall and secure backup protection? ○ Yes ● No

   iv. failed to encrypt all protected health care information and credit card data stored digitally? ● N/A ○ Yes ○ No

q. provided any of the following services to others for a fee: run errands, planned events, set appointments, made travel arrangements, transported passengers, provided personal physical care, provided pet care and assistance, maintained the tangible property of others in your care, custody or control? ○ Yes ● No

r. engaged subcontractors without requiring proof of insurance or hold harmless agreement? ○ Yes ● No

5. With respect to matters involving professional services rendered in a fiduciary capacity:  ☐ N/A

   a. How many such matters does Applicant currently handle? `208`

   b. what percentage involve health care decisions? `20`

   c. what percentage involve business assets? `2`

   d. what percentage are court appointed? `60`

   e. Please list below Applicant's top ten (10) conservatorships, guardianships, trusts, estates, powers of attorney (POA) or similar fiduciary matters by gross assets (rounded to the nearest $100,000), indicating whether any affirmative or non-zero responses to questions 4 or 5.c pertain to the listed matter:

| Conservatorship, Guardianship, Trust, Estate, POA, or Other Matter Name | Zip Code | Assets | Yes | No |
|---|---|---|---|---|
| Estate of Jose Luis Olvera | 92663 | 40,000,000 | ● | ○ |
| Sykes Family Trust | 92663 | 30,000,000 | ● | ○ |
| Ibsen Family Trust | 92663 | 20,000,000 | ○ | ● |
| Jones Family Trust | 92663 | 15,000,000 | ● | ○ |
| Douglas PRT | 92663 | 4,800,000 | ○ | ● |
| Estate of William Eugene Martin | 92663 | 4,000,000 | ● | ○ |
| Gerald D. Dunn Trust | 92663 | 3,000,000 | ● | ○ |
| Aryn Turner Special Needs Trust | 92663 | 2,500,000 | ○ | ● |
| Johnny Blackburn Special Needs Trust | 92663 | 2,500,000 | ○ | ● |
| Audrey Aguilar Special Needs Trust | 92663 | 2,500,000 | ○ | ● |

6.
**Please provide a description of any "other" matters in question 2.c., explain any negative response to question 2.d and any positive responses within questions 4, include the name/relationship of any co-trustee/agent, provide an explanation if question 5.c is greater than 0%, a matter-specific explanation for any positive response in question 5.e, and provide a narrative regarding any matter in 5.e with Assets greater than $10mil or for each matter greater than $5mil if at least 5 matters are greater than $5mil.**
**For Predecessors in Business, please provide the firm name and dates of operation,**
**For Additional Insureds required by contract or law, please provide the name, address, and relationship to Applicant:**

2d: Many clients are court supervised, and fees must be approved post each accounting period. Non court supervised cases normally get billed at a monthly, quarterly, or semi-annual basis.
4c: Fiduciaries in our firm often co-
Trustee within our firm.  We also have a couple matters where we are co-trustee with an elder grantor who has capacity,
4d. Some court approved cases are litigious due to the prior trustee being removed for going against fiduciary duties.
4i.v.: No, we have two matters now where the former trustee was removed and they do not like our neutrality.
4f: Hitchman Fiduciaries has two office locations:  20351 Irvine Ave Ste C1/C2, Newport Beach, CA 92660; and 1606 Crenshaw Blvd., Torrance, CA 90501;
and a mailbox address:  120 Tustin Ave Ste C, Newport Beach, CA 92663
Increased revenues over prior year.
5e. Estate of Jose Luis Olvera: owns 3 LLCs which own commercial properties, total value approximately $30,000,000; Sykes Family Trust: owns 1 LLC which own properties, total value approximately $22,000,000; Jones Family Trust: owns shares of Limited Partnerships, total value approximately $10,000,000;

Confirmation that all LLCs are covered PL and GL insurance of $2/$4 million. Two of the LLCs are single property triple net lease and have at least $2/$4 million coverage. The other two LLCs belong to an estate that is managed by an employee of the estate and have at least $2/$4 million PL/GL insurance.

The Limited Partnership is professionally managed.

here is a list of the licensed fiduciaries we currently have:

Lee Ann Hitchman
Bruce Hitchman
Brett Hitchman
Rafael Chavez
Annelise Hitchman

We also have an office manager:

Daniel Skene

By and through the undersigned, Applicant acknowledges, agrees and declares to the best of its knowledge and belief that:

1. The information set forth herein is true and any change in circumstances prior to the effective date of the insurance applied for, which may render inaccurate, untrue, or incomplete any statement or disclosure made herein, will immediately be reported in writing to underwriters who may in turn withdraw or modify any outstanding offer of insurance;

2. Underwriters are hereby authorized, but not required, to make an investigation and inquiry in connection with the information provided in this application, understanding that any failure to do so shall not abridge any such rights nor estop underwriters from relying upon any of Applicant's representations herein;

3. The submission and review of this application shall not serve to bind Applicant to purchase, nor underwriters to issue, any policy of insurance;

4. In the event that an insurance policy is issued to Applicant, in doing so, underwriters shall be entitled to rely upon all material representations contained within this application which forms the basis for such insurance and shall be attached to and become a part of any such policy;

5. Subject to all other policy terms and conditions, coverage under any policy issued will only apply to claims first made against Applicant and reported to underwriters during the policy period, or extended reporting period;

6. Subject to all other policy terms and conditions, the limit of liability available to pay damages shall be reduced and may be completely exhausted by payment of claims expenses; moreover, damages and claims expenses shall be applied against the applicable deductible;

7. Any person who knowingly and with intent to defraud files an application for insurance containing any materially false information, or for the purpose of misleading conceals any material fact, may be held criminally liable depending upon the laws of the applicable jurisdiction; moreover, any misrepresentation or misstatement of material facts may void coverage under the proposed insurance; and

8. Pursuant to the provisions of the Electronic Signatures in Global and National Commerce Act (E-SIGN, 2000) and the Uniform Electronic Transactions Act (UETA, 1999), execution of this application form by means of typing ones name, title and date below carries the same weight and legal effect as traditional paper documents and handwritten signatures.

| /s/ | Bruce Hitchman | Manager | 11/26/2019 |
|---|---|---|---|
| | **Electronic Signature** | **Signer's Title** | **Date Executed** |

Dominion FPL Application (12/19)                                                                                              Page 4 of 4

Dominion Insurance Services Inc. © 2020 | All Rights Reserved.

# EXHIBIT 3



370 Park Street, Suite 8, Moraga CA. 94556
341 S. Main, Suite 100, Alpine UT. 84004
888.313.9977(t) ~ 925.313.9978(f)
info@dominioninsurance.com
dominion-insurance.com

**DECLARATIONS**
**Fiduciary Professional Liability Insurance**
**Effected with Certain Underwriters at Lloyd's of London**
*Claims Made and Reported Coverage*

**Authority Number:** B0621P33057520

**Policy Number:** FPL21105754M

1. **Named Assured:** Hitchman Fiduciaries LLC
   120 Tustin Avenue, Suite C915, Newport Beach, CA 92663

2. **Period of Insurance:** 2021-01-01 to 2022-01-01 (year-month-day)
   both dates at 12:01 am standard time at the location identified in item 1, above.

3. **Limits of Liabilty:**

   | $2,000,000/$4,000,000 | Per Claim/Aggregate, Including Costs and Expenses (Primary Limits) |
   | $50k/$50k | Data Security Breach/Client Network Infection Each Occurrence/Aggregate, including Costs and Expenses |
   | $250k/$250k | Bodily Injury/Property Damage Each Occurrence/Aggregate, Including Costs and Expenses |
   | $50k | Fire Damage Liability Per Occurrence, Including Costs and Expenses |
   | $2.5k/$5k | Medical Expense Per Person/Aggregate |
   | $25k/$25k | Hired Auto/Non-Owned Auto Liability Each Occurrence/Aggregate, Including Costs and Expenses |
   | $25k/$25k | Theft Each Occurrence/Aggregate, Including Costs and Expenses |

4. **Deductible:** $15,000  Per Claim, Including Costs and Expenses

5. **Premium:** $62,331.00

6. **Retroactive Date:** 2019-01-01 (year-month-day)

7. **Notice of Claim:** Dominion Insurance Services, Inc.
   341 South Main Street, Suite 100, Alpine, Utah 84004

   Claim Prevention Hotline:
   (212) 376-8599

8. **Service of Suit:** Wilson, Elser, Moskowitz, Edelman & Dicker LLP
   150 East 42nd Street, New York, New York 10017

9. **Short Rate Table:** As per attached endorsement NMA 45.

**Prepared/Issued By:** Dominion Insurance Services, Inc.

_____     2021-01-01
Countersignature                    Date

**Forms & Notices:**
California Surplus Lines Notice
Dominion FPL Wording (11/19)
Deletion of Co-Trustee/Co-Agent Restriction Endorsement
General Change Endorsement Split Retroactive Date of 01 Jan 2019 for Higher Limits of $2,000,000/$4,000,000
Pandemic or a Public Health Emergency of International Concern Endorsement
Specific Claim(s) Exclusion: Anna L. Bostelman Trust
Medication Coordinator Endorsement
Neutral Facilitator Endorsement
Notary Public Endorsement
NMA2918 War & Terrorism Exclusion
Several Liability Notice
Syndicates List
Policy Sublimits (Included as part of the Primary Limits)
- All Limits Listed Above in Item 3 Other Than Primary Limits
- Disciplinary Proceedings Defense: $10,000
- Lost Earnings Reimbursement: $250/Day; $5,000/Period of Insurance

**Additional Charges/Information:**
Taxes: $2,025.76

- Contractual Travel Indemnity: $25,000
- Loss of Key Indiviual Replacement Expenses: $5,000
- Terrorism Travel Reimbursement: $25,000
- Travel Delay Reimbursement: $1,500
- Bodily Injury/Personal Property Damage due to Assault: $2,000
- Temporary Meeting Space Reimbursement: $10,000
- Emergency Real Estate Consulting Fee: $5,000
- Identity Theft Expense: $15,000
- Image Restoration and Counseling: $10,000

Dominion FPL Dec (10/20)



370 Park Street, Suite 8, Moraga CA. 94556
341 S. Main, Suite 100, Alpine UT. 84004
888.313.9977(t) ~ 925.313.9978(f)
info@dominioninsurance.com
dominion-insurance.com

## IMPORTANT NOTICE:

**1. The insurance policy that you have purchased is being issued by an insurer that is not licensed by the State of California. These companies are called "nonadmitted" or "surplus line" insurers.**

**2. The insurer is not subject to the financial solvency regulation and enforcement that apply to California licensed insurers.**

**3. The insurer does not participate in any of the insurance guarantee funds created by California law. Therefore, these funds will not pay your claims or protect your assets if the insurer becomes insolvent and is unable to make payments as promised.**

**4. The insurer should be licensed either as a foreign insurer in another state in the United States or as a non-United States (alien) insurer. You should ask questions of your insurance agent, broker, or "surplus line" broker or contact the California Department of Insurance at the toll-free number 1-800-927-4357 or internet website www.insurance.ca.gov. Ask whether or not the insurer is licensed as a foreign or non-United States (alien) insurer and for additional information about the insurer. You may also visit the NAIC's internet website at www.naic.org. The NAIC-the National Association of Insurance Commissioners-is the regulatory support organization created and governed by the chief insurance regulators in the United States.**

**5. Foreign insurers should be licensed by a state in the United States and you may contact that states department of insurance to obtain more information about that insurer. You can find a link to each state from this NAIC internet website: https://naic.org/state_web_map.htm.**

**6. For non-United States (alien) insurers, the insurer should be licensed by a country outside of the United States and should be on the NAIC's International Insurers Department (IID) listing of approved nonadmitted non-United States insurers. Ask your agent, broker, or "surplus line" broker to obtain more information about that insurer.**

**7. California maintains a "List of Approved Surplus Line Insurers (LASLI)." Ask your agent or broker if the insurer is on that list, or view that list at the internet website of the California Department of Insurance: www.insurance.ca.gov/01-consumers/120-company/07-lasli/lasli.cfm.**

**8. If you, as the applicant, required that the insurance policy you have purchased be effective immediately, either because existing coverage was going to lapse within**

**two business days or because you were required to have coverage within two business days, and you did not receive this disclosure form and a request for your signature until after coverage became effective, you have the right to cancel this policy within five days of receiving this disclosure. If you cancel coverage, the premium will be prorated and any brokers fee charged for this insurance will be returned to you.**

**D-2 (Effective January 1, 2020)**

Dominion Insurance Services Inc. © 2020 | All Rights Reserved.



370 Park Street, Suite 8, Moraga CA. 94556
341 S. Main, Suite 100, Alpine UT. 84004
888.313.9977(t) ~ 925.313.9978(f)
info@dominioninsurance.com
dominion-insurance.com

## FIDUCIARY PROFESSIONAL LIABILITY INSURANCE

**NOTICE:** This is a claims made form. Words and phrases in **bold** (other than titles and section headings) have special meaning. See section V "Definitions." Except to such extent as may otherwise be provided herein, the coverage afforded under this **Insurance Policy** is limited to liability for only those **Claims** that are first made against the **Assured** and reported to the **Underwriters** while the insurance is in force. The **Limit of Liability** available to pay **Damages** shall be reduced and may be completely exhausted by payment of **Claims Expenses**. **Damages** and **Claims Expenses** shall be applied against the **Deductible**. Please review the coverage afforded under this **Insurance Policy** carefully and discuss the coverage hereunder with **Your** insurance agent or broker.

### I. INSURING AGREEMENTS

The **Underwriters** agree with the **Assured**, named in the **Declarations** made a part hereof, in consideration of the payment of the premium and reliance upon the statements in the application which is made a part of this **Insurance Policy** (hereinafter "**Policy**" or "**Insurance**") and subject to the **Limit of Liability**, exclusions, conditions and other terms of this **Insurance**:

#### A. Coverage

To pay on behalf of the **Assured Damages** and **Claims Expenses** which the **Assured** shall become legally obligated to pay because of any **Claim** or **Claims**, including **Claims** for **Personal Injury** as hereafter defined, first made against the **Assured** and reported to the **Underwriters** during the **Period of Insurance** or **Extended Reporting Period**, arising out of any act, error or omission of the **Assured** in rendering or failing to render **Professional Services** as hereinafter defined for others but solely for acts on behalf of the **Named Assured** designated in Item 1 of the **Declarations** and caused by the **Assured**, except as excluded or limited by the terms, conditions and exclusions of this **Policy**.

#### B. Defense and Settlement (Included in the Limit of Liability)

1. The **Underwriters** shall have the right and duty to defend, subject to the **Limits of Liability**, any **Claim** against the **Assured** seeking **Damages** which are payable under the terms of this **Insurance**, even if any of the allegations of the **Claim** are groundless, false or fraudulent. Although **Underwriters** retain the exclusive right to appoint defense counsel to represent the **Assured** during all pre-trial stages of any litigated **Claim** seeking **Damages** which are payable under the terms of this **Insurance**, **Underwriters** shall not formally appoint trial counsel without the consent of the **Named Assured**, such consent not to be unreasonably withheld.

2. It is agreed that the **Limit of Liability** available to pay **Damages** shall be reduced and may be completely exhausted by payment of **Claims Expenses**. **Damages** and **Claims Expenses** shall be applied against the **Deductible**.

3. The **Underwriters** shall have the right to make any investigation they deem necessary, including, without limitation, any investigation or examination of the **Assured** under oath with respect to the application and statements made in the application and with respect to coverage.

4. If the **Assured** shall refuse to consent to any settlement or compromise recommended by the **Underwriters** and acceptable to the claimant and elects to contest the **Claim**, **Underwriters'** liability for any **Damages** and **Claims Expenses** shall not exceed the amount for which the **Claim** could have been settled plus the **Claims Expenses** incurred up to the time of such refusal, or the applicable **Limit of Liability**, whichever is less, and the **Underwriters** shall have the right to withdraw from the further defense thereof by tendering control of said defense to the **Assured**.

Without waiving the foregoing, in order to enhance the likelihood of resolving **Claims** covered by this **Insurance** in a mutually agreeable manner to both **Underwriters** and the **Assured**, **Underwriters** agree to: (1) seek the **Assured's** views regarding any potential settlement or compromise recommended by **Underwriters** and acceptable to the claimant; and (2) substantively respond to any such views, explaining **Underwriters'** position and the reason(s) therefor.

No **Deductible** applies to the following supplemental coverages. However, all payments under the following supplemental coverages erode and are not in addition to the **Limit of Liability**:

#### C. Disciplinary Proceedings Defense (not in addition to the Limit of Liability)

To pay on behalf of the **Assured** up to ten thousand dollars ($10,000) for all **Claims Expenses** incurred with respect to the defense of any and all proceedings before any state or federal licensing board, peer review committee or governmental regulatory body first instituted against the **Assured** and reported to the **Underwriters** during the **Period of Insurance** or **Extended Reporting Period**, arising out of any act, error or omission of the **Assured** in rendering or failing to render **Professional Services** as hereinafter defined for others but solely for acts on behalf of the **Named Assured**

designated in Item 1 of the **Declarations** and caused by the **Assured**, except as excluded or limited by the terms, conditions and exclusions of this **Policy**.

D. **Lost Earnings Reimbursement (not in addition to the Limit of Liability)**

To pay to the **Assured** two hundred and fifty dollars ($250) per day (subject to a maximum of five thousand dollars ($5,000) for the entire **Period of Insurance**) for each day any **Assured** is required to appear at a trial, hearing or arbitration involving any and all **Claims** first made against the **Assured** and reported to the **Underwriters** during the **Period of Insurance** or **Extended Reporting Period**, arising out of any act, error or omission of the **Assured** in rendering or failing to render **Professional Services** as hereinafter defined for others but solely for acts on behalf of the **Named Assured** designated in Item 1 of the **Declarations** and caused by the **Assured**, except as excluded or limited by the terms, conditions and exclusions of this **Policy**.

E. **Data Security Breach and Client Network Infection Coverage (not in addition to the Limit of Liability)**

**Underwriters** will, subject to the **Limits of Liability** set forth below, pay on behalf of any **Assured Damages** and **Claims Expenses**, in excess of the "per **Claim**" **Deductible**, the greater of fifty thousand dollars ($50,000) or other applicable limit expressly designated in the **Declarations**, which the **Assured** shall become legally obligated to pay because of any **Claim** first made against any **Assured** and reported in writing to **Underwriters** during the **Period of Insurance** or **Extended Reporting Period** (if applicable) arising out of:

1. any **Data Security Breach** of any **Data Security System** maintained by the **Assured** for the storage of **Confidential Information** pertaining to the **Assured's** clients in the **Assured's** rendering of **Professional Services**; or

2. any **Client Network Infection**.

Multiple **Claims** by more than one claimant arising out of the same **Data Security Breach** or **Client Network Infection** will be considered a single **Claim** for purposes of applying the per-**Claim Limit of Liability** and **Deductible**.

It is a condition precedent to coverage and our liability under this section I.E of the **Policy** that at all times during the **Period of Insurance** the **Assured** shall:

1. maintain anti-virus and malware prevention solutions on the **Assured's Data Security System** and update the protection at regular intervals;

2. maintain firewalls on its **Data Security System**; and

3. maintain and implement ongoing patch management process to ensure timely patching of its **Data Security System**.

F. **Bodily Injury, Property Damage, Fire Legal or Advertising Liability Coverage (not in addition to the Limit of Liability)**

**Underwriters** will, subject to the **Limits of Liability** set forth below, pay on behalf of any **Assured Damages** and **Claims Expenses** the greater of two hundred and fifty thousand dollars ($250,000) or other applicable limit expressly designated in the **Declarations**, which the **Assured** shall become legally obligated to pay because of any **Claim** first made against any **Assured** and reported in writing to the **Underwriters** during the **Period of Insurance** or **Extended Reporting Period** (if applicable) arising out of, in connection with, or in any way related to **Property Damage**, **Bodily Injury**, **Fire Legal Liability** or **Advertising Liability** caused by an event or happening, including continuous or repeated exposure to substantially the same general harmful conditions, which involves one or more persons or entities on or after the **Retroactive Date** set forth in Item 6. of the **Declarations** and before the end of the **Period of Insurance**.

G. **Hired and Non-Owned Auto Liability Coverage (not in addition to the Limit of Liability)**

To pay on behalf of any **Assured Damages** and **Claims Expenses** the greater of twenty five thousand dollars ($25,000) or other applicable limit expressly designated in the **Declarations**, which the **Assured** shall become legally obligated to pay because of any **Claim** first made against any **Assured** and reported in writing to the **Underwriters** during the **Period of Insurance** or **Extended Reporting Period** (if applicable) arising out of:

1. **Bodily Injury** or **Property Damage** arising out of the use or operation of a **Hired Auto** by **You** or **Your Employees** in the course of **Your** business; and

2. **Bodily Injury** or **Property Damage** arising out of the use or operation of a **Non-Owned Auto** by any person other than **You** in the course of **Your** business.

The coverage provided under this endorsement applies in excess of any other valid and collectible auto liability insurance coverage, including any personal or business auto liability coverage held by any **Assured** or other party on any **Auto** used in the conduct of **Your** business or operations.

The **Named Assured** agrees and warrants that all **Employees**, and **You**, if **You** are a natural person, will maintain in full force and effect during the effective **Period of Insurance** primary auto liability insurance. If a **Claim** is made and the

**Employee** or **You**, if **You** are a natural person, is determined to have failed to maintain the minimum limits required by State Law then the coverage under this endorsement will respond as excess coverage as though the minimum limits were in full force and effect, with the **Named Assured** agreeing to pay all amounts within and up to the required minimum limit.

H. **Theft Coverage (not in addition to the Limit of Liability)**

To pay on behalf of any **Assured** not complicit in any alleged **Theft** perpetrated with the alleged complicity of any other **Assured**, **Damages** and **Claims Expenses** and in excess of the full extent of the recoverable assets of any complicit **Assured**, the greater of twenty five thousand dollars ($25,000) or other applicable limit expressly designated in the **Declarations**, which any non-complicit **Assured** shall become legally obligated to pay because of any **Claim** first made against an **Assured** and reported in writing to **Underwriters** during the **Period of Insurance** or **Extended Reporting Period** (if applicable) arising out of any alleged **Theft** perpetrated with the alleged complicity of any **Assured** during the **Ordinary Course of Business** on or after the **Retroactive Date** set forth in Item 6 of the **Declarations** and before the end of the **Period of Insurance**. In the event that **Underwriters** elect to indemnify all **Assureds** under this coverage grant, including those potentially complicit in the subject **Theft**, **Underwriters** reserve the right to recover any such amounts from complicit **Assureds**.

I. **Contractual Travel Indemnity (not in addition to the Limit of Liability)**

Subject to the limits of indemnity set forth below, **Underwriters** will indemnify the **Assured** for the **Contractual Financial Obligation** the **Assured** becomes obligated to pay to an officer, director, or **Employee** in excess of any other insurance coverage, contribution, or indemnification available to the **Assured** and/or to the officer, director, or **Employee**, where such obligation is based on or arises out of any written contract or manual requiring the **Assured** to indemnify the officer, director, or **Employee** for **Injury** or **Accidental Death** sustained while traveling on a common carrier for the **Assured's** business during the **Period of Insurance**.

For the purposes of the **Contractual Travel Indemnity** coverage set forth above:

**Accidental Death** means the loss of life due to physical injury to an officer, director, or **Employee** of the **Assured** caused by violence, fracture, or an accident occurring while traveling on a common carrier for the **Assured's** business during the **Period of Insurance**, provided that the loss of life takes place no later than one hundred eighty (180) days after the expiration date or the effective date of cancellation of the **Policy**.

**Injury** means:

1. Physical damage to the body caused by violence, fracture, or an accident;

2. Accidental loss of limbs or multiple fingers;

3. **Permanent** total loss of sight, speech or hearing caused by violence, fracture, or an accident.

Contractual Financial Obligation means a sum that the **Assured** is required to pay to satisfy its obligations under a written contract or manual which has a binding effect on the **Assured**.

**Permanent** means lasting more than 12 months and at the end of that time being without prospect of improvement.

The limit of indemnity for this **Contractual Travel Indemnity** coverage is twenty-five thousand dollars ($25,000) for all **Contractual Financial Obligation** combined for the **Period of Insurance**. No deductible applies to this **Contractual Travel Indemnity** coverage.

No coverage shall be afforded and no amounts shall be payable pursuant to the **Contractual Travel Indemnity** coverage if the cause of the **Injury** or **Accidental Death** was:

1. An intentional act by or at the direction of the **Assured**;

2. An act of suicide or attempted suicide;

3. An act of war or **Act of Terrorism** as defined in Section G. below; or

4. Any disease process, whether sudden, slow, or degenerative.

J. **Loss of Key Individual Replacement Expenses (not in addition to the Limit of Liability)**

The **Underwriters** will indemnify the **Assured** for its **Ascertained Net Loss** up to the limit of indemnity set forth below if the Chief Executive Officer of the **Assured** suffers an accidental **Injury** during the **Period of Insurance** which results in the death of the Chief Executive Officer during the **Period of Insurance**. No deductible applies to this coverage.

For the purposes of the **Loss of Key Individual Replacement Expenses** coverage set forth above:

**Ascertained Net Loss** means additional irrecoverable **Replacement Expenses** directly incurred by the **Assured** independently of any other cause less any savings the **Assured** is able to obtain in mitigation of the loss.

**Replacement Expenses** means:

1. Costs of advertising the employment position opening;

2. Travel, lodging, meal and entertainment expenses incurred in interviewing job applicants for the employment position opening; and

3. Miscellaneous extra expenses incurred in finding, interviewing and negotiating with the job applicants, including, but not limited to, overtime pay, costs to verify the background and references of the applicants and legal expenses incurred to draw up and employment contract.

The aggregate limit of indemnity for this **Loss of Key Individual Replacement Expenses** coverage is five thousand dollars ($5,000) for all **Ascertained Net Loss** for the **Period of Insurance**. No deductible applies to this **Loss of Key Individual Replacement Expenses** coverage.

K. **Terrorism Travel Reimbursement (not in addition to the Limit of Liability)**

The **Underwriters** will, subject to the limit of indemnity set forth below, indemnify the **Assured** for the **Assured's** obligation to reimburse any present director or officer for **Emergency Travel Expenses** incurred by such director or officer during the **Period of Insurance** as the result of an **Act of Terrorism** taking place during the **Period of Insurance**. The aggregate limit of indemnity for this coverage is twenty-five thousand dollars ($25,000) for all **Emergency Travel Expenses** incurred by all such directors and officers for the **Period of Insurance**. No deductible applies to this coverage.

For the purposes of the **Terrorism Travel Reimbursement** coverage set forth above:

**Act of Terrorism** means an act, or acts, of any person, or group(s) of persons, committed for political, religious, ideological or similar purposes with the intention to influence any government and/or to put the public, or any section of the public, in fear. An **Act of Terrorism** can include, but not be limited to, the actual use of force or violence and/or the threat of such use. Furthermore, the perpetrators of an **Act of Terrorism** can either be acting alone, or on behalf of, or in connection with any organisation(s) or government(s).

Notwithstanding the above, **Underwriters** will not indemnify the **Assured** for any **Emergency Travel Expenses** arising out of or attributable to an **Act of Terrorism** involving the use or release, or the threat of use or release of any nuclear weapon or device or chemical or biological agent, regardless of any contributory cause(s).

**Emergency Travel Expenses** mean:

1. Hotel expenses incurred which directly result from the cancellation of a scheduled transport by a commercial transportation carrier, resulting directly from and within forty-eight (48) hours of an **Act of Terrorism**; and

2. The increased amount incurred which may result from re-scheduling comparable transport, to replace a similarly scheduled transport canceled by a commercial transportation carrier in direct response to an **Act of Terrorism**;

L. **Travel Delay Reimbursement (not in addition to the Limit of Liability)**

The **Underwriters** will, subject to the limit of indemnity set forth below, indemnify the **Assured** for its obligation to reimburse any present Chief Executive Officer of the **Assured** for any **Non-Reimbursable Travel Delay Expenses** the Chief Executive Officer incurs as a result of the cancellation of any regularly scheduled business travel on a common carrier. The aggregate limit of indemnity for this coverage is fifteen hundred dollars ($1,500) for all **Non-Reimbursable Travel Delay Expenses** incurred by all Chief Executive Officers during the **Period of Insurance**.

For the purposes of the **Travel Delay Reimbursement** coverage set forth above:

**Non-Reimbursable Travel Delay Expenses** means the following travel-related expenses incurred after a seventy-two (72) hour waiting period, beginning from the time documented on the proof of cancellation, which are not otherwise reimbursable by the carrier or any other, entity or insurer and for which the Chief Executive Officer produces a receipt:

1. Meals and lodging;

2. Alternative transportation;

3. Clothing and necessary toiletries; and

4. Emergency prescription and non-prescription drug expenses.

No coverage shall be afforded and no amounts shall be payable pursuant to the **Travel Delay Reimbursement** coverage if the cancellation is as a direct result of an **Act of Terrorism**.

M. **Reimbursement for Bodily Injury and Property Damage to Personal Property due to Assault (not in addition to the Limit of Liability)**

The **Underwriters** will, subject to the limit of indemnity set forth below, reimburse the **Assured** for those amounts the **Assured** becomes obligated to pay to an officer, director, or **Employee** of the **Assured** for medical expenses as to **Bodily Injury** and **Property Damage** to the **Personal Property** of such officer, director, or **Employee** sustained as a result of a physical assault on the officer, director, or **Employee** taking place during the **Period of Insurance** at the **Premises** of the **Assured**, or while the officer, director, or **Employee** is traveling to or from the **Premises** of the **Assured**, and which assault is reported to **Underwriters** within forty-eight (48) hours after the assault took place.

For the purposes of the Reimbursement for the **Bodily Injury** and **Property Damage** to **Personal Property** due to Assault coverage set forth above:

> **Bodily Injury** means bodily injury, sickness or disease, mental anguish, psychological injury or emotional distress sustained by any officer, director, or **Employee** of the **Assured**, which occurs during the **Period of Insurance**, including death arising directly from any of these at any time.

> **Premises** means the physical premises owned, leased, or rented by the **Assured** for the conducting of its business.

The aggregate limit of indemnity payable to all directors, officers and **Employees** of the **Assured** as a result of all such physical assaults taking place during the **Period of Insurance** for all **Bodily Injury** due to Assault is ten thousand dollars ($10,000) and the aggregate limit of indemnity for all **Property Damage** to **Personal Property** due to Assault is two thousand dollars ($2,000). No deductible applies to this coverage.

N. **Temporary Meeting Space Reimbursement and Emergency Real Estate Consulting Fee (not in addition to the Limit of Liability)**

The **Underwriters** will, subject to the limit of indemnity set forth below, reimburse the **Assured** for

1. The cost of rental of meeting space necessitated by the temporary unavailability for up to one week of the **Assured's** primary location due to the failure of a climate control system, or leakage of a hot water heater during the **Period of Insurance**, but this coverage shall only apply if the scheduled meeting was with parties who are not insured under this **Policy**. The aggregate limit of indemnity for this coverage is ten thousand dollars ($10,000) for all costs of rental of meeting space as to all instances of temporary unavailability of the **Assured's** primary location during the **Period of Insurance**. No deductible applies to this coverage.

2. Reasonable realtor's fee or real estate consultant's fee incurred due to the need of the **Assured** to relocate its primary place of business from the principal location set forth in the **Declarations** as a direct result of the **Unforeseeable Destruction** of the **Assured's** primary location during the **Period of Insurance**. The aggregate limit of insurance for this coverage is five thousand dollars ($5,000) for all reasonable realtor's fees and real estate consultant's fees incurred by the **Assured** due to all **Unforeseen Destructions** of the principal location of the **Assured** during the **Period of Insurance**. No deductible applies to this coverage.

For purposes of the **Emergency Real Estate Consulting Fee** coverage set forth in 2. Above:

> **Unforeseeable Destruction** means the accidental and unpredictable destruction, or the long term or **Permanent** rendering as unusable and uninhabitable for any purposes, of the principal location of the **Assured**. **Unforeseeable Destruction** shall not include any destruction or the rendering as unusable or uninhabitable of the principal location of the **Assured** as a result of any intentional or grossly negligent acts of the **Assured** or its officers, directors, or **Employees**, nor due to any nuclear incident, accident, war, **Act of Terrorism** or other nuclear event. The term "long term" shall mean for the purposes of this definition any period longer than six months.

O. **Identity Theft Expense (not in addition to the Limit of Liability)**

The **Underwriters** will, subject to the limits of indemnity set forth below, reimburse the **Assured** for **Identity Theft Expense** the **Assured** becomes obligated to pay to its directors, officer, or **Employees** as a result of any **Identity Theft** committed against such directors, officers, or **Employees** while they were acting in their positions and on behalf of the **Assured**, provided such **Identity Theft** (1) is first discovered by the **Assured** or its officers, directors or **Employees** and is reported to **Underwriters** as soon as practicable during the **Period of Insurance**, but in no event later than ten (10) days of the discovery by the **Assured** of the **Identity Theft** and (2) the **Identity Theft** took place subsequent to the effective date of the **Assured's** first policy with **Underwriters**.

For purposes of the **Identity Theft Expense** coverage set forth above:

> **Identity Theft** means the acquisition by fraud or other means of the private identifying information for the **Assured's** officers, directors, or **Employees** and the use of such identifying information for financial gain or other purposes.

> **Identity Theft Expense** means those expenses incurred as a direct result of **Identity Theft** for the following:

> > 1. the cost of obtaining up to twelve (12) credit reports obtained within twelve (12) months of the discovery of the **Identity Theft** for purposes of determining and restoring credit ratings;

2. fees incurred in reapplying for loans, grants and other credit vehicles that were rejected solely as a result of the **Identity Theft** to which this **Policy** applies;

3. costs incurred in reporting the **Identity Theft** to applicable authorities, agencies, creditors, stores and other persons and entities, including telephone charges, postage, notarization fees, local travel expenses if personal appearance is required and duplication costs;

4. actual wages lost by the officer, director, or **Employee** as a result of time away from work reasonably and necessarily required to take steps in order to correct and repair the results of the **Identity Theft**, including reimbursement for lost paid vacation and personal days used to take such steps;

5. fees and costs charged by an attorney retained by the officer, director, or **Employee** with **Our** approval for purposes of defending any action or removing any judgment or award resulting directly from the **Identity Theft**; and

6. the cost of replacing any personal documents or other materials, including but not limited to passports, driver's licenses and credit and identification cards, which are lost or rendered unusable due directly to the **Identity Theft**.

The aggregate limit of indemnity for this coverage is fifteen thousand dollars ($15,000) for all **Identity Theft Expense** the **Assured** becomes obligated to pay to any and all of its officer, directors and **Employees** due to all **Identity Theft** within the scope of this coverage. No deductible applies to this coverage.

P. **Image Restoration and Counseling (not in addition to the Limit of Liability)**

The **Underwriters** will, subject to the limits of indemnity set forth below, reimburse the **Assured** for **Covered Image Restoration and Counseling Expenses** incurred by the **Assured** as a direct result of **Improper Acts** by any officer, director, or **Employee** of the **Assured** taking place and reported to **Underwriters** during the **Period of Insurance** before.

For purposes of the **Image Restoration and Counseling** coverage set forth above:

**Covered Image Restoration and Counseling Expenses** shall only mean and this coverage shall only apply to the following:

1. The costs of rehabilitation and counseling for the accused officer, director, or **Employee** of the **Assured**, provided the officer, director, or **Employee** is not ultimately found guilty of criminal conduct. No reimbursement of any **Covered Image Restoration and Counseling Expenses** by **Underwriters** to the **Assured** unless and until there has been an acquittal of the officer, director, or **Employee** of the **Assured** accused of committing the **Improper Acts**;

2. The costs charged by a recruiter or expended on advertising for replacement of an officer or director as a result of **Improper Acts** by such officer or director; and

3. The costs of restoring the **Assured's** reputation and public, consumer or client confidence through image consulting.

**Improper Acts** means any criminal, fraudulent, immoral, or scandalous acts or conduct by an officer, director, or **Employee** of the **Assured**, whether or not committed or conducted on behalf of or as part of the business of the **Assured**.

The aggregate limit of indemnity for this coverage is ten thousand dollars ($10,000) for all **Covered Image Restoration and Counseling Expenses** incurred by the **Assured** as a direct result of **Improper Acts** during the **Period of Insurance**. No deductible applies to this coverage.

## II. DEFINITION OF ASSURED

Each of the following is an **Assured** under this **Insurance** to the extent set forth below:

A. if the **Named Assured** designated in Item 1 of the **Declarations** is an individual, the person so designated but only with respect to the conduct of a fiduciary practice of which the individual is the sole proprietor;

B. if the **Named Assured** designated in Item 1 of the **Declarations** is a partnership or Limited Liability Partnership, the partnership or Limited Liability Partnership so designated;

C. any **Fiduciary** who is a partner in the **Named Assured** including any incorporated partners and their shareholders but solely for acts on behalf of the **Named Assured** designated in Item 1 of the **Declarations**;

D. if the **Named Assured** designated in Item 1 of the **Declarations** is a corporation, Professional Corporation, Professional Association or Limited Liability Corporation, the corporation, Professional Corporation, Professional Association or Limited Liability Corporation so designated;

E. any **Fiduciary** who is a stockholder or member of the corporation, Professional Corporation, Professional Association or Limited Liability Corporation but solely for acts on behalf of such **Named Assured**;

F. any **Fiduciary** acting as an independent contractor but solely for acts on behalf of the **Named Assured** designated in Item 1 of the **Declarations**;

G. any employed **Fiduciary** or other **Employee** or volunteer but solely for acts on behalf of the **Named Assured** designated in Item 1 of the **Declarations**;

H. any person who previously qualified as an **Assured** under C, E, F or G above prior to the termination of the required relationship with the **Named Assured**, but solely for acts on behalf of the **Named Assured** designated in Item 1 of the **Declarations**;

I. any partnership, Limited Liability Partnership, corporation, Professional Corporation, Professional Association or Limited Liability Corporation, advised in writing to the **Underwriters**, of which the **Named Assured** is the successor;

J. any **Fiduciary** who during the **Period of Insurance** becomes a partner, member, stockholder or **Employee** of the **Named Assured** but solely for acts on behalf of the **Named Assured** designated in Item 1 of the **Declarations**;

K. the estate, heirs, executors, administrators, assigns and legal representatives of any **Assured** in the event of such **Assured's** death, incapacity, insolvency or bankruptcy, but only to the extent that such **Assured** would otherwise be provided coverage under this **Insurance**.

Solely in respect of **Hired** and **Non-Owned Auto** Liability Coverage provided in section I.G the DEFINITION OF **ASSURED** is deleted in its entirety and replaced with the following:

Each of the following is an **Assured** under this **Insurance** to the extent set forth below:

1. **You**.

2. Any other person using a **Hired Auto** with **Your** permission.

3. With respect to a **Non-Owned Auto**, any **Employee**, partner or Executive Officer of **Yours**, but only while such **Non-Owned Auto** is being used in **Your** business.

4. Any other person or organization, but only with respect to their liability because of acts or omissions of an **Assured** under paragraphs A., B. or C. above.

None of the following is an **Assured**:

i. Any person engaged in the business of his or her employer with respect to **Bodily Injury** to any co-**Employee** of such person injured in the course of employment;

ii. Any person while employed in or otherwise engaged in performing duties related to the conduct of an **Auto Business**, other than an **Auto Business You** operate;

iii. The owner or lessee (of whom **You** are a sublessee) of a **Hired Auto** or the owner of a **Non-Owned Auto** or any agent or **Employee** of any such owner or lessee;

iv. Any person or organization with respect to the conduct of any current or past partnership or joint venture that is not shown as a **Named Assured** in the Declarations.

## III. **TERRITORY**

This **Insurance** applies to acts, errors or omissions which take place anywhere in the world provided that **Claim** is first made against the **Assured** within the United States of America, its territories or possessions or Canada during the **Period of Insurance** or **Extended Reporting Period** when purchased in accordance with Clause IX.

## IV. **EXCLUSIONS**

The coverage under this **Insurance** does not apply to **Damages** or **Claims Expenses** incurred with respect to:

A. any **Claim** alleging in whole or in part, arising out of, in connection with, or in any way related to **Theft** or any other criminal, dishonest, fraudulent or malicious act, error or omission of any **Assured**, regardless of the existence of additional **Claims** arising from substantially the same circumstances that would otherwise be covered, unless or until entry of a court or tribunal finding or determination of the absence of any actual, criminal, dishonest, fraudulent or malicious purpose or intent supporting any such **Claim**;

However, notwithstanding the foregoing, the insurance afforded by this **Policy** shall apply to **Claims Expenses** incurred in defending any **Claim** which would otherwise be excluded hereunder, other than one for **Theft**, up to a maximum aggregate sublimit of two hundred fifty thousand dollars ($250,000) with such amount eroding the **Limit of Liability**, but shall not apply to any **Damages** which the **Assured** might become legally obligated to pay as a result of such **Claim**.

This exclusion does not apply to **Theft** coverage under section I.H of the **Policy**.

B. fines, penalties or sanctions, except that if a **Claim** shall have been brought against the **Assured** seeking **Damages** as well as fines, penalties or sanctions, then any coverage which may be afforded by this **Policy** will apply to any **Claims Expenses** incurred, without liability, however, for such fines, penalties or sanctions;

C. any **Claim** by one **Assured** under this **Policy** against another **Assured** under this **Policy**;

D. any **Claim** arising out of, in connection with or in any way related to **Bodily Injury, Property Damage, Fire Legal or Advertising Liability**;

This exclusion shall not apply to **Bodily Injury** and **Property Damage** Liability Coverage provided in section I.F or **Hired** and **Non-Owned Auto** Liability Coverage provided in section I.G.

E. any loss sustained by an **Assured** as a beneficiary or distributee of any trust or estate;

F. any **Claim** arising out of any **Assured's** activities as a trustee, partner, officer, director or **Employee** of any **Employee** trust, charitable organization, corporation, company or business other than that of the **Named Assured** (except where the **Assured** is acting in such capacity by virtue of having been retained to perform **Professional Services** provided that it is notified to **Underwriters** as soon as practicable but no later than within 90 days of such appointment);

G. any **Claim** made by or against or in connection with any business enterprise (including the ownership, maintenance or care of any property in connection therewith), not named in Item 1 of the **Declarations**, which is owned by any **Assured** or in which any **Assured** is a trustee, partner, officer, director or **Employee** (except where the **Assured** is acting in such capacity by virtue of having been retained to perform **Professional Services**), or which is directly or indirectly controlled, operated or managed by any **Assured** in a non-fiduciary capacity;

H. any **Claim** or circumstance which might lead to a **Claim** in respect of which any **Assured** has given notice to the insurer of any other policy in force previous to the effective date of this **Policy**;

I. any **Claim** arising out of any acts, errors, or omissions which took place prior to the effective date of this **Insurance**, if any **Assured** on the effective date knew or could have reasonably foreseen that such acts, errors or omissions might be expected to be the basis of a **Claim**;

J. any **Claim** arising out of any **Assured's** capacity as an elected public official or as an **Employee** of a governmental body, subdivision, or agency thereof unless the **Assured** is deemed an **Employee** solely by virtue of rendering services to such governmental body, the remuneration for which services inures to the benefit of the **Named Assured**;

K. any **Claim** arising out of any **Assured's** activities and/or capacity as a **Fiduciary** under the Employment Retirement Income Security Act of 1974 and its amendment or any regulation or order issued pursuant thereto;

L. any **Claim** directly or indirectly brought about by, arising out of, or attributable to any actual or alleged violation of the Racketeer Influenced and Corrupt Organization Act, 18 USC Sections 1961 et seq., or any comparable state law, and any amendments thereto, or any rules or regulations promulgated thereunder;

M. any **Claim** or circumstance that might lead to a **Claim** arising out of any act, error or omission which took place, or is alleged to have taken place, prior to the retroactive date, if any, as set forth in Item 6 of the Declarations;

N. any **Claim** arising directly or indirectly out of the **Assured's** activities in any trade, business or profession other than a **Fiduciary**, including without limitation activities as a lawyer, accountant, property manager, nurse or other health care provider, securities broker, mortgage banker, mortgage broker, independent third party escrow agent, real estate and/or construction advisor, real estate and/or property appraiser, real estate and/or property developer, insurance agent or insurance broker, or activities involving property syndication, real estate investment trusts, limited partnerships or similar investments.

This exclusion shall not, however, apply to any **Claim** arising directly or indirectly out of the **Assured's** performance of **Professional Services** simply because such or similar services could be rendered by a lawyer, accountant, property manager, independent third party escrow agent, nurse or other health care provider.

O. any **Claim** seeking, related to, or arising out of any disputes involving an accounting, return or reimbursement of fees, commissions, costs or expenses paid to the **Assured**, paid on the **Assured's** behalf, paid to attorneys or other advisors retained by the **Assured**, or paid at the direction of the **Assured** pursuant to the **Assured's** role in providing **Professional Services**, including but not limited to any fees, costs, expenses or expenditures paid from a trust, estate, guardianship, bank account or other financial instrument under the **Assured's** control;

While this exclusion applies to the cost of initially preparing or subsequently correcting a trust or estate accounting, it does not exclude coverage for any irreparable, consequential **Damages** resulting from allegedly related acts, errors or omissions in the rendition of **Professional Services** by the **Assured**.

P. any **Claim** arising out of any actual or alleged commingling, conversion, misappropriation, defalcation, or inability or failure to collect or safeguard any funds, premium, escrow of tax money or other property for personal profit or advantage;

Q. any **Claim** involving misappropriation of trade secrets, client lists, any proprietary information or anything related thereto; and/or to any **Claim** arising out of the alleged violation of the Securities Act of 1933, the Securities Exchange Act of 1934, and any amendments thereto, or any related state Blue Sky law or regulation;

R. any **Claim** arising out of the sale or purchase of insurance, or the failure to effect or maintain adequate levels or types of insurance;

This exclusion shall not, however, apply to any **Claim** brought against the **Assured** where such **Claim** arises out of:

1. failure by the **Assured** to determine the scope or existence of insurance coverage for any estate property within 90-days of the **Assured's** first appointment as **Fiduciary** of such estate;

2. failure by the **Assured** to identify property included within an estate after having conducted a diligent search and inventory of the estate within 90-days of the **Assured's** first appointment as **Fiduciary** of such estate;

3. a negligent clerical act, error or omission by or on behalf of the **Assured** in failing to make timely premium payments or otherwise respond to insurance carrier coverage requests to provide documentation and/or information; or

4. any act, error or omission of the **Assured** while acting as a trustee under a life insurance trust;

S. any **Claim** arising out of the **Assured's** services involving investment advice;

This exclusion shall not, however, apply to any **Claim** brought against the **Assured** based upon the **Assured's** alleged negligent retention of a particular investment advisor so long as prior to any such **Claim** being made, the **Assured** had conducted a background check on such investment advisor and had instructed the advisor to develop and implement an investment plan based on the "prudent investor" strategy as set forth in the Uniform Prudent Investor Act or other similar legislation.

T. any **Claim** arising directly or indirectly out of any depreciation or loss of investment when such depreciation or loss arises from fluctuations in any financial stock or commodity or other markets;

U. any **Claim** arising directly or indirectly out of any express or implied warranty or guarantee relating to the financial return of any investment or portfolio of investments;

V. any **Claim** alleging, arising out of, based upon, attributable to, or in consequence of any actual or alleged liability of any **Assured** under any express contract or agreement;

This exclusion shall not however apply to liability for **Damages** that the **Assured** would have in the absence of the contract or agreement.

W. any loss, cost or expense, directly or indirectly arising out of, resulting as a consequence of, or related to the manufacture, mining, processing, distribution, testing, remediation, removal, storage, disposal, sale, use of, or exposure to asbestos or materials or products containing asbestos, whether or not there is another cause of loss which may have contributed concurrently or in any sequence to a loss;

This exclusion shall not however apply to any **Claim** brought against the **Assured** arising out of the provision of **Professional Services**.

X. any loss, costs, or expenses, directly or indirectly arising out of, resulting from or in any manner related to "Fungi" whether or not there is another cause of loss which may have contributed concurrently or in any sequence to a loss;

"Fungi" as utilised herein shall mean any fungus or mycota or any by-product or type of infestation produced by such fungus or mycota, but not limited to mold, mildew, mycotoxins, spores or any biogenic aerosols.

This exclusion shall not however apply to any **Claim** brought against the **Assured** arising out of the provision of **Professional Services**.

Y. any **Claim** arising from the intentional release or disclosure of **Confidential Information** by the **Assured** which is alleged to be in violation of any statute, regulation, ethical rule, court or arbitral order, confidentiality agreement, or any other provision of this **Policy**;

Z. any **Claim** arising from the **Assured's** intentional transmittal of a virus or other electronic infection;

AA. the costs of repairing, replacing, or modifying the **Assured's Data Security System** or clearing the **Assured's Data Security System** of viruses and electronic infections, either preventatively or in response to a **Data Security Breach**, **Client Network Infections**, and/or **Claim** against the **Assured**;

AB. any **Data Security Breach** or **Client Network Infection** occasioned by acts of God, war, riot, civil commotion, insurrection or usurpation of governmental power;

AC. any **Data Security Breach** or **Client Network Infection** brought about by reason of any governmental authority seizing or gaining access to the **Assured's** computer or **Data Security System**;

AD. any proceedings initiated against the **Assured** before a governmental agency in connection with a **Data Security Breach** or **Client Network Infection**, including any audit or other investigation by such governmental agency;

AE. any **Claim** made by a client of the **Assured** arising out of the transmittal of a **Computer Virus** or other electronic infection from that same client's computer network to the **Assured's Data Security System**;

AF. any **Claim** arising out of **Social Engineering Fraud**; however, this exclusion shall not apply up to the aggregate sublimit of fifty thousand dollars ($50,000) for all **Claims** for **Social Engineering Fraud** solely arising out of the rendering of **Professional Services** by the **Assured**;

AG. any **Claim** or circumstance that might lead to a **Claim** arising out of the **Assured's** role as an employer, or joint employer, whether jointly or severally liable as an employer and/or joint employer, directly or indirectly, or in any other capacity whatsoever, to any of its **Employees**, including without limiting the generality of the foregoing, any liability under any Workers' Compensation Law, Labor Law, Unemployment Compensation Law, Disability Benefit Law, Longshore and Harbor Workers' Compensation Act, Jones Act, Death on the High Seas Act, General Maritime Law, Federal Employers' Liability Act, Employers Liability, Employers' Liability as respects Occupational Disease or any similar laws of liabilities, and including without limiting generality of the foregoing, any liability under a negligent hiring or related theory;

AH. any **Claim** or circumstance that might lead to a **Claim** arising out of loss resulting directly or indirectly from war, whether or not declared; civil war; insurrection; rebellion or revolution; military, naval or usurped power; governmental intervention, expropriation or nationalization; or any act or condition related to any of the foregoing; and arising out of loss resulting directly or indirectly from seizure or destruction of property by order of governmental authority;

AI. **Bodily Injury and Property Damage, Fire Legal or Advertising Liability** coverage provided in section I.F and **Hired** and **Non-Owned Auto** liability coverage provided in section I.G, any **Claim** or circumstance that might lead to a **Claim**:

    1. arising out of **Property Damage** or **Bodily Injury** resulting from the use of force expected or intended from the standpoint of the **Assured**;

    2. arising out of **Bodily Injury** or **Property Damage** arising out of ownership, maintenance, operation, use, loading or unloading of any aircraft or watercraft owned by operated by or rented or loaned to any **Assured**. This exclusion does not apply to:

        i. A watercraft while ashore on **Premises You** own or rent;

        ii. A watercraft **You** do not own that is:

            a. Less than 26 feet long; and

            b. Not being used to carry persons or property for a charge;

        iii. Liability assumed under any **Insured Contract** for the ownership, maintenance or use of aircraft or watercraft;

    3. arising out of **Property Damage** or **Bodily Injury** arising out of:

        i. the ownership, maintenance, operation, use, loading or unloading of any **Mobile Equipment** while being used in any prearranged or organized racing, speed or demolition contest or in any stunting activity or in practice or preparation for such contest or activity; or

        ii. the operation or use of any snowmobile, moped or motorized bicycle, or trailer designed for use therewith;

    4. for **Property Damage** or **Bodily Injury** arising out of and in the course of the transportation of **Mobile Equipment** by any **Auto** owned or operated by or rented or loaned to any;

    5. arising out of **Property Damage**, **Bodily Injury** or **Advertising Liability** for which the **Assured** or his or her indemnitee may be held liable:

        i. as a person or organization engaged in the business of manufacturing, distributing, selling, or serving alcoholic beverages; or

        ii. if not so engaged, as an owner or lessor of **Premises** used for such purposes, if such liability is imposed by, or because of the violation of, any statute, ordinance or regulation pertaining to the sale, gift, distribution or use of any alcoholic beverage;

    6. arising out of **Bodily Injury** to:

        i. any **Employee** or volunteer of the Named **Assured** arising out of and in the course of his employment or retention by the Named **Assured**; or

        ii. the spouse, child, parent, brother or sister of the **Employee** as a consequence of above. This exclusion applies:

            a. whether the **Assured** may be liable as an employer or in any other capacity; and

     b. to any obligation to share **Damages** with or repay someone else who must pay **Damages** arising out of such liability;

7. arising out of **Property Damage** to:

     i. property owned or occupied or rented to the **Assured**;

     ii. property used by the **Assured**; or

     iii. property in the care, custody or control of the **Assured** or as to which the **Assured** is for any purpose exercising physical control;

     provided, that this exclusion shall not apply to **Fire Legal Liability**;

8. arising out of **Property Damage** to **Premises** owned or alienated by the **Named Assured** arising out of such **Premises** or any part thereof;

9. arising out of that part of any contract or agreement entered into, as part of **Your** business, pertaining to the rental or lease, by **You** or any of **Your Employees**, of any **Auto**. However, such contract or agreement shall not be considered an **Insured Contract** to the extent that it obligates **You** or any of **Your Employees** to pay for **Property Damage** to any **Auto** rented or leased by **You** or any of **Your Employees**.

10. arising out of loss of use of tangible property which has not been physically injured or destroyed resulting from:

     i. a delay in or lack of performance by or on behalf of the Named **Assured** of any contract or agreement; or

     ii. the failure of the **Named Assured's Products** or work performed by or on behalf of the **Named Assured** to meet the level of performance, quality, fitness or durability warranted or represented by the **Named Assured**;

     but this Exclusion does not apply to loss of use of the other tangible property resulting from the sudden and accidental **Injury** to or destruction of the **Named Assured's Products** or work performed by or on behalf of the **Named Assured** after such products or work have been put to use by any person or organization other than the **Assured**, or products that are still in the **Named Assured's** possession;

11. arising out of **Property Damage** to the **Named Assured's Products**, or for the cost of inspecting, repairing or replacing any defective or allegedly defective product or part thereof or for loss of use of any defective or allegedly defective product;

12. arising out of **Property Damage** to work performed by or on behalf of the **Named Assured** arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith;

13. arising out of the withdrawal, recall, inspection, repair, replacement or loss of life of the **Named Assured's Products** or work completed by or for the **Named Assured** or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein;

14. arising out of **Aircraft Products**, including, but not limited to, consequential loss of use thereof resulting from **Grounding**;

15. relating to **Advertising Liability** arising out of:

     i. failure of performance of contract; provided, however, that this Exclusion shall not apply to the unauthorized appropriation of ideas based upon alleged breach of an implied contract;

     ii. infringement of patent, trademark, service mark, and trade name, other than titles or slogans by use thereof on or in connection with goods, products or services sold, offered for sale or advertised;

     iii. incorrect description or mistake in advertised price of goods, products or services sold, offered for sale or advertised;

     iv. the failure of goods, products or services to conform with advertised quality or performance; or

     v. an offense committed by an **Assured** whose business is advertising, broadcasting, publishing or telecasting;

16. for or arising out of, or resulting from **Property Damage** or **Bodily Injury** for which any **Assured** may be held liable by reason of:

     i. Causing or contributing to the intoxication of any person;

     ii. The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

      iii. Any statute, ordinance or regulation relating to the sale, gift, distribution or use alcoholic beverages;

This exclusion applies only if **You** are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages;

17. any obligation of the **Assured** under a workers' compensation, disability benefits or unemployment compensation law or any similar law;

18. arising out of loss, damage, destruction, distortion, erasure, corruption or alteration of **Electronic Data** from any cause whatsoever (including but not limited to **Computer Virus**) or loss of use, reduction in functionality, cost, expense of whatsoever nature resulting therefrom, regardless of any other cause or event contributing concurrently or in any other sequence to the loss;

19. for or arising out of, or resulting from **Property Damage** or **Bodily Injury** for which any **Assured** may be held liable by reason of:

    i. Physically administering any medication, whether prescription or over-the-counter, to others; or

    ii. Indirectly administering any medication, whether prescription or over-the-counter, to others via a remote and/or computerized system or by instructing a third party to administer said medication; or

    iii. Giving advice or opinion on medication or any medical condition or treatment thereof; or

    iv. Directly or indirectly administering and/or performing medical services commonly administered and/or performed by a nurse, licensed physician, or other licensed or certified medical professional;

20. arising out of **Bodily Injury** to any person while being transported by **You** for a fee.

## V. **DEFINITIONS**

- "**Advertising Liability**" means injury arising out of one or more of the following, committed in the course of the **Assured's** advertising activities:

    i. libel, slander or defamation;

    ii. infringement of copyright, title, slogan, trade dress, or advertising idea;

    iii. Piracy or idea misappropriation under an implied contract;

    iv. Invasion of right of privacy.

- "**Aircraft Products**" means any aircraft whether or not heavier than air (including spacecraft and missiles) and any ground support, guidance, control or communications equipment used in connection therewith, and also includes parts, supplies, or equipment installed in or on or used in connection with aircraft, including tools, training aids, instructions, manuals, blue prints and other data, engineering and other advice, services and labor used in the operation, maintenance or manufacture of such products.

- "**Auto**" means a land motor vehicle, trailer or semi-trailer designed for travel on public roads, including any attached machinery or equipment.

- "**Auto Business**" means the business or occupation of selling, repairing, servicing, storing or parking **Autos**.

- "**Bodily Injury**" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

- "**Bookkeeper**" means one who performs the mechanical recording of debits and credits or the summarizing of financial information for others for a fee.

- "**Care Manager**" means one who provides the following services to others for a fee:

    1. coordinating assistance from paid service providers and/or unpaid help from family and friends to enable individuals with functional limitations to obtain the highest level of independence consistent with their capacity and preferences for care;

    2. face-to-face interviewing of individuals with functional limitations;

    3. assessment of functional limitations;

    4. care plan development for individuals with functional limitations;

    5. administrative and clerical aspects of care plan implementation and monitoring of individuals with functional limitations.

The services performed by a **Care Manager** do not include:

1. providing actual health care services directly; or

2. performing any services in any trade, business or profession other than a **Care Manager**, including without limitation activities as a nurse or other health care provider.

- "**Claim**" means a demand received by any **Assured** for money or services outside the **Ordinary Course of Business** including the service of suit or institution of arbitration proceedings against the **Assured**.

- "**Claims Expenses**" means:

    1. fees charged by an attorney designated by **Underwriters** and consented to by the **Named Assured**, with such consent not to be unreasonably withheld; and

    2. all other fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a **Claim**, suit or proceeding arising in connection therewith, if incurred by the **Underwriters**, or by the **Assured** with the written consent of the **Underwriters**.

    3. **Claims Expenses** does not include any costs incurred in the **Ordinary Course of Business**, nor any salary, overhead or other charges incurred by the **Assured** for time spent in cooperating in the defense and investigation of any **Claim** or circumstance which might lead to a **Claim** notified under this **Insurance**.

    4. **Claims Expenses** also does not include any fees, costs, expenses or other charges incurred by the **Assured** -- or incurred for or on behalf of the **Assured** -- if such fees, costs, expenses or other charges are payable or reimbursable by any other sources, including but not limited to any applicable trust or estate.

- "**Client Network Infection**" means the actual diagnosed transmittal from the **Assured's Data Security System** to the computer system of a client for whom the **Assured** is performing **Professional Services** of a **Computer Virus** or other electronic infection which causes damage to the client's computer or computer network or disrupts the client's business.

- "**Computer Consultant**" means one who provides to others for a fee advice, implementation, support and management of computer based information systems consisting of pre-packaged (not custom) locally-installed software or remote internet-based applications, as well as personal computer hardware together with associated peripheral devices, all in conjunction with other **Professional Services** aside from those rendered as a **Computer Consultant**.

- "**Computer Virus**" means a set of corrupting, harmful or otherwise unauthorized instructions or code including a set of maliciously introduced unauthorized instructions or code, programmatic or otherwise, that propagate themselves through a computer system or network of whatsoever nature. **Computer Virus** includes but is not limited to 'Trojan Horses', 'worms' and 'time or logic bombs'.

- "**Confidential Information**" means personal and/or financial information of a sensitive nature including but not limited to account numbers, account balances, financial statements, tax returns, social security numbers, and medical and/or healthcare information protected by HIPAA.

- "**Daily Money Manager**" means one who provides any of the following services to others for a fee:

    1. paying bills;

    2. preparing budgets;

    3. reconciling accounts;

    4. making bank deposits

    5. balancing check books;

    6. preparing checks for signature;

    7. organizing or reviewing incoming correspondence and/or other miscellaneous documents;

    8. organizing tax records or other similar financial documents; or

    9. tracking/monitoring payments to creditors, insurance companies or medical providers.

The services performed by a "**Daily Money Manager**" do not include:

1. incurring debt on behalf of a client;

2. performing any services on behalf of a person adjudged to be legally incompetent;

3. signing checks drawn on a client's account or otherwise withdrawing or transferring funds from a client's account other than to pay bills on behalf of a client pursuant to an express client directive or invoice received in the regular course of business;

4. performing any services in any trade, business or profession other than a **Daily Money Manager**, including without limitation activities as a lawyer, accountant, property manager, nurse or other health care provider,

securities broker, mortgage banker, mortgage broker, independent third party escrow agent, real estate and/or construction advisor, real estate and/or property appraiser, real estate and/or property developer, insurance agent or insurance broker, or activities involving property syndication, real estate investment trusts, limited partnerships or similar investments; or

5. consultation or training in connection with customized financial software.

- "**Damages**" means a monetary judgment, award or settlement, and shall include:

    1. compensatory damages;

    2. damages calculated as a multiple of compensatory damages (where insurable by law);

    3. punitive or exemplary damages (where insurable by law);

    4. pre-judgment interest; and

    5. post-judgment interest that accrues after entry of judgment and before we have paid, offered to pay or deposited in court that part of judgment within the applicable **Limit of Liability**.

However, **Damages** shall not include any amounts for which the **Assured** is not financially liable or for which there is no legal recourse against the **Assured**, the costs and expenses of complying with any injunctive or other form of equitable relief, the reimbursement of fees, the payment of sanctions, surcharges or any other matters that may be deemed uninsurable under the law.

- "**Data Security Breach**" means the actual breach, violation, unauthorized interception, unauthorized use, or misuse by any person not employed by, an agent of, or otherwise affiliated with or authorized by the **Assured**, of any **Data Security System** maintained by the **Assured** for the purpose of maintaining **Confidential Information** concerning the **Assured's** clients in the course of the **Assured's** provision of **Professional Services**.

- "**Data Security System**" means the **Assured's** computer system and/or computerized network utilized by the **Assured** to store and/or retrieve **Confidential Information** concerning the **Assured's** clients in connection with the **Assured's** rendering of **Professional Services**.

- "**Declarations**" means the front page (or pages) of **Your Insurance Policy** that specifies the **Named Assured**, **Period of Insurance**, **Limits of Liability**, **Deductibles**, forms/endorsements and other key information relating to this **Insurance**.

- "**Electronic Data**" means facts, concepts and information converted to a form useable for communications, interpretation or processing by electronic and electromechanical data processing or electronically controlled equipment and includes programs, software and other coded instructions for the processing and manipulation of data or the direction and manipulation of such equipment.

- "**Employee**" includes a "**Leased Worker**". "**Employee**" does not include a "**Temporary Worker**."

- "**Extended Reporting Period**", if applicable, means the 12 month period of time after the end of the **Period of Insurance** for reporting **Claims** arising out of acts, errors or omissions which take place prior to the end of the **Period of Insurance** and otherwise covered by this **Insurance**.

- "**Fiduciary**" means an **Assured's** capacity as:

    1. a guardian, guardian ad litem, or conservator;

    2. an executor or estate administrator;

    3. a bankruptcy administrator;

    4. a representative payee;

    5. a receiver;

    6. an agent or attorney in fact, serving alone without any co-agent, under a written power of attorney for the person or estate of a natural person, not a commercial or charitable entity; or

    7. a trustee, serving alone without any co-trustee, or trust administrator under trusts created by written trust agreement or court order with respect to the estate of natural persons, not commercial or charitable entities (although trust assets may include ownership interests in such entities).

**Fiduciary** does not mean an **Assured's** capacity, nor activities as a lawyer, accountant, property manager, nurse or other health care provider, securities broker, mortgage banker, mortgage broker, independent third party escrow agent, real estate and/or construction advisor, real estate and/or property appraiser, real estate and/or property developer, insurance agent or insurance broker, or activities involving property syndication, real estate investment trusts, limited partnerships or similar investments.

- **"Fire Legal Liability"** means **Property Damage** to structures or portions thereof rented to or occupied by the **Named Assured**, including fixtures **Permanently** attached thereto, if such **Property Damage** arises out of fire.

- **"Grounding"** means the withdrawal of one or more aircraft from flight operation or the imposition of speed, passenger or load restrictions on such aircraft because of the existence of or alleged existence of a defect, fault or conditions in any **Aircraft Product**.

- **"Hired Auto"** means any **Auto You** lease, hire, rent or borrow. This does not include any **Auto You** lease, hire, rent or borrow from any of **Your Employees**, **Your** partners or **Your** Executive Officers, or members of their households.

- **"Insured Contract"** means a contract for lease of **Premises**. However, that portion of the contract for a lease of **Premises** that indemnifies any person or organization for damage by fire to **Premises** while rented to the **Named Assured** or temporarily occupied by the **Named Assured** with permission of the owner is not an "**Insured Contract**."

- **"Leased Worker"** means a person leased to the **Named Assured** by a labor leasing firm under an agreement between the **Named Assured** and the labor leasing firm to perform duties related to the conduct of the **Named Assured's** business. "**Leased Worker**" does not include a "**Temporary Worker**."

- **"Limit of Liability"** means the maximum amount for which **Underwriters** will be liable as provided herein.

- **"Mobile Equipment"** means a land vehicle (including any attached machinery or apparatus) whether or not self-propelled:

  - i. not subject to motor vehicle registration;

  - ii. maintained for use exclusively on premises owned by or rented to the **Named Assured**, including the ways immediately adjoining;

  - iii. designed for use principally off public roads; or

  - iv. designed or maintained for the sole purpose of affording mobility to equipment of the following types forming an integral part of or **Permanently** attached to such vehicle:

    - A. power cranes, shovels, loaders, diggers and drills;

    - B. concrete mixers (other than the mix-in-transit type), graders, scrapers, rollers and on the road construction or repair equipment;

    - C. air-compressors, pumps and generators including spraying, welding and building cleaning equipment; or

    - D. geophysical exploration and well servicing equipment.

- **"Named Assured's Products"** means goods or products manufactured, sold, handled or distributed by the **Named Assured** or by others trading under its name, including any container thereof (other than a vehicle) but shall not include a vending machine or any property, other than such container rented to or located for use of others but not sold.

- **"Non-Owned Auto"** means any **Auto You** do not own, lease, hire, rent or borrow which is used in connection with **Your** business. This includes **Autos** owned by **You**, if **You** are a natural person, **Your Employees**, **Your** partners or **Your** Executive Officers, or members of their households, but only while used in **Your** business.

- **"Occurrence"** means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

- **"Ordinary Course of Business"** means the usual, routine or customary services, practices and procedures of an **Assured** in rendering **Professional Services**, including but not limited to the production of, revision or supplement to an accounting, financial statement, invoice or other similar report or document.

- **"Period of Insurance"** means the period of time between the inception date shown in the **Declarations** and the effective date of termination, expiration or cancellation of this **Insurance** and specifically excludes any **Extended Reporting Period** hereunder.

- **"Personal Injury"** means:

  1. false arrest, detention or imprisonment, wrongful entry or eviction or other invasion of the right of private occupance, or malicious prosecution; and/or

  2. libel or slander or other defamatory or disparaging material, or a publication or an utterance in violation of an individual's right of privacy.

- **"Professional Services"** means services provided by an **Assured** to others for a fee, unless acting as a volunteer or in an official pro bono capacity, on behalf of the **Named Assured** in any of the following capacities:

  - **Fiduciary**

  - **Daily Money Manager**

- **Computer Consultant**
- **Care Manager**
- **Bookkeeper**

- "**Property Damage**" means:

    a. physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the **Occurrence** that caused it.

- "**Social Engineering Fraud**" means the fraudulent, deceptive, or intentional practice of causing others, by means of hacking, phishing, spear phishing, smishing, spoofing, business e-mail compromise, or other similar electronic, telephonic, or other schemes, devices, or ploys seeking to impersonate legitimate persons or entities or influence transactions, to transmit funds or other assets of value electronically or otherwise to persons, entities, or accounts that are not the recipients intended to receive the funds or assets.

- "**Temporary Worker**" means a person who is furnished to the **Assured** to substitute for a **Permanent Employee** on leave to meet seasonal or short-term workload conditions.

- "**Theft**" means the intentional, unlawful taking, diversion or sequestration of money, securities or tangible property to the deprivation of another, including but not limited to such taking, diversion or sequestration by means of any criminal, dishonest, fraudulent or malicious act, error or omission committed with actual, criminal, dishonest, fraudulent or malicious purpose or intent.

- "**Underwriters**" means those certain underwriters at Lloyd's of London subscribed to the **Insurance** afforded hereby.

- "**You**" and "**Your**" means and refers to the **Named Assured**.

Whenever the singular form of a word is used herein, the same shall include the plural when required by the context.

## VI. **LIMIT OF LIABILITY**

A. The **Limit of Liability** stated in the **Declarations** as "per **Claim**" is the limit of the **Underwriters**' liability for all **Damages** and **Claims Expenses** arising out of the same, related or continuing **Professional Services** without regard to the number of **Assureds**, **Claims** or claimants.

B. The **Limit of Liability** stated in the **Declarations** as "Aggregate" is the total limit of the **Underwriters**' liability for all **Damages** and **Claims Expenses** arising out of **Claims** or circumstances which might lead to a **Claim** first made and reported to the **Underwriters** during the **Period of Insurance** or during the **Extended Reporting Period** and **Claims** arising out of the same, related or continuing **Professional Services** as such **Claims** or circumstances which might lead to a **Claim**.

C. The **Limit of Liability** for the **Extended Reporting Period** shall be part of, and not in addition to, the **Limits of Liability** of the **Underwriters** for the **Period of Insurance**.

D. If both **Damages** covered by this **Insurance** and damages not covered by this **Insurance** are incurred, either because a **Claim** against any **Assured** includes both covered and uncovered matters or because a **Claim** is made against both **Assureds** and others, the **Assured** and **Underwriters** shall use their best efforts to agree upon a fair and proper allocation of such amount between covered **Damages** and **Claims Expenses** and uncovered portions of damages, settlements, judgments and/or **Claims Expenses**.

E. Notwithstanding Section VI. D above, **Underwriters**, at their sole discretion, have the right and the option to pay for non-covered damages, settlements, judgments and/or **Claims Expenses**, in which event the **Assured** agrees to repay **Underwriters** for any amounts so paid.

F. Additionally, notwithstanding Section VI. D above, any **Damages** or **Claims Expenses** payments made by **Underwriters** shall be repaid to **Underwriters** by the **Assured** in the event and to the extent that the **Assured** shall not be entitled under the terms and conditions of this **Insurance** to payment of such **Damages** or **Claims Expenses**.

G. **Limit of Liability** for **Data Security Breach** and **Client Network Infection**:

    1. Per **Claim**

    The per **Claim Limit of Liability** indicated in the **Declarations** is the limit of the **Underwriters'** liability for all **Damages** and **Claims Expenses** arising out of the same, related or continuing **Professional Services** without regard to the number of **Assureds**, **Claims** or claimants.

    2. Aggregate

The Aggregate **Limit of Liability** for indicated in the **Declarations** is the total limit of the **Underwriters'** liability for all **Damages** and **Claims Expenses** arising out of **Claims** or circumstances which might lead to a **Claim** first made and reported to the **Underwriters** during the **Period of Insurance** or during the **Extended Reporting Period** and **Claims** arising out of the same, related or continuing **Professional Services** as such **Claims** or circumstances which might lead to a **Claim**.

H. **Limit of Liability** for **Property Damage**, **Bodily Injury** and **Advertising Liability**:

    1. Each **Occurrence**

The Each **Occurrence Limit of Liability** indicated in the **Declarations** is the most **Underwriters** will pay for all **Claims** first made against the **Assured** and reported to **Underwriters** during the **Period of Insurance** for **Property Damage**, **Bodily Injury** or **Advertising Liability** arising out of any one **Occurrence**. The **Limit of Liability** Each **Occurrence** applies regardless of the number of **Assureds** covered or **Claims** made based on the same **Occurrence** or interrelated **Occurrences**.

    2. Aggregate

The Aggregate **Limit of Liability** indicated in the **Declarations** is the most **Underwriters** will pay for all **Claims** for **Property Damage**, **Bodily Injury** or **Advertising Liability** first made against the **Assureds** and reported to **Underwriters** during the **Period of Insurance** arising out of all **Occurrences** regardless of the number of **Assureds** covered or **Claims** made against the **Assureds**.

I. **Limit of Liability** for **Fire Legal Liability**:

    1. Each **Occurrence**

The Each **Occurrence Limit of Liability** indicated in the **Declarations** is the most **Underwriters** will pay for all **Claims** first made against the **Assured** and reported to **Underwriters** during the **Period of Insurance** for **Fire Legal Liability** arising out of any one **Occurrence**. The **Limit of Liability** Each Occurrence applies regardless of the number of **Assureds** covered or **Claims** made based on the same **Occurrence** or interrelated **Occurrences**.

    2. Aggregate

The Aggregate **Limit of Liability** indicated in the **Declarations** is the most **Underwriters** will pay for all **Claims** for **Fire Legal Liability** first made against the **Assureds** and reported to **Underwriters** during the **Period of Insurance** arising out of all **Occurrences** regardless of the number of **Assureds** covered or **Claims** made against the **Assureds**.

J. **Limit of Liability** for **Hired** and **Non-Owned Auto** Liability:

    1. Each **Occurrence**

The **Hired** and **Non-Owned Auto** Each **Occurrence Limit of Liability** indicated in the **Declarations** is the most **Underwriters** will pay for all **Claims** first made against the **Assured** and reported to **Underwriters** during the **Period of Insurance** for **Property Damage** or **Bodily Injury** arising out of any one **Occurrence**. The **Limit of Liability** Each **Occurrence** applies regardless of the number of **Assureds** covered or **Claims** made based on the same **Occurrence** or interrelated **Occurrences**.

    2. Aggregate

The **Hired** and **Non-Owned Auto** Aggregate **Limit of Liability** indicated in the **Declarations** is the most **Underwriters** will pay for all **Claims** for **Property Damage** or **Bodily Injury** first made against the **Assureds** and reported to **Underwriters** during the **Period of Insurance** arising out of all **Occurrences** regardless of the number of **Assureds** covered or **Claims** made against the **Assureds**.

These **Limits of Liability** stated above are part of, and not in addition to, the General Liability Limits listed in the **Declarations**.

K. The Aggregate **Limit of Liability** for all coverages indicated in the **Declarations** is the most **Underwriters'** will pay in the aggregate for all amounts payable by **Underwriters'** for all coverages afforded under this **Policy**.

VII. **DEDUCTIBLE**

The **Deductible** amount stated in the **Declarations**, shall be satisfied by payments by the **Assured** of **Damages** and **Claims Expenses** resulting from each **Claim** first made and reported to the **Underwriters** during the **Period of Insurance** and the **Extended Reporting Period** as a condition precedent to the payment by the **Underwriters** of any amounts hereunder and the **Underwriters** shall be liable only for amounts in excess of such **Deductible** subject to **Underwriters'** total liability not exceeding the limit set forth in Item 3 of the **Declarations**. The **Assured** shall make direct payments within the **Deductible** to appropriate other parties designated by the **Underwriters**.

If the **Assured**, at **Underwriters**' written request, submits a **Claim** to alternative dispute resolution in accordance with the rules of the American Arbitration Association or the Defense Research Institute, and such **Claim** is settled through this process, the **Deductible** obligation stated in the Declarations shall be deemed to be fifty percent (50%).

## VIII. INNOCENT ASSURED

A. Whenever coverage under this **Insurance** would be excluded, suspended or lost:

1. because of any exclusion relating to criminal, dishonest, fraudulent or malicious acts, errors or omissions by any **Assured**, and with respect to which any other **Assured** did not personally participate or personally acquiesce or remain passive after having personal knowledge thereof, or

2. because of non-compliance with Clause XI Notice of **Claim** or Circumstance that may lead to a **Claim**, with respect to which any other **Assured** shall be in default solely because of the failure to give such notice or concealment of such failure by one or more **Assureds** responsible for the loss or damage otherwise insured hereunder,

the **Underwriters** agree that such insurance as would otherwise be afforded under this **Policy** shall cover and be paid with respect to those **Assureds** who did not personally commit or personally participate in committing or personally acquiesce in or remain passive after having personal knowledge of (a) one or more of the acts, errors or omissions described in any such exclusion; or (b) such failure to give notice, provided that if the condition be one with which such **Assured** can comply, after receiving knowledge thereof, the **Assured** entitled to the benefit of Clause VIII shall comply with such condition promptly after obtaining knowledge of the failure of any other **Assured** hereunder to comply therewith.

B. With respect to this provision, the **Underwriters**' obligation to pay in such event shall be in excess of the **Deductible** and in excess of the full extent of any assets of any **Assured** to whom the exclusion applies. Coverage under this **Innocent Assured** section shall only apply to **Claims** with respect to coverage under section I.H of this **Policy**, whether purchased or not. However, subject to the terms and conditions of the **Policy** the **Innocent Assured** section will apply to criminal, dishonest, fraudulent or malicious acts, errors or omissions by any **Assured** not subject to coverage under section I.H of this **Policy**. In no event shall the **Underwriters**' obligation to pay exceed the **Limit of Liability** stated in Item 3 of the **Declarations**. Additionally, in no event shall the **Underwriters**' obligation to pay **Claim Expenses** exceed two hundred fifty thousand dollars ($250,000).

## IX. EXTENDED REPORTING PERIOD

A. **Extended Reporting Period Options**

1. **Automatic Extended Reporting Period**

If **Underwriters** or the **Assured** shall cancel or elect not to renew this **Policy**, the **Named Assured** designated in Item 1 of the **Declarations** shall have the right following the effective date of such cancellation or non-renewal to a period of sixty (60) days (herein referred to as the "Automatic **Extended Reporting Period**") in which to give written notice to **Underwriters** of **Claims** first made against the **Assured** during the Automatic **Extended Reporting Period** for any wrongful act occurring prior to the end of the policy period and otherwise covered by this **Policy**. The Automatic **Extended Reporting Period** shall not apply to **Claims** that are covered under any subsequent insurance **You** purchase or which is purchased for the **Assured's** benefit, or that would be covered by such subsequent insurance but for: (1) the exhaustion of the amount of insurance applicable to such **Claims**; or (2) any applicable retention or deductible.

2. **Optional Extended Reporting Period**

In the event of cancellation or non-renewal of this **Insurance** by **Underwriters** or the **Assured**, the **Named Assured** designated in Item 1 of the **Declarations** shall have the right, upon payment in full and not proportionally or otherwise in part of one hundred percent (100%) of the Premium set forth in Item 5 of the **Declarations** to have issued an endorsement providing a 12 month **Extended Reporting Period** for **Claims** first made against any **Assured** and reported to the **Underwriters** during the **Extended Reporting Period**, subject to the conditions set forth in the definition of **Extended Reporting Period** herein.

3. **Optional Retirement Extended Reporting Period**

In the event of non-renewal of this **Insurance** because of retirement (where the **Named Assured Permanently** ceases to render **Professional Services**) by the **Named Assured** designated in Item 1 of the Declarations, provided that the **Named Assured** is a sole practitioner, the **Named Assured** shall have the right to have issued an endorsement providing a 12 months **Extended Reporting Period** for **Claims** first made against any **Assured** and reported to the **Underwriters** during the **Extended Reporting Period**, subject to the conditions set forth in the definition of **Extended Reporting Period** herein.

The calculation of the additional Premium for the **Extended Reporting Period** endorsement shall be according to the following table:

- For **Assureds** who have purchased insurance coverage under this program for a period of three consecutive years or less -- an additional premium of one hundred percent (100%) of the expiring annual policy premium.

- For **Assureds** who have purchased insurance coverage under this program for a period of four consecutive years -- an additional premium of ninety percent (90%) of the expiring annual policy premium.

- For **Assureds** who have purchased insurance coverage under this program for a period of five consecutive years -- an additional premium of eighty percent (80%) of the expiring annual policy premium.

- For **Assureds** who have purchased insurance coverage under this program for a period of six consecutive years -- an additional premium of seventy percent (70%) of the expiring annual policy premium.

- For **Assureds** who have purchased insurance coverage under this program for a period of seven consecutive years -- an additional premium of sixty percent (60%) of the expiring annual policy premium.

- For **Assureds** who have purchased insurance coverage under this program for a period of eight or more consecutive years -- an additional premium of fifty percent (50%) of the expiring annual policy premium.

B. In order for the **Named Assured** to invoke the Extended Reporting option, the payment of the premium for the **Extended Reporting Period** must be paid to **Underwriters** within 30 days of the non-renewal or cancellation.

C. The **Limit of Liability** for the **Extended Reporting Period** shall be part of, and not in addition to, the **Limits of Liability** of the **Underwriters** for the **Period of Insurance**.

D. The quotation by **Underwriters** of a different premium or deductible or limits of liability or changes in policy language for the purpose of renewal shall not constitute a refusal to renew by the **Underwriters**.

E. The right to the **Extended Reporting Period** shall not be available to the **Named Assured** where cancellation or non-renewal by the **Underwriters** is due to non-payment of premium or failure of an **Assured** to pay such amounts in excess of the applicable **Limit of Liability** or within the amount of the applicable **Deductible**.

F. All notices and premium payments with respect to the Extended Reporting option shall be directed to **Underwriters** through the entity named in Item 9 of the **Declarations**.

G. At the commencement of the **Extended Reporting Period** the entire premium shall be deemed earned, and in the event the **Named Assured** terminates the **Extended Reporting Period** for any reason prior to its natural expiration, **Underwriters** will not be liable to return any premium paid for the **Extended Reporting Period**.

## X. OTHER INSURANCE

This **Insurance** shall apply in excess of any other valid and collectible insurance available to any **Assured**, unless such other insurance is a surety bond or is written only as specific excess insurance over the **Limit of Liability** of this **Policy**.

## XI. NOTICE OF CLAIM, OR CIRCUMSTANCE THAT MAY LEAD TO A CLAIM

A. If any **Claim** is made against the **Assured**, the **Assured** shall immediately forward to **Underwriters** through persons named in Item 7 of the **Declarations** every demand, notice, summons or other process received by him or his representative.

B. If during the **Period of Insurance** the **Assured** first becomes aware of any act, error or omission that could reasonably be the basis for a **Claim** it must give written notice to **Underwriters** through persons named in Item 7 of the **Declarations** as soon as practicable during the **Period of Insurance** of:

1. the specific act, error or omission; and

2. the injury or damage which may result or has resulted from the act, error or omission; and

3. the circumstance by which the **Assured** first became aware of the act, error or omission.

Any subsequent **Claim** made against the **Assured** which is the subject of the written notice shall be deemed to have been made at the time written notice was first given to **Underwriters**.

C. In the event the **Assured** becomes aware of a **Data Security Breach** or **Client Network Infection**, the **Assured** shall promptly notify **Underwriters**, through persons named in Item 7 of the **Declarations**, of such occurrence regardless of whether a **Claim** has been made against the **Assured**.

D. With respect to any actual or potential **Data Security Breach** or **Client Network Infection Claim**, the **Assured** consents to **Underwriters** engaging, at their own expense, a computer forensics specialist or security specialist to investigate the circumstances surrounding the **Claim**, and the **Assured** agrees to cooperate fully with any such specialist.

E. A **Claim** shall be considered to be reported to the **Underwriters** when notice is first given to **Underwriters** through persons named in Item 7 of the **Declarations** of the **Claim** or of an act, error or omission which could reasonably be expected to give rise to a **Claim**.

F. All **Claims** arising out of the same, continuing or related **Professional Services** shall be considered a single **Claim** and deemed to have been made at the time the first of the related **Claims** is reported to **Underwriters** and shall be subject to one **Limit of Liability**.

G. In the event of non-renewal of this **Insurance** by the **Underwriters**, the **Assured** shall have sixty (60) days from the expiration date of the **Period of Insurance** to notify **Underwriters** of **Claims** made against the **Assured** during the **Period of Insurance** which arises out of any act, error or omission which took place prior to the termination date of the **Period of Insurance** and otherwise covered by this **Insurance**.

H. If any **Assured** shall make any **Claim** under this **Policy** knowing such **Claim** to be false or fraudulent, as regards amount or otherwise, this **Policy** shall become null and void and all coverage hereunder shall be forfeited.

## XII. ASSISTANCE AND COOPERATION OF THE ASSURED

The **Assured** shall co-operate with the **Underwriters** in all investigations, including investigations regarding the application and coverage under this **Insurance** and, upon the **Underwriters'** request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization other than an **Employee** of any **Assured** who may be liable to the **Assured** because of acts, errors or omissions with respect to which insurance is afforded under this **Policy**; and the **Assured** shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The **Assured** shall not, except at his own cost, admit liability, make any payment, assume any obligation, incur any expense, enter into any settlement, stipulate to any judgment or award or otherwise dispose of any **Claim** without the consent of the **Underwriters**.

## XIII. ACTION AGAINST UNDERWRITERS

No action shall lie against the **Underwriters** unless, as a condition precedent thereto, there shall have been full compliance with all terms of this **Insurance**, nor until the amount of the **Assured's** obligation to pay shall have been finally determined either by judgment or award against the **Assured** after actual trial or arbitration or by written agreement of the **Assured**, the claimant and the **Underwriters**.

Any person or organization or the legal representative thereof who has secured such judgment, award or written agreement shall thereafter be entitled to make a **Claim** under this **Policy** to the extent of the insurance afforded by this **Policy**. No person or organization shall have any right under this **Insurance** to join the **Underwriters** as a party to an action or other proceeding against the **Assured** to determine the **Assured's** liability, nor shall the **Underwriters** be impleaded by the **Assured** or his legal representative. Bankruptcy or insolvency of the **Assured** or of the **Assured's** estate shall not relieve the **Underwriters** of any of their obligations hereunder.

## XIV. SUBROGATION

In the event of any payment under this **Insurance**, the **Underwriters** shall be subrogated to all the **Assured's** rights of recovery therefor against any person or entity and the **Assured** shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The **Assured** shall do nothing after the payment of **Damages** by **Underwriters** to prejudice such rights.

## XV. CHANGES

Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this **Insurance** or estop the **Underwriters** from asserting any right under the terms of this **Insurance**; nor shall the terms of this **Insurance** be waived or changed, except by endorsement issued to form a part of this **Insurance**, signed by **Underwriters**.

## XVI. CHANGE IN MEMBERSHIP OF FIRM

Any additions to the list of **Fiduciaries** in the application which take place during the **Period of Insurance** must be immediately reported to **Underwriters** in the event that:

A. the total number of new **Fiduciaries** brought into or added to the firm during the **Period of Insurance** increases the number of **Fiduciaries** as stated in the application for coverage by 5 persons or 10% of the total number of **Fiduciaries** listed in the application, whichever amount is greater; or

B. any **Fiduciary** brought into or added to the firm during the **Period of Insurance** had been or was in the process of being reprimanded or censured by any court or association body or disqualified or prohibited from practicing in a specified area of **Professional Services**; or

C. prior to joining the firm, any **Claim** had been made against the **Fiduciary** or the **Fiduciary** had become aware of circumstances that might lead to a **Claim**.

**Underwriters** expressly reserve the right to demand a premium adjustment in the event that any additions to the list of **Fiduciaries** in the application for this **Insurance** meet the criteria set forth in the paragraphs immediately above.

## XVII. MERGERS AND ACQUISITIONS

The **Named Assured** shall be required to give written notice to the **Underwriters** prior to the completion of a merger or acquisition by or of the **Named Assured** and **Underwriters** expressly reserve the right to demand a premium adjustment if this **Insurance** is to remain in force subsequent to any merger or acquisition.

## XVIII. ASSIGNMENT

The interest hereunder of any **Assured** is not assignable. If the **Assured** shall die or be adjudged incompetent, this **Insurance** shall cover the **Assured's** legal representative as the **Assured** with respect to liability previously incurred and covered by this **Insurance**.

## XIX. CANCELLATION

A. This **Policy** may be canceled by the **Named Assured** by surrender thereof to **Underwriters** or by mailing to **Underwriters** written notice stating when thereafter the cancellation shall be effective. This **Insurance** may be canceled by the **Underwriters** by mailing to the **Named Assured** at the address shown in the **Declarations** written notice stating when not less than 60 days thereafter such cancellation shall be effective. However, if the **Underwriters** cancel this **Insurance** because the **Assured** has failed to pay a premium when due this **Insurance** may be canceled by the **Underwriters** by mailing a written notice of cancellation to the **Named Assured** at the address shown in the **Declarations** stating when not less than 10 days thereafter such cancellation shall be effective. The mailing of notice as aforesaid shall be sufficient proof of notice. The time of surrender or the effective date and hour of cancellation stated in the notice shall become the end of the **Period of Insurance**. Delivery (where permitted by law) of such written notice either by the **Named Assured** or by the **Underwriters** shall be equivalent to mailing.

B. If the **Named Assured** cancels this **Insurance**, earned premium shall be computed in accordance with the attached short rate table and procedure. If the **Underwriters** cancel this **Insurance**, earned premium shall be computed pro rata. Premium adjustment may be made either at the time cancellation is effected or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

## XX. ENTIRE CONTRACT

By acceptance of this **Policy** the **Assured** agrees that the statements in the Declarations and application are his agreements and representations, that this **Insurance** is issued in reliance upon the truth of such representations and that this **Policy** embodies all agreements existing between the **Assured** and the **Underwriters** relating to this **Insurance**.

## XXI. NUCLEAR INCIDENT EXCLUSION CLAUSE - LIABILITY - DIRECT

This **Policy** does not apply:

A. Under any liability coverage, to injury, sickness, disease, death or destruction:

    1. with respect to which an **Assured** under the **Policy** is also an **Assured** under a nuclear energy liability policy issued by Nuclear Energy Liability **Insurance** Association, Mutual Atomic Energy Liability **Underwriters** or Nuclear **Insurance** Association of Canada, or would be an **Assured** under any such policy but for its termination upon exhaustion of its **Limit of Liability**; or

    2. resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the **Assured** is, or had this **Policy** not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

B. Under any medical payments coverage, or under any supplementary payments provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

C. Under any liability coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if:

    1. the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an **Assured** or (2) has been discharged or dispersed therefrom;

    2. the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an **Assured**; or

    3. the injury, sickness, disease, death or destruction arises out of the furnishing by an **Assured** of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion 3 applies only to injury to or destruction of property at such nuclear facility.

D. As used in this Clause (XXI):

"hazardous properties" include radioactive, toxic or explosive properties; "nuclear material" means source material, special nuclear material or by-product material; "source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act 1954 or in any law amendatory thereof; "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor; "waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph 1 or 2 thereof; "nuclear facility" means:

1. any nuclear reactor,

2. any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

3. any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the **Assured** at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

4. any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste, and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material. With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this clause is subject to the terms, exclusions, conditions and limitations of the **Policy** of which it is a part.

In relation to liability arising outside the USA, its Territories or Possessions, Puerto Rico or the Canal Zone, the **Policy** does not cover any liability of whatsoever nature directly or indirectly caused by or contributed to by or arising from ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel.

## XXII. SERVICE OF SUIT

A. It is agreed that in the event of the failure of the **Underwriters** to pay any amount claimed to be due under this **Insurance**, the **Underwriters**, at the request of the **Named Assured**, will submit to the jurisdiction of a court of competent jurisdiction within the United States. This clause does not constitute and should not be understood to constitute an agreement by **Underwriters** that an action is properly maintained in a specific forum, nor may it be construed as a waiver of the **Underwriters'** rights to commence an action in a court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any State of the United States, all of which rights the **Underwriters** expressly reserve. It is further agreed that service of process in such suit may be made upon the persons named in Item 8 of the **Declarations** and that in any suit instituted against any one of them upon this **Policy** the **Underwriters** will abide by the final decision of such court or of any Appellate Court in the event of an appeal.

B. The persons named in Item 8 of the **Declarations** are authorized and directed to accept service of process on behalf of the **Underwriters** in any such suit and/or upon the request of the **Named Assured** to give written undertaking to the **Named Assured** that they will enter a general appearance upon **Underwriters'** behalf in the event such a suit shall be instituted. Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, **Underwriters** hereon hereby designate the Superintendent, Commissioner or Director of **Insurance** or other officer specified for that purpose in the statute or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the **Named Assured** or any beneficiary hereunder arising out of this **Policy** of insurance, and hereby designate the persons named in Item 8 of the **Declarations** as the persons to whom the said officer is authorized to mail such process or a true copy thereof.

## XXIII. SHORT RATE CANCELLATION TABLE

Notwithstanding anything to the contrary contained herein and in consideration of the premium for which this **Insurance** is written it is agreed that in the event of cancellation thereof by the **Assured** the Earned Premium shall be computed as follows:

A. For insurance written for one year:

| Days In Force | % | Days In Force | % | Days In Force | % | Days In Force | % |
|---|---|---|---|---|---|---|---|
| 1 | 5 | 66-69 | 29 | 154-156 | 53 | 256-260 | 77 |
| 2 | 6 | 70-73 | 30 | 157-160 | 54 | 261-264 | 78 |
| 3-4 | 7 | 74-76 | 31 | 161-164 | 55 | 265-269 | 79 |
| 5-6 | 8 | 77-80 | 32 | 165-167 | 56 | 270-273 (9 months) | 80 |
| 7-8 | 9 | 81-83 | 33 | 168-171 | 57 | 274-278 | 81 |
| 9-10 | 10 | 84-87 | 34 | 172-175 | 58 | 279-282 | 82 |
| 11-12 | 11 | 88-91 (3 months) | 35 | 176-178 | 59 | 283-287 | 83 |

| | | | | |
|---|---|---|---|---|
| 13-14 | 12 92-94 | 36 179-182 (6 months) | 60 288-291 | 84 |
| 15-16 | 13 95-98 | 37 183-187 | 61 292-296 | 85 |
| 17-18 | 14 99-102 | 38 188-191 | 62 297-301 | 86 |
| 19-20 | 15 103-105 | 39 192-196 | 63 302-305 (10 months) | 87 |
| 21-22 | 16 106-109 | 40 197-200 | 64 306-310 | 88 |
| 23-25 | 17 110-113 | 41 201-205 | 65 311-314 | 89 |
| 26-29 | 18 114-116 | 42 206-209 | 66 315-319 | 90 |
| 30-32 (1 month) | 19 117-120 | 43 210-214 (7 months) | 67 320-323 | 91 |
| 33-36 | 20 121-124 (4 months) | 44 215-218 | 68 324-328 | 92 |
| 37-40 | 21 125-127 | 45 219-223 | 69 329-332 | 93 |
| 41-43 | 22 128-131 | 46 224-228 | 70 333-337 (11 months) | 94 |
| 44-47 | 23 132-135 | 47 229-232 | 71 338-342 | 95 |
| 48-51 | 24 136-138 | 48 233-237 | 72 343-346 | 96 |
| 52-54 | 25 139-142 | 49 238-241 | 73 347-351 | 97 |
| 55-58 | 26 143-146 | 50 242-246 (8 months) | 74 352-355 | 98 |
| 59-62 (2 months) | 27 147-149 | 51 247-250 | 75 356-360 | 99 |
| 63-65 | 28 150-153 (5 months) | 52 251-255 | 76 361-365 (12 months) | 100 |

% = Percentage of annual premium deemed earned

B. For insurances written for more or less than one year:

    1. If insurance has been in force for 12 months or less, apply the standard short rate table for annual insurances to the full annual premium determined as for an insurance written for a term of one year.

    2. If insurance has been in force for more than 12 months:

        a. Determine full annual premium as for an insurance written for a term of one year.

        b. Deduct such premium from the full insurance premium, and on the remainder calculate the pro rata Earned Premium on the basis of the ratio of the length of time beyond one year the insurance has been in force to the length of time beyond one year for which the insurance was originally written.

        c. Add premium produced in accordance with items a and b to obtain Earned Premium during full period insurance has been in force.

### POLICYHOLDER DISCLOSURE NOTICE OF TERRORISM INSURANCE COVERAGE

**You** are hereby notified that, under the Terrorism Risk Insurance Act (the "Act"), effective December 26, 2007, this **Policy** makes available to **You** insurance for losses arising out of certain acts of terrorism. Terrorism is defined as any act certified by the Secretary of the Treasury, in concurrence with the Secretary of State, and the Attorney General of the United States, to be an **Act of Terrorism**; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States Mission; and to have been committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the **Policy** or affect the conduct of the United States Government by coercion.

**You** should know that the insurance provided by **Your Policy** for losses caused by acts of terrorism is partially reimbursed by the United States under the formula set forth in the Act. Under this formula, the United States pays 85% of covered terrorism losses that exceed the statutorily established deductible to be paid by the insurance company providing the coverage. However, if aggregate **Assured** losses attributable to terrorist acts certified under the Act exceed $100 billion in a Program Year (January 1 through December 31), the treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

If aggregate **Assured** losses attributable to terrorist acts certified under the Act exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case **Assured** losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

The portion of **Your Policy's** annual premium that is attributable to insurance for such acts of terrorism is: $0.

If **You** have any questions about this notice, please contact **Your** agent or broker.

FPL Policy Form (11/19)
Dominion Insurance Services Inc. © 2020 | All Rights Reserved.



370 Park Street, Suite 8, Moraga CA. 94556
341 S. Main, Suite 100, Alpine UT. 84004
888.313.9977(t) ~ 925.313.9978(f)
info@dominioninsurance.com
dominion-insurance.com

**FPL Change Endorsement**
**Deletion of Co-Trustee/Co-Agent Restriction**

In consideration of the premium for which this **Insurance** is written it is hereby understood and agreed that section V.H. of the **Policy** is amended to include the following as part of the definition of **Fiduciary**:

<u>Old Wording</u>:

H. "**Fiduciary**" means an **Assured's** capacity as:

    viii. an agent or attorney in fact, <u>*serving alone without any co-agent*</u>, under a written power of attorney for the person or estate of a natural person, not a commercial or charitable entity [emphasis added]; or

    ix. a trustee, <u>*serving alone without any co-trustee*</u>, or trust administrator under trusts created by written trust agreement or court order with respect to the estate of natural persons, not commercial or charitable entities (although trust assets may include ownership interests in such entities) [emphasis added].

<u>New (Revised) Wording</u>:

H. "**Fiduciary**" means an **Assured's** capacity as:

    viii. an agent or attorney in fact, under a written power of attorney for the person or estate of a natural person, not a commercial or charitable entity; or

    ix. a trustee or trust administrator, under trusts created by written trust agreement or court order with respect to the estate of natural persons, not commercial or charitable entities (although trust assets may include ownership interests in such entities).

All other terms and conditions of the **Policy** remain unchanged.

Dominion FPL Change Endorsement (02/08)

Dominion Insurance Services Inc. © 2020 | All Rights Reserved.



370 Park Street, Suite 8, Moraga CA. 94556
341 S. Main, Suite 100, Alpine UT. 84004
888.313.9977(t) ~ 925.313.9978(f)
info@dominioninsurance.com
dominion-insurance.com

## General Change Endorsement

In consideration of the premium charged for which this **Insurance** is written, it is hereby understood and agreed that the wording listed under Forms & Notices on the Declarations is included as part of this **Policy**.

All other terms and conditions of the **Policy** remain unchanged.

General Change Endorsement (05/17)
Dominion Insurance Services Inc. © 2020 | All Rights Reserved.



370 Park Street, Suite 8, Moraga CA. 94556
341 S. Main, Suite 100, Alpine UT. 84004
888.313.9977(t) ~ 925.313.9978(f)
info@dominioninsurance.com
dominion-insurance.com

## Pandemic or a Public Health Emergency of International Concern Endorsement

This **Insurance** does not apply to any **Claim**, circumstance, **Occurrence**, suit, and/or demand involving, caused by, resulting from or arising out of, either directly or indirectly, any illness, disease, or medical condition classified by the World Health Organization (WHO) as a pandemic or a Public Health Emergency of International Concern (PHEIC).

With respect to the above, we shall have no obligation to:

Pay any **Damages** or **Claims Expenses**, or any sums for **Bodily Injury**, **Property Damage**, **Personal Injury**, **Personal Property**, **Theft** of money or securities, or any medical expenses as set forth in Insuring Agreement M.

All other terms and conditions of the **Policy** remain unchanged.

Pandemic or a Public Health Emergency of International Concern Endorsement (05/20)

Dominion Insurance Services Inc. © 2020 | All Rights Reserved.



370 Park Street, Suite 8, Moraga CA. 94556
341 S. Main, Suite 100, Alpine UT. 84004
888.313.9977(t) ~ 925.313.9978(f)
info@dominioninsurance.com
dominion-insurance.com

## Specific Claim(s) Exclusion Endorsement

In consideration of the premium for which this **Insurance** is written it is hereby understood and agreed that this **Policy** does not apply to any claims brought by or related to any entity listed on the Declarations Page.

All other terms and conditions of the **Policy** remain unchanged.

Specific Claim(s) Exclusion Endorsement (11/15)

Dominion Insurance Services Inc. © 2020 | All Rights Reserved.



370 Park Street, Suite 8, Moraga CA. 94556
341 S. Main, Suite 100, Alpine UT. 84004
888.313.9977(t) ~ 925.313.9978(f)
info@dominioninsurance.com
dominion-insurance.com

## Medication Coordinator Endorsement

In consideration of the premium for which this **Insurance** is written it is understood and agreed that section V of the **Policy** is hereby amended as follows:

1. **Medication Coordinator** is added to the list of insured capacities under the definition of **Professional Services**; and

2. The following definition of **Medication Coordinator** is hereby added to this Policy.

"**Medication Coordinator**" means one who provides one or more of the following services to others for a fee:
    i. retrieving from a pharmacy medications prescribed by a physician (hereinafter the "Doctor") of a client, ward or conservatee;

    ii. filling weekly medication reminder pill boxes according to the Doctor's instructions.

    iii. reviewing with the **Assured's** client, ward or conservatee the manufacturer's warnings and/or instructions

Notwithstanding the foregoing, "**Medication Coordinator**" does not mean one who physically administers any medication to others. Nor shall the activity of medication coordinator cover any liability arising out of the giving of advice or opinion on medication or any medical condition.

All other terms and conditions of the **Policy** remain unchanged.

Fiduciary Trainer Endorsement (07/10)

Dominion Insurance Services Inc. © 2020 | All Rights Reserved.



370 Park Street, Suite 8, Moraga CA. 94556
341 S. Main, Suite 100, Alpine UT. 84004
888.313.9977(t) ~ 925.313.9978(f)
info@dominioninsurance.com
dominion-insurance.com

## Neutral Facilitator Endorsement

In consideration of the premium for which this **Insurance** is written it is understood and agreed that the **Policy** is hereby amended as follows:

1. "**Neutral Facilitator**" is added to the list of insured capacities under the definition of **Professional Services** found in section V of the **Policy**.

2. The following Definition is added to section V of the **Policy**:

   "**Neutral Facilitator**" means one who provides services to others for a fee in any of the following capacities:

   1. Arbitrator;

   2. Mediator; or

   3. Court-Appointed Referee, Special Master, Neutral Evaluator or Judge Pro Tem.

3. The following exclusion is added to section IV of the **Policy**:

   to any **Claim** arising out of or in any way related to conflicts of interest, including but not limited to conflicts of interest alleged to have resulted from any **Assured** having rendered **Professional Service**s other than as a **Neutral Facilitator** to any party to a dispute resolution proceeding in which such **Assured** subsequently acts as a **Neutral Facilitator**.

All other terms and conditions of the **Policy** remain unchanged.

Neutral Facilitator Endorsement (12/15)

Dominion Insurance Services Inc. © 2020 | All Rights Reserved.



370 Park Street, Suite 8, Moraga CA. 94556
341 S. Main, Suite 100, Alpine UT. 84004
888.313.9977(t) ~ 925.313.9978(f)
info@dominioninsurance.com
dominion-insurance.com

**Notary Public Endorsement**

In consideration of the premium for which this Insurance is written it is understood and agreed that the Policy is hereby amended as follows:

1. "**Notary Public**" is added to the list of insured capacities under the definition of **Professional Services** found in section V of the **Policy**; and

2. The following exclusion is added to section IV of the policy:
   to any **Claim** arising out of or in any way related to any notarization(s) performed by any **Assured** absent the immediate physical presence of the signatory(ies).

All other terms and conditions of the **Policy** remain unchanged.

Notary Public Endorsement (12/08)

Dominion Insurance Services Inc. © 2020 | All Rights Reserved.



370 Park Street, Suite 8, Moraga CA. 94556
341 S. Main, Suite 100, Alpine UT. 84004
888.313.9977(t) ~ 925.313.9978(f)
info@dominioninsurance.com
dominion-insurance.com

It is hereby understood and agreed that this insurance is subject to the following clauses:

## WAR AND TERRORISM EXCLUSION ENDORSEMENT

Notwithstanding any provision to the contrary within this insurance or any endorsement thereto it is agreed that this insurance excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss;

1. war, invasion, acts of foreign enemies, hostilities or warlike operations (whether war be declared or not), civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power; or

2. any act of terrorism.
   For the purpose of this endorsement an act of terrorism means an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organisation(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear.

This endorsement also excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to 1. and/or 2. above.

If the Underwriters allege that by reason of this exclusion, any loss, damage, cost or expense is not covered by this insurance the burden of proving the contrary shall be upon the Assured.

In the event any portion of this endorsement is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

**NMA2918**
**08/10/2001**

Dominion Insurance Services Inc. © 2020 | All Rights Reserved.



370 Park Street, Suite 8, Moraga CA. 94556
341 S. Main, Suite 100, Alpine UT. 84004
888.313.9977(t) ~ 925.313.9978(f)
info@dominioninsurance.com
dominion-insurance.com

## SEVERAL LIABILITY NOTICE

The subscribing Insurers' obligations under contracts of insurance to which they subscribe are several and not joint and are limited solely to the extent of their individual subscriptions. The subscribing Insurers are not responsible for the subscription of any co-subscribing Insurer who for any reason does not satisfy all or part of its obligations.

LSW1001

Dominion Insurance Services Inc. © 2020 | All Rights Reserved.



370 Park Street, Suite 8, Moraga CA. 94556
341 S. Main, Suite 100, Alpine UT. 84004
888.313.9977(t) ~ 925.313.9978(f)
info@dominioninsurance.com
dominion-insurance.com

## List of Lloyd's Syndicates

100.0000% Lloyd's Syndicate 609 AUW, UK

---

100.0000%

Dominion Insurance Services Inc. © 2020 | All Rights Reserved.



370 Park Street, Suite 8, Moraga CA. 94556
341 S. Main, Suite 100, Alpine UT. 84004
888.313.9977(t) ~ 925.313.9978(f)
info@dominioninsurance.com
dominion-insurance.com

**FIDUCIARY PROFESSIONAL LIABILITY INSURANCE**
**CLAIMS MADE COVERAGE APPLICATION**
**Underwritten by Lloyd's of London**

1. Business Name:
   (Named Insured on Policy)     Hitchman Fiduciaries LLC
   a. Address:     120 Tustin Avenue, Suite C915, Newport Beach, CA     92663
   Please provide full physical address above and website below.
   www.hitchmanfiduciaries.com

   b. Contact:

   | First Name | Last Name | Phone | Email |
   |---|---|---|---|
   | Bruce | Hitchman | 9492009712 | bruce@hitchmanfiduciaries.com |

   c. Business:  Founded 2018-01-01  as ○ SP ○ GP ○ LLP ○ PC ● LLC ○ Other

   d. Headcount and Roster     Professionals: 6   Support Staff: 3

   | Professional's Name | Licenses\Certificates\Memberships | Hire Date | Hours/Week |
   |---|---|---|---|
   | Bruce Hitchman | CLPF | 1/1/2009 | 40 |
   | Lee Ann Hitchman | CLPF | 1/1/2005 | 40 |
   | Brett Hitchman | CLPF | 3/1/2016 | 40 |
   | Rafael Chavez Giron | CLPF | 1/1/2017 | 40 |
   | Annelise Hitchman | CLPF | 12/1/2018 | 40 |
   | Michael Lefonts | CLPF | 8/1/2019 | 40 |
   |  |  |  |  |

   **Please list any additional Professional Staff in question 6 below.**

2. Gross Billings Details:
   a. Provide Applicant s annual gross billings, whether received or not.     2386000
      (If Applicant is a startup, please estimate Applicant s first year s gross billings)
   b. Provide the number of clients Applicant serves in each of the following areas, **without double counting matters**:
      (For clients receiving services in multiple categories, count the one generating the highest revenue for Applicant.)

   | Guardian* | Conservator* | Executor | POA Agent | Trustee | Protector* | Rep. Payee | DMM* | Care Manager | Receiver | Other* |
   |---|---|---|---|---|---|---|---|---|---|---|
   | 5 | 18 | 10 | 1 | 173 |  | 3 | 0 |  | 0 | 3 |

   *Guardian - of the Person (including Ad Litem); **Conservator** - of the Estate; Trust **Protector**; **DMM** - Daily Money Manager; Describe **Other** in  uestion 7, below.

   c. Indicate whether Applicant informs clients, in writing, on at least a  uarterly basis of services performed     ○ Yes ● No
      and costs/fees incurred:
      If no, please describe Applicant s reporting and invoicing policies and procedures in the space provided under  uestion 6, below.

   d. List the states and counties in which those Applicant serves reside:

   California: Riverside, Orange, San Bernardino, Los Angeles, San Diego
   Alabama: Walker
   Nevada: Clark County

3.  List below Applicant s current and desired professional liability insurance:

| Carrier | Incept | Expiry | Retro* | Limits | Deductible |
|---|---|---|---|---|---|
| Lloyds | 01/01/2020 | 01/01/2021 | 01/01/2010 | 2000000/4000000 | 15,000 |
| Desired Coverage: 01/01/2021 | 01/01/2022 | 01/01/2010 | 2000000/4000000 | 15000 | |

Note: Your **Retro(active) date** normally matches the date you first began uninterrupted liability coverage.

4.  Within the past five (5) years has Applicant or any of its current or past professional or other money-handling staff:

a.  participated as an owner, officer, director or employee of any other business, company, trade or profession ○ Yes ● No

b.  handled any cases without written documentation of Applicant s scope of services and authority ○ Yes ● No

c.  acted in a co-trustee/co-agent capacity or served under or as a trust protector ● Yes ○ No

d.  been appointed the successor to a fiduciary who was terminated for cause ● Yes ○ No

e.  brought any suit for the collection of professional service fees ○ Yes ● No

f.  maintained any branch offices/separate mailing addresses ● Yes ○ No

g.  performed professional services for a family member ○ Yes ● No

h.  contracted family members to serve clients ○ Yes ● No

i.  become aware of any pending:

    i.  demand that any of its bonds be surcharged ○ Yes ● No

    ii.  objection to an accounting issued by the Applicant ○ Yes ● No

    iii.  demand for a reduction or waiver of the Applicant s fees ○ Yes ● No

    iv.  demand that Applicant be removed for cause from any professional roles ● Yes ○ No

    v.  circumstances which may result in a claim against Applicant, a predecessor or member ● Yes ○ No

j.  been subject to **any actual liability claim** arising out of the rendition of professional services ● Yes ○ No

k.  been accused of or charged with any crime or offense involving fraud or deceit ○ Yes ● No

l.  had a liability policy cancelled or non-renewed by an insurer ○ Yes ● No

m.  been subject to a surety company bond surcharge ○ Yes ● No

n.  been subject to professional discipline ○ Yes ● No

o.  had a credit score below 600 ○ Yes ● No

p.  with respect to the risk of interruption, suspension or unauthorized access, intrusion, breach, compromise or use of your computer systems, including embezzlement, fraud, theft of proprietary information, denial of service, electronic vandalism or sabotage, computer virus or other similar incidents:

    i.  experienced any such computer or information security incidents ○ Yes ● No

    ii.  provided written notice of any such security event to an insurance carrier ○ Yes ● No

    iii.  failed to maintain ade uate computer virus, firewall and secure backup protection ○ Yes ● No

    iv.  failed to encrypt all protected health care information and credit card data stored digitally ● N/A ○ Yes ○ No

.  provided any of the following services to others for a fee: planned events, made travel arrangements, transported passengers, provided personal physical care, provided pet care and assistance, maintained in your care, custody or control or managed the tangible personal or real property of others

r.  engaged subcontractors for any business activities managed for clients without re uiring a hold harmless agreement or proof of insurance with limits of liability at least e ual to yours ○ Yes ● No

5. With respect to matters involving professional services rendered in a fiduciary capacity: ☐ N/A
   a. what percentage involve health care decisions `10`
   b. what percentage involve your client s business assets `4`
      (i.e., rental properties, restaurants, etc.) If any, describe in   uestion 7.
   c. what percentage are court appointed `60`
   d. Please list below Applicant s top ten (10) conservatorships, guardianships, trusts, estates, powers of attorney (POA) or similar fiduciary matters by gross assets under Applicant s control (rounded to the nearest $100,000):
      Less than ten (10) accounts with asset management: ☐ Yes

| Conservatorship, Guardianship, Trust, Estate, POA, or Other Matter Name | Controlled Assets |
|---|---|
| Estate of Jose Luis Olvera | 20,000,000 |
| Sykes Family Trust | 20,000,000 |
| Ibsen Family Trust | 20,000,000 |
| Jones Family Trust | 15,000,000 |
| David Goren Family Trust | 15,000,000 |
| Douglas PRT | 4,800,000 |
| George Replogle Special Needs Trust | 4,100,000 |
| Gregory T. Fisher Trust | 8,000,000 |
| Arnold Starr Trust | 5,000,000 |
| Shipman Trust | 9,000,000 |

6. With respect to any illness, disease, or medical condition classified by the World Health Organization (WHO) as a pandemic or a Public Health Emergency of International Concern (PHEIC) within 5 years:
   a. has Applicant assured and documented:
      i. its compliance with applicable laws, regulations, directives, and best practices promulgated by relevant governmental entities and professional associations, such as the National Guardianship Association   ◉ Yes  ○ No
      ii. Each client s physical, emotional and financial well-being and related health care decisions on an ongoing basis, and has done and continues to do so, notwithstanding any temporary restrictions that may have been imposed by regulatory bodies   ◉ Yes  ○ No
   b. how many of Applicant s clients:
      i. are currently admitted to a hospital `2`
      ii. reside in a licensed residential skilled care facility `2`
      iii. reside in other long-term care settings, e.g. Assisted Living Facilities, Personal Care Homes `4`
      iv. reside in a facility with a pandemic or PHEIC incident `2`
      v. have been diagnosed as having pandemic or PHEIC symptoms `0`
      vi. have died with pandemic or PHEIC related conditions cited as a cause of death `0`

7. **Please confirm that Applicant has provided additional information in the space below with respect to the following matters:**
   a. description of any "Other" matters referred to in   uestion 2.b   ◉ Yes  ○ N/A
   b. explanation of a "No" response to   uestion 2.c   ◉ Yes  ○ N/A
   c. explanation of any "Yes" responses within   uestion 4   ◉ Yes  ○ N/A
      Include the name/relationship of any co-trusteee/agent, if applicable.
   d. description of any client business assets disclosed in   uestion 5b   ◉ Yes  ○ N/A
      Include the extent of any property management services provided, percentage residential vs. commercial, and the number of units, if applicable.
   e. description of matters where Applicant manages in excess of $10mil   ◉ Yes  ○ N/A
   f. listing of the names and dates of operation of any Predecessors in Business   ◉ Yes  ○ N/A
   g. the name, address and relationship of any Additional Insured(s) re  uired by law or contract   ○ Yes  ◉ N/A

2b: We act as a case manager for one client which includes care planning with her facility, general plan of care, working with the trustee who is a professional fiduciary. We also act as case manager to two successor trustees who need assistance with some of the general trust administration tasks.

2c: Many clients are court supervised, and fees must be approved post each accounting period. Non court supervised cases normally get billed at a monthly,  uarterly, or semi-annual basis.

4c: Fiduciaries in our firm often co-Trustee, co-conservator, or co-administrate within our firm.  We also have a couple matters where we are co-trustee with an elder grantor who has capacity.

4d. Some court approved cases are litigious due to the prior trustee being removed for going against fiduciary duties.

4f: Hitchman Fiduciaries has two office locations:  20351 Irvine Ave Ste C1/C2, Newport Beach, CA 92660; and 1606 Crenshaw Blvd., Torrance, CA 90501;and a mailbox address:  120 Tustin Ave Ste C, Newport Beach, CA 92663

4j. We are currently in mediation on a trust matter where a Beneficiary believes we breached our fiduciary duty.

5b. Estate of Jose Luis Olvera: owns 3 LLCs which own commercial properties, total value approximately $30,000,000; Sykes Family Trust: owns 1 LLC which own properties, total value approximately $22,000,000; Jones Family Trust: owns shares of Limited Partnerships, total value approximately $10,000,000; Colover Trust: owns an LTD which provides documentary film making services. The company is currently being wound down and dissolved.

e. Estate of Jose Olvera: see above. Sykes Family Trust: see above. Ibsen Family Trust: trust assets are held in 3 different investment accounts, along with a smaller checking account. Jones Family Trust: see above. David Goren Family Trust: trust assets are held in 16 different real properties, 3 investment accounts, and 7 other accounts. Checking accounts are used to monitor rent deposits from tenants.

Confirmation that all LLCs are covered PL and GL insurance of $2/$4 million. Two of the LLCs are single property triple net lease and have at least $2/$4 million coverage. The other two LLCs belong to an estate that is managed by an employee of the estate and have at least $2/$4 million PL/GL insurance.

The Limited Partnership is professionally managed.

here is a list of the licensed fiduciaries we currently have:

Lee Ann Hitchman
Bruce Hitchman
Brett Hitchman
Rafael Chavez
Annelise Hitchman
Michael Lefonts

We also have an office manager:

Daniel Skene

Case manager:

By and through the undersigned, Applicant acknowledges, agrees and declares to the best of its knowledge and belief that:

1. The information set forth herein is true and any change in circumstances prior to the effective date of the insurance applied for, which may render inaccurate, untrue, or incomplete any statement or disclosure made herein, will immediately be reported in writing to underwriters who may in turn withdraw or modify any outstanding offer of insurance;

2. Underwriters are hereby authorized, but not re uired, to make an investigation and in uiry in connection with the information provided in this application, understanding that any failure to do so shall not abridge any such rights nor estop underwriters from relying upon any of Applicant s representations herein;

3. The submission and review of this application shall not serve to bind Applicant to purchase, nor underwriters to issue, any policy of insurance;

4. In the event that an insurance policy is issued to Applicant, in doing so, underwriters shall be entitled to rely upon all material representations contained within this application which forms the basis for such insurance and shall be attached to and become a part of any such policy;

5. Subject to all other policy terms and conditions, coverage under any policy issued will only apply to claims first made against Applicant and reported to underwriters during the policy period, or extended reporting period;

6. Subject to all other policy terms and conditions, the limit of liability available to pay damages shall be reduced and may be completely exhausted by payment of claims expenses; moreover, damages and claims expenses shall be applied against the applicable deductible;

7. Any person who knowingly and with intent to defraud files an application for insurance containing any materially false information, or for the purpose of misleading conceals any material fact, may be held criminally liable depending upon the laws of the applicable jurisdiction; moreover, any misrepresentation or misstatement of material facts may void coverage under the proposed insurance; and

8. Pursuant to the provisions of the Electronic Signatures in Global and National Commerce Act (E-SIGN, 2000) and the Uniform Electronic Transactions Act (UETA, 1999), execution of this application form by means of typing ones name, title and date below carries the same weight and legal effect as traditional paper documents and handwritten signatures.

| /s/ Bruce Hitchman | Manager | 11/04/2020 |
|---|---|---|
| **Electronic Signature** | **Signer's Title** | **Date Executed** |

Dominion FPL Application (11/20)

# EXHIBIT 4

Scott D. Bertzyk (SBN 116449)
Matthew R. Gershman (SBN 253031)
**GREENBERG TRAURIG, LLP**
1840 Century Park East, Suite 1900
Los Angeles, CA 90067
Telephone: (310) 586-7700
Facsimile: (310) 586-7800

Justin B. Gold (SBN 227648)
**OLDMAN, COOLEY, SALLUS, BIRNBERG,
COLEMAN & GOLD LLP**
16133 Ventura Blvd.
Penthouse Suite
Encino, CA 91436-2447
Telephone: (818) 986-8080
Facsimile: (818) 789-0947

Attorneys for Beneficiary and Trustee
THOMAS E. MORGAN, III

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

In Re

The Beverly C. Morgan Family Trust as amended and restated on November 6, 2013.

THOMAS E. MORGAN III, individually and as Trustee of the Beverly C. Morgan Family Trust,

Petitioner,

v.

BRUCE HITCHMAN and LEE ANN HITCHMAN, former Interim Co-Trustees of the Beverly C. Morgan Family Trust; and DOES 1-100,

Respondents.

CASE NO. 30-2014-00726771-PR-TR-CJC

Assigned to Department C06

**AMENDED PETITION FOR (1) INSTRUCTIONS, (2) DAMAGES FOR FAILURE TO ASSERT CLAIM, (3) DISGORGEMENT OF FEES FOR FAILURE TO DISCLOSE CONFLICT OF INTEREST IN ORDER TO SECURE AND PRESERVE APPOINTMENT, AND (4) DAMAGES FOR BREACH OF FIDUCIARY DUTY**

[JURY TRIAL DEMANDED TO FULLEST EXTENT PERMITTED BY LAW]

**AMENDED PETITION**

*ACTIVE 43771546v2*

1

# **TABLE OF CONTENTS**

2

**Page**

SUMMARY OF AMENDED PETITION ............................................................................ 6

PARTIES AND PERSONS ENTITLED TO NOTICE .................................................... 13

BACKGROUND FACTS ................................................................................................ 14

    A.    With Tom Morgan and Morgan Partners, Inc. at the Helm, the Morgan Family Builds a Real Estate Empire. ......................................................................... 14

    B.    Beverly Dies, and the Hitchmans Gain an Entrée into the Morgan Family Fortune. ....... 15

    C.    The Hitchmans Take Over Lamplighter Chino and Drain Its Cash Reserves. ................. 19

    D.    The Hitchmans Take Sides and Conspire with the Other Beneficiaries Against Tom. .......................................................................................................... 22

    E.    In Their Zeal to Attack Tom, the Hitchmans Failed to Press a Slam-Dunk Malpractice Claim Against Former Trust Counsel Richard Pech. ................... 26

    F.    The Hitchmans' Profligate Spending as Trustees. ........................................... 28

    G.    Separately, The Hitchmans Mismanage Lamplighter Chino in Every Way Imaginable. .................................................................................................... 41

        1.    The Hitchmans Dissipated Funds Belonging to Tom, Nancy and the Thomas E. Morgan Children's Trust. ................................................. 41

        2.    The Hitchmans Interfered with MPI's Management Contract. ............ 42

        3.    The Hitchmans Disrupt the Morgan Family's Longstanding Relationship with Bank of America. ...................................................................... 44

        4.    The Hitchmans Trigger an Event of Default on a $14 Million Loan .................... 47

        5.    The Hitchmans Cause Lamplighter Chino to Breach a Third-Party Contract. ......................................................................................... 49

        6.    The Hitchmans Ignore a Valuable "Takings" Lawsuit Against the City of Chino, Which Would Have Been Lost but For the Actions of the Attorney They Tried to Fire. ........................................................................... 50

    H.    The Beneficiaries Settle Without Giving the Hitchmans a Release, So the Hitchmans And Their Counsel Begin Making Wild Threats in Hopes of Coercing One. ................................................................................................................ 51

    I.    After More Hitchman Fighting—And an Eleventh-Hour Surprise—The Court Approves the Beneficiaries' Settlement.  Although This Mitigates Damages, The

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

**AMENDED PETITION**

Hitchmans Still Refuse to Accept Any Responsibility for The Remaining Damage Resulting from Their Misconduct...................................................... 55

FIRST CLAIM FOR RELIEF ............................................................. 59

SECOND CLAIM FOR RELIEF ........................................................ 61

THIRD CLAIM FOR RELIEF ............................................................ 62

FOURTH CLAIM FOR RELIEF ........................................................ 64

PRAYER FOR RELIEF ..................................................................... 66

VERIFICATION................................................................................. 68

INDEX OF EXHIBITS TO AMENDED PETITION ......................... 69

3

**AMENDED PETITION**

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Rodriguez v. Disner*
(9th Cir. 2012) 688 F.3d 645 .................................................................. 64

**State Cases**

*Borissoff v. Taylor Faust*
(2004) 33 Cal.4th 523 ................................................................. 11, 27

*Doolittle v. Exchange Bank*
(2015) 241 Cal.App.4th 529 ........................................................... 22

*Flatley v. Mauro*
(2006) 39 Cal.4th 299 ................................................................. 11, 12

*Lofton v. Wells Fargo Home Mortgage*
(2014) 230 Cal.App.4th 1050 ......................................................... 64

*Meister v. Mensinger*
(2014) 230 Cal.App.4th 381 ........................................................... 64

*Mendoza v. Hamzeh*
(2013) 215 Cal.App.4th 799 ........................................................... 12

*Moeller v. Superior Court*
(1997) 16 Cal.4th 1124 .................................................................... 6

*Morales v. Field, Degoff, Huppert & Macgowan*
(1979) 99 Cal.App.3d 307 .......................................................... 62, 63

*Pierce v. Lyman*
(1991) 1 Cal.App.4th 1093 ............................................................. 63

*Savage v. Mayer*
(1949) 33 Cal.2d 548 ..................................................................... 64

*St. James Armenian Church of Los Angeles v. Kurkjian*
(1975) 47 Cal.App.3d 547 .............................................................. 64

*State v. Harrington*
(1969) 128 Vt. 242 ........................................................................ 12

*Uzyel v. Kadisha*
(2010) 188 Cal.App.4th 866 ........................................................... 64

ACTIVE 43771546v3

*Western States Life Ins. Co. v. Lockwood*
(1913) 166 Cal. 185 ................................................................................................ 64

*Whittlesey v. Aiello*
(2002) 104 Cal.App.4th 1221 ................................................................................ 22

**State Statutes**

California Financial Code § 1450 .............................................................................. 69

California Probate Code § 12002 ........................................................................ *passim*

California Probate Code § 15403 .............................................................................. 71

California Probate Code § 16000 .............................................................................. 22

California Probate Code § 16003 .............................................................................. 22

California Probate Code § 16004.5 ........................................................................... 11

California Probate Code § 16440 .............................................................................. 63

California Probate Code § 17200 .............................................................................. 70

**Rules**

California Rules of Professional Conduct, Rule 3.10, Comment 1 ........................... 12

**AMENDED PETITION**

*ACTIVE 43771546v3*

1  For his Amended Petition herein, Thomas E. Morgan III ("Tom"), in his capacities as current
2  trustee of the Beverly C. Morgan Family Trust and as a beneficiary of that Trust, alleges as follows:

3  ### SUMMARY OF AMENDED PETITION

4  1.     Over twenty years ago, our California Supreme Court succinctly summarized the proper
5  relationship between trustees and the beneficiaries they are appointed to serve:

6  > In a trust relationship, then, the benefits belong to the beneficiaries and the burdens to the
> trustee. The office of trustee is thus by nature an onerous one, and the proper discharge of
7  > its duties necessitates great circumspection. Liability to beneficiaries for mismanagement
> of trust assets is merely one of the burdens professional trustees take on—for,
8  > presumably, an appropriate fee.

9  (*Moeller v. Superior Court* (1997) 16 Cal.4th 1124.)

10  2.     Many trustees take their duties seriously and faithfully serve their beneficiaries with great
11  circumspection. But, others treat the office of trustee as an opportunity to line their own pockets at the
12  expense of the beneficiaries they are supposed to serve. Bruce Hitchman and Lee Ann Hitchman (the
13  "Hitchmans"), licensed professional fiduciaries, fall into the latter camp. As described more fully
14  below, the Hitchmans abused the privilege of a temporary appointment as Interim Co-Trustees of the
15  Beverly C. Morgan Family Trust to line their own pockets (and the pockets of their attorneys and other
16  professionals) at the expense of the Morgan family. And, adding insult to injury, after the beneficiaries
17  reached a settlement between themselves designed to bring an end to the Hitchmans' profligate
18  spending, the Hitchmans made extortionist threats in hopes of procuring a global release for all their
19  misdeeds as a condition for them agreeing to walk away—yet another breach of their fiduciary duties.

20  3.     Based on the testimony of Bruce Hitchman himself, attempting to extract releases as a
21  condition to their agreeing to walk away appears to be part of Hitchman Fiduciaries' standard operating
22  procedure. But, whether the Hitchmans have done this only to the Morgans or whether this is standard
23  Hitchman operating procedure, the facts described in this Amended Petition are disturbing, and tell a
24  cautionary tale to any court tempted to ever again appoint the Hitchmans or Hitchman Fiduciaries as
25  professional fiduciaries. Up front, we provide a brief summary of what the Hitchmans have done, and
26  just some of the harm they have caused.

27  4.     In the Spring of 2017, this Court (the Hon. Kim R. Hubbard) appointed the Hitchmans to
28  act as Interim Co-Trustees of the Beverly C. Morgan Family Trust, while litigation between the Trust

beneficiaries ran its course.[1]  It now is known that the Hitchmans actually concealed critical information that would have imperiled their appointment and/or continuing involvement—and continued to conceal that information throughout the duration of their tenure as Interim-Co-Trustees—by failing to disclose a known conflict of interest that rendered the Hitchman team inappropriate for service in any case pending before Judge Hubbard.

5.     Despite this breach of their duty of candor, the damage the Hitchmans should have been able to inflict as Interim Co-Trustees still should have been minimal.  After all, Judge Hubbard had made clear that, without Court approval, the Hitchmans were ***not*** to get involved in the litigation taking place between beneficiaries of the Trust, and instead were to remain impartial and to simply preserve the status quo while the litigation between Beverly's children resolved itself:

> [T]he Hitchmans, in this as the interim successor trustees, go in to protect the trust assets and avoid waste and hold the place until these beneficiaries battle it out and decide what's going to happen. And we're either going to have a situation where Tom Morgan is found to be put back in as trustee or somebody else becomes the permanent successor trustee.

> But the issue here is what is the duty of an interim successor trustee appointed by the court in terms of the litigation. …

> An interim trustee in my opinion does preserve the estate assets, make sure they're not wasted, try to marshal whatever assets they can obviously that are out there. …

> But in terms of investigating, in terms of proceeding to file actions on their own or being necessary parties, I think that's where we have the confusion because essentially it seems to me that it's the parties who have to do that.  Ms. [Nancy] Shurtleff and the children and her brother [John Morgan] need to do their investigation as to what they say Tom Morgan has done in terms of not acting correctly as trustee.  [Mr. Pech, Tom Morgan's then counsel] and his associates obviously would contest that and say, no, he's done everything right.

> I don't think the interim trustees need to get involved in that because they essentially are up here holding everything steady until we get the litigation worked out.

---

[1] Litigation was between Tom, on the one hand, and his brother (John Morgan), sister (Nancy Morgan Shurtleff), and sister's children (Jessica and Kathleen Shurtleff), on the other hand.  A true and correct copy of the Trust, as executed by Beverly Morgan on November 6, 2013 and in effect at the time of her death, is attached hereto as **Exhibit 1**.  Under that instrument: (i) Tom, Nancy and John all were given specific bequests; and (ii) Tom also was entitled to 50% of any residue, with the other 50% going to Nancy's daughters.  Beverly never contemplated a residue and, in point of fact, there never was one.

7

**AMENDED PETITION**

(A true and correct copy of the June 28, 2017 Transcript of Proceedings (a.m. session) confirming this and other facts alleged herein is attached hereto as **Exhibit 2**.)

6.     To say that the Hitchmans overstepped their bounds would be a decorous understatement. Rather than act impartially and fairly towards all beneficiaries, the Hitchmans and their lawyers (i) quickly sided with all the other Trust beneficiaries (e.g., Nancy, John and Nancy's daughters) in their litigation against Tom, and (ii) without ever obtaining Court approval to assert a single claim, began engaging in scorched-earth litigation against Tom in hopes of creating leverage for those beneficiaries to use against Tom.[2]  Tom is not alone in his view that the Hitchmans were siding with the other beneficiaries.  In their June 11, 2019, "First Supplement" filed with the Court, a true and correct copy of which is attached hereto as **Exhibit 3**, the ***Hitchmans themselves*** boasted that, from their perspective, their "tenacity" in pursuing claims against Tom created leverage that supposedly "forced" Tom to settle with the other beneficiaries.  Although the Hitchmans' glowing self-assessment is comically wrong as a factual matter—their claims were so misguided as to provide no leverage at all—the Hitchmans' admission that they spent millions of dollars trying to create leverage to be used by the other family members against Tom speaks volumes as to their faithlessness as fiduciaries, and establishes a breach of their fiduciary duty to act impartially.

7.     The Hitchmans committed harm in other ways, too.  Because the Trust had few liquid assets to fund a scorched-earth litigation campaign against anyone, the Hitchmans took over a valuable business in which the Trust had an interest (a mobile home park commonly called Lamplighter Chino), and drained its cash reserves to create a litigation war chest to pursue Tom.[3]  Although the Hitchmans spent millions in monies that otherwise would have gone to the Morgan family (or to pay estate taxes),

---

[2] The record is replete with conspiratorial communications between the Hitchmans and counsel for the other beneficiaries over a variety of topics, including (i) claims the other beneficiaries wanted the Hitchmans to pursue in their stead (see **Exhibit 4**), (ii) companies the Hitchmans should take over to create a war chest for pursuing those claims (see **Exhibit 5**), and (iii) even the filing of a supplemental 706 with the IRS, in hopes of creating a refund and, with that refund, a Trust residue that would benefit Nancy's children (see **Exhibit 6**).  Tom was wrongfully excluded from all this covert planning.

[3] Lamplighter Chino is an upscale mobile home park owned by a series of laddered entities, whose ultimate owners are Tom, Nancy and the Trust.  For convenience, we refer to the Chino entities simply as "Lamplighter Chino."

**AMENDED PETITION**

they ultimately accomplished nothing other than enriching themselves, their lawyers and their various and sundry litigation experts.  Here is the abbreviated financial scorecard.

8.     When the Hitchmans took over as Interim Co-Trustees of the Beverly C. Morgan Family Trust, the Trust held more than $140,000 in cash and securities for the Hitchmans to work with.  In and of itself, this should have been enough for the Hitchmans to fulfill the caretaker role this Court had carved out for them, because (i) the Trust was little more than a holding company, with a condo whose expenses all were being paid for by Tom already, and passive interests in three Morgan family businesses that generated no Trust expenses of their own, and (ii) the Trust's only debts were a $50,000 obligation to the Thomas E. Morgan Children's Trust (which had lent monies to the Trust to pay for administrative expenses) and a potential obligation, after the litigation between Tom and Nancy had run its course, to repay $2.5 million borrowed on a line of credit taken out by one of the family businesses (Lamplighter Chino).[4]     Still, the Hitchmans, as self-appointed Mangers of Lamplighter Chino, distributed to (or for the benefit of) the Trust (i) more than $4 million out of a $6 million certificate of deposit held in the name of Lamplighter Chino (notwithstanding that the Trust held only a 51% interest in Lamplighter Chino),[5] and (ii) another $510,000 out of the settlement proceeds paid by the City of

---

[4] Of this, $2 million was used to make the initial estate tax payment to the IRS, and the remaining $500,000 was used to cover administrative expenses. The borrowings from Lamplighter Chino were set up so that the Trust was responsible for interest payments, but principal would not have to be repaid until litigation between the Trust beneficiaries had been resolved.  Thus, the current expenses associated with that debt were negligible.

[5] We say "in the name of" because not all of the monies actually belonged to the Chino entities.  To assist the Chino entities in securing a higher return on the certificate of deposit, the Thomas E. Morgan Children's Trust contributed $250,000 to bring the total on deposit to $6 million.  That money should have been repaid to the Children's Trust, with interest, if and when the certificate of deposit was cashed out.  Instead, the Hitchmans simply took the Children's Trust's money, and spent it on pointless litigation against Tom.

As reflected in the letter attached hereto as **Exhibit 7**, the Children's Trust provided the Hitchmans with bank records confirming that it was the source of $250,000 of the $6 million on deposit, and requested that the Hitchmans return the $250,000 they had wrongfully taken.  Although the Hitchmans seemingly recognized their error, they refused to return a penny—proclaiming that they planned to obtain far more in damages against Tom (as opposed to the Children's Trust) and were going to hold the Children's Trust's money hostage until litigation concluded.  (See **Exhibit 8**.)  Although this and many other wrongful actions by the Hitchmans present civil claims for a different court (and a jury), we discuss them here to provide a full and complete picture of just how faithless the Hitchmans have been.

9

**AMENDED PETITION**

1  Chino to settle a "takings" lawsuit brought by Tom and kept alive by the attorney Tom had selected to
2  protect Lamplighter Chino.

3      9.      Amazingly, the Hitchmans depleted virtually this entire war chest.[6]  Among other things,
4  the Hitchmans paid themselves more than $300,000 in trustee fees—including, brazenly, "extraordinary
5  fees" for their decision to take over and loot Lamplighter Chino, which the Hitchmans have never even
6  bothered to visit.[7]  And, they paid their attorneys and an army of experts approximately $2 million more
7  trying to gin up claims against Tom for the benefit of the other Trust beneficiaries.

8      10.     At the end of the day, the Trust has not benefitted one iota from the Hitchmans'
9  profligate spending.  What is more, although it was a breach of fiduciary duty for them to try to aid one
10 set of beneficiaries over another, the Hitchmans didn't even create settlement leverage for the other
11 beneficiaries, as the settlement ultimately reached by the Beneficiaries ended up being a business
12 settlement that, but for the Hitchmans' litigious presence, actually could have been reached sooner.
13 Indeed, it merits emphasis that the Hitchmans actively put off Tom's overtures for an early mediation,
14 professing that: "The Hitchmans support mediation and want to do everything in their power to help the
15 Trust beneficiaries resolve their disputes.  That being said, the Hitchmans will need four to six months
16 of discovery and document review before they (we) will be able to contribute meaningfully in the
17 mediation."  (See **Exhibit 9**, 8/15/17 Carico e-mail.)  As the Court's files will reflect, the Hitchmans
18 took even longer than that—merrily using Tom's inheritance to investigate and file multiple petitions
19 against Tom—all without ever seeking probate court approval.  Only the Hitchmans, their lawyers, and
20 their litigation experts profited, while the Morgan family saw its inheritance dwindle.  The Hitchmans'
21 profligate spending in breach of their fiduciary duties gives rise to a Trust claim against the Hitchmans
22 as Interim Co-Trustees.  But, sadly, it is not the only Trust claim.

23     11.     In their zeal to gin up claims against Tom, the Hitchmans failed to assert a malpractice
24 claim against former Trust counsel (Richard Pech), for wrongly advising the trustee (Tom) that it was

---

26 [6] By the time the Hitchmans were replaced as trustees, the Trust was back down to approximately
$170,000 in cash and securities.

27 [7] "Q. When is the first time you visited Chino – Lamplighter Chino? A. I've never visited."  "Q.
28 Without a guide or a treasure map or something like that, would you be able to drive over to
Lamplighter Chino and pick out any of these lots that are listed in this agreement? A. No, I would not."

10

**AMENDED PETITION**

1  permissible for him to pay all Pech's fees associated with Trust litigation out of funds held by the Trust,

2  rather than distinguishing between Trust claims (for which Trust assets could be used) and claims

3  properly viewed as personal to Tom (as to which Tom was to pay from personal funds).   Because the

4  Trust and Probate Code impose an extraordinarily high bar for Tom to be held liable for those fees—a

5  fact our Supreme Court articulated 15 years ago (see *Borissoff v. Taylor Faust* (2004) 33 Cal.4th 523)—

6  Pech always was the easiest (indeed, only viable) source of recovery, and the Hitchmans certainly were

7  aware that Pech was in possession of Trust assets.   Indeed, a Pech-prepared accounting memorialized

8  that fact in writing.   Yet, although they have assured the claim is worth $1 million, the Hitchmans did

9  nothing to pursue Mr. Pech at all, and chose instead to pursue Tom alone with the fervor of a honey

10  badger.   Although Tom is doing all he can to preserve the claim against Mr. Pech—and already has

11  asserted that claim—the Hitchmans' failure to act gives rise to a potential statute of limitations defense

12  that would not have been available to Mr. Pech if the Hitchmans had acted within one year of the

13  Hitchmans' appointment as Trust counsel.   Indeed, Pech already has asserted a statute of limitations

14  defense, based on the contention that the Hitchmans should have sued him sooner and, so far, the trial

15  court has agreed with Pech.   At best, the direct consequence of the Hitchmans' inaction vis-à-vis Mr.

16  Pech will be to make litigation against him more costly; at worst, it will result in the Trust's loss of a

17  valid claim.

18        12.     Finally, once they learned that the Trust beneficiaries had reached an April 9, 2019

19  settlement that (i) resolved all issues between the beneficiaries (including disposition of the myriad

20  claims the Hitchmans had been pursuing against Tom to try to benefit certain of the beneficiaries), but

21  (ii) did not give the Hitchmans the release they always demand in return for their agreeing to step down,

22  the Hitchmans went out of their way to try to block that settlement through improper threats—such as a

23  threat to falsely report to the IRS that Tom had committed "tax fraud"—unless the settlement were

24  restructured to provide the Hitchmans with a release.

25        13.     Under settled precedent, such conduct is unethical extortion, forbidden for any

26  professional fiduciary or lawyer.   (See, e.g., Probate Code § 16004.5 [trustee may not refuse

27  performance of obligations in order to secure benefits for themselves]; *Flatley v. Mauro* (2006) 39

28  Cal.4th 299 [attorney threatening to accuse entertainer of rape and of violating certain laws, including

11
**AMENDED PETITION**

tax laws, was extortion; anti-SLAPP statue does not apply to illegal activity]; *Mendoza v. Hamzeh* (2013) 215 Cal.App.4th 799, 807 [an attorney's demand letter was extortion as a matter of law because he threatened to report "substantial fraud" to the California Attorney General, Los Angeles District Attorney, and IRS, etc. if the opposing party did not pay $75,000]; Cal. Rules of Prof. Conduct, R. 3.10, comment 1 ["a lawyer could not state or imply that a criminal or administrative action will be pursued unless the opposing party agrees to settle the civil dispute."]; see also *State v. Harrington* (1969) 128 Vt. 242 [cited by *Flatley v. Mauro*; suggestion in attorney demand letter that he might advise his client to report her husband to the IRS was extortion].)

14.     Ultimately, the extortion failed because Tom stood strong and, by making a written record of the truth, forced the Hitchmans to withdraw their accusations in a written pleading filed with this Court.[8]  It is for this reason, and this reason only, that there is no separate claim for extortion here. That said, because the Beneficiaries' settlement provides that all assets not specifically bequeathed through the Trust (save for 50% of any tax refund the Trust might receive) belong to Tom alone, Tom is entitled to recoup from the Hitchmans every penny of Trust assets they wasted resisting the Beneficiaries' settlement in hopes of extorting a release, and Tom does assert that modest claim on his own behalf.

15.     Although the conduct of the Hitchmans and their counsel has been deplorable from beginning to end, Tom has acted with extreme restraint even though, if Tom wanted to exact vengeance against the Hitchmans and subject the Hitchmans and their representatives to maximum damage exposure, it would have been an exceedingly easy thing for him to do.  For example, the Hitchmans engaged in a host of reckless acts with respect to Lamplighter Chino—ranging from causing Lamplighter to Chino breaching a third-party contract (with a company called Family Homes), to

---

[8] Sadly, the Hitchmans have never accepted responsibility for anything.  And, true to form, rather than simply admit they had tried to coerce a release, the Hitchmans have continued to attack Tom while retreating from their baseless accusation.  By way of example, in their unverified October 18, 2019 Response to the Trustee's Second Status Report, the Hitchmans resurrected the tax fraud claim, and attributed their backing off from their disclosure threats to the advice of tax counsel that they did not have to make disclosures because "the IRS effectively 'blew it' by not discovering it when Tom filed the original estate tax return."  (Response at 1:15-16 & 5:19-6:23.)  But, this latest story is yet another Hitchman fabrication.  There never was a credible claim to begin with.

1 | triggering a default under a $14 million loan with PNC Bank, to leaving a valuable takings lawsuit

2 | against the City of Chino unattended—that, had Tom not acted to save the Hitchmans from themselves,

3 | most surely would have resulted in significant additional damage.  Yet, Tom and his representatives led

4 | the charge in avoiding (or, at least, greatly mitigating) damage from each of these reckless acts.

5 |       16.     The few claims asserted here are the few Trust-related damage claims Tom could not

6 | mitigate, and, so far as Tom is aware, they are the only claims left insofar as the Trust is concerned.  If

7 | the Hitchmans are willing to accept even a modicum of responsibility for their misdeeds, these claims

8 | can be resolved in short order, without the expense of litigation.  If the Hitchmans continue to stick their

9 | head in the sand and pretend they did nothing wrong—then resolution will take more time, because the

10 | Hitchmans have caused far too much damage to be allowed to walk away without consequence.

11 | **PARTIES AND PERSONS ENTITLED TO NOTICE**

12 |       17.     Petitioner Thomas E. Morgan III is an individual residing in Seattle, Washington, and the

13 | current Trustee of the Beverly C. Morgan Family Trust, whose principal place of administration in

14 | Orange County, California.  Tom also is a beneficiary of the Trust.

15 |       18.     Respondents Bruce and Lee Ann Hitchman are professional fiduciaries who, in the

16 | Spring of 2017, were appointed by this Court to act as Interim Co-Trustees of the Trust.  The Hitchmans

17 | reside in Orange County, California, and the firm through which they conduct business, Hitchman

18 | Fiduciaries, has its principal place of business in Orange County, California as well.  The Hitchmans'

19 | reign as Interim Co-Trustees formally ended on June 21, 2019.

20 |       19.     Petitioner is unaware of the true names or capacities, whether individual, corporate,

21 | associate, or otherwise, of Respondents sued herein as Does 1 through 100, inclusive, and therefore sues

22 | these Respondents by such fictitious names.  Petitioner will amend this pleading to set forth the true

23 | names and capacities of these Doe Respondents when the same are ascertained.  Petitioner is informed

24 | and believes, and based thereon alleges, that each of the fictitiously named Respondents is responsible

25 | in some manner for the occurrences herein alleged or was acting in concert with, and with the

26 | permission, approval, and authorization of, the other Respondents.

27 |       20.     Petitioner is informed and believes, and based thereon alleges, that each of the

28 | Respondents was the agent or employee of each of the remaining Respondents, and in doing the things

**AMENDED PETITION**

1  alleged herein, was acting within the scope of such agency, and that, in taking the actions described

2  herein, Respondents were acting by and through duly authorized and empowered agents and

3  representatives, who were acting within the course and scope of their authority at the time of their

4  actions, or whose actions were ratified and approved.

5       21.    Additional interested persons potentially entitled to notice of this Petition are listed on

6  the proof of service attached hereto as **Exhibit 10**.

7  **BACKGROUND FACTS**

8       22.    To provide the Court with a complete picture of Bruce and Lee Ann Hitchman, we

9  describe below all of the misconduct committed by the Hitchmans in all capacities, whether such

10  misconduct gives to rise to one of the claims asserted here, whether it gives rise to a civil claim to be

11  asserted against the Hitchmans elsewhere, and/or whether it simply provides corroborating evidence for

12  the ultimate conclusion of this Amended Petition—namely, that the Hitchmans have a pattern and

13  practice of acting with oppression, fraud and malice, such that an award of punitive damages is not only

14  required, but essential, to deter the Hitchmans from ever again abusing their positions as trusted

15  fiduciaries.

16  **A.**    **With Tom Morgan and Morgan Partners, Inc. at the Helm, the Morgan Family Builds a**

17      **Real Estate Empire.**

18       23.    The Morgan family business empire depleted by the Hitchmans' tortious actions owes its

19  success to two people—Beverly C. Morgan ("Beverly," now deceased) and her oldest son, Tom.

20       24.    Beverly was a noted physician and professor who specialized in pediatric cardiology.

21  For decades, Beverly practiced in Seattle, Washington, rising to the rank of Chair of the Department of

22  Pediatrics and Chief Pediatrician at Seattle Children's Orthopedic Hospital.  In 1980, Beverly moved to

23  Orange County, California, to become Chair of Pediatrics for the University of California Irvine

24  Medical School.  After stepping down from administration, Beverly remained at UC Irvine as a

25  professor of pediatric cardiology, a clinician and an educator, until her retirement in 2009.  Beverly also

26  was a notable philanthropist, endowing chairs in pediatrics at both the University of Washington and

27  Duke University Medical Schools, as well as a private foundation focused on education.

28

14
**AMENDED PETITION**

25.     Beverly also invested in commercial real estate, including in mobile home parks, and, for decades, she looked to Tom to manage those investments, which he faithfully did—in the main through a company called Morgan Partners, Inc. ("MPI").[9]  Tom was uniquely qualified for that task.  Prior to joining the family business in 1989, Tom obtained his undergraduate degree in Classics and Economics from Pomona College in Claremont, and his MBA from UCLA.  From 1982 to 1984, he worked for Accenture Consulting (the consulting division of Arthur Andersen), reviewing management systems and business practices.  From 1984 until 1989, he worked for Kenneth Leventhal and Company (a real estate-specific accounting and consulting firm), working with financial modeling, organizational consulting and appraisals of real estate projects.

26.     By any measure, Tom's performance running the Morgan family businesses exceeded expectations and delivered vast wealth to all members of his family, including his siblings.  There are a number of reasons for this impressive growth, but they all can be traced to the vision of Tom and Beverly, and to Tom's dedicated management with Beverly's approval.  Simply, for the past thirty years, the Morgan family business model has been built around the guiding principle of building healthy cash reserves (be it profits from operations, refinance proceeds, or something else) to use either to assist other Morgan family businesses in times of need or to expand into other opportunities as they might arise from time to time.  Tom adhered to this principle faithfully, with the end result being that all branches of the Morgan family business tree were able to flourish, and the Morgan family real estate empire grew steadily over time, both in terms of value and in terms of the number of businesses in which the Morgan family invested.

**B.     Beverly Dies, and the Hitchmans Gain an Entrée into the Morgan Family Fortune.**

27.     Beverly passed away on January 25, 2014, at the age of 88.  Within months, litigation ensued among the beneficiaries (primarily Tom and Nancy) over Beverly's dispositive plan, which Nancy despised because it favored Tom.  In the Spring of 2017, the probate court appointed respondents Bruce and Lee Ann Hitchman to serve as Interim Co-Trustees while that litigation ran its course.  Sadly,

---

[9] Beverly, Tom, Nancy and John were the original "Morgan partners."  Ultimately, Tom bought out the interests held by his siblings, leaving only Tom and Beverly as the "partners" of MPI.  After Beverly passed, Tom succeeded to his mother's interests, and now owns 100% of MPI.

**AMENDED PETITION**

1  it now is known that the Hitchmans and their lawyers concealed critical information to ensure they

2  would secure and/or retain what they perceived to be a lucrative representation.

3      28.     Specifically, the Hitchmans were but one of three professional fiduciaries nominated by

4  Nancy to serve as interim co-trustees. Tom is informed and believes that, at the time, they knew that:

5  (i) they were utilizing the services of an Orange County real estate attorney who is the longtime partner

6  of the probate judge (Hon. Kim R. Hubbard) who would choose the fiduciary from among the three

7  nominated candidates;[10] and (ii) yet, did not disclose that conflicting relationship to Judge Hubbard or to

8  Tom. Had the Hitchmans made a timely disclosure, they never would have secured this representation.

9  (We know this because, once Judge Hubbard learned of the conflict (more than two years after the

10  Hitchmans had been appointed), she promptly disclosed it, and recused herself from the case going

11  forward.) Instead, the Hitchmans and their lawyers kept quiet, secured the appointment, and quickly

12  began billing to beat the band.

13      29.     Although the Hitchmans and their lawyers should have made appropriate disclosures

14  prior to the Court's selection of an interim co-trustee, once they were selected, they indisputably were

15  obligated to disclose any conflicting relationships to honor their duties of candor to the Court and to the

16  Beneficiaries. Yet, even after being appointed—and, at points where it is undisputed this conflicting

17  relationship existed—the Hitchmans and their lawyers continued to withhold this important

18  disqualifying information from the Court and from Tom, in order to keep their lucrative appointment.

19      30.     Had the Hitchmans at least done what the Probate Court directed them to do, the damage

20  from this breach would have been contained. After all, as noted above, Judge Hubbard herself had made

21  clear that the Hitchmans were *not* to get involved in the litigation taking place between beneficiaries of

22  the Trust, but rather, were to remain impartial and simply preserve the status quo while the litigation

23  between Beverly's children resolved itself:

24

---

25  [10] Precisely when the Hitchmans began retaining attorney Coombs is something the Hitchmans have
26  yet to share with Tom—although, based on Judge Hubbard's June 2019 disclosures and the comments
    of Hitchman counsel thereafter, Tom came away with the clear impression that the attorney-client
27  relationship was longstanding, and seemed to exist before the Hitchmans were selected. Even if
    attorney Coombs was retained shortly after the Hitchmans' selection in in this case, their duty of
28  disclosure would have run from then, so there can be no justification for the Hitchmans' silence.

**AMENDED PETITION**

*ACTIVE 43771546v3*

[T]he Hitchmans, in this as the interim successor trustees, go in to protect the trust assets and avoid waste and hold the place until these beneficiaries battle it out and decide what's going to happen. And we're either going to have a situation where Tom Morgan is found to be put back in as trustee or somebody else becomes the permanent successor trustee.

But the issue here is what is the duty of an interim successor trustee appointed by the court in terms of the litigation. ...

An interim trustee in my opinion does preserve the estate assets, make sure they're not wasted, try to marshal whatever assets they can obviously that are out there. ...

But in terms of investigating, in terms of proceeding to file actions on their own or being necessary parties, I think that's where we have the confusion because essentially it seems to me that it's the parties who have to do that. Ms. [Nancy] Shurtleff and the children and her brother [John Morgan] need to do their investigation as to what they say Tom Morgan has done in terms of not acting correctly as trustee.  [Mr. Pech, Tom Morgan's then counsel] and his associates obviously would contest that and say, no, he's done everything right.

I don't think the interim trustees need to get involved in that because they essentially are up here holding everything steady until we get the litigation worked out.[11]

31.     Contrary to the probate court's directives, however, the Hitchmans quickly launched a full-on assault on Beverly's Trust and Tom, going so far as to file multiple petitions against Tom without ever seeking, much less obtaining, court approval, and without performing any form of cost-benefit analysis before filing.  Compounding the problem, the Hitchmans weren't content simply to file lawsuits.  They also set about identifying family businesses they might want to take over in order to provide sources of cash to pay themselves and their lawyers.

32.     Specifically, within weeks of being appointed, the Hitchmans began targeting two companies in which the Trust held an interest: (i) a Washington-based limited liability company named

---

[11] Underscoring that the Hitchmans were to serve a limited role, Judge Hubbard declined to rule on an affirmative Hitchman request for leave to intervene in the pending litigation, and left things with the Hitchmans *having to return to Court with a proposed complaint-in-intervention for approval if they desired to litigate*.  They never did.  Instead, they simply starting billing and filing unauthorized and redundant petitions against Tom, with no regard for the limits Judge Hubbard had placed on their authority.

Tellingly, once the Presiding Judge of the probate court (the Hon. Gerald Johnston) learned that the Hitchmans were spending Trust assets without a Court Order specifically authorizing them to do so, he immediately forbade any further compensation without a Court order. Although Judge Johnston ultimately vacated that order as to this case (for reasons not material here), he enunciated a future Hitchman-inspired rule to preclude any court-appointed fiduciaries in Orange County from paying themselves or their counsel compensation without first obtaining court approval.

17
**AMENDED PETITION**

Country Hills, LLC, whose primary asset was the West Valley Business Park in Kent, Washington, near the SeaTac Airport, and (ii) the Washington-based entities that own Lamplighter Chino, an upscale mobile home park in Chino, California. As for Country Hills, the Hitchmans went so far as to have Nancy sign an Action by Written Consent allowing them to take over that entity, a true and correct copy of which is attached hereto as **Exhibit 11**. Displaying their utter disregard for Tom (despite their fiduciary duties to him), the Hitchman-prepared Consent falsely accused Tom of "gross negligence, incompetence, and/or fraud" with respect to the West Valley Business Park and purported to authorize extri ouster on that basis. **Tellingly, the Hitchmans did this even though they had no factual basis for making these accusations—and have conceded that they still have no basis for such accusations today**. Here is Bruce Hitchman, under oath:

> Q. As of April 24 [2017, the date of the written action], would you have considered yourself up to date and [informed] enough to have an informed opinion as to how well Morgan Partners had performed as the manager of any of the entities for which it provided management services?
>
> [OBJECTION OMITTED]
>
> A. No.
>
> Q. Do you have any reason to believe that Morgan Partners Inc. had been guilt of gross negligence, incompetence, or fraud with respect to Country Hills LLC and the West Valley Business Park that it operated?
>
> MR. GLOWACKI: Objection. It's compound and it's vague as to time. Are you asking him today or back on April 24th?
>
> Q. Let's start with April 24th?
>
> A. No.
>
> Q. Okay. Now, let's go to today.
>
> A. Today. I – I don't have – I don't have a strong opinion as to – as to that.
>
> …
>
> Q. As you sit here today, sir, can you give me any factual basis for putting in a resolution and having Nancy Shurtleff sign that accuses my client of gross negligence, incompetence, and/or fraud with respect to Country Hills LLC?
>
> A. No.

(The condensed transcripts of the complete deposition of Bruce Hitchman, taken on March 19-20, 2019, with the most salient passages highlighted, are attached hereto as **Exhibit 12**.)

33.     Ultimately, the Hitchmans (i) never signed the Country Hills Action by Written Consent, (ii) shelved their takeover plan for that entity, because Country Hills was missing the one thing the Hitchmans wanted—abundant cash, and (iii) chose instead to take over Lamplighter Chino (which had cash in abundance). Nonetheless, the mere fact that the Hitchmans would make a false and unsupported claim against Tom—within weeks of their appointment and without conducting any investigation whatsoever—speaks volumes as to their faithlessness and greed.

**C.    The Hitchmans Take Over Lamplighter Chino and Drain Its Cash Reserves.**

34.     At the same time they were preparing the paperwork needed to take over West Valley Business Park, the Hitchmans covertly took over Lamplighter Chino.  On or about April 24, 2017, they (i) marched into a local Bank of America branch, (ii) brandished the Order appointing them as interim co-trustees and resolutions they had signed alone purporting to install themselves as Manager of Lamplighter Chino, and (iii) demanded that they be granted control over all the Lamplighter Chino accounts (which included more than $6 million held in a Certificate of Deposit and approximately $500,000 in cash reserves).  As it turned out, the resolutions were legally ineffective—because, at a minimum, a majority in number of the members had to consent—so the Hitchmans went back to the drawing board and drafted a new resolution, which they had Nancy sign on the evening of June 2, 2017.[12]  (A true and correct copy of that Action, with cover e-mail, is attached hereto as **Exhibit 13**.)  It is this June 2, 2017 Action by Written Consent that actually replaced Morgan Partners, Inc. as the Manager of Chino Holdings GP, LLC, and installed the Hitchmans as co-managers in MPI's stead.

35.     Four points are important here.  <u>First</u>, although he did his level best to resist admitting the point, Bruce Hitchman ultimately was forced to concede he could identify no management issues concerning MPI to warrant taking over Lamplighter Chino:

> Q.     And you would agree with me that you didn't take over Chino because of any management issues, per se.  It's because you wanted control over that asset, correct?
>
> [OBJECTION OMITTED]

---

[12] We say "at a minimum" because arguments exist that all members had to consent.  Although Tom will not press that issue here—because the Hitchmans now have been ousted—Tom would not want his petition to be misinterpreted as admitting that the Hitchmans ultimately complied with Washington law and the organizational documents.

19
**AMENDED PETITION**

A.      I don't agree with you.

Q.      Okay.  Then, identify for me so we're very clear any management issue you had with Tom Morgan, MPI's management of Lamplighter Chino as of April 24, 2017, when you walked into Bank of America with a resolution that didn't work.

[OBJECTION OMITTED]

A.      Yeah, at this time I can't give you any precise reasons.

Q.      You can't give me any reason, can you?

[OBJECTION OMITTED]

A.      I would not agree with that.

Q.      Then what is it?

[OBJECTION OMITTED]

…

Q.      …Can you give me any management reason or concern that prompted your takeover in April 2017?

[OBJECTION OMITTED]

A.      At this time, I cannot.

36.     Second, according to Mr. Hitchman, the takeover was done surreptitiously to ensure that Tom and MPI would have no inkling as to what the Hitchmans were up to until after the accounts had been seized:

Q.      Wouldn't it be fair to say, sir, that from your perspective and the perspective others who wanted to see you take over Lamplighter Chino, secrecy would be a good ting until you had accomplished your objective of gaining an entrée into those accounts?

[OBJECTION OMITTED]

A.      I would say that given the – the likely reaction, yes.

Q.      Okay.  So, and you can have your reasons for being secret, but it would be fair to say that you did not want to tip off Newport [the property manager] or Tom Morgan or Morgan Partners of the plan to take over these accounts until you were in a position to have control?

…

A.      Why would I share – why would I even discuss it with them before we're – before we're, you know, we're going to be in place?

Q.      Okay.

A.      It wouldn't make sense.

Q.      Let me come at it this way so we have clean record.  Your best memory, as you sit here today, would be, for whatever your reasons were, you said noting to Mr.

20

**AMENDED PETITION**

Morgan, Morgan Partners, or Newport Pacific about this plan until you were in a position of control, fair?

[OBJECTION OMITTED]

A.     I think that's accurate.

Q.     Okay.  And, to your knowledge, no one else on your side of the table did either, correct?

A.     Correct.[13]

37.    <u>Third</u>, the only material factual distinction between West Valley Business Park (which the Hitchmans ultimately decided not to take over) and Lamplighter Chino (which they did take over), is that West Valley was cash poor, while Lamplighter Chino was flush with cash:

Q.     I didn't ask you what your reasoning was, sir.  I asked you would you agree that one clear objective factual distinguishing characteristic between these two enterprises is Chino had millions in cash.  West Valley Business Park did not?

A.     That is, as I believe, factually correct that they had differing financial conditions, yes.

And, again:

Q.     All other things being equal, if you're going to take over something, an entity that is flush with millions in cash is a lot better than a company that is struggling to get by, true?

[OBJECTION OMITTED]

A.     All of the – all other things being equal, yes.

38.    <u>Fourth</u>, prior to taking over Lamplighter Chino, the Hitchmans didn't even bother to read applicable loan documents for Lamplighter Chino to see if their covert actions would result in any problems.  Nor did they ever bother to consult Tom Morgan—the person who had negotiated the loan documents and who was most knowledgeable about them.  As a consequence, the Hitchmans triggered an event of default under a $14 million loan Lamplighter Chino had with PNC Bank.  (Ultimately, Tom and Nancy mitigated that damage by reinstating MPI as Manager before the lender exercised default remedies.  We note the point here solely to underscore how the Hitchmans' lust for money caused them to take reckless actions.)

39.    Once they got their hands on Lamplighter Chino's cash reserves, the Hitchmans made substantial distributions to the Trust (and, to a lesser extent, the other owners) so they could spend

---

[13] We pause to note that this professional fiduciary is proudly admitting to a secret plan adverse to the main beneficiary of the Trust—all within just a few weeks of his appointment as Interim Co-Trustee.

21

**AMENDED PETITION**

money on themselves and their lawyers.  Certain of the claims flowing from that misconduct—e.g., claims associated with how the Hitchmans *as trustees* spent the money they distributed to the Trust—are for this Court.  Many more claims will be for a civil court and a jury.

40.     With that background, we now turn to the specific facts regarding the Hitchmans' misconduct as Interim Co-Trustees.

**D.     The Hitchmans Take Sides and Conspire with the Other Beneficiaries Against Tom.**

41.     It is basic that, upon taking over as Interim Co-Trustees, the Hitchmans owed a fiduciary duty to treat all Beneficiaries neutrally and fairly, and to avoid taking sides in ways that could benefit one set of beneficiaries over another.  (See *Doolittle v. Exchange Bank* (2015) 241 Cal.App.4th 529, 537 ["Unless the language of a trust provides otherwise, a trustee is bound to deal impartially with all beneficiaries.  (§§ 16000, 16003.)  Hence, when a dispute arises as to who is the rightful beneficiary under a trust, involving no attack upon the validity or assets of the trust itself, the trustee ordinarily must remain impartial, and may not use the trust assets to defend the claim of one party against the other."]; see also *Whittlesey v. Aiello* (2002) 104 Cal.App.4th 1221, 1230 [rejecting request for attorneys' fees from attorney who represented trustee, who also was a beneficiary, in defending against challenge to validity of trust amendment that changed beneficiaries; trustee should remain neutral even assuming "the existence of facts that would have led the trustee to believe the trust amendment was valid"].)

42.     Yet, from the moment they were appointed, the Hitchmans chose sides and did all they could to try to help Nancy and the other beneficiaries secure an advantage over Tom, and to bring in recoveries that might benefit Nancy's daughters.  (See 12/7/18 Tr. at 25:16-19 [Hitchmans' counsel expressly conceding that they were acting for the benefit of the other 50% beneficiaries of the residue—i.e., Nancy's daughters].)  Records produced in discovery confirm that, at every turn, the Hitchmans and/or their counsel conferred and conspired with counsel for Nancy, John, and Nancy's daughters on strategies designed to benefit those other beneficiaries over Tom.[14]  For example:

---

[14] We hasten to add that Nancy, John and Nancy's children did not owe fiduciary duties towards Tom with respect to the Trust, and were free to lobby the Hitchmans to act as they desired.  The fault lies with the Hitchmans, who were duty bound to treat all beneficiaries impartially, and to avoid succumbing to the temptation to take sides with the parties who had sponsored their lucrative appointment.

**AMENDED PETITION**

*ACTIVE 43771546v3*

(a) Within weeks of their appointment, the Hitchmans' counsel began communicating with Nancy's counsel over which companies to take over to grab money to litigate against Tom.  Through those communications, the Hitchmans became acutely aware that: (i) the Morgan family had an important and substantial relationship with Bank of America spreading across a wide range of Morgan family businesses and trusts—far beyond the few businesses in which the Trust held an interest; and (ii) of the two entities they easily could take over, Lamplighter Chino was the only one sitting on the cash reserves the Hitchmans could tap to fund a litigation war chest against Tom.  (See, e.g., **Exhibit 14**.)

(b) The Hitchmans also quickly began fielding ideas for potential claims to pursue against Tom, and uncritically adopted every idea presented by Nancy as a claim they should pursue, without ever bothering to (i) get Tom's side of the story, or (ii) do a cost-benefit analysis as to whether pursuit of the claims even made financial sense.  Although it was a blatant breach of their fiduciary duties to do so, ***the Hitchmans even joined in and supported Nancy's trust contest claims***.  (See, e.g., Exhibit 4; see also **Exhibit 15** [Hitchmans' first petition against Tom, without exhibits].)

(c) Promptly after they had built their war chest out of Lamplighter Chino, the Hitchmans began pursuing claims against Tom, and Tom alone.  We discuss the lack of merit to the claims later in this Amended Petition, but for purposes here, we note an undisputed fact demonstrating the Hitchmans' bias:  Although Tom and the other beneficiaries all engaged in similar activities at the same time, the Hitchmans only ever singled out Tom to sue.  (By way of example, in "Hitchman world," every gift Tom received from his mother was financial elder abuse of an infirm Beverly, while identical gifts to Nancy, John and Nancy's daughters were perfectly fine, and simply the caring acts of a competent Beverly.)

(d) Nancy and John had no interest in Trust residue, which was to be split equally between Tom (50%) and Nancy's daughters (50%) should there be a residue after estate taxes and administrative expenses had been paid.  Conversely, if there was no residue, the Trust provided that Tom and Tom alone would be responsible for making up any shortfall in

23

**AMENDED PETITION**

estate taxes and administrative expenses.  Because (i) any net recoveries on claims the Hitchmans chose to pursue would go first to cover administrative expenses and estate taxes, (ii) there was no Trust residue when the Hitchmans took over, and (iii) estate tax liability at the time was approximately $6 million, the Hitchmans found themselves in a position of having to win big for their litigation onslaught to make any sense.  Otherwise (i) any recoveries from Tom would go straight to paying estate taxes for which Tom already would be responsible, and (ii) it would have made no sense for the Hitchmans to litigate against Tom, even if their claims had colorable merit.[15]  So, the Hitchmans began attacking the "problem" on both ends.  At the same time they were pursuing claims to recover something from Tom, the Hitchmans filed a supplemental 706 seeking to generate a refund of taxes already paid, based on a staggering projection that almost $14 million in attorneys' fees would be incurred in the litigation against Tom.  The Hitchmans discussed this secretly with counsel for the other beneficiaries for the better part of six months before filing their supplemental 706.  (See Exhibit 7.)  In contrast, Tom and his counsel were excluded from the discussions, and advised of the plan only the business day before the Hitchmans made their filing.  As Bruce Hitchman conceded in his deposition, Tom was excluded from those deliberations, ***even though Hitchman knew this supplemental filing would create a risk of a new audit and a higher estate tax liability for Tom and Tom alone***.[16]

(e) When Tom's Children's Trust demanded return of (i) $50,000 previously lent to the Trust, and (ii) the additional $250,000 belonging to the Children's Trust that the Hitchmans had pilfered out of a certificate of deposit being held by Lamplighter Chino,

---

[15] The Hitchmans filed their initial "Petition" against Tom in November 2017, many months before they filed their Supplemental 706. At the time, there was no conceivable metric under which the claims in that Hitchman Petition ever could have generated a large enough recovery to bring any benefit to the Trust, or to Nancy's daughters.

[16] Amazingly, after exposing Tom to the theoretical risk of increased estate tax liability, the Hitchmans later increased the risk to Tom by filing pleadings make false allegations of "tax fraud" – not because it was remotely in the best interests of the Trust or the beneficiaries the Hitchmans were supposed to be serving, but because the Hitchmans hoped that their reckless allegations, although false, might extort a release from the Beneficiaries.

24
**AMENDED PETITION**

the Hitchmans refused, claiming they were going to hold the funds while they waited to see how the litigation between other parties was resolved.  Of course, there were no claims against the Children's Trust at all, and there was no justification for holding the Children's Trust's money.  (See, e.g., Exhibits 7-8.)

(f) Over and over again, in hopes of prejudicing this Court against Tom and securing some sort of advantage, the Hitchmans made knowingly false allegations about Tom, both in pleadings and under oath.

(g) Finally, in a June 11, 2019, First Supplement filed with this Court, the Hitchmans openly admitted what has been painfully clear to Tom from the outset:  their singular goal as trustees was attempting to create leverage for Nancy to use against Tom in hopes that Nancy could obtain a settlement more to her liking.  (See Exhibit 3.)

43.    What is more, the Hitchmans treated Tom as an adversary at every turn.  They did not consult him as to (i) the potential pitfalls of taking over Lamplighter Chino before they acted, (ii) Lamplighter Chino's contractual obligations, or (iii) the actual owners of the funds sitting in the $6 million certificate of deposit over which they had gained control.  They simply pilfered the Children's Trust's money, and interfered with Lamplighter Chino contract after Lamplighter Chino contract.  Nor did the Hitchmans ever bother to inquire as to what the true facts might be before making baseless claims against Tom.  Instead, they simply parroted every wild attack fed them by Nancy, without regard for the truth.

44.    Indeed, to state that the Hitchmans' practice was to "shoot first and ask questions later" would be overly charitable to the Hitchmans—because the Hitchmans didn't even ask questions after firing their reckless shots at Tom, and they ignored all the information Tom provided in response. Perhaps most telling is Bruce Hitchman's admission that, as of his deposition, he had never e-mailed, called, communicated with or even seen Tom Morgan:

Q.    Let's take Tom Morgan.  You understand that even though Tom's represented by counsel as a party, you were always free to call him and get facts, correct?

A.    We would be free to call him, yes.  That would be true.

Q.    Right.  And you never once picked up the phone to call Tom Morgan; correct?

A.    Yes.

**AMENDED PETITION**

Q.      You never wrote him; said, "Tom, I need information"?

A.      Not that I can recall, no.

Q.      On anything?

A.      No…

…

Q.      There is a beneficiary in this…conference room; correct?

A.      Yes.

Q.      Okay.  First time you met him?

A.      Yes.

Q.      First time you've seen him?

A.      Yes.

Q.      I gather you're yet to talk to him?

A.      That would be correct.

45.     The hostility, lack of neutrality and breach of fiduciary duties to Tom could not be more palpable.  And, the Hitchmans' actions had real-life consequences.  Tom was forced to spend a small fortune defending himself against the Hitchmans' reckless onslaught.

**E.      In Their Zeal to Attack Tom, the Hitchmans Failed to Press a Slam-Dunk Malpractice Claim Against Former Trust Counsel Richard Pech.**

46.     Once the Hitchmans were appointed as Interim Co-Trustees, they, and they alone, had the ability to sue former trust counsel Richard Pech for malpractice to the office of trustee with respect to his advice that he should be paid out of Trust funds.  Although he continued to represent Tom as beneficiary (as well as in honoring his fiduciary obligations as a suspended trustee), Mr. Pech's tenure as active trust counsel effectively ended on or about March 29, 2017, when the Hitchmans were appointed.  Absent some sort of tolling, there is a one-year statute of limitations on attorney malpractice claims.  Yet, the Hitchmans did not bring any malpractice claims against Mr. Pech all the way up through the day their reign as interim co-trustees ended (on June 21, 2019).

47.     To be clear, there always was a slam dunk claim against Pech for his professional malpractice, as Trust counsel, in wrongly advising Tom that it was permissible for him to pay all Pech's fees associated with Trust litigation out of funds held by the Trust, rather than distinguishing between Trust claims (for which Trust assets could be used) and claims properly viewed as personal to Tom (as

1    to which Tom was to pay from personal funds).  And, it is undisputed that, as a result of Pech's advice,

2    Pech was in possession of Trust assets.  Yet, although the Hitchmans have assured that Pech is

3    wrongfully withholding Trust assets in the neighborhood of $1 million, they did nothing to pursue Mr.

4    Pech at all.

5          48.      Instead, the Hitchmans sued Tom, rather than Pech, even though it would have been

6    virtually impossible for the Hitchmans to prevail against Tom given the terms of the Trust, which:

7    (i) allowed Tom to rely on professionals for his actions (and immunized him from liability if he did);

8    and (ii) required that Tom have acted in bad faith (which he didn't).  The notion that Pech was the

9    correct target here, and Tom was uniquely the wrong target, should not have come as news to either the

10   Hitchmans or the highly-experienced probate firms they hired to represent them.  After all, as early as

11   2004, the California Supreme Court had made this very point in the seminal case of *Borissoff v. Taylor*

12   *Faust* (2004) 33 Cal.4th 523.)  In *Borissoff*, a successor trustee sought to sue trust counsel for a

13   predecessor trustee, who had withdrawn as trust counsel once the predecessor trustee had sought the

14   firm's advice on immunizing himself for liability for misuse of trust assets.  In rejecting the law firm's

15   claim that the successor trustee lacked standing to sue and, at most, should have sued the former trustee

16   and left it to the former trustee to cross-claim for malpractice, our Supreme Court went out of its way to

17   make clear that:  (i) it would be improper to sue the fiduciary in Tom's position (who, to discharge his

18   duties, should hire professionals to advise him in areas like this and would be immune from liability for

19   doing so); and (ii) the proper target for the successor trustee should be former trust counsel directly.

20   There is one reason, and one reason only, why the Hitchmans failed to follow the proper course of

21   action laid out by our Supreme Court 13 years before they assumed this engagement:  suing Pech would

22   not further their goal of harassing Tom.[17]

23         49.      Consistent with his practice of mitigating Hitchman damages wherever possible, Tom, in

24   his capacity as reinstated trustee, has attempted to pursue the claim against Mr. Pech directly.  But, what

25   should have been a slam dunk now is a claim subject to a potential statute of limitations defense that

26   _____

27   [17] Here, of course, the Hitchmans are licensed professional fiduciaries, and hold themselves out as
     such in order to secure lucrative appointments like this.  Case law long has recognized that professional

28   fiduciaries are held to higher standards, making it appropriate to hold the Hitchmans accountable
     directly.

**AMENDED PETITION**

(i) Mr. Pech already has asserted, and (ii) the trial court already has upheld once (by sustaining Pech's demurrer based on the statute of limitations).  Tom has invited the Hitchmans' thoughts as to what, if anything, can be pleaded by way of amendment to overcome Pech's statute of limitations defense. Should an attempt be made to amend, a further Pech demurrer is anticipated.  At a minimum, Tom is incurring fees and costs that could have been avoided entirely had the Hitchmans acted sooner.  At worst, a claim the Hitchmans have valued at $1 million will have been lost as a direct result of their inaction.

**F.**     **The Hitchmans' Profligate Spending as Trustees.**

50.     Many of the attorneys', expert's and trustees' fees incurred by the Hitchmans were unreasonable and of no benefit to the Trust.  On October 17, 2018, the Hitchmans filed their "First and Second Accounts Current," covering the first half of their reign (from April 4, 2017 through September 30, 2018).  Per Court order, the Hitchmans are due to the account for the remainder of their tenure by either December 9, 2019 (if they simply supplement their existing accounting) or December 16, 2019 (if they file a separate accounting for their trusteeship from October 1, 2018 to the end).  Given this timing, the Trustee cannot present here a "to the penny" summary of the Hitchmans' spending spree.  Still, based on their accounts of record and information the Hitchmans have provided to the IRS, it appears the Hitchmans have spent more than $2 million on themselves, their lawyers and litigation experts— primarily by making distributions to the Trust out of Lamplighter Chino and then spending those distributions on litigation, rather than holding them for the benefit of the beneficiaries.  Here is a breakdown of the Hitchman expenditures that, either in whole or in part, were for wasteful litigation— including a competency expert the Hitchmans hired to lend support to Nancy's trust contest.[18]

| Firm | Estimated Total Fees/Costs |
| --- | --- |
| Roehl & Glowacki | $ 462,092 |
| Carico Macdonald, et al. | 986,165 |
| Goren Marcus, et al. (expert) | 267,185 |

---

[18] A detailed review of the invoices submitted by the Hitchmans' legal counsel will be required to break out those modest fees and costs spent on legitimate trust administration activities, rather than breach of their fiduciary duties to Tom.

| | |
|---|---|
| FTI Consulting (expert) | 21,008 |
| Hill Farrer & Burrell (expert) | 28,479 |
| Daniel Plotkin, MD (expert) | 6,550 |
| **TOTAL** | **$1,771,479** |

Adding insult to injury, the Trustee is informed and believes that the Hitchmans have paid themselves well over $300,000 in fees, including "extraordinary fees" for their decision to take over and loot Lamplighter Chino.

51.     Several points are in order here with respect to the Hitchmans' profligate spending. <u>First</u>, under the terms of the Trust, absent a Court order, the Hitchmans had no duty to pursue a single claim against Tom and could not be held liable for failing to do so.  Further, as noted above, the Hitchmans, being merely Interim co-trustees appointed to preserve the status quo, were supposed to obtain a Court order if they desired to jump into the litigation.  Yet, without ever seeking, much less obtaining, a Court order, they began litigating against Tom with unbridled zeal.

52.     <u>Second</u>, it is well-settled in California that trustees have an obligation to do a cost/benefit analysis before embarking on costly litigation.  How much will litigation cost?  What are the prospects for success?  Is recovery likely and, if so, how much?  Will we spend more litigating than we can hope to recover?  Will recovery make any financial difference for the beneficiaries we are supposed to serve?  Unless the answers to questions like these show it makes financial sense to proceed, the prudent trustee, mindful of his duty to preserve and grow Trust assets, should stand down, even if he thinks a claim might have colorable merit in the abstract.

53.     Incredibly, the Hitchmans never both to ask a single one of these questions for a single one of the claims they pursued against Tom.  Here is Bruce Hitchman in his deposition:

Q.     …Do you recall – you're aware that you and your wife through your counsel are asserting a variety of claims against Mr. Morgan?

A.     Yes.

Q.     Okay.  And let me just cover that now.  Have you done a cost-benefit analysis with respect to a single one of the claims that you're asserting against Mr. Morgan?

A.     No, we have not.

And, here is the truth: even if the Hitchmans had strong claims to establish liability (they didn't), until very late in the game—essentially until sometime in February 2019, when the Hitchmans completely changed their claim over Avalara stock—the Hitchmans could have prevailed 100% on every one of their claims against Tom and the recoveries still would have been insufficient to make a difference for any beneficiary (because the aggregate amount of the claims was less than the estate taxes the Trust residue still would have had to pay). In other words, whether the claims were strong or weak, it made no financial sense for the Hitchmans to ever pursue them in the first place because any recoveries from Tom would have gone straight to the IRS to pay estate taxes that otherwise would be owed by Tom.[19]

54.   Third, not only did it make no financial sense to pursue litigation even if the Hitchmans' claims had been good, but the claims were weak and contrived. Here is a quick summary of the Hitchmans' claims and their many flaws:

| Claims by the Hitchmans | Flaws in the Claims |
| --- | --- |
| The Hitchmans sought to surcharge Tom for any Trust funds used to pay for legal services that were for personal claims against Tom, and hence, did not benefit the Trust. The Hitchmans noted the following total payments to lawyers: (i) $1,362,068.84 to litigator Richard Pech; (ii) $48,996 to the Law Offices of Michael Vollmer; (iii) $56,849.62 paid to Moen Law Offices; and (iv) $14,520.28 paid to the Law Offices of Russell Allen. The Hitchmans based all these claims on the fact that Tom's accounting admitted that a portion of the fees paid to Mr. | Tom concedes that, under California law, Trust funds should not have been used to pay for defense of Nancy's trust contest – something he did not learn until it was too late (due to Mr. Pech's negligent representation). But, that does not mean either that: (i) the Hitchmans ever could have made the showing required to surcharge Tom, or (ii) there was any damage from Tom's actions. As for the first point, the Trust emphatically required bad faith conduct by Tom for there to be liability; negligence would not suffice. (See ¶ 10.14; see also id., ¶ 10.12 |

[19] In the Spring of 2019, shortly before the beneficiaries reached their settlement, the Hitchmans completely re-wrote a claim against Tom with respect to speculative interests in a company called Avalara, Inc. that Tom had acquired from Beverly. Originally, the Hitchmans made no claim that Tom had acquired his mother's interests for less than fair value, and complained only that Tom had abused the loan forgiveness provisions of the Trust by effecting his purchase through promissory notes that would be forgiven upon his mother's death. But, in February 2019, the Hitchmans' counsel "discovered" that 4½ years after Beverly Morgan died, Avalara somehow had managed to launch a successful initial public offering and was trading for real value, even though it had never made a penny in its entire existence—and, to date, actually had lost approximately half a billion dollars. Although no one could have foreseen that the interests Tom acquired from Beverly—when Avalara was a private struggling company, with no public market for its stock—ever would have value, the Hitchmans quickly changed their story to claim that Tom somehow knew Avalara would succeed, and took advantage of his mother by acquiring her interests for a fraction of what they would be worth years later. Tom has many talents, but omniscience is not one of them.

ACTIVE 43771546v3

| | |
|---|---|
| Pech were for services personal to Thomas. (See Amended Claims Schedule, pages J1-1 to J1-2.)[20] | [following advice of professionals establishes presumption of good faith; if advice is in writing, presumption is conclusive].)  Although he knows it now, Tom didn't know then that he should hire separate counsel to handle this personally; Tom understood it was the job of a trustee to defend the Trust (even if he had a beneficial interest in the outcome), and his then-counsel (Mr. Pech) advised him Trust funds could be used to pay for such a defense.  As for the damage issue, the simple fact is that the lawyers largely were paid from distributions the Trust received from (i) the proceeds of loans made by Tom and his Children's Trust to the Beverly C. Morgan Family Trust, and (ii) borrowings from entities whose interests the Trust bequeathed to Tom.  Under Probate Code section 12002, any distributions to the Trust from entities bequeathed to Tom ultimately were to be preserved for Tom anyway, so this truly was a case of "no harm, no foul."  Finally, the litigator here was Mr. Pech, meaning that there really shouldn't even be an issue as to the actions of the other lawyers, who served in an administrative capacity.  This claim always had zero value. |
| For their next claim, the Hitchmans complained about the amount of management fees paid to Morgan Partners, Inc. for managing various properties in which the Trust holds an interest.  Specifically, $25,000 per month was paid from Dr. Morgan's accounts and, on top of that, MPI charged management fees to the underlying entities.   So, for example, the Hitchmans complained that, between 2012 and 2016: (i) Lamplighter Chino was charged a total of $326,885.26, (ii) Lamplighter Ontario was charged $389,776.79, and (iii) West Valley Business Park was charged $321,351.26.  The Hitchmans further noted that, for part of this period, Lamplighter Chino and Lamplighter Ontario also had a full-time onsite property management company.  (See Amended Claims Schedule, page J1-3.) | **First**, as for the onsite management company, there was no duplication of services.  The onsite management company does routine and basic things for an extremely modest cost, such as handling onsite payroll and human resource issues, local repairs, and the like.  MPI always was responsible for strategic issues and planning, as well as activities designed to increase revenues.  **Second**, the fees charged by MPI for its managerial services were modest and below industry standards.   Most partners in MPI's position charge promotes and fees for virtually any value-add, including refinancing fees, leasing fees, and the like.  MPI charged none of these things.   **Third**, all of this kerfuffle over management fees would have been relevant only if Tom's salary from MPI was rising, but that hasn't happened.   Instead, Tom's salary has decreased dramatically from a starting number |

---

[20] The Amended Schedule referred to throughout this chart is a new claims schedule attached to a February 8, 2019 Supplement to the Hitchmans' October 17, 2018 Accounting Petition.

**AMENDED PETITION**

*ACTIVE 43771546v3*

that already was below market.   This claim always had zero value.

For their next claim, the Hitchmans complained about a decision to convert an $850,000 loan to Country Hills, LLC from the Trust, at 3% interest, into an equity interest in that enterprise, based upon Tom's conclusion that (i) the underling debt was likely uncollectable given the property's overall performance and senior debt that had to be satisfied, and (ii) considering tax impacts, it was more advantageous to convert the loan to capital.   The Hitchmans noted that Country Hills made interest payments up until the conversion (at a rate of $25,500 per year), and thus pondered why $850,000 in principal was out of reach.   The Hitchmans also complained about the Trust's return of $12,750 in interest payments to Country Hills (for periods after Beverly's death) to be consistent with the conversion to capital.   Lastly, the Hitchmans complained that there was no conversion because the Trust's percentage interest in Country Hills has not increased. (See Amended Schedule, page J1-3.)

The basic facts are not in dispute.   The loan was converted, and the meager interest was returned. What is in dispute is the wisdom of Tom's decision, and Tom always had the better of the argument. Repayment of principal was seriously in question given the additional debt that had to be satisfied and past experience with the property, including past offers. Yet, absent this conversion, the $850,000 loan—which Country Hills had been unable to pay off for nine years—would have been reported as a Trust asset and subject to estate tax.   This immediately would have cut the net value of the asset in half.   Alternatively, to pay the debt prior to Beverly's death, Tom would have had to make a capital call on all the partners, forcing Nancy and his mother to come out of pocket to pay the debt, and that cash would have been part of the estate subject to estate tax. Conversely, if the loan had been written off as a bad debt, then Country Hills would have experienced forgiveness of indebtedness income, to the disadvantage of its owners, including Nancy.   It was a classic "lose, lose."   Tom consulted his accountants, and was advised that this conversion was the best course of action to minimize all adverse effects, so he followed that advice.   As noted above, because he relied on professional advice, the Trust insulates Tom from liability, whether his decision was right or wrong. (To be clear, it was right.)

Finally, the Hitchmans' complaint that the Trust's percentage equity interest did not increase after the conversion completely missed the point.   By treating this as a capital contribution, the Trust's tax basis for its interest would increase by $850,000, which means that the first $850,000 in distributions to the Trust would not be taxable as income, and instead would be treated as a return of capital.   The solution was elegant.   If Country Hills prospered, the money would be returned in full with no tax – making this outcome much more preferable to listing the $850,000 as a loan on the estate tax return, and paying almost half that amount in estate taxes.   If Country Hills did not prosper, taxes would have been minimized.

32

**AMENDED PETITION**

| | |
|---|---|
| | Either way, this decision turned a "lose, lose" into a "win, win." |
| | In any event, the Hitchmans' complaint that the Trust should have gotten an increased percentage vis-à-vis the other owners shows just how incapable they are of seeing things through to a logical conclusion. To close the logic loop here, had other owners been forced to reduce their percentage interests (rather than the Trust's dollar basis in its capital account being increased), the Trust's percentage interest would have increased and the interests of all other owners (including Tom and the Shurtleff owners) would have decreased in proportion. Yet, once Beverly passed, Tom would have been bequeathed the Trust's higher percentage interest and ended up not just recapturing the personal interest he had just surrendered, but also the percentage interest Nancy would have been forced to surrender to the Trust. ***Tom's chosen path benefitted Nancy.*** |
| On or about August 11, 2014, Tom transferred $1 million from a Dr. Morgan account to the Thomas E. Morgan Children's Trust. He transferred it back in full through two $500,000 transfers on October 27, 2015 and November 2, 2015. Because the temporary transfer was booked as a "loan," the Hitchmans sued for interest on the funds while they were held by the Children's Trust. (See Tab 24, page J1-4.) | The underlying facts are true insofar as they go. Here is the rest of the story. After Dr. Morgan passed, Tom, as Trustee of the Trust, transferred $1 million from the Trust to his Children's Trust, to protect that money in the face of an apparent asset freeze. In other words, the money was being parked temporarily; it was not intended to be an actual loan. Thereafter, after the threat of an asset freeze over Trust assets had dissipated, Tom transferred the money back to the Trust without prompting from anyone. For the period for which the Children's Trust held the funds, Tom sought the advice of an accountant as to how to treat the transaction. The accountant advised to book it as a "loan," and that is what Tom did. In sum, this transaction was not in all practical realities a loan, but rather, was asset protection for the Trust. With that, we have three points. **First**, had the money remained in a trust bank account, it would have earned about $400 in interest over the relevant time period. It cost the Hitchmans more to pay attorneys to write the claim than this potential recovery. **Second**, at all material times, the Trust owed the Children's Trust $50,000. So, the Children's Trust always has been a creditor, not a debtor—even if we allow an offset for interest. **Third**, the Hitchmans |

33

**AMENDED PETITION**

|   |   |
|---|---|
| | could not have hoped to prove the bad faith standard required to surcharge Tom. Tom's good faith was demonstrated by the facts that (i) he rectified this on his own, without prompting from anyone, (ii) he and his Children's Trust both loaned substantial funds to the Trust during Tom's tenure as trustee (without interest), and (iii) this asset protection measure was documented as a "loan" on the advice of an accountant. The claim always was pointless. |
| On December 31, 2012, Tom caused a cashier's check to be drawn on Beverly's accounts for $349,998.75 in favor of his supposed business partners, Jared and Kristin Vogt. The Hitchmans claimed that Beverly never was paid back, and there was no business reason for the transfer. So, they claimed $349,998.75 plus interest. (See Amended Schedule, at p. J1-4.) | The short answer is that the Hitchmans took an isolated fact out of context to create a false picture. Here, is the rest of the story. A family-owned entity known as Juanita Springs Associates LP ("Juanita Springs") purchased a loan worth $500,000 from Bainbridge Community Development ("BCD"). The borrowers on that loan were the Vogts, who were tenants then at Juanita Spring's commercial property, Island Gateway. As part of restructuring that deal, the $500,000 BCD loan was to be replaced by a $350,000 loan to the Vogts. Accordingly, on December 31, 2012, the Vogts had to – and did – repay the old $500,000 loan to Juanita Springs. (See 12/31/12 check from the Vogts to Juanita Springs for $500,000.) In turn, Juanita Springs was to re-loan $350,000 to the Vogts. However, Juanita Springs did not have the liquidity to do so on the same day it received the $500,000 check from the Vogts, because the Vogts' check needed time to clear. To bridge that short period of days and provide sufficient liquidity to Juanita Springs, on December 31, 2012, Beverly's MobilePark Management account purchased a cashier's check made out to the Vogts in the amount of the new loan ($349,998.75). (See cashier's check to the Vogts.) At the same time, however, Juanita Springs wrote a check to MobilePark Management for the $350,000, which was deposited on the next business day. In short, MobilePark merely provided bridge funds, and was repaid completely and immediately within one to two banking days. The promissory note for the new $350,000 loan thus properly reflected that Juanita Springs was the lender, and the Vogts were the borrower. The Hitchmans always knew these facts. That they would present a false |

34

**AMENDED PETITION**

| | |
|---|---|
| | picture speaks volumes.   Regardless, the claim always had zero value. |
| The Hitchmans' next four claims were for the Trust's share of interest they claim a family business called Ontario Associates LP should have charged on loans to other family-owned businesses, including (i) Island Gateway, (ii) Blakely Rock Holdings, LLC, (iii) Juanita Springs Associates LP, and (iv) Covina Hills MHC.  (See Tab 24, at pp. J1-4 to J1-5.) | It is true that no interest was charged, but this isn't something new.  Instead, this is consistent with longstanding practices of which Dr. Morgan knew about and approved when she was alive and the acting trustee.   Given the longstanding practice of Dr. Morgan's approval of transactions just like these, the Hitchmans never could have made the bad faith showing necessary to surcharge Tom.  Three more points.  First, this was a derivative claim of Ontario Associates not even properly brought by the Hitchmans. Second, the cost of litigating any claim for interest would have vastly exceeded any potential recovery, thus making this another waste of Trust assets.  Third, under both the 2013 Trust and the 2012 Trust, the Trust's interests in Ontario Associates are bequeathed to Tom.  This means that, under Probate Code section 12002, if Ontario Associates had charged and collected interest, and if Ontario Associates had then distributed the Trust's share of that interest to the Trust (which it had no obligation to do), the Hitchmans would have been obligated to hold those funds for Tom.  For this additional reason, the claims always made no sense and always had zero value. |
| The Hitchmans complained that there was a duplicate payment of $35,000 to Blakely Rock Holdings that has not been returned.   They wanted it back, plus interest.   (See Amended Schedule, at p. J1-5.) | Here is the complete story.  When Dr. Morgan sought to purchase a home for one of her caregivers (with whom Dr. Morgan was very close), Thomas caused Blakely Rock Holdings ("BRH") – an entity principally owned by Tom's Children's Trust – to put up the $35,000 earnest money deposit for the home purchase, simply as an accommodation and matter of convenience for his mother.  When escrow closed on the home's purchase, Beverly repaid the $35,000 to BRH. Thereafter, after Dr. Morgan passed away and the home was sold, $35,000 from the sale proceeds mistakenly was transferred to BRH, as an unintentional duplicate repayment.  In light of the accidental double payment, the Trust/Tom accurately booked a receivable owing from BRH in the amount of $35,000.  However, there was no practical need for BRH to send back the double payment to the Trust, because the Trust already |

35
**AMENDED PETITION**

| | owed Tom's Children's Trust $50,000, and the Children's Trust was an owner of BRH. In other words, the BRH obligation owed to the Trust was more than offset already by what the Trust already owed to a BRH owner. Nothing was hidden, and this was a big "so what?" Finally, because the Hitchmans chose to make an issue of it, Tom offered to clean up these offsetting claims by having Blakely Rock write a $35,000 check to the Trust, and the Trust in turn write a $50,000 check to Tom's Children's Trust. The Hitchmans refused the offer, taking the position that they would wait until the litigation concluded to work offsets. Ultimately, Tom resolved both outstanding obligations promptly after being reinstated as Trustee. |
|---|---|
| The Hitchmans complained about certain gift checks written in December and January 2014, before Beverly Morgan died. The Hitchmans cherry picked. In "Hitchman world," checks to Nancy, Nancy's children and husband, John and caregivers were okay. Checks to Laurie Morgan (Tom's now wife), Tom's former wife, and the Children's Trust for Tom's children somehow were branded as improper and "clear acts of unauthorized self-dealing." (See Amended Schedule, at p. J1-6.) | First, these checks were written while Dr. Morgan was alive (and trustee), and were to implement her wishes. Because Tom wasn't the trustee, the claim of self-dealing was a non-starter. Second, each of these gifts minimized estate tax liability by reducing the amount of cash on hand. Simply, given estate taxes, every dollar on hand at the time of Beverly's death would be worth about 50 cents thereafter. Third, the amounts were negligible, and would have cost far more to litigate than the claim was worth. Fourth, this claim vividly underscores how the Hitchmans sided with Nancy against Tom, in breach of their fiduciary duty of impartiality. |
| The Hitchmans quarreled with the fees paid to an accounting firm to prepare accountings for the Trust for the years 2014, 2015, and 2016. The Hitchmans branded the accountings as "valueless" because, for example, "they round all numbers to the nearest dollar" and other picayune complaints. The Hitchmans never quantified this claim. (See Amended Schedule, at p. J1-6.) | **First**, this is a classic administrative expense. That the Hitchmans chose not to use the accountings hardly means they get to surcharge Tom. **Second**, and again, the standard imposed by the Trust for surcharging Tom – bad faith – is high, and the Hitchmans offered nothing to suggest they ever could meet the required standard. **Third**, this was another negligible claim that would cost far more to litigate than the claim was worth. |
| The Hitchmans claimed that a $3,500 payment to James Spar, M.D., a competency expert, was not appropriately paid by the Trust. They sought reimbursement plus interest. (See Amended Schedule, at p. J1-6.) | Once again, the cost of litigating this issue exceeded its value. That said, to the extent Dr. Spar would have been called to testify in defense of claims personal to Tom, Tom concedes that, under California law, Trust funds should not have been used to pay for defense of Nancy's trust |

36

**AMENDED PETITION**

| | |
|---|---|
| | contest – something he did not learn until it was too late.  But, that does not mean either that: (i) the Hitchmans could have made the bad faith showing required to surcharge Tom, or (ii) there was any damage from Tom's actions. |
| The Hitchmans complained that monies were paid to Morgan Partners, Inc. to reimburse it for expense advances "without an adequate showing that the expenses charged were for the benefit of Beverly."  More specifically, they complained of $252,437.85 in transfers prior to Beverly's death, and one $50,000 transfer after Beverly's death.  [Note:  They used to claim there were two transfers.]  (See Amended Schedule, at p. J1-7.) | The detail had been provided (home care for Beverly).  The Hitchmans simply ignored it.  Regardless, even if there were questions, we note that, for all but $50,000, the trustee was Beverly Morgan, not Thomas, and there were obvious statute of limitations issues. |
| The Hitchmans' next claim was for the Trust's share of interest they claim a family business called Chino MHC LP should have charged on a $1 million loan to another family-owned business, called Juanita Springs.  (See Amended Schedule, at p. J1-7.) | The problems with this negligible claim mirror the problems with the Hitchmans' claim for the Trust's share of interest the Hitchmans claim Ontario Associates should have charged for loans to family-owned businesses. It always was a non-starter the Hitchmans didn't even have standing to bring. |
| Demonstrating that no petty claim was too petty for them, the Hitchmans complained that, while Beverly was alive, $77,000 was used to purchase a piano.  They wanted that money back, plus interest. (See Tab 24, at p. J1-7.) | The purchase was approved by Beverly, for the benefit of Tom's children (who otherwise would get nothing under the Trust).  Interestingly, the piano was purchased from Tom's ex-wife who, rather than give the piano to her own children, insisted that full value be paid. |
| Through two promissory notes—one effective as of January 1, 2012 and the other effective as of January 1, 2013—Tom acquired Dr. Morgan's interest in slightly more than 1 million shares of stock in a privately-held company called Avalara, Inc. (The total cost of the promissory notes is approximately $750,000, which reflected the acquisition cost of the stock.) Years later (in June of 2018), Avalara went public, and, although there have been wild price fluctuations thereafter, its stock currently is trading for more than $70 per share.  The Hitchmans chalked this up as some sort of sinister plan by an omniscient Thomas, capable of predicting the future six years later and taking advantage of his mother.  They wanted something for these events, but placed no dollar value on the claim.  (See Amended | At least this claim presented a dollar value potentially worthy of talking about – although the Hitchmans overstated things again.  The short answer, though, is that the Hitchmans went off half-cocked once more.  **First**, as the Hitchmans would have learned had they simply asked, Tom had jointly owned the stock with his mother since it was acquired: (i) 909,786 shares acquired **in early 2009**, for 44 cents per share, and (ii) 155,555 shares acquired on **December 31, 2012**, for $2.25 per share.  There is an ambiguity as to whether Tom and Beverly held this stock as tenants in common or joint tenants with a right of survivorship.  If the latter, Tom had no obligation to pay anything to acquire his mother's interests.  If the former, then one would deem Thomas as already having a 50% interest in the stock, and simply acquiring his mother's remaining interest |

Schedule, at p. J1-7.)

– which, to be clear, would mean Thomas agreed to pay a 100% premium on the acquisition cost (because Tom already owned at least half). These notes were done simply to remove the possibility of estate tax issues down the road. **Second**, Tom was not trustee during these transactions; Dr. Morgan was. And, Dr. Morgan, not Tom, signed the two agreements as trustee of her Trust. (Thomas signed as borrower.) **Third**, events like this were not unusual for Dr. Morgan. Instead, it was part and parcel of her broader overall plan of placing assets in the hands of her children so as to minimize estate taxes. **Fourth**, Avalara (a tenant in the Morgan family's Island Gateway project) was a highly speculative investment. Avalara never had made money, and was constantly seeking new investors to keep its doors open. By way of example, Juanita Springs (which owns Island Gateway) took warrants for a lease guarantee because Avalara was too cash-strapped to even deal in cash. To be sure, the stock is worth more today (thanks to an unlikely but successful initial public offering), but there was no way of knowing that back then, when Avalara was a private company with no public market. There is ample evidence to demonstrate that (i) the Avalara stock was a flier and Tom simply got lucky years later, and (ii) Tom had no inkling as to what would happen in the future. For example:

1.  While Avalara was still a private company, it always was seeking investors and would do yearly valuations. Each year, it would give shareholders the opportunity to buy or sell shares at the valuation price. Tom always sold. If Tom thought this was the next big thing, he obviously would have (i) sold something else, and (ii) bought more stock every chance he got.

2.  Tom had so little faith in Avalara that he even gave a significant part of the stock to charity, rather than hold it.

Tom's unexpected good fortune is not a tort.

ACTIVE 43771546v3

In sum, at the end of the day, the Hitchmans' contrived claims serve only to underscore the desperate lengths to which they were willing to go to aid Nancy's quest to attack Tom. They always were a complete and utter waste of time and money for multiple reasons, including that: (i) they lacked merit, and (ii) even if the claims had colorable merit, the cost of litigating them outweighed the benefits of a potential recovery. Indeed, with the possible exception of the revised Avalara stock claim (which the Hitchmans conjured only very late in the game), the dollar value of all the remaining claims combined was less than the estate tax liability to be borne by the Trust residue, if a residue existed.[21] Yet, as if to underscore their wholesale disregard of their duties to Tom, the Hitchmans wasted an inheritance earmarked for Tom trying to pursue each one of these claims against Tom—without ever bothering to learn the truth from Tom, or to perform a cost/benefit analysis to determine whether litigation even made financial sense.

55. <u>Fourth</u>, not content just to waste fees trying to gin up claims against Tom, the Hitchmans wasted fees in other ways. For example:

(a) As noted above, the Hitchmans expended significant attorneys' fees plotting to take over various Morgan family businesses managed by Tom/Morgan Partners—specifically, Lamplighter Chino and West Valley Business Park. Although they had no factual basis for doing so, within weeks of their appointment, the Hitchmans even went so far as to have counsel draft up an action by written consent, for Nancy to sign, that wrongly accused Tom of "gross negligence, incompetence, and/or fraud" with respect to Country Hills LLC. Bruce Hitchman already has admitted that he had no factual basis for such an accusation—and, indeed, that he still has no factual basis today. The Trust should not bear the cost for what, at the end of the day, was slander.

(b) In June of 2017, the Hitchmans prepared an ex parte application, with declarations from Mr. Glowacki and Mr. Hitchman, designed to convince the Court that Tom had

---

[21] Accounting for (i) actual events (such as gifts to charity, sell-backs of stock when Avalara still was private, and sales after Avalara went public), (ii) the extreme cost of litigation, (iii) the fact that the Hitchmans would have had to reimburse specific devisees for their share of any income the Hitchmans should have been preserving under Probate Code section 12002, and (iv) the Hitchmans' meager prospects for success, the Hitchmans' revised Avalara claim still made no sense to pursue.

misappropriated $450,000 from Lamplighter Chino.  And, just days prior to that, they spent still more funds preparing an Affidavit that Bruce Hitchman filed with Bank of America making the same accusation.  (True and correct copies of the Declarations and false Affidavit are attached hereto as **Exhibits 16-18**.)  The story was false, and the Hitchmans either knew it was false or made the accusation recklessly and without regard for the truth.  It is of no benefit to the Trust and its beneficiaries for the Hitchmans to misrepresent facts to the Court or to a financial institution having a longstanding, valued relationship with the Morgan family.  Here, too, the Trust should not bear the cost for what, at the end of the day, was slander.

(c) The Hitchmans spent inordinate sums haggling over the terms of a lease with Tom for Beverly's Lido Drive condo, which is bequeathed to Tom under either the 2012 or 2013 Trust.  Once the Court determined that rent only would be booked (and not paid) for so long as the Trust failed to distribute the Lido condo to Tom, there was no point to further lease negotiation at all because, under Probate Code section 12002, any rental income ever received by the Trust would have gone right back to Tom along with the condo itself.  Yet, not only did the Hitchmans continue to spend money haggling over a lease, but they brought a motion trying to force on Tom unreasonable terms that the Court ultimately rejected.  This was another waste of funds.

(d) The Hitchmans needlessly wasted attorneys' fees conditioning settlement of a lawsuit between Lamplighter Chino and the City of Chino on probate court approval.  Not only did this add an unnecessary layer of expense, but, by delaying the effectiveness of the settlement, it had the effect of giving the City of Chino an "interest free" loan on the $1.15 million the City was to pay Lamplighter Chino as part of that settlement.

(e) Many of the Hitchmans' claims have overlapped with claims already brought by Nancy – or, in some cases, with earlier Hitchman petitions.  There was no need for such duplication.

(f) Multiple Hitchman attorneys were billing for nearly every task in this case, bringing into question the reasonableness of the bills in general.  Because the Hitchmans have yet to

40

**AMENDED PETITION**

disclose their invoices to Tom—although they apparently have shared them with Nancy's counsel—the amount of any excess cannot be quantified with any precision at this juncture.

(g) Any penny spent by the Hitchmans resisting the beneficiaries' settlement, or continuing to litigate after the April 8-9, 2019 mediation, was wasteful and, in certain respects, tortious.  Again, the only thing the Hitchmans should have done after the settlement was stop billing, and start working with the beneficiaries on an orderly transition.

## G.   Separately, The Hitchmans Mismanage Lamplighter Chino in Every Way Imaginable.

56.     We now summarize all the Hitchmans' misconduct in their separate role as self-appointed Managers of Lamplighter Chino, starting with those acts that have caused damage Tom could not mitigate, and ending with those acts that would have resulted in still more damage but for Tom's mitigation efforts.  Although the acts described below give rise to civil claims properly brought elsewhere, because there is only one Bruce Hitchman and one Lee Ann Hitchman, the facts described below also underscore how the Hitchmans have acted with oppression, fraud and malice towards Tom on the claims asserted here.

### 1.   The Hitchmans Dissipated Funds Belonging to Tom, Nancy and the Thomas E. Morgan Children's Trust.

57.     At the time the Hitchmans had themselves appointed as Manager of Lamplighter Chino, the enterprise had slightly more than $6 million in a certificate of deposit with Bank of America, broken down as follows: (i) $250,000 contributed by the Thomas E. Morgan Children's Trust (to get the funds on deposit to $6 million, thereby yielding more favorable terms); (ii) $5.75 million from the proceeds of a refinance of a loan secured by the Lamplighter Chino property; and (iii) interest on those funds.  No one had a right to the $250,000 (plus interest) belonging to the Children's Trust other than the Children's Trust.  The three Lamplighter Chino owners (Tom, Nancy and the Trust) had interests in the remaining $5.75 million (plus interest) in accordance with their percentage ownership interests in the enterprise: (i) Tom (20%), (ii) Nancy (29%), and (iii) the Beverly C. Morgan Family Trust (51%).

58.     The $5.75 million representing the proceeds of a refinance for the Lamplighter Chino project was to be held for business purposes.  But, if the Hitchmans were going to break the $6 million

certificate of deposit to distribute the funds, then at least they were obligated to return the additional $250,000 to the Children's Trust (plus interest) and distribute the remainder it in accordance with the ownership percentages set forth above. Specifically, after backing out the $250,000 owed to the Children's Trust, the remaining $5.75 million was allocable to the owners as follows: (i) the Trust (51% -- $2,932,500); (ii) Nancy (29% -- $1,667,500); and (iii) Tom (20% -- $1,150,000).

59. Instead, of distributing the proceeds that way, the Hitchmans took $2.5 million off the top to extinguish what ultimately was a **Trust** obligation ($2.5 million worth of line of credit draws for the benefit of the Trust), and then split only the remaining $3.5 million proportionally among the Lamplighter Chino owners. The end result is that (i) the Children's Trust has been shortchanged $250,000 (plus interest), (ii) Nancy was shortchanged $652,000 (plus interest), and (iii) Tom was shortchanged $450,000 (plus interest). (On top of that, the Hitchmans' election to distribute the proceeds of a refinance gives rise to potential adverse tax consequences they never even bothered to consider before acting.)

60. Underscoring their avarice, the Hitchmans were not content simply to plunder the $6 million certificate of deposit. Thanks to a "takings" lawsuit brought by Tom while MPI was Manager of Lamplighter Chino, that enterprise ultimately was able to reach a settlement with the City of Chino that yielded another $1.15 million. As with the proceeds of the certificate of deposit, the Hitchmans distributed $1 million of those settlement proceeds to the owners and then quickly spent the Trust's 51% share of that distribution as well.

**2.    The Hitchmans Interfered with MPI's Management Contract.**

61. The Hitchmans were not content simply to loot Lamplighter Chino. Instead, they went out of their way to attack anything and everything associated with Tom Morgan. It is to this topic that we turn next.

62. MPI had (and still has) a contract with Lamplighter Chino for the provision of asset management services. Specific steps were required to terminate the contract, which annually renews absent timely notice of termination.

63. Promptly after gaining control over Lamplighter Chino's cash reserves, the Hitchmans attacked Tom (and MPI) once more. Without even bothering to look at the contract, much less take the

1  steps necessary to properly terminate it, the Hitchmans simply directed that all payments to MPI stop

2  immediately.  The end result is this:  MPI's contract has remained in place the entire time, but MPI was

3  deprived of its contractually-required compensation during the Hitchmans' reign—even though MPI

4  continued to protect Lamplighter Chino in a multitude of ways.

5          64.     The following passages from Mr. Hitchman's deposition reveal his cavalier attitude

6  towards Tom Morgan and any company Tom Morgan runs:

7      Q.    Okay.  Mr. Hitchman, you were aware that the Chino entities had until you took
              over been paying fees to Morgan Partners; correct?

8      A.    Yes.

9      ...

10     Q.    Do you know whether there was – what type of arrangement it was?  And let me
              give you some examples.  There may be others.  This is just a menu of
11            suggestions:  oral contract, written contract, custom and practice?  Do you know
              how fees were determined?

12     A.    No, I do not.

13     Q.    Did you make any effort to look for any written agreements with Morgan Partners
14            for their fees?

15     A.    No, I did not.

16     Q.    Safe to say that if you've never seen one, you've made no effort follow any steps
              any written agreement might have required to terminate a relationship with
17            Morgan Partners?

18     A.    No.

       Q.    We may have a double negative in there.  You'd agree with me it's safe to say
19            that you haven't made – taken any steps to terminate any written contracts that
              may exist?

20     A.    Correct.

21     ...

22     Q.    Once you took over Lamplighter Chino, you just simply said, "No more payments
              to Morgan Partners"; correct?
23
       A.    Basically.
24
       Q.    Did you ever serve any written notice on Mr. Morgan or Morgan Partners to
25            advise them of that decision?

26     A.    I don't recall a notice, no.

27         65.     The Hitchmans had no cause to harm MPI, which was providing critical services to the

28  Morgan family and Morgan family businesses at a bargain price.  The decision was made out of animus

---

43

**AMENDED PETITION**

1  towards Tom, pure and simple.  As bad as all this is, the Hitchmans' tortious interference with the

2  Morgan family's relationship with Bank of America is far, far worse.  We turn to this topic next.

3      **3.**  **The Hitchmans Disrupt the Morgan Family's Longstanding Relationship with Bank**

4         **of America.**

5      66.  As established above, upon being appointed as Interim Co-Trustees of the Beverly C.

6  Morgan Family Trust, the Hitchmans quickly aligned themselves with the beneficiaries litigating against

7  Tom, and began looking for the best assets to seize as a source of cash.  Through that process, the

8  Hitchmans became acutely aware that the Morgan family and Morgan family businesses had developed

9  a deep, valuable and longstanding relationship with Bank of America—a relationship that included

10  certificates of deposits and other savings accounts, checking accounts, business operating accounts,

11  secured loans on real property, and lines of credit that were key to providing the Morgan family with the

12  flexibility needed to meet obligations as they came due, and to expand the business as opportunities

13  arose.

14      67.  By way of example, in mid-2017, when the Hitchmans entered the picture, the following

15  lines of credit (LOC) and loans existed with Bank of America:

| Entity | Credit Type | Amount |
|---|---|---|
| Morgan Partners/Silver Oaks | LOC | $5 million |
| Island Gateway, LLC | Loan | $5 million |
| Las Palmas Holdings LP | LOC | $3.5 million |
| TEMCT | LOC | $2.75 million |
| Juanita Springs | LOC | $5 million |
| Chino Holdings LP | LOC | $6 million |
| Ontario Associates LP | LOC | $4 million |

24      68.  To marginalize Tom, and to enhance their control over the Morgan family's cash

25  reserves, the Hitchmans built a knowingly false story around Tom's and MPI's decision, in the first two

26  days of June, to move $450,000 from a Lamplighter Chino account at Bank of America into a new

27  Lamplighter Chino account at Wells Fargo Bank.  Here is what actually happened.

28

69.     As noted above, starting in April 2017, the Hitchmans began trying to take control of Lamplighter Chino assets at Bank of America.  Rather than go to court or approach Tom, however, they acted in secret, providing no inkling to Tom or MPI of their plan.  As Bruce Hitchman conceded:

Q.     Okay.  So, and you can have your reasons for being secret but it would be fair to say that you did not want to tip off Newport [Pacific, the day-to-day property manager] or Tom Morgan or Morgan Partners of the plan to take over these accounts until you were in a position to have control?

…

A.     Why would I share – why would I even discuss it with them before we're – before we're, you know, we're going to be in place?

Q.     Okay.

A.     It wouldn't make sense.

Q.     Let me come at it this way so we have a clear record.  Your best memory, as you sit here today, would be, for whatever your reasons were, you said nothing to Mr. Morgan, Morgan Partners, or Newport Pacific about this plan until you were in a position of control, fair?

A.     I think that's accurate.

Q.     Okay.  And, to your knowledge, no one else on your side of the table did either, correct?

A.     Correct.

70.     Ultimately, as a result of the Hitchmans' meddling with Bank of America, MPI and Newport Pacific (the property manager) lost the ability to access the Lamplighter Chino accounts online, even though MPI remained the lawful manager of that enterprise.  So, Tom/MPI worked with Newport Pacific to get funds deposited into an operational account so that Lamplighter Chino would have the ability to pay bills as they came due.  Specifically, because Newport Pacific did not have signature authority on the Lamplighter Chino account at Bank of America, Tom wrote checks totaling $450,000 and deposited them into an account for a separate Morgan family business (Covina Hills) to hold while Newport opened up a new Lamplighter Chino account at Wells Fargo.  Then, when the Wells Fargo account was opened, Tom secured a $450,000 cashier's check on the Covina Hills account and had it deposited into the new Lamplighter Chino account.  The process took less than 24 hours.  At all material times (i) Tom/MPI still was the lawful manager of Lamplighter Chino, (ii) Newport Pacific was involved every step of the way, and (iii) Lamplighter Chino was protected.

**AMENDED PETITION**

71.     The events described immediately above all took place on June 1-2, 2017.   The Hitchmans only became lawful managers of Lamplighter Chino **after** those events, no earlier than the evening of June 2 (and, doubtless, even later).   Late in the evening on June 2 (after 10 p.m.), the Hitchmans notified Tom's counsel that they had taken over, by which time the $450,000 in question already was sitting safely in a Lamplighter Chino account at Wells Fargo.

72.     ***Ten days after that***, Bruce Hitchman, with the concurrence of his wife and co-manager (respondent Lee Ann Hitchman), filed an affidavit with Bank of America to freeze funds in the Covina Hills account that had been used to transfer Lamplighter Chino's $450,000 from its account at Bank of America to its account at Wells Fargo.   To justify that extraordinary step, the Hitchmans claimed that Tom had stolen the $450,000, and they had no assurance it would ever get back to Lamplighter Chino. Of course, as the Hitchmans knew, the entire $450,000 had been sitting in the Lamplighter Chino Wells Fargo account since June 2, 2017.   The story was simply a lie, concocted so the Hitchmans could attack Tom and cement their hold on Lamplighter Chino.

73.     But, the lie had disastrous consequences for the Morgan family and their businesses.   In short order, the decades-old Morgan family relationship with Bank of America was referred to special handling; the debt was called; Bank of America collapsed certificates of deposit in which it had a security interest to retire some of the debt; and inter-company loans had to be taken out to retire the remainder.   All the Morgan family businesses were able to survive, but the consequences will be felt for years because cash reserves earmarked for expansion to increase Morgan family wealth instead were drawn to eliminate debt that, but for the Hitchmans' interference, could have been retired over a lengthy period of time (while the reserves were used instead to grow the family businesses).

74.     As a result, various Morgan family companies lost expansion opportunities and the profits they promised to bring, and/or incurred costs retiring the debt.   And, Tom Morgan's reputation with Bank of America was sullied.

75.     Did the Hitchmans even care?   Doubtless the reader already has intuited the answer ("no").   Still, to confirm the point, here is Bruce Hitchman:

> Q.     Okay.   So, you knew that Bank of America was a significant financial institution not just for Lamplighter Chino, but for a host of businesses with which Mr. Morgan was involved, correct?

**AMENDED PETITION**

A.    I knew that there were a number of businesses, yes.

Q.    Before you accused Tom Morgan of misappropriating money in this affidavit you filed with Bank of America, did you ever stop to think about the impact such an accusation might have on his business relationship with that financial institution?

A.    No.

Q.    Did you ever stop to consider the impact this affidavit we've marked as Exhibit 25 could have on any relationship that any of the other Morgan family businesses might have with Bank of America?

…

A.    No.

Q.    Okay.  And, did you care one way or the other whether or not statements like this would have an adverse impact on my client?

A.    When it's – when it's an action that we find that it's – that it's not proper, we don't – we don't stop think, oh, might it – might it damage somebody in other ways.  If it's inappropriate, it's inappropriate.

Q.    Well, we can – it will be for a finder of fact to conclude what's inappropriate or not.  My question is did you care whether or not it would have an adverse impact on Mr. Morgan's business reputation?

A.    It didn't enter into the decision.

76.    Make no mistake about it.  Tom and MPI had acted appropriately, and did so at a time when MPI was still the lawful Manager of Lamplighter Chino.  Yet, blinded by their lust for money and animus towards Tom, the Hitchmans chose to attack Tom Morgan (and his companies) with a knowing lie, even though they knew the Morgan family had extensive business relationships with Bank of America.  The Hitchmans didn't given the slightest thought to the impact their false attacks might have.  All they cared about was grabbing money to line their own pockets.

**4.    The Hitchmans Trigger an Event of Default on a $14 Million Loan.**

77.    To provide another example, the Chino property is financed through a $14 million loan from PNC Bank, which in turn is backed by a personal guaranty from Tom.  PNC recognized all too well the value Tom always has brought to this project; the loan documents designated Tom as a "Key Principal" and were anchored on the notion that Tom would remain in charge.  As they now admit, the Hitchmans never bothered to read the loan documents before taking over the project and ousting Tom; thereafter, whether out of hubris or animus towards Tom, they summarily dismissed multiple entreaties by Tom that they prepare for the inevitable problems with PNC that were sure to follow given the terms of the loan documents.  Upon learning what the Hitchmans had done, PNC wrote to advise the

47

**AMENDED PETITION**

1  Hitchmans that "such a Transfer made without Lender approval triggers a default under the Loan and
2  also triggers full recourse liability on the part of the borrower under the Loan."  (See **Exhibit 19**.)
3  Despite being so advised, the Hitchmans did not reach out to Tom to try to assuage his legitimate
4  concerns; further, they refused a reasonable request by Tom to work in concert to avoid adverse actions
5  by PNC.  Indeed, the Hitchmans blithely denied that any event of default had been declared.

6        78.    Thereafter, counsel for the lender wrote to confirm that the Hitchmans' misguided
7  actions had, in fact, triggered a default under the loan documents that imperiled both this valuable
8  project and Tom's guaranty.  (See **Exhibit 20**.)  As the letter made clear, the Hitchmans' actions have
9  "trigger[ed] an Event of Default under the Loan Agreement and also trigger[ed] full recourse liability on
10 the part of the Borrower under the Loan Agreement and Tom Morgan under the Guaranty."  (*Id.*)  The
11 letter also went on to suggest that, unless Tom remained in place as guarantor of a loan to an entity
12 actively being run into the ground by the incompetent Hitchmans, the lender would exercise its default
13 remedies.  (*Ibid.*)

14       79.    For his part, Tom proposed a sensible solution to moot this looming crisis—namely,
15 restoring MPI as manager.  To address any pretextual objections the Hitchmans might have to placing
16 Tom back in control of that enterprise, Tom even offered to stipulate to restrictions on his ability to
17 disburse funds.  But, unwilling to relinquish their cash cow, the Hitchmans refused the offer, without
18 explanation.

19       80.    Adding insult to injury, the Hitchmans hired additional lawyers to deal with PNC and the
20 problems the Hitchmans had created through their covert takeover of Lamplighter Chino.  And, at least
21 one of the lawyers slandered Tom to PNC Bank, suggesting — falsely — that this Court suspended Tom
22 and put the Hitchmans in charge because Tom supposedly was wasting Lamplighter Chino assets.  Of
23 course, this was entirely false, and the Hitchmans knew it.  Indeed, the only ones wasting Lamplighter
24 Chino assets were the Hitchmans and their lawyers.

25       81.    Ultimately, as part of a settlement between the Trust's beneficiaries, Tom and Nancy
26 brought an end to this particular abuse by signing an Action by Written Consent that removed the
27 Hitchmans as Co-Managers, and reinstated Morgan Partners.  Although the beneficiaries' settlement
28 should have ended the matter, the Hitchmans still refused to relinquish their hold on Lamplighter Chino,

and forced the beneficiaries to obtain a Court order compelling their removal from that separate post. We discuss those events in Section H, *infra*.

82.   Tom's first order of business, upon entry of the Court order approving his settlement with Nancy, was to contact the Lender, provide it with a copy of the Court's June 21 Order approving the settlement, and thereby cure the default triggered by the Hitchmans in 2017.  The lender responded with the following statement (and a $9,000 invoice for the legal services it had incurred dealing with the Hitchmans' wrongful conduct):

> We are happy to hear that the litigation/change of ownership that resulted in a non-monetary default has concluded favorably.  PNC incurred legal costs in monitoring the legal action.  Attached is our letter requiring reimbursement of the legal fees/costs and the invoice from our counsel, Ballard Spar.

The letter advised: "So long as there was no grant deed recorded transferring title of Lamplighter Chino MHC and the ownership structure of our Borrower is unchanged, the transfer fee of 1% of the loan balance is waived and will not be charged."  (See **Exhibit 21**.)  Translation:  Apart from (i) the $9,000 bill tendered by PNC, (ii) any Lamplighter Chino assets the Hitchmans wasted trying to secure lender approval of their misguided takeover, and (iii) fees the Lamplighter Chino owners were forced to incur cleaning up the Hitchmans' mess, further damage from the Hitchmans' improvident actions has been mitigated.  Doubtless, the Hitchmans will trumpet Tom's mitigation of the potentially-disastrous damages from their misconduct as somehow impeaching the seriousness of this Hitchman transgression. Candidly, Tom welcomes such a hubristic defense, as it will provide one more building block in the wall of growing evidence confirming that the Hitchmans must be stopped before they can harm another family again.

### 5.   The Hitchmans Cause Lamplighter Chino to Breach a Third-Party Contract.

83.   Had Tom and his representatives not acted to mitigate damages, there would be even more claims arising from the Hitchmans' mismanagement of the Chino property—or, to be more precise (since everything Chino-related seems to have been directed by the lawyers), the mismanagement of their lawyer agents.  By way of example (and not limitation), in addition to interfering with Lamplighter Chino's management contract with Morgan Partners (Tom's company), the Hitchmans deliberately caused Lamplighter Chino to breach a contract calling for the installation of ground-set mobile homes at

**AMENDED PETITION**

the park—an action that, in and of itself, would have triggered litigation but for Tom stepping in and making spaces available for installation of the homes at a separate mobile home park he manages.

**6.     The Hitchmans Ignore a Valuable "Takings" Lawsuit Against the City of Chino, Which Would Have Been Lost but For the Actions of the Attorney They Tried to Fire.**

84.     By way of further example, at the time of the hostile takeover, Lamplighter Chino was pursuing a valuable "takings" lawsuit against the City of Chino.   Although (i) the lawsuit was meritorious and poised to add significant value, and (ii) the Hitchmans had been advised about the lawsuit, the Hitchmans inexplicably directed counsel handling the litigation (Mr. Pech) to immediately cease working on the action, but then failed to pay an iota of attention to the matter for more than half a year or to hire a new lawyer to step in, take over, and pursue the lawsuit to a successful conclusion. (See **Exhibit 22**.)   It was only because the terminated counsel denied the Hitchmans' reckless instructions and continued to protect the valuable claims being asserted that the lawsuit wasn't lost long before the Hitchmans could be bothered to start acting.   Ultimately, thanks to the efforts of terminated counsel (including obtaining a favorable ruling defeating the City's summary judgment motion), the case settled on terms so favorable—a seven figure payment and approval of a tract map—that even Nancy approved of them.   But, all of this would have been lost but for the protective actions of Tom and the counsel he had hired to represent Chino.[22]

85.     Adding insult to injury, the Hitchmans refused to pay the lawyer who had been protecting Lamplighter Chino, thereby putting Lamplighter Chino on the precipice of still more litigation.[23]   Upon

---

[22] The Hitchmans' only excuse for this was another lie.   Specifically, the Hitchmans claimed they were unaware of the lawsuit being handled by Pech until December 28, 2017, when they received a letter from Mr. Pech.   In truth, Pech had disclosed the existence of the lawsuit to the Hitchmans' counsel on June 28, 2017, in open court.   The Reporter's Transcript of those proceedings proves this to a moral certainty.   It is unclear whether the Hitchmans ever bothered to read the transcript or whether their counsel ever advised them of the lawsuit.   Sadly, just as they never could be bothered to visit Lamplighter Chino, the Hitchmans never could be bothered to attend a single court hearing, and seem to have relied entirely on their counsel to run things.   ***The extent to which the Hitchmans actually relied on their counsel, and whether their counsel share responsibility for this travesty, will be the subject of discovery.   Unlike the Hitchmans, Tom investigates to learn facts before making accusations.***

[23] Ironically, as an excuse for putting the lawyer off on his demand for payment of fees, the Hitchmans actually took the position that they were mere interim trustees, and important decisions should be made by the permanent trustee after all the litigation between Thomas and Nancy had been resolved.   (See

---

50

**AMENDED PETITION**

1 learning that the Hitchmans were stiffing the lawyer, Tom forcefully communicated that, having taken

2 over management, the Hitchmans must review his invoices and have Lamplighter Chino pay his

3 reasonable fees and costs—and, should do so before Mr. Pech initiated litigation.  Ultimately, the

4 Hitchmans paid almost the entire amount claimed, but only after forcing Mr. Pech to sue and the

5 Hitchmans to hire a lawyer to defend the suit they could have avoided by acting promptly.  Whatever

6 was spent to pay lawyers before capitulating will be yet another damage laid at the feet of the

7 Hitchmans.

8 **H.     The Beneficiaries Settle Without Giving the Hitchmans a Release, So the Hitchmans And**

9 **Their Counsel Begin Making Wild Threats in Hopes of Coercing One.**

10      86.     On April 8, 2019, all Trust beneficiaries and the Hitchmans attended a mediation in

11 downtown Los Angeles before the Hon. Roy Paul (Ret.).  After marathon negotiations spanning 21

12 hours, the Beneficiaries reached a settlement that went far beyond the claims and issues raised in all the

13 petitions then pending before the probate court, and that greatly mitigated the potential damages flowing

14 from the Hitchmans' misconduct.  Pursuant to the settlement:  (i) Tom and Nancy, representing a

15 majority of the owners of Lamplighter Chino, signed a written consent to remove the Hitchmans and

16 reinstate Morgan Partners as Manager, thereby curing the event of default triggered when the Hitchmans

17 displaced Morgan Partners without the lender's advance consent; (ii) all Beneficiaries agreed on a plan

18 of disposition for all Trust assets and to support a Court order reinstating Tom as trustee of the Trust;

19 (iii) the beneficiaries agreed that all the misguided litigation the Hitchmans had launched against Tom

20 could and should be dismissed; and (iv) the beneficiaries agreed on terms to resolve the much broader

21 business disputes between them over Morgan family businesses, including many businesses in which the

22 Trust has no interest at all.  Truly, the only thing the settlement did not do was give the Hitchmans what

23 they coveted and were expecting to get – a release for nothing.

24      87.     Although the beneficiaries did not agree to give the Hitchmans a blanket release, they did

25 express their desire to settle with the Hitchmans as well, and made it an express term of their settlement

26 that litigation of the claims still pending against the Hitchmans would be stayed pending a further

27 ───────────────────────

28 Exhibit 23.)  If only they had followed that guiding principle the rest of the time, this Petition could
have been avoided.

**AMENDED PETITION**

*ACTIVE 43771546v3*

mediation.  This was not enough for the Hitchmans, who apparently have made it a staple of their professional fiduciary practice to waste so much money that most families feel compelled simply to give them a release to relinquish their fiduciary posts, solely to stop the bleeding.

88.     Within hours of learning of the existence of the settlement, and before the Hitchmans and their lawyers even knew what the terms of the settlement were, Hitchman attorney Chris Carico—whose firm had billed, and been paid, almost $1 million during the Hitchmans' reign—quickly wrote Tom's counsel to threaten that the Hitchmans would file an incendiary pleading accusing Tom of tax fraud if the settlement were not restructured to provide the Hitchmans with a blanket release for nothing:

> The confidential settlement agreement by definition raises a whole number of public policy concerns…[which] include, among others, *the underreporting of assets to the IRS, the IRS equitable recoupment claim against the refund*, the inventorying and probating of assets held in decedent's name, the violation of CCP Section 2017.310 and the Hitchmans' right under *Kasperbauer v. Fairfield* to withhold an adequate reserve.  [¶] Sadly, by deliberately excluding the Hitchmans from settlement discussions and in turn the possibility for a complete resolution of the matter, your client has given the Hitchman[s] no real choice other than to object to those portions of the settlement that would return management and control to Tom, who the Court suspended, without addressing the important policy concerns and laws instrumental to properly completing the estate administration....*[T]he Hitchmans are providing you with an advance copy of their petition in the event you want to attempt to have meaningful discussions with me this evening....Barring a last minute settlement this evening with the Hitchmans that addresses their concerns as set forth in the attached petition, the Hitchmans will have to file the petition tomorrow morning.*[24]

(**Exhibit 24**, emphasis added.)

89.     Tom refused to bend to the coercion so, on April 10, the Hitchmans filed their petition in advance of a Court hearing before Judge Hubbard, thereby carrying through on their threat.  (See **Exhibit 25**.)  In turn, Tom and the other beneficiaries shared a copy of their confidential settlement agreement with the Court and with the Hitchmans, and Judge Hubbard set a status conference for April 15, at 1:45 p.m., to take up the settlement.

---

[24] The Petition was hyperbolic.  It falsely accused Tom of settling to block inquiry into alleged elder abuse, supposedly buying the silence of the other Beneficiaries, and supposedly trying to "avoid[] the accurate disclosure of reportable events to the taxing authorities."  Based on those false accusations, the Petition asked the Court to (i) affirm the Hitchmans' status as trustees and their status as Manager of Lamplighter Chino (notwithstanding that such relief imperiled one of the Trust's most valuable assets), and (ii) allow the Hitchmans to continue wasting Trust assets on discovery in furtherance of litigation all Beneficiaries wanted to end.

90.     Meanwhile, counsel for Tom and the Hitchmans scheduled a conference call for Saturday, April 13, to discuss things such as the Hitchmans' unfounded concern that the settlement was designed to deprive them of the opportunity to obtain a *Kasperbauer* reserve.  Sadly, the call was as short as it was unproductive, because Hitchman counsel Chris Carico doubled down again, with even more incendiary threats.  Specifically, Mr. Carico jumped in by (i) stating, in ominous tones, "you know, we have the Avalara production," and (ii) then proceeding to accuse Tom of "tax fraud" by supposedly failing to report as assets of Beverly Morgan's estate various tranches of stock in Avalara. Mr. Carico essentially ended the conversation by stating that it was incumbent upon the Beneficiaries to come up with a settlement proposal satisfactory to the Hitchmans or they would object to the settlement and report to the IRS that, in their view, Tom had committed tax fraud.[25]   Translation?   "Give us a release or we will drop more bombs and blow up your settlement."

91.     The very next day, the Hitchmans doubled down again, filing a "Status Report"—in truth, a petition labeled as a Status Report—publishing their false stories, and seeking all sorts of sweeping relief without allowing Tom or anyone else due process.  (See **Exhibit 26**.)  Tom will not even dignify that filing with a summary of its contents.  Suffice it to say, the implicit message in the "Status Report" was the same message the Hitchmans had been trumpeting all along: "Give us a release, or we will do our best to harm you."

92.     All these smear tactics failed to gain traction with Judge Hubbard, who, on April 15, 2019: (i) stayed all pending litigation; and (ii) set a briefing schedule for the beneficiaries to bring a petition seeking approval of their settlement.

93.     Although Tom had been falsely attacked again, he responded with commendable restraint.  On May 2, 2019, Tom's counsel wrote the tax lawyer retained by the Hitchmans to lay out the true facts regarding Avalara.  (See **Exhibit 27**.)  And, on May 7, 2019, Tom's counsel provided Mr. Carico the underlying documents confirming those facts.  (See **Exhibit 28**.)   Through these two communications, Tom effectively painted the Hitchmans into a corner, and left them with two choices: (i) double down once more, continue to object to the settlement based on the manufactured claims of

---

[25] In truth, the Avalara stock all was properly accounted for, and there was no tax fraud – only a clumsy Hitchman threat based on a manufactured story.

supposed "tax fraud" regarding the Avalara stock and then watch as Tom, on reply, came forward with the true facts to expose the Hitchmans for the dissemblers they are; or (ii) move to the final stage of grief (acceptance), realize that the jig was up, and beat a hasty retreat from the false attacks they had published to this Court.

94. On May 13, 2019, the Hitchmans filed a response to the beneficiaries' Joint Petition for approval of their settlement that (i) threw in the towel on their main pretext for opposing the settlement (the contrived claim of "tax fraud"),[26] (ii) effectively withdrew objections to the settlement, and (iii) retreated to a series of overreaching suggestions as to how the Court should protect them against the claims they feared would be asserted (e.g., by allowing the Hitchmans to sell a condo bequeathed to Tom, or by requiring Tom to put $1 million in to the Trust, to establish a *Kasperbauer* reserve, and/or by appointing a trustee ad litem to control litigation against them, rather than leaving litigation decisions to Tom as the reinstated trustee).  (See **Exhibit 29**.)

95. On May 29, 2019, the parties participated in a further mediation—this time before the Hon. Reva Goetz (Ret.)—in hopes of settling claims arising from Hitchman misconduct.  Well in advance of the mediation, Tom provided the Hitchmans with a detailed letter laying out the potential claims over which settlement negotiations should focus; as a gesture of good faith, that letter also identified significant damages that would be recoverable in litigation, but that Tom wouldn't ask a cent for in mediation.  The mediation failed and, if the Court wishes to know why, Tom (i) is happy to waive the mediation privilege and have the Court inquire directly from Judge Goetz, and (ii) invites the Hitchmans to waive the privilege as well.

96. Although we cannot disclose what transpired at the mediation, we can say this.  In the absence of a settlement, the Hitchmans refused to give on anything.  For example, the Hitchmans refused to accept the validity of the resolution reinstating Morgan Partners as Manager of Lamplighter Chino—thereby keeping alive the event of default they had created, with all the risks that default posed

---

[26] As noted above, rather than simply admit they had gone off half-cocked and made threats out of desperation, the Hitchmans retreated under cover of another false story—that they supposedly were advised by tax counsel that they need not made disclosures because the IRS had blown it by failing to question the original return submitted by Tom.  This was, of course, another Hitchman lie.  (See note 9, *supra*.)

for Tom, Nancy and the enterprise.  And, they refused to take any further actions to help soon-to-be trustee Tom mitigate damages in other ways, holding everything in abeyance until the Court ruled.

97.    Despite the Hitchmans' ongoing breaches of their fiduciary duties, Tom continued to act with restraint.  On June 3, 2019, Tom wrote to propose that the parties enter into a tolling agreement to provide breathing space for further dialogue and exchange of information, and to ensure that the parties could focus on important damage-mitigating matters such as (i) mooting the event of default hanging over the head of Lamplighter Chino and its owners, and (ii) resolving any outstanding issues with the IRS.  Although they soon would go back to attacking Tom, the Hitchmans agreed to do something reasonable in this one instance and signed the tolling agreement; a true and correct copy of the executed tolling agreement is attached hereto as **Exhibit 30** and incorporated by this reference.

**I.    After More Hitchman Fighting—And an Eleventh-Hour Surprise—The Court Approves the Beneficiaries' Settlement.  Although This Mitigates Damages, The Hitchmans Still Refuse to Accept Any Responsibility for The Remaining Damage Resulting from Their Misconduct.**

98.    Meanwhile, on April 29, 2019, the beneficiaries brought a petition for approval of their settlement.  The Hitchmans responded on May 13, 2019, and Tom replied on May 20, 2019.   The petition then came on for hearing on June 17, 2019, before Judge Hubbard.  It was here that Tom learned how the Hitchmans and their lawyers had been breaching their duties of candor to line their own pockets.

99.    The hearing began with Judge Hubbard disclosing it had just come to her attention that her significant other (an Orange County attorney) had been retained by, and was working for, the Hitchmans on a number of matters.  To be clear, it was apparent to all that Judge Hubbard had just learned of this, and had acted promptly and properly in making the disclosure.  Sadly, the same cannot be said of the Hitchmans.  On the heels of Judge Hubbard making her commendable disclosure, Hitchman counsel John Glowacki jumped in and effectively admitted the Hitchmans had known of the conflict for a very long time, and yet had said nothing.

100.    After allowing the parties time to confer with counsel, Judge Hubbard recused herself, and the pending matters were transferred that same day to the Hon. Jacki C. Brown in Dept. C06.  After

entertaining lengthy argument—all over various issues the Hitchmans had raised in hopes of protecting themselves once the settlement was approved—Judge Brown approved the Beneficiaries' settlement in full, with protections for the Hitchmans that the Beneficiaries had been proposing from the outset. The Court then directed Tom's counsel to prepare an order accurately memorializing her rulings and advised that, if all parties approved the form of the order, she would sign it forthwith. As a precaution, the Court also set a further hearing for June 21, 2019 to resolve any objections to the form of the order should the parties not be able to agree.

101. No powers of omniscience are required to divine what happened next. All beneficiaries quickly agreed on the form of a proposed order for entry by the Court, which did precisely what the Court had requested and ordered; the Hitchmans in turn proposed changes that, if accepted, would have directly contravened what the Court had just ordered. Rather than dig in their heels, with Tom's counsel taking the lead, the beneficiaries quickly agreed on a revised proposed order that provided even more protections for the Hitchmans, but the Hitchmans objected again. So, the June 21, 2019, hearing went forward as scheduled.

102. The hearing is reported and, for that reason, will not be described at length here. Suffice it to say, the Court overruled the Hitchmans' objections and, with minor edits, ended up entering the beneficiaries' proposed order. A true and correct copy of that order is attached hereto as **Exhibit 31**.[27]

103. As he had assured the Court he would do, Tom quickly set about trying to mitigate still-more potential damages. He promptly notified PNC Bank that MPI was back in charge of Lamplighter Chino, thereby curing the Hitchmans' longstanding event of default.

104. He worked with tax counsel to provide the IRS with all information necessary to complete and successfully resolve the supplemental 706.

---

[27] Hitchman attempts to rewrite Court orders did not end after this. After an August 26, 2019, Case Review Hearing (i) the Court made further orders and directed Tom's counsel to prepare a proposed order to run by Hitchmans' counsel, and (ii) history repeated itself once more, with the Hitchmans' counsel wrongly attempting to water down the accurate order prepared by Tom's counsel, and the Court once again resolving the dispute by signing Tom's proposed order. Perhaps hoping to cut off further Hitchman re-writes going forward, the Court prepared its own order after the next hearing, on October 25, 2019. But, true to form, the Hitchmans tried to re-write that order, too—by proposing that Tom agree to changes that would have misrepresented the Court's ruling and, perhaps, limited Tom's ability to bring claims belonging to the Trust.

**AMENDED PETITION**

105.   Finally, in hopes of never having to litigate against the Hitchmans for failing to sue Mr. Pech, Tom, as trustee, even sued Mr. Pech to recover any fees that should not have been paid out of Trust funds.   Mr. Pech, predictably, has asserted a statute of limitations defense, claiming that the Hitchmans let the claim against him lapse while under their watch.   It remains to be seen whether Pech's defense will succeed or fail—although it has gained considerable traction so far.   What is certain now is that: (i) the Hitchmans gave Pech the opportunity to assert it; and (ii) no matter what happens, the Trust will incur fees dealing with a defense Pech never should have had the opportunity to assert if the Hitchmans had asserted the claim sooner.

106.   After all these things had been accomplished, Tom turned back to the Hitchmans and attempted to resolve any outstanding claims against them consensually.   Tom proposed yet another mediation, provided that the Hitchmans disclose information concerning their insurance coverage and show up at the mediation with insurance representatives in tow.   Although Tom already had walked the Hitchmans through the claims to be mediated—and even listed them in the parties' tolling agreement[28]—the Hitchmans attempting to delay things by objecting to providing insurance information and professing a lack of knowledge as to what the nature of the claims against them might be.   So, on August 26, 2019, this Court ordered Tom to lodge a draft complaint in advance of the next Case Review Conference to provide the information the Hitchmans claimed to need.   So, Tom prepared and lodged that pleading, along with a companion draft civil complaint identifying the additional claims to be resolved outside of probate court.

107.   Although the Court (by ordering the filing of a draft complaint) and Tom (by complying with the order) had taken away the Hitchmans' false excuse for delaying mediation (that they supposedly didn't know what the claims were), at the next Court-ordered hearing, the Hitchmans simply came up with a new excuse for avoiding mediation.   Now, the Hitchmans claimed, they and their insurers could not be expected put money on the table unless the Hitchmans were allowed to first test Tom's claims through discovery—i.e., unless they were allowed to litigate.   With the Hitchmans having made clear that mediation would be a waste of time, the Court, on October 25, 2019, declined to extend

---

[28] The only claim not specifically listed in that letter is the Third Claim for Relief, which is based on facts the Hitchmans did not disclose until after the tolling agreement had been entered into.

1 its existing stay on litigation and made clear that its prior stay would expire on November 18, 2019.  The

2 Court further ordered the filing of this Amended Petition by November 22, 2019.

3     108.    Doubtless, the Hitchmans will once again start crying as to how this Amended Petition

4 (and the civil complaint) somehow prove that Tom is bent on exacting vengeance.  But, here is the

5 unvarnished truth: in "Hitchman world," vengeance doesn't mean "pursuing questionable claims" or

6 "litigating to excess"—which is what the Hitchmans did against Tom.  Instead, it means "refusing to

7 abandon strong claims that have caused extreme damage and refusing to give a release for nothing, even

8 though the Hitchmans should have professional liability insurance, and have a \$12 million bond to

9 boot." Tom is more than willing to compromise each of these strong claims.  He simply is unwilling to

10 do what the Hitchmans want – give them up for nothing so the Hitchmans can avoid the ignominy of

11 being justly surcharged or otherwise held liable for at least some of the damages they have caused,

12 particularly when ample insurance coverage exists to satisfy the claims.

13     109.    A few words about the content.  Under California law—and, more importantly, the law

14 of this case—the Hitchmans were obligated to turn over all their files to the successor trustee promptly

15 after they were relieved of their duties on June 21, 2019.  They failed and deliberately refused to do so,

16 forcing Tom to obtain a Court order entered on October 25, 2019, and calling for the Hitchmans, by

17 November 22, 2019, to turn over more than 20 categories of documents (identified on Exhibit C to

18 Tom's Second Status Report, filed September 25, 2019).   Had the Hitchmans turned over these

19 documents when they should have (in June), Tom and his counsel would have had ample time to review

20 them all and incorporate any material facts found, in this Amended Petition.  Because the Hitchmans

21 obstructed instead, Tom has been prevented from pleading the full facts here.  So, while Tom has done

22 his best to plead the facts as he understands them—and to avoid overstating anything—it may well be

23 that, as Tom works his way through the files finally produced (i) additional material facts may be

24 uncovered revealing that the Hitchmans' conduct is even worse than believed; and/or (ii) additional facts

25 may emerge that may be slightly different from the facts pled here.  Should material facts emerge, Tom

26 will file a Supplement to this Amended Petition to note them.

27

28

**AMENDED PETITION**

*ACTIVE 43771546v3*

110.   With that, we set forth below the claims properly brought by Tom as trustee, followed by claims personal to Tom in his capacity as a beneficiary of the Trust.   (As noted above, civil claims relating to actions by the Hitchmans in a non-trustee capacity will be brought elsewhere.)

## FIRST CLAIM FOR RELIEF

**(By the Trustee Against the Hitchmans For Damage to the Trust Resulting from the Hitchmans' Breaches of Fiduciary Duties)**

111.   The Trustee realleges by this reference paragraphs 1-110 above, as though set forth in full herein.

112.   It is the Hitchmans' burden to prove the reasonableness of their expenditures, not Tom's burden to prove unreasonableness.   Still, it is beyond question that, from the beginning of their reign to the end, the Hitchmans have wasted Trust assets on attorneys' fees, litigation expert fees and excessive trustee fees for services that have been of no value to the Trust, such that they are subject to surcharge for any amounts the Court determines to have been excessive or improper, which the Trustee reasonably believes to exceed $1 million.

113.   This First Claim for Relief is a claim for fees spent by the Hitchmans in breach of their basic fiduciary duties prior to the beneficiaries having reached their settlement on April 9, 2019.   There are a number of different theories that exist for the Trustee to seek redress for this waste.   For example:

(a) **Probate Code 12002.**   Under Probate Code section 12002, the Hitchmans were obligated to preserve income tied to specifically devised assets for the benefit of the specific devisees (such as income distributions from Lamplighter Chino), rather than spend them on general administrative expenses.   And, even if the Hitchmans believed that some form of abatement was required to cover expenses, the Probate Code would have obligated them to abate first from the Trust's cash gift to Nancy, rather than from specific bequests like the specific bequest of the Chino interests.   Thus, because most of the monies spent by the Hitchmans consisted of distributions from Lamplighter Chino (a specifically-devised asset) one theory available would be to sue the Hitchmans for a breach of their duties under Probate Code section 12002, as described above.   This theory would be specific to the recipient of the

59
**AMENDED PETITION**

Trust's interests in Lamplighter Chino which, as described in the margin, remains in a state of flux.[29]

(b) **General Attacks on Hourly Rates and Reasonableness of Time Spent.**  More generally, Tom could challenge the hourly rates used or the reasonableness of the time spent by the Hitchmans and their lawyers litigating against Tom, in conjunction with a review of the Hitchmans' accountings.[30]

(c) **Breach of Fiduciary Duties to Avoid Taking Sides, To Conduct a Cost-Benefit Analysis of Claims, and To Obtain Court Approval Before Litigating.**  More simply, as established in paragraphs 41-47 and 51-53 above, the Hitchmans owed duties (i) of impartiality to all the beneficiaries (including Tom), (ii) to refrain from litigation without first seeking and obtaining advance Court approval, and (iii) to perform a cost-benefit analysis before pressing any claim, and it is undisputed that the Hitchmans did none of these

---

[29]  Specifically, under the 2013 Trust in effect when Beverly Morgan died, the Trust's interests in Lamplighter Chino were to be bequeathed to Tom.  For business reasons not relevant to the Hitchmans and having nothing to do with the claims previously asserted by Nancy or the Hitchmans, the beneficiaries' April 9, 2019, settlement contemplated those assets being transferred out of the Trust to Nancy (with Tom receiving additional consideration in return).  But, also for business reasons not relevant to the Hitchmans and having nothing to do with the claims previously asserted in the litigation, the beneficiaries may find it necessary to revert back to the original 2013 Trust insofar as the Trust's interests in Lamplighter Chino are concerned.

This creates a quandary.  Although the section 12002 claim is strong and meritorious because, as the Trustee reads the law, recovery from the Hitchmans of fees spent prior to the Beneficiaries' settlement *on a theory that the Hitchmans' actions violated Probate Code section 12002*, would be recovery of Lamplighter Chino distributions that should have been held for the devisee of those interests (formerly Tom, now, Nancy, but possibly Tom once more).  Because that beneficiary is in a state of flux and Nancy indicated she did not want to pursue the claim if she is the ultimately recipient, Tom already has sought and obtained instructions from the Court that he could incur no liability to Nancy for failure to pursue such a claim.  Because Tom is not the present recipient of the Trust's Lamplighter Chino interests, he does not pursue a Probate Code section 12002 theory now, although he reserves the right to do so should he ultimately receive the Trust's Lamplighter Chino interests directly.  The theory is noted now to put the Hitchmans on notice, and so that an amendment is not required for this purpose should the theory become relevant.

[30]  Doubtless, the Hitchmans' lawyers would love this, as it would give them a pretext for racking up fees fighting over the wisdom of every claim and every hour spent—and, perhaps, to support a request for an excessive *Kasperbauer* reserve.  For this reason, Tom will not initiate the trust equivalent of the Great Land War in China over general reasonableness of fees, either here or in his objections to the Hitchmans' accountings.

**AMENDED PETITION**

things.  As a consequence, literally every penny they spent on offensive litigation against Tom is a damage resulting from a breach of their duties.

114.  As noted in the margin, the Probate Code 12002 damage theory is noted for notice purposes, but will not be actively pursued unless the Trust's interests ultimately are bequeathed to Tom. Further, specific reasonableness objections can be evaluated in the context of the Court's review of the Hitchmans' accountings and Tom's objections thereto.  So, this claim is limited for now to the third theory identified above.  The theory is straightforward and bottomed on the notion that all fees spent in breach of these basic fiduciary duties are unreasonable as a matter of law.

115.  The Hitchmans breached the duties pled in paragraphs 42-46, 52-54 and 114(c) above.

116.  Informed consent by all beneficiaries was not given to any of the Hitchmans' wrongful conduct.

117.  The Trust has been harmed, and the Hitchmans' breaches of fiduciary duty were a substantial factor in causing that harm, in an amount to be proven at trial but well in excess of the jurisdictional minimum of this Court.  Specifically, fees spent by the Hitchmans in activities that breached their fiduciary duties were per se improper, and are recoverable here.

118.  Finally, apart from a potential refund from the IRS, the Beneficiaries' April 9, 2019 settlement confirms that Tom will be entitled to any Trust residue himself.  Thus, any Trust assets the Hitchmans wasted after learning of the settlement is a waste of assets that otherwise would have gone to Tom.  For this reason, that waste has been broken out separately and pled as part of the Fourth Claim for Relief.

**SECOND CLAIM FOR RELIEF**

**(By the Trustee Against the Hitchmans for Their Gross Negligence in Failing to**

**Assert the Pech Claim)**

119.  The Trustee realleges by this reference paragraphs 1-110 above, as though set forth in full herein.

120.  Claims dealing with the payment of personal fees to Mr. Pech are the only claims the Hitchmans actually were given license to pursue.  Instead, of pursuing recovery from Mr. Pech on a claim that, frankly, was a slam dunk, the Hitchmans chose to chase Tom alone, even though (i) the

1    standards imposed by the Trust to surcharge Tom imposed insurmountable obstacles to the successful

2    pursuit of any such claim against Tom, and (ii) our California Supreme Court has made clear, long ago,

3    that the prudent course of action for successor trustees in the Hitchmans' shoes is to assert malpractice

4    claims against the wayward professionals relied upon by the predecessor trustee, rather than sue the

5    predecessor trustee who relied upon the professionals in good faith.  Due to the Hitchmans' delay, they

6    now have handed Mr. Pech a potential statute of limitations defense to what otherwise would have been

7    a slam dunk claim for the Trust.

8    121.    The Hitchmans were grossly negligent in doing this.  The Trustee is doing all he can to

9    mitigate the potential damage, by asserting the claim the Hitchmans already should have asserted.  But,

10   as alleged above, Mr. Pech already has asserted a statute of limitations defense and, so far, that defense

11   has been successful (with a demurrer having been sustained already).  If Mr. Pech's statute of limitations

12   defense succeeds, the Trust will have been damaged significantly.  Specifically, based on pleadings the

13   Hitchmans have filed with this Court, the claim the Hitchmans will have let lapse was worth at least $1

14   million. If Pech's defense fails, then the damage will have been mitigated (although any costs of having

15   to deal with a statute of limitations defense still properly are laid at the Hitchmans' feet).  Either way,

16   the Trust already has sustained real damage.

17   122.    The Hitchmans' gross negligence, as described above, has resulted in damage in an

18   amount to be proven at trial, but already alleged by the Hitchmans to be in excess of $1 million.

### THIRD CLAIM FOR RELIEF

**(By the Trustee Against the Hitchmans for Disgorgement of the Profits Realized**

**Through Breach of Their Duty of Candor to the Court and to the Beneficiaries)**

22   123.    The Trustee realleges by this reference paragraphs 1-110 above, as though set forth in

23   full herein.

24   124.    As professional fiduciaries, the Hitchmans owed a duty to the Court and to all Trust

25   beneficiaries to disclose all material facts concerning their suitability to provide ongoing service in this

26   case, and whether there were potential conflicts that could work adversely to the beneficiaries, and/or

27   that could cause a reasonable person to question the fairness of ongoing proceedings.  (E.g., *Morales v.*

28   *Field, Degoff, Huppert & Macgowan* (1979) 99 Cal.App.3d 307, 314 ["it is imperative that in matters of

62

**AMENDED PETITION**

probate that the court be fully informed as to all facts that might influence the decision to be made."].)

Indeed, there is an affirmative duty to furnish this information; the court will properly assume that nothing material to the matter in hand has been concealed; and failure by the trustee or the attorney to disclose material facts to the court, such as dual representation, will amount to extrinsic fraud on the court. (*Id.*)[31]

125.    As alleged above, the Hitchmans (i) were aware of a conflict that rendered the Hitchmans unsuitable for service in a case being overseen by Judge Hubbard, (ii) failed to disclose those facts in hopes of securing and/or retaining the lucrative post of co-trustees for the Beverly C. Morgan Family Trust, and (iii) indeed, continued to conceal that critical information for the entire tenure of their service.

126.    As the events of June 17, 2019 confirm, had the Hitchmans made these disclosures timely, they either never would have been appointed in this case (if the conflict existed at the time of appointment) or would have been replaced (if the conflict arose later), and never would have had the opportunity to pillage the Beverly C. Morgan Family Trust for trustee and attorneys' fees.  Even if the Hitchmans had waited until their appointment to make disclosures, the inevitable consequence would have been the selection of a different trustee, unburdened by the conflicts that ultimately resulted in Judge Hubbard's recusing herself (because more than two years had passed and it was too late to remove the Hitchmans, who, once the settlement was approved, already were out the door).  Instead, they kept quiet so they and their lawyers could loot the Beverly C. Morgan Family Trust.  Specifically, the Hitchmans paid themselves at least $320,000 in ordinary and extraordinary trustee fees, while, between them, the Hitchmans' two law firms pocketed approximately $1.5 million.

127.    The remedy for the Hitchmans' calculated breach of their duties of candor is disgorgement of these ill-gotten profits plus interest, and the Trustee prays for such an order here. (Probate Code, § 16440 ["If the trustee commits a breach of trust, the trustee is chargeable with any of the following that is appropriate under the circumstances: … (2) Any profit made by the trustee through

---

[31] The duty is so important that attorneys can be held to have colluded with trustees in breaching their fiduciary duties. (*Pierce v. Lyman* (1991) 1 Cal.App.4th 1093, 1104 & 1106.)  Of course, until the Hitchmans turn over their complete files to the Trustee, there would be no way for the Trustee to know precisely what the attorneys knew about the Hitchmans' lack of candor (and when they knew it).  What is known now is that the Hitchmans are responsible for their acts and the acts of their agents, which is why the claim is asserted against them.

*ACTIVE 43771546v3*

1  the breach of trust, with interest."]; *Savage v. Mayer* (1949) 33 Cal.2d 548, 551; *Uzyel v. Kadisha*

2  (2010) 188 Cal.App.4th 866, 893; *Meister v. Mensinger* (2014) 230 Cal.App.4th 381, 391, 393; see also

3  *Rodriguez v. Disner* (9th Cir. 2012) 688 F.3d 645, 653 [court has power to order disgorgement of fees

4  from attorney operating under conflict of interest]; *Lofton v. Wells Fargo Home Mortgage* (2014) 230

5  Cal.App.4th 1050, 1065.)  This is so even where, unlike here, the breach of trust, resulted in no damage

6  to the plaintiff.  (See *Western States Life Ins. Co. v. Lockwood* (1913) 166 Cal. 185, 195 ["It is entirely

7  immaterial that the corporation may not have been damaged in the transaction in which the profits were

8  made"; corporation was entitled to recover secret profits obtained by a director when he breached his

9  fiduciary duties by receiving a personal advantage while occupying his position without the fullest

10  possible disclosure to and assent of all shareholders].)

11      128.   And, to be clear, this remedy properly includes recovery of profits made by others, such

12  as the Hitchmans' attorneys, as a result of the fiduciary's breach of trust.  In *St. James Armenian Church*

13  *of Los Angeles v. Kurkjian* (1975) 47 Cal.App.3d 547, for example, the defendant Kurkjian, chairman of

14  the church, negotiated with a real estate broker the purchase of new properties by the church. (*Id.* at pp.

15  549-550.) As such he was acting as agent and fiduciary of the church. (*Id.*) When the fiduciary failed to

16  disclose that part of the commission for the seller's broker would be paid to the church's broker (non-

17  defendant Baxter Hallajian), he breached his fiduciary duty to the church, giving the church the right to

18  recover the profits received by the church's broker as a result of the fiduciary's breach. (*Id.* at pp. 550-

19  51.)

20      129.   If the Hitchmans do not like this outcome, their remedy is to seek disgorgement from any

21  attorneys who knew of the conflict, and yet stayed silent for personal advantage.

22  **FOURTH CLAIM FOR RELIEF**

23  **(By Tom as Beneficiary Against the Hitchmans For Damages to Tom Resulting from Hitchman**

24  **Breaches of Fiduciary Duties)**

25      130.   Tom realleges by this reference paragraphs 1-110 above, as though set forth in full

26  herein.

27

28

**AMENDED PETITION**

*ACTIVE 43771546v3*

131.    As Interim Co-Trustees of a Trust in which Thomas is a beneficiary, the Hitchmans owed Tom fiduciary duties of loyalty and reasonable care, a duty to treat him fairly and to not favor other beneficiaries over him, and a duty to preserve assets Tom was entitled to receive.

132.    The Hitchmans have breached all these duties to Tom and have failed to act as a reasonably prudent trustee would have acted under the same or similar circumstances.  They also knowingly acted against Tom's interests in engaging in the acts alleged above, and improperly treated Trust beneficiaries unequally (with Tom getting the short end of the stick in favor of Nancy—who, at all times material to the Hitchmans, wasn't even a Trust beneficiary).

133.    Tom did not give informed consent to any of the Hitchmans' wrongful conduct.

134.    Tom has been harmed, and the Hitchmans' breaches of fiduciary duty were a substantial factor in causing Tom harm, in an amount to be proven at trial but well in excess of the jurisdictional minimum of this Court.

135.    Specifically, and among other damages, the beneficiaries' settlement, signed on April 9, 2019, provided, in pertinent part:

> Nancy (on behalf of herself and the trust for which she is trustee), John (on behalf of himself and the trusts for which he is trustee) and the Shurtleff Children all represent and warrant that their rights now are those rights set forth in this Term Sheet, such that they have no further beneficial interest in the Trust (or any of its earlier versions), such that Tom shall be the sole remaining beneficiary under this Trust, entitled to all remaining assets (including unliquidated claims), except as specifically provided herein, and responsible for any remaining estate taxes.

136.    The "remaining assets" of the Trust included cash and securities.  Once the beneficiaries reached their settlement, which provided for Tom to be reinstated as trustee of the Trust and for MPI to be reinstated as Manager of Lamplighter Chino, the Hitchmans had one duty left—to lend their full support to the settlement and work with the Beneficiaries in general, and Tom in particular, to achieve a smooth and orderly resolution.  Instead, Tom is informed and believes, the Hitchmans wasted still more Trust assets (i) generating defamatory pleadings and engaging in extortionists' actions, in hopes of extracting a release from the beneficiaries for the privilege of having the Hitchmans honor the settlement agreement and step aside, (ii) trying to cling to Lamplighter Chino, which had been their cash cow, and (iii) lobbying for overreaching protections to chill the claims they anticipated being brought against them.  All these acts were not acts to protect the Trust; instead, they were acts designed to

65

**AMENDED PETITION**

1  frustrate the beneficiaries' desires and to put the Hitchmans' self-interest above the interests of the

2  beneficiaries they were supposed to be serving.  Tom is entitled to recover these improperly spent sums

3  as damages.

4       137.    Additionally, ever since their appointment, the Hitchmans have violated one of their most

5  basic fiduciary duties, by taking sides with one set of beneficiaries and working with them to

6  disadvantage another beneficiary (Tom).  As a direct result of the Hitchmans' breaches of fiduciary

7  duty, Tom was forced to incur substantial fees and costs in order to protect himself from the Hitchmans'

8  unrelenting, more than two-year assault.

9       138.    Tom has sustained more damages beyond these particular harms, which are offered

10  solely as examples of the severe consequences flowing from the Hitchmans' serial breaches of their

11  fiduciary duties.

12       139.    The Hitchmans have acted with oppression, fraud and malice, such that an award of

13  exemplary damages is appropriate to punish them and deter them from engaging in similar misconduct

14  in the future.

15       **PRAYER FOR RELIEF**

16      Wherefore, Petitioner, in his various capacities, prays for relief as follows:

17      **On the First Claim for Relief**

18       1.    For damages in an amount to be proven at trial, but in excess of the jurisdictional

19  minimum of this Court.

20      **On the Second Claim for Relief**

21       1.    For damages in an amount to be proven at trial, but that the Hitchmans themselves have

22  estimated to be in excess of $1 million.

23      **On the Third Claim for Relief**

24       1.    For an order requiring the Hitchmans to disgorge their ill-gotten profits (and the ill-gotten

25  profits of their agents) secured through breach of their duties of candor to the Court and to Petitioner.

26      **On the Fourth Claim for Relief**

27       1.    For damages in an amount to be proven at trial, but in excess of the jurisdictional

28  minimum of this Court; and

**AMENDED PETITION**

1    2.    For punitive damages.

2    **On All Claims for Relief**

3    1.    For costs of suit.

4    2.    For such other and further relief as the Court may deem just as proper.

5    Dated: November 22, 2019                     Respectfully submitted,

6                                                 GREENBERG TRAURIG, LLP and

7                                                 OLDMAN, COOLEY, SALLUS,
                                                  BIRNBERG, COLEMAN & GOLD LLP

8

9                                                 By: _____
                                                          Scott D. Bertzyk
10                                                Attorneys for Petitioner
                                                  THOMAS E. MORGAN, III

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**AMENDED PETITION**

**VERIFICATION**

1
2   I, Thomas E. Morgan, III, declare as follows:

3       I am the current trustee and a beneficiary of the Beverly C. Morgan Family Trust.  I have read the

4   foregoing **AMENDED PETITION FOR (1) INSTRUCTIONS, (2) DAMAGES FOR FAILURE TO**

5   **ASSERT CLAIM, (3) DISGORGEMENT OF FEES FOR FAILURE TO DISCLOSE CONFLICT**

6   **OF INTEREST IN ORDER TO SECURE AND PRESERVE APPOINTMENT, AND (4)**

7   **DAMAGES FOR BREACH OF FIDUCIARY DUTY**, and know its contents.  The matters stated in

8   the foregoing document are true of my own knowledge except as to those matters that are stated on

9   information and belief and, as to those matters, I believe them to be true.

10       I declare under penalty of perjury under the laws of the State of California that the foregoing is

11   true and correct.  Executed this ___ day of November, 2019, in Kent, Washington.

THOMAS E. MORGAN, III

68
**AMENDED PETITION**

# EXHIBIT 5

Case 8:22-cv-00580-JLS Document 2-1 Filed 09/07/22 Page 222 of 365

30-2020-01155277-CU-BT-CJC - ROA # 2 - DAVID H. YAMASAKI, Clerk of the Court By Katie Trent, Deputy Clerk.

Scott D. Bertzyk (SBN 116449)
**GREENBERG TRAURIG, LLP**
1840 Century Park East, Suite 1900
Los Angeles, CA 90067
Telephone: (310) 586-7700
Facsimile: (310) 586-7800

Justin B. Gold (SBN 227648)
**OLDMAN, COOLEY, SALLUS, BIRNBERG,
COLEMAN & GOLD LLP**
16133 Ventura Blvd., Penthouse Suite
Encino, CA 91436-2447
Telephone: (818) 986-8080
Facsimile: (818) 789-0947

Attorneys for Plaintiffs

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

| | |
|---|---|
| THOMAS E. MORGAN III, individually and as Trustee of the Thomas E. Morgan Children's Trust; MORGAN PARTNERS, INC., a Washington corporation, COVINA HILLS GP LLC, a California limited liability company, COVINA HILLS MHC LP, a California limited partnership, LAMPLIGHTER ONTARIO ASSOCIATES, L.P., a California limited partnership, LOA GP, LLC, a California limited liability company, ONTARIO ASSOCIATES, LP, a California limited partnership, LAS PALMAS MHC LP, a California limited partnership, LAS PALMAS GP LLC, a Delaware limited liability company, LAS PALMAS HOLDINGS L.P., a California limited partnership, SILVER OAKS BUSINESS PARK LP, a California limited partnership, SILVER OAKS BUSINESS PARK LLC, a California limited liability company, JUANITA SPRINGS ASSOCIATES LIMITED PARTNERSHIP, a Washington limited partnership, ISLAND GATEWAY LLC, a Washington limited company liability company, <br><br> Plaintiffs, <br><br> v. <br><br> BRUCE HITCHMAN and LEE ANN HITCHMAN, professional fiduciaries, and DOES 1-100, <br><br> Defendants. | CASE NO. 30-2020-01155277-CU-BT-CJC <br><br> **VERIFIED COMPLAINT FOR DAMAGES** <br><br> [JURY TRIAL DEMANDED] <br><br><br> Assigned for all purposes <br> Judge Glenn Salter |

**COMPLAINT**

ACTIVE 45454160v3

ACTIVE 45454160v4

# <u>TABLE OF CONTENTS</u>

**Page**

SUMMARY OF ACTION ................................................................................................ 5

PARTIES AND VENUE ............................................................................................... 7

BACKGROUND FACTS .............................................................................................. 9

    A.    With Tom Morgan and Morgan Partners, Inc. at the Helm, The Morgan Family Builds a Real Estate Empire. ............................................................... 9

    B.    Beverly Dies, and the Hitchmans and Their Lawyers Gain an Entrée to The Morgan Family Fortune. ...................................................................... 10

    C.    The Hitchmans Take Over Lamplighter Chino and Drain Its Cash Reserves, Giving Rise to a Variety of Claims. ................................................. 16

    D.    The Hitchmans Tortiously Interfere with MPI's Relationship with Lamplighter Chino. .......................................................................................... 21

    E.    The Hitchmans Destroy a Valuable, Decades-Old Relationship Between the Morgan Family and Bank of America. ........................................................ 23

    F.    The Hitchmans Take Sides and Conspire with the Other Beneficiaries Against Tom. ...................................................................................................... 31

    G.    In Their Zeal to Attack Tom, the Hitchmans and Their Lawyers Failed to Press a Slam-Dunk Malpractice Claim Against Former Trust Counsel Richard Pech. ............... 33

    H.    The Beneficiaries Settle Without Giving the Hitchmans a Release, So the Hitchmans And Their Counsel Begin Making Wild Threats in Hopes of Coercing One. ..................................................................................... 34

    I.    The Beneficiaries' Settlement Is Approved After Another Surprise—Disclosure That the Hitchmans and Their Lawyers Had Been Breaching Their Duty of Candor. ........................................................... 38

FIRST CAUSE OF ACTION ....................................................................................... 41

SECOND CAUSE OF ACTION ................................................................................... 42

THIRD CAUSE OF ACTION ...................................................................................... 43

FOURTH CAUSE OF ACTION ................................................................................... 45

FIFTH CAUSE OF ACTION ....................................................................................... 46

SIXTH CAUSE OF ACTION ...................................................................................... 46

2
**COMPLAINT**

SEVENTH CAUSE OF ACTION ......................................................................................... 47

PRAYER FOR RELIEF ...................................................................................................... 48

VERIFICATION................................................................................................................. 50

3

**COMPLAINT**

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**California Cases**

*Doolittle v. Exchange Bank* (2015)
    241 Cal.App.4th 529 ..................................................................................................32

*Flatley v. Mauro* (2006)
    39 Cal.4th 299 ........................................................................................................37

*Mendoza v. Hamzeh* (2013)
    215 Cal.App.4th 799 ..................................................................................................37

*Whittlesey v. Aiello* (2002)
    104 Cal.App.4th 1221 ..................................................................................................32

*Wolf v. Mitchell, Silberberg & Knupp* (1999)
    76 Cal.App.4th 1030 ..................................................................................................32

**Other State Cases**

*State v. Harrington* (1969)
    128 Vt. 242..................................................................................................37

**California Statutes**

California Probate Code
    § 16000..................................................................................................32
    § 16003..................................................................................................32
    § 16004.5..................................................................................................37

**Other Authorities**

California Rules of Professional Conduct, Rule 3.10 ..................................................................37

4

**COMPLAINT**

## SUMMARY OF ACTION

1. This action arises from the tortious conduct of defendants Bruce and Lee Ann Hitchman, who, through their company Hitchman Fiduciaries, hold themselves out as professional fiduciaries but who, in truth, are predators who abuse their roles as professional fiduciaries to gain access to, and then plunder, the fortunes of families they are supposed to serve.

2. In this specific case, the Hitchmans gained access to the fortune of the family of Beverly C. Morgan, a noted physician and philanthropist, through a 2017 order appointing them to serve as interim co-trustees of the Beverly C. Morgan Family Trust ("BCMFT"). Although they were directed to act as caretakers of the BCMFT, simply preserving assets while litigation between the beneficiaries ran its course, the Hitchmans, armed with knowledge of the Morgan family empire they had acquired as trustees, took a variety of acts, in non-trustee capacities, designed to enrich themselves in reckless (if not conscious) disregard of the harm they were inflicting on the Morgan family and family businesses.

3. Certain claims arising from the Hitchmans' misconduct as trustees of the BCMFT were required by law to be, and already have been, asserted in a probate proceeding pending in Orange County Superior Court. (A true and correct copy of the operative petition in that proceeding, complete with exhibits, is attached hereto as **Exhibit 1** and incorporated by this reference.) For that reason, ***none of the claims being asserted here are claims belonging to the BCMFT.*** Indeed: (i) not one of the claims asserted against the Hitchmans herein is a claim by a beneficiary for harm to his or her inheritance or harm to the BCMFT, and (ii) with the exception of plaintiff Thomas E. Morgan, III, none of the plaintiffs here even is beneficiary of the BCMFT.

4. Instead, all the claims asserted here are civil claims, for which the plaintiffs have a right to trial by jury. Specifically, the claims are summarized as follows:

(a) While serving as co-managers of an upscale mobile home park called Lamplighter Chino, the Hitchmans took $250,000 belonging to the Thomas E. Morgan Children's Trust ("TEMCT"). Although the TEMCT pointed out this transgression to the Hitchmans in writing (and even provided unimpeachable evidence to prove the wrongful taking), the Hitchmans flatly refused to reimburse the TEMCT for the monies wrongfully taken.

(b) The Hitchmans also orchestrated a series of overdistributions to the BCMFT (so they could spend money on themselves and their lawyers) to the detriment of the other owners of Lamplighter Chino—namely, Thomas Morgan ("Tom"), and his sister, Nancy Morgan Shurtleff ("Nancy").  As a result, Tom was shortchanged $450,000 in distributions due him as an owner of Lamplighter Chino, while Nancy was shortchanged $652,000 in her capacity as an owner.

(c) Morgan Partners, Inc. ("MPI") had a written management contract with Lamplighter Chino, calling for Lamplighter Chino to pay MPI a monthly fee for asset management services.  Upon gaining control over Lamplighter Chino, the Hitchmans, out of spite for Tom, tortiously interfered with that contract by directing that payments be cut off, even though (i) to protect Lamplighter Chino, MPI continued to faithfully provide services, and (ii) if they are to be believed, the Hitchmans never even bothered to determine precisely what the contractual arrangement with MPI might be, much less take the steps necessary to have that contract properly terminated.

(d) Most egregiously of all, in the process of taking control over Lamplighter Chino, the Hitchmans wrongfully disrupted an important, decades-old relationship that the Morgan family and Morgan family businesses had with Bank of America by making false attacks on Tom Morgan, including, but not limited to, filing affidavits with Bank of America that wrongly accused Tom of stealing $450,000 of Lamplighter Chino funds.  The accusation was false and the Hitchmans either knew it was false when they made it or made the accusation with reckless disregard for the truth (in that they never even had the decency to inquire of Tom as to what the true facts might be).  The results of that spiteful act were catastrophic for these plaintiffs. The banking relationship ended quickly as a result of the Hitchmans' attacks; debts to Bank of America were called; the bank took assets in which it held a security interest to retire some of the debt; and, the Morgan family and Morgan family businesses had to use funds earmarked for growth to eliminate the remainder.  The consequences of all this, including adverse tax consequences and lost business opportunities, will be felt by Plaintiffs for years.

**COMPLAINT**

5.      There are two possibilities with respect to each of the claims summarized above.  Either the Hitchmans acted in bad faith and with reckless disregard for plaintiffs' rights and were grossly negligent, or the Hitchmans' conduct was intentionally tortious, and engaged in with malice, fraud and oppression.  For this reason, we plead both tortious states of mind in the alternative.

## PARTIES AND VENUE

6.      Plaintiff Tom Morgan is a resident of the State of Washington, who has conducted substantial business in California on behalf of the Morgan family.  Either directly or through Morgan Partners, Inc., Tom has been responsible for management of every one of the plaintiff business entities.  Tom also has an ownership interest in every one of the business entity plaintiffs and is trustee and sole current beneficiary of the TEMCT, a trust organized and administered under the laws of the State of Washington.  Tom asserts claims here both in his individual capacity and in his capacity as trustee of the TEMCT.

7.      Plaintiff Morgan Partners, Inc. ("MPI") is a Washington corporation with its principal place of business in Kent, Washington.  MPI was formed to provide management and advisory services to various Morgan family businesses.  Originally, there were four "Morgan partners" – Beverly Morgan and her three children (Tom, Nancy and John).  Over time, Tom bought out the MPI interests held by his siblings, leaving two partners (Beverly, with a 5% interest, and Tom with the remainder).  After his mother passed, Tom succeeded to his mother's interest and now is the sole owner of MPI.

8.      Plaintiffs Covina Hills GP LLC, Covina Hills MHC LP are entities organized and existing under the laws of the State of California.  Together with and Juanita Springs Associates Limited Partnership, a limited partnership organized and existing under the laws of the State of Washington, they own and operate a mobile home park called Covina Hills in La Puente, California.  Collectively, these entities are referred to as the "Covina Hills Plaintiffs."  Because it has ownership interests in other properties besides Covina Hills, Juanita Springs Associates Limited Partnership also is sometimes referred to as "Juanita Springs."

9.      Plaintiffs Lamplighter Ontario Associates, L.P., LOA GP, LLC, and Ontario Associates LP are entities organized and existing under the laws of the State of California that, between them, own

7

**COMPLAINT**

and operate a mobile home park called Lamplighter Ontario in Ontario, California.  Collectively, these three entities are referred to as the "Lamplighter Ontario Plaintiffs."

10.     Plaintiffs Las Palmas MHC LP and Las Palmas Holdings L.P. are entities organized and existing under the laws of the State of California, while plaintiff Las Palmas GP LLC is an entity organized and existing under the laws of the State of Delaware.  Between them, these three entities own and operate a mobile home park in Indio, California.  Collectively, these three entities are referred to as the "Las Palmas Plaintiffs."  Las Palmas Holdings also holds interests other enterprises, including plaintiff Silver Oaks Business Park LP.

11.     Plaintiff Silver Oaks Business Park LP and Silver Oaks Business Park LLC are entities organized and existing under the laws of the State of California that, between them, own and operate a business park in Riverside, California.  Collectively, these two entities are referred to as the "Silver Oaks Plaintiffs."

12.     Plaintiff Island Gateway LLC is a Washington limited liability company that owns and operates a business park on Bainbridge Island, in the State of Washington.  Together with MPI, Juanita Springs owns Island Gateway LLC.  As noted above, Juanita Springs also holds an interest in plaintiff Covina Hills MHC LP.

13.     Defendants Bruce and Lee Ann Hitchman are residents of Orange County, California who (i) have served in the various capacities described above, and (ii) in those capacities, quite literally have inflicted damage up and down the West Coast, including Washington State, Oregon State, Los Angeles County, San Bernardino County, Orange County and Riverside County.  As interim co-trustees of the Beverly C. Morgan Trust, the Hitchmans have inflicted still more damage but, as noted above, claims related to the Trust are for the Orange County probate court, not civil claims for this Court.

14.     Plaintiffs are unaware of the true names or capacities, whether individual, corporate, associate, or otherwise, of Defendants sued herein as Does 1 through 100, inclusive, and therefore sue these Defendants by such fictitious names.  Plaintiffs will amend this pleading to set forth the true names and capacities of these Doe Defendants when the same are ascertained.  Plaintiffs are informed and believe, and based thereon allege, that each of the fictitiously named Defendants is responsible in some

8
**COMPLAINT**

manner for the occurrences herein alleged or were acting in concert with, and with the permission, approval, and authorization of, the other Defendants.

15.     Plaintiffs are informed and believe, and based thereon allege, that each of the Defendants was the agent or employee of each of the remaining Defendants, and in doing the things alleged herein, was acting within the scope of such agency, and that, in taking the actions described herein, Defendants were acting by and through duly authorized and empowered agents and representatives, who were acting within the course and scope of their authority at the time of their action, or whose actions were ratified and approved.

16.     As alleged above, the plaintiffs in this case are residents of different counties and/or states and have principal places of business in varied locales.  What is more, the defendants in this case have committed harm up and down the West Coast in general, and throughout Southern California in particular.  Further, plaintiffs anticipate that, once tolling agreements expire, defendants who are residents of Los Angeles County will be added as defendants to this complaint.  Thus, it is not possible to choose a forum in a county where all plaintiffs reside, all ultimate defendants reside or where all the harm occurred— making, at a minimum, both Los Angeles and Orange Counties appropriate venues.  On June 16, 2020, plaintiffs originally filed this complaint in Los Angeles Superior Court, where it was assigned Case No. 20STCV22812.  After accepting service, the Hitchmans have expressed a desire to have the case venued in Orange County and, because they are indifferent to the venue, plaintiffs agreed to refile their complaint in this Court and to then dismiss their Los Angeles complaint without prejudice, provided that, for purposes of any timing defenses the Hitchmans may choose to assert, the filing of this Complaint shall be deemed to relate back to the date of filing the Los Angeles Complaint.  The Hitchmans have so agreed.

## BACKGROUND FACTS

### A.     With Tom Morgan and Morgan Partners, Inc. at the Helm, The Morgan Family Builds a Real Estate Empire.

17.     The Morgan family business empire adversely impacted by the Hitchmans' tortious actions all can be traced to two people—Beverly C. Morgan ("Beverly," now deceased) and her oldest son, Tom. Beverly was a noted physician and professor who specialized in pediatric cardiology.  For decades, Beverly practiced in Seattle, Washington, rising to the rank of Chair of the Department of Pediatrics and

9

**COMPLAINT**

Chief Pediatrician at Seattle Children's Orthopedic Hospital. In 1980, Beverly moved to Orange County, California, to become Chair of Pediatrics for the University of California Irvine Medical School. After stepping down from administration, Beverly remained at UC Irvine as a professor of pediatric cardiology, a clinician and an educator, until her retirement in 2009. Beverly also was a notable philanthropist, endowing chairs in pediatrics at both the University of Washington and Duke University Medical Schools, as well as a private foundation focused on education.

18.     Beverly also invested in commercial real estate, including in mobile home parks, and, for decades, she looked to Tom to manage those investments, which he faithfully did—in the main through plaintiff MPI. Tom was and is uniquely qualified for that task. Prior to joining the family business in 1989, Tom obtained his undergraduate degree in Classics and Economics from Pomona College in Claremont, and his MBA from UCLA. From 1982 to 1984, he worked for Accenture Consulting (the consulting division of Arthur Andersen), reviewing management systems and business practices. From 1984 until 1989, he was a Senior Consultant for Kenneth Leventhal and Company (a real estate-specific accounting and consulting firm), working with financial modeling, organizational consulting and appraisals of real estate projects.

19.     By any measure, Tom's performance running the Morgan family businesses exceeded expectations and delivered vast wealth to all members of his family, including his siblings. There are a number of reasons for this impressive growth, but they all can be traced to the vision of Tom and Beverly, and to Tom's dedicated management with Beverly's approval. Simply, for the past thirty years, the Morgan family business model has been built around the guiding principle of maintaining healthy cash reserves (be it profits from operations, refinance proceeds, or something else) to be used either to assist other Morgan family businesses in times of need or to expand into other opportunities as they might arise from time to time. Tom adhered to this principle faithfully, with the end result being that all branches of the Morgan family business tree were able to flourish, and the Morgan family real estate empire grew steadily over time, both in terms of value and in terms of the number of businesses in which the Morgan family invested.

**B.     Beverly Dies, and the Hitchmans and Their Lawyers Gain an Entrée to The Morgan Family Fortune.**

**COMPLAINT**

20. Beverly passed away on January 25, 2014, at the age of 88. Within months, litigation ensued among the beneficiaries (primarily Tom and Nancy) over Beverly's dispositive plan, which Nancy disliked because it favored Tom.[1] As jealous siblings often do in the context of unequal estate plans, Nancy wrongly accused Tom of misconduct, and sought to contest the final version of the BCMFT. (The validity of the final version of the BCMFT now has been upheld in full.) In the Spring of 2017, thanks to malpractice by Tom's attorney at the time (Richard Pech), the probate court determined to appoint professional fiduciaries nominated by Team Nancy—defendants Bruce Hitchman and Lee Ann Hitchman—as interim co-trustees, to serve as caretakers while litigation ran its course. Sadly, it now seems clear that the Hitchmans concealed information concerning their unfitness to serve in cases pending before the probate court judge who appointed them, in order to secure and/or at the very least retain that lucrative appointment.

21. Specifically, the Hitchmans were but one of three professional fiduciaries nominated by Team Nancy to serve as interim co-trustees of the BCMFT. Plaintiffs are informed and believe that, at the time, the Hitchmans: (i) knew they were utilizing the services of an Orange County real estate attorney who is the longtime partner of the probate judge (Hon. Kim R. Hubbard) who would choose the fiduciary from among the three nominated candidates;[2] and (ii) yet, did not ever disclose that conflicting relationship to Judge Hubbard or to Tom. Had the Hitchmans made a timely disclosure, they never would have secured or kept this representation because it would have given rise to an appearance of impropriety for Judge Hubbard to appoint them.[3] Instead of making disclosures, the Hitchmans kept quiet, secured the appointment, and quickly began pillaging the wealth of the Morgan family.

---

[1] More specifically, litigation was between Tom, on the one hand, and all the other beneficiaries of the BCMFT, on the other hand, viz: Tom's sister (Nancy Shurtleff), Nancy's daughters (Jessica and Kathleen) and Tom's brother (John), on the other hand (collectively referred to for convenience as "Team Nancy").

[2] Precisely when the Hitchmans began retaining attorney Coombs is something the Hitchmans have yet to share with Tom—although, based on Judge Hubbard's June 2019 disclosures and the comments of one of the Hitchmans' lawyers thereafter (Roehl & Glowacki attorney John Glowacki), Tom came away with the clear impression that the attorney-client relationship was longstanding, and seemed to exist before the Hitchmans were selected. Even if attorney Coombs was retained shortly after the Hitchmans' selection in this case, a duty of disclosure would have run from then, so there can be no justification for the Hitchmans' silence.

[3] This is not speculation on Plaintiffs' part. We know that, once Judge Hubbard learned of the conflict (more than two years after the Hitchmans had been appointed and just days before they were to be

22.     Although the Hitchmans should have made appropriate disclosures prior to the Court's selection of an interim co-trustee, once they were selected, they indisputably were obligated to disclose any conflicting relationships in order to honor their duties of candor to the Court and to the Beneficiaries. Yet, even after being appointed—and, at points where it is undisputed this conflicting relationship existed—the Hitchmans continued to withhold this important disqualifying information from the Court and from Tom in order to keep their lucrative appointment.

23.     Had the Hitchmans at least done what the Probate Court directed them to do, the damage from this particular breach would have been contained.  After all, early on (at a June 28, 2017 hearing), the court made clear that the Hitchmans were ***not*** to get involved in the litigation taking place between beneficiaries of the BCMFT, but rather, were to remain impartial and simply preserve the status quo while the litigation between Beverly's children resolved itself:

>  [T]he Hitchmans, in this as the interim successor trustees, go in to protect the trust assets and avoid waste and hold the place until these beneficiaries battle it out and decide what's going to happen. And we're either going to have a situation where Tom Morgan is found to be put back in as trustee or somebody else becomes the permanent successor trustee.

> But the issue here is what is the duty of an interim successor trustee appointed by the court in terms of the litigation. …

> An interim trustee in my opinion does preserve the estate assets, make sure they're not wasted, try to marshal whatever assets they can obviously that are out there.  …

> But in terms of investigating, in terms of proceeding to file actions on their own or being necessary parties, I think that's where we have the confusion because essentially it seems to me that it's the parties who have to do that. Ms. [Nancy] Shurtleff and the children and her brother [John Morgan] need to do their investigation as to what they say Tom Morgan has done in terms of not acting correctly as trustee.  [Mr. Pech, Tom Morgan's then counsel] and his associates obviously would contest that and say, no, he's done everything right.

> I don't think the interim trustees need to get involved in that because they essentially are up here holding everything steady until we get the litigation worked out.

24.     Sadly, however, it now is clear that remaining impartial, avoiding waste and preserving the status quo never were part of the agenda for the Hitchmans, not even for a nanosecond.  Instead, as the files recently turned over by the Hitchmans and their lawyers confirm, the Hitchmans were selected by

---

replaced), Judge Hubbard promptly disclosed it, and recused herself from the case going forward to avoid any appearance of impropriety.  Had Judge Hubbard been timely advised of the conflict, there would have been no need for her to recuse herself; instead, she simply could have chosen a different interim co-trutee.

**COMPLAINT**

Team Nancy precisely because they were willing to (i) breach the duty of impartiality they owed to all beneficiaries, (ii) side firmly with Team Nancy, and (iii) use Tom's inheritance to pursue the legal theories Team Nancy wanted them to pursue, in hopes that this would create leverage against Tom.  Tellingly, the Hitchmans agreed to do this without ever trying to communicate with Thomas Morgan, let alone learning the truth about the allegations against him. The record could not be more clear in this regard.

25.     Before the Hitchmans even were retained, they and their lawyers were thinking of creative ways to curry the favor of Team Nancy and get the coveted role of interim co-trustees of the BCMFT, charged with pursuing Tom as Team Nancy desired.  By way of example, on March 25, 2017, Hitchman attorney Cynthia Roehl wrote Bruce Hitchman to state: "I began drafting an email to Tom Garrett [who represents Tom's brother (John) and Nancy's daughters] about the Moeller issue and the new case that just came down but I decided not to send it *because I don't want an email in our file that makes us look like we are aligned with Tom [Garrett] and his client*.  *I will call him instead.*  This case looks like it is being heavily litigated.  Translation?  From even before their retention, the Hitchmans and their lawyers (i) were on board Team Nancy, and (ii) aware that they were supposed to be acting impartially to all beneficiaries (including Tom), were consciously attempting to minimize the paper trial showing their calculated breach of their duty of impartiality.  By March 30, 2017, the day after the Hitchmans were appointed, Team Nancy already was exerting pressure on the Hitchmans to jump at their command, implying they would be replaced if they didn't.  For example, at 11:04 a.m. on March 30, 2017, attorney Garrett e-mailed the Hitchmans and their attorneys from the law firm of Roehl & Glowacki (hereinafter, "R&G") to express his displeasure at their lack of responsiveness—and, specifically, at their expressed inability to participate in a call that day with the lawyers from Team Nancy.  Garrett wrote:

> Just so you are aware, when Mr. McDermott [Nancy's lawyer] and I discussed things with Bruce Hitchman on Monday we had mentioned that our nominations of the three private professional fiduciaries requested by the court hinged on the ability of each to have the time and resources for quick action on this matter and Bruce assured us that this was the case.

Translation?  "If you can't jump fast enough for us, we'll move on to someone who can."  And, by now, it should come as no surprise that team Hitchman got the message loud and clear.  Here is Hitchman attorney John Glowacki's response just eight minutes later:

> Hitchman Fiduciaries and Roehl & Glowacki have the time and resources for quick action. We learned of the appointment yesterday afternoon. This morning we learned of a call being scheduled. With Cynthia out of the office, we have coordinated our schedules and provided three windows of time for this initial call, two of which are today. There is no cause for concern about responsiveness.

Sure enough, the call went ahead, and lawyers from Team Nancy promptly began feeding the lawyers information about (i) the Trust, (ii) businesses run by Tom Morgan, (iii) bank accounts they might wish to target, and (iv) theories they wanted the Hitchmans and their lawyers to pursue.  The interests and objectives of Team Nancy and the Hitchmans were so overlapping that their lawyers routinely shared pleadings before filing them, and even discussed preparing a common interest agreement to shield their communications from discovery.  In short, the fix was in from the start, and the Hitchmans and their lawyers were glad to be part of it.  As the newest members of Team Nancy, the Hitchman attorneys even began joking internally about "binge work parties" they would hold to rack up time reviewing files.

26.     Although the Hitchmans always have attempted to portray themselves as faithful fiduciaries who had no plan to litigate and simply stumbled across facts they supposedly could not ignore, their internal files reveal a very different picture—namely, of fiduciaries, armed with aggressive lawyers, planning to pursue litigation against Tom from the outset.  To that end, the day after their March 30 conference call with "Team Nancy," the Hitchmans and the R&G lawyers began looking at selling or taking a hard money loan against Beverly Morgan's valuable Lido Island condominium—still held in Trust but bequeathed to Tom—to "fund litigation."  The Hitchmans were so bent on raising cash to ligate that, in a lending climate where it was possible to take out long-term mortgages for sub-4% interest rates, the Hitchmans seriously contemplated taking out a hard money loan at 12.99% interest.

27.     With the lawyers for Team Nancy urging aggressive litigation on their behalf, R&G also quickly reached out and brought in a second law firm (Carico Macdonald Kil & Benz LLP, hereinafter the "Carico Firm") to take the lead in litigating against Tom.  The Carico Firm understood its mission well.  Just like R&G, the mission wasn't to remain neutral, avoid wasting assets and preserve the status quo.  It wasn't even to neutrally gather facts to see if there were any areas for concern involving any beneficiary or any third party.  Instead, as the very first draft of their retainer agreement stated, it was to pursue "litigation relating to…THOMAS E. MORGAN."

14
**COMPLAINT**

28.     Meanwhile, the Hitchmans and their lawyers began exploring additional options to raise funds for their planned assault on Tom.  Most notably, the Hitchmans and their lawyers began evaluating the three companies managed by Tom Morgan and/or MPI and in which the Trust still held a substantial interest as possible takeover targets—or, as the Carico Firm's Bruce Macdonald colorfully branded it, the possible subjects of a "coup."  Macdonald, who had specifically been tasked by R&G with developing that strategy, quickly focused on: (i) a Washington-based limited liability company named Country Hills, LLC, whose primary asset was the West Valley Business Park in Kent, Washington, near the SeaTac Airport, and (ii) the Washington-based entities that own Lamplighter Chino, an upscale mobile home park in Chino, California.  As for Country Hills, the Hitchmans went so far as to prepare an Action by Written Consent allowing them to take over that entity.  Displaying defendants' utter disregard for Tom (despite their fiduciary duties to him), a Consent prepared by the Carico Firm—which the Hitchmans and Nancy all gleefully signed—accused Tom of "gross negligence, incompetence, and/or fraud" with respect to the West Valley Business Park and purported to authorize Tom's ouster on that basis.

29.     The Carico Firm did not think twice about securing Nancy's and the Hitchmans' signatures to this libelous writing—and Bruce and Lee Ann Hitchman did not think twice about signing it—even though, as Bruce Hitchman would concede, they had no factual basis for making these accusations—and still have no basis for such accusations today.  Here is Bruce Hitchman himself:

Q.     As of April 24 [2017, the date of the written action], would you have considered yourself up to date and [informed] enough to have an informed opinion as to how well Morgan Partners had performed as the manager of any of the entities for which it provided management services?

[OBJECTION OMITTED]

A.     No.

Q.     Do you have any reason to believe that Morgan Partners Inc. had been guilty of gross negligence, incompetence, or fraud with respect to Country Hills LLC and the West Valley Business Park that it operated?

MR. GLOWACKI:  Objection.  It's compound and it's vague as to time.  Are you asking him today or back on April 24th?

Q.     Let's start with April 24th?

A.     No.

Q.     Okay.  Now, let's go to today.

A.     Today.  I – I don't have – I don't have a strong opinion as to – as to that.

ACTIVE 45454160v4

…

Q.    As you sit here today, sir, can you give me any factual basis for putting in a resolution and having Nancy Shurtleff sign that accuses my client of gross negligence, incompetence, and/or fraud with respect to Country Hills LLC?

A.    No.

30.    Ultimately, the Hitchmans (i) shelved their takeover plan for that entity, and (ii) chose instead to take over Lamplighter Chino, which—it will come as no surprise—was the significantly more cash-rich entity of the two.  Nonetheless, the mere fact that the Hitchmans were willing to make a false and unsupported claim against Tom—within weeks of their appointment and without conducting any investigation whatsoever—speaks volumes as to their faithlessness and greed.

**C.    The Hitchmans Take Over Lamplighter Chino and Drain Its Cash Reserves, Giving Rise to a Variety of Claims.**

31.    At the same time they were preparing the paperwork needed to take over West Valley Business Park, the Hitchmans covertly set about trying to take over Lamplighter Chino based on invalid resolutions that they, and they alone, had signed.  In late April 2017, they (i) marched into a local Bank of America branch, (ii) brandished the Order appointing them as interim co-trustees and resolutions they had signed alone purporting to install themselves as Manager of Lamplighter Chino, and (iii) demanded that they be granted control over all the Lamplighter Chino accounts (which included more than $6 million held in a Certificate of Deposit and approximately $750,000 in cash reserves).  As it turned out, the resolutions were legally ineffective because a majority in number of the members had to consent.  Still, simply by presenting papers, the Hitchmans opened up a line of communication to Bank of America that they (and their lawyers) used to start poisoning the relationship between Bank of America and Tom Morgan and the other Morgan family entities.  Ultimately, the Hitchmans went back to the drawing board and prepared a new resolution, which they had Nancy sign on the evening of Friday, June 2, 2017.  (The Hitchmans didn't sign until the next day and didn't present the resolution to Bank of America until June 5, at the earliest.)  It is that Action by Written Consent that ultimately replaced Morgan Partners, Inc. as the Manager of Chino Holdings GP, LLC, and installed the Hitchmans as co-managers in MPI's stead.

32.    Four points are important here.  <u>First</u>, although he did his level best to resist admitting the point, Bruce Hitchman ultimately was forced to concede he could identify no management issues concerning MPI to warrant taking over Lamplighter Chino:

16

**COMPLAINT**

Q.     And you would agree with me that you didn't take over Chino because of any management issues, per se.  It's because you wanted control over that asset, correct?

[OBJECTION OMITTED]

A.     I don't agree with you.

Q.     Okay.  Then, identify for me so we're very clear any management issue you had with Tom Morgan, MPI's management of Lamplighter Chino as of April 24, 2017, when you walked into Bank of America with a resolution that didn't work.

[OBJECTION OMITTED]

A.     Yeah, at this time I can't give you any precise reasons.

Q.     You can't give me any reason, can you?

[OBJECTION OMITTED]

A.     I would not agree with that.

Q.     Then what is it?

[OBJECTION OMITTED]

…

Q.     …Can you give me any management reason or concern that prompted your takeover in April 2017?

[OBJECTION OMITTED]

A.     At this time, I cannot.

33.    <u>Second</u>, according to Mr. Hitchman, the takeover was done surreptitiously to ensure that Tom and MPI would have no inkling as to what the Hitchmans were up to until after the accounts had been seized:

Q.     Wouldn't it be fair to say, sir, that from your perspective and the perspective others who wanted to see you take over Lamplighter Chino, secrecy would be a good thing until you had accomplished your objective of gaining an entrée into those accounts?

[OBJECTION OMITTED]

A.     I would say that given the – the likely reaction, yes.

Q.     Okay.  So, and you can have your reasons for being secret, but it would be fair to say that you did not want to tip off Newport [the property manager] or Tom Morgan or Morgan Partners of the plan to take over these accounts until you were in a position to have control?

…

A.     Why would I share – why would I even discuss it with them before we're – before we're, you know, we're going to be in place?

Q.     Okay.

A.     It wouldn't make sense.

17

**COMPLAINT**

Q.   Let me come at it this way so we have clean record.  Your best memory, as you sit here today, would be, for whatever your reasons were, you said nothing to Mr. Morgan, Morgan Partners, or Newport Pacific about this plan until you were in a position of control, fair?

[OBJECTION OMITTED]

A.   I think that's accurate.

Q.   Okay.  And, to your knowledge, no one else on your side of the table did either, correct?

A.   Correct.

34.   <u>Third</u>, the only material factual distinction between West Valley Business Park (which the Hitchmans ultimately decided not to take over) and Lamplighter Chino (which they did take over), is that West Valley was cash poor, while Lamplighter Chino was flush with cash:

Q.   I didn't ask you what your reasoning was, sir.  I asked you would you agree that one clear objective factual distinguishing characteristic between these two enterprises is Chino had millions in cash.  West Valley Business Park did not?

A.   That is, as I believe, factually correct that they had differing financial conditions, yes.

And, again:

Q.   All other things being equal, if you're going to take over something, an entity that is flush with millions in cash is a lot better than a company that is struggling to get by, true?

[OBJECTION OMITTED]

A.   All of the – all other things being equal, yes.

35.   <u>Fourth</u>, prior to taking over Lamplighter Chino, the Hitchmans and their lawyers didn't even bother to read applicable loan documents for Lamplighter Chino to see if their covert actions would result in any problems.  Nor did they consult Tom Morgan—the person who had negotiated the loan documents and who was most knowledgeable about them.  As a consequence, the Hitchmans and their lawyers triggered an event of default under a $14 million loan that Lamplighter Chino had with PNC Bank.  (Ultimately, Tom and Nancy mitigated that damage by entering into a settlement that, among other things, reinstated MPI as Manager before the lender exercised default remedies.  We note the point here solely to underscore how the Hitchmans' lust for money and control caused them to take reckless actions.)

36.   Once they got their hands on Lamplighter Chino's cash reserves, the Hitchmans and their lawyers made substantial distributions to the BCMFT (and, to a lesser extent, the other owners) so they could spend money on themselves and their lawyers—always to pursue Tom.  In this regard, the

18

**COMPLAINT**

Hitchmans did not give their role as fiduciaries to Lamplighter Chino—or the need for cash reserves for operations and expansion—a second thought.  Instead, they were focused solely on getting money out of Lamplighter Chino and to the BCMFT, where they could spend it with unbridled zeal.  Some of the claims flowing from the Hitchmans' misconduct—e.g., claims associated with how the Hitchmans as trustees wasted the money they distributed to the BCMFT—are being litigated in probate court.  Others—e.g., the ways in which the Hitchmans abused their separate (and, given the way they managed things, conflicting) fiduciary positions as co-managers of Lamplighter Chino—present civil claims for this Court.

37.     To elaborate with respect to the claims for this Court, at the time the Hitchmans had themselves appointed as Manager of Lamplighter Chino, the enterprise had slightly more than $6 million in a certificate of deposit with Bank of America, broken down as follows: (i) $250,000 contributed by the TEMCT (to get the funds on deposit to $6 million, thereby yielding more favorable terms); (ii) $5.75 million from the proceeds of a refinance of a loan secured by the Lamplighter Chino property; and (iii) interest on those funds.  No one had a right to the $250,000 (plus interest) belonging to the TEMCT other than the TEMCT.  The three Lamplighter Chino owners (Tom, Nancy and the BCMFT) had interests in the remaining $5.75 million (plus interest) in accordance with their partner ownership interests in the enterprise: (i) Tom (20%), (ii) Nancy (29%), and (iii) the BCMFT (51%).

38.     The $5.75 million representing the proceeds of a refinance for the Lamplighter Chino project was to be held for business purposes.  But, if the Hitchmans were going to break the $6 million certificate of deposit to distribute the funds, then at least they were obligated to return the $250,000 to the TEMCT (plus interest) and distribute the remainder in accordance with the partner ownership percentages set forth above.  Specifically, after backing out the $250,000 owed to the TEMCT, the remaining $5.75 million was allocable to the owners as follows: (i) BCMFT (51% -- $2,932,500, which included paydown of $2,500,000 in BCMFT draws on the Chino line of credit); (ii) Nancy (29% -- $1,667,500); and (iii) Tom (20% -- $1,150,000).

39.     Instead, of distributing the proceeds that way, the Hitchmans took $2.5 million off the top to extinguish what ultimately was a **BCMFT** obligation ($2.5 million worth of line of credit draws for the benefit of the BCMFT), and then split only the remaining $3.5 million proportionally.  The end result is that (i) the TEMCT was shortchanged $250,000, (ii) Nancy was shortchanged $652,000, and (iii) Tom

was shortchanged $450,000.  (On top of that, the Hitchmans' election to distribute the proceeds of a refinance gives rise to potential adverse tax consequences they never even bothered to consider before acting.)

40.     The Hitchmans and their lawyers all knew there was a legitimate question as to whether all the funds held in the $6 million Certificate of Deposit belonged to Lamplighter Chino or whether some of the funds belonged to other entities.  For example, in a May 22, 2017 e-mail chain between the two law firms and the Hitchmans, R&G attorney Cynthia Roehl specifically inquired of the Carico Firm: "I spoke with Bruce Macdonald today about marshaling the entities and he mentioned that the $6M CD may be part of a 'pooled fund.'  Do you know how title is held to this CD?  Is this an asset that Hitchman Fiduciaries will be able to marshal as part of the attached accounts?  Please advise at your earliest convenience."   And, then, the Carico Firm's Bruce Macdonald quickly passed the baton to Bruce Hitchman: "Bruce H. – I believe you told me about this CD (or account) and that it was someone at B of A that told you about it.  Can you please give us all a bit more background on that?...The idea that it may be a 'pooled' account came from something I came across in the IRS audit response from the CPA."  (In other words, and to be clear, one of the Hitchmans lawyers (i) expressed a concern to Bruce Hitchman that, based on what he had seen in the accountant's papers, not all the money held in the Certificate of Deposit belonged to Lamplighter Chino, and (ii) then punted the issue to Bruce Hitchman to answer.)

41.     Yet, by the evening of June 9, 2017, this important question remained unanswered.  As Bruce Hitchman reported to the lawyers: "sparse information for the $6 million CD held in the name of Chino LP.  I was able to find out from our banker that Thomas Morgan's name is on the CD so at this point we are unable to do anything with it – i.e., cash it out, move it, etc.  We also don't have the full account number for the CD at this time."  To some, this absence of information would have led to caution when it came to pursuing the CD the lawyers had indicated might be holding funds the Hitchmans had no right to touch, but it was no impediment at all to Bruce Hitchman and his team.  On June 11, 2017, Bruce Hitchman wrote the lawyers to state: "The second page of the CD docs is addressed to the LP, so we should be okay."  Translation?  "Even though we still don't know what's what, I've come up with an excuse for grabbing this CD and taking someone else's money, so let's go grab it all."  And, grab it they did—through deceit.

42.     Adding insult to injury, when the TEMCT later pointed out to the Hitchmans that $250,000 of the proceeds in the certificate of deposit they had plundered belonged to the TEMCT and must be returned, the Hitchmans effectively acknowledged the theft but still refused to do anything about it.  Why? In an April 1, 2019 response, Hitchman lawyer Chris Carico proclaimed that it would be "imprudent" for the Hitchmans to do the right thing until all pending claims—none of which involved the TEMCT as a defendant—had been resolved.

43.     Underscoring their avarice, the Hitchmans and their lawyers were not content simply to plunder the $6 million certificate of deposit, and cling to the $250,000 in TEMCT funds they had pilfered. Indeed, thanks to a "takings" lawsuit brought by Tom while MPI was Manager of Lamplighter Chino— which the Hitchmans then nearly abandoned, but Tom kept alive—that enterprise ultimately reached a settlement with the City of Chino yielding another $1.15 million.  As with the proceeds of the Certificate of Deposit, the Hitchmans distributed $1 million of those settlement proceeds to the owners and then quickly spent the BCMFT's 51% share of that distribution as well—once again, trying to gin up some sort of claim against Tom.

44.     Truly, the Hitchmans had an insatiable appetite for attacking anything and everything associated with Tom Morgan.  We provide more examples below.

**D.    The Hitchmans Tortiously Interfere with MPI's Relationship with Lamplighter Chino.**

45.     As noted above, MPI had (and still has) a contract with Lamplighter Chino for the provision of asset management services, a true and correct copy of which is attached hereto as **Exhibit 2** and incorporated by this reference.  Specific steps are required to terminate the contract, which annually renews absent timely notice of termination.

46.     Promptly after gaining control over Lamplighter Chino's cash reserves, the Hitchmans attacked once more, directing that all payments to MPI stop immediately.  The end result was this:  MPI's contract remained in place the entire time, but MPI was deprived of its contractually-required compensation—even though MPI continued to protect Lamplighter Chino in a multitude of ways.

47.     The following passages from Mr. Hitchmans' deposition reveal his cavalier attitude towards Tom Morgan and any company Tom Morgan runs:

Q.     Okay.  Mr. Hitchman, you were aware that the Chino entities had until you took
over been paying fees to Morgan Partners; correct?

**COMPLAINT**

A.    Yes.

...

Q.    Do you know whether there was – what type of arrangement it was?  And let me give you some examples.  There may be others.  This is just a menu of suggestions: oral contract, written contract, custom and practice?  Do you know how fees were determined?

A.    No, I do not.

Q.    Did you make any effort to look for any written agreements with Morgan Partners for their fees?

A.    No, I did not.

Q.    Safe to say that if you've never seen one, you've made no effort follow any steps any written agreement might have required to terminate a relationship with Morgan Partners?

A.    No.

Q.    We may have a double negative in there.  You'd agree with me it's safe to say that you haven't made – taken any steps to terminate any written contracts that may exist?

A.    Correct.

...

Q.    Once you took over Lamplighter Chino, you just simply said, "No more payments to Morgan Partners"; correct?

A.    Basically.

Q.    Did you ever serve any written notice on Mr. Morgan or Morgan Partners to advise them of that decision?

A.    I don't recall a notice, no.

48.    There was no cause for the Hitchmans to harm MPI, which was providing critical services to the Morgan family and Morgan family businesses at a bargain price compared to industry standards. The decision was made out of animus towards Tom, pure and simple.

49.    And, this was not the only harm the Hitchmans visited upon MPI.  MPI serves as the General Partner of a significant number of the Morgan family businesses.  It is a subchapter S corporation that had to be distributed within a set period after Beverly's death in order to permit timely filings and avoid financial penalties.  Tom had planned to do this effective as of the two-year anniversary of Beverly's death, but the Hitchmans became interim co-trustees of the BCMFT before Tom had done so.  So, Tom implored the Hitchmans and their lawyers to distribute the BCMFT's modest interest in MPI, effective as of Beverly's death, to avoid those consequences.  Yet, the Hitchmans and their lawyers affirmatively

ACTIVE 45454160v4

threw up obstacles to resolution, at significant expense for all concerned.  Tom remedied the problem as soon as he was reinstated as trustee, but Tom and MPI had to bear the financial penalties resulting from the Hitchmans' unwillingness to act.

50.     Although the conduct described above speaks volumes about the Hitchmans' animus, their tortious interference with the Morgan family's relationship with Bank of America is far, far worse.  We turn to this topic next.

**E.     The Hitchmans Destroy a Valuable, Decades-Old Relationship Between the Morgan Family and Bank of America.**

51.     As noted above, upon being appointed as interim co-trustees of the BCMFT, the Hitchmans and their lawyers (i) quickly aligned themselves with the beneficiaries litigating against Tom, and (ii) began looking for the best assets to seize as a source of cash.  Through those efforts, the Hitchmans became acutely aware that the Morgan family and Morgan family businesses had developed a deep, valuable and longstanding relationship with Bank of America—a relationship that included certificates of deposits and other savings accounts, checking accounts, business operating accounts, secured loans on real property, and lines of credit that were key to providing the Morgan family with the flexibility needed to meet obligations as they came due, and to expand the business as opportunities arose.

52.     By way of example, in mid-2017, when the Hitchmans entered the picture, the Morgan family and Morgan family businesses collectively had more than $30 million worth of lines of credit (LOC) and loans with Bank of America, much of it secured by certificates of deposit, as follows:

| Entity | Credit Type | Amount |
| --- | --- | --- |
| Morgan Partners/Silver Oaks | LOC | $5 million |
| Island Gateway, LLC | Loan | $5 million |
| Las Palmas Holdings LP | LOC | $3.5 million |
| TEMCT | LOC | $2.75 million |
| Juanita Springs | LOC | $5 million |
| Chino Holdings LP | LOC | $6 million |
| Ontario Associates LP | LOC | $4 million |

All of this was blown up as a result of egregious misconduct by the Hitchmans.

**COMPLAINT**

ACTIVE 45454160v4

53.     As alleged above, starting in late April 2017, the Hitchmans began covertly trying to take control of one of the most valuable Morgan-family businesses (Lamplighter Chino) and, through that process, opened up a line of communication with Bank of America that they used to disparage Tom Morgan, the principal of all the other Plaintiffs.  Most egregiously, the Hitchmans built a false story around Tom and MPI's decision, in the first two days of June (and while they still were the lawful managers of Lamplighter Chino), to move $450,000 from a Lamplighter Chino operating account at Bank of America into a new Lamplighter Chino operating account at Wells Fargo Bank.  By focusing solely on the first half of this benign event (the transfer of funds out of a Lamplighter Chino Bank of America account) and ignoring the last half of the event (the transfer of the same amount of money into a Lamplighter Chino Wells Fargo account), the Hitchmans falsely accused Tom of stealing $450,000.

54.     Rather than seek court approval to takeover Lamplighter Chino or at least advise Tom of their plans to minimize disruption, the Hitchmans acted in secret, providing no inkling of their plan to Tom or MPI.  As Bruce Hitchman conceded:

> Q.     Okay.  So, and you can have your reasons for being secret but it would be fair to say that you did not want to tip off Newport [Pacific, the day-to-day property manager] or Tom Morgan or Morgan Partners of the plan to take over these accounts until you were in a position to have control?
>
> …
>
> A.     Why would I share – why would I even discuss it with them before we're – before we're, you know, we're going to be in place?
>
> Q.     Okay.
>
> A.     It wouldn't make sense.
>
> Q.     Let me come at it this way so we have a clear record.  Your best memory, as you sit here today, would be, for whatever your reasons were, you said nothing to Mr. Morgan, Morgan Partners, or Newport Pacific about this plan until you were in a position of control, fair?
>
> A.     I think that's accurate.
>
> Q.     Okay.  And, to your knowledge, no one else on your side of the table did either, correct?
>
> A.     Correct.

55.     Ultimately, as a result of the Hitchmans' covert meddling with Bank of America, MPI and Newport Pacific (the property manager) lost the ability to access the Lamplighter Chino accounts online, even though MPI remained the lawful manager of that enterprise.  Not knowing why they had lost access

**COMPLAINT**

to the accounts (because the Hitchmans were keeping their interference a secret), Tom/MPI worked with Newport Pacific to get funds into an operational account so that Lamplighter Chino would have the ability to pay bills as they came due.  Tom initially wanted Newport Pacific do this all itself but, because Newport Pacific did not have signature authority available to write checks on the Bank of America account, Tom and Newport Pacific worked together: (i) Tom wrote checks totaling $450,000 and deposited them into an account for a separate Morgan family business (Covina Hills) for holding while Newport Pacific simultaneously opened a new Lamplighter Chino account at Wells Fargo; and (ii) then, when the Wells Fargo account was opened, Tom immediately secured a $450,000 cashier's check and personally deposited it into the new Lamplighter Chino account at Wells Fargo.  The entire process took less than 24 hours; at all material times, Tom/MPI still was the lawful manager of Lamplighter Chino; Newport Pacific was involved every step of the way; and Lamplighter Chino was fully protected.  And, underscoring that there was nothing improper in what Tom/MPI had done while the lawful managers of Lamplighter Chino, the Hitchmans themselves did the same thing (i.e., move $450,000 from one account to another) once they became managers.

56.    The events described immediately above all took place on June 1-2, 2017.  The Hitchmans only became managers of Lamplighter Chino **after** all those events.  Specifically, the Consent substituting the Hitchmans in as manager (i) wasn't signed by anyone until the evening of June 2 (when Nancy signed it), (ii) wasn't signed by the Hitchmans until June 3, and (iii) wasn't presented to Bank of America until the morning of June 5.  The Hitchmans did not confirm their "coup" until late in the evening on June 2 (after 10 p.m.), when one of the Hitchmans' lawyers notified Tom's counsel that the Hitchmans had taken over, by which time the $450,000 in question already was sitting safely in a Lamplighter Chino account at Wells Fargo.

57.    There is ample cause to believe that the Hitchmans knew all the relevant facts concerning the $450,000 transfer to Wells Fargo in virtual real time.  After all, by the afternoon of June 2, the Hitchmans had begun speaking directly to Lamplighter Chino's property manager (Newport Pacific) and requesting financial information (which Newport Pacific began providing the very next day).  Bruce Hitchman and attorney Bill Benz (of the Carico Firm) also spoke with Newport Pacific representatives (and Newport's counsel) on June 8.  According to the sworn testimony of a Newport Pacific witness,

Hitchman and his lawyers were informed about the $450,000 transfer to a new account at Wells Fargo on June 8. Although the Hitchmans and their lawyers deny being told, the internal files show that approximately 40 minutes before Bruce Hitchman had obtained and forwarded copies of the checks comprising the $450,000 moved from Bank of America to Wells Fargo, one of his attorneys (Roehl) already was emailing the team about the "[p]otential need for ex parte application" because "TEM drew $450K out of Chino accounts on 6/1 and 6/2"—thus evidencing clear knowledge of facts they supposedly did not know. It is this false notion—that Tom supposedly had stolen $450,000 from Lamplighter Chino—that the Hitchmans used to attack Tom to Bank of America, and thereafter to the probate court.

58. It will be for the finder of fact to determine whether (i) the Hitchmans and their lawyers already knew that the $450,000 was sitting safely in a Lamplighter Chino account at Wells Fargo (and, hence, were deliberately using just the first half of the story (transfer out of Bank of America) to create a false emergency), or (ii) the Hitchmans and their lawyers never bothered to ask Tom for the rest of the story, and recklessly assumed the worst. (Either possibility is sufficient to establish liability.) What is known to a moral certainty is that (i) as soon Bruce Hitchman obtained copies of the Bank of America records, his legal team quickly set about preparing legal documents to accuse Tom Morgan of stealing $450,000 when, in truth, Tom simply had moved the money to a different Lamplighter Chino account at a different bank, and (ii) the Hitchmans and their lawyers had a compelling motive to gin up the worst story about Tom that they could.

59. Remember, at this precise time, the Hitchmans and their lawyers were skating on exceedingly thin ice: (i) without notice to Tom or the probate court, much less advance approval from the probate court, they had covertly taken over Lamplighter Chino in what they joked was a "coup" and then had grabbed everything at Bank of America, including every penny of a $6 million certificate of deposit (despite questions being raised as to whether the CD consisted of "pooled funds"), (ii) they had staged this coup to grab money for the purpose of litigating against Tom, and (iii) they knew that once their coup became public Tom would justifiably complain and they would need a good reason to convince the Court they had no choice but to act without advance court approval. Needless to say, a story that Tom had stolen $450,000 was tailor made for that purpose and, even though the probate court had no jurisdiction over the governance of Chino, the Hitchmans and their lawyers knew that allegations of a $450,000 theft by Tom

would motivate the court to bless the Hitchman's "coup" after the fact.  As attorney Chris Carico noted in a June 11 email to the team commenting on a draft of an Affidavit that his partner had prepared to give to Bank of America: "I glanced at what Bill has done.  I will wait until early tomorrow morning to review once the facts on the taking of the $450,000 are established.  I think it will be important to attest to the Covina account holding misappropriated funds as the basis for the freeze…."  Translation?  "We need to be able to call Tom a thief, so make sure to tell that story."

60.     On the evening of Friday, June 9, 2017, Hitchman attorney Bill Benz e-mailed Bank of America's lawyers to set the table for the Hitchmans' planned assault: "Miguel, Frank, and Mark, I need to speak with you as soon as possible about an urgent matter on the Chino accounts."  On Monday, June 12, 2017—ten days after he first had spoken to Newport Pacific—Bruce Hitchman, with the concurrence of his wife and co-manager (Lee Ann), provided two separate affidavits to Bank of America (drafted by the lawyers) to, among other things, freeze funds in the Covina Hills account that had been used to briefly hold Lamplighter Chino's $450,000 until it could be transferred to a new Lamplighter Chino account at Wells Fargo.  To justify the extraordinary relief they were seeking, the Hitchmans claimed that Tom had stolen the $450,000, and they had no assurance it would ever get back to Lamplighter Chino.  Of course, as the Hitchmans and their lawyers knew or would have learned with the most rudimentary investigation, the entire $450,000 already had been sitting in the Lamplighter Chino Wells Fargo account for 10 days. The accusation of theft was simply false.

61.     As bad as that was, the Hitchmans and their lawyers were just getting warmed up.  After delivering the false affidavits to Bank of America, they used their false story as a pretext to apply for an emergency order approving their covert "coup" after the fact.  For their part, Tom and the property manager did all they could to set the record straight, providing copies of the bank records proving the rest of the story—i.e., that (i) the money hadn't been stolen and was sitting in a different Lamplighter Chino account, and (ii) Newport Pacific already had reported this to the Hitchmans and their counsel.  And, make no mistake about it: *the Hitchmans and their lawyers were aware of the full truth before the ex parte application had been ruled upon on the afternoon of June 14*.  Here is the chronology:

- Tom's opposition papers were filed and served on the morning of the 14th.

27

**COMPLAINT**

- By 10:32 a.m., attorney John Glowacki (who was tasked with appearing for the ex parte), e-mailed to confirm he (Glowacki) already had given Tom's papers an "early read."

- At 12:11 p.m., an attorney with the Carico Firm emailed the Hitchman team to advise: "All – unsure if anyone has read TEM's declaration and the exhibits attached but he has correspondence with the property manager and bank statements that tell a different story than what we have alleged."

- At 1:19 p.m., Newport Pacific's counsel e-mailed all the lawyers with a copy of a declaration further debunking the Hitchmans' story.  He wrote: "We had been provided, late last night, copies of the Ex Parte documentation [filed by the Hitchmans]. Because of certain incorrect statements and such declarations, attributable to our client, we are attaching a signed Declaration from our client. In order for such declaration to be part of such hearing, we are having delivered, duplicate originals, of the attached declaration to the court, so that the Court, and the parties will have equal access to Newport Pacific's clarifying Declaration."  In addition to backing up what Tom said, the declarant testified that he and Candace Holcombe and Newport counsel spoke with Hitchman and his counsel on the morning of June 8.  He ends: "[A]t no time did Mr. Morgan refuse to transfer funds, and Mr. Hitchman has been advised by the undersigned of the circumstance in numerous telephone conversations."

- Shortly thereafter, and still before the Court had ruled, Glowacki e-mailed the team to advise that he had read that declaration, too.  At that point (i) an ethical attorney recognizing that his clients owed fiduciary duties to Tom Morgan, and a duty of candor to the Court, would have contacted the clerk and advised that the Court needed to be apprised of new evidence before a ruling issued, and (ii) an ethical trustee, owing fiduciary duties to Tom Morgan, would have instructed his counsel to make sure the true facts were known, and the good name of the beneficiary he was duty bound to serve was cleared.  Glowacki and Hitchman were unencumbered by such ethical constraints.  Here was their plan: "FYI. In the department now with Garrett, Le, Cynthia and Katie. Clerk says there will be no hearing, just a ruling. This Declaration tells a very different story than we did, to copy Lilian's phrase about TEM's declaration. I'm going to try to focus, if the Court takes the bench after all, on corporate control and avoid the mechanics of the transactions. We will

**COMPLAINT**

keep you posted, and may try to loop everyone on a call during our return drive." Translation? "Let's hope Judge Hubbard doesn't catch it, but if she does, I'll refuse to admit the allegations were false and shift to topics I'd rather discuss in the hopes of procuring this Order, at whatever cost."

- Sadly, Judge Hubbard didn't take oral argument and didn't catch that the Application had been built on a false premise. A short while later, she granted the ex parte application and issued an order bottomed on the Hitchmans' false suggestion that Tom Morgan had stolen $450,000. Indeed, the order expressly directed that Tom (i) "transfer $450,000- from Bank of America account …held in the name of Covina Hills MHC LLP to Bruce Hitchman and Lee Ann Hitchman as Interim Co-Trustees for re-deposit by them into an account managed by them for the benefit of" Lamplighter Chino; and (ii) "cease and desist removing any funds from any account held by" the Lamplighter Chino entities.

62.     Did the Hitchmans and their lawyers ever advise the court they had gone off half-cocked and that Tom had not stolen the money? No. Not ever. Did they ever tell Bank of America—who, by that time, had been inundated with the false story for the better part of a week—that the Hitchmans' story was false and Tom had done nothing wrong? No. Not ever. Instead, the Hitchmans' lawyers emailed the order to both Bank of America and Newport Pacific, with its damning findings based on the Hitchmans' false story and thereby left the Bank with the false impression that Tom Morgan was a thief. Curiously, counsel's email to the property manager revealed that he already knew the $450,000 was sitting in a Lamplighter Chino account at Wells Fargo: "Also, as we discussed, pursuant to the order, Hitchman Fiduciaries will be moving the $450,000 deposited into the Wells Fargo account in the name of LCH Lamplighter Chino to another account." And, his e-mail to Bank of America's lawyers was more cryptic, simply advising that: "It appears we will not need the continued freeze of the Covina Hills MHC account, as referenced in the order, since the $450K no longer resides there. We are satisfied that the first alternative that it has been returned to the Chino entities has been satisfied."

63.     Needless to say, for people who claimed to have been unaware of the truth as an excuse for filing false affidavits with Bank of America and false pleadings with the probate court, the Hitchmans and their lawyers suddenly knew an awful lot the moment they had obtained the order they coveted.

ACTIVE 45454160v4

Regardless, nowhere in anything the Hitchmans or their lawyers have turned over have Plaintiffs been able to find a communication from the Hitchmans or their lawyers to Bank of America clearing Tom Morgan's good name.

64.   The false attacks the Hitchmans peddled to Bank of America had disastrous consequences for the Morgan family and their businesses.  In short order, the decades-old Morgan family relationship with Bank of America was referred to special handling; the debt was called; Bank of America collapsed certificates of deposit in which it had a security interest to retire some of the debt; and inter-company loans had to be taken out to retire the remainder.  All the Morgan family businesses were able to survive, but the consequences will be felt for years because cash reserves earmarked for expansion to increase Morgan family wealth were instead drawn to eliminate debt that, but for the Hitchmans' interference, could have been retired over a lengthy period of time (while the reserves were used instead to grow the family businesses).  Further, the distribution of cash previously held at the partnership will trigger adverse tax consequences.  Plaintiffs have lost expansion opportunities and the profits they promised to bring. Plaintiffs have incurred costs retiring the debt and Tom Morgan's reputation with Bank of America was sullied.

65.   Did the Hitchmans even care?  Doubtless the reader already has intuited the answer ("no"). Still, to confirm the point, here is Bruce Hitchman:

Q.   Okay.  So, you knew that Bank of America was a significant financial institution not just for Lamplighter Chino, but for a host of businesses with which Mr. Morgan was involved, correct?

A.   I knew that there were a number of businesses, yes.

Q.   Before you accused Tom Morgan of misappropriating money in this affidavit you filed with Bank of America, did you ever stop to think about the impact such an accusation might have on his business relationship with that financial institution?

A.   No.

Q.   Did you ever stop to consider the impact this affidavit we've marked as Exhibit 25 could have on any relationship that any of the other Morgan family businesses might have with Bank of America?

…

A.   No.

Q.   Okay.  And, did you care one way or the other whether or not statements like this would have an adverse impact on my client?

**COMPLAINT**

A.     When it's – when it's an action that we find that it's – that it's not proper, we don't – we don't stop think, oh, might it – might it damage somebody in other ways.  If it's inappropriate, it's inappropriate.

Q.     Well, we can – it will be for a finder of fact to conclude what's inappropriate or not.  My question is did you care whether or not it would have an adverse impact on Mr. Morgan's business reputation?

A.     It didn't enter into the decision.

66.     Make no mistake about it.  Tom and MPI had acted appropriately, and did so at a time when MPI was the lawful Manager of Lamplighter Chino.  Yet, blinded by their lust for money and/or their animus towards Tom Morgan and anything associated with him, the Hitchmans and their team simply attacked with lies.  Although they knew the Morgan family had extensive business relationships with Bank of America, the Hitchmans and their team didn't give the slightest thought to the impact their false attacks might have.  All they cared about was grabbing money form themselves.

67.     Tom is in the process of building new banking relationships untainted by Hitchman misconduct.  But, the harm cannot be undone overnight.  Instead, the damage flowing from the Hitchmans' misrepresentations to, and interference with, Bank of America will be felt by Plaintiffs for years.

F.     **The Hitchmans Take Sides and Conspire with the Other Beneficiaries Against Tom.**

68.     It is basic that, upon taking over as interim co-trustees, the Hitchmans owed a fiduciary duty to treat all Beneficiaries neutrally and fairly, and to avoid taking sides in ways that could benefit one set of beneficiaries over another.  (See *Doolittle v. Exchange Bank* (2015) 241 Cal.App.4th 529, 537 ["Unless the language of a trust provides otherwise, a trustee is bound to deal impartially with all beneficiaries.  (§§ 16000, 16003.)  Hence, when a dispute arises as to who is the rightful beneficiary under a trust, involving no attack upon the validity or assets of the trust itself, the trustee ordinarily must remain impartial, and may not use the trust assets to defend the claim of one party against the other."]; see also *Whittlesey v. Aiello* (2002) 104 Cal.App.4th 1221, 1230 [rejecting request for attorneys' fees from attorney who represented trustee, who also was a beneficiary, in defending against challenge to validity of trust amendment that changed beneficiaries; trustee should remain neutral even assuming "the existence of facts that would have led the trustee to believe the trust amendment was valid"]; see also *Wolf v. Mitchell, Silberberg & Knupp* (1999) 76 Cal.App.4th 1030 [beneficiary can directly sue trust lawyers who actively assist trustees in their breaches of trust].)

69.     Yet, from the get go, the Hitchmans and their lawyers chose sides and did all they could to try to help Team Nancy secure an advantage over Tom, and to bring in recoveries that might benefit Nancy's daughters.  (See 12/7/18 Tr. at 25:16-19 [Hitchmans' counsel expressly conceding that they were acting for the benefit of the other 50% beneficiaries of the residue—i.e., Nancy's daughters].)

70.     What is more, the Hitchmans and their lawyers treated Tom as an adversary at every turn.  They did not consult him as to (i) the potential pitfalls of taking over Lamplighter Chino before they acted, (ii) Lamplighter Chino's contractual obligations, or (iii) the actual owners of the funds sitting in the $6 million certificate of deposit over which they had gained control.  They simply pilfered the TEMCT's money and interfered with Lamplighter Chino contracts, including the MPI contract.  And, everywhere they went, the Hitchmans justified their actions by parroting every wild attack fed them by Team Nancy, without regard for the truth, and without ever bothering to investigate and learn what the actual truth was.

71.     Indeed, to state that the Hitchmans' practice was to "shoot first and ask questions later" would be overly charitable to the Hitchmans and their lawyers.  Perhaps most telling is Bruce Hitchman's admission that, as of his deposition (almost two years after the Hitchmans had been appointed), he had never e-mailed, called, communicated with or even seen Tom Morgan:

Q.     Let's take Tom Morgan.  You understand that even though Tom's represented by counsel as a party, you were always free to call him and get facts, correct?

A.     We would be free to call him, yes.  That would be true.

Q.     Right.  And you never once picked up the phone to call Tom Morgan; correct?

A.     Yes.

Q.     You never wrote him; said, "Tom, I need information"?

A.     Not that I can recall, no.

Q.     On anything?

A.     No…

…

Q.     There is a beneficiary in this…conference room; correct?

A.     Yes.

Q.     Okay.  First time you met him?

A.     Yes.

Q.     First time you've seen him?

A.     Yes.

32

**COMPLAINT**

Q.     I gather you've yet to talk to him?

A.     That would be correct.

72.     The recklessness of assaulting a Beneficiary to whom you owe fiduciary duties—without ever getting his side of the story—is palpable.  And, the actions of the Hitchmans and their lawyers had real-life consequences.

## G.     In Their Zeal to Attack Tom, the Hitchmans and Their Lawyers Failed to Press a Slam-Dunk Malpractice Claim Against Former Trust Counsel Richard Pech.

73.     Once the Hitchmans were appointed as interim co-trustees, they, and they alone, had the ability to sue former trust counsel Richard Pech for malpractice to the office of trustee with respect to his advice that he should be paid out of BCMFT funds, regardless of whether his services were for trust administration or whether they were for services in defense of claims personal to Tom.  Although Pech continued to represent Tom as beneficiary (as well as in honoring his fiduciary obligations as a suspended trustee) for a time, his tenure as active trust counsel for the BCMFT effectively ended on or about March 29, 2017, when the Hitchmans were appointed.  Absent some sort of tolling, there is a one-year statute of limitations on attorney malpractice claims.  Yet, the Hitchmans and their lawyers did not bring any malpractice claims against Mr. Pech all the way up through the day their reign as interim co-trustees ended (on June 21, 2019).

74.     To be clear, there always was a slam dunk claim against Pech for his professional malpractice, as BCMFT counsel, in wrongly advising the prior trustee (Tom) that it was permissible for him to pay all Pech's fees associated with trust litigation out of funds held by the BCMFT, rather than distinguishing between trust claims (for which BCMFT assets could be used) and claims properly viewed as personal to Tom (as to which Tom was to pay from personal funds, even though, for all intents and purposes, he was the sole beneficiary).  And, it is undisputed that, as a result of Pech's advice, Pech came into possession of BCMFT assets.  Yet, although the Hitchmans and their lawyers have assured that Pech is wrongfully withholding BCMFT assets in the neighborhood of $1 million, they did nothing to pursue Mr. Pech at all, and didn't even obtain a tolling agreement from him.

75.     In an effort to mitigate this damage, Tom attempted to pursue the claim against Mr. Pech directly promptly after he was reinstated as trustee of the BCMFT.  But, what should have been a slam dunk became a claim subject to a potential statute of limitations defense that (i) Mr. Pech asserted via

33

**COMPLAINT**

demurrer, and (ii) the trial court there has upheld so far.  Although Tom (i) solicited the Hitchmans' lawyers' thoughts as to what, if anything, could be pleaded by way of amendment to overcome Pech's statute of limitations defense, and (ii) then pled what the Hitchmans offered, Pech has demurred again, and that demurrer will be resolved later this Summer.  At a minimum, Tom will have incurred fees dealing with a defense that wouldn't have even been available had the Hitchmans acted with the slightest diligence.  At worst, a claim the Hitchmans valued at more than $1 million may well have been lost as a direct result of the inaction of the Hitchmans and their lawyers.

76.     As the Court can see from Exhibit 1 to this Complaint, Tom's Amended Petition in probate court asserts a claim against the Hitchmans for their failures with respect to the Pech claim.  These facts are noted here solely to underscore the Hitchmans' pattern of carelessness.

**H.     The Beneficiaries Settle Without Giving the Hitchmans a Release, So the Hitchmans And Their Counsel Begin Making Wild Threats in Hopes of Coercing One.**

77.     On April 8, 2019, all BCMFT Beneficiaries and their counsel, along with the Hitchmans and their counsel (four lawyers in tow), attended a mediation in downtown Los Angeles before the Hon. Roy Paul (Ret.).  After marathon negotiations spanning 21 hours, the Beneficiaries reached a settlement that went far beyond the claims and issues raised in all the petitions then pending before the probate court, and that greatly mitigated the potential damages flowing from the misconduct of the Hitchmans and their lawyers.  Pursuant to the settlement:  (i) Tom and Nancy, representing a majority of the owners of Lamplighter Chino, signed a written consent to remove the Hitchmans and reinstate Morgan Partners as Manager, thereby curing the event of loan default triggered when the Hitchmans displaced Morgan Partners without the lender's advance consent; (ii) all Beneficiaries agreed on a plan of disposition for all trust assets and to support a Court order reinstating Tom as trustee of the BCMFT; (iii) the Beneficiaries agreed that all the misguided litigation the Hitchmans and their lawyers had launched against Tom could and should be dismissed with prejudice; and (iv) the Beneficiaries agreed on terms to resolve the much broader business disputes between them over Morgan family businesses, including many businesses in

which the Trust has no interest at all.  The Hitchmans and their lawyers were not parties to the settlement, and any claims against them were not released.[4]

78.     With the benefit of the files turned over by the Hitchmans and their counsel, we now know what they had hoped to receive if the Beneficiaries settled: they expected that (i) their accountings would be approved in full, (ii) they all would receive general releases, and (iii) the Hitchmans and their lawyers would be freed to go off in search of other family trusts and estates to loot.  For this reason, before the ink even was dry on the Beneficiaries' settlement, the Hitchmans and their lawyers began plotting ways to disrupt a settlement that did not include them, and/or to extort the outcome the coveted.  By way of example, at 1:29 a.m. on April 9, 2019—after the Hitchmans and their lawyers had left the mediation—the Hitchmans' lawyers already had put in place a game plan to attack a Beneficiary settlement that had yet to even be signed.  The game plan included: (i) continuing with discovery motions, (ii) trying to avoid Tom being put back in charge of the Trust and Lamplighter Chino, (iii) requesting "a very large reserve to defend themselves," and (iv) floating a threat to accuse Tom of tax fraud if everyone didn't agree to provide team Hitchman with general releases.

79.     On the evening of April 9, and still before the Hitchmans even had seen the settlement agreement, attorney Chris Carico transmitted a draft pleading along with a threatening cover letter. Specifically, Mr. Carico threatened to make a claim to the IRS that Tom had engaged in "tax fraud" if the Hitchmans did not get what they wanted:

> The confidential settlement agreement [which, again, the Hitchmans had not even seen] agreement by definition raises a whole number of public policy concerns…[which] include, among others, *the underreporting of assets to the IRS*, *the IRS equitable recoupment claim about the refund*, the inventorying and probating of assets held in decedent's name, the violation of CCP Section 2017.310 and the Hitchmans' right under *Kasperbauer v. Fairfield* to withhold an adequate reserve.  [¶] Sadly, by deliberately excluding the Hitchmans from settlement discussions and in turn the possibility for a complete resolution of the matter, your client has given the Hitchman[s] no real choice other than to object to those portions of the settlement that would return management and control to Tom, who the Court suspended, without addressing the important policy

---

[4] After the mediation, the Hitchmans and their lawyers repeatedly complained that they were excluded from the mediation. However, as the parties all know, and as subsequent documents confirm, the Hitchmans and their lawyers never were excluded—and, indeed, through Team Nancy, were closely tracking negotiations.  Ultimately, the Hitchmans and their lawyers excluded themselves from the resulting **settlement** by refusing to recognize the harm they had caused and contribute consideration to secure the releases they coveted.

ACTIVE 45454160v4

> concerns and laws instrumental to properly completing the estate administration.…*[T]he Hitchmans are providing you with an advance copy of their petition in the event you want to attempt to have meaningful discussions with me this evening.…Barring a last minute settlement this evening with the Hitchmans that addresses their concerns as set forth in the attached petition, the Hitchmans will have to file the petition tomorrow morning.*[5]

Of course, the claim conjured by Carico—which was built around Tom's acquisition from his mother of stock in a private company called Avalara, Inc.—was false. What is more, the mere fact that Mr. Carico was desirous of resuming settlement discussions confirms that obtaining a release was his end goal, and his threats were simply a clumsy ploy that he hoped would bring Tom to the table.

80.     Under settled precedent, such conduct is unethical extortion, forbidden for any professional fiduciary or lawyer. (See, e.g., Probate Code § 16004.5 [trustee may not refuse performance of obligations in order to secure benefits for themselves]; *Flatley v. Mauro* (2006) 39 Cal.4th 299 [attorney threatening to accuse entertainer of rape and of violating certain laws, including tax laws, was extortion; anti-SLAPP statue does not apply to illegal activity]; *Mendoza v. Hamzeh* (2013) 215 Cal.App.4th 799, 807 [an attorney's demand letter was extortion as a matter of law because he threatened to report "substantial fraud" to the California Attorney General, Los Angeles District Attorney, and IRS, etc. if the opposing party did not pay $75,000]; Cal. Rules of Prof. Conduct, R. 3.10, comment 1 ["a lawyer could not state or imply that a criminal or administrative action will be pursued unless the opposing party agrees to settle the civil dispute."]; see also *State v. Harrington* (1969) 128 Vt. 242 [cited by *Flatley v. Mauro*; suggestion in attorney demand letter that he might advise his client to report her husband to the IRS was extortion].) The only reason a separate cause of action for civil extortion is not asserted here is because (i) Tom refused to give in to the threats, and (ii) parting with money is an element of the tort. Still, such misconduct is relevant for punitive damages, so we detail it above and below.

81.     After the Hitchmans persisted with their efforts to force Tom to grant them an undeserved release, Tom's lawyers attempted to set up a conference call with the Hitchmans' counsel to allay their fears and discuss things such as *Kasperbauer* issues (i.e., a reserve to cover fees for the Hitchmans to defend their still-pending accountings). A conference call finally took place on April 13, 2019, but sadly,

---

[5] The draft petition was hyperbolic. It falsely accused Tom of settling to block inquiry into alleged elder abuse, supposedly buying the silence of the other Beneficiaries, and supposedly trying to "avoid[] the accurate disclosure of reportable events to the taxing authorities."

the call was as short as it was unproductive, because Hitchman counsel Chris Carico proceeded to double down again with even more incendiary threats.  Specifically, Mr. Carico jumped in at the outset of the call to (i) state, in ominous tones, "you know, we have the Avalara production," and (ii) then accuse Tom of "tax fraud" by supposedly failing to report as assets of Beverly Morgan's estate various tranches of stock in Avalara that Tom had acquired before Beverly died.  Mr. Carico essentially ended the conversation by stating that it was incumbent upon the Beneficiaries to come up with a settlement proposal satisfactory to the Hitchmans and their lawyers or they would object to the settlement and report to the IRS that, in their view, Tom had committed tax fraud.[6]

82.    Tom responded with commendable restraint.  On May 2, 2019, after the Hitchmans and their lawyers refused to allow their tax lawyer to speak to any of the Beneficiaries or their counsel, Tom's counsel directly wrote the tax lawyer retained by the Hitchmans to lay out the true facts regarding Avalara, in order to debunk the Hitchmans' contrived "tax fraud" claim.  And, on May 7, 2019, Tom's counsel again provided Mr. Carico with the underlying documents re-confirming the facts presented to the tax lawyer.  Through these two communications, Tom effectively painted the Hitchmans into a corner, and left them with two choices:  (i) continue to object to the Beneficiaries' settlement based on the manufactured claims of supposed "tax fraud" regarding the Avalara stock and then watch as Tom came forward with the true facts to expose the Hitchmans and their lawyers for the extortionists they were; or (ii) move to the final stage of grief (acceptance), realize that the jig was up, and beat a hasty retreat from the false attacks they had been publishing.

83.    On May 13, 2019, the Hitchmans and their lawyers filed a response to the Beneficiaries' Joint Petition for approval of their settlement that (i) threw in the towel on their main pretext for opposing the settlement (the contrived claim of "tax fraud"),[7] and (ii) effectively withdrew objections to the settlement.

---

[6] In truth, the Avalara stock all was properly accounted for, and there was no tax fraud – only a clumsy Hitchman threat based on a story manufactured by the lawyers.

[7] Rather than simply admit they had gone off half-cocked and made threats out of desperation, the Hitchmans and their lawyers retreated under cover of another false story—that they supposedly were advised by tax counsel that they need not made disclosures because the IRS had blown it by failing to question the original return submitted by Tom.  *This was another Hitchman lie*.

84.     On May 29, 2019, the parties participated in a further mediation—this time before the Hon. Reva Goetz (Ret.)—in hopes of settling claims arising from misconduct by the Hitchmans and their lawyers.  Well in advance of the mediation, Plaintiffs provided a detailed letter laying out the potential claims over which settlement negotiations should focus; as a gesture of good faith, that letter also identified significant damages that would be recoverable in litigation, but that Plaintiffs wouldn't ask a cent for in mediation.  The mediation failed and, if this Court wishes to know why, Plaintiffs (i) are happy to waive the mediation privilege and have the Court inquire directly from Judge Goetz, and (ii) invites the Hitchmans and their lawyers to waive the privilege as well.

85.     Meanwhile, the Hitchmans refused to accept the validity of the resolution reinstating Morgan Partners as Manager of Lamplighter Chino—thereby keeping alive the event of default they had created, with all the risks that default posed for Tom, Nancy and the enterprise.  And, they refused to take any further actions to help soon-to-be trustee Tom mitigate damages in other ways, holding everything in abeyance until the Court ruled.

86.     Despite the Hitchmans' ongoing breaches of their fiduciary duties, Tom continued to act with restraint.  On June 3, 2019, Tom wrote to propose that the parties enter into a tolling agreement to provide breathing space for further dialogue and exchange of information, and to ensure that the parties could focus on important damage-mitigating matters such as (i) mooting the event of default hanging over the head of Lamplighter Chino and its owners, and (ii) resolving any outstanding issues with the IRS.  Although they soon would go back to attacking Tom, the Hitchmans agreed to do something reasonable in this one instance and signed the tolling agreement; a true and correct copy of the executed tolling agreement is attached hereto as **Exhibit 3** and incorporated by this reference.  (As alleged in paragraph 16, the Hitchmans have agreed to further tolling beyond this.)

**I.      The Beneficiaries' Settlement Is Approved After Another Surprise—Disclosure That the Hitchmans and Their Lawyers Had Been Breaching Their Duty of Candor.**

87.     Meanwhile, on April 29, 2019, the beneficiaries brought a petition for approval of their settlement.  The Hitchmans responded on May 13, 2019, and Tom replied on May 20, 2019.  The petition then came on for hearing on June 17, 2019, before Judge Hubbard.  It was here that Tom learned how the Hitchmans and their lawyers had been breaching their duties of candor to line their own pockets.

88.     The hearing began with Judge Hubbard disclosing it had just come to her attention that her significant other (an Orange County attorney) had been retained by, and was working for, the Hitchmans on a number of matters.  To be clear, it was apparent to all that Judge Hubbard had just learned of this and had acted promptly and properly in making the disclosure.  Sadly, the same cannot be said of the Hitchmans and their lawyers.  On the heels of Judge Hubbard making her commendable disclosure, Hitchman counsel John Glowacki jumped in and admitted that he and the Hitchmans had known of the conflict for a very long time and yet had said nothing.

89.     After allowing the parties time to confer with counsel, Judge Hubbard recused herself to avoid any appearance of impropriety, and the pending matters were transferred that same day to the Hon. Jacki C. Brown in Dept. C06.  After entertaining lengthy argument—all over various issues the Hitchmans had raised in hopes of protecting themselves once the settlement was approved—Judge Brown approved the Beneficiaries' settlement in full, with protections for the Hitchmans that the Beneficiaries had been proposing from the outset.  The Court then directed Tom's counsel to prepare an order accurately memorializing her rulings and advised that, if all parties approved the form of the order, she would sign it forthwith.  As a precaution, the Court also set a further hearing for June 21, 2019 to resolve any objections to the form of the order should the parties not be able to agree.

90.     No powers of omniscience are required to divine what happened next.  All Beneficiaries quickly agreed on the form of a proposed order for entry by the Court, which did precisely what the Court had requested and ordered; the Hitchmans' lawyers in turn proposed changes that, if accepted, would have directly contravened what the Court had just ordered.  Rather than dig in their heels, with Tom's counsel taking the lead, the Beneficiaries quickly agreed on a revised proposed order that provided even more protections for the Hitchmans, but the Hitchmans' lawyers objected again.  So, the June 21, 2019, hearing went forward as scheduled.

91.     The hearing is reported and, for that reason, will not be described at length here.  Suffice it to say, the Court overruled the Hitchmans' lawyers' objections and, with minor edits, ended up entering the Beneficiaries' proposed order.

92.     As he had assured the Court he would do, Tom quickly set about trying to mitigate still-more potential damages.  He promptly notified PNC Bank that MPI was back in charge of Lamplighter Chino, thereby curing the Hitchmans' longstanding event of default.

93.     He worked with tax counsel to provide the IRS with all information necessary to complete and successfully resolve the supplemental 706.

94.     Finally, in hopes of never having to litigate against the Hitchmans or their lawyers for failing to sue Mr. Pech, Tom, as trustee, even sued Mr. Pech to recover any fees that should not have been paid out of Trust funds.  But, Pech demurred on statute of limitations grounds—an argument on which he has been successful so far.

95.     Ultimately, Tom turned back to the Hitchmans and attempted to resolve any outstanding claims against them consensually.  Tom proposed yet another mediation, provided that the Hitchmans disclose information concerning their insurance coverage and show up at the mediation with insurance representatives in tow.  Although Tom already had walked the Hitchmans and their lawyers through the claims to be mediated—and even listed them in the parties' tolling agreement—the Hitchmans' lawyers attempted to delay things by objecting to providing insurance information and professing a lack of knowledge as to what the nature of the claims might be.  To be clear, that proffered excuse was false: Tom already had laid out the claims in a detailed letter prior to the last, failed mediation, and the claims also were identified by name in the parties' tolling agreement.  Still, on August 26, 2019, the probate court ordered Tom to lodge a draft complaint in advance of the next Case Review Hearing to provide the information the Hitchmans claimed to need.  So, Tom prepared and lodged that pleading, along with a companion draft civil complaint laying out the claims now asserted against the Hitchmans here.

96.     Although the Court (by ordering the filing of a draft complaint) and Tom (by complying with the order) had taken away the latest Hitchman excuse for delaying mediation (that the Hitchmans and their lawyers supposedly didn't know what the claims were), at the next Court-ordered hearing, the Hitchmans' lawyers simply came up with a new excuse for avoiding mediation.  Now, the Hitchmans and their lawyers claimed, the Hitchmans' insurers could not be expected put money on the table unless the Hitchmans were allowed to first test Tom's claims through discovery—i.e., unless they were allowed to litigate.  With the Hitchmans' lawyers having made clear that mediation would be a waste of time, the

Court, on October 25, 2019, declined to extend a stay on litigation that it had imposed and made clear that its prior stay would expire on November 18, 2019.  The Court further ordered Tom to file his Amended Petition in probate against the Hitchmans by November 22, 2019, which Tom did.

97.     Significantly, the Court also ordered the Hitchmans and their counsel to turn over the files relating to their stewardship as trustees and trust counsel.  Soon thereafter, the Hitchmans retained new counsel to represent them, and substituted out R&G and the Carico Firm.  After all this, there was yet another mediation with the Hitchmans, but that mediation also failed to bear fruit so, with their tolling agreement with the Hitchmans having just expired, Plaintiffs have brought this timely complaint.

98.     Meanwhile, after reviewing the files turned over by the Hitchmans, R&G and the Carico Firm, Tom learned that the Hitchmans' lawyers have culpability, too.  Rather than file a lawsuit, however, Tom offered both R&G and the Carico Firm the opportunity to (i) enter into a separate tolling agreement of their own, and (ii) participate in yet another mediation.

99.     Both firms entered into a tolling agreement, a true and correct copy of which is attached hereto as **Exhibit 4** and incorporated by this reference.  By the terms of that agreement, plaintiffs' claims against the Hitchmans' lawyers cannot be asserted as of this filing.  So, at this juncture, this Complaint is asserted against the Hitchmans alone.

100.    With that, we set forth below the non-probate claims against the Hitchmans.

## FIRST CAUSE OF ACTION

**(By Tom Morgan, as Trustee of the TEMCT, against the Hitchmans for Conversion of TEMCT Funds)**

101.    As Trustee of the TEMCT, Tom realleges by this reference paragraphs 1-100 above, as though set forth in full herein.

102.    The TEMCT lent Lamplighter Chino $250,000 to be used for the purpose of pooling funds for a certificate of deposit with Bank of America.  These funds were to be repaid with interest if and when the certificate of deposit was liquidated.

103.    The Hitchmans substantially interfered with the TEMCT's right to these funds by liquidating the certificate of deposit in question but refusing to return either the $250,000 or interest thereon.  The Hitchmans did this even though one of their lawyers had advised there was some evidence

**COMPLAINT**

to suggest that not all of the funds belonged to Lamplighter Chino.  Rather than return the TEMCT's property to its rightful owner, the Hitchmans willfully and deliberately transferred it to the BCMFT and then, as Interim Co-Trustees, spent the funds for improper purposes and without authority.

104.   Although the TEMCT made demand on the Hitchmans for return of these monies—and even provided irrefutable proof that the money belonged to the TEMCT—the Hitchmans wrongfully refused to return the TEMCT's money and have continued to wrongfully refuse to return it to this day.

105.   The TEMCT, and Tom as Trustee of the TEMCT, did not consent to this wrongful retention.

106.   The TEMCT was harmed thereby.

107.   The Hitchmans' conduct was a substantial factor in causing the TEMCT harm.

108.   At a minimum, the Hitchmans were grossly negligent in taking these actions. Alternatively, they engaged in this misconduct intentionally, and acted with oppression, fraud and malice, such that an award of exemplary damages is appropriate to punish them and deter them from engaging in similar misconduct in the future.

## SECOND CAUSE OF ACTION

### (By Tom Morgan, as an Individual Owner of Lamplighter Chino, against the Hitchmans for Conversion of Distributions)

109.   Tom realleges by this reference paragraphs 1-100 above, as though set forth in full herein.

110.   As a 20% owner of Lamplighter Chino, Tom was entitled to 20% of the distributions made from that enterprise.  As alleged above, after deducting $250,000 on deposit belonging to the TEMCT, Lamplighter Chino had $5.75 million held in a certificate of deposit.  The Hitchmans liquidated the certificate of deposit but, instead, of properly distributing the owners their proportionate shares of the $5.75 million (plus interest), they over-distributed to the BCMFT and under-distributed to the other owners (e.g., Tom and his sister, Nancy) by first spending $2.5 million to pay off an obligation of the BCMFT and then distributing the balance in accordance with the percentage ownership interests, with no accounting for the fact that ***2.5 million already had been distributed on behalf of the BCMFT***.  As a result, Tom was shortchanged $450,000 of distributions due him as an owner of Lamplighter Chino, while Nancy was shortchanged $652,000.  Tom understands that, whether out of fatigue for litigation or loyalty

**COMPLAINT**

to the Hitchmans for having sided with her in attempting to pursue Tom, Nancy does not wish to pursue recovery of the $652,000 pilfered from her.  Thus, Tom sues in his individual capacity for his individual loss, rather than as Manager of Lamplighter Chino for all losses sustained by all Lamplighter Chino owners.

111.     The Hitchmans substantially interfered with Tom's right to these funds by liquidating the certificate of deposit in question and distributing the proceeds, but wrongfully failing to return Tom's share to him.  Rather than return this property to its rightful owner, the Hitchmans willfully and deliberately transferred it to the BCMFT and then, as Interim Co-Trustees, spent the funds for improper purposes.

112.     Although Tom has made demand on the Hitchmans for return of these monies, the Hitchmans wrongfully refused to return the monies and have continued to wrongfully refuse to return such sums to this day.

113.     Tom did not consent to this wrongful retention.

114.     Tom was harmed thereby.

115.     The Hitchmans' conduct was a substantial factor in causing Tom harm.

116.     At a minimum, the Hitchmans were grossly negligent in taking these actions.  Alternatively, they engaged in this misconduct intentionally, and acted with oppression, fraud and malice, such that an award of exemplary damages is appropriate to punish them and deter them from engaging in similar misconduct in the future.

**THIRD CAUSE OF ACTION**

**(By Tom Morgan, as an Individual Owner of Lamplighter Chino, against the Hitchmans for Breach of Fiduciary Duty)**

117.     Tom realleges by this reference paragraphs 1-100 above, as though set forth in full herein.

118.     By installing themselves as the Manager of Lamplighter Chino, the Hitchmans assumed fiduciary duties to Tom and the other owners, including fiduciary duties of loyalty and to use reasonable care, a duty to treat Tom fairly vis-à-vis the other owners, and a duty to preserve assets Tom was entitled to receive.  In other words, the Hitchmans' fiduciary duties to the owners of Lamplighter Chino, were to preserve assets for the benefit of the owners of Lamplighter Chino—not to drain Lamplighter Chino of

43

**COMPLAINT**

assets so that the Hitchmans, as Interim Co-Trustees of the BCMFT, could spend them for purposes that did not benefit Lamplighter Chino (such as trying to gin up claims against Tom).

119.    The Hitchmans have breached all these duties to Tom and have failed to act as a reasonably prudent fiduciary would have acted under the same or similar circumstances.  They also knowingly acted against Tom's interests in engaging in the acts alleged above, and improperly treated owners unequally (by, for example, covertly conspiring with Nancy to plot actions that harmed Tom).

120.    By way of example, as a 20% owner of Lamplighter Chino, Tom was entitled to 20% of the distributions made from that collective enterprise.  As alleged above, after deducting $250,000 on deposit belonging to the TEMCT, Lamplighter Chino had $5.75 million held in a certificate of deposit. The Hitchmans liquidated the certificate of deposit but, instead, of properly distributing the owners their proportionate shares of the $5.75 million (plus interest), they over-distributed to the BCMFT by (i) applying $2.5 million to extinguish what was a BCMFT obligation, and (ii) then distributing the remainder all the owners (including BCMFT) in accordance with their percentage interests without accounting for the fact that $2.5 million already had been distributed for the BCMFT, with no corresponding distributions to the other owners (e.g., Tom and his sister, Nancy).  All told, Tom was shortchanged $450,000 of distributions due him as an owner of Lamplighter Chino, while Nancy was shortchanged $652,000 (although she at least benefitted in other ways, through the Hitchmans using such pilfered funds to try to benefit her).

121.    Additionally, as alleged in detail above, the Hitchmans deliberately tarred and feathered Tom to Bank of America, thereby sullying Tom's valuable, decades-old relationship with that financial institution, by falsely accusing Tom of stealing $450,000 from Lamplighter Chino.

122.    Finally, having improperly wrested control of Lamplighter Chino in a way that triggered a default with that enterprise's lender (PNC Bank), the Hitchmans refused to cure that default by reinstating MPI as Manager of Lamplighter Chino, and instead, spent as yet unquantified sums hiring lawyers to attempt to secure retroactive approval of their covert takeover.  All those efforts failed—meaning the expenditures were wasted—and, adding insult to injury, PNC Bank has tendered a bill to Lamplighter Chino for $9,000 to cover its legal costs for having to deal with the Hitchmans' machinations.

123.    Tom understands that Nancy does not wish to litigate to recover her individual damages flowing from the facts described above, leaving Tom as the only Lamplighter Chino owner with a grievance—a grievance that now is unique.  Accordingly, rather than use Lamplighter Chino funds to pursue a company claim to benefit all owners, Tom is using his own funds to pursue an individual claim for his share of the damage.

124.    Tom did not give informed consent to any of the Hitchmans' wrongful conduct.

125.    Tom has been harmed, and the Hitchmans' misconduct was a substantial factor in causing Tom harm, in an amount to be proven at trial but well in excess of the jurisdictional minimum of this Court.

126.    At a minimum, the Hitchmans were grossly negligent in taking these actions. Alternatively, they engaged in this misconduct intentionally, and acted with oppression, fraud and malice, such that an award of exemplary damages is appropriate to punish them and deter them from engaging in similar misconduct in the future.

## FOURTH CAUSE OF ACTION

### (By MPI against the Hitchmans for Intentional Interference with MPI's Asset Management Contract)

127.    MPI realleges by this reference paragraphs 1-100 above, as though set forth in full herein.

128.    At all material times, there was a valid written contractual relationship between MPI and Chino Holdings LP calling for MPI to provide certain services to Chino Holdings LP in return for compensation specified therein.

129.    Tom is informed and believes, and based thereon alleges, that either directly or through their authorized agents, the Hitchmans knew of this contractual relationship.

130.    The Hitchmans wrongfully interfered with that contract by instructing that MPI should not be paid for the services it was providing thereunder, without causing Chino Holdings LP to take any of the steps lawfully required to terminate that contract, which still is in existence to this day.

131.    The Hitchmans intended to disrupt the performance of this contract, and/or knew that disruption of performance was certain or substantially certain to occur.

**COMPLAINT**

132.   MPI was harmed in an amount to be proven at trial, but in excess of the jurisdictional minimum of this Court.

133.   The Hitchmans' conduct was a substantial factor in causing MPI's harm.

134.   The Hitchmans have acted with oppression, fraud and malice, such that an award of exemplary damages is appropriate to punish them and deter them from engaging in similar misconduct in the future.

## FIFTH CAUSE OF ACTION

**(By MPI against the Hitchmans for Negligent Interference with MPI's Economic Advantage)**

135.   MPI realleges by this reference paragraphs 1-100 above, as though set forth in full herein. This claim is pled in alternative to the Fourth Cause of Action.

136.   At all material times, there was a valid written contractual relationship between MPI and Chino Holdings LP calling for MPI to provide certain services to Chino Holdings LP in return for compensation specified therein.  Whether or not the Hitchmans were specifically aware of the existence of this contract, they knew of this relationship.

137.   The Hitchmans knew or should have known that this relationship would be disrupted if they failed to act with reasonable care.

138.   The Hitchmans failed to act with reasonable care and engaged in wrongful conduct by instructing that payments to MPI be discontinued.  And, in fact, their conduct rose to the level of gross negligence.

139.   MPI's relationship with Chino Holdings LP was disrupted thereby.

140.   MPI was harmed in an amount to be proven at trial, but in excess of the jurisdictional minimum of this Court.

141.   The Hitchmans' wrongful conduct was a substantial factor in causing that harm.

## SIXTH CAUSE OF ACTION

**(By All Business Entity Plaintiffs Against the Hitchmans for Intentional Interference with Bank of America Relationship)**

142.   Plaintiffs reallege by this reference paragraphs 1-100 above, as though set forth in full herein.

**COMPLAINT**

143.    At all material times, each of these plaintiffs had a contractual relationship with Bank of America carrying a substantial probability of an economic benefit.

144.    Either directly or through their authorized agents, the Hitchmans knew of the existence of these contractual relationships.

145.    The Hitchmans wrongfully interfered with these contractual relationships by engaging in the acts alleged above, including the filing of Affidavits falsely accusing plaintiffs' principal of theft.

146.    The Hitchmans intended to disrupt the performance of these contractual relationships, and/or knew that disruption of performance was certain or substantially certain to occur.

147.    Plaintiffs were harmed thereby in an amount to be proven at trial, but in excess of the jurisdictional minimum of this Court.

148.    The Hitchmans' conduct was a substantial factor in causing plaintiffs' harm.

149.    The Hitchmans have acted with oppression, fraud and malice, such that an award of exemplary damages is appropriate to punish them and deter them from engaging in similar misconduct in the future.

## SEVENTH CAUSE OF ACTION

**(By All Business Entity Plaintiffs Against the Hitchmans for Negligent Interference with Bank of America Relationship)**

150.    Plaintiffs reallege by this reference paragraphs 1-100 above, as though set forth in full herein.  This claim is pled in alternative to the Sixth Cause of Action.

151.    At all material times, there were valid contractual relationships between these plaintiffs and Bank of America carrying a substantial probability of an economic benefit.

152.    The Hitchmans knew or should have known that these relationships would be disrupted if they failed to act with reasonable care.

153.    The Hitchmans failed to act with reasonable care and engaged in wrongful conduct by engaging in the acts alleged above, including the filing of a perjured Affidavit falsely accusing plaintiffs' principal of theft.  In fact, the Hitchmans' conduct rose to the level of gross negligence.

154.    Plaintiffs' relationships with Bank of America were disrupted thereby.

**COMPLAINT**

155.    Plaintiffs were harmed in an amount to be proven at trial, but in excess of the jurisdictional minimum of this Court.

156.    The Hitchmans' wrongful conduct was a substantial factor in causing that harm.

### PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for judgment as follows:

1.    For compensatory and consequential damages according to proof.

2.    For punitive damages, on all causes of action where they are permitted, in an amount sufficient to make an example of the Hitchmans and to deter similar misconduct in the future.

3.    For costs of suit.

4.    For such other and further relief as the Court may deem just as proper, including attorneys' fees to the fullest extent permitted by law.

**COMPLAINT**

ACTIVE 45454160v4

Dated: August <u>10</u>, 2020

Respectfully submitted,

GREENBERG TRAURIG, LLP, and

OLDMAN, COOLEY, SALLUS,
BIRNBERG, COLEMAN & GOLD LLP

By: _____

     Scott D. Bertzyk

Attorneys for Petitioner
THOMAS E. MORGAN, III

49
**COMPLAINT**

## VERIFICATION

I, Thomas E. Morgan, III, declare as follows:

I am a party to this action and am authorized to act on behalf of each of the Plaintiffs herein.  I have read the foregoing **VERIFIED COMPLAINT FOR DAMAGES** and know its contents.  The matters stated in the foregoing document are true of my own knowledge except as to those matters that are stated on information and belief and, as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed this _10_ day of August, 2020, in Kent, Washington.

THOMAS E. MORGAN, III

50
**COMPLAINT**

# EXHIBIT 6

**FKB** **Furman Kornfeld**
**& Brennan** LLP

61 Broadway, 26th Floor, New York, NY 10006
Tel: 212-867-4100  Fax: 212-867-4118
www.fkblaw.com

March 29, 2019

**VIA EMAIL (PDF): Bruce@hitchmanfiduciaries.com**
**PRIVILEGED & CONFIDENTIAL**

Hitchman Fiduciaries
120 Tustin Ave, Suite C
Newport Beach, CA 92663

Attn:   Bruce Hitchman

| Re: | Insured | : | Hitchman Fiduciaries |
|-----|---------|---|----------------------|
| | Potential Claimant | : | Thomas Edward Morgan, III |
| | Policy No. | : | FPL19105754K |
| | Policy Period | : | January 1, 2019 to January 1, 2020 |
| | Policy Limits | : | $2,000,000/$4,000,000 Per Claim/Aggregate, Including Costs and Expenses; |
| | Deductible | : | $15,000 Per Claim, Including Costs and Expenses |
| | Retroactive Date | : | January 1, 2010 |
| | FKB File No. | : | 407.369 |

Dear Mr. Hitchman:

As you know, my Firm represents the interests of those certain interested Underwriters at Lloyd's, London ("Underwriters") who subscribed to the above-referenced January 1, 2019 to January 1, 2020 Policy with limits of $2,000,000/$4,000,000 Per Claim/Aggregate, including Costs and Expenses, subject to a $15,000 Per Claim Deductible, including Costs and Expenses (the "Policy").

We are in receipt of the following materials on behalf of Underwriters: (1) the Fiduciary Professional Liability Insurance Policy referenced above; (2) your Notice of Potential Claims dated March 10, 2019; (3) the Removal Request; (4) Thomas Morgan's Petition for: i) Order Suspending and Removing Interim Co-Trustees; ii) Review of Accounting and Surcharges; and, iii) Damages for Breach of Fiduciary Duty filed on October 3, 2018; (5) Private Professional Fiduciaries' First and Second Accounts Current and Report of Interim Co-Trustees and Petition for Settlement of Accounts, And For Ratification of Attorneys' Fees Paid and Interim Cotrustees' Fees Paid filed on October 17, 2018; (6) Respondents, Bruce Hitchman And Lee Ann Hitchman, Interim Co-Trustees', Response And Objections To Thomas E. Morgan III's Petition filed on November 28, 2018; and (7) First Verified Supplement To Private Professional Fiduciaries' First And Second Accounts Current And Report Of Interim Co-Trustees filed on January 30, 2019.

We do not lend any credence to the allegations made against you. However, the coverage position described below is based upon information provided in connection with your submission of the above-noted matter. Should further pertinent information become available, we may revise Underwriters' position accordingly and reserve the right to do so.

Hitchman Fiduciaries
FKB No. 407.369
Page 2 of 6

## I.     FACTUAL BACKGROUND

Please advise us if anything within the following summary appears inaccurate.

This matter arises out of your role as Interim Co-Trustees of the Beverly C. Morgan Family Trust as Amended and Restated November 6, 2013 (the "Trust").  Beverly C. Morgan died on January 25, 2014. Following Beverly's death, the Trustee of the Trust was Thomas Edward Morgan, III ("Claimant").

In March 2017, the Court in Orange County Superior Court issued Minute Orders suspending Claimant as Trustee, and appointed you as "Co-Successor Trustees." On April 4, 2017, the Honorable Judge Kim R. Hubbard signed an Order appointing the Assured as Interim Co-Trustees of the 2013 Trust.

On October 3, 2018, Claimant filed a Petition for: 1) Order Suspending and Removing Interim Co-Trustees; 2) Review of Accounting and Surcharges; and, 3) Damages for Breach of Fiduciary Duty filed on October 3, 2018.  Wherein, Claimant seeks an unspecified amount of punitive damages, an award of exemplary damages, the imposition of surcharges for attorney and trustees' fees, and costs of suit.

You advised us that Cynthia V. Roehl & John P. Glowacki of Roehl & Glowacki, P.C., are representing you regarding the Petitions filed by Claimant, and that the Attorney's fees are being paid out of the Trust.  You further advised that Carico Macdonald Kil & Benz LLP are also representing them in regards to tax and corporate issues in managing Trust assets.

The next hearing regarding these matters is on April 10, 2019.  The accounting and petition to remove are set for trial, ostensibly, on May 20, 2019, however your counsel, John P. Glowacki, advised that the date for trial might change.

## II.     COVERAGE  OPINION & ANALYSIS

There are certain terms of the Policy that define and limit the coverage afforded.  Having reviewed the materials provided in connection with the above-referenced Claim, and in conjunction with the terms and conditions of your Policy, we take this opportunity to convey Underwriters' preliminary position with regard to coverage.  As noted, Underwriters recognize that the allegations are unsubstantiated at this time, and nothing contained in this letter is intended to suggest that those allegations have any factual or legal merit.

Although the analysis herein is based upon information presently available, since this matter is still "preliminary," Underwriters' analysis is, by necessity, also preliminary. Nevertheless, we believe it is prudent (and of benefit to you and Underwriters) at this early juncture to outline certain Policy terms which may later become applicable.

Hitchman Fiduciaries
FKB No. 407.369
Page 3 of 6

Please refer to the **INSURING AGREEMENTS** section (Section I) of your Policy. Under the Insuring Agreement, Underwriters agreed:

"[t]o pay on behalf of the **Assured Damages** and **Claims Expenses**[1] which the **Assured** shall become legally obligated to pay because of any **Claim** or **Claims,** including **Claims** for **Personal Injury** as hereafter defined, first made against the **Assured** and reported to the **Underwriters** during the **Period of Insurance** or **Extended Reporting Period**, arising out of any act, error or omission of the **Assured** in rendering or failing to render **Professional Services** as hereinafter defined for others but solely for acts on behalf of the **Named Assured** designated in Item 1 of the Declarations and caused by the **Assured**, except as excluded or limited by the terms, conditions and exclusions of this **Policy**."

See Policy Section I.A.

Further, the **DEFINITIONS** section of your Policy states as follows:

"**Claim**" is defined under the Policy as "a demand received by any **Assured** for money or services outside the **Ordinary Course of Business** including the service of suit or institution of arbitration proceedings against the **Assured**." See Policy, Section V.

"**Damages**" is defined under the Policy as "a monetary judgment, award or settlement, and shall include:

1.  compensatory damages;
2.  damages calculated as a multiple of compensatory damages (where        insurable by law);
3.  punitive or exemplary damages (where insurable by law);
4.  pre-judgment interest; and
5.  post-judgment interest that accrues after entry of judgment and before we have paid, offered to pay or deposited in court that part of judgment within the applicable Limit of Liability.

---

[1] Pursuant to Section V. of the Policy, "**Claims Expenses**" means:

1.  fees charged by an attorney designated by **Underwriters** and consented to by the **Named Assured**, with such consent not to be unreasonably withheld; and
2.  all other fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a **Claim**, suit or proceeding arising in connection therewith, if incurred by the **Underwriters**, or by the **Assured** with the written consent of the **Underwriters**.
3.  **Claims Expenses** does not include any costs incurred in the **Ordinary Course of Business**, nor any salary, overhead or other charges incurred by the **Assured** for time spent in cooperating in the defense and investigation of any **Claim** or circumstance which might lead to a **Claim** notified under this **Insurance**.
4.  **Claims Expenses** also does not include any fees, costs, expenses or other charges incurred by the **Assured** -- or incurred for or on behalf of the **Assured** -- if such fees, costs, expenses or other charges are payable or reimbursable by any other sources, including but not limited to any applicable trust or estate.

Hitchman Fiduciaries
FKB No. 407.369
Page 4 of 6

> However, Damages shall not include any amounts for which the Assured is not financially liable or for which there is no legal recourse against the Assured, the costs and expenses of complying with any injunctive or other form of equitable relief, the reimbursement of fees, the payment of sanctions, or any other matters that may be deemed uninsurable under the law."

<u>See</u> Policy, Section V. ("DEFINITIONS").

### A. <u>The October 3, 2018 Petition</u>

The Petition presents a **Claim**, since it constitutes a demand for money or services outside the **ordinary course of business**.[2]  As discussed above, the Petition includes various allegations of breach of fiduciary duties and Claimant seeks an unspecified amount of punitive damages, an award of exemplary damages, the imposition of surcharges for excessive attorneys' and trustees' fees, and costs of suit.  <u>However, you have requested that Underwriters treat this matter as a potential Claim at this time.</u>  We understand that Cynthia V. Roehl Esq. & John P. Glowacki Esq. of Roehl & Glowacki, P.C. represent you in defense of this matter, and that their fees are being paid by the Trust.  <u>Accordingly, as discussed and agreed, it is not necessary for Underwriters to assign defense counsel at this time.</u>

Pursuant to the Policy, Underwriters have the following duty to defend:

**Defense and Settlement (Included in the Limit of Liability)**

1. The **Underwriters** shall have the right and duty to defend, subject to the **Limits of Liability**, any **Claim** against the **Assured** seeking **Damages** which are payable under the terms of this **Insurance**, even if any of the allegations of the **Claim** are groundless, false or fraudulent.  However, **Underwriters** shall not formally appoint defense counsel without the consent of the **Named Assured**, such consent not to be unreasonably withheld.

<u>See</u> Policy Section I.B.

As noted above, you have requested that Underwriters **not** appoint counsel on your behalf to defend your interests in connection with the Petition at this time.  Therefore, and for the reasons set forth more fully in the Policy (see in particular the definition of **Claims Expenses**), Underwriters are and will not be responsible for any fees incurred by you and Underwriters reserve rights in regard to the selection of defense counsel.  **<u>If you wish to later request that Underwriters appoint defense counsel, such a request must be sent to our office in writing.</u>**

---

[2] **"Ordinary Course of Business"** means the usual, routine or customary services, practices and procedures of an Assured in rendering Professional Services, including but not limited to the production of, revision or supplement to an accounting, financial statement, invoice or other similar report or document. <u>See</u> Policy, Section V.

Hitchman Fiduciaries
FKB No. 407.369
Page 5 of 6

### B. **Applicable Exclusions**

Please refer to the **EXCLUSIONS** Section of the Policy (Section IV). Depending upon any allegations that may be made against you in any future Claim arising out of the Petition, it presently appears that one or more of the following could apply to preclude or restrict coverage under the Policy. We specifically direct your attention to Exclusions A, B, L, I, and P. See Policy, Section IV. Under these Exclusions the coverage under this Insurance does not apply to **Damages** or **Claims Expenses**.

### C. **Notice**

Section XI of the Policy ("NOTICE OF CLAIM, OR CIRCUMSTANCE THAT MAY LEAD TO A CLAIM") states in pertinent part that:

If any **Claim** is made against the Assured, the Assured shall immediately forward to Underwriters through persons named in Item 7 of the Declarations [Dominion Insurance] every demand, notice, summons or other process received by him or his representative.

If during the **Period of Insurance** the Assured first becomes aware of any act, error or omission that could reasonably be the basis for a **Claim** it must give written notice to Underwriters through persons named in Item 7 of the Declarations [Dominion Insurance] during the **Period of Insurance** of:

1.     the specific act, error or omission; and
2.     the injury or damage which may result or has resulted from the act, error or omission; and
3.     the circumstance by which the Assured first became aware of the act, error or omission.

Any subsequent **Claim** made against the Assured which is the subject of the written notice shall be deemed to have been made at the time written notice was first given to Underwriters.

A **Claim** shall be considered to be reported to the Underwriters when notice is first given to Underwriters through persons named in Item 7 of the Declarations [Dominion Insurance] of the **Claim** or of an act, error or omission which could reasonably be expected to give rise to a **Claim**.

All **Claims** arising out of the same, continuing or related **Professional Services** shall be considered a single **Claim** and deemed to have been made at the time the first of the related **Claims** is reported to Underwriters and shall be subject to one Limit of Liability.

According to our records, Underwriters first received notice of this matter from you via e-mail on March 10, 2019, despite Claimant filing his Petition for Removal October 3, 2018. Underwriters therefore reserve all rights in that regard.

Hitchman Fiduciaries
FKB No. 407.369
Page 6 of 6

### D. __Other Applicable Insurance/Subrogation__

To the extent that you maintain other applicable insurance, Underwriters reserves its rights under Section X. of the Policy ("Other Insurance"):

> This insurance shall apply in excess of any other valid and collectible insurance available to any **Assured**, unless such other insurance is a surety bond or is written only as specific excess insurance over the **Limit of Liability** of this Policy.

To the extent that any other insurance policy naming you as an additional insured provides coverage to this matter, Underwriters reserves rights under the foregoing provision.

Pursuant to Policy Section XIV ("Subrogation") any rights of the Assured to recover defense costs or indemnity incurred from any sources other than Underwriters shall be subrogated to Underwriters, entitling Underwriters to the same such rights of recovery. See Policy, section XIV. ("Subrogation").

Please also be aware that there may be other Policy terms, conditions and exclusions that may be applicable, and that this letter is not intended to be an exhaustive recitation of all potentially applicable terms, conditions, or exclusions of the Policy.

### I. __FURTHER HANDLING__

As discussed and agreed, Underwriters will treat this matter as a potential Claim, and it is not necessary to, and Underwriters will not, appoint defense counsel at this time.[3]  Although we do not lend any credence to the allegations against you, the coverage position described above is based upon the information provided.  Please notify us immediately of any developments.  Should further pertinent information become available, we may revise Underwriters' position and reserve the right to do so.  If you have additional information you believe may impact Underwriters' coverage position, we ask that you immediately forward the same.

If you have any questions regarding Underwriters' position, or wish to submit additional information bearing on coverage, please promptly contact the undersigned.

Very truly yours,

FURMAN KORNFELD & BRENNAN LLP

Andrew R. Jones

---

[3] All costs incurred in any independent engagement of legal counsel in connection with the Complaint are not payable by Underwriters as they are not "**Claims Expenses**" as defined in the Policy.

Hitchman Fiduciaries
FKB No. 407.369
Page 7 of 6

cc:    Geoff Lealan / Andrew Hua– Miller Insurance:
       Geoff.Lealan@miller-insurance.com; Andrew.Hua@miller-insurance.com

       Larry Hilton – Dominion Insurance:
       larry.hilton@dominioninsurance.com

       David Furman (FKB-NYC)

# EXHIBIT 7

| From: | Andrew R. Jones, Esq. |
|---|---|
| To: | James A. Lowe; David Furman, Esq. |
| Cc: | Bruce@hitchmanfiduciaries.com; LeeAnn@hitchmanfiduciaries.com |
| Subject: | Underwriters" coverage for Hitchman Fiduciaries, FKB # 407.369, 10949.001, Demand for independent defense counsel |
| Date: | Monday, January 24, 2022 2:51:23 PM |
| Attachments: | image776110.jpg<br>21-12-24 demand to Underwriters for independent counsel.PDF |

Dear Mr. Lowe,

Thank you for your correspondence dated December 24, 2021 (attached for reference).  Please allow this to respond; I anticipate, to your satisfaction.

As you know, Underwriters are currently funding the defense of Hitchman Fiduciaries and agreed to the appointment of Hitchman Fiduciaries' own, independent, hand-selected choice of counsel, Sheppard Mullen, to proceed as Lead Counsel in the defense of the Morgan Actions.  Underwriters object to your assertion that the exclusions referenced in our October 19, 2021 Coverage Opinion are somehow improper. And you have not pointed to any allegation or fact which Underwriters reserved its rights on where the outcome could have been controlled by Larry Hilton, Esq. and Paul Savage, Esq. (who as you know were first engaged in the defense of this claim). Thus, while Underwriters do not beleive this to be a matter within the purview of CA Civil Code Section 2860, Underwriters have nonetheless complied with Hitchman Fiduciaries' request for the appointment of independent choice of counsel. Accordingly, there is no basis for the assertions in your December 24, 2021 correspondence, including no conflict of interest.

Nevertheless, and in a show of utmost good faith, with respect to Larry Hilton, Esq. and Paul Savage, Esq.'s involvement in the defense of this action (which your own client has repeatedly acknowledged was extremely helpful), Underwriters agree to the designation of Larry Hilton, Esq. and Paul Savage, Esq as "monitoring counsel" (on behalf of Underwriters) moving forward. **This leaves Sheppard Mullen, the Hitchman Fiduciaries' hand-selected, choice of counsel, to continue to serve as sole defense counsel on behalf of Hitchman Fiduciaries moving forward in defending the Morgan Actions**.  Larry Hilton, Esq. and Paul Savage will continue to be available to the Hitchmans and Sheppard Mullen as a (free) resource, on an as-needed basis.

As noted above, Underwriters' coverage position is based upon the information recently available.  Should further pertinent information become available, Underwriters may revise its position accordingly and we reserve the right to do so.  If you have any questions regarding Underwriters' position, please contact us at your earliest convenience.

Kind Regards,
Andrew & David



**Andrew R. Jones, Esq.**

61 Broadway, 26th Floor
New York, NY 10006
Tel:212-867-4100 Ext. 344
Direct:212-293-7344
Fax:212-867-4118

ajones@fkblaw.com
Bio | LinkedIn
www.fkblaw.com

*** Our office will only be transmitting and accepting communications and pleadings via E-mail as many
of our attorneys and staff continue to work remotely due to the Covid-19 crisis***

CONFIDENTIALITY NOTICE: This email is intended only for the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited, and you are requested to please notify us immediately by telephone, and return the original message to us at the above address. Thank you.

**From:** James A. Lowe <JAL@gauntlettlaw.com>
**Sent:** Friday, December 24, 2021 2:54 PM
**To:** David Furman, Esq. <dfurman@fkblaw.com>; Andrew R. Jones, Esq. <ajones@fkblaw.com>
**Cc:** Bruce Hitchman <Bruce@hitchmanfiduciaries.com>; LeeAnn Hitchman
<LeeAnn@hitchmanfiduciaries.com>
**Subject:** Underwriters' coverage for Hitchman Fiduciaries, FKB # 407.369, 10949.001, Demand for
independent defense counsel

> [EXTERNAL] This email originated from outside of **FKB**. Do not click links or open attachments unless you trust the
> sender and know the content is safe.

Counsel,

Please see the attached letter explaining the urgent need for Underwriters to agree to treat
appointed counsel as independent defense counsel;

James A. Lowe, Esq.
Gauntlett & Associates

Gauntlett & Associates
(949) 242-7936
(949) 553-2050 FAX

This information is intended for use by the individuals or entity to which it is addressed, and may contain information that is privileged, confidential, and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us.

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use
by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that

any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

# EXHIBIT 8

| | |
|---|---|
| **From:** | David Furman, Esq. |
| **To:** | James A. Lowe |
| **Cc:** | LeeAnn Hitchman; Bruce Hitchman; Larry Hilton; David A. Gauntlett |
| **Subject:** | RE: Hitchman Fiduciaries advs. Morgan, FKB # 407.369, 10949.001, Appointment of trial counsel |
| **Date:** | Monday, September 13, 2021 10:45:39 AM |
| **Attachments:** | image955891.jpg |

Mr. Lowe,

Yes, I can confirm that I advised you that Underwriters have approved the retainment of Sheppard Mullen as trial counsel to defend Hitchman Fiduciaries at a rate of $425/hour for their services. Underwriters' understanding is that Larry & Paul would continue doing the heavy lifting in terms of drafting filings and discovery requests/responses while Sheppard Mullen would assist in litigation strategy and advisory role and appear at hearings going forward and at trial because of their experience, etc.

Regards,
David



**David Furman, Esq.**

61 Broadway, 26th Floor
New York, NY 10006
Tel:212-867-4100 Ext. 370
Fax:212-867-4118

dfurman@fkblaw.com
www.fkblaw.com

*** Our attorneys and staff are working remotely as required by government directives during the COVID-19 crisis.  Accordingly, our office will only be transmitting and accepting communications and pleadings via E-mail. ***

CONFIDENTIALITY NOTICE: This email is intended only for the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited, and you are requested to please notify us immediately by telephone, and return the original message to us at the above address. Thank you.

**From:** James A. Lowe <JAL@gauntlettlaw.com>
**Sent:** Monday, September 13, 2021 1:23 PM
**To:** David Furman, Esq. <dfurman@fkblaw.com>
**Cc:** LeeAnn Hitchman <LeeAnn@hitchmanfiduciaries.com>; Bruce Hitchman <Bruce@hitchmanfiduciaries.com>; Larry Hilton <ldhilton@gmail.com>; David A. Gauntlett <DAG@gauntlettlaw.com>
**Subject:** Hitchman Fiduciaries advs. Morgan, FKB # 407.369, 10949.001, Appointment of trial counsel

[EXTERNAL] This email originated from outside of **FKB.** Do not click links or open attachments unless you trust the sender and know the content is safe.

Mr. Furman,

This will confirm that you advised me today that Underwriters has agreed to appoint the firm if Sheppard Mullen as trial counsel to defend its insureds, Hitchman Fiduciaries, in the Morgan suits. We understand that Sheppard Mullen will act as lead defense counsel for the insured because of their experience, etc.

James A. Lowe, Esq.
Gauntlett & Associates

Gauntlett & Associates
(949) 242-7936
(949) 553-2050 FAX

This information is intended for use by the individuals or entity to which it is addressed, and may contain information that is privileged, confidential, and exempt from disclosure under applicable law.  If the reader of this message is not the intended recipient, or employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify us immediately by telephone and return the original message to us.

# EXHIBIT 9

| From: | "James A. Lowe" |
|---|---|
| To: | David Furman, Esq. |
| Cc: | LeeAnn Hitchman; Bruce Hitchman; Larry Hilton; David A. Gauntlett |
| Subject: | RE: Hitchman Fiduciaries advs. Morgan, FKB # 407.369, 10949.001, Appointment of trial counsel |
| Date: | Monday, September 13, 2021 4:22:53 PM |
| Attachments: | image001.jpg |

Mr. Furman,

Thank you for your note.

While Underwriters doubtless prefers that Larry Hilton and his assistant "would continue doing the heavy lifting in terms of drafting filings and discovery requests/responses" in the Morgan defense because that is cheaper for the insurer, a concern about the price point of the defense cannot obscure the need in this case for supervising trial counsel well experienced in probate defense. It is important that Sheppard Mullen direct the defense of the case.

Unlike the common practice in the UK where a solicitor directs the work of and "instructs" the barrister, American trial lawyers are fully responsible to the client and the court for all aspects of a defense. In my own experience over 50 years as lead counsel in hundreds of complex cases, I have usually been assisted by other lawyers who often never see the courtroom. But I and every other lead counsel are always responsible for all work on a case (including discovery and briefing done by others) and answerable to the judge and client for everything done or not done. It is never acceptable to suggest that "someone else" may have overlooked something. California law does not recognize a distinction between "litigation counsel" and "trial counsel." Underwriters must provide defense counsel.

Mr. Hilton cannot be seen as providing a "courtesy defense," as he has previously suggested, because California law does not recognize a difference in an insurer's obligation between defense counsel and courtesy defense counsel. See *Mosier v. S. Cal. Physicians Ins. Exch.*, 63 Cal. App. 4th 1022, 1040 (1998).

Mr. Hilton appears to have certain useful experience and background in this matter but has admitted to me and the insured that this case requires trial counsel of far more experience to mount a proper defense against a very aggressive plaintiff and his equally aggressive attorneys who have vowed to "make an example of the Hitchmans." We also understand that Mr. Hilton's assistant is not licensed to practice law in California; so such services in defense are problematic.

I don't know the level of Mr. Hilton's brief writing skills but briefing in this factually complex case will certainly be critical. We are also concerned about an apparent lack of discovery in this case on behalf of the insured (including the failure to schedule an early deposition of Mr. Morgan himself). Mr. Hilton may be good at drafting discovery requests, although we have not seen any. However, the counsel who will try the case should be directing the discovery. No matter what information Mr. Hilton believes he has, trial counsel must direct the discovery efforts to properly prepare a full defense.

We are concerned that, despite recently urging him to immediately do so, Mr. Hilton has apparently not served discovery requests on Morgan or noticed his deposition. If this information is incorrect, we would like to see the discovery requests and they should also be immediately provided to Sheppard Mullen for review.

Additionally, the trial counsel will be required to properly coordinate in substantial detail with the counsel for other defendants in this case to assure the most favorable outcome for the insured. The insureds have learned that counsel for other defendants in the Morgan case are concerned about a lack of coordination of Mr. Hilton's defense activities.

It will not benefit the insured, or Underwriters, to save attorneys' fees if the case is not properly and promptly prepared for trial. It should be made entirely clear that Sheppard Mullen is in charge of and responsible for the defense of the insured, and that Sheppard Mullen will direct the work of Mr. Hilton and any assistants.

Since Underwriters' policy is self-liquidating with defense expenses, perhaps your client believes that its financial responsibility is limited in this case to the maximum policy limit amount, even in the worst outcome. However, the Hitchmans are threatened with financial ruin if Mr. Morgan and his avaricious lawyers are not met with an effective and high quality defense. You and your client certainly know that the insured is entitled, under California law, to a meaningful, immediate, and entire defense. Our client expects nothing less. The insured is counting entirely on Underwriters to provide a good and proper defense directed by experienced counsel and not limited by an accountant's attitude of simply saving money, however desirable saving money may be.

We expect Underwriters to supervise and instruct Sheppard Mullen to provide an excellent defense for the Hitchman's, using Mr. Hilton only for appropriate tasks for which Sheppard Mullen remains responsible. Please confirm that this will be done.

By the way, we think the changed circumstances in this matter since March 29, 2019 indicate that an updated coverage letter from Underwriters would be appropriate to provide clarity for all concerned

James A. Lowe, Esq.
Gauntlett & Associates

Gauntlett & Associates
(949) 242-7936
(949) 553-2050 FAX

This information is intended for use by the individuals or entity to which it is addressed, and may contain information that is privileged, confidential, and exempt from disclosure under applicable law.  If the reader of this message is not the intended recipient, or employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify us immediately by telephone and return the original message to us.

**From:** David Furman, Esq. [mailto:dfurman@fkblaw.com]
**Sent:** Monday, September 13, 2021 10:45 AM
**To:** James A. Lowe <JAL@gauntlettlaw.com>
**Cc:** LeeAnn Hitchman <LeeAnn@hitchmanfiduciaries.com>; Bruce Hitchman <Bruce@hitchmanfiduciaries.com>; Larry Hilton <ldhilton@gmail.com>; David A. Gauntlett <DAG@gauntlettlaw.com>
**Subject:** RE: Hitchman Fiduciaries advs. Morgan, FKB # 407.369, 10949.001, Appointment of trial counsel

Mr. Lowe,

Yes, I can confirm that I advised you that Underwriters have approved the retainment of Sheppard Mullen as trial counsel to defend Hitchman Fiduciaries at a rate of $425/hour for their services. Underwriters' understanding is that Larry & Paul would continue doing the heavy lifting in terms of drafting filings and discovery requests/responses while Sheppard Mullen would assist in litigation strategy and advisory role and appear at hearings going forward and at trial because of their experience, etc.

Regards,
David



**David Furman, Esq.**
61 Broadway, 26th Floor
New York, NY 10006
Tel: 212-867-4100 Ext. 370
Fax: 212-867-4118

dfurman@fkblaw.com
www.fkblaw.com

*** Our attorneys and staff are working remotely as required by government directives during the COVID-19 crisis.  Accordingly, our office will only be transmitting and accepting communications and pleadings via E-mail. ***

CONFIDENTIALITY NOTICE: This email is intended only for the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited, and you are requested to please notify us immediately by telephone, and return the original message to us at the above address. Thank you.

**From:** James A. Lowe <JAL@gauntlettlaw.com>
**Sent:** Monday, September 13, 2021 1:23 PM
**To:** David Furman, Esq. <dfurman@fkblaw.com>
**Cc:** LeeAnn Hitchman <LeeAnn@hitchmanfiduciaries.com>; Bruce Hitchman <Bruce@hitchmanfiduciaries.com>; Larry Hilton <ldhilton@gmail.com>; David A. Gauntlett <DAG@gauntlettlaw.com>
**Subject:** Hitchman Fiduciaries advs. Morgan, FKB # 407.369, 10949.001, Appointment of trial counsel

[EXTERNAL] This email originated from outside of **FKB.** Do not click links or open attachments unless you trust the sender and know the content is safe.

Mr. Furman,

This will confirm that you advised me today that Underwriters has agreed to appoint the firm if Sheppard Mullen as trial counsel to defend its insureds, Hitchman Fiduciaries, in the Morgan suits. We understand that Sheppard Mullen will act as lead defense counsel for the insured because of their experience, etc.

James A. Lowe, Esq.
Gauntlett & Associates

Gauntlett & Associates
(949) 242-7936
(949) 553-2050 FAX

This information is intended for use by the individuals or entity to which it is addressed, and may contain information that is privileged, confidential, and exempt from disclosure under applicable law.  If the reader of this message is not the intended recipient, or employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify us immediately by telephone and return the original message to us.

# EXHIBIT 10

GAUNTLETT & ASSOCIATES
ATTORNEYS AT LAW

Our File Number:
10949.001

October 8, 2021

**VIA EMAIL**
ajones@fkblaw.com
dfurman@fkblaw.com

Andrew R. Jones, Esq.
David Furman, Esq.
Furman Kornfeld & Brennan LLP
61 Broadway, 26th Floor
New York, NY 10006

> **Re:**   ***Hitchman Fiduciaries advs. Thomas Edward Morgan, III***
> **Orange County California Superior Court**
> **Civil Case No. 30-2020-01155277-CU-BT-CJC;**
> **Probate Case No. 30-2014-00726771-PR-TR-CJC**
> Insurer: Underwriters at Lloyd's, London, Policy No. FPL19105754K
> FKB File No. 407.369

### REQUEST FOR RESERVATION OF RIGHTS LETTER

Dear Counsel:

As you know we are coverage counsel for Hitchman Fiduciaries, insured under the above referenced Underwriters' policy. On March 29, 2019, as counsel for Underwriters, you acknowledged Hitchman Fiduciaries report of claims against them by Thomas Edward Morgan, III which developed into the above referenced lawsuits. Your letter "convey[ed] Underwriters' preliminary position with regard to coverage" of the Morgan claims. You advised that "Underwriters will treat this matter as a potential Claim, and it is not necessary to, and Underwriters will not, appoint defense counsel at this time."

Underwriters later did apparently appoint Larry Hilton as defense counsel although you did not provide any formal advice to Hitchman Fiduciaries of doing so. While Mr. Hilton is an attorney, he is actually the "broker" on the policy sold to Hitchman Fiduciaries. Mr. Hilton advised me that he is actually the Managing General Agent for Underwriters on the policy sold to Hitchman Fiduciaries. Mr. Hilton has entered an appearance as counsel for Hitchman Fiduciaries in both cases referenced above. Mr. Hilton, acting on behalf of Underwriters, has apparently tried to "defend" the Morgan suits at minimal expense.

As you know Mr. Hilton agree to the setting of a trial in the Probate Court matter. We understand that Mr. Hilton has not conducted any significant discovery in either case although he reports reviewing information discovered by co-defendants. Mr. Hilton has confirmed to me and to the insured that he does not believe himself competent to act as trial counsel for the insured in

the Morgan cases. Consequently, you advised us by email on September 13, 2021 that Underwriters has arranged with Sheppard Mullin to act as trial counsel but "that Larry & Paul would continue doing the heavy lifting in terms of drafting filings and discovery requests/responses while Sheppard Mullin would assist in litigation strategy and advisory role and appear at hearings going forward and at trial because of their experience, etc."

We have repeatedly expressed our client's concern that Sheppard Mullin should be lead counsel in these cases—not Larry Hilton—because of his lack of appropriate experience. On September 24 Golnaz Yazdchi of Sheppard Mullin wrote you asking for written assurance from Underwriters about their involvement in the defense of Hitchman Fiduciaries. We doubt that Sheppard Mullin is interested in being responsible for the outcome of a trial effort that they do not lead.

Underwriters' defense cannot be restricted by focusing on minimizing the insurer's cost at the expense of its insured. Larry Hilton may be a cheaper defense alternative but, regardless of his good intentions, we all know that he does not have the experience to lead the defense.

On September 16, 2021 you said you were "recommending to Underwriters that an updated coverage opinion be issued." You advised Mr. Yazdchi on September 24 that your firm would be preparing a letter on defense and Sheppard Mullin' defense role. On October 6 you advised us that a letter would be forthcoming on behalf of Underwriters but you had no "ETA."

We still do not know Underwriters' position on the defense of the Morgan suits with a rapidly approaching trial. Under these circumstances Hitchman Fiduciaries and their counsel must therefore presume that Underwriters will fully defend and indemnify them in the Morgan suits and will not reserve any rights.

Very truly yours,

/s/ James A. Lowe
James A. Lowe

JAL/sjs
cc:     Client
        Golnaz Yazdchi, Esq.

278754_1.docx--10/8/2021 1:56 PM

Page 2

# EXHIBIT 11

**Furman Kornfeld & Brennan LLP**

61 Broadway, 26th Floor, New York, NY 10006
Tel: 212-867-4100  Fax: 212-867-4118
www.fkblaw.com

October 19, 2021

**VIA EMAIL (PDF): Bruce@hitchmanfiduciaries.com & leeann@hitchmanfiduciaries.com**
**PRIVILEGED & CONFIDENTIAL**
Hitchman Fiduciaries
120 Tustin Ave, Suite C
Newport Beach, CA 92663

Attn:  Bruce Hitchman & Lee Ann Hitchman

| Re: | Insured | : | Hitchman Fiduciaries ("you" or the "Hitchmans") |
| --- | --- | --- | --- |
| | Potential Claimant | : | Thomas Edward Morgan, III |
| | Policy No. | : | FPL19105754K |
| | Policy Period | : | January 1, 2019 to January 1, 2020 |
| | Policy Limits | : | $2,000,000/$4,000,000 Per Claim/Aggregate, Including Costs and Expenses; |
| | Deductible | : | $15,000 Per Claim, Including Costs and Expenses |
| | Retroactive Date | : | January 1, 2010 |
| | FKB File No. | : | 407.369 |

Dear Mr. Hitchman & Ms. Hitchman:

As you know, my Firm represents the interests of those certain interested Underwriters at Lloyd's, London ("Underwriters") who subscribed to the above-referenced January 1, 2019 to January 1, 2020 Policy with limits of $2,000,000/$4,000,000 Per Claim/Aggregate, including Costs and Expenses, subject to a $15,000 Per Claim Deductible, including Costs and Expenses (the "Policy").

We write further to our previous correspondence to you dated March 13, 2019. The terms set forth in the aforementioned communications remain in effect.

We have reviewed: (1) correspondence from John P. Glowacki, Esq., dated October 11, 2019; (2) the Trustee's Second Status Report, filed on behalf of Trustee, Thomas E. Morgan, III, of the Beverly C. Morgan Family Trust, filed on October 25, 2019; (3) Thomas Morgan III's Amended Petition for Instructions, Damages for Failure to Assert Claim, Disgorgement of Fees for Failure to Disclose Conflict of Interest in Order to Secure and Preserve Appointment, and Damages for Breach of Fiduciary Duty, and (4) Claimant's Verified Complaint for Damages filed in Superior Court of the State of California, County of Orange, Case No. 30-2020-01155277-CU-BT-CJC, filed on August 14, 2020.

We do not lend any credence to the allegations made against you. However, the coverage position described below is based upon information provided in connection with your local counsel's submission of the above-noted matter. Should further pertinent information become available, we may revise Underwriters' position accordingly and reserve the right to do so.

# I.   <u>FACTUAL BACKGROUND</u>

Please advise us if anything within the following summary appears inaccurate.

This matter arises out of your role as Interim Co-Trustees of the Beverly C. Morgan Family Trust as Amended and Restated November 6, 2013 (the "Trust").  On April 4, 2017, the Honorable Judge Kim R. Hubbard signed an Order appointing you as Interim Co-Trustees of the Trust. Effective June 21, 2019, your appointment as temporary trustees expired, and Claimant resumed the Trusteeship.

We understand there was underlying litigation between Claimant and beneficiaries of the Trust, which thereafter expanded to include Hitchman Fiduciaries when Claimant filed petitions to remove Hitchman Fiduciaries as Interim Co-Trustees and to surcharge them. Claimant ultimately settled in mediation, receiving the entire residue of the Trust Estate, giving him ownership of the misappropriation and financial elder abuse claims that you had filed against Claimant in your capacity as Interim Co-Trustees of the Trust.

Claimant has continued to make allegations against you, most recently in the Trustee's Second Status Report. Claimant's Amended Petition seeks: (1) the imposition of surcharges for alleged wasted attorneys' fees, expert fees, and excessive trustee fees prior to the settlement in the underlying litigation between Claimant and the beneficiaries of the Trust; (2) damages in the amount of $1M for negligence in failing to assert a legal malpractice claim against former trust counsel, Richard Pech; (3) disgorgement of fees due to the failure to disclose a conflict of interest; and (4) damages for alleged breach of fiduciary duty, for allegedly acting against Claimant's interest in their administration of the Trust and allegedly treating beneficiaries unequally.

On October 25, 2019, there was a hearing on Trustee's Second Status Report where the court confirmed, among other things, that the stay on revoking the tolling agreement, initiating litigation, and taking discovery in pending litigation expired on November 18, 2019. The court further ordered that Claimant is to file his amended petition between November 18, 2019 and November 22, 2019.

On August 14, 2020, Claimant filed their Verified Complaint for Damages in Superior Court of the State of California, County of Orange, Case No. 30-2020-01155277-CU-BT-CJC against Hitchman Fiduciaries. The allegations relate to and arise from the Hitchmans' interim administration of the Trust. Specifically, the Complaint alleges 7 causes of actions. Claimant's first cause of action is for conversion wherein Claimant alleges the Hitchmans were grossly negligent, engaged in misconduct intentionally, and acted with oppression, fraud and malice, by allegedly liquidating the certificate of deposit for the $250,000 lent from Thomas E. Morgan Children's Trust ("TEMCT") to Lamplighter Chin, and allegedly transferred the monies to the Trust and allegedly spent the funds for improper purposes and without authority. Claimant's second cause of action is for conversion of distributions, wherein Claimant alleges the Hitchmans were grossly negligent, engaged in misconduct intentionally, and acted with oppression, fraud and malice, by allegedly interfering with Claimant's rights to certain distributions made from the Lamplighter Chino enterprise. Claimant's third cause of action is for breach of fiduciary duty

against the Hitchmans. Claimant alleges the Hitchmans were grossly negligent, engaged in misconduct intentionally, and acted with oppression, fraud and malice in breaching their fiduciary duties by *inter alia* failing to preserve Trust assets, knowingly acting against Claimant's interests, improperly treating the owners of Lamplighter Chino equally, and improperly distributing Trust assets. Claimant's fourth cause of action is for intentional interference with contract, herein Claimant alleges the Hitchmans were grossly negligent, engaged in misconduct intentionally, and acted with oppression, fraud and malice, by allegedly instructing those payments to Morgan Partners, Inc. be discontinued, thereby disrupting the relationship between Claimant and MPI.

Similar to Claimant's fourth cause of action, Claimant's fifth cause of action is for negligent interference with MPI's economic advantage, wherein Claimant alleges the Hitchmans were grossly negligent, engaged in misconduct intentionally, and acted with oppression, fraud and malice, by allegedly instructing those payments to MPI be discontinued, thereby disrupting the relationship between Climant and MPI. Claimant's sixth cause of action is for intentional interference with Bank of America Relationship wherein Claimant alleges the Hitchmans were grossly negligent, engaged in misconduct intentionally, and acted with oppression, fraud and malice, by allegedly interfering with certain contracts between Claimant and Bank of America, accusing Claimant of theft, disrupting the performance of certain contractual relationships between Claimant and Bank of America. Lastly, Claimant's seventh cause of action is for negligent interference with Bank of America relationship wherein Claimant alleges the Hitchmans were grossly negligent, engaged in misconduct intentionally, and acted with oppression, fraud and malice, by allegedly interfering with Claimant's contractual relationships with Bank of America.

You previously advised that Cynthia V. Roehl, Esq. & John P. Glowacki, Esq. of Roehl & Glowacki, P.C., and Bill G. Benz, Esq. of Carico Macdonald Kil & Benz LLP were representing you in this matter and in the underlying litigation connected to this matter. However, because Claimant made certain allegations creating a conflict between you and your prior legal counsel, you agree to the appointment of Larry Hilton, Esq. and Paul Savage, Esq as Defense Counsel.

## II.    COVERAGE OPINION & ANALYSIS

There are certain terms of the Policy that define and limit the coverage afforded. Having reviewed the materials provided in connection with the above-noted claim, and in conjunction with the terms and conditions of the Policy, we take this opportunity to convey Underwriters' position with regard to coverage.

Underwriters recognize that the allegations set forth in the demand letter are unsubstantiated at this time. Nothing contained in this letter is intended to suggest that those allegations have any legal or factual merit. Nevertheless, Underwriters believe it is prudent to identify relevant policy terms which may give rise to coverage defenses, depending upon further factual discovery and developments.

Hitchman Fiduciaries
FKB No. 407.369
Page 4 of 9

### A. <u>Covered Claims</u>

As discussed, in light of the allegations made against you in Claimant's Amended Petition and in Claimant's Verified Complaint, this matter presents a **Claim**[1] as defined under your Policy.

Please refer to the **INSURING AGREEMENTS** section (Section I) of your Policy.  Under the Insuring Agreement, Underwriters agreed:

> "[t]o pay on behalf of the **Assured Damages** and **Claims Expenses**[2] which the **Assured** shall become legally obligated to pay because of any **Claim** or **Claims,** including **Claims** for **Personal Injury** as hereafter defined, first made against the **Assured** and reported to the **Underwriters** during the **Period of Insurance** or **Extended Reporting Period**, arising out of any act, error or omission of the **Assured** in rendering or failing to render **Professional Services** as hereinafter defined for others but solely for acts on behalf of the **Named Assured** designated in Item 1 of the Declarations and caused by the **Assured**, except as excluded or limited by the terms, conditions and exclusions of this **Policy**."

<u>See</u> Policy Section I.A.

Further, the **DEFINITIONS** section of your Policy states as follows:

> "**Damages**" is defined under the Policy as "a monetary judgment, award or settlement, and shall include:
>
> 1.  compensatory damages;
> 2.  damages calculated as a multiple of compensatory damages (where insurable by law);
> 3.  punitive or exemplary damages (where insurable by law);

---

[1] "**Claim**" is defined under the Policy as "a demand received by any **Assured** for money or services outside the **Ordinary Course of Business** including the service of suit or institution of arbitration proceedings against the **Assured**." See Policy, Section V.

[2] Pursuant to Section V. of the Policy, "**Claims Expenses**" means:

1.  fees charged by an attorney designated by **Underwriters** and consented to by the **Named Assured**, with such consent not to be unreasonably withheld; and
2.  all other fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a **Claim**, suit or proceeding arising in connection therewith, if incurred by the **Underwriters**, or by the **Assured** with the written consent of the **Underwriters**.
3.  **Claims Expenses** does not include any costs incurred in the **Ordinary Course of Business**, nor any salary, overhead or other charges incurred by the **Assured** for time spent in cooperating in the defense and investigation of any **Claim** or circumstance which might lead to a **Claim** notified under this **Insurance**.
4.  **Claims Expenses** also does not include any fees, costs, expenses or other charges incurred by the **Assured** -- or incurred for or on behalf of the **Assured** -- if such fees, costs, expenses or other charges are payable or reimbursable by any other sources, including but not limited to any applicable trust or estate.

    4.      pre-judgment interest; and

    5.      post-judgment interest that accrues after entry of judgment and before we have paid, offered to pay or deposited in court that part of judgment within the applicable Limit of Liability.

However, **Damages** shall not include any amounts for which the **Assured** is not financially liable or for which there is no legal recourse against the **Assured**, the costs and expenses of complying with any injunctive or other form of equitable relief, the reimbursement of fees, the payment of sanctions, or any other matters that may be deemed uninsurable under the law."

<u>See</u> Policy, Section V. ("DEFINITIONS").

### 1)  <u>Claimant's Amended Petition and Verified Complaint</u>

The Amended Petition present a **Claim**, since it is demand for money or services outside the **ordinary course of business**.[3]  As discussed above, Claimant's Amended Petition seeks: (1) the imposition of surcharges for alleged wasted attorneys' fees, expert fees, and excessive trustee fees prior to the settlement in the underlying litigation between Claimant and the beneficiaries of the Trust; (2) damages in the amount of $1M for negligence in failing to assert a legal malpractice claim against former trust counsel, Richard Pech; (3) disgorgement of fees due to the failure to disclose a conflict of interest; and (4) damages for alleged breach of fiduciary duty, for allegedly acting against Claimant's interest in their administration of the Trust and allegedly treating beneficiaries unequally.

Claimant's Verified Complaint alleges seven causes of action against the Hitchmans. Claimant's first cause of action is for conversion wherein Claimant alleges the Hitchmans were grossly negligent, engaged in misconduct intentionally, and acted with oppression, fraud and malice, by allegedly liquidating the certificate of deposit for the $250,000 lent from TEMCT to Lamplighter Chin, and allegedly transferred the monies to the Trust and allegedly spent the funds for improper purposes and without authority. Claimant's second cause of action is for conversion of distributions, wherein Claimant alleges the Hitchmans were grossly negligent, engaged in misconduct intentionally, and acted with oppression, fraud and malice, by allegedly interfering with Claimant's rights to certain distributions made from the Lamplighter Chino enterprise. Claimant's third cause of action is for breach of fiduciary duty against the Hitchmans. Claimant alleges the Hitchmans were grossly negligent, engaged in misconduct intentionally, and acted with oppression, fraud and malice in breaching their fiduciary duties by *inter alia* failing to preserve Trust assets, knowingly acting against Claimant's interests, improperly treating the owners of Lamplighter Chino equally, and improperly distributing Trust assets. Claimant's fourth cause of action is for intentional interference with contract, herein Claimant alleges the Hitchmans were grossly negligent, engaged in misconduct intentionally, and acted with oppression, fraud and

---

[3] **"Ordinary Course of Business"** means the usual, routine or customary services, practices and procedures of an Assured in rendering Professional Services, including but not limited to the production of, revision or supplement to an accounting, financial statement, invoice or other similar report or document. <u>See</u> Policy, Section V.

malice, by allegedly instructing those payments to MPI be discontinued, thereby disrupting the relationship between Claimant and MPI.

Similar to Claimant's fourth cause of action, Claimant's fifth cause of action is for negligent interference with MPI's economic advantage, wherein Claimant alleges the Hitchmans were grossly negligent, engaged in misconduct intentionally, and acted with oppression, fraud and malice, by allegedly instructing those payments to MPI be discontinued, thereby disrupting the relationship between Claimant and MPI. Claimant's sixth cause of action is for intentional interference with Bank of America Relationship wherein Claimant alleges the Hitchmans were grossly negligent, engaged in misconduct intentionally, and acted with oppression, fraud and malice, by allegedly interfering with certain contracts between Claimant and Bank of America, accusing Claimant of theft, disrupting the performance of certain contractual relationships between Claimant and Bank of America. Lastly, Claimant's seventh cause of action is for negligent interference with Bank of America relationship wherein Claimant alleges the Hitchmans were grossly negligent, engaged in misconduct intentionally, and acted with oppression, fraud and malice, by allegedly interfering with Claimant's contractual relationships with Bank of America.

To the extent that the Amended Petition and/or Verified Complaint seek damages arising out of acts, errors or omissions in rendering or failing to render **Professional Services**, while acting on behalf of the **Named Insured**, Underwriters agree to defend these claims under a reservation of rights. See Policy Section I.A.

Pursuant to the Policy, Underwriters have the following duty to defend:

**Defense and Settlement (Included in the Limit of Liability)**

1. The **Underwriters** shall have the right and duty to defend, subject to the **Limits of Liability**, any **Claim** against the **Assured** seeking **Damages** which are payable under the terms of this **Insurance**, even if any of the allegations of the **Claim** are groundless, false or fraudulent. However, **Underwriters** shall not formally appoint defense counsel without the consent of the **Named Assured**, such consent not to be unreasonably withheld.

See Policy Section I.B.

**2)  Non-Covered Claims/Applicable Exclusions**

Notwithstanding that this matter presents at least a partially-covered **Claim** under the Policy, several exclusions may apply to preclude or restrict coverage. Under these exclusions the coverage under this Policy does not apply to **Damages** or **Claims Expenses** incurred with respect to:

A.  "to any **Claim** arising out of any criminal, dishonest, fraudulent or malicious act, error or omission of any **Assured**, committed with actual, criminal, dishonest, fraudulent or malicious purpose or intent. However, notwithstanding the foregoing, the insurance

afforded by this Policy shall, subject to the sub-limit of liability specified in this Policy, apply to **Claims Expenses** incurred in defending any such claim, but shall not apply to **Damages** which the **Assured** might become legally obligated to pay as a result of such a claim;"

Underwriters expressly reserve their rights as to the applicability of Exclusion "A" to the extent that it is found that you acted with malicious purpose or intent.

B. "to fines, penalties or sanctions, except that if a **Claim** shall have been brought against the **Assured** seeking **Damages** as well as fines, penalties, or sanctions, then any coverage which may be afforded by this **Policy** will apply to any **Claims Expenses** incurred, without liability, however, for such fines, penalties, or sanctions;"

I. "to any Claim arising out of any acts, errors, or omissions which took place prior to the effective date of this Insurance, if any Assured on the effective date knew or could have reasonably foreseen that such acts, errors or omissions might be expected to be the basis of a Claim;"

L. "to any **Claim** seeking the return or reimbursement of fees, costs, expenses or expenditures paid to the **Assured**, paid on the **Assured's** behalf, or paid at the direction of the **Assured** pursuant to the **Assured's** role in providing **Professional Services**, including but not limited to any fees, costs, expenses or expenditures paid from a trust, estate, guardianship, bank account or other financial instrument at the **Assured's** control."

Underwriters expressly reserve their rights as to the applicability of Exclusion "L" to the extent that Claimant seeks the disgorgement of fees procured through alleged breach of fiduciary duty and to the extent that Claimant is seeking reimbursement of fees or transfer of funds paid at your direction.

P. "to any Claim arising out of any disputes involving an accounting, return or reimbursement of fees, commissions, costs or expenses paid to the Assured;"

This exclusion shall not, however, apply to any Claim seeking Damages based upon an alleged act, error or omission by the Assured with respect to an accounting of any estate or trust for which the Assured has provided Professional Services. Underwriters accordingly reserve rights in connection with the foregoing Policy terms.

Underwriters expressly reserve their rights as to the applicability of Exclusion "P" to the extent that Claimant is seeking a reimbursement of fees paid to you.

Q. "to any Claim arising out of any actual or alleged commingling, conversion, misappropriation, defalcation, or inability or failure to collect or safeguard any funds, premium, escrow of tax money or other property for personal profit or advantage;"

Underwriters expressly reserve their rights as to the applicability of Exclusion "Q" to the extent that Claimant seeks damages for any alleged conversion of funds or failure to safeguard any funds.

### 3) Other Applicable Insurance/Subrogation

To the extent that you maintain other applicable insurance, Underwriters reserves its rights under Section X. of the Policy ("Other Insurance"):

> This insurance shall apply in excess of any other valid and collectible insurance available to any **Assured**, unless such other insurance is a surety bond or is written only as specific excess insurance over the **Limit of Liability** of this Policy.

To the extent that any other insurance policy naming you as an additional insured provides coverage to this matter, Underwriters reserves rights under the foregoing provision.

Pursuant to Policy Section XIV ("Subrogation") any rights of the Assured to recover defense costs or indemnity incurred from any sources other than Underwriters shall be subrogated to Underwriters, entitling Underwriters to the same such rights of recovery. <u>See</u> Policy, Section XIV. ("Subrogation").

Please also be aware that there may be other Policy terms, conditions and exclusions that may be applicable, and that this letter is not intended to be an exhaustive recitation of all potentially applicable terms, conditions, or exclusions of the Policy.

## III.    FURTHER ACTIONS

### Defense Arrangements

As discussed herein, you previously agreed for Larry Hilton, Esq. and Paul Savage, Esq. (collectively, "Investigatory Defense Counsel") to assist in this matter.  This assistance included (1) initial case work-up, fact finding and the development of factual declarations; (2) preparing written discovery, answers, and discovery motions; and (3) settlement discussions (with your consent, as per the Policy).  Further to our recent discussions, and at your request, Underwriters have approved of the appointment of the law firm Sheppard Mullin, and Nicholas Van Brunt, Esq. and Golnaz Yazdchi, Esq. as co-Defense Counsel to represent you in defense of Claimant's Amended Petition and Verified Complaint, at a rate of $425/hour.

Underwriters' understanding of the relationship between co-defense counsels is that while Shepard Mullen will proceed designated as "lead counsel," both firms will continue to cooperate in providing the Hitchmans with an excellent defense through coordinating an appropriate division

Hitchman Fiduciaries
FKB No. 407.369
Page 9 of 9

of labor and litigation defense strategy. As Shepard Mullen proceeds with directing the litigation on behalf of the Hitchmans, Underwriters acknowledge the time spent by Investigatory counsel on gaining in-depth knowledge of the factual history in the Morgan matters. Thus, Underwriters ask that Attorney Van Brunt and Attorney Yazdchi continue to liaise with Investigatory Counsel to prevent redundancies and reduce time spent re-learning the factual history for this matter.

Co-Defense Counsels' duty of care is to you, the Insured. By copy of this letter, we advise both Co-Defense Counsel of the foregoing so that they will not inadvertently provide Underwriters with confidential or privileged information bearing on coverage issues.

As noted above, Underwriters' coverage position is based upon the information recently available. Should further pertinent information become available, we may revise Underwriters position accordingly and we reserve the right to do so. If you have any questions, or wish to submit additional information, please promptly contact the undersigned.

If you have any questions regarding Underwriters' position, or wish to submit additional information bearing on coverage, please promptly contact the undersigned.

Very truly yours,

FURMAN KORNFELD & BRENNAN LLP

Andrew R. Jones

cc:     Andrew Hua - Andrew.Hua@miller-insurance.com

Larry Hilton - larry.hilton@dominioninsurance.com

Golnaz Yazdchi - GYazdchi@sheppardmullin.com

Nicholas Van Brunt - NVanBrunt@sheppardmullin.com

James A. Lowe - JAL@gauntlettlaw.com

David A. Gauntlett - DAG@gauntlettlaw.com

David Furman (FKB-NYC)

# EXHIBIT 12

GAUNTLETT & ASSOCIATES
ATTORNEYS AT LAW

Our File Number:
10949.001

December 24, 2021

**<u>VIA EMAIL</u>**
ajones@fkblaw.com
dfurman@fkblaw.com

Andrew R. Jones, Esq.
David Furman, Esq.
Furman Kornfeld & Brennan LLP
61 Broadway, 26th Floor
New York, NY 10006

> **Re:** ***Hitchman Fiduciaries advs. Thomas Edward Morgan, III***
> **Orange County California Superior Court**
> **Civil Case No. 30-2020-01155277-CU-BT-CJC;**
> **Probate Case No. 30-2014-00726771-PR-TR-CJC**
> Insurer: Underwriters at Lloyd's, London, Policy No. FPL19105754K
> FKB File No. 407.369

**EMAN   FOR IN   EPEN   ENT   EFENSE COUNSEL**

Dear Counsel:

As you know we are coverage counsel for Hitchman Fiduciaries, insured under the above referenced Underwriters' policy. On March 29, 2019, as counsel for Underwriters, you acknowledged Hitchman Fiduciaries report of claims against them by Thomas Edward Morgan, III which developed into the above referenced lawsuits. Your letter "convey[ed] Underwriters' preliminary position with regard to coverage" of the Morgan claims. You advised that "Underwriters will treat this matter as a potential Claim, and it is not necessary to, and Underwriters will not, appoint defense counsel at this time."

On October 19, 2021 you provided a reservation of rights letter on behalf of Underwriters in which the insurer agreed to defend the above referenced Morgan lawsuits under a reservation of numerous rights and Underwriters appointed "the law firm Sheppard Mullin, and Nicholas Van Brunt, Esq. and Golnaz Yazdchi, Esq. as co-Defense Counsel to represent [the insured] in defense of Claimant's Amended Petition and Verified Complaint, at a rate of   425/hour."

Your October 19 letter also said that Larry Hilton, Esq. and Paul Savage, Esq. would act as "'Investigatory Defense Counsel' to assist in this matter." As you know, Larry Hilton, who happens to be a lawyer, is the broker or managing general agent who sold the above policies to Hitchman Fiduciaries. Paul Savage is Mr. Hilton's associate. We do not know the meaning of your term "Investigatory Defense Counsel" because your letter did not explain it and I cannot find any reference to that term in any reported case by any court anywhere in the United States. We cannot

avoid the conclusion that, regardless of his knowledge, abilities, or intentions, Mr. Hilton must principally be interested in protecting his own insurance and brokerage business, and secondarily interested in protecting the interests of Underwriters. This is natural and cannot be avoided. But it is inconsistent with his ethical duty of loyalty to Hitchman Fiduciaries. Like other lawyers, Messrs. Hilton and Savage cannot serve two masters.

### Hitchman Fiduciaries Has       ight to Inde  endent   e ense   ounse
###       ecause o    nderwriter    eservation o    ights

Underwriters' reservations of rights letter asserts many coverage limitations and exclusions and we will revisit some of them in a later letter because we believe them to be improper. But in addition to the numerous asserted limitations and exclusions on indemnity coverage, Underwriters does not limit its right to disclaim coverage at any time for any reason it wants to assert. Beyond the stated reasons to deny indemnity, Underwriters asserts an open ended reservation of rights by claiming that "there may be other Policy terms, conditions and exclusions that may be applicable, and      this letter is not intended to be an exhaustive recitation of all potentially applicable terms, conditions, or exclusions of the Policy." October 19, 2021 letter, p. 8.

Underwriters' ability to develop facts in defending the Morgan Actions is contrary to its insureds' rights and is precisely what an insurer is not permitted to do. Underwriters certainly wants to find a way to limit its costs in these lawsuits. The language of your letters suggest that Underwriters intends to do exactly that and use possibly newly discovered facts as it sees fit, whether it benefits its insured or not. Underwriters doesn't clarify all the grounds that would preclude indemnification because of coverage concerns, nor does it purport to waive any coverage defenses. Thus Underwriters' position can only be interpreted as reserving *all* rights, exactly as it says. That position creates a conflict of interest entitling Hitchman Fiduciaries to independent defense counsel.

Hitchman Fiduciaries desires and is entitled to be defended by the law firm Sheppard Mullin, and Nicholas Van Brunt, Esq. and Golnaz Yazdchi, Esq. as independent defense counsel to solely represent the insureds in defense of Morgan's Amended Petition and Verified Complaint. This is required to avoid that counsel having a conflict of interest as they go forward. Any attempt, however sincere, to be loyal to the interests of both Hitchman Fiduciaries and Underwriters is ethically impossible. We do not believe that an actual conflict has developed yet but the potential for a conflict of interest between the insurer and the insured is entirely unavoidable. Immediate action is necessary to avoid disqualifying these counsel at a critical point in the defense.

For the same reasons, Larry Hilton and Paul Savage have an unavoidable conflict of interest because of their intimate relationship with Underwriters and because of Underwriters unlimited reservation of rights letter. Mr. Hilton can represent Underwriters as monitoring counsel but he cannot ethically serve as defense counsel for Hitchman Fiduciaries.

281255_1.docx

### Hitchman Fiduciaries Has Classic Right to Independent Defense Counsel Under Underwriters Reservation of Rights To Deny Coverage for <u>Intentional Acts</u>

Underwriters' reservation of a right to deny coverage for intentional acts has created the classic conflict of interest identified in *San Diego Federal Credit Union v. Cumis Ins. Society, Inc.* 162 Cal.App.3d 358, 375. 1984. Morgan's Amended Petition and Verified Complaint alternatively allege both intentional and negligent conduct resulting in damages. This creates "divergent interests" between the insurer and the insured that entitle the insured to have independent defense counsel. If a conflict arises, "brought about by the insurer s reservation of rights based on possible noncoverage under the insurance policy, the insurer must pay the reasonable cost for hiring independent counsel by the insured. *The insurer may not compel the insured to surrender control*" of the defense. *Ibid.*, italics added.

The holding in *Cumis* has been codified in a California statute: "If the provisions of a policy of insurance impose a duty to defend upon an insurer and a conflict of interest arises which creates a duty on the part of the insurer to provide independent counsel to the insured, the insurer shall provide independent counsel to represent the insured" unless the insured waives its right to independent counsel. Cal. Civ. Code, 2860 a . **A onfli t of interest arises en an insurer reserves its rig ts on a given issue and t e out o e of t at overage issue an be ontrolled by ounsel first retained by t e insurer for t e defense of t e lai** . . . ." *Id.*, subd. b *Blanchard v. State Farm Fire & Casualty Co*., 2 Cal.App.4th 345, 350 1991 .

"The paradigm case requiring independent counsel is one in which the way counsel retained by the insurance company defends the action will affect an underlying coverage dispute between the insurer and the insured." *Golden Eagle Ins. Co. v. Foremost Ins. Co*. 20 Cal.App.4th 1372, 1395 1993 . So, where the Morgan Actions allege that the conduct of the insured was intentional or negligent, there is a likely conflict of interest that operates upon the attorney selected by the insurer. The insurer s interests diverge from those of the insured because a finding of intentional conduct would free the insurer from liability, while nonintentional conduct would be covered. *Cumis*, 162 Cal.App.3d at 364-365. The insurer s reservation of rights letter in *Cumis* was general, and did not specifically list the intentional acts exclusion. *Id.* at p. 362, fn. 2. In this case Underwriters has expressly reserved its right not to pay any judgment based on intentional conduct. So Underwriters "'may not compel the insured to surrender control of the litigation.'" *Id*. at p. 369. "If the insurer must pay for the cost of defense and, when a conflict exists, the insured may have control of the defense if he wishes, it follows the insurer must pay for such defense conducted by independent counsel." *Ibid*.

### Hitchman Fiduciaries Has Classic Right to Independent Defense Counsel Under Underwriters <u>Broad</u> Reservation of Rights To Deny Coverage

After failing to clarify its position for many months, Underwriters October 19, 2021 reservation of rights letter asserts numerous reservations to rely on named and unnamed policy exclusions to avoid paying indemnity. Underwriters' letter reserves its right to deny indemnity coverage based on Morgan's very broad allegations against Hitchman Fiduciaries. Although these allegations are denied, if Morgan should prove a right to money based on conduct excluded from coverage, Underwriters will pay nothing.

Among the broad exclusions that Underwriters has reserved a right to rely upon in denying payment for damages in the October 19 letter at pp. 8-9 are:

"[A]ny Claim arising out of any criminal, dishonest, fraudulent or malicious act, error or omission of any Assured, committed with actual, criminal, dishonest, fraudulent or malicious purpose or intent."

"[F]ines, penalties or sanctions, except that if a Claim shall have been brought against the Assured seeking Damages as well as fines, penalties, or sanctions"

"[A]ny Claim arising out of any acts, errors, or omissions which took place prior to the effective date of this Insurance, if any Assured on the effective date knew or could have reasonably foreseen that such acts, errors or omissions might be expected to be the basis of a Claim"

"[A]ny Claim seeking the return or reimbursement of fees, costs, expenses or expenditures paid to the Assured, paid on the Assured's behalf, or paid at the direction of the Assured pursuant to the Assured's role in providing Professional Services, including but not limited to any fees, costs, expenses or expenditures paid from a trust, estate, guardianship, bank account or other financial instrument at the Assured's control.":

"[A]ny Claim arising out of any disputes involving an accounting, return or reimbursement of fees, commissions, costs or expenses paid to the Assured"

"[A]ny Claim arising out of any actual or alleged commingling, conversion, misappropriation, defalcation, or inability or failure to collect or safeguard any funds, premium, escrow of tax money or other property for personal profit or advantage"

These asserted exclusions are hardly clearly defined and defense counsel seeking to protect the interests of Underwriters can easily allow a judgement that would fall within one or more of these exclusions. At the least, defense counsel cannot protect both the interests of the insured and the insurer in light of these broad exclusions for any judgment.

### Hitchman Fiduciaries Has ight to Inde endent e ense ounse nder nderwriters en Ended eservation o ights

An insurer's open-ended reservation of the right to disclaim coverage results in a "conflict requiring independent counsel." In *Cunniff v. Westfield, Inc*., 829 F. Supp. 55, 56 E.D.N.Y. 1993 ., the insurer " reserve[d] the right to any policy defenses not heretofore raised.'" Applying New York law on the right to independent counsel, the court held:

> [T]he Court agrees with Westfield that a clear conflict of interest is present between itself and Maryland. As noted Maryland may continue to attempt to avoid coverage of any liability assessed against Westfield in the underlying action by invoking policy exclusions. Furthermore, Maryland can present Westfield's case in such a way as to defeat liability based upon the ground of

> Westfield's [uncovered conduct]. Indeed, as implicitly recognized by Maryland, a finding of Westfield's affirmative negligence would trigger the policy's exclusion and thereby relieve Maryland of any obligation to indemnify Westfield.  That the loyalty of the insurer's attorney would consequently be divided can hardly be questioned.  *See* [*Klein v. Salami*, 545 F. Supp. 175, 179  E.D.N.Y. 1982 ].  Accordingly, the conflict presented herein requires independent counsel on behalf of Westfield.

It is not a fair argument, as insurers often assert, that the facts cannot be changed by counsel so that coverage cannot be controlled by appointed counsel.  This analysis fails to understand the character of the actual conflict that requires a defense through non-conflicted "independent counsel." *Bethlehem Constr. Inc. v. Transportation Ins. Co.*, No. CV-03-0324-EFS, 2006 U.S. Dist. LE   IS 70357  E.D. Wash. Sep. 27, 2006 .

*Bethlehem* at   82  applying California coverage law  highlighted an "interplay" problem revealing a conflict of interest entitling the insured to independent counsel. The court noted that:

> As was the case in *Cumis Insurance Society* Mr. Crowley, as the insurer-retained counsel in *Cumis* Insurance *Society*, was bound to investigate all conceivable bases on which liability might attach.  These investigations and client communications may provide information relating directly to the coverage issue.  Furthermore, counsel may form an opinion about the insured['s] credibility.  As between counsel's two clients, there is no confidentiality regarding communications intended to promote common goals.   But confidentiality is essential where communication can affect coverage.  Thus, the lawyer is forced to walk an ethical tightrope, and not communicate relevant information which is beneficial to one or the other of his clients.

That conflict is no different that the classic one identified between covered negligence and excluded intentional acts identified in the *Cumis* case. *Long v. Century Indem. Co.*, 163 Cal. App. 4th 1460, 1469  2008  explained that independent counsel is required in California based on the ethical obligations of California defense counsel whenever there is an actual or potential conflict of interest between the insured and the insurer who controls that counsel.

> "Although issues of coverage under the policy are not actually litigated in the third party suit, this does not detract from the force of these opposing interests as they operate on the attorney selected by the insurer, who has a dual agency status [citation].'   Consequently, in order to    "  eliminate the ethical dilemmas and temptations that arise along with conflict in joint representations,' " ' the insurer is required to provide its insured with independent counsel of the insured s choosing "who represents the insured, not the insurer"  and the insured may thereafter control the

> defense of the case   .[A]n insurer has a duty to allow its insured to select independent counsel  whenever a conflict or potential conflict of interest between the insurer and the insured exists or may arise with respect to third party litigation."

Where the outcome of the underlying case  liability for covered claims or non-covered claims  is largely in the hands of defense counsel because of tactical and strategic decisions on discovery, motion practice, and trial presentation, the undeniably divergent economic interests of the insured and the insurer place an appointed defense counsel in an untenable ethical dilemma, even where the counsel intends to avoid that dilemma. Even a decision whether to seek a settlement before the policy limits are used up paying that counsel places the appointed attorney in an ethical dilemma between his and his client's economic interests. This cannot be permitted.

*nderwriters  eservation o  ights  reates Ethical  ro em or   ointed  e ense  ounse*

*Appointed Counsel Can Control The Outcome Of Litigation At the Insureds' Expense*

In assessing whether an insurer's retained counsel can "control" the outcome of the coverage issue courts look to whether appointed counsel is "**able** to control the outcome of coverage to [the insured's] detriment by positions [counsel]   ig  t take in litigation[.]" *Silacci v. Scottsdale Ins. Co.*, No. C 04-04125 JF, 2006 U.S. Dist. LE  IS 6076, at  9  N.D. Cal. Feb. 16, 2016  emphasis added . It is the "**possibility**" that "policy coverage will be determined or affected by the nature of [the insured's] conduct as developed" that is determinative, regardless of whether appointed counsel **a  tually** acts to sway the outcome of coverage issue. *James 3 Corp. v. Truck Ins. Exch*. 91 Cal. App. 4th 1093, 1108  2001  emphasis added .

Underwriters' reservation to later raise and rely upon any "other Policy terms, conditions and exclusions that may be applicable" clearly limits the control of appointed counsel as any effort by appointed counsel to defend Hitchman Fiduciaries in a way that would potentially raise one or more of the reserved terms, conditions and exclusions would cause a direct conflict. *Id.* at 1107-1108  "Since Appointed Counsel decides how to defend the claims, how to bill his services for the defense, how to describe his tasks, how to allocate his time, and how much to charge—all of which is beyond the control of the Insureds—Appointed Counsel can control the outcome of this coverage issue."

*Appointed Counsel Will Inevitably Have To Prioritize Some Aspects Of Liability Exposure*

Insurers often assert that the facts cannot be changed by counsel so coverage cannot be controlled by appointed counsel.  This analysis fails to understand the character of the actual conflict that requires a defense through non-conflicted "independent counsel." *Bethlehem Constr. Inc. v. Transportation Ins. Co.*, No. CV-03-0324-EFS, 2006 U.S. Dist. LE  IS 70357  82  E.D. Wash. Sep. 27, 2006  applying California coverage law highlighted an "interplay" problem revealing a conflict of interest entitling the insured to independent counsel. *Bethlehem Constr., Inc.* explained that when there is a conflict of interest, even if the insurer and insured had a common interest in pursuing a non-liability defense, the defense attorney "still would have   to make

certain decisions during discovery and trial that may have      adverse effects on either [the insured] or [the insurer]." *Id* at 81.

In *Aspen Am. Ins. Co. v. William Ou,* No. CV 18-2312 DSF  GJSx , 2019 U.S. Dist. LE  IS 77822  13  C.D. Cal. Mar. 14, 2019 , the court found appointed counsel to have a conflict where it was:

> in [the insured's] interest in the [underlying action] that [appointed counsel] marshal facts that establish [the insured's] actions did not amount to a breach of his professional duties. But it is in [the insurer's] interest here to marshal facts that establish the contrary — or at the very least, undermine [the insured's] defense with facts that establish [the insured] had at least a reasonable basis to believe that his medical treatment of Limon would result in a lawsuit. This results in an incentive for [the insurer] to attach liability to [the insured]. Therefore     there is an actual conflict of interest and [the insured] has met his burden to show that, as a matter of law, he has a right independent counsel at [the insurer's] expense

Similar to the circumstances in *Aspen*, Underwriters wants to limit defense spending and has an incentive to characterize all allegations in the Morgan Actions as being within the exclusions. Appointed counsel will necessarily be conflicted in the way it investigates and defends the case to protect Underwriters' interests, even if unconsciously. Defense counsel will naturally be tempted, even unconsciously, to act favorably toward the interests of the insurer who is paying them.

*James 3 Corp.* 91 Cal. App. 4th at 1101 held that independent counsel is required when the conflict of interest is "significant, not merely theoretical, actual, not merely potential." This can occur "where the insurer *reserves* its rights on a given issue and the outcome of that coverage issue can be controlled by the insurer s retained counsel" or "whenever the[] common lawyer s representation of [one client] is rendered less effective by reason of his representation of the other [client]." Here the conflict of interest is significant and actual. It cannot be avoided even by good intentions.

In *Hartford Casualty Ins. Co. v. J.R. Marketing, L.L.C.*, 61 Cal. 4th 988, 998  2015 , Hartford had reserved its right to "dispute coverage for some or all of the defendants or claims in the [underlying] actions. The California Supreme Court in Hartford held:

> [W]hen the third party suit includes some claims that are potentially covered, and some that are clearly outside the policy's coverage, the law nonetheless implies the insurer's duty to defend the entire action. Unless the insured agrees otherwise, in a case where— because of the insurer's reservation of rights based on possible noncoverage under the policy—the interests of the insurer and the insured diverge, the **insurer    ust pay reasonable  osts for retaining independent  ounsel by t e insured**.

*Id*. at 989.  emphasis added .

The language of Underwriters' reservation of rights letter is similar to the one at issue in *J.R. Marketing*. There, Hartford's reservation of its rights to decline coverage based on exclusions and

not waive any coverage defenses put Hartford at odds with the insured, triggering the right to independent counsel under *Cumis*.

Underwriters, like the insurer in the *J.R. Marketing* case, asserted in its reservation of rights letters that it could and would raise "any additional terms, conditions and exclusions." This mirrors the language of Harford's reservation of rights in *J.R. Marketing* and creates a conflict of interest between Hitchman Fiduciaries and Underwriters based on Underwriters' reservation of rights, which encompasses any exclusions in its Policy.

### *onc usion*

As was required in *J.R. Marketing, Cumis*, and other cases, independent defense counsel is required for Hitchman Fiduciaries in defending the Morgan Actions. Consequently, Underwriters has a duty to permit and pay for a defense by independent counsel as outlined above.

We look forward to Underwriters promptly agreeing to this arrangement.

Very truly yours,

/s/ *James A. Lowe*
James A. Lowe

JAL/sjs
cc:      Client

281255_1.docx

# EXHIBIT 13



61 Broadway, 26th Floor, New York, NY 10006
Tel: 212-867-4100  Fax: 212-867-4118
www.fkblaw.com

March 30, 2022

**SENT BY EMAIL**                                    **PRIVILEGED & CONFIDENTIAL**

Hitchman Fiduciaries
120 Tustin Ave, Suite C
Newport Beach, California 92663

Attn:   Bruce Hitchman (Bruce@HitchmanFiduciaries.com)
        Lee Ann Hitchman (LeeAnn@HitchmanFiduciaries.com)


Re:   Insurer            :   Certain Underwriters at Lloyd's, London
      Insured            :   Hitchman Fiduciaries, LLC
      Claimant           :   Thomas Edward Morgan, III

      Policy Number      :   FPL**18**105754**J**
      Policy Period      :   January 1, 2018 to January 1, 2019
      Policy Limits      :   $1,000,000/$2,000,000 Per Claim/Aggregate
      Deductible         :   $15,000
      Retroactive Date   :   January 1, 2010

      Policy Number      :   FPL**19**105754**K**
      Policy Period      :   January 1, 2019 to January 1, 2020
      Policy Limits      :   $1,000,000/$2,000,000 Per Claim/Aggregate
      Deductible         :   $15,000
      Retroactive Date   :   January 1, 2010 for the general limit, and
                             January 1, 2019 for the higher Policy Limits of
                             $2,000,000/$4,000,000 Per Claim/Aggregate

      Claim Date         :   October 3, 2018
      Claim Number       :   35387
      FKB File           :   407.369


Dear Bruce and Lee Ann:

        As you know, my firm represents Certain Underwriters at Lloyd's, London
("Underwriters"), who issued certain liability insurance to Hitchman Fiduciaries, LLC (the
"Insured" or "Assured").  This letter supplements and incorporates by reference our letters to you
dated March 29, 2019 and October 19, 2021, in which Underwriters formally acknowledged
receipt of the above-captioned Claim, advised of their preliminary position regarding coverage,
and reserved rights under the insurance provided with respect to developments in, and the
continuing investigation into, the Claim.

As you know, Underwriters issued policy number FPL18105754J, with an effective date of January 1, 2018 to January 1, 2019 (the "2018 Policy"). The "2018 Policy" was subject to a Retroactive Date of January 1, 2010, together with policy limits of $1,000,000 per Claim and $2,000,000 in the aggregate of all Claims. Underwriters subsequently issued policy number FPL19105754K, with an effective date of January 1, 2019 to January 1, 2020 (the "2019 Policy"). The "2019 Policy" was also subject to a Retroactive Date of January 1, 2010, together with policy limits of $1,000,000 per Claim and $2,000,000 in the aggregate of all Claims, but also contained an additional Retroactive Date of January 1, 2019 for higher policy limits of $2,000,000 per Claim and $4,000,000 in the aggregate of all Claims. This higher limit would only potentially apply to: (1) acts that occurred on or after January 1, 2019 that were first reported during the 2019 Policy, or (2) Claims that were first made against the Insured during the 2019 Policy that arose out of acts which occurred on or after January 1, 2019. Each the 2018 Policy and the 2019 Policy had a $15,000 deductible, and the applicable Limits of Liability were subject to reduction by Claims Expenses incurred by Underwriters.

## I.   CLAIM DEVELOPMENTS

A second mediation was conducted on March 24, 2022. Claimant made an "opening demand" for $30,000,000. Claimant made a subsequent demand for $21,000,000 and for the Insured to retire from providing fiduciary services, and an impasse was reached shortly thereafter.

Defense counsel, Sheppard Mullen Richter & Hampton, LLP ("Sheppard Mullen"), advises that there are viable defenses to each cause of action asserted by Claimant. However, given the amount of damages Claimant is seeking, if he prevails at trial, it is possible that he obtains a verdict in excess of the remaining insurance available to the Insured. To the extent you may have "excess" or umbrella insurance, and to the extent such other insurance may not have already been put on notice of this Claim, kindly notify such other insurance of this Claim and the damages alleged.

## II.   COVERAGE ANALYSIS

### A.   The 2018 Policy Applies To The Claim

While we continue to lend no credence to any allegations that have been or may be asserted against the Insured, developments in this Claim necessitate that your attention be drawn to certain coverage issues as well as the remaining limits of insurance available to you. As Claimant is asserting allegations of professional liability, we draw your attention to the Fiduciary Professional Liability insurance form, which, at the opening preface, states the following:

**NOTICE:** This is a claims made form. Words and phrases in **bold** (other than titles and section headings) have special meaning. See section V "Definitions." Except to such extent as may otherwise be provided herein, the coverage afforded under this **Insurance Policy**

is limited to liability for only those **Claims** [1] that are first made against the **Assured** and reported to the **Underwriters** while the insurance is in force.  The **Limit of Liability** available to pay **Damages** shall be reduced and may be completely exhausted by payment of **Claims Expenses**.  **Damages** and **Claims Expenses** shall be applied against the **Deductible**. Please review the coverage afforded under this **Insurance Policy** carefully and discuss the coverage hereunder with your insurance agent or broker.

In connection with the foregoing, we now direct your attention to **Section I.**, "Insuring Agreements," **Section XI.**, "Notice Of Claim, Or Circumstance That May Lead To A Claim," and **Section IV.**, "Limit Of Liability," which, in relevant part, provide as follows:

I.   **INSURING AGREEMENTS**

The **Underwriters** agree with the **Assured**, named in the Declarations made a part hereof, in consideration of the payment of the premium and reliance upon the statements in the application which is made a part of this **Insurance Policy** (hereinafter "**Policy**" or "**Insurance**") and subject to the **Limit of Liability**, exclusions, conditions and other terms of this **Insurance**:

A.   **Coverage**

To pay on behalf of the **Assured Damages** and **Claims Expenses** which the **Assured** shall become legally obligated to pay because of any **Claim** or **Claims**, including **Claims** for **Personal Injury** as hereafter defined, first made against the **Assured** and reported to the **Underwriters** during the **Period of Insurance** or **Extended Reporting Period**, arising out of any act, error or omission of the **Assured** in rendering or failing to render **Professional Services** as hereinafter defined for others but solely for acts on behalf of the **Named Assured** designated in Item 1 of the Declarations and caused by the **Assured**, except as excluded or limited by the terms, conditions and exclusions of this **Policy**.

B.   **Defense and Settlement (Included in the Limit of Liability)**

1.   The **Underwriters** shall have the right and duty to defend, subject to the **Limits of Liability**, any **Claim** against the **Assured** seeking **Damages** which are payable under the terms of this **Insurance**, even if any of the allegations of the **Claim** are groundless, false or fraudulent. However, **Underwriters** shall not formally appoint defense counsel without the consent of the **Named Assured**, such consent not to be unreasonably withheld.

---

[1]   Section V., **Definitions**, of the Policy defines "Claim" as "a demand received by any **Assured** for money or services outside the **Ordinary Course of Business** including the service of suit or institution of arbitration proceedings against the **Assured**."

Hitchman Fiduciaries
FKB No. 407.369
Page 4 of 10

2.   It is agreed that the **Limit of Liability** available to pay **Damages** shall be reduced and may be completely exhausted by payment of **Claims Expenses**. **Damages** and **Claims Expenses** shall be applied against the **Deductible**.

3.   The **Underwriters** shall have the right to make any investigation they deem necessary, including, without limitation, any investigation with respect to the application and statements made in the application and with respect to coverage.  . . .

## XI.   NOTICE OF CLAIM, OR CIRCUMSTANCE THAT MAY LEAD TO A CLAIM

A.   If any **Claim** is made against the **Assured**, the **Assured** shall immediately forward to **Underwriters** through persons named in Item 7 of the Declarations every demand, notice, summons or other process received by him or his representative.

B.   If during the **Period of Insurance** the **Assured** first becomes aware of any act, error or omission that could reasonably be the basis for a **Claim** it must give written notice to **Underwriters** through persons named in Item 7 of the Declarations as soon as practicable during the **Period of Insurance** of:

1.   the specific act, error or omission; and

2.   the injury or damage which may result or has resulted from the act, error or omission; and

3.   act, error or omission.

Any subsequent **Claim** made against the **Assured** which is the subject of the written notice shall be deemed to have been made at the time written notice was first given to **Underwriters**.

C.   A **Claim** shall be considered to be reported to the **Underwriters** when notice is first given to **Underwriters** through persons named in Item 7 of the Declarations of the **Claim** or of an act, error or omission which could reasonably be expected to give rise to a **Claim**.

D.   All **Claims** arising out of the same, continuing or related **Professional Services** shall be considered a single **Claim** and deemed to have been made at the time the first of the related **Claims** is reported to **Underwriters** and shall be subject to one **Limit of Liability**.  . . .

IV.   **LIMIT OF LIABILITY**

    A.    The **Limit of Liability** stated in the Declarations as "per Claim" is the limit of the **Underwriters'** liability for all **Damages** and **Claims Expenses** arising out of the same, related or continuing **Professional Services** without regard to the number of **Assureds**, **Claims** or claimants. . . .

On December 20, 2018, when the 2018 Policy was nearing expiration, the Insured completed an application for a renewal policy (the "Renewal Application"). The Insured was asked, in question 3.c., whether it was aware of any pending demand for the removal of the applicant or any of its members from a fiduciary role. The Insured answered "Yes," and disclosed that "we have two matters now where the former trustee was removed and they do not like our neutrality." The Insured advised that it would obtain more detail about these circumstances from its attorney and provide Underwriters with summaries. On March 10, 2019, the Insured provided a summary relative to the Morgan Trust. That summary states as follows:

Morgan Trust

Bruce Hitchman and Lee Ann Hitchman of Hitchman Fiduciaries ("Hitchman Fiduciaries") were appointed by the Court as Interim Co-Trustees of the Beverly C. Morgan Family Trust as Amended and Restated on November 6, 2013 ("Trust").

Beverly C. Morgan died on January 25, 2014. From and after Beverly's death, the Trustee of the Trust was Thomas Edward Morgan, III ("Thomas"). In late March 2017, however, Thomas was suspended as Trustee pursuant to Minute Orders issued by the Court in Orange County Superior Court case number 30-2014-00726771-PR-TR-CJC.

Hitchman Fiduciaries were appointed by Minute Order on March 29, 2017, and were soon after confirmed as Interim Co-Trustees by the Order Appointing Interim Co-Trustees issued by the Orange County Superior Court on April 4, 2017.

Extensive litigation regarding the management of the many corporate assets owned by the Trust, which had commenced between the trust beneficiaries (i.e., Thomas, on the one hand, and his sister, Nancy Shurtleff, and her children, on the other hand) was thereafter expanded to include Hitchman Fiduciaries. Thomas, the suspended trustee, has filed petitions to remove Hitchman Fiduciaries as Interim Co-Trustees and to surcharge them.

After receiving this summary, the Insured requested that Underwriters appoint defense counsel, and a claim file was opened under the policy within which this request was made, the 2019 Policy, subject to Underwriters' continuing investigation into the developments of the Claim. Since that time, however, and since receiving the "Petition for Removal" that Claimant filed against the Insured on October 3, 2018, as well as Claimant's "Amended Petition for Removal" and "Verified Complaint," we have seen no independent wrongful acts alleged that would *not* arise out of, or

relate back to, the acts disclosed during the 2018 Policy, or that would otherwise constitute a separate Claim that would trigger coverage under the 2019 Policy.  Accordingly, since the subject Claim was made on October 3, 2018 and reported during the 2018 Policy, when the Renewal Application was completed, the policy applicable to the Claim is the 2018 Policy.  The 2018 Policy has limits of liability of $1,000,000 per Claim and $2,000,000 in the aggregate of all Claims.

We wish to advise you that if the 2019 Policy applied to the Claim, there would likely be no coverage available for the Claim *at all* based on the information obtained at this point.  In that regard, we direct your attention to Section IV., Exclusion I. of the 2019 Policy, which states as follows:

### IV.   EXCLUSIONS

The coverage under this **Insurance** does not apply to **Damages** or **Claims Expenses** incurred with respect:  . . .

I.      to any **Claim** arising out of any acts, errors, or omissions which took place prior to the effective date of this **Insurance**, if any **Assured** on the effective date knew or could have reasonably foreseen that such acts, errors or omissions might be expected to be the basis of a **Claim**;

The Claim was made during the 2018 Policy and reported in the Renewal Application, while the 2018 Policy was in effect.  Therefore, coverage is available for the Claim under the 2018 Policy.  However, had the Claim not been disclosed before the inception of the 2019 Policy, the Claim would be excluded from coverage in its entirety pursuant to Exclusion I.

As a further hypothetical, if it were only circumstances of a potential Claim of which the Insured first became aware during the 2019 Policy and the Insured notified Underwriters of such circumstances during the 2019 Policy, then the 2019 Policy would apply for purposes of analyzing insurance coverage.  However, such a notice would be subject to the "Split Retroactive Date" of the 2019 Policy.  The "Split Retroactive Date" provides general limits of liability ($1,000,000/$2,000,000) for Claims that arise out of acts occurring *before* January 1, 2019 and higher limits of liability ($2,000,000/$4,000,000) for Claims that arise out of acts occurring *on or after* January 1, 2019.  In this instance, if the 2019 Policy applied, which it now appears it does not, only the general limits would apply because the subject Claim arose out of acts occurring before January 1, 2019.  We understand that this was communicated to you on December 15, 2021 by Dominion Insurance, the agent of Underwriters.

### B.   Policy Exclusions

In addition to the foregoing, we redirect your attention to Section IV., Exclusions, which, in relevant part, provides as follows:

Hitchman Fiduciaries
FKB No. 407.369
Page 7 of 10

IV.   **EXCLUSIONS**

A.   to any **Claim** arising out of any criminal, dishonest, fraudulent or malicious act, error or omission of any **Assured**, committed with actual, criminal, dishonest, fraudulent or malicious purpose or intent. However, notwithstanding the foregoing, the insurance afforded by this Policy shall, subject to the sub-limit of liability specified in this Policy, apply to **Claims Expenses** incurred in defending any such claim, but shall not apply to **Damages** which the **Assured** might become legally obligated to pay as a result of such a claim;

B.   to fines, penalties or sanctions, except that if a **Claim** shall have been brought against the **Assured** seeking **Damages** as well as fines, penalties, or sanctions, then any coverage which may be afforded by this **Policy** will apply to any **Claims Expenses** incurred, without liability, however, for such fines, penalties, or sanctions; . . .

I.   to any **Claim** arising out of any acts, errors, or omissions which took place prior to the effective date of this **Insurance**, if any **Assured** on the effective date knew or could have reasonably foreseen that such acts, errors, or omissions might be expected to be the basis of a **Claim**; . . .

L.   to any **Claim** seeking the return or reimbursement of fees, costs, expenses or expenditures paid to the **Assured**, paid on the **Assured's** behalf, or paid at the direction of the **Assured** pursuant to the **Assured's** role in providing **Professional Services**, including but not limited to any fees, costs, expenses or expenditures paid from a trust, estate, guardianship, bank account or other financial instrument at the **Assured's** control."

P.   to any **Claim** arising out of any disputes involving an accounting, return or reimbursement of fees, commissions, costs or expenses paid to the **Assured**;

This exclusion shall not, however, apply to any **Claim** seeking **Damages** based upon an alleged act, error or omission by the **Assured** with respect to an accounting of any estate or trust for which the **Assured** has provided **Professional Services**. Underwriters accordingly reserve rights in connection with the foregoing Policy terms.

Q.   to any **Claim** arising out of any actual or alleged commingling, conversion, misappropriation, defalcation, or inability or failure to collect or safeguard any funds, premium, escrow of tax money or other property for personal profit or advantage;

Underwriters reserve their rights as to: Exclusion "A" if it is found that you acted with malicious purpose or intent; Exclusion "B" if this matter involves fines, penalties or sanctions; Exclusion "I"

Hitchman Fiduciaries
FKB No. 407.369
Page 8 of 10

if it is determined that this Claim arises out of any acts, errors, or omissions which took prior to the 2018 Policy; Exclusions "L" and "P" if this matter involves a disgorgement or reimbursement of fees; and Exclusion "Q" to the extent that Claimant seeks damages for any alleged conversion of funds or failure to safeguard any funds.

### C.  Present Defense Fees / Remaining Limits of Liability

As you know, the defense of the Claim was initially provided by Larry Hilton, Esq. and Paul Savage, Esq. (collectively, "Investigatory Defense Counsel") and, upon your request, subsequently transferred to Sheppard Mullen.  Underwriters agreed to pay Sheppard Mullen a blended hourly rate of $425, and you agreed to pay Sheppard Mullen an additional blended hourly rate of $70.

We understand that Investigatory Defense Counsel incurred $139,024.31 in fees and costs and that, as of February 28, 2022, Sheppard Mullen had incurred approximately $490,000 in fees and costs.  While we are awaiting receipt of all current invoices, which would include additional fees and costs incurred by Sheppard Mullen through March 2022, it is our present understanding that approximately $629,024 has been billed to date.   As stated in the opening preface of the Policy, as well as in Section I.B.2. of the Insuring Agreements, both referenced above, Claims Expenses incurred by Underwriters reduce the Limits of Liability available to the Insured. **Accordingly, the applicable $1,000,000 limit has been reduced by approximately $629,024, leaving what is likely to be less than $370,976 in remaining insurance coverage for the subject Claim.  The precise amount remaining will continue to erode as Claims Expenses continue to be incurred.  If any Damages or Claims Expenses exceed the applicable Policy limit ($1,000,000), such amounts will become your responsibility to pay.**

### D.  Other Insurance / Subrogation

To the extent that you may have other applicable insurance, we direct your attention to Section X., "Other Insurance," of the Policy, which states as follows:

> This insurance shall apply in excess of any other valid and collectible insurance available to any **Assured**, unless such other insurance is a surety bond or is written only as specific excess insurance over the **Limit of Liability** of this Policy.

To the extent that this matter may involve subrogation, we direct your attention to Section XIV., "Subrogation," of the Policy, which states as follows:

> In the event of any payment under this **Insurance**, the **Underwriters** shall be subrogated to all the **Assured's** rights of recovery therefor against any person or entity and the **Assured** shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The **Assured** shall do nothing after the payment of **Damages** by **Underwriters** to prejudice such rights.

Underwriters accordingly reserve their rights pursuant to the "Other Insurance" and "Subrogation" provisions of the Policy.

### III. FURTHER ACTIONS

Again, the 2018 Policy is a self-liquidating Policy, meaning that the limits are reduced by the amount of defense costs incurred on behalf of the Insured. In the Pre-Mediation report prepared by Sheppard Mullen, Claimant asserted quantified damages of approximately $4,000,000, plus unquantified damages. As the damages sought by Claimant exceed the Limit of Liability remaining on the Policy, kindly put any excess insurers on notice of this matter and the potential damages alleged. Given the eroding limits, you may also wish to explore cost-effective means of litigating this matter. Although Underwriters authorized your use of Sheppard Mullen as defense counsel and negotiated a reduced rate for you, the reduced rates still exceed that of Larry Hilton, Esq. and Paul Savage, Esq. who remain willing, ready and able to assist you and Sheppard Mullen, as needed.

At this time, our investigation is ongoing, and it is uncertain whether this matter will present any additional potential coverage issues with respect to the Policy. Accordingly, we fully reserve the rights of Underwriters, including Underwriters' right to deny coverage or supplement this letter. No actions taken by Underwriters or their representatives shall be deemed to be a waiver or estoppel of any of the terms or conditions of the Policy. We acknowledge that the rights of the Insured are equally reserved.

Underwriters additionally reserve their right to pursue all actions for contribution, indemnity, or subrogation as may ultimately be appropriate in connection with this matter. Underwriters require cooperation from the Insured with respect to the pursuit of any such actions. Further, Underwriters reserve their right to file a declaratory judgment action or a claim for subrogation or contribution against the Insured or any of the Insured's other insurers to have Underwriters' rights and duties under the Policy determined or to recoup any monies paid on the Insured's behalf, to the extent that the Insured was not entitled to such sums pursuant to the terms and conditions of the Policy.

If further information comes to Underwriters' attention, we expressly reserve the right to rely on any additional coverage defenses available, whether set forth herein or not. If there is information which would require the assertion of coverage defenses, nothing contained herein should be construed as a waiver of any provisions that may act to properly preclude or otherwise limit the coverage under this Policy.

If you believe that this claim has been wrongfully handled, you may have the matter reviewed by the California Department of Insurance, which may be contacted at the following address and telephone number:

Hitchman Fiduciaries
FKB No. 407.369
Page 10 of 10

California Department of Insurance
Claims Service Bureaus
300 S. Spring Street, 11th Floor
Los Angeles, California 90013
Telephone: (800) 927-4357

Additionally, you may also contact the undersigned at any time if you have any questions or comments regarding the contents of this letter or if you have any information that would impact upon or cause Underwriters to alter or reconsider their coverage position.

Very truly yours,

FURMAN KORNFELD & BRENNAN LLP

Andrew R. Jones

c:      Mitchell Young – Mitchell.Young@miller-insurance.com
        Larry Hilton – Larry.Hilton@DominionInsurance.com
        Nicholas Van Brunt – NVanBrunt@sheppardmullin.com
        Golnaz Yazdchi – GYazdchi@sheppardmullin.com
        James A. Lowe – JAL@gauntlettlaw.com
        David A. Gauntlett – DAG@gauntlettlaw.com

        David Furman (FKB-NYC)

# EXHIBIT 14



61 Broadway, 26th Floor, New York, NY 10006
Tel: 212-867-4100 Fax: 212-867-4118
www.fkblaw.com

April 20, 2022

**SENT BY EMAIL**                                   **PRIVILEGED AND CONFIDENTIAL**

Gauntlett & Associates
18400 Von Karman, Suite 300
Irvine, California 92612

Attn:   James A. Lowe (JAL@gauntlettlaw.com)

|  | Re: | Insurer | : | Certain Underwriters at Lloyd's, London |
|---|---|---|---|---|
|  |  | Insured | : | Hitchman Fiduciaries, LLC |
|  |  | Claimant | : | Thomas Edward Morgan, III |
|  |  |  |  |  |
|  |  | Policy Number | : | FPL18105754J |
|  |  | Policy Period | : | January 1, 2018 to January 1, 2019 |
|  |  | Policy Limits | : | $1,000,000/$2,000,000 Per Claim/Aggregate |
|  |  | Deductible | : | $15,000 |
|  |  | Retroactive Date | : | January 1, 2010 |
|  |  |  |  |  |
|  |  | Policy Number | : | FPL19105754K |
|  |  | Policy Period | : | January 1, 2019 to January 1, 2020 |
|  |  | Policy Limits | : | $1,000,000/$2,000,000 Per Claim/Aggregate |
|  |  | Deductible | : | $15,000 |
|  |  | Retroactive Date: | | January 1, 2010 for the general limit, and January 1, 2019 for the higher Policy Limits of $2,000,000/$4,000,000 Per Claim/Aggregate |
|  |  |  |  |  |
|  |  | Claim Date | : | October 3, 2018 |
|  |  | Claim Number | : | 35387 |
|  |  | FKB File | : | 407.369 |

Dear James:

It was good speaking with you last week, on April 14, 2022.  As promised, herein is our written response to your two recent correspondences, both dated April 8, 2021, which were received by us on April 8, 2022.

**I.    Direct Contact with Underwriters' Insureds, Hitchman Fiduciaries**

Thank you for bringing this issue to our attention.  As you know, we had maintained direct communications with your clients, and our Insureds, who are sophisticated professional fiduciaries, since this Claim was reported to us.  Since your involvement, we have copied your

Hitchman Fiduciaries
FKB No. 407.369
Page 2 of 4

offices on our continued correspondence directly to the Insureds.  We had copied your offices on the supplemental reservation of rights letters we issued to the Insureds on October 19, 2021 and March 30, 2022, and we had copied your offices on our email correspondence to the Insureds on April 8, 2022.  We had also corresponded with Sheppard Mullin during the most recent mediation, where the Insureds were copied on that correspondence.  We had not been instructed to refrain from issuing correspondence to the Insureds until receiving the second letter you transmitted to us on the night of April 8, 2022.  Therefore, we believed our communications with the Insureds was agreeable.  Nevertheless, considering your recent correspondence and request to communicate only through your offices, we will now direct any future correspondence regarding this matter only to your offices.  Please be assured we did not intend anything inappropriate or disrespectful.

## II.    **Applicability of Investigative Fees to Policy Erosion**

As you are aware, the defense of the Claim was initially provided by Larry Hilton, Esq. and Paul Savage, Esq. (collectively, "Investigatory Defense Counsel") and, upon the Insureds' request, subsequently transferred to Sheppard Mullen.

We draw your attention to the Fiduciary Professional Liability Insurance policy, which, at the opening preface, states the following:

> **NOTICE:** This is a claims made form. Words and phrases in **bold** (other than titles and section headings) have special meaning. See section V "Definitions."  Except to such extent as may otherwise be provided herein, the coverage afforded under this **Insurance Policy** is limited to liability for only those **Claims** that are first made against the **Assured** and reported to the **Underwriters** while the insurance is in force.  <u>The **Limit of Liability** available to pay **Damages** shall be reduced and may be completely exhausted by payment of **Claims Expenses**</u>.  **Damages** and **Claims Expenses** shall be applied against the **Deductible**. Please review the coverage afforded under this **Insurance Policy** carefully and discuss the coverage hereunder with your insurance agent or broker. [underline emphasis added]

Pursuant to Section V. of the Policy, "Claims Expenses" means:

1.  fees charged by an attorney designated by **Underwriters** and consented to by the **Named Assured**, with such consent not to be unreasonably withheld; and

2.  all other fees, costs and expenses resulting from the ***<u>investigation</u>***, adjustment, ***<u>defense</u>*** and appeal of a **Claim**, suit or proceeding arising in connection therewith, if incurred by the **Underwriters**, or by the **Assured** with the written consent of the Underwriters.

3.  **Claims Expenses** does not include any costs incurred in the **Ordinary Course of Business**, nor any salary, overhead or other charges incurred by the **Assured** for time spent in cooperating in the defense and investigation of any **Claim** or circumstance which might lead to a **Claim** notified under this **Insurance**.

Hitchman Fiduciaries
FKB No. 407.369
Page 3 of 4

4. **Claims Expenses** also does not include any fees, costs, expenses or other charges incurred by the **Assured** – or incurred for or on behalf of the **Assured** – if such fees, costs, expenses or other charges are payable or reimbursable by any other sources, including but not limited to any applicable trust or estate.

Investigatory Defense Counsel provided the initial investigation into the Claim and defense for the Insureds. Such investigation and defense resulted in Claims Expenses that, pursuant to the Policy, erode the Limit of Liability available for the Claim. Nevertheless, considering your position regarding these Claims Expenses as well as the likely future of this Claim, Underwriters propose an offer that would, in part, forego the applicability of Investigatory Defense Counsel's fees to the Limit of Liability.

Underwriters make this part of their offer because they still do not see a realistic scenario where this Claim will be resolved within the remaining $1,000,000 Limit of Liability, particularly in view of Sheppard Mullin's billed fees and future litigation budget. Considering the fees paid to Sheppard Mullin, Underwriters will have paid $634,832.68 to Sheppard Mullen for the defense of this matter. By deducting the $139,024.31 incurred by Investigatory Defense Counsel, there would be $365,167.32 in available insurance proceeds remaining for this Claim. This amount would, of course, be subject to continued erosion by future Claims Expenses that may be incurred by Sheppard Mullen, as well as any other time that may have been incurred by Sheppard Mullen but not yet submitted to Underwriters. As previously stated, Underwriters are, in other words, effectively holding insurance proceeds ($365,167.32) that would likely be paid to the Insureds (or on their behalf) in the near future.

**Therefore, in lieu of our continued monitoring of the defense of this Claim, Underwriters propose foregoing the applicability of Investigatory Defense Counsel's fees to the Limit of Liability and tendering the $365,167.32 to the Insureds at this time <u>in exchange for the Insureds executing a Claim release form</u> so Underwriters can satisfy their coverage obligations to the Insureds under the Policy and so the Insureds can use the $365,167.32 as they see appropriate.**

Please let us know if the Insureds agree in principle to this arrangement. Subject to an agreed-upon Claim Release Agreement, we will have the funds transferred to the Insureds, Sheppard Mullin, or some other designee in exchange for the Insureds executing a Claim release form. Please note that Underwriters will continue to assist as requested, pursuant to the terms and conditions and the Limits of Liability of the Policy.

Very truly yours,

FURMAN KORNFELD & BRENNAN LLP

Andrew R. Jones

Hitchman Fiduciaries
FKB No. 407.369
Page 4 of 4

c:      Mitchell Young – Mitchell.Young@miller-insurance.com
        Larry Hilton – Larry.Hilton@DominionInsurance.com
        Nicholas Van Brunt – NVanBrunt@sheppardmullin.com
        Golnaz Yazdchi – GYazdchi@sheppardmullin.com

        David A. Gauntlett – DAG@gauntlettlaw.com

        David Furman (FKB-NYC)

# EXHIBIT 15

GAUNTLETT & ASSOCIATES
ATTORNEYS AT LAW

Our File Number:
10949.001

May 12, 2022

**VIA EMAIL**
ajones@fkblaw.com
dfurman@fkblaw.com

Andrew R. Jones, Esq.
David Furman, Esq.
FURMAN KORNFELD & BRENNAN LLP
61 Broadway, 26th Floor
New York, NY 10006

   Re: **Hit    an Fidu iaries advs. T  o  as E. Morgan  et al.**
     **Orange County California Superior Court**
     **Probate Case No. 30-2014-00726771-PR-TR-CJC**
     **Civil Case No. 30-2020-01155277-CU-BT-CJC;**
     Insurer: Underwriters at Lloyd's, London
     **F  B File No. 407.36**

    **CLAIMS AGAINST THE HITCHMANS TRIGGER MULTIPLE POLIC**
     **EARS AN   AGGREGATE POLIC   LIMITS**

Dear Counsel:

   Your firm's recent communications on behalf of your client, Underwriters at Lloyd's, assert that the allegations in the Civil Case and in the Probate Case referenced above constitute a single "Claim" as defined in Underwriters' policies sold to Hitchman Fiduciaries and that single Claim has a Policy Limit of  1,000,000. Those assertions are incorrect. When the allegations are properly understood and the policy language is properly interpreted, the facts establish that multiple different Claims have been made against the Hitchmans by numerous parties extending over several Policy periods which trigger more than one Policy Limit. And because there are multiple Claims within Policy periods, the Aggregate Claim limit applies, not a single Claim limit.

   The Hitchmans appreciate that Underwriters is defending these complex but groundless claims through independent defense counsel. However, Underwriters cannot expect to terminate that defense early through a claim buyout or otherwise. Such a termination of Underwriters' obligations is not supported by the policy language, the facts, or the law. More than one policy is triggered by the various and unrelated claims. The defense and any settlement of the claims are subject to policy limits of  2 million "per claim" and  4 million "aggregate" for the years 2019 and 2020.

   Your March 29, 2019 letter to Hitchman Fiduciaries, which was Underwriters' initial response to the underlying claims, acknowledged Thomas Morgan's initial claim was covered by

the 2019 policy. Your letter specifically referenced Underwriters' policy number FPL19105754K for the period January 1, 2019 to January 1, 2020 with policy limits of 2,000,000/ 4,000,000 Per Claim/Aggregate. That letter acknowledged the Hitchmans gave Underwriters a notice of Potential Claims dated March 10, 2019 based on Thomas Morgan's filings in the Orange County Probate Court between October 3, 2018 and January 30, 2019.

Your October 21, 2021 letter to Hitchman Fiduciaries concerning defense arrangements for the claims also referenced Underwriters' policy number FPL19105754K for the period January 1, 2019 to January 1, 2020 with policy limits of 2,000,000/ 4,000,000 Per Claim/Aggregate.

Your March 30, 2022 letter, however, suggests that the various claims against Underwriters' insureds, Hitchman Fiduciaries, are subject to a 1 million "per claim" policy limit. That letter refers to Underwriters' policy number FPL18105754J and asserts that policy for the period January 1, 2018 to January 1, 2019 has policy limits of 1,000,000/ 2,000,000 Per Claim/Aggregate. That letter's reference to Underwriters' 2018 policy was in error.

Your April 20, 2022 letter suggesting a buyout of the claims referenced both Underwriters' policy number FPL18105754J for the period January 1, 2018 to January 1, 2019 and policy number FPL19105754K for the period January 1, 2019 to January 1, 2020 with policy limits of 2,000,000/ 4,000,000 Per Claim/Aggregate.

Underwriters also issued Policy Number FPL21105754M to Hitchman Fiduciaries for the period 2020-01-01 to 2021-01-01 with policy limits of 2,000,000/ 4,000,000 Per Claim/Aggregate with a retroactive date of 2010-01-01.

The various claims against the Hitchmans in the two suits are made by fifteen parties and potentially fall within several policy years which provide at least policy limits of 2 million "per claim" and 4 million in the aggregate.

I.   **MORGAN S 201  CLAIMS   O NOT RELATE BAC   TO 201**

A.   **Morgan s Clai s I pli ate Under riters  201  Poli y to Hit    an Fidu iaries**

1.   **Morgan s Initial Clai    as Made and Reported   uring t e 201 Poli y Period**

The initial claim of Thomas E. Morgan III, individually and as Trustee of the Beverly C. Morgan Family Trust "Morgan" was made to Underwriters through Dominion Insurance Services, Inc. and Larry Hilton on March 10, 2019. This was based on Morgan's filings in the Orange County California Probate Court.

Your March 29, 2019 letter to Hitchman Fiduciaries, which was Underwriters' initial response to Morgan's claims, acknowledged Morgan's initial claim was covered by the 2019 policy. Your letter specifically referenced Underwriters' policy number FPL19105754K for the period January 1, 2019 to January 1, 2020 with policy limits of 2,000,000/ 4,000,000 Per

Claim/Aggregate. That letter acknowledged the Hitchmans gave Underwriters a notice of Potential Claims dated March 10, 2019 based on Thomas Morgan's filings in the Orange County Probate Court between October 3, 2018 to January 30, 2019.

## 2.    Under riters   201    Poli y   Pro ises   Poli y   Li its   of   2 000 000   4 000 000

Underwriters' Policy Number: FPL19105754K for the period 2019-01-01 to 2020-01-01 provides Coverage in Insuring Agreement to pay on behalf of the insureds Damages and Claims Expenses because of any Claim first made and reported "to the Underwriters during the Period of Insurance" for any "act, error or omission of the Assured in rendering or failing to render Professional Services."

> To pay on behalf of the **Assured   a ages** and **Clai s E penses** which the **Assured** shall become legally obligated to pay because of any **Clai**   or **Clai s**, including **Clai s for Personal In ury** as hereafter defined, first made against the **Assured** and reported to the Underwriters during the **Period of Insuran e** or Extended Reporting Period, arising out of any act, error or omission of the **Assured** in rendering or failing to render **Professional Servi es** as hereinafter defined for others but solely for acts on behalf of the **Na ed Assured** designated in Item 1 of the Declarations and caused by the **Assured**, except as excluded or limited by the terms, conditions and exclusions of this Policy.

The Declarations section of the 2019 Policy reports that the Limits of Liability are 2,000,000/ 4,000,000 Per Claim/Aggregate with a Retroactive Date of 2010-01-01.

> 3.Limits of Liability:  2,000,000/ 4,000,000 Per Claim/Aggregate, Including Costs and Expenses
> .
> 6.Retroactive Date: 2010-01-01

## 3.    Noti e of Potential Clai    as Given on Mar   10 201

Policy section   I. Notice of Claim, or Circumstance That May Lead To A Claim provides that a claim shall be considered to be reported to the Underwriters when notice if first given to Underwriters.

> E. A Claim shall be considered to be reported to the Underwriters when notice is first given to Underwriters through persons named in Item 7 of the Declarations of the Claim or of an act, error or omission which could reasonably be expected to give rise to a Claim.

Your March 29, 2019 letter to Hitchman Fiduciaries agreed that notice was first given to Underwriters on March 10, 2019.

> We are in receipt of    your Notice of Potential Claims dated March 10, 2019

Your March 29, 2019 letter to Hitchman Fiduciaries  p. 4  also agreed that the Morgan allegations would be treated as a potential Claim at that time since lawyers paid by the trust were representing the Hitchmans at that time and no insurer defense was being provided.

[Y]ou have requested that Underwriters treat this matter as a potential Claim at this time. We understand that Cynthia V. Roehl Esq. & John P. Glowacki Esq. of Roehl & Glowacki, P.C. represent you in defense of this matter, and that their fees are being paid by the Trust. Accordingly, as discussed and agreed, it is not necessary for Underwriters to assign defense counsel at this time.

## B.    Morgan s Various Clai  s Are Not All  Related

### 1.    All Clai  s Are Not  Sa  e  Related or Continuing

Your March 30, 2022 letter suggested for the first time that the various claims of Thomas Morgan against Underwriters' insureds, Hitchman Fiduciaries, are subject to a  1 million "per claim" policy limit. That letter refers to Underwriters' policy number FPL18105754J and asserted that policy for the period January 1, 2018 to January 1, 2019 has policy limits of  1,000,000/ 2,000,000 Per Claim/Aggregate. We believe that letter's reference to Underwriters' 2018 policy was in error.

Underwriters cannot, in effect, throw a blanket over all underlying claims to assert a single limit of liability, regardless of how many years it has collected policy premiums for its "claims made" policies, by generally asserting the underlying actions allege "the same, related or continuing Professional Services" claims, no matter how many are made, who made them, or what is alleged.

Policy section VI. Limit of Liability in Underwriters' 2018, 2019, and 2020 Policies contain language that the  per Claim.' Limit of Liability is the limit for all "same, related or continuing Professional Services" claims.

A. The Limit of Liability stated in the Declarations as "per Claim" is the limit of the Underwriters liability for all Damages and Claims Expenses arising out of the same, related or continuing Professional Services without regard to the number of Assureds, Claims or claimants.

Because Underwriters' policies provide no definitions for the adjectives in the phrase "same, related or continuing Professional Services" the dictionary is a natural source of guidance for interpretation. The primary definition of "same" when used as an adjective is "resembling in every relevant respect."[1] "Related" is defined as "connected by reason of an established or discoverable relation."[2] Finally, "continuing" is defined as "continuous" or "constant,"[3] which are respectively assigned meanings of "marked by uninterrupted extension in space, time, or sequence"[4] and "invariable, uniform."[5]

---

[1] "Same," Merriam-Webster, https://www.merriam-webster.com/dictionary/same.

[2] "Related," Merriam-Webster, https://www.merriam-webster.com/dictionary/related.

[3] "Continuing," Merriam-Webster, https://www.merriam-webster.com/dictionary/continuing.

[4] "Continuous," Merriam-Webster, https://www.merriam-webster.com/dictionary/continuous.

[5] "Constant," Merriam-Webster, https://www.merriam-webster.com/dictionary/constant.

### a.   T e Alleged Professional Servi es Are Not t e Sa e

The alleged professional services provided by the Hitchmans that form the bases of the underlying actions broadly range from interference with a bank account to taking control of a mobile home park to failing to pursue malpractice claims against the trust's former lawyer, Mr. Pech, to wastefully draining trust funds on imprudent litigation. Any assertion that such disparate actions "resemble[e] in every relevant respect" one another is simply incorrect, so they cannot be the "*same*" professional services.

### b.   T e Alleged Professional Servi es Are Not All  Related

Turning to "related," the acts are admittedly "connected by reason of an established or discoverable relation" if one takes the broadest possible view of things. If inclined to be generous enough, one could find any event related to any other under such a definition. For this reason, courts have applied additional requirements to the "related" term when used in this exact policy language.

In *Beale v. Am.   at l Lawyers Ins. Reciprocal*, 379 Md. 643  2004 , the court was faced with a policy using identical language to that of Underwriters' policies sold to the Hitchmans. In the underlying Beale case, a lawyer representing five children who had suffered from lead paint poisoning neglected their claims and was sued for malpractice. *Id.* at 646  47. The trial court held that the claims were related because " the alleged negligence [is] identical in all ten counts of the [malpractice] Complaint,' and [the plaintiffs] alleged their attorneys,  had[, and breached,] the same, identical duties as to the Beales.'" *Id.* at 650  alterations in original .

The appellate court, however, reversed. It held that a broad interpretation of the dictionary definition for "related" leads to a slippery slope problem in which any two events can conceivably be linked to one another. *Id.* at 660. The *Beale* court rejected an interpretation that would permit *any* logical connection to satisfy the "related" test. The claims of each child were separate and not related.

The California Supreme Court in *Bay Cities Paving & Grading v. Lawyers  Mut. Ins. Co*., 5 Cal. 4th 854, 873  1993  held that two errors by an attorney arising out of one specific transaction, the collection of a single debt for a single client, were a single claim, agreeing "that the term  related' as it is commonly understood and used encompasses both logical and causal connections." But "[w]e do not suggest, however, that, in determining the amount of coverage, the term  related' would encompass every conceivable logical relationship. At some point, a relationship between two claims, though perhaps  logical,' might be so attenuated or unusual that an objectively reasonable insured could not have expected they would be treated as a single claim under the policy."

In explaining its conclusion of a single claim, the court stated that "when, as in this case, a *single* client seeks to recover from a *single* attorney alleged damages based on a *single* debt

collection matter for which the attorney was retained—there is a *single* claim under the attorney s professional liability insurance policy." *Id.* at 861  emphasis in original . This conclusion was based on the California's consistent use of the "primary rights" theory, " under which the invasion of one primary right gives rise to a single cause of action.'" *Id.* at 860   *uoting Slater v. Blackwood*, 15 Cal. 3d 791, 795  1975  . The court repeatedly emphasized that a single injury, regardless of the number of legal theories surrounding it, gives rise to a single claim. *Bay Cities*, 5 Cal. 4th at 860.

But the fact driven *Bay Cities* conclusion does not apply here. The underlying actions do not allege a single injury to a single party under numerous legal theories but instead allege many injuries supposedly occurring at different times, and are alleged by fifteen parties, an individual, a trust, a corporation, five different limited liability companies, and seven limited partnerships. Underwriters cannot ignore either the legal separation of the plaintiffs or the different injuries alleged by them. The fact that Thomas Morgan may have pressed the entities to join his crusade against the Hitchmans does not make them a single claim by Thomas Morgan and does not make them "same, related or continuing." These various claims are alleged in numerous pleadings that only happen to be alleged against the Hitchmans who are in the fiduciary business, as well as against other parties not insured by Underwriters. These allegations are not all connected logically or otherwise.

The *Bay Cities* court also concluded that, even if the attorney's two omissions were separate claims, they would be related claims. *Id.* at 866. In the absence of a policy definition, the two parties argued over whether "related" meant "logically related" or "causally related." The court decided the broader "logically related" interpretation was appropriate in that case. However, the court was careful to point out the conclusion was restricted to the term "as used in this policy and in these circumstances." *Id.* at 873. The court also stressed that even when the broader interpretation applies, there are limits.

> At some point, a relationship between two claims, though perhaps "logical," might be so attenuated or unusual that an objectively reasonable insured could not have expected they would be treated as a single claim under the policy. In the present case, there is no attenuation or surprise to the insured. The two errors by the attorney are "related" in multiple respects. They arose out of the same specific transaction, the collection of a single debt. They arose as to the same client. They were committed by the same attorney. They resulted in the same injury, loss of the debt. No objectively reasonable insured under this policy could have expected that he would be entitled to coverage for two claims under the policy. *Id.*

The *Bay Cities* court also explained that the term "related" does not encompass every conceivable logical relationship and that at some point, a relationship between two claims, though perhaps logical, might be so attenuated that an objectively reasonable insured could not have expected they would be treated as a single claim. *Id.* While Morgan has cobbled together a variety of allegations against the Hitchmans, there is no common nexus of any fact, circumstance, situation, event, or transaction that tie all these allegations together except that they are made against Underwriters' insureds. These are not interrelated wrongful acts but

separate acts based on different fact allegations. Distinct "wrongful acts" cannot denote a "Related Claim" no matter how broadly the "Related Claims" definition.

A California court would require that various allegedly wrongful professional services have a close connection in order for them to be considered "related" under the terms of Underwriters' policy. All the alleged Hitchmans' actions are not "related" professional services. As just one example, taking control of Lamplighter Chino did not cause and is not logically related to the failure to pursue malpractice claims against Mr. Pech, Mr. Morgan's former attorney. There is no connection between these two things other than that they happened while the Hitchmans were co-trustees.

An expansive interpretation of the "related claim" language in the policies is also inconsistent with the "nature and kind of risks" insured by a liability policy. *Horace Mann. Ins. Co. v. Barbara B.*, 4 Cal. 4th 1076, 1086  1993   "An insured buys liability insurance in large part to secure a defense against all claims potentially within policy coverage[.]" .

Various disparate claims are alleged in the underlying actions and are made by fifteen different entities, not simply by Thomas Morgan. The acts allegedly occurred over years and resulted in different alleged injuries. They are not all "*related*."

.    T e Alleged Professional Servi es Are Not  Continuing

The same differences in nature that established these acts could not be the "same" professional services also demonstrate that the alleged conduct or injuries are not "invariable" or "uniform," invalidating any attempts to categorize them as "continuing" under its "constant" definition. For the "continuous" definition of "continuing," they are only "marked by uninterrupted extension in space, time, or sequence" to the same extent that all things in the universe are. No one can avoid the fact that time only moves forward, forcing things to be in sequence. Even considering Mr. Morgan's skewed perspective viewing virtually every action taken by the Hitchmans as wrongful, there are months and years between the acts he complains about. These time partitions isolate the various incidents and prevent them from reasonably being considered "marked by uninterrupted extension in . . . time," which defeats the "continuous" definition of "continuing."

Additionally, any meaning ascribed to "continuing" must be limited by the doctrine of *e usdem generis*. "In a contract, " [w]here general words follow the enumeration of particular kinds or classes of persons or things, the general words will, unless a contrary intent is manifested, be construed as applicable only to persons or things of the same general nature or class as those specifically enumerated.'   yg  rd, Inc. v. Uusi Kerttula  2008  159 Cal.App.4th 1027, 1045, fn. 4 ."[6] "The principle of *e usdem generis* provides that where general words follow the enumeration of particular classes of persons or things, the general words will be construed as

---

[6] *Huverserian v. Catalina Scuba Luv, Inc.*, 184 Cal. App. 4th 1462, 1468-69  2010 .

applicable only to persons or things of the same general nature or class as those enumerated."[7] So the adjective "continuing" must be interpreted as having the same general nature as "same, related."

"[S]pecific provision [in an insurance contract] relating to a particular subject will govern in respect to such subject, as against general provision, even though general provision, standing alone, would be broad enough to include subject to which more specific provision relates." *Furtado v. Metropolitan Life Ins. Co., Inc.,* 60 Cal.App.3d 17, 25  1976 . Because of the tight relationship of events required to be seen as the "same" and "related" under their proper definitions, "continuing" must be interpreted as being of the same nature as "same" and "related" and not given some broader meaning. Underwriters cannot reasonably argue that "continuing" should be given a broader meaning so as to classify the allegations of Hitchmans' myriad wrongful acts under the banner of a single, continuous act of professional service. Just because some professional  such as a doctor, lawyer, etc.  allegedly commits several wrongful acts over a period of time, those cannot be characterized as the "same, related, or continuing professional services."

The many and various allegations against the Hitchmans assert different unrelated actions and events over long periods that cannot be considered the "same, related or continuing **Professional Servi es.**" They are not connected by causation or logic. Underwriters cannot establish that only one policy applies or that a single policy's "per Claim" limit applies.

Instead, various distinct "wrongful acts" alleged against the Hitchmans should be recognized as separate claims, with a limit of liability determined by appropriate policies and by "Aggregate" limits. This is because the assorted claims of multiple parties in the probate and civil cases are not the "same, related or continuing **Professional Servi es.**" As the policies state, "[t]he **Li it of Liability** stated in the Declarations as  Aggregate' is the total limit of the **Under riters**' liability for all **a ages** and **Clai s E penses** arising out of **Clai s** . . . ." within that policy year. Under identical policy language, the *Beale* court reached the same conclusion after determining that the claims were distinct rather than part of the "same, related, or continuing Professional Services." *Beale*, 379 Md. 643, 667  2004   "Case remanded [for] a declaration that the aggregate limit of liability applies to the appellants' claims against the appellee." .

### d.   All Clai s o Not Arise Out Of T e Sa e Related Or Continuing Professional Servi es

The phrase "arising out of" has been quite narrowly construed in general when used in an exclusionary sense and requires a strong causal connection. See, e.g., *Golden Eagle Ins. Co. v. Rocky Cola Cafe, Inc.* 114 Cal. Rptr. 2d 16, 20-21, 23  Cal. Ct. App. 2001  exclusion for personal

---

[7] *Atl. Mut. Ins. Co. v. J. Lamb, Inc.,* 100 Cal. App. 4th 1017, 1036 n.15,  2002 .

injury to a person "arising out of any ... employment-related practices" narrowly construed to require direct and proximate causation.

The term "arising out of" connecting to a claim about "Professional Services" must also be interpreted narrowly against the insurer. *orth Counties Engineering, Inc. v. State Farm Gen. Ins. Co.*, 224 Cal. App. 4th 902, 933  2014  "The more inclusive use of the phrase  arise out of,' urged by [the insurer], has been to provide coverage, not limit it." This view was recently adopted by the Ninth Circuit in *My Choice Software, Ltd. Liab. Co. v. Travelers Cas. Ins. Co. of Am*., No. 19-56030, 2020 U.S. App. LE  IS 26328  9th Cir. Aug. 19, 2020 . at  5, see also *Tower Ins. Co. of  ew  ork v. Capurro Enterprises Inc.*, No. C 11-03806 SI, 2012 U.S. Dist. LE  IS 46443  N.D. Cal. Apr. 2, 2012  at  9-10 "We reject the argument that "arising out of" is always construed broadly, even in exclusionary clauses, and nothing that the "broad coverage  narrow exclusion" principle is well illustrated with respect to the phrase "arising out of.""

So the use of the "arising out of" language concerning policy limits cannot provide an expansive interpretation of the "same, related or continuing" language.

## C.   Under  riters  201  and 2020 Poli  ies Provide Retroa  tive  ate of 2010-01-01

### 1.   T  e Only Understandable Retroa  tive  ate Is 2010-01-01

Underwriters' 2019 and 2020 Policies provide FPL Coverage with a retroactive date of January 1, 2010 although each contain a confusing, unexplained, and unclear reference to a "split retroactive date."

According to *Merrill & Seeley v. Admiral Ins. Co*., 225 Cal. App. 3d 624, 631  1990 "the inclusion of the retroactive date on the [declaration] page  puts the insureds on notice that they should examine the coverage provision to determine exactly how that impacts coverage. The word  retroactive' connotes an extension of scope or effect to an earlier time." Underwriters, however, did not explain the two different dates in the policy so the insured cannot determine "exactly how that impacts coverage."

The Declarations section of the 2019 and 2020 Policies, under Forms and Notices, lists a supposed "General Change Endorsement: Split Retroactive Date of 2019-01-01 for Higher Limits of  2,000,000/  4,000,000" but makes no other explanation about how it may apply, when, and to what claims. The Policy then includes a General Change Endorsement form which does not explain the meaning of the referenced "split retroactive date." That term is not explained anywhere in the policy and there is no explanation as to what is "split" or the basis of any "split."

> In consideration of the premium charged for which this Insurance is written, it is hereby understood and agreed that the wording listed under Forms & Notices on the Declarations is included as part of this Policy. All other terms and conditions of the Policy remain unchanged.

The Forms and Notices section of Policy appears to reference two different retroactive dates but does not explain which date applies to what. There is only one court case in America

that has ever referenced the term "split retroactive date." But it does not help understand Underwriters' use of the term.

The only case we have located in American jurisprudence that mentions a "split retroactive date" endorsement is *Weeks & Irvine LLC v. Associated Indus. Ins. Co.*, 433 F. Supp. 3d 791  D.S.C. 2020 . The *Weeks* court concluded that the endorsement effectively "modifies the limits of coverage available depending on when an insured commits a  wrongful act' that underlies a claim." *Id.* at 802. But the *Weeks* court did not suggest that some wrongful acts had different retroactive dates than other wrongful acts. Apparently all wrongful acts had the same retroactive date under the policy change so the use of the word "split" in the endorsement title was not explained. Instead the endorsement was deemed to explain an exclusion.

The policy in the *Weeks* case can be distinguished from Underwriters' 2019 policy by the simple fact that the *Weeks* policy endorsement actually described its operation by expressly changing the previous retroactive date. *Id.* at 801  "The liability of the Company for all Claims Expenses and Damages for each Claim made against the Insured for a Wrongful Act and the Retroactive Date of the Declarations is revised as follows: [The retroactive date is listed as 10/27/2012]."  alteration in original .

In contrast, Underwriters 2019 and 2020 policy endorsements are simply a reference back to the Declarations page that contains nothing but a brief set of words that doesn't even form a complete sentence. This ambiguous term appears to have been newly made up by Underwriters but it is nowhere explained.

The term "retroactive date" is also used in the 2019 and 2020 Policies in section IV Exclusions  IV. N in 2019 Policy and IV.M in 2020 Policy :

> The coverage under this Insurance does not apply to Damages or Claims Expenses incurred with respect:
> to any Claim or circumstance that might lead to a Claim arising out of any act, error or omission which took place, or is alleged to have taken place, prior to the retroactive date, if any, as set forth in Item 6 of the Declarations

This language expressly refers to the Retroactive Date in Item 6 of the Declarations, which is "2010-01-01." This language does not reference the "split retroactive date" of 2019-01-01 which is not "set forth in Item 6 of the Declarations."

The term "retroactive date" is also used in the General Liability Coverage Endorsement amending Clause I. Insuring Clauses    to include the following: O. General Liability Coverage

> To pay on behalf of any Assured Damages and Claims Expenses, in excess of the "per Claim" Deductible, which the Assured shall become legally obligated to pay because of any Claim first made against any Assured and reported in writing to the Underwriters during the Period of Insurance or Extended Reporting Period  if applicable  arising out of Property Damage, Bodily Injury, Fire Legal Liability or Advertising Liability caused by an event or happening, including continuous or repeated exposure to substantially the same general harmful conditions, which

involves one or more persons or entities on or after the Retroactive Date set forth in Item 6. of the Declarations and before the end of the Period of Insurance.

This language also expressly refers only to the Retroactive Date in Item 6 of the Declarations, which is "2010-01-01."

Although Underwriters never explained the use of "split retroactive date," it did advise the Hitchmans that "Your Retro active date normally matches the date you first began uninterrupted liability coverage."[8] For the Hitchmans, that date was 01/01/2010, just as listed on every policy sold to the Hitchmans from 2010 to 2020.

So the only use of the term "Retroactive Date" in the 2019 Policy directs the insureds' attention expressly to the date of "2010-01-01." There is no reference to a different retroactive date whether "split" or otherwise. The vague language of the endorsement was, for whatever reason, never explained or referenced anywhere in the policy. Consequently, the insured could not understand Underwriters intention, even after a careful review of the Policy.

## 2.    T e Poli ies Must Be Interpreted To Ma i i e Coverage

*Harabedian v. urich Ins. Co*., 218 Cal. App. 2d 702, 707 1963 summarized long-standing California law that requires interpretation of uncertain insurance language in a way that maximizes coverage for the insured:

> [W]here possible an insurance policy will be interpreted so as to provide coverage and protect the insured. "It is elementary in insurance law that any ambiguity or uncertainty in an insurance policy is to be resolved against the insurer. [Citations.] If semantically permissible, the contract will be given such construction as will fairly achieve its object of securing indemnity to the insured for the losses to which the insurance relates. [Citation.] **If t e insurer uses language i is un ertain any reasonable doubt ill be resolved against it** if the doubt relates to extent or fact of coverage, whether as to peril insured against [citations], the amount of liability [citations] or the person or persons protected [citations], the language will be understood in its most inclusive sense, for the benefit of the insured." *Continental Cas. Co. v. Phoenix Constr. Co*., 46 Cal.2d 423, 437-438 1956 See also, *Prickett v. Royal Ins. Co., Ltd*., 56 Cal.2d 234, 237 1961 *Coast Mutual Bldg. Loan Assn. v. Security T. Ins. & Guar. Co*., 14 Cal.App.2d 225, 232 1936 *Hoover v. Travelers Ins. Co*., 173 Cal.App.2d 361, 365 1959 *Pacific Heating etc. Co. v. Williamsburgh City Fire Inc. Co*., 158 Cal. 367, 369-370 1910 *Kautz v. urich Gen. A. & L. Ins. Co*., 212 Cal. 576, 580 1931 . Emphasis supplied.

*Producers Dairy Delivery Co. v. Sentry Ins. Co*., 41 Cal. 3d 903, 912 1986 also highlighted the long established principle that uncertain or ambiguous insurance policy language should be resolved in favor of the insured:

> It is a basic principle of insurance contract interpretation that doubts, uncertainties and ambiguities arising out of policy language ordinarily should be resolved in favor of the insured in order to protect his reasonable expectation of coverage. Insurance Co. of North America v. Sam Harris Constr. Co. 1978 22 Cal.3d 409, 412-413 Gray v. urich Insurance Co., 1966 65 Cal.2d 263,

---

[8] See e.g., Dominion FPL Application 12/19 attached to 2020 FPL Policy, p. 2.

269, 270, fn. 7  It is also well established, however, that this rule of construction is applicable only when the policy language is found to be unclear.  Gray, supra, at p. 271  Wolf Machinery Co. v. Insurance Co. of North America  1982  133 Cal.App.3d 324, 328  Safeco Title Ins. Co. v. Moskopoulos  1981  116 Cal.App.3d 658, 665  "'A policy provision is ambiguous when it is capable of two or more constructions, both of which are reasonable.' [Citation.]"  Delgado v. Heritage Life Ins. Co.  1984  157 Cal.App.3d 262, 271.

This principle was repeated by the California Supreme Court: "An insurance policy provision is ambiguous when it is capable of two or more constructions, both of which are reasonable  . If an asserted ambiguity is not eliminated by the language and context of the policy, courts then invoke the principle that ambiguities are generally construed against the party who caused the uncertainty to exist  i.e., the insurer  in order to protect the insured s reasonable expectation of coverage." *La Jolla Beach & Tennis Club, Inc. v. Indus. Indem. Co.*, 9 Cal. 4th 27, 37  1994  Internal quotation marks and citations omitted .

### 3.    Unintelligible Ter s Must Be Stri en

Additionally, to the extent that a term restricting the insurer's liability may be unintelligible to the point that no meaning can be discerned, California policy again favors the insured by striking the term entirely. *Hays v. Pac. Indem. Grp*., 8 Cal. App. 3d 158, 159  1970  "Courts strike from insurance contracts *unclear*, unexpected, inconspicuous, or unconscionable limitations of liability which would frustrate the reasonable expectations of the insured."  emphasis added . Additionally, the standard by which clarity is measured is that of an average reader, not an expert in the field.

> It must be presumed, ordinarily, that persons are familiar with the terms of written contracts to which they are parties, and in the absence of fraud they are justly bound by the provisions therein, but the rule should not be strictly applied to insurance policies. It is a matter almost of common knowledge that a very small percentage of policy holders are actually cognizant of the provisions of their policies and many of them are ignorant of the names of the companies issuing the said policies. The policies are prepared by the experts of the companies, they are highly technical in their phrase[o]logy, they are complicated and voluminous . . . .

*Gemini Ins. Co. v. W. Marine Ins. Servs. Corp.*, No. 2:10-cv-03172-KJM-CKD, 2016 U.S. Dist. LE IS 81484, at  28-29  E.D. Cal. June 21, 2016   uoting *Steven v. Fid. & Cas. Co.*, 58 Cal. 2d 862, 879  1962  stating that the quoted reasoning justifies resolving terms uncertain in the eyes of the average insured in favor of the insured due to the unequal bargaining power .

Consequently, the unclear and unexplained reference to "split retroactive date" should simply be struck from the policies.

### 4.    A biguous Language Is Interpreted In Favor of t e Insured

It cannot be disputed that Underwriters' 2019 and 2020 Policy references to the unexplained term "split retroactive date" is uncertain and, at least, ambiguous. "A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable." *MacKinnon v. Truck Ins. Exch.,* 31 Cal. 4th 635, 648  2003 . One

reasonable understanding of this unexplained "split" language is that it applies to new coverage appearing in the 2019 policy for "General Liability" and "Crime," both of which were added by endorsement for the first time. The insured would reasonably expect that the higher policy limits would apply for the fiduciary professional liability coverage, the Policy's principal coverage when Underwriters had increased the 2019 premium by 26    after nine years of premium payments by Hitchman Fiduciaries.

The 2020 policy premium increased by 150    after new coverages were added by the Neutral Facilitator Endorsement, the Mediation Coordinator Endorsement, coverage for Lost Earnings, Contractual Travel Indemnity, Disciplinary Proceedings, and the deletion of the co-trustee/co-agent restriction endorsement. The increased premium also reflects the doubling of Hitchman Fiduciaries' gross billings from   900,000 per year to   1,800,000 per year. The insured would reasonably expect that the higher premiums would be justified by these changes.

## II.    VARIOUS   IFFERENT ALLEGATIONS MA  E AGAINST THE HITCHMANS

### A.    Morgan s 201  Allegations in T e Probate A tion

Throughout the probate action, Thomas Morgan periodically objected to actions of the Hitchmans as co-trustees. In Morgan's Objection to Interim Co-Trustees' Ex Parte Application For Control of Lamplighter Chino MHC, filed June 14, 2017, attached as **E   ibit  A**   and Morgan's Ex Parte Application For Suspension of Bruce and Lee Ann Hitchman as Interim Trustees, filed June 27, 2017, attached as **E    ibit  B** , Morgan alleged that the Hitchmans  1  improperly executed an invalid written consent appointing themselves as manager of Chino Holdings GP LLC and Chino MHC GP LLC,  2  converted assets that do not belong to the trust, and  3  failed to remain impartial by siding with Nancy. But Morgan did not make any demand for money so these cannot be considered "claims."

Morgan then filed a petition in the Probate Court on October 3, 2018, attached as **E    ibit  C** , alleging mismanagement of Lamplighter Chino by  1  excessive spending to benefit the Hitchmans and their lawyers and  2  causing Lamplighter Chino to breach contractual obligations, including the management contract with MPI and contracts for the installation of ground-set mobile homes. **E  ibit  C** ,    36-38.

The 2018 petition alleged multiple instances of conduct regarding to the takings suit against the City of Chino. The petition said that the Hitchmans failed to pursue the valuable and meritorious suit as "the Hitchmans inexplicably directed counsel handling the litigation  Mr. Pech to immediately cease working on the action, but then failed to hire new counsel or pay an iota of attention to the matter for more than half a year." **E   ibit  C** ,    39. The Hitchmans are alleged to have caused Lamplighter Chino to breach their contractual obligations to Pech and expose Lamplighter Chino to potential litigation by refusing to pay Pech. *Id.* Morgan also asserted that the Hitchmans made misrepresentations to the Court by "falsely claim[ing] that they did not learn about the Chino Litigation until December 28, 2017." **E    ibit  C** ,    55.

Morgan added new and different claims of injury against the Hitchmans in more recent pleadings. Morgan's Amended Petition in Probate Court, filed November 22, 2019, attached as **E   ibit** , and the Verified Civil Complaint, filed August 14, 2020, attached as **E   ibit E** , allege that the Hitchmans improperly spent trust resources after the Beneficiaries' settlement and continuously sought to disrupt and restructure the settlement agreement, including by threatening and filing claims accusing Morgan of tax fraud. **E   ibit** , 88-91 **E   ibit E** , 78-81. These are completely new alleged injuries that did not appear in any 2018 filing. In fact, the mediation that resulted in the settlement about which Morgan complained did not even occur until April 2019.

Morgan's alleged injury from his settlement with other trust beneficiaries had no logical or other connection with any prior conduct of the Hitchmans. *Pa.   at l Mut. Cas. Ins. Co. v. Beach Mart, Inc.*, 932 F.3d 268, 277  4th Cir. 2019  Similarly, Morgan's allegations that the Hitchmans improperly attempted to rewrite court orders and their alleged failure to "turn over all their files to the successor trustee promptly after they were relieved of their duties" could not have occurred prior to the approval of the Beneficiaries' settlement on June 17, 2019. **E   ibit** , 101-102, 109, FN27 **E   ibit E** , 90. The alleged *intent* to obtain protections within the settlement for wrongs that allegedly occurred in prior years has no bearing on the determination of similarity as the focus must be on the *wrongful act*, not anyone's "intent."

Morgan's claim in the Amended Petition in Probate Court, filed November 22, 2019, alleged that the Hitchmans failed to disclose a conflict of interest in the probate case overseen by Judge Hubbard. Morgan did not and could not have asserted claims stemming from a failure to disclose a conflict of interest before June 17, 2019 as that is when Morgan alleged that he first "learned how the Hitchmans and their lawyers had been breaching their duties of candor to line their own pockets" because of the alleged conflict of interest. **E   ibit** , 98.

Morgan's new and additional allegations, if true, could potentially establish liability independent from any prior allegations. Exemplifying the independent nature of these claims, Morgan asserts, with respect to the failure to disclose a conflict of interest, that "the Hitchmans owed a duty to the Court and to all Trust beneficiaries to disclose all material facts concerning their suitability to provide ongoing service in this case, and whether there were potential conflicts that could work adversely to the beneficiaries, and/or that could cause a reasonable person to question the fairness of ongoing proceedings." **E   ibit** , 124.

Failure to disclose that the Hitchmans "were utilizing the services of an Orange County real estate attorney who is the longtime partner of" Judge Hubbard is alleged independently as having breached this duty. This is not support, in connection with other allegations, for a single wrongful act. The alleged breach of duty itself is the claimed wrongful act causing injury to Morgan. No prior claim concerns breach of the Hitchmans' duty to disclose concerning their suitability as trustees. The alleged breach of the Hitchmans' duty by failing to disclose the use of the real estate attorney's services, first alleged in 2019, is a new and different claim.

**B.    T o  as Morgan s Clai s in t e 2020 Civil A tion**

Morgan's Third Claim for Relief in the Civil Action, filed August 14, 2020 concerns the Hitchmans' alleged failure to disclose a conflict of interest in the probate case overseen by Judge Hubbard. **E   ibit  E  ,  87.**

Morgan alleged that it was only after Judge Hubbard "disclos[ed] it had just come to her attention that her significant other  an Orange County attorney  had been retained by, and was working for, the Hitchmans," that "Hitchman counsel John Glowacki jumped in and admitted that he and the Hitchmans had known  and yet had said nothing." **E   ibit  E  ,  88.** These Morgan claims cannot relate to any prior claim since Morgan could not claim a conflict of interest or a failure to disclose before he learned that the Hitchmans were utilizing  in another case  the services of an attorney with a relationship with the judge.

Morgan also asserted in 2020 that "the Hitchmans and their lawyers did not bring any malpractice claims against Mr. Pech"  who had been retained by Tom Morgan when he was the Trustee  for "his advice that he should be paid out of BCMFT funds, regardless of whether his services were for trust administration or whether they were for services in defense of claims personal to Tom." **E   ibit  E  ,   73-74.** No prior allegation involves a malpractice suit, or failure to assert one, against Pech.

Additionally, the Second Claim for Relief in the Civil Action alleges only the Hitchmans' negligence for failure to assert the malpractice claim against Pech, evidencing the independent nature of the claim. The action cannot carry out the same wrongful act as other claims because the failure to assert the malpractice claim is itself the claimed wrongful act. The alleged negligence of failing to assert a malpractice claim against Pech is entirely unrelated to any prior claims. Consequently, these allegations trigger Underwriters' obligations under Underwriters' 2020 policy.

**C.    T o  as E. Morgan C ildren s Trust Clai s in t e 2020 Civil A tion**

New claims against the Hitchmans were made in the 2020 Civil Action by the Thomas E. Morgan Children's Trust. These included the following allegations.

> "While serving as co-managers of an upscale mobile home park called Lamplighter Chino, the Hitchmans took  250,000 belonging to the Thomas E. Morgan Children's Trust  "TEMCT" . Although the TEMCT pointed out this transgression to the Hitchmans in writing  and even provided unimpeachable evidence to prove the wrongful taking , the Hitchmans flatly refused to reimburse the TEMCT for the monies wrongfully taken." **E   ibit  E  ,  4 a**

> "Lamplighter Chino  had slightly more than  6 million in a certificate of deposit with Bank of America  [which included]  250,000 contributed by the TEMCT  to get the funds on deposit to  6 million, thereby yielding more favorable terms .  No one had a right to the  250,000  plus interest  belonging to the TEMCT other than

the TEMCT.    The end result [of the Hitchman's improper distribution] is that    the TEMCT was shortchanged  250,000." **E   ibit  E** ,    37-39

"The Hitchmans substantially interfered with the TEMCT's right to these funds by liquidating the certificate of deposit in question but refusing to return either the 250,000 or interest thereon.    Rather than return the TEMCT's property to its rightful owner, the Hitchmans willfully and deliberately transferred it to the BCMFT and then, as Interim Co-Trustees, spent the funds for improper purposes and without authority." **E   ibit  E** ,   103

"Although the TEMCT made demand on the Hitchmans for return of these monies—and even provided irrefutable proof that the money belonged to the TEMCT—the Hitchmans wrongfully refused to return the TEMCT's money and have continued to wrongfully refuse to return it to this day." **E   ibit  E** ,   104

**.    Morgan Partners  In . Clai  s in t  e 2020 Civil A  tion**

New claims against the Hitchmans were made in the 2020 Civil Action by Morgan Partners, Inc. These included the following allegations.

"Morgan Partners, Inc.  "MPI"  had a written management contract with Lamplighter Chino, calling for Lamplighter Chino to pay MPI a monthly fee for asset management services. Upon gaining control over Lamplighter Chino, the Hitchmans    tortuously interfered with that contract by directing that payments be cut off...[and] never even bothered to determine precisely what the contractual arrangement with MPI might be, much less take the steps necessary to have that contract properly terminated." **E   ibit  E** ,   4 c

"It is that Action by Written Consent that ultimately replaced Morgan Partners, Inc. as the Manager of Chino Holdings GP, LLC, and installed the Hitchmans as co-managers in MPI's stead." **E   ibit  E** ,   31

"Promptly after gaining control over Lamplighter Chino's cash reserves, the Hitchmans    direct[ed] that all payments to MPI stop immediately. The end result was this: MPI's contract remained in place the entire time, but MPI was deprived of its contractually-required compensation—even though MPI continued to protect Lamplighter Chino in a multitude of ways." **E   ibit  E** ,   46

"It is a subchapter S corporation that had to be distributed within a set period after Beverly's death in order to permit timely filings and avoid financial penalties.   Tom implored the Hitchmans and their lawyers to distribute the BCMFT's modest interest in MPI  to avoid those consequences. Yet, the Hitchmans and their lawyers affirmatively threw up obstacles to resolution, at significant expense for all concerned. Tom remedied the problem as soon as he was reinstated as trustee, but Tom and MPI had to bear the financial penalties resulting from the Hitchmans' unwillingness to act." **E   ibit  E** ,   49

"The Hitchmans wrongfully interfered with that contract by instructing that MPI should not be paid for the services it was providing thereunder, without causing Chino Holdings LP to take any of the steps lawfully required to terminate that contract, which still is in existence to this day." E   ibit  E ,   130

"The Hitchmans failed to act with reasonable care and engaged in wrongful conduct by instructing that payments to MPI be discontinued. And, in fact, their conduct rose to the level of gross negligence." E   ibit  E ,   138

**E.    La  plig  ter C  ino C  ino Holdings GP  LLC Clai  s in t  e 2020 Civil A  tion**

New claims against the Hitchmans were made in the 2020 Civil Action by Tom Morgan apparently on behalf of Lamplighter Chino/Chino Holdings GP, LLC. These included the following allegations.

"Morgan Partners, Inc.  "MPI"  had a written management contract with Lamplighter Chino, calling for Lamplighter Chino to pay MPI a monthly fee for asset management services. Upon gaining control over Lamplighter Chino, the Hitchmans   tortuously interfered with that contract by directing that payments be cut off...[and] never even bothered to determine precisely what the contractual arrangement with MPI might be, much less take the steps necessary to have that contract properly terminated." E   ibit  E ,   4 c

"In late April 2017, they  i  marched into a local Bank of America branch,  ii  brandished the Order appointing them as interim co-trustees and resolutions they had signed alone purporting to install themselves as Manager of Lamplighter Chino, and  iii  demanded that they be granted control over all the Lamplighter Chino accounts  which included more than  6 million held in a Certificate of Deposit and approximately  750,000 in cash reserves . As it turned out, the resolutions were legally ineffective because a majority in number of the members had to consent." E   ibit  E ,   31

"It is that Action by Written Consent that ultimately replaced Morgan Partners, Inc. as the Manager of Chino Holdings GP, LLC, and installed the Hitchmans as co-managers in MPI's stead." E   ibit  E ,   31

"[P]rior to taking over Lamplighter Chino, the Hitchmans and their lawyers didn't even bother to read applicable loan documents for Lamplighter Chino to see if their covert actions would result in any problems  . As a consequence, the Hitchmans and their lawyers triggered an event of default under a  14 million loan that Lamplighter Chino had with PNC Bank [which was ultimately mitigated]. E   ibit   E ,   35

"Once they got their hands on Lamplighter Chino's cash reserves, the Hitchmans and their lawyers made substantial distributions to the BCMFT  and, to a lesser extent, the other owners  so they could spend money on themselves and their

lawyers.  In this regard, the Hitchmans did not give their role as fiduciaries to Lamplighter Chino—or the need for cash reserves for operations and expansion—a second thought." E   ibit  E  ,  36

"The  5.75 million representing the proceeds of a refinance for the Lamplighter Chino project was to be held for business purposes. But, if the Hitchmans were going to break the  6 million certificate of deposit to distribute the funds, then at least they were obligated to return the  250,000 to the TEMCT  plus interest  and distribute the remainder in accordance with the partner ownership percentages. Instead, of distributing the proceeds that way, the Hitchmans took  2.5 million off the top to extinguish what ultimately was a BCMFT obligation.  The end result is that  Tom was shortchanged  450,000." E   ibit  E  ,  38-39

"He promptly notified PNC Bank that MPI was back in charge of Lamplighter Chino, thereby curing the Hitchmans' longstanding event of default." E   ibit  E  ,  92

"The Hitchmans liquidated the certificate of deposit but, instead, of properly distributing the owners their proportionate shares of the  5.75 million  plus interest , they over-distributed to the BCMFT and under-distributed to the other owners  e.g., Tom and his sister, Nancy  by first spending  2.5 million to pay off an obligation of the BCMFT and then distributing the balance in accordance with the percentage ownership interests, with no accounting for the fact that  2.5 million already had been distributed on behalf of the BCMFT. As a result, Tom was shortchanged  450,000 of distributions due him as an owner of Lamplighter Chino." E   ibit  E  ,  110

"By installing themselves as the Manager of Lamplighter Chino, the Hitchmans assumed fiduciary duties to Tom and the other owners, including fiduciary duties of loyalty and to use reasonable care, a duty to treat Tom fairly vis-  vis the other owners, and a duty to preserve assets Tom was entitled to receive.  The Hitchmans have breached all these duties to Tom and have failed to act as a reasonably prudent fiduciary would have acted under the same or similar circumstances." E   ibit  E  ,  119

**F.    Clai  s Made By Ot  er Legal Entities in t  e 2020 Civil A  tion In  luding Covina Hills GP LLC  Covina Hills MHC LP  La  plig  ter Ontario Asso  iates L.P.  Loa GP LLC  Ontario Asso  iates LP  Las Pal  as MHC LP  Las Pal  as GP LLC  Las Pal  as Holdings L.P.  Silver Oa  s Business Par  LP  Silver Oa  s Business Par   LLC  Juanita Springs Asso  iates Li  ited Partners  ip  Island Gate  ay LLC**

New claims against the Hitchmans were made in the 2020 Civil Action by twelve other legal entities with unexplained relations to Tom Morgan. They all allege vague financial injuries caused by wrongful acts of the Hitchmans. These included the following allegations.

"[T]he Hitchmans wrongfully disrupted an important, decades-old relationship that the Morgan family and Morgan family businesses had with Bank of America by making false attacks on Tom Morgan, including, but not limited to, filing affidavits with Bank of America that wrongly accused Tom of stealing  450,000 of Lamplighter Chino funds  .The banking relationship ended quickly as a result of the Hitchmans' attacks  debts to Bank of America were called  the bank took assets in which it held a security interest to retire some of the debt  and, the Morgan family and Morgan family businesses had to use funds earmarked for growth to eliminate the remainder. The consequences of all this, including adverse tax consequences and lost business opportunities, will be felt by Plaintiffs for years." **E    ibit  E  ,  4 d**

"Still, simply by presenting papers [including the Order appointing them as interim co-trustees and resolutions they had signed alone purporting to install themselves as Manager of Lamplighter Chino], the Hitchmans opened up a line of communication to Bank of America that they  and their lawyers  used to start poisoning the relationship between Bank of America and Tom Morgan and the other Morgan family entities." **E    ibit  E  ,   31**

"By way of example, in mid-2017, when the Hitchmans entered the picture, the Morgan family and Morgan family businesses collectively had more than  30 million worth of lines of credit  LOC  and loans with Bank of America, much of it secured by certificates of deposit.   All of this was blown up as a result of egregious misconduct by the Hitchmans." **E    ibit  E  ,   52**

"Most egregiously, the Hitchmans built a false story around Tom and MPI's decision, in the first two days of June  and while they still were the lawful managers of Lamplighter Chino , to move  450,000 from a Lamplighter Chino operating account at Bank of America into a new Lamplighter Chino operating account at Wells Fargo Bank. By focusing solely on the first half of this benign event  the transfer of funds out of a Lamplighter Chino Bank of America account  and ignoring the last half of the event  the transfer of the same amount of money into a Lamplighter Chino Wells Fargo account , the Hitchmans falsely accused Tom of stealing  450,000." **E    ibit  E  ,   53**

"On Monday, June 12, 2017   Bruce Hitchman, with the concurrence of his wife and co-manager  Lee Ann , provided two separate affidavits to Bank of America  drafted by the lawyers  to, among other things, freeze funds in the Covina Hills account that had been used to briefly hold Lamplighter Chino's  450,000 until it could be transferred to a new Lamplighter Chino account at Wells Fargo. To justify the extraordinary relief they were seeking, the Hitchmans claimed that Tom had stolen the  450,000, and they had no assurance it would ever get back to Lamplighter Chino.   The accusation of theft was simply false." **E    ibit  E  ,   60**

"[Judge Hubbard] granted the ex parte application and issued an order bottomed on the Hitchmans' false suggestion that Tom Morgan had stolen  450,000.  [T]he

Hitchmans' lawyers emailed the order to both Bank of America and Newport Pacific, with its damning findings based on the Hitchmans' false story and thereby left the Bank with the false impression that Tom Morgan was a thief." **E    ibit  E** , 61-62

"The false attacks the Hitchmans peddled to Bank of America had disastrous consequences for the Morgan family and their businesses. In short order, the decades-old Morgan family relationship with Bank of America was referred to special handling  the debt was called  Bank of America collapsed certificates of deposit in which it had a security interest to retire some of the debt  and inter-company loans had to be taken out to retire the remainder. All the Morgan family businesses were able to survive, but the consequences will be felt for years because cash reserves earmarked for expansion to increase Morgan family wealth were instead drawn to eliminate debt that, but for the Hitchmans' interference, could have been retired over a lengthy period of time." Verified Complaint   64

"The Hitchmans wrongfully interfered with these contractual relationships by engaging in the acts alleged above, including the filing of Affidavits falsely accusing plaintiffs' principal of theft." **E    ibit  E** ,   145

"The Hitchmans failed to act with reasonable care and engaged in wrongful conduct by engaging in the acts alleged above, including the filing of a perjured Affidavit falsely accusing plaintiffs' principal of theft. In fact, the Hitchmans' conduct rose to the level of gross negligence." **E    ibit  E** ,   154

## III.    AGGREGATE LIMITS ARE AVAILABLE UN  ER 201   AN   2020 POLICIES

The aggregate policy limits under both Underwriters' 2019 and 2020 policies are available for defense and indemnity for the various different claims made in both those years by multiple parties. Underwriters cannot restrict its obligations to a single policy or treat all allegations by the multiple parties over the years as a single claim.

The policies say that the "per Claim" policy limit "is the limit of the Underwriters  liability for all Damages and Claims Expenses arising out of the same, related or continuing Professional Services" while the "Aggregate" policy limit "is the total limit of the Underwriters  liability for all Damages and Claims Expenses." Underwriters can avoid application of aggregate limits only if all the claims asserted throughout both the probate and civil actions, amongst the various entities, "aris[e] out of the same, related or continuing Professional Services." This is the proper interpretation of the policy language of "[a]ll Claims arising out of the same, continuing or related Professional Services   [as] a single Claim. See *Cincinnati Ins. Co. v. T   Eng g Corp.*, 265 F. Supp. 2d 1078, 1081  E.D. Mo. 2003   "An aggregate limit is  the maximum limit of coverage available under a liability policy during a specified period of time   regardless of the number of claims that may be made.' Its counterpart is the per occurrence limit, which expressly limits the amount to be paid under an insurance policy for liability arising out of each compensable occurrence." .

In *Fin. Mgmt. Advisors, LLC v. Am. Int l Specialty Lines Ins. Co.*, 506 F.3d 922, 923-24 9th Cir. 2007 , the court addressed coverage for two lawsuits filed against a financial management firm and the firm's president under sequential policies. The first suit, brought by "a family of investors who invested in traditional equities and fixed income products managed by" the firm, alleged that the President "made certain misrepresentations in order to dissuade the [investors] from liquidating their equity investments and  misrepresented the risk inherent in several Collateral Bond Obligation funds  CBOs   in order to induce the [investors] to invest in those funds." *Id.* at 924. A separate client filed suit following significant loss in his investment in the CBO II fund, one of the portfolios that the plaintiffs in the prior suit invested in, alleging that the president "had misrepresented the riskiness of CBO II and  had placed [the client's] investment into a tranche of the fund different from and riskier than the tranche he had agreed to invest in." *Id.* at 924-25.

At issue in that coverage suit was whether the two claims "arise[ ] out of the same or related Wrongful Acts." *Id.* at 925. The court reversed the district court's determination that the claims "were  related' because both involved material misrepresentations made by the same financial advisor about the risk of investing in CBO II." *Id.* The court first noted that the plaintiffs "were unrelated investors, with unique investment objectives   [who] were advised at separate meetings on separate dates, according to their unique financial positions." *Id.*

Crucial to the court's decision was that "the Wrongful Acts alleged by the two clients were different." *Id.* The court found that "a large part of the [first] case  was based on misrepresentations concerning   equity investments," which were investments not made by the second case's plaintiff. *Id.* Additionally, "[e]ven with respect to CBO II, [the plaintiffs] allege different wrongful conduct" by the firm and the firm's President. *Id.* The first plaintiffs "based their CBO claims largely on [the president's] failure to disclose certain significant information, including:  1  that [the firm] failed to maintain sufficient liability insurance  2  that [the firm] had been stripped of its management duties with respect to the first CBO it managed  and  3  that [the firm and its president] stood to earn substantial fees on the CBO investments." *Id.* at 925-26. In contrast, the second claim "relie[d] heavily on affirmative misrepresentations in written materials prepared by  the underwriter for the CBOs and in a commitment letter confirming that [the] investment would be placed in a low risk,  senior' tranche of CBO II when in fact it was placed in a more junior, higher-risk tranche." *Id.* at 926.

Despite being organized by Thomas Morgan, the multiple claims asserted against the Hitchmans are made by separate and distinct parties. The BCMFT, Thomas Morgan as an individual, and the fourteen other claiming entities are all unique parties with individual objectives and roles. Each plaintiff or petitioner alleges harm suffered and asserts a claim to remedy the harm, establishing a Claim under the policies.

Evidencing the distinctions, Morgan Partners, Inc.  "MPI"  asserts a claim for intentional interference with its Asset Management Contract, alleging that "[t]he Hitchmans wrongfully interfered with that contract by instructing that MPI should not be paid for the services it was providing thereunder, without causing Chino Holdings LP to take any of the steps lawfully required to terminate that contract." **E  ibit  E** ,  130. No other plaintiff asserts interference, or even breach, of a contract by withholding payments.

In contrast, Thomas Morgan, as trustee of the TEMCT, asserts conversion of TEMCT funds when the Hitchmans "liquidat[ed] the certificate of deposit   but refus[ed] to return either the  250,000 or interest thereon." E   ibit E  ,  103. MPI never had an interest in any amount of the certificate of deposit as the complaint asserts that the  6 million should have been distributed to only the TEMCT, the BCMFT, Thomas Morgan, and Nancy Shurtleff. E   ibit E  , 37.

Distinct from either of those claims, over a dozen business entities claim that the Hitchmans wrongfully interfered with their relationship with Bank of America, by, among other things, "filing   Affidavits falsely accusing plaintiffs' principal of theft." E   ibit E  ,  145. Similar to the commonality of misrepresentations related to the CBO in *Fin. Mgmt. Advisors*, any slight overlaps in interests of some of these entities do not transform the otherwise distinct claims asserted against the Hitchmans into related claims. Therefore, MPI's intentional interference with its Asset Management Contract claim, TEMCT's conversion claim, and the interference with the Bank of America relationships are at least three distinct claims. The Civil Action is stayed pending trial of the Probate Action so it will be some time before a determination will be made about the vague claims of some of the parties. However, substantial discovery is presently underway that will likely clarify the claims. While the "per Claim" policy limit of the 2020 policy can apply to MPI's intentional interference with its Asset Management Contract claim, the "aggregate" policy limit must be available to address the entirety of the other fourteen parties' claims. Underwriters cannot simply assert that everything is a single claim and cannot show any evidence to establish such an assertion.

In *Scott v. Am.   at l Fire Ins. Co.*, 216 F. Supp. 2d 689, 691-92  N.D. Ohio 2002 , the court addressed coverage for malpractice claims following an attorney's representation of a corporation and two of its investors. The declaratory judgment action sought a determination of the availability of the aggregate limit, requiring a finding of whether the claims by the three plaintiffs were "alleging, based upon, arising out of or attributable to the same or related acts, errors, or omissions" so as to be "treated as a single claim." *Id.* at 692-93. The court concluded that "the malpractice claims against [the attorney] are separate claims and are subject to the aggregate limits of policy coverage" because the attorney "owed separate and distinct duties" to the corporation and each of its investors and the attorney's "breaches of his separate duties resulted in different and discrete harms." *Id.* at 695.

Other distinct alleged misconduct of the Hitchmans while managing Lamplighter Chino portrays the distinct duties and separate harms alleged. While managing Lamplighter Chino, the Hitchmans' duties allegedly "were to preserve assets for the benefit of the owners of Lamplighter Chino." E   ibit E  ,  118. This duty to Lamplighter Chino's owners is distinct from the Hitchmans' duty to the BCMFT, evidenced by the allegations asserting that the Hitchmans improperly distributed Lamplighter Chino's  6 million certificate of deposit by taking " 2.5 million off the top to extinguish what ultimately was a **BCMFT** obligation." E   ibit E  ,  39  emphasis in original . These duties are also distinct from the Hitchmans' duties to the TEMCT, where the Hitchmans allegedly had a duty to return the  250,000 contributed by the TEMCT to that CD, and the Hitchmans' duties to Tom and Nancy, where the Hitchmans allegedly had a duty to make proper distributions according to their ownership percentage.

Breach of each of these duties created separate alleged harm that could have, and has, been independently asserted. The First Cause of Action asserts, on behalf of the TEMCT, a claim for conversion because the Hitchmans "liquidat[ed] the certificate of deposit in question but refus[ed] to return either the  250,000 or interest thereon." E   ibit  E  ,  103. Separately, in the Second Cause of Action, Thomas Morgan alleges a conversion of "  450,000 of distributions due him as an owner of Lamplighter Chino." E   ibit  E  ,  110. Supporting the independent nature of these claims even further, the TEMCT and Thomas Morgan are asserting these claims while Nancy is not. The consolidation of these claims into one suit does not convert the independently alleged claims into one claim subject to the "per Claim" limit. As a result, multiple claims are being asserted against the Hitchmans simultaneously, establishing the necessary availability of the "aggregate" policy limits.

In *Beale v. Am.   at l Lawyers Ins. Reciprocal*, 379 Md. 643, 645  2004 , the court addressed whether "the claims of each of five children allegedly injured as a result of the negligence of the same defendants   where all five of the claims are totally neglected, constitute a single claim under an insurance policy limiting the malpractice carrier s liability for damages to those  arising out of the same, related or continuing Professional Services.'" The court concluded that "the claim of one of the Beale children does not arise out of the same or related professional services rendered by the attorney in the case of one of the other children." *Id.* at 660.

The court noted that an attorney owes a duty "to each client individually and separate and apart from that owed his or her other clients." *Id.* at 661. While each child "had been exposed to, and poisoned by, the lead paint in the house that they shared and, therefore, those were facts in common to all, their cases were not at all identical." *Id.* at 666. The court explained that "the injury to each child and   the amount of damages to which each was entitled as a result were   clear differences" and "[c]onsequently, the result in one case would not foreshadow, necessarily, the result in any of the others." *Id.* In addition, the defendant attorney "could not rely on the service rendered in one case being sufficient to meet the needs of the client in any of the other cases" as "an investigation as to one child, or having that child examined, applies only with respect to that child  it provides no information with respect to, and furthers not at all, the case of any other child." *Id.*

Similarly, breach or fulfillment of the Hitchmans' duties discussed above would not necessarily impact the breach or fulfillment of any of the remaining duties. As managers of Lamplighter Chino, the Hitchmans could not simply rely on completion of their duties as trustees of the BCMFT to meet the needs of Lamplighter Chino and its owners. For example, the pursuit of malpractice claims against Richard Pech, or the failure to do so, on behalf of the BCMFT has no impact on Lamplighter Chino or any of the Hitchmans' alleged duties to Lamplighter Chino. Lamplighter Chino was not harmed by Richard Pech and thus, did not have any interest in potentially recoverable damages.

On the other end, properly preserving Lamplighter Chino's assets would not cure any breach of fiduciary duty as trustees of the BCMFT. No amount of Lamplighter Chino savings would prevent the alleged breaches of fiduciary duties "to treat all Beneficiaries neutrally and fairly, and to avoid taking sides in ways that could benefit one set of beneficiaries over another." E   ibit  E  ,  68.

at l State Bank v. Am. Home Assurance Co., 492 F. Supp. 393, 394  S.D.N.Y. 1980  is a factually analogous case in which "several civil actions were commenced against" a certified public accounting firm alleging that the firm "reviewed and certified Generics  financial statements during the period 1971 through 1976 and negligently failed to report misstatements contained therein." The underlying plaintiffs "included various shareholders who allegedly invested in Generics stocks based on [the firm's] financial reports and two banks which extended loans to Generics allegedly based upon said financial reports." *Id.* The only remaining issue in the coverage action was "whether the individual assertions against [the firm] by the plaintiffs  together constitute one  claim' under the insurance policy issued by American Home or separate distinct  claims,'" which would "establish the limits of American Home s liability to the plaintiffs in the Generics Litigation." *Id.* at 395.

Finding that the aggregate limit applies, the court rejected the insurer's argument that "all such individual claims must be aggregated into a single  claim' under the insurance policy and that American Home is liable   only up to a limit of  1 million rather than up to the  aggregate' limit of  2 million." *Id.* The court found "untenable" the insurer's "contention that all such demands which relate to a continuous course of professional service rendered by [the insured] to Generics constitute a single  claim' under the policy." *Id.* at 397.

Under the Hitchmans' policies, the term "Claim" is defined as "a demand received by any Assured for money or services outside the Ordinary Course of Business." The various underlying plaintiffs all assert legal rights against the Hitchmans to support their own financial demands. To support their conversion claims, the TEMCT asserts that "[n]o one had a right to the  250,000  plus interest  belonging to the TEMCT other than the TEMCT." **E   ibit  E** ,  37. In contrast, Thomas Morgan asserts a legal right to the  450,000 that he was "shortchanged." **E   ibit  E** , 39. Based on these rights, the two plaintiffs make "a demand   for money   outside the Ordinary Course of Business," establishing Claims under the policies.

These claims, for example, must be independent as their respective rights are independent. If the Hitchmans had returned the  250,000 owed to the TEMCT and still "took  2.5 million off the top to extinguish what ultimately was a BCMFT obligation," Thomas Morgan would still be "shortchanged" and have a claim for conversion. **E   ibit  E** ,  39. On the other hand, if the Hitchmans had split the distributions "in accordance with the partner ownership percentages" but failed to separate out  250,000 to provide to the TEMCT, the TEMCT would still have a conversion claim while Thomas Morgan would not. Therefore, the allegations against the Hitchmans by each plaintiff assert distinct legal rights, supporting distinct Claims under the policy and establishing the availability of the "aggregate" limit.

In *Chi. Ins. Co. v. Lappin*, 58 Mass. App. Ct. 769, 770-71  2003 , the insured attorney hired a "secretary and administrative assistant" who "began embezzling client funds   [that] took place over a period of several years, from different individuals, and using [different] devices." The applicability of the aggregate limit required a determination of whether the "claims aris[e] from the same related negligent act, error or omission or personal injury." *Id.* at 781.

The court rejected the insurer's "attempt[] to characterize [the attorney's] negligence merely as a continuing failure to supervise, thus constituting a single  occurrence' subject to the

policy s single claim limit." *Id.* Concluding that "[t]he aggregate liability limit    applies," the court noted that "[t]he trial judge found    [the attorney's] negligence was not singular, but multiple, with discrete, unrelated breaches occurring over many years resulting in discrete, unrelated losses to numerous individuals." *Id.* at 781-82.

Similarly here, the claims against the Hitchmans assert multiple, discrete and unrelated breaches. Thomas Morgan, on behalf of the trust, alleges that the Hitchmans failed "to disclose all material facts concerning their suitability to provide ongoing service in this case, and whether there were potential conflicts that could work adversely to the beneficiaries." **E    ibit**    ,    124-125. This failure to disclose was not one, ongoing wrong that created the alleged injuries suffered by each of the plaintiffs in the civil action. A failure to disclose did not fail to return    250,000 to the TEMCT, interfere with MPI's Asset Management Contract or disrupt any Bank of America relationships.

Notably, Thomas Morgan claims to have learned about the alleged conflict of interest, and the failure to disclose said conflict, on June 17, 2019. **E    ibit**    ,    98-99. Yet, Thomas Morgan, on behalf of the BCMFT, asserts that "[a]ny penny spent by the Hitchmans    continuing to litigate after the April 8-9, 2019 mediation, was wasteful and, in certain respects, tortious    [as] the only thing the Hitchmans should have done after the settlement was stop billing, and start working with the beneficiaries on an orderly transition." **E    ibit**    ,    55. This, among other allegations, necessarily includes alleged misconduct occurring after June 17, 2019, such as the Hitchmans' failure "to turn over all their files to the successor trustee promptly after they were relieved of their duties on June 21, 2019." **E    ibit**    ,    109.

The Hitchmans allegedly owed separate duties to the various plaintiffs/petitioners and allegedly breached each such duty, causing discrete harm to each adverse party. Of course the Hitchmans deny having breached any duties owed to the various parties or that they even had the duties asserted. But their defense must take all these claims seriously in an effort to defeat them. So must Underwriters. These circumstances are why the policies contain aggregate limits.

The allegations made in the pleadings of the Probate and Civil Actions allege numerous distinct claims that do not "aris[e] out of the same, related or continuing Professional Services." Consequently, multiple claims have been asserted against the Hitchmans, requiring the availability of each policies' aggregate limits.

## IV.    CONCLUSION

Because the various parties' assorted unrelated claims stretch over more than one policy issued by Underwriters to Hitchmans Fiduciaries and were reported periodically to Underwriters, the insured is entitled to policy limits of    2,000,000/    4,000,000 Per Claim/Aggregate over at least the 2019 and 2020 policy periods for the defense or indemnity of the above referenced claims.

Morgan's probate allegations apparently will be tried in the Orange County California Superior Court    Probate Dept    later in 2022. Afterward the Civil Action will become more active. Meanwhile substantial discovery and trial preparation is underway by defense counsel.

We expect Underwriters to continue paying the reasonable defense expenses in these actions against the Hitchmans while we all hope for positive developments.

Consequently, Hitchman Fiduciaries rejects Underwriters' proposal for a claim buyout suggested in your recent letter.

Very truly yours,

/s/ *James A. Lowe*

James A. Lowe

JAL/sjs

cc:     Client

287778_1.docx--5/12/2022 8:36 AM

# EXHIBIT 16



61 Broadway, 26th Floor, New York, NY 10006
Tel: 212-867-4100  Fax: 212-867-4118
www.fkblaw.com

June 16, 2022

**PRIVILEGED & CONFIDENTIAL**
**FOR DISPUTE RESOLUTION PURPOSES ONLY**
**SENT BY EMAIL**

Gauntlett & Associates
18400 Von Karman, Suite 300
Irvine, California 92612

Attn:   James A. Lowe (JAL@gauntlettlaw.com)


Re:   Insurer            :   Certain Underwriters at Lloyd's, London
      Insured           :   Hitchman Fiduciaries, LLC
      Claimant          :   Thomas Edward Morgan, III

      Policy Number     :   FPL18105754J
      Policy Period     :   January 1, 2018 to January 1, 2019
      Policy Limits     :   $1,000,000/$2,000,000 Per Claim/Aggregate
      Deductible        :   $15,000
      Retroactive Date  :   January 1, 2010

      Policy Number     :   FPL19105754K
      Policy Period     :   January 1, 2019 to January 1, 2020
      Policy Limits     :   $1,000,000/$2,000,000 Per Claim/Aggregate
      Deductible        :   $15,000
      Retroactive Date  :   January 1, 2010 for the general limit, and
                            January 1, 2019 for the higher Policy Limits of
                            $2,000,000/$4,000,000 Per Claim/Aggregate

      Claim Date        :   October 3, 2018
      Claim Number      :   35387
      FKB File          :   407.369

Dear James:

   We write in response to your May 12, 2022 correspondence. Respectfully, we do not find your interpretation of the policy language to be. First, Underwriters' Policy is a claim made and reported Policy, and this Claim was made against Hitchman Fiduciaries, LLC ("Hitchmans" or "Insured") on October 3, 2018, when Thomas Edward Morgan, III ("Claimant"), and various entities within his control, filed the "Petition for Removal." The Hitchmans first gave notice of this potential claim through their application for a renewal policy on December 20, 2018 ("Renewal Application"). The Claim was therefore made and reported during the 2018 Policy Period, and thus subject to the $1,000,000 per Claim limits of liability.

Second, the causes of action in the probate litigation, the "Petition for Removal" and the "Amended Petition for Removal", and in the civil litigation, the "Verified Complaint", stem from the same related acts where the Hitchmans were administering the Beverly C. Morgan Family Trust as Amended and Restated on November 6, 2013 (the "Trust") in their capacity as Interim Trustees. As such, the allegations in the later commenced civil litigation relate back to the initial notice of Claim, reported to Underwriters on December 20, 2018. The allegations in the "Petition for Removal", the "Amended Petition for Removal" and the "Verified Complaint," do not allege any independent wrongful acts that would not be deemed to have arisen out of, or relate back to, the acts first disclosed during the 2018 Policy. The allegations do not constitute a separate Claim that would trigger coverage under the 2019 Policy.

Third, the Policy language concerning the applicable retroactive date is not ambiguous and establishes that the "Split Retroactive Date" provision provides general limits of liability ($1,000,000/$2,000,000) for Claims that arise out of acts occurring before January 1, 2019 and higher limits of liability ($2,000,000/$4,000,000) for Claims that arise out of acts occurring on or after January 1, 2019. Furthermore, if the 2019 Policy applied, which it does not, only the general limits would apply because the subject Claim arose out of acts occurring before January 1, 2019. This was communicated to the Hitchmans on December 15, 2021 by Dominion Insurance.

We reject your assertion that the Insured "is entitled to policy limits of $2,000,000/$4,000,000 Per Claim/Aggregate over at least the 2019 and 2020 policy periods…" and provide this letter as an additional explanation of why the 2018 Policy, with limits of liability of $1,000,000/$2,000,000 Per Claim/Aggregate apply to this matter.

## I.   The Morgan Claims were Made and Reported Within the 2018 Policy Period

As described in our March 30, 2022 correspondence, the Hitchmans completed an application for a renewal policy on December 20, 2018 (the "Renewal Application"), which was during the 2018 Policy Period – January 1, 2018 to January 1, 2019. In the Renewal Application, the Hitchmans answered in the affirmative that they were aware of a pending demand for their removal from a fiduciary role. This was the initial notice to Dominion of the Probate Litigation involving Hitchmans' role as Interim Trustees of the Trust. We were later informed that the "Petition for Removal" was filed by Claimant against the Hitchmans on October 3, 2018.

Pursuant to Policy, Section XI – Notice, "[i]f during the Period of Insurance the Assured becomes aware of any act, error, or omission that could reasonably be the basis for a Claim, it must give Written notice to Underwriters through persons named in Item 7 of the Declarations…" See XI.B. Item 7 of the Declarations designates Dominion Insurance. Thus, by submitting the Renewal Application to Dominion on December 20, 2018, within the 2018 Policy Period, the Hitchmans provided initial notice of the claims involving Tom Morgan.

California law holds that where an Insured gives notice to an insurer of relevant facts that may constitute a notice of claim, a claim has been reported under a 'claims made' Policy. *See California Shoppers v. Royal Globe Ins. Co.*, 175 Cal. App. 3d1, 37 (1985). An awareness provision, similar to the one in Underwriters' Policy, or clause is a coverage clause which extends

the limits of insurance in a claims-made policy by calling for an insured to report anything that "may give rise to a 'claim'" and not merely actual lawsuits naming the insured. *Gyler v. Mission Ins. Co.*, 10 Cal.3d 216, 220 (1973).

Here, the first reporting of any claim related to the Hitchmans' role as Trustee for the Morgan trust was first made on December 20, 2018. This initial notice was followed with a second notice with substantiating details where the Insured requested that Underwriters appoint defense counsel. Underwriters then opened a claim file under the 2019 policy, within which this request was made, subject to Underwriters' continuing investigation into the developments of the Claim.

Following the initial and second notice of Morgan claim, and since Underwriters' receipt of the "Petition for Removal" that Claimant filed against the Insured on October 3, 2018, as well as Claimant's "Amended Petition for Removal" and "Verified Complaint," Underwriters have seen no independent wrongful acts alleged that would *not* arise out of, or relate back to, the acts disclosed during the 2018 Policy. That is, the notice under the 2018 Policy relates to each of the "Petition for Removal", the "Amended Petition for Removal" and the "Verified Complaint." None of these would otherwise constitute a separate Claim that would trigger coverage under the 2019 Policy.

Accordingly, since the subject Claim was made on October 3, 2018 and reported during the 2018 Policy, when the Renewal Application was completed, the policy applicable to the Claim is the 2018 Policy. The 2018 Policy has limits of liability of $1,000,000 per Claim and $2,000,000 in the aggregate of all Claims.

## II.   The Probate Litigation and The Civil Litigation Are Related and Must Therefore Be Treated as A Single Claim

As described above, the "Petition for Removal", the "Amended Petition for Removal" and the "Verified Complaint," all stem from the same related acts that were first reported to Underwriters in the Renewal Application. There is a casual relationship between the allegations in the "Petition for Removal", the "Amended Petition for Removal" and the "Verified Complaint" – that each allegation made against the Hitchmans would not arise but for their administering the Trust as Interim Trustees. The fact that each allegation is slightly different, and the fact that the Petition and Complaint were brought at different times does not change the relatedness of the actions, and the allegations therein.

In *Liberty Insurance Underwriters, Inc. v. Davies Lemmis Raphaely Law Corp.*, 162 F. Supp. 3d 1068 (C.D. Cal. 2016), the Court took note of both state and federal decisions finding that multiple claims are "sufficiently related where the underlying actions are in service of a single plan" or "goal" or where there is a "single course of conduct." Id. at 1076, 1078 (internal quotation marks omitted). Here, the allegations made by Claimant arise out of the Hitchmans' single plan, or goal, or course of conduct, in administering the Trust in their capacity as Interim Trustees.

Hitchman Fiduciaries
FKB No. 407.369
Page 4 of 6

We find your distinctions of *Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Insur. Co.*, 5 Cal.4th 854 (1993), unveiling. The logic that the *Bay Cities* Court employed, and its reasoning behind it defining the term "related" in a similar insurance policy, is applicable in the instant matter. There, the Court found that the claims were logically related because they: (1) arose out of the same transaction, the collection of a debt; (2) arose as to the same client; (3) were committed by the same attorney; and (4) resulted in a single injury, the loss of the debt. *Id.* at 873, 21 Cal.Rptr.2d 691. Here, the allegations in the "Petition for Removal", the "Amended Petition for Removal" and the "Verified Complaint," arose out of the Hitchmans' administration of the Trust, arose as to the same client – Tom Morgan, were all alleged to have been committed by the Hitchmans, and resulted in an injury allegedly attributable to the same, related, and continuing services provided by the Hitchmans in their administering of the Trust.

It is apparent from a comparison of the "Petition for Removal", the "Amended Petition for Removal" and the "Verified Complaint" that the allegations all pertain to the Hitchmans' administration of the Trust. Even if the later "Verified Complaint" expanded its theories of recoveries, the allegations contained therein all had "as a common nexus any fact, circumstance, situation, event or transaction or series of facts, circumstances, situations, events or transactions" in relation to the original Petition for Removal and Amended Petition for Removal. *See Feldman v Illinois Union Ins. Co.*, 198 Cal App 4th 1495, 1504, (2011). As such, all three would be sufficiently deemed to constitute a single claim, which was originally reported by the Hitchmans in December 2018, before the inception of the 2019 Policy.

The allegations in the "Petition for Removal", the "Amended Petition for Removal" and the "Verified Complaint," do not allege any independent wrongful acts that would not be deemed to have arisen out of, or relate back to, the acts first disclosed during the 2018 Policy. Further, the allegations would not constitute a separate Claim that would trigger coverage under the 2019 Policy.

**III.   The Policy Language Is Not Ambiguous, And Split Retroactive Date Provision Is Applicable**

As we informed you in our March 30, 2022 correspondence, in the hypothetical that the Insured first became aware of the Morgan Claim in 2019, and the Insured first notified Underwriters of such circumstances during the 2019 Policy, then the 2019 Policy might apply for purposes of analyzing applicable limits for coverage of the Morgan Claims.[1] Under this hypothetical, such a notice would be subject to the "Split Retroactive Date" provision of the 2019 Policy.

"Interpretation of an insurance policy is a question of law and follows the general rules of contract interpretation." *MacKinnon v. Truck Ins. Exchange,* 31 Cal.4th 635, 647 (Cal.2003).[4] "A

---

[1] As noted above, this hypothetical is demonstrably false as the Claim was made in 2018, and first reported in 2018, within the 2018 Policy Period.

contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Cal. Civ.Code § 1636. "Such intent is to be inferred, if possible, solely from the written provisions of the contract. The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' controls judicial interpretation. Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning." *AIU Ins. Co. v. Superior Court*, 51 Cal.3d 807, 822, 274 Cal.Rptr. 820, 799 P.2d 1253 (Cal.1990) (internal citations omitted); see also *Alterra Excess & Surplus Ins. Co. v Gotama Bldg. Engineers, Inc.*, CV 14-2969-JFW ASX, 2014 WL 3866093, at *4 (CD Cal July 24, 2014).

"A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable. But language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract. Courts will not strain to create an ambiguity where none exists." *Waller v. Truck Ins. Exchange, Inc.,* 11 Cal.4th 1, 18–19, 44 Cal.Rptr.2d 370, 900 P.2d 619 (Cal.1995) (internal citations omitted).

The "Split Retroactive Date" provides general limits of liability ($1,000,000/$2,000,000) for Claims that arise out of acts occurring before January 1, 2019 and higher limits of liability ($2,000,000/$4,000,000) for Claims that arise out of acts occurring on or after January 1, 2019. There is no ambiguity in what the Split Retroactive Date provision provides depending on the circumstances of the Claim. Indeed, an explanation of the Split Retroactive Date provision was communicated to the Insured on December 15, 2021 by Dominion Insurance. In that correspondence, Dominion explained that for higher limits of liability ($2,000,000/$4,000,000), the retroactive date is January 1, 2019. The correspondence explicitly states that there is a retroactive date of January 1, 2010 for the lower limits of liability ($1,000,000/$2,000,000).

This exact explanation is clearly drawn from the wording of the "Split Retroactive Date" provision. "The fact that a term is not defined in the policies does not make it ambiguous. Nor does disagreement concerning the meaning of a phrase or the fact that a word or phrase isolated from its context is susceptible of more than one meaning. Language in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract." *Natl. Cas. Co. v Sovereign Gen. Ins. Services, Inc.*, 137 Cal App 4th 812, 818, 40 Cal Rptr 3d 591, 596 (Cal Ct App 2006) (Internal citations removed).

## IV.   **Conclusion**

The 2018 Policy provides $1,000,000/$2,000,000 Per Claim/Aggregate in coverage to the Insured for the Morgan Claims. Underwriters continue to believe that there is not a realistic scenario where this Claim will be resolved within the remaining $1,000,000 Limit of Liability, particularly in view of Sheppard Mullin's billed fees and future litigation budget. Considering the fees paid to Sheppard Mullin, Underwriters will have paid $685,959.02 to Sheppard Mullen for

Hitchman Fiduciaries
FKB No. 407.369
Page 6 of 6

the defense of this matter, in addition to the amounts incurred by Investigatory Defense Counsel ($139,024.31). The precise amount remaining will continue to erode as Claims Expenses continue to be incurred. **If any Damages or Claims Expenses exceed the applicable Policy limit ($1,000,000), such amounts will become the Insured's responsibility to pay.**

It is uncertain whether this matter will present additional potential coverage issues with respect to the Policy. Accordingly, we fully reserve the rights of Underwriters, including Underwriters' right to deny coverage or supplement this letter. No actions taken by Underwriters or their representatives shall be deemed to be a waiver or estoppel of any of the terms or conditions of the Policy.

Underwriters additionally reserve their right to pursue all actions for contribution, indemnity, or subrogation as may ultimately be appropriate in connection with this matter. Underwriters require cooperation from the Insured with respect to the pursuit of any such actions. Underwriters reserve their right to file a declaratory judgment action or a claim for subrogation or contribution against the Insured or any of the Insured's other insurers to have Underwriters' rights and duties under the Policy determined or to recoup any monies paid on the Insured's behalf, to the extent that the Insured was not entitled to such sums pursuant to the terms and conditions of the Policy.

Additionally, you may also contact the undersigned at any time if you have any questions or comments regarding the contents of this letter or if you have any information that would impact upon or cause Underwriters to alter or reconsider their coverage position.

Very truly yours,

FURMAN KORNFELD & BRENNAN LLP

Andrew R. Jones

c:      Mitchell Young – Mitchell.Young@miller-insurance.com

Larry Hilton – Larry.Hilton@DominionInsurance.com

Nicholas Van Brunt – NVanBrunt@sheppardmullin.com
Golnaz Yazdchi – GYazdchi@sheppardmullin.com

David A. Gauntlett – DAG@gauntlettlaw.com

David Furman (FKB-NYC)

4TH DISTRICT COURT - PROVO
UTAH COUNTY, STATE OF UTAH


    HITCHMAN FIDUCIARIES LLC et al. vs. DOMINION INSURANCE SERVICES IN et al.
CASE NUMBER 220401108 Contracts
_____

CURRENT ASSIGNED JUDGE
      JAMES BRADY

PARTIES
      Plaintiff - HITCHMAN FIDUCIARIES LLC
      Represented by: ALAN BRADSHAW
      Represented by: MICHAEL HARMOND

      Plaintiff - LEE ANN HITCHMAN
      Represented by: ALAN BRADSHAW
      Represented by: MICHAEL HARMOND

      Plaintiff - BRUCE HITCHMAN
      Represented by: ALAN BRADSHAW
      Represented by: MICHAEL HARMOND

      Defendant - CERTAIN UNDERWRITERS AT LLOYDS

      Defendant - DOMINION INSURANCE SERVICES IN

      Defendant - LAWRENCE D HILTON

      Other Party - JAMES A LOWE

      Other Party - DAVID A GAUNTLETT


ACCOUNT SUMMARY
            Total Revenue Amount Due:        625.00
                        Amount Paid:         625.00
                      Amount Credit:           0.00
                           Balance:            0.00
      REVENUE DETAIL - TYPE: COMPLAINT - NO AMT S
                Original Amount Due:         375.00
                Amended Amount Due:          375.00
                        Amount Paid:         375.00
                      Amount Credit:           0.00
                           Balance:            0.00

      REVENUE DETAIL - TYPE: JURY DEMAND - CIVIL
                Original Amount Due:         250.00
                Amended Amount Due:          250.00
                        Amount Paid:         250.00
                      Amount Credit:           0.00
                           Balance:            0.00

CASE NOTE


PROCEEDINGS

| | |
|---|---|
| 07-21-2022 | Filed: Complaint for Declaratory Relief, Breach of Contract, Breach of Fiduciary Duty, Breach of the Implied Covenant of Good Faith and Fair Dealing |
| 07-21-2022 | Filed: Exhibits 1-4 to Complaint |
| 07-21-2022 | Filed: Exhibits 5-16 to Complaint |
| 07-21-2022 | Case filed by efiler |
| 07-21-2022 | Fee Account created Total Due: 375.00 |
| 07-21-2022 | Fee Account created Total Due: 250.00 |
| 07-21-2022 | COMPLAINT - NO AMT S Payment Received:  375.00 |
| 07-21-2022 | JURY DEMAND - CIVIL Payment Received:  250.00 |
| 07-21-2022 | Judge JAMES BRADY assigned. |
| 07-21-2022 | Filed: Return of Electronic Notification |
| 07-21-2022 | Filed: Appearance of Counsel/Notice of Limited Appearance (Michael E. Harmond) |
| 07-21-2022 | Filed: Return of Electronic Notification |
| 08-08-2022 | Filed return: Return of Service - Affidavit of Service of Summons and Complaint upon FRANK MARINO for |
| | Party Served: CERTAIN UNDERWRITERS AT LLOYDS |
| | Service Type: Personal |
| | Service Date: August 04, 2022 |
| | Garnishee: |
| 08-08-2022 | Filed: Return of Electronic Notification |
| 08-11-2022 | Filed return: Return of Service - Summons and Complaint on Lawrence D. Hilton |
| | Party Served: LAWRENCE D HILTON |
| | Service Type: Personal |
| | Service Date: August 10, 2022 |
| | Garnishee: |
| 08-11-2022 | Filed return: Return of Service - Summons and Complaint on Dominion Insurance Services, Inc. |
| | Party Served: DOMINION INSURANCE SERVICES IN |
| | Service Type: Personal |
| | Service Date: August 04, 2022 |
| | Garnishee: |
| 08-11-2022 | Filed: Return of Electronic Notification |
| 08-15-2022 | Filed: Motion Pro Hac Vice for Admission of David A. Gauntlett |
| | Filed by: LEE ANN HITCHMAN |
| 08-15-2022 | Filed: Motion Pro Hac Vice for Admission of James A. Lowe |
| | Filed by: LEE ANN HITCHMAN |
| 08-15-2022 | Filed: Order (Proposed) for Admission of David A. Gauntlett Pro Hac Vice |
| 08-15-2022 | Filed: Order (Proposed) for Admission of James A. Lowe Pro Hac Vice |
| 08-15-2022 | Filed: Return of Electronic Notification |
| 08-17-2022 | Filed order: Order for Admission of David A. Gauntlett Pro Hac Vice |
| | Judge JAMES BRADY |
| | Signed August 17, 2022 |
| 08-17-2022 | Filed order: Order for Admission of James A. Lowe Pro Hac Vice |

Judge JAMES BRADY
Signed August 17, 2022

| | |
|---|---|
| 08-17-2022 | Filed: Return of Electronic Notification |
| 08-17-2022 | Filed: Return of Electronic Notification |
| 08-23-2022 | Filed: Stipulation for Extension of Time for Dominion Insurance Services and Lawrence D. Hilton to Respond to Complaint |
| 08-23-2022 | Filed: Return of Electronic Notification |
| 08-24-2022 | Filed: Stipulation for Extension of Time for Certain Underwriters at Lloyd's London to Respond to Complaint |
| 08-24-2022 | Filed: Return of Electronic Notification |
| 08-26-2022 | Filed: Motion for Partial Summary Judgment re Declaratory Relief |

Filed by: LEE ANN HITCHMAN

| | |
|---|---|
| 08-26-2022 | Filed: Affidavit/Declaration of Bruce Hitchman in Support of Motion for Partial Summary Judgment (with Exs. 1, 2, 17)) |
| 08-26-2022 | Filed: Affidavit/Declaration of James Lowe in Support of Motion for Partial Summary Judgment (with Ex. 4) |
| 08-26-2022 | Filed: Return of Electronic Notification |
| 08-26-2022 | Filed: Ex. 5 (Part 1) to Declaration of of James Lowe in Support of Motion for Partial Summary Judgment |
| 08-26-2022 | Filed: Ex. 5 (Part 2) to Declaration of of James Lowe in Support of Motion for Partial Summary Judgment |
| 08-26-2022 | Filed: Ex. 5 (Part 3) to Declaration of of James Lowe in Support of Motion for Partial Summary Judgment |
| 08-26-2022 | Filed: Ex. 5 (Part 4) to Declaration of of James Lowe in Support of Motion for Partial Summary Judgment |
| 08-26-2022 | Filed: Return of Electronic Notification |
| 08-26-2022 | Filed: Ex. 5 (Part 5) to Declaration of of James Lowe in Support of Motion for Partial Summary Judgment |
| 08-26-2022 | Filed: Ex. 5 (Part 6) to Declaration of of James Lowe in Support of Motion for Partial Summary Judgment |
| 08-26-2022 | Filed: Ex. 5 (Part 7) to Declaration of of James Lowe in Support of Motion for Partial Summary Judgment |
| 08-26-2022 | Filed: Ex. 5 (Part 8) to Declaration of of James Lowe in Support of Motion for Partial Summary Judgment |
| 08-26-2022 | Filed: Exs. 6, 10, 11, 13 to Declaration of James Lowe in Support of Motion for Partial Summary Judgment |
| 08-26-2022 | Filed: Return of Electronic Notification |
| 08-26-2022 | Filed: Return of Electronic Notification |
| 08-26-2022 | Filed: Ex. 15 to Declaration of James Lowe in Support of Motion for Partial Summary Judgment |
| 08-26-2022 | Filed: Exs. 16, 18-21 to Declaration of James Lowe in Support of Motion for Partial Summary Judgment |
| 08-26-2022 | Filed: Return of Electronic Notification |
| 08-26-2022 | Filed: Return of Electronic Notification |